**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Centric Brands Inc., *et al.*,[1]<br><br>                    Debtors. | Chapter 11<br><br>Case No. 20-22637 (SHL)<br><br>(Jointly Administered) |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING, (B) GRANT SENIOR SECURED LIENS
AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, AND
(C) UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE
PROTECTION TO THE PREPETITION SECURED PARTIES; (III) MODIFYING
THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated May 18, 2020 (the "Motion"), of Centric Brands Inc. ("Centric")

and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-

captioned chapter 11 cases (the "Chapter 11 Cases") commenced on May 18, 2020 (the "Petition

Date") for entry of the Interim Order[2] and final order (this "Final Order")[3] under sections 105,

361, 362, 363, 364, 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101,

---

[1]     The Debtors in these chapter 11 cases, for which joint administration has been granted, along with the last four
digits of their federal tax identification numbers, are as follows:  Centric Brands Inc. (8178); Added Extras LLC
(5851); American Marketing Enterprises Inc. (9672); Briefly Stated Holdings, Inc. (9890); Briefly Stated Inc.
(6765); Centric Bebe LLC (2263); Centric Brands Holding LLC (3107); DBG Holdings Subsidiary Inc. (4795);
DBG Subsidiary Inc. (6315); DFBG Swims, LLC (8035): F&T Apparel LLC (9183); Centric Accessories Group
LLC (3904); Centric Beauty LLC (8044); Centric Denim Retail LLC (1013); Centric Denim USA, LLC (9608);
Centric Jewelry Inc. (6431); Centric Socks LLC (2887); Centric West LLC (3064); Centric-BCBG LLC (5700);
Centric-BCBG Retail LLC (4915); HC Acquisition Holdings, Inc. (4381); Hudson Clothing, LLC (2491); Hudson
Clothing Holdings, Inc. (4298); Innovo West Sales, Inc. (8471); KHQ Athletics LLC (7413); KHQ Investment
LLC (0014); Lotta Luv Beauty LLC (0202); Marco Brunelli IP, LLC (0227); RG Parent LLC (4002); RGH Group
LLC (9853); Robert Graham Designs, LLC (1207); Robert Graham Holdings, LLC (0213); Robert Graham Retail
LLC (7152); Rosetti Handbags and Accessories, Ltd. (2905); and VZI Investment Corp. (5233).

[2]     "Interim Order" shall mean the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing,
(B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash
Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic
Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief.*  [Docket No. 59].

[3]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Interim Order.

*et seq.* (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") seeking the relief as set forth in the Motion; the Court having considered the Motion and the exhibits thereto, the First Day Declarations,[4] the evidence submitted or proffered and the arguments of counsel made at the Interim Hearing and the Final Hearing; and the Interim Order having been entered by this Court on May 20, 2020; and proper and sufficient notice of the Motion, the Interim Hearing and the Final Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014; and the Interim Hearing and the Final Hearing to consider the relief requested in the Motion having been held and concluded; and all objections, if any, to the relief requested in the Motion and to the entry of this Final Order having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in the best interests of the Debtors, their estates, creditors and parties in interest; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:[5]

1.      *Disposition*.  The Motion is GRANTED on a final basis in accordance with the terms of this Final Order.  Any objections to the Motion with respect to the entry of this Final

---

[4]     The *Declaration of James H. Baird in Support of (A) the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (1) Obtain Postpetition Financing, (2) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (3) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief and (B) the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Certain Debtors to Continue Selling Receivables and Related Rights Pursuant to a Securitization Facility, (II) Modifying the Automatic Stay, (III) Scheduling Final Hearing, and (iv) Granting Related Relief* [Docket No. 22] (the "Baird Declaration") and the *Declaration of Joseph J. Sciametta, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 27] (the "Sciametta Declaration" and, together with the Baird Declaration, the "First Day Declarations").

[5]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent that any of

Order that have not been withdrawn, waived or settled, and all reservation of rights included therein, are hereby denied and overruled.

2.      *Jurisdiction*.    This Court has core jurisdiction over the Chapter 11 Cases commenced on Petition Date, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      *Notice*.    Under the circumstances, the notice given by the Debtors of, and as described in, the Motion, the relief requested therein, and the Final Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and the Local Rules, and no further notice of the relief sought at the Final Hearing and the relief granted herein is necessary or required.

4.      *Debtors' Stipulations*.    Without prejudice to the rights of any other party, but subject to the limitations thereon contained in paragraphs 29 and 30 of this Final Order, the Debtors represent, admit, stipulate and agree as follows:

(a)      Prepetition First Lien Obligations.    As of the Petition Date, the First Lien Obligors, without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Prepetition First Lien Parties under the Prepetition First Lien Credit Documents in the aggregate amount of not less than $809,942,338.08, which consists of (i) approximately $163,944,754.79 in aggregate principal amount of revolving loans and issued and undrawn letters of credit on account of the Prepetition Revolving Credit Facility, *plus* accrued and unpaid interest thereon as of the Petition Date, (ii) $625,997,583.29 in aggregate principal amount of term loans,

---

the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

other than the 2020 Term Loans (the "<u>Prepetition First Lien Term Loans</u>") advanced on account the Prepetition First Lien Term Loan Facility, *plus* accrued and unpaid interest thereon as of the Petition Date and (iii) 2020 Term Loans in aggregate principal amount of $20,000,000.00, *plus* accrued and unpaid interest thereon as of the Petition Date ((i) through (iii) together, the "<u>Prepetition First Lien Obligations Amount</u>"), plus all other fees, costs, expenses, indemnification obligations, reimbursement obligations (including on account of issued and undrawn letters of credit), charges, premiums, if any, additional interest, any other "Obligations" (as defined in the Prepetition First Lien Credit Agreement) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition First Lien Credit Documents (collectively, including the Prepetition First Lien Obligations Amount, the "<u>Prepetition First Lien Obligations</u>").  The Prepetition First Lien Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition First Lien Parties by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition First Lien Credit Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(b)    <u>Prepetition First Priority Liens</u>.  Pursuant to the Prepetition First Lien Credit Documents, the Prepetition First Lien Obligations are secured by valid, binding, perfected and

enforceable first priority liens on and security interests in (the "Prepetition First Priority Liens")

the "Collateral" (as defined in the Prepetition First Lien Credit Documents) (the "Prepetition

Collateral"), subject only to certain permitted liens as permitted under the Prepetition First Lien

Credit Documents.  The Prepetition First Priority Liens (i) are valid, binding, perfected and

enforceable first priority liens and security interests in the Prepetition Collateral, (ii) are not

subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance,

recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as

defined in the Bankruptcy Code) of any kind, (iii) as of the Petition Date are subject and/or

subordinate only to certain permitted liens (if any) as permitted by the terms of the Prepetition

First Lien Credit Documents and (iv) constitute the legal, valid and binding obligation of the

"Loan Parties" (as defined in the Prepetition First Lien Credit Documents), enforceable in

accordance with the terms of the applicable Prepetition First Lien Credit Documents.

(c)     Prepetition Second Lien Obligations.  As of the Petition Date, the Second Lien

Obligors, without defense, counterclaim or offset of any kind, were jointly and severally indebted

and liable to the Prepetition Second Lien Parties under the Prepetition Second Lien Credit

Documents in the aggregate principal amount of not less than $712,593,877.17 of term loans

advanced under the Prepetition Second Lien Credit Agreement, *plus* accrued and unpaid interest

thereon as of the Petition Date (the "Prepetition Second Lien Obligations Amount"), plus all other

fees, costs, expenses, indemnification obligations, charges, premiums, if any, additional interest,

any other "Obligations" as defined in the Prepetition Second Lien Credit Agreement and all other

obligations of whatever nature owing, whether or not contingent, whenever arising, accrued,

accruing, due, owing or chargeable under the Prepetition Second Lien Credit Documents

(collectively, including the Prepetition Second Lien Obligations Amount, the "Prepetition Second

Lien Obligations" and, together with the Prepetition First Lien Obligations, the "Prepetition Secured Obligations"). The Prepetition Second Lien Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise. No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Second Lien Agent or Prepetition Second Lien Lenders by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition Second Lien Credit Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(d)    Prepetition Second Priority Liens. Pursuant to the Prepetition Second Lien Credit Documents, the Prepetition Second Lien Obligations are secured by valid, binding, perfected and enforceable second priority liens on and security interests in the Prepetition Collateral (the "Prepetition Second Priority Liens" and, together with the Prepetition First Priority Liens, the "Prepetition Liens"), which Prepetition Second Priority Liens are subject and subordinate only to the Prepetition First Priority Liens and certain permitted liens as permitted by the terms of the Prepetition Second Lien Credit Documents. The Prepetition Second Priority Liens (i) are valid, binding, perfected, and enforceable second priority liens and security interests in the Prepetition Collateral, (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind, (iii) as of the Petition Date are subject

and/or subordinate only to the Prepetition First Priority Liens and certain permitted liens as permitted by the terms of the Prepetition Second Lien Credit Documents and (iv) constitute the legal, valid and binding obligation of the "Loan Parties" (as defined in the Prepetition Second Lien Credit Documents), enforceable in accordance with the terms of the applicable Prepetition Second Lien Credit Documents.

(e)    <u>Prepetition Intercreditor Agreement</u>.  As of the Petition Date, the Prepetition First Lien Secured Agent and the Prepetition Second Lien Agent were party to that certain Intercreditor and Subordination Agreement, dated as of October 29, 2018 (as amended, supplemented, amended and restated or otherwise modified from time to time prior to the date of this Interim Order, the "<u>Prepetition Intercreditor Agreement</u>").  The Prepetition Intercreditor Agreement governs the respective rights, interests, obligations, priority and positions of the Prepetition Secured Parties with respect to the Prepetition Collateral and the Prepetition Secured Obligations. The Obligors have acknowledged and agreed to recognize all rights granted to the parties to the Prepetition Intercreditor Agreement.

(f)    <u>Agreement Among First Lien Parties</u>.  As of the Petition Date, the Prepetition First Lien Parties were party to that certain Agreement Among Lenders, dated as of October 29, 2018 (as amended, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, including, without limitation, that certain Amendment No. 1 to Agreement Among Lenders, dated May 11, 2020, entered into in connection with the Obligors' incurrence of the 2020 Term Loans, the "<u>Prepetition First Lien Lenders' Agreement</u>").  The Prepetition First Lien Lenders' Agreement governs the respective rights and obligations of the Prepetition First Lien Lenders with respect to, among other things, the Prepetition Collateral and any postpetition liens or payments granted to the Prepetition First Lien Lenders in connection with any postpetition

financing facility contemplated as part of the Chapter 11 Cases (including the DIP Facilities), and the 2020 Term Loans. The Obligors have acknowledged and agreed to, and are bound by, the Prepetition First Lien Lenders' Agreement. The Debtors acknowledge the Prepetition First Lien Lenders' Agreement and the Court's authority to enforce said agreement on a postpetition basis in accordance with Bankruptcy Code section 510(a). For the avoidance of doubt, the Prepetition Second Lien Parties are not party to the Prepetition First Lien Lenders' Agreement.

(g)    <u>Cash Collateral</u>.    Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable (except to the extent sold to the Debtors' affiliate Spring Funding LLC pursuant to the Securitization Facility,[6] or other disposition of the Prepetition Collateral (as defined herein) existing as of the Petition Date or from time to time, and the proceeds of any of the foregoing, is the Prepetition Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "<u>Cash Collateral</u>").

5.    *Findings Regarding the DIP Facilities and Use of Cash Collateral.* Based on the record established and evidence presented at the Interim Hearing and the Final Hearing, including the First Day Declarations, the proffers presented at the Interim Hearing and the Final Hearing, and the representations of the parties, the Court makes the following findings:

(a)    Good cause has been shown for the entry of this Final Order.

(b)    As set forth in the First Day Declarations, the Debtors have an immediate need to obtain the DIP Facilities and to use the Cash Collateral in each case on a final basis, in order to,

---

[6]    "<u>Securitization Facility</u>" shall mean, collectively, (i) the various agreements executed by and between, among others, non-Debtor and borrower Spring Funding LLC, certain Debtors as Originators, PNC Bank, N.A., Fifth Third Bank, National Association and Wells Fargo Bank, N.A. relating to, among other things, the purchase and sale of the Debtors' accounts receivable and related assets, and (ii) the various agreements executed by and between, among others, non-debtor Spring Funding LLC and The CIT Group/Commercial Services, Inc. relating to, among other things, the factoring of certain of the Debtors' accounts receivable, in each case as more fully defined in an order of the Bankruptcy Court relating thereto.

among other things, (i) permit the orderly continuation of their respective businesses, (ii) maintain

business relationships with their vendors, suppliers, customers and other parties, (iii) make

payroll, (iv) following entry of the Interim Order, but subject to paragraph 30 of this Final Order,

to repay in full any amounts outstanding under the Prepetition Revolving Credit Facility and the

2020 Term Loans with the proceeds of the DIP Revolving Loans and the DIP Term Loan Facility,

respectively, (v) make adequate protection payments, (vi) pay the costs of the administration of

the Chapter 11 Cases and (vii) satisfy other working capital and general corporate purposes of the

Debtors. The Debtors require immediate access to sufficient working capital and liquidity through

the incurrence of the new indebtedness for borrowed money and other financial accommodations

to avoid irreparable harm by, among other things, preserving and maintaining the going concern

value of the Debtors' business. The Debtors will not have sufficient sources of working capital

and financing to operate their business or maintain their properties in the ordinary course of

business throughout the Chapter 11 Cases without the DIP Facilities and authorized use of Cash

Collateral.

(c)     As set forth in the First Day Declarations, the Debtors are unable to obtain financing

on more favorable terms from sources other than the DIP Lenders under the DIP Documents and

are unable to obtain adequate unsecured credit allowable under Bankruptcy Code section

503(b)(1) as an administrative expense. The Debtors are unable to obtain secured credit allowable

under Bankruptcy Code sections 364(c)(1), 364(c)(2) and 364(c)(3) for the purposes set forth in

the DIP Documents without the Debtors granting to the DIP Agents, for the benefit of itself and

the DIP Lenders, the DIP Liens (as defined herein), in each case, under the terms and conditions

set forth in this Final Order and the DIP Documents.

(d)    The terms of the DIP Facilities, the DIP Documents and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)    The DIP Facilities have been negotiated in good faith and at arm's length among the Debtors, the DIP Agents and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Facilities and the DIP Documents including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Revolving Documents (the "DIP Revolving Obligations"), DIP Term Documents (the "DIP Term Obligations") and all other Obligations (as defined in the DIP Credit Agreements) (together with the  DIP Revolving Obligations and the DIP Term Obligations, the "DIP Obligations") shall be deemed to have been extended by the DIP Agents and the DIP Lenders in good faith as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e). The DIP Obligations and the DIP Liens shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Final Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, and any liens or claims granted to the DIP Agents or the DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

(f)    The Debtors have requested entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001-2.  For the reasons set forth in the Motion, the declarations filed in support of the Motion, and the record presented to the Court at the Interim Hearing and the Final Hearing, consummation of the DIP Facilities and authorization of the use

of the Prepetition Collateral (including the Cash Collateral) in accordance with this Final Order and the DIP Documents are in the best interests of the Debtors' estates and are consistent with the Debtors' fiduciary duties.

(g)    Pursuant to section 6.2 of the Prepetition Intercreditor Agreement, (i) the Prepetition Second Lien Parties have consented, or are deemed to have consented, to the terms of the DIP Facilities and entry of this Final Order, and (ii) the Prepetition Second Priority Liens and the Second Lien Adequate Protection Liens (as defined herein) are subordinate to the Carve Out, the Permitted Liens (if any), the DIP Liens, the First Lien Adequate Protection Liens and the Prepetition First Priority Liens.

6.    *Authorization of the DIP Facilities and the DIP Documents.*

(a)    Upon entry of the Interim Order, the Debtors were expressly authorized and empowered to execute and deliver and, on such execution and delivery, perform under the DIP Documents, including the DIP Credit Agreements, which are approved and incorporated herein by reference.[7]

(b)    Upon entry of this Final Order, the Borrower is hereby authorized to borrow, and the Guarantors are hereby authorized to guaranty, borrowings of (i) available amounts under the DIP Revolving Credit Facility up to $275,000,000, including the Roll-Up Revolving Loans and (ii) up to an aggregate principal amount of $160,000,000 in DIP Term Loans (plus interest, fees, indemnities and other expenses and other amounts provided for in the DIP Credit Agreements), subject to and in accordance with this Final Order and the DIP Documents.

---

[7]    The DIP Revolving Credit Agreement shall be in substantially the same form as attached hereto as <u>Exhibit 2</u>.  The DIP Term Credit Agreement shall be in substantially the same form as attached hereto as <u>Exhibit 3</u>.

(c)    Proceeds of the DIP Loans and Cash Collateral shall be used solely for the purposes permitted under the DIP Credit Agreements, the Interim Order and this Final Order and in accordance with the DIP Budget, the DIP Documents, the Interim Order and this Final Order.

(d)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by Bankruptcy Code section 362 is hereby lifted to the extent necessary and applicable, to perform all acts and to make, execute and deliver all instruments and documents (including, without limitation, the DIP Credit Agreements and any collateral documents contemplated thereby), and to pay all fees, expenses, indemnities and other amounts contemplated thereby or that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facilities including, without limitation:

(i)    the execution, delivery and performance of the DIP Documents, including, without limitation, the DIP Credit Agreements and any collateral documents contemplated thereby;

(ii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents (in each case in accordance with the terms of the DIP Documents and in such form as the Debtors, the DIP Agents and the Required Lenders (as defined in the DIP Credit Agreements, as applicable) may agree in accordance with the DIP Documents, including without limitation, the Postpetition Pari Passu Intercreditor Agreement), it being understood that no further approval of the Court shall be required for any amendments, waivers, consents or other modifications to and under the DIP Documents or the DIP Budget, except that any modifications or amendments to the DIP Documents that shorten the maturity thereof, increase the aggregate commitments thereunder or increase the rate of interest payable with respect thereto shall be on notice and subject to a hearing and Court approval, as necessary;

(iii)    the non-refundable and irrevocable payment to each of the DIP Lenders or the DIP Agents, as applicable, of any amounts due (or that may become due) in respect of any indemnification obligations under the DIP Documents or any other amounts payable in connection with the DIP Revolving Credit Facility, including without limitation the payment of all reasonable and documented fees, out of pocket expenses, and disbursements of counsel

incurred by the DIP Agents arising prior to, on, or after the Petition Date, subject to and in accordance with the terms hereof;

(iv)    making any payments on account of the Adequate Protection Obligations provided for in the Interim Order or this Final Order; and

(v)    the performance of all other acts required under or in connection with the DIP Documents.

(e)    The DIP Credit Agreements and the other DIP Documents constitute valid, binding and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of the Interim Order and this Final Order for all purposes during the Chapter 11 Cases, any subsequently converted Chapter 11 Case of any Debtor to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any Chapter 11 Case.  No obligation, payment, transfer or grant of security under the DIP Credit Agreements, the other DIP Documents, the Interim Order or this Final Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under Bankruptcy Code sections 502(d), 548 or 549 or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transaction Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

(f)    The Guarantors hereby are authorized and directed to jointly, severally and unconditionally guarantee in full all of the DIP Obligations of the Borrower and to incur any DIP Obligations and DIP Liens in connection therewith.

7.    *Budget*.

(a)    Except as otherwise provided herein or in the DIP Documents, the Debtors may only use Cash Collateral and the proceeds of the DIP Facilities to fund payments benefitted by the Carve Out and otherwise in accordance with a projected statement of sources and uses of cash

for the Debtors for the current and following 13 calendar weeks (but not any preceding weeks) attached hereto as <u>Exhibit 1</u> (as may be amended, replaced, supplemented or otherwise modified in accordance with the terms of this Final Order and the DIP Documents, the "<u>DIP Budget</u>") as set forth in the DIP Credit Agreements.  On Thursday (or the next succeeding business day) of the fourth calendar week following the week in which the Petition Date occurs, and thereafter on the Thursday (or the next succeeding business day) following the end of every fourth calendar week, the Debtors shall deliver an updated DIP Budget, in each case substantially in the form attached hereto as <u>Exhibit 1</u> (with only such changes thereto as the (i) Required Lenders (as defined in the DIP Revolving Credit Agreement) (the "<u>Required DIP Revolving Lenders</u>") and (ii) Required Lenders (as defined in the DIP Term Loan Credit Agreement) (the "<u>Required DIP Term Lenders</u>") and (iii) Required Lenders (as defined in the Prepetition First Lien Credit Agreement) (the "<u>Required First Lien Lenders</u>") shall each agree in their sole discretion in accordance with the DIP Credit Agreements.

(b)     The Debtors shall only incur DIP Obligations and expend Cash Collateral and other DIP Collateral (as defined herein) to make payments benefitted by the Carve Out and otherwise in accordance with the specific purposes and amounts set forth in the DIP Budget, subject to the permitted variances as set forth in the DIP Documents (collectively referred to herein as the "<u>Budget Covenants</u>").

(c)     The consent of the DIP Lenders to the DIP Budget shall not be construed as consent to the use of any Cash Collateral or DIP Loans after the occurrence of an Event of Default (as defined in the DIP Credit Agreements), regardless of whether the aggregate funds shown on the DIP Budget have been expended, other than funds necessary to satisfy the Carve Out.

8.      *Reporting Requirements/Access to Records*.  The Debtors shall provide (a) counsel to the Revolving DIP Lenders, (b) Latham & Watkins LLP ("Latham"), as counsel to the Prepetition First Lien Administrative Agent and the DIP Revolving Facility Administrative Agent, (c) Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), as counsel to the DIP Term Loan Lenders and Prepetition Second Lien Lenders, (d) Morgan Lewis & Bockius LLP ("MLB"), as counsel to the Prepetition First Lien Secured Agent and DIP Revolving Facility Collateral Agent, (e) Ducera Partners LLC ("Ducera" and, together with Akin Gump, the "Ad Hoc Second Lien Advisors"), as financial advisor to the DIP Term Loan Lenders and Prepetition Second Lien Lenders, (f) McDermott Will & Emery LLP, as counsel to the official committee of unsecured creditors (the "Creditors' Committee"), and Berkeley Research Group, LLC, as financial advisor to the Creditors' Committee, (g) Mayer Brown LLP, as counsel to the providers under the Securitization Facility, and (h) the U.S. Trustee, upon request, with all reporting and other information required to be provided to the DIP Agents under the DIP Documents.  In addition to, and without limitation, whatever rights to access the DIP Agents and the DIP Lenders have under the DIP Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents and employees of the DIP Agents and the DIP Lenders to (i) have access to and inspect the Debtors' assets, (ii) examine the Debtors' books and records and (iii) discuss the Debtors' affairs, finances and condition with the Debtors' officers and financial advisors.

9.      *DIP Superpriority Claims*.  Pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed senior administrative expense claims of the DIP Agents and the DIP Lenders, against each of the Debtors' estates (the "DIP Superpriority Claims"), without the need to file any proof of claim or request for payment of administrative

expenses, with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b) and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including actions to recover property transferred pursuant to section 549 of the Bankruptcy Code and the proceeds of any other claims or causes of action arising under chapter 5 of the Bankruptcy Code (the "Avoidance Actions"), subordinate only to the Carve Out; *provided* that (x) the DIP Superpriority Claims arising under the DIP Revolving Credit Facility (the "DIP Revolving Superpriority Claims") shall be senior in right of payment to the DIP Superpriority Claims arising under the DIP Term Loan Facility (the "DIP Term Superpriority Claims") and the First Lien Adequate Protection Superpriority Claims (as defined herein), *pari passu* with the superpriority claims granted in connection with the Securitization Facility pursuant to the *Interim Order (I) Authorizing Certain Debtors to Continue Selling Receivables and Related Rights Pursuant to a Securitization Facility, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [ECF No. 60] (the "Interim Securitization Order") and any order of the Bankruptcy Court approving the Securitization Facility on a final basis (the "Final Securitization Order" and, together with the Interim Securitization Order, the "Securitization

Orders"), and (y) the DIP Term Superpriority Claims shall be junior to the superpriority claims granted in connection with the Securitization Facility pursuant to the Securitization Orders, and *pari passu* with the First Lien Adequate Protection Superpriority Claims (which shall be *pari passu* with the Prepetition First Lien Obligations).  Except as set forth in, or permitted by, this Final Order and the Securitization Orders, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.  Notwithstanding anything to the contrary contained herein, the rights of the DIP Term Lenders and Prepetition First Lien Lenders to be paid in full in cash on account of their DIP Term Superpriority Claims and Prepetition First Lien Obligations (including any First Lien Adequate Protection Obligations in respect thereof), respectively, on the effective date of any plan of reorganization or as a precondition to approval of a sale under section 363 of the Bankruptcy Code shall be subject to the terms and conditions of the Restructuring Support Agreement (as defined herein).

10.    *DIP Liens*.  As security for the DIP Obligations, effective and automatically perfected upon the date of the Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agents or any DIP Lender of, or over, any DIP Collateral (as defined herein), the following security interests and liens are hereby granted by the Debtors to the DIP Agents, for the benefit of the DIP Agents and the DIP Lenders (the "DIP Liens" and, all property identified in clauses (a) - (d) below, collectively, the "DIP Collateral"), which shall be subordinate only to the Carve Out and the Permitted Liens (if any), to the extent specifically provided for herein, and otherwise subject to the terms of this Final Order and the DIP Documents.

(a)     <u>Liens Priming the Prepetition Liens</u>.  Subject to the terms of this Final Order (including, without limitation, paragraph 12 hereof), pursuant to Bankruptcy Code section 364(d)(1), in respect of the DIP Revolving Credit Facility, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien (the "<u>DIP Revolving Priming Liens</u>") upon all prepetition and postpetition property of the Debtors to the extent set forth in the DIP Documents including, without limitation, the following except to the extent constituting Excluded Assets (as defined in the DIP Documents): the Prepetition Collateral, Cash Collateral, and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action, and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, that is subject to any of the Prepetition Liens securing the Prepetition Secured Obligations (collectively, the "<u>Debtor Property</u>"), subject only to the Carve Out and Permitted Liens (if any).  For the avoidance of doubt, the liens granted pursuant to the Interim Order and this Final Order shall not attach to the Debtors' leases and real property leaseholds (other than the

"Headquarters" (as defined in the DIP Credit Agreements)), and shall attach solely to the proceeds of such leases and real property leaseholds.

(b)    Liens *Pari Passu* with Prepetition First Priority Liens.  Subject to the terms of this Final Order (including, without limitation, paragraph 12 hereof) and the Postpetition Pari Passu Intercreditor Agreement and to the extent set forth in the DIP Documents, pursuant to Bankruptcy Code section 364(d)(1), in respect of the DIP Term Loan Facility, valid, binding, continuing, enforceable, fully-perfected first priority senior security interests and liens (the "DIP Term Liens"), which shall (i) be subordinate only to the Carve out, the Permitted Liens (if any), the DIP Revolving Priming Liens, and the liens granted in connection with the Securitization Facility pursuant to the Securitization Orders, (ii) rank *pari passu* with the First Lien Adequate Protection Liens and Prepetition First Priority Liens and (iii) rank senior to the Second Lien Adequate Protection Liens and the Prepetition Second Priority Liens, upon the Debtor Property.

(c)    Liens Junior to Permitted Liens.  Subject to the terms of this Final Order (including, without limitation, paragraph 12 hereof) and the Postpetition Pari Passu Intercreditor Agreement and to the extent set forth in the DIP Documents, pursuant to Bankruptcy Code section 364(c)(3), with respect to each of the DIP Facilities, valid, binding, continuing, enforceable and fully-perfected security interests in and liens (the "DIP Facility Junior Liens"), which shall be subordinate only to the Carve Out, in all prepetition and postpetition property of the Debtors (other than the property described in subparagraphs (a) and (b) of this paragraph 10, as to which the liens and security interests in favor of the DIP Agents will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date, if any, that are senior to the liens securing the Prepetition First Lien Obligations or to valid and unavoidable liens in existence immediately prior

to the Petition Date, if any, that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) that are senior to the liens securing the Prepetition First Lien Obligations, which security interests and liens in favor of the DIP Agents and the DIP Lenders are junior only to such valid, perfected and unavoidable liens (collectively, the "Permitted Liens"). For the avoidance of doubt, the DIP Facility Junior Liens with respect to the DIP Revolving Facility shall be senior to the DIP Facility Junior Liens with respect to the DIP Term Facility (which liens shall be *pari passu* with the First Lien Adequate Protection Liens).

(d)    Liens on Unencumbered Assets.  Subject to the terms of this Final Order (including, without limitation, paragraph 12 hereof) and the Postpetition Pari Passu Intercreditor Agreement and to the extent set forth in the DIP Documents, pursuant to Bankruptcy Code section 364(c)(2), in respect of each of the DIP Facilities, a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and lien (the "DIP Unencumbered Asset Liens") upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), including, without limitation, any unencumbered cash of the Debtors (whether maintained with the DIP Agents or otherwise) and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property,

leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action (excluding Avoidance Actions and proceeds of Avoidance Actions) and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired or arising and wherever located.   For the avoidance of doubt, the DIP Unencumbered Asset Liens with respect to the DIP Revolving Facility shall be senior to the DIP Unencumbered Asset Liens with respect to the DIP Term Facility (which liens shall be *pari passu* with the First Lien Adequate Protection Liens).   For the avoidance of doubt, the liens granted pursuant to the Interim Order and this Final Order shall not attach to the Debtors' leases and real property leaseholds (other than the "Headquarters" (as defined in the DIP Credit Agreements)), and shall attach solely to the proceeds of such leases and real property leaseholds.

11.   *Carve Out*.

(a)   Carve Out.   As used in this Final Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee for Region 2 (the "U.S. Trustee") under section 1930(a) of title 28 of the United States Code, together with interest, if any, under section 3717 of title 31 of the United States Code (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000.00 incurred by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in (iii) below); (iii) to the extent allowed, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to Bankruptcy Code sections 327, 328 or 363 (the "Debtor Professionals") and, subject

to the limitations set forth in paragraph 11(g) hereof, the Creditors' Committee pursuant to Bankruptcy Code sections 328 or 1103 (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons"), at any time before or on the first business day following delivery of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice and, solely in the event the Restructuring Support Agreement has been terminated, subject to the cumulative amount set forth for such expenses in the DIP Budget for such period; and (iv) subject to the limitations set forth in paragraph 11(g) hereof, Allowed Professional Fees of Professional Persons, in an aggregate amount not to exceed $2,500,000, incurred after the first business day following delivery of the Carve Out Trigger Notice, to the extent allowed, whether by interim order, procedural order or otherwise, but excluding any "success fee" or "transaction fee" payable to the Debtors' or Creditors' Committee's investment banker or financial advisor (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Revolving Agent, the DIP Term Agent or the Prepetition First Lien Agents, as applicable (in accordance with the terms of this Final Order and the Postpetition Pari Passu Intercreditor Agreement), to the Debtors, their lead restructuring counsel, the U.S. Trustee and lead restructuring counsel to the Creditors' Committee providing that a Termination Event (as defined herein) has occurred and is continuing and stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)    Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is delivered (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any

Debtor to fund a reserve in an amount equal to the then unpaid amounts of (A) the Allowed

Professional Fees of Debtor Professionals, (B) the Allowed Professional Fees of the Committee

Professionals (solely in the event the Restructuring Support Agreement has been terminated,

subject to the DIP Budget and subject to the limitations set forth in paragraph 11(g) hereof), and

(C) the obligations accrued as of the Termination Declaration Date with respect to clauses (i) and

(ii) of the definition of Carve Out set forth in paragraph 11(a) (the "<u>Additional Carve Out</u>

<u>Obligations</u>").  The Debtors shall deposit and hold such amounts in a segregated account in a

manner reasonably acceptable to the DIP Revolving Agent, the Required DIP Revolving Lenders

and Required DIP Term Lenders in trust to pay such then unpaid Allowed Professional Fees and

Additional Carve Out Obligations (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to the use

of such reserve to pay any other claims.  On the Termination Declaration Date, after funding the

Pre-Carve Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of

such date and any available cash thereafter held by any Debtor to fund a reserve in an amount

equal to the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>"

and, together with the Pre-Carve Out Trigger Notice Reserve, the "<u>Carve Out Reserves</u>") prior to

the use of such reserve to pay any other claims.  All funds in the Pre-Carve Out Trigger Notice

Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the

definition of Carve Out set forth above in paragraph 11(a) (the "<u>Pre-Carve Out Amounts</u>"), but

not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then,

to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to

the terms of this Final Order (including, without limitation, paragraph 12 hereof), to pay any other

amounts (if owing) benefitted by the Carve Out and then to the DIP Revolving Agent for the

benefit of itself and the DIP Revolving Lenders in accordance with the terms of this Final Order

and the DIP Documents, unless the DIP Revolving Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have been indefeasibly paid in full, in cash, and all commitments under the DIP Revolving Facility have been terminated (the "Discharge of DIP Revolving Obligations"), in which case any such excess shall be paid to the DIP Term Agent and Prepetition First Lien Agents (in accordance with the Postpetition Pari Passu Intercreditor Agreement) for the benefit of themselves and the DIP Term Lenders and the Prepetition First Lien Lenders in accordance with their rights and priorities as provided in the DIP Term Loan Credit Agreement, the Prepetition Credit Documents, the Prepetition First Lien Lenders' Agreement, the Postpetition Pari Passu Intercreditor Agreement and this Final Order.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to the terms of this Final Order (including, without limitation, paragraph 12 hereof), to pay the DIP Revolving Agent for the benefit of itself and the DIP Revolving Lenders in accordance with the terms of this Final Order and the DIP Documents, unless the Discharge of the DIP Revolving Obligations shall have occurred, in which case any such excess shall be paid to the DIP Term Agent and Prepetition First Lien Agents (in accordance with the Postpetition Pari Passu Intercreditor Agreement) for the benefit of themselves and the DIP Term Lenders and the Prepetition First Lien Lenders in accordance with their rights and priorities as provided in the DIP Term Loan Credit Agreement, the Prepetition Credit Documents, the Prepetition First Lien Lenders' Agreement, the Postpetition Pari Passu Intercreditor Agreement and this Final Order.  Notwithstanding anything to the contrary in the DIP Documents or this Final Order, if either of the Carve Out Reserves are not funded in full in the amounts set forth in this paragraph

11, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 11, prior to making any payments to the DIP Agents or the Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Documents or this Final Order, following delivery of a Carve Out Trigger Notice, the DIP Agents and the Prepetition First Lien Agents, as applicable (in accordance with the terms of the Final Order, the DIP Credit Agreements and the Postpetition Pari Passu Intercreditor Agreement), shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a valid and perfected security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Revolving Agent for the benefit of itself and the DIP Revolving Lenders in accordance with the terms of this Final Order and the DIP Documents, unless the Discharge of DIP Revolving Obligations shall have occurred, in which case any such excess shall be paid to the DIP Term Agent and Prepetition First Lien Agents (in accordance with the Postpetition Pari Passu Intercreditor Agreement) for the benefit of themselves and the DIP Term Lenders and the Prepetition First Lien Lenders in accordance with their rights and priorities as provided in the DIP Term Loan Credit Agreement, the Prepetition Credit Documents, the Prepetition First Lien Lenders' Agreement, the Postpetition Pari Passu Intercreditor Agreement and this Final Order.  Further, notwithstanding anything to the contrary in this Final Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not increase or reduce the DIP Obligations, or constitute additional DIP Loans (unless, for the avoidance of doubt, additional DIP Loans are used to fund the Carve Out Reserves), (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the

priority of the Carve Out, and (iii) except as otherwise provided in paragraph 11(g) hereof, in no

way shall the DIP Budget, Carve Out, Post-Carve Out Trigger Notice Cap or the Carve Out

Reserves or any of the foregoing, be construed as a cap or limitation on the amount of the Allowed

Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding

anything to the contrary in this Final Order, the DIP Documents or in any Prepetition Credit

Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facilities, the

Adequate Protection Obligations and the Prepetition Secured Obligations, and any and all other

forms of adequate protection, liens or claims securing the DIP Obligations or the Prepetition

Secured Obligations.

(c)    Fee Estimates. On a bi-weekly basis, starting with the second full calendar week

following the Petition Date, each Professional Person shall deliver to the Debtors a statement

setting forth a good-faith estimate of the amount of fees and expenses (collectively, "Estimated

Fees and Expenses") incurred during the preceding bi-weekly period by such Professional Person

(through Saturday of the second week of such bi-weekly period, the "Calculation Date"), along

with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses

incurred through the applicable Calculation Date and a statement of the amount of such fees and

expenses that have been paid to date by the Debtors (each such statement, a "Bi-Weekly

Statement"); provided, that within one business day of the occurrence of the Termination

Declaration Date, each Professional Person shall deliver one additional statement (the "Final

Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during

the period commencing on the calendar day after the most recent Calculation Date for which a Bi-

Weekly Statement has been delivered and concluding on the Termination Declaration Date (and

the Debtors shall cause such Bi-Weekly Statement and Final Statement to be delivered on the same day received to the DIP Revolving Agent and the DIP Term Agent).

(d)    <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)    <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Agents, DIP Lenders or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Agents, the DIP Lenders or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.  The foregoing shall in no way limit the rights for payment of the Professional Fees benefitted from the Carve Out from the assets of the Debtors, including to the extent such assets are in the possession of the DIP Agents, DIP Lenders or Prepetition Secured Parties.

(f)    <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out under the DIP Facilities shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Final Order, the DIP Documents, the Bankruptcy Code and applicable law.

(g)    <u>Committee Fee and Expense Cap</u>.  Notwithstanding anything to the contrary herein or in any agreement approved hereby, (i) except as provided in the proviso below, in no event during these Chapter 11 Cases will actual payments in respect of the fees and expenses of all Committee Professionals exceed $4,500,000 in the aggregate (the "<u>Committee Fee and Expense Cap</u>"), (ii) any portion of the Challenge Budget (as defined in paragraph 29(a) hereof) actually used by the Creditors' Committee and Committee Professionals shall be deducted from and reduce dollar-for-dollar the Committee Fee and Expense Cap, and (iii) any and all fees and expenses incurred by the Creditors' Committee and Committee Professionals in excess of the Committee Fee and Expense Cap (other than such fees and expenses incurred in connection with any matter set forth in paragraph 29(a) hereof, which fees and expenses shall be subject to the Challenge Budget and the provisions of paragraph 29(b) hereof) (the "<u>Excess Committee Fees and Expenses</u>") shall not constitute an allowed administrative expense claim for purposes of section 1129(a)(9) of the Bankruptcy Code; *provided*, that the Committee Professionals may seek allowance of any Excess Committee Fees and Expenses, and any Excess Committee Fees and Expenses allowed by a final order of this Court may be paid solely from proceeds of Avoidance Actions, if any (and shall be subject to the DIP Superpriority Claims, allowed Adequate Protection Superpriority Claims, and the superpriority claims granted pursuant to the Securitization Orders), and all parties in interest reserve their rights to challenge or contest the allowance of any Excess Committee Fees and Expenses; *provided further*, that in the event (i) the Restructuring Support Agreement is terminated, (ii) the *Joint Chapter 11 Plan of Reorganization of Centric Brands Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 119] (as amended, modified or supplemented, the "<u>Plan</u>") is materially modified in a manner that adversely affects unsecured creditors or the Creditors' Committee's rights under this Final Order, or (iii) the

Plan is not consummated on or before October 25, 2020 (the date that is 160 days after the Petition Date) (the "Plan Milestone Date"), the Creditors' Committee and Committee Professionals may send a notice to the Debtors reserving the right to seek allowance and payment of any fees and expenses incurred after the Plan Milestone Date in excess of the Committee Fee and Expense Cap as an administrative expense or otherwise (the "Committee Fee Cap Notice").  In the event that a Committee Fee Cap Notice is delivered, the Committee Fee and Expense Cap shall be limited to the amount set forth in the approved budgeted for the Committee Professionals as of the date of the Committee Fee Cap Notice and the Debtors' and all other parties in interest's rights to challenge or contest any such fees and expenses are expressly preserved.

12.    *DIP Intercreditor Provisions*

(a)    Standstill.

(i)    Until the Discharge of DIP Revolving Obligations has occurred, the DIP Term Parties and the Prepetition First Lien Parties will not:

1.    exercise or seek to exercise any rights or remedies with respect to any DIP Collateral (including taking any Enforcement Action (as defined herein) with respect to DIP Collateral); *provided* that (1) the DIP Term Agent and Prepetition First Lien Agents (in accordance with the Postpetition Pari Passu Intercreditor Agreement) may take Enforcement Actions with respect to the DIP Collateral after the passage of a period of ninety (90) days (the "Standstill Period") after the earlier of (x) the Maturity Date (as defined in the DIP Term Loan Credit Agreement) and (y) the date on which the DIP Term Agent or Prepetition First Lien Agents (in accordance with the Postpetition Pari Passu Intercreditor Agreement) provide written notice to the DIP Revolving Agent stating that the DIP Term Agent have declared all of the DIP Term Obligations to be immediately due and payable (such earlier date, the "Standstill Commencement Date") and (2) in no event shall the DIP Term Parties or Prepetition First Lien Parties (in accordance with the Postpetition Pari Passu Intercreditor Agreement) exercise any rights or remedies with respect to the DIP Collateral if, notwithstanding the expiration of the Standstill Period, the DIP Revolving Agent or any other DIP Revolving Party shall have commenced prior to the expiration of the Standstill Period and be diligently pursuing in good faith any Enforcement Action with respect to all or any material portion of the DIP Collateral;

2.    on and after the Standstill Commencement Date (but prior to the termination of the Standstill Period), contest, protest, or object to any Enforcement Action by the DIP Revolving Agent or any other DIP Revolving Party, and have no right to direct the DIP Revolving Agent or any other DIP Revolving Party to take any Enforcement Actions or take any other action under the DIP Documents, in each case, with respect to the DIP Collateral; and

3.    prior to the termination of the Standstill Period, but subject to the rights of the DIP Term Parties and Prepetition First Lien Parties (in accordance with the Postpetition Pari Passu Intercreditor Agreement) under the first proviso to subparagraph 12(a)(i)1 above, object to the forbearance by the DIP Revolving Agent or any other DIP Revolving Party from taking any Enforcement Action with respect to the DIP Collateral.

(ii)    Notwithstanding the foregoing, the DIP Term Parties and the Prepetition

First Lien Parties (in accordance with the Postpetition Pari Passu Intercreditor Agreement) may:

1.    take Enforcement Actions with respect to the DIP Collateral after the termination of the Standstill Period to the extent permitted by subparagraph 12(a)(i)(1) above and subject to subparagraph 12(c) below;

2.    take any action not adverse to the DIP Revolving Parties in order to preserve or protect their rights in the DIP Collateral;

3.    bid for or purchase DIP Collateral in cash or, subject to paragraph 33 of this Final Order, by credit bid, at any public foreclosure or sale upon such DIP Collateral in accordance with the terms of the DIP Documents and this Final Order or join (but not exercise any control with respect to) any judicial foreclosure proceeding or other judicial lien enforcement proceeding with respect to the DIP Collateral initiated by the DIP Revolving Agent to the extent that any such action could not reasonably be expected to restrain, hinder, limit, delay for any material period or otherwise interfere with the Enforcement Action by DIP Revolving Agent;

4.    file a claim, proof of claim or statement of interest, credit bid their debt in accordance with this Final Order and make any arguments, pleadings and motions that do not violate the terms of this Final Order or the Postpetition Pari Passu Intercreditor Agreement and that are not inconsistent with the lien provisions set forth in such documents;

5.    take any action (not adverse to the priority status of the liens on the DIP Collateral securing the DIP Revolving Obligations or the rights of DIP Revolving Agent) in order to create, prove, perfect, file, protect or preserve, its lien in and to the DIP Collateral;

6.      file any necessary responsive or defensive pleadings or appeal in opposition to any motion, claim, adversary proceeding, or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of DIP Term Parties or Prepetition First Lien Parties, including any claims secured by the DIP Collateral, if any; or

7.      vote on any plan of reorganization, make other filings and make any arguments, pleadings and motions (including in support of or opposition to, as applicable, the confirmation or approval of any plan of reorganization) that are, in each case, in accordance with and not otherwise prohibited by, the terms of this Final Order and the Postpetition Pari Passu Intercreditor Agreement, with respect to the DIP Term Obligations or Prepetition First Lien Obligations, as applicable, and the DIP Collateral.

(iii)    On and after the Standstill Commencement Date (but prior to the termination of the Standstill Period), until the Discharge of the DIP Revolving Obligations has occurred, but subject to the rights of the DIP Term Parties and Prepetition First Lien Parties under the first proviso to clause 12(a)(i)1 above and the terms of this Final Order and the Postpetition Pari Passu Intercreditor Agreement, the DIP Revolving Agent and the DIP Revolving Lenders shall have the exclusive right to take Enforcement Actions with respect to the DIP Collateral. Subject to the terms of this Final Order, in connection with any such Enforcement Action, the DIP Revolving Agent or any other DIP Revolving Party may enforce the provisions of the DIP Revolving Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion.

(iv)    For purposes of this paragraph 12, "Enforcement Action" means, with respect to the DIP Obligations or the Prepetition Secured Obligations, the exercise of any rights and remedies with respect to any DIP Collateral securing such obligations or the commencement or prosecution of enforcement of any of the rights and remedies under, as applicable, the DIP Documents, the Prepetition First Lien Credit Documents, or applicable law, including without limitation the exercise of any rights of set-off or recoupment, and the exercise of any rights or

remedies of a secured creditor under the Uniform Commercial Code (the "UCC") of any applicable jurisdiction or under this Final Order.

(v)    So long as the Discharge of DIP Revolving Obligations has not occurred, all DIP Collateral or proceeds thereof received in connection with the sale or other disposition of, or collection or realization on, such DIP Collateral upon the exercise of remedies by the DIP Revolving Agent, the DIP Revolving Lenders, the DIP Term Parties or the holders of the First Lien Adequate Protection Superpriority Claims and all other cash payments or distributions made by the Debtors (to the extent required by paragraph 12(c) below) shall be applied by the DIP Revolving Agent to the DIP Revolving Obligations in such order as specified in the relevant DIP Revolving Documents, after giving effect to the Carve Out.  Upon the Discharge of the DIP Revolving Obligations, the DIP Revolving Agent shall promptly deliver to the Prepetition First Lien Agents and the DIP Term Agent (in accordance with the Postpetition Pari Passu Intercreditor Agreement) any remaining DIP Collateral and remaining proceeds of DIP Collateral held by it in the same form as received, with any necessary endorsements (as determined by the Prepetition First Lien Agents and the DIP Term Agent in accordance with the Postpetition Pari Passu Intercreditor Agreement) or as a court of competent jurisdiction may otherwise direct to be applied by the Prepetition First Lien Agents and DIP Term Agent to the Prepetition First Lien Obligations, the DIP Term Obligations and the First Lien Adequate Protection Obligations in accordance with the Postpetition Pari Passu Intercreditor Agreement and this Final Order.

(b)    Bailee for Perfection. Each of the DIP Revolving Agent, the DIP Term Agent the Prepetition First Lien Agents and the Prepetition Second Lien Agent agree to hold or control that part of the DIP Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon

under the UCC, or other applicable law as bailee and as a non-fiduciary agent for the DIP Term

Agent, the DIP Revolving Agent, the Prepetition First Lien Agents and the Prepetition Second

Lien Agent, as applicable (such bailment and agency being intended, among other things, to satisfy

the requirements of Sections 8-301(a)(2), 9-313(c), 9-104, 9-105, 9-106, and 9-107 of the UCC),

solely for the purpose of perfecting the security interest granted under any of the DIP Documents,

as applicable, and the DIP Revolving Agent, the DIP Term Agent, the Prepetition First Lien Agents

and the Prepetition Second Lien Agent hereby appoint each other agent to act as its non-fiduciary

agent for such purposes and each such agent accepts such appointment.

(c)      Notwithstanding anything to the contrary set forth in this Final Order, prior to the

Discharge of DIP Revolving Obligations, each Debtor will not make, and the DIP Term Parties

will not accept, any cash payment of principal or interest in respect of the DIP Term Obligations.

The foregoing is intended to constitute a "subordination agreement" within the meaning of

Bankruptcy Code section 510(a). Any payment received by any DIP Term Party in violation of

this paragraph 12(c) shall be segregated and forthwith paid over to the DIP Revolving Facility

Collateral Agent for application to the DIP Revolving Obligations.

13.      *Limitation on Charging Expenses Against Collateral.*  Except to the extent of the

Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any future

proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings

under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the

Prepetition Collateral, the DIP Agents, the DIP Lenders or the Prepetition Secured Parties

pursuant to Bankruptcy Code sections 506(c) or 105(a), or any similar principle of law or equity,

without the prior written consent of the DIP Agents, the DIP Lenders and the Prepetition Secured

Parties, as applicable, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agents, the DIP Lenders or the Prepetition Secured Parties.

14. *No Marshaling/Application of Proceeds.* The DIP Agents and the Prepetition Agents shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition Collateral, as applicable, in accordance with the provisions of the Interim Order or this Final Order, as applicable, the DIP Documents, the Postpetition Pari Passu Intercreditor Agreement, the Prepetition First Lien Lenders' Agreement, the Prepetition Intercreditor Agreement and the Prepetition Credit Documents, as applicable, and in no event shall the DIP Agents, the DIP Lenders or any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral.

15. *Equities of the Case.* The Prepetition Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b), and the Debtors shall not invoke the "equities of the case" exception under Bankruptcy Code section 552(b) with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral.

16. *Use of Cash Collateral.* The Debtors are hereby authorized to use all Cash Collateral solely in accordance with this Final Order, the DIP Documents and the DIP Budget including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in the Interim Order and this Final Order. Except on the terms and conditions of this Final Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral absent further order of the Court.

17. *Adequate Protection for the Prepetition First Lien Parties.* Subject only to the Carve Out and the terms of this Final Order, pursuant to Bankruptcy Code sections 361, 363(e),

and 364, and in consideration of the stipulations and consents set forth in the Interim Order and this Final Order, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition diminution in value of such interests (each such diminution, a "Diminution in Value"), resulting from the imposition of the DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' sale, lease or use of the Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay and/or any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition First Lien Agents, for the benefit of themselves and the Prepetition First Lien Lenders, are hereby granted the following (collectively, the "First Lien Adequate Protection Obligations"):

(a)    First Lien Adequate Protection Liens.  As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in, and liens on, as of the date of the Interim Order (the "First Lien Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, all DIP Collateral.  Subject to the terms of this Final Order, the First Lien Adequate Protection Liens shall be subordinate only to the Carve Out, the Permitted Liens (if any), the DIP Revolving Priming Liens, and the liens granted in connection with the Securitization Facility pursuant to the Securitization Orders.  The First Lien Adequate Protection Liens shall otherwise be *pari passu* with the DIP Term Liens and the Prepetition First Priority Liens, and senior to all other security interests in, liens on or claims against any of the DIP Collateral (including, for the avoidance of doubt, the Second Lien Adequate Protection Liens, the Prepetition Second Priority Liens and any

lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551).

(b)     <u>First Lien Adequate Protection Superpriority Claim</u>.   As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), an allowed administrative expense claim in the Chapter 11 Cases to the extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such Chapter 11 Cases, except the Carve Out, the DIP Revolving Superpriority Claims, and the superpriority claims granted in connection with the Securitization Facility pursuant to the Securitization Orders (the "<u>First Lien Adequate Protection Superpriority Claim</u>").   The First Lien Adequate Protection Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including the proceeds of Avoidance Actions).   The First Lien Superpriority Adequate Protection Claims shall be subject only to the Carve Out, the DIP Revolving Superpriority Claims, and the superpriority claims granted in connection with the obligations arising in connection with the Securitization Facility pursuant to the Securitization Orders, and shall be *pari passu* with the DIP Term Superpriority Claims and the Prepetition First Lien Obligations.   The First Lien Superpriority Adequate Protection Claims shall be senior to the Second Lien Adequate Protection Superpriority Claims and the Prepetition Second Lien Obligations.   Except as set forth in this Final Order, the First Lien Adequate Protection Superpriority Claims shall not be junior to any other claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(d), 726, 1113 and 1114.

(c)    <u>Fees and Expenses</u>.  As further adequate protection, the Debtors are authorized and directed to pay, without further Court order, reasonable and documented fees and expenses (the "<u>First Lien Adequate Protection Fees</u>"), whether incurred before or after the Petition Date, of the Prepetition First Lien Agents and the Prepetition First Lien Lenders, including, without limitation, the reasonable and documented fees and expenses of (a) Latham and (b) MLB.  Statements of any such fees and expenses to be paid after the Petition Date shall be provided by the applicable professional to counsel to the Debtors, the U.S. Trustee, the DIP Term Lenders and the Creditors' Committee.  Except as provided herein, the invoices for such fees and expenses shall not be required to comply with any particular format, may be in summary form only and may include redactions necessary to maintain privilege.[8]  Recipients of the invoices shall have 10 days after receipt to notify counsel of any objections to the reasonableness of the fees and expenses incurred. If no objection is raised with counsel on or before the expiration of the ten-day review period, such invoice shall be paid without further order of the Court and shall not be subject to any further review, challenge or disgorgement.  If any objection is raised as to reasonableness of fees or expenses, the undisputed amounts shall be paid immediately and any disputed amounts shall be subject to further order of this Court.  For the avoidance doubt, the provision of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine.

---

[8]    For the avoidance of doubt, the fees provided for in this Final Order must be reasonable. Although the U.S. Trustee fee guidelines do not specifically apply, professionals shall submit time and expense detail entries to the U.S. Trustee, as well as any further information or back up documentation requested by the U.S. Trustee to determine the reasonableness of the invoiced amount. Invoices for such fees and expenses provided to any party other than the U.S. Trustee shall not be required to include any information subject to the attorney-client privilege or any information constituting attorney work product, and time and expense detail entries and other information provided solely to the U.S. Trustee shall be returned or destroyed after the U.S. Trustee has reviewed such material and any objections to the applicable fees and expenses have been resolved upon request of the applicable professional. Furthermore, the provision of invoices, time entries or other information pursuant to the terms hereof (including pursuant to paragraph 17) shall in no event constitute a waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine.

(d)    <u>First Lien Accrued Adequate Protection Payments</u>.  As further adequate protection, the Prepetition First Lien Agents, on behalf of the Prepetition First Lien Lenders, shall receive monthly adequate protection payments (the "<u>First Lien Accrued Adequate Protection Payments</u>") payable in-kind on the thirtieth day of each month equal to the interest at the non-default rate that would otherwise be owed to the Prepetition First Lien Lenders under the Prepetition First Lien Credit Agreement during such monthly period in respect of the Prepetition First Lien Obligations (but excluding the amount of any Roll-Up Revolving Loans and 2020 Term Loans from and after the time that such loans are rolled-up or refinanced, as applicable, pursuant to the Interim Order or this Final Order) until such time as the full Prepetition First Lien Obligations Amount is paid in full, in cash.

(e)    <u>Information Rights</u>.  The Debtors shall promptly provide the Prepetition First Lien Agents and PNC Bank, N.A., as administrative agent under the Securitization Facility, with all required financial reporting and other periodic reporting that is required to be provided to the DIP Agents or the DIP Lenders under the DIP Documents.

18.    *Adequate Protection for the Prepetition Second Lien Lenders*.  Subject to the Carve Out and the terms of this Final Order, pursuant to Bankruptcy Code sections 361, 363(e) and 364, and in consideration of the stipulations and consents set forth in the Interim Order and this Final Order, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition Diminution in Value of such interests, resulting from the imposition of the DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' sale, lease or use of the Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay and/or any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition Second Lien Lenders are hereby granted the

following obligations (collectively, the "Second Lien Adequate Protection Obligations" and, together with the First Lien Adequate Protection Obligations, the "Adequate Protection Obligations"):

(a)    Second Lien Adequate Protection Liens.  As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable and effective and automatically perfected postpetition security interests in, and liens on, as of the date of the Interim Order (the "Second Lien Adequate Protection Liens" and, together with the First Lien Adequate Protection Liens, the "Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, all DIP Collateral.  Subject to the terms of this Final Order, the Second Lien Adequate Protection Liens shall be subordinate only to (i) the Carve Out, (ii) the Permitted Liens (if any), (iii) the DIP Revolving Priming Liens, (iv) the First Lien Adequate Protection Liens, (v) the DIP Term Liens, (vi) the Prepetition First Priority Liens, and (vii) the liens granted in connection with the Securitization Facility pursuant to the Securitization Orders.  The Second Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on or claims against any of the DIP Collateral (including, for the avoidance of doubt, the Prepetition Second Priority Liens and any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551).

(b)    Second Lien Adequate Protection Superpriority Claim.  As further adequate protection, to the extent provided by Bankruptcy Code sections 503(b) and 507(b), an allowed administrative expense claim in the Chapter 11 Cases ahead of and senior to any and all other administrative expense claims in such Chapter 11 Cases to the extent of any postpetition

Diminution in Value, except the Carve Out, the DIP Superpriority Claims and the First Lien Adequate Protection Superpriority Claims (the "Second Lien Adequate Protection Superpriority Claim" and, together with the First Lien Adequate Protection Superpriority Claim, the "Adequate Protection Superpriority Claims").  The Second Lien Adequate Protection Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including the proceeds of Avoidance Actions). Subject to the terms of this Final Order, the Second Lien Adequate Protection Superpriority Claims shall be junior in right of payment only to (i) the Carve Out, (ii) the DIP Revolving Superpriority Claims, (iii) the First Lien Adequate Protection Superpriority Claims, (iv) the DIP Term Superpriority Claims, (v) the Prepetition First Lien Obligations, and (vi) the superpriority claims granted to secure the obligations arising in connection with the Securitization Facility pursuant to the Securitization Orders.  The Second Lien Adequate Protection Superpriority Claims shall not be junior to any other claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(d), 726, 1113 and 1114.

(c)     Fees and Expenses.  As further adequate protection, the Debtors are authorized and directed to pay, without further Court order, reasonable and documented fees and expenses (the "Second Lien Adequate Protection Fees"), whether incurred before or after the Petition Date, of the Prepetition Second Lien Agent and counsel to the Prepetition Second Lien Agent, including, without limitation, the reasonable and documented fees and expenses of (a) Akin Gump and (b) Ducera.  Statements of any such fees and expenses incurred subsequent to the Petition Date

shall be provided by the applicable professional to counsel to the Debtors, the U.S. Trustee, and

the Creditors' Committee.  The invoices for such fees and expenses shall not be required to comply

with any particular format, may be in summary form only and may include redactions necessary

to maintain privilege.[9]  Recipients of the invoices shall have 10 days after receipt to notify counsel

of any objections to the reasonableness of the fees and expenses incurred.  If no objection is raised

with counsel on or before the expiration of the ten-day review period, such invoice shall be paid

without further order of the Court and shall not be subject to any further review, challenge or

disgorgement.  If any objection is raised as to reasonableness of fees or expenses, the undisputed

amounts shall be paid immediately and any disputed amounts shall be subject to further order of

this Court.  For the avoidance doubt, the provision of such invoices shall not constitute a waiver

of attorney-client privilege or any benefits of the attorney work product doctrine.  Notwithstanding

anything to the contrary contained herein (including paragraph 28 of this Final Order), the Debtors

shall not be obligated to pay the Second Lien Adequate Protection Fees and the fees and expenses

of the DIP Term Lenders incurred after termination of the Restructuring Support Agreement (other

than as a result of breach by the Consenting First Lien Lenders or Consenting DIP Revolving Loan

Lenders (each as defined therein)) that are in excess of $500,000 for Akin Gump and $2,200,000

for Ducera (in each case without regard to fees incurred prior to such termination of the

Restructuring Support Agreement).

---

[9]    For the avoidance of doubt, the fees provided for in this Final Order must be reasonable. Although the U.S. Trustee fee guidelines do not specifically apply, professionals shall submit time and expense detail entries to the U.S. Trustee, as well as any further information or back up documentation requested by the U.S. Trustee to determine the reasonableness of the invoiced amount. Invoices for such fees and expenses provided to any party other than the U.S. Trustee shall not be required to include any information subject to the attorney-client privilege or any information constituting attorney work product, and time and expense detail entries and other information provided solely to the U.S. Trustee shall be returned or destroyed after the U.S. Trustee has reviewed such material and any objections to the applicable fees and expenses have been resolved upon request of the applicable professional. Furthermore, the provision of invoices, time entries or other information pursuant to the terms hereof (including pursuant to paragraph 18) shall in no event constitute a waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine.

19.     *Section 507(b) Reservation*.   Subject in all respects to the terms of the Prepetition

Intercreditor Agreement, nothing herein shall impair or modify the application of Bankruptcy

Code section 507(b) in the event that the adequate protection provided to the Prepetition Secured

Parties is insufficient to compensate for any Diminution in Value of their interests in the

Prepetition Collateral during the Chapter 11 Cases.   Nothing contained herein shall be deemed a

finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties, that the

adequate protection granted herein does in fact adequately protect any of the Prepetition Secured

Parties against any Diminution in Value of their respective interests in the Prepetition Collateral

(including the Cash Collateral); provided, however, that any such additional section 507(b) claims

shall be subject to the same relative priority as such party's Adequate Protection Obligations, as

provided in this Final Order.

20.     *Restrictions on Disposition of Material Assets Outside the Ordinary Course of*

*Business.*   Except as expressly permitted under the DIP Documents, the Debtors shall not use, sell

or lease any material assets outside the ordinary course of business, or seek authority of this Court

to the extent required by Bankruptcy Code section 363, without obtaining the prior written

consent of the Required DIP Revolving Lenders, the Required DIP Term Lenders and the

Required First Lien Lenders at least five days (or such shorter period as the DIP Agents, at the

direction of the Required DIP Revolving Lenders, the Required DIP Term Lenders and the

Required First Lien Lenders, applicable, may agree) prior to the date on which the Debtors seek

the Court's authority for such use, sale or lease.   Subject to the Carve Out and the Permitted Liens

(if any), in the event of any such sale, lease, transfer, license or other disposition of property of

the Debtors that constitutes DIP Collateral outside the ordinary course of business (to the extent

permitted by the DIP Documents and this Final Order), subject to the terms of the DIP Documents

and this Final Order (including, without limitation, paragraph 12 hereof), the Debtors are authorized and shall promptly pay, without further notice or order of this Court, such amount (if any) of net cash proceeds resulting therefrom no later than the second business day following receipt of such proceeds, to the DIP Revolving Agent for the benefit of itself and the DIP Revolving Lenders in accordance with the terms of this Final Order and the DIP Documents, unless the Discharge of DIP Revolving Obligations shall have occurred, in which case any such net cash proceeds shall be paid to the DIP Term Agent and Prepetition First Lien Agents (in accordance with the Postpetition Pari Passu Intercreditor Agreement) for the benefit of themselves and the DIP Term Lenders and the Prepetition First Lien Lenders in accordance with their rights and priorities as provided in the DIP Term Credit Agreement, the Prepetition Credit Documents, the Prepetition First Lien Lenders' Agreement, the Postpetition Pari Passu Intercreditor Agreement and this Final Order.  Subject to the Carve Out and the Permitted Liens (if any), in the event of any casualty, condemnation or similar event with respect to property that constitutes DIP Collateral, subject to the terms of the DIP Documents and this Final Order (including, without limitation, paragraph 12 hereof), the Debtors are authorized and shall promptly pay, without further notice or order of this Court, the required amount of any insurance proceeds, condemnation award or similar payment (excluding any amounts on account of any D&O policies) no later than the second business day following receipt of payment by the Debtors, to the DIP Revolving Agent for the benefit of itself and the DIP Revolving Lenders in accordance with the terms of this Final Order and the DIP Documents, unless the Discharge of DIP Revolving Obligations shall have occurred, in which case any such proceeds, awards or similar payments shall be paid to the DIP Term Agent and Prepetition First Lien Agents (in accordance with the Postpetition Pari Passu Intercreditor Agreement) for the benefit of themselves and the DIP Term

Lenders and the Prepetition First Lien Lenders in accordance with their rights and priorities as provided in the DIP Term Credit Agreement, the Prepetition Credit Documents, the Prepetition First Lien Lenders' Agreement, the Postpetition Pari Passu Intercreditor Agreement and this Final Order, unless (in accordance with applicable DIP Documents, including this Final Order and the Postpetition Pari Passu Intercreditor Agreement) the DIP Revolving Lenders, DIP Term Lenders and the Prepetition First Lien Lenders consent, in writing, to the funds being reinvested by the Debtors.

21.     *Insurance.* At all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date.  As of entry of the Interim Order, the DIP Agents are, and shall be deemed to be, without any further action or notice, named as additional insureds and lender's loss payees on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

22.     *Reservation of Rights of the DIP Agents, DIP Lenders and Prepetition Secured Parties*.  Except as otherwise expressly set forth in this Final Order (including, without limitation, paragraph 12 hereof), the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, subject in all respects to the terms of the Postpetition Pari Passu Intercreditor Agreement, the Prepetition First Lien Lenders' Agreement and the Intercreditor Agreement, as applicable: (a) any of the rights of any of the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right to seek additional adequate protection; (b) any of the rights of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of the DIP Agents, the DIP Lenders or the

Prepetition Secured Parties to (i) request modification of the automatic stay of Bankruptcy Code section 362, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7 or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Chapter 11 Cases, (iii) seek to propose, subject to the provisions of Bankruptcy Code section 1121, a chapter 11 plan or plans; or (c) any other rights, claims or privileges (whether legal, equitable or otherwise) of any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties.  The delay in or failure of the DIP Agents, the DIP Lenders and/or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Agents', the DIP Lenders' or the Prepetition Second Lien Parties' rights and remedies.

23.    *Termination Event*.  The occurrence of any of the following shall constitute a "Termination Event": (a) the occurrence of an Event of Default (as defined in either of the DIP Credit Agreements) to the extent not waived or subject to a forbearance or similar agreement with the applicable lenders; (b) the Debtors' failure to comply in any material respect with any provision of the Interim Order and this Final Order unless waived by the applicable lenders; or (c) the occurrence of the Maturity Date (as defined in each of the DIP Credit Agreements).

24.    *Remedies Upon a Termination Event.*  The Debtors shall immediately provide notice to counsel to the DIP Agents, the DIP Lenders, the Prepetition First Lien Agents, and the Prepetition Second Lien Agent (with a copy to counsel to the Creditors' Committee), of the occurrence of any Termination Event, at which time (i.e., the time of the occurrence of the Termination Event) the Debtors' ability to use Cash Collateral hereunder shall terminate (subject to the proviso at the end of this paragraph 24), the DIP Obligations shall become due and payable and any commitments under the DIP Facilities shall terminate.  Upon the occurrence of a

Termination Event and following the giving of not less than five business days' advance written notice (which may be by email) (the "Notice Period") by the DIP Revolving Agent or if the Discharge of DIP Revolving Obligations has occurred, by the DIP Term Agent or Prepetition First Lien Agents (in accordance with the Postpetition Pari Passu Intercreditor Agreement) (the "Enforcement Notice"), to counsel to the Debtors, applicable DIP Agents and DIP Lenders, applicable Prepetition Agents, the U.S. Trustee and counsel to the Creditors' Committee, (a) subject to the terms of this Final Order (including, without limitation, paragraph 12 hereof), the Postpetition Pari Passu Intercreditor Agreement, and the Prepetition First Lien Lenders' Agreement, the DIP Revolving Parties, the DIP Term Loan Parties and the Prepetition First Lien Parties may exercise any rights and remedies against the DIP Collateral available to them under this Final Order, the DIP Documents, the Prepetition First Lien Credit Documents and applicable non-bankruptcy law, including but not limited to terminating all commitments to extend credit under the DIP Facilities, in each case subject to the Carve Out and Permitted Liens (if any) and (b) subject to the Prepetition Intercreditor Agreement and the terms of this Final Order, the Prepetition Second Lien Parties may exercise any rights and remedies to satisfy the Prepetition Second Lien Obligations, the Second Lien Adequate Protection Liens, the Second Lien Adequate Protection Superpriority Claims and any other Second Lien Adequate Protection Obligations, in each case subject to the Prepetition First Lien Obligations, the First Lien Adequate Protection Obligations, the DIP Obligations, the Permitted Liens (if any) and the Carve Out.  The only permissible basis for the Debtors, the Creditors' Committee or any other party to contest, challenge or object to an Enforcement Notice shall be solely with respect to the validity of the Termination Event(s) giving rise to such Enforcement Notice (*i.e.*, whether such Termination Event validly occurred and has not been cured or waived in accordance with this Interim Order).

The automatic stay pursuant to Bankruptcy Code section 362 shall be terminated automatically with respect to the DIP Revolving Parties, the DIP Term Parties and the Prepetition Secured Parties at the end of the Notice Period, without further notice or order of the Court, unless the DIP Revolving Agent, or if the Discharge of DIP Revolving Obligations has occurred, the DIP Term Agent or Prepetition First Lien Agents (in accordance with the Postpetition Pari Passu Intercreditor Agreement) elect otherwise in a written notice to the Debtors, which may be by email.  Upon termination of the automatic stay, subject to the terms of this Final Order, the DIP Documents, the Prepetition Intercreditor Agreement, the Prepetition First Lien Lenders' Agreement and the Postpetition Pari Passu Intercreditor Agreement, the DIP Revolving Parties, the DIP Term Loan Parties and the Prepetition Secured Parties shall be permitted to exercise all rights and remedies set forth herein and in the DIP Documents, as applicable, and as otherwise available at law against the DIP Collateral, without any further order of or application or motion to the Court, and without restriction or restraint imposed by any stay under Bankruptcy Code sections 362 or 105, or otherwise, against the enforcement of the liens and security interests in the DIP Collateral or the Prepetition Collateral, or the pursuit of any other rights and remedies granted to such parties pursuant to the DIP Documents, the Prepetition First Lien Credit Documents or the Prepetition Second Lien Credit Documents; provided that during the Notice Period the Debtors may use the proceeds of the DIP Facilities (to the extent drawn prior to the occurrence of a Termination Event) or Cash Collateral only to fund (i) operations in accordance with the DIP Credit Agreements and the DIP Budget and (ii) the Carve Out Reserves; provided further that during the Notice Period, the Debtors, the DIP Agents, the DIP Lenders and the Prepetition Secured Parties consent to a hearing on an expedited basis to consider whether a Termination Event has occurred; provided further, that if a hearing to consider the foregoing is

requested to be heard before the end of the Notice Period but is scheduled for a later date by the Court, the Notice Period shall be automatically extended to the date of such hearing, but in no event later than five business days after delivery of the Enforcement Notice or at such other date that may be agreed to by the parties after good faith negotiations; provided further that any fees and expenses incurred by the Debtors or the Creditors' Committee during the Notice Period shall permanently reduce the Post-Carve Out Trigger Notice Cap; provided further that notwithstanding anything to the contrary contained herein, the DIP Revolving Parties, DIP Term Parties, and the Prepetition Secured Parties, as applicable, can only enter upon a leased premises during the continuation of a Termination Event in accordance with (i) a separate written agreement by and between the DIP Revolving Parties, DIP Term Parties, and Prepetition Secured Parties, as applicable, and any applicable landlord, (ii) pre-existing rights of the DIP Revolving Parties, DIP Term Parties, and Prepetition Secured Parties, as applicable, and any applicable landlord under applicable non-bankruptcy law, or (iii) entry of an order of this Court obtained by motion of the DIP Revolving Parties, DIP Term Parties, and Prepetition Secured Parties, as applicable, on such notice to the applicable landlord as shall be required by this Court. Any party in interest shall be entitled to seek an emergency hearing for the purpose of contesting whether assets constitute assets of the Debtors' estates and nothing in this Final Order shall affect any party in interest's rights or positions at such hearing.

25. *No Waiver for Failure to Seek Relief.* The failure or delay of the DIP Agents, the DIP Lenders or any of the Prepetition Secured Parties to exercise their respective rights and remedies under this Final Order, the DIP Documents, the Prepetition Credit Documents or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise.

26.    *Perfection of the DIP Liens and Adequate Protection Liens.*

(a)    Subject to the limitations in paragraph 27(a) of this Final Order, the DIP Agents and the Prepetition Agents are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder. Whether or not the DIP Agents or the Prepetition Agents shall, in their sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, such liens and security interests shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Final Order), at the time and on the date of entry of the Interim Order.  Upon the request of the DIP Agents and the Prepetition Agents, each of the Prepetition First Lien Lenders, the Prepetition Second Lien Lenders and the Debtors, without any further consent of any party, is authorized to take, execute, deliver and file such instruments (in the case of the Prepetition Secured Lenders, without representation or warranty of any kind) to enable the DIP Agents and the Prepetition Agents to further validate, perfect, preserve and enforce the DIP Liens and the applicable Adequate Protection Liens, respectively.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)    A certified copy of this Final Order may, in the discretion of the DIP Agents or the applicable Prepetition Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and

recording; provided, however, that notwithstanding the date of any such filing, the date of such

perfection shall be the date of the Interim Order.

(c)       Any provision of any lease (including the Headquarters lease but excluding any

other unexpired lease of non-residential real property) or other license, contract or other agreement

that requires (i) the consent or approval of one or more counterparties or other parties or (ii) the

payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge,

grant, sell, assign or otherwise transfer any such leasehold interest, or the proceeds thereof, or other

collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the

Bankruptcy Code.  Thereupon, any such provision shall have no force and effect with respect to

the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the

proceeds of any assignment, and/or sale thereof by any Debtor in accordance with the terms of the

DIP Credit Agreements or this Final Order.

27.    *Preservation of Rights Granted Under this Final Order.*

(a)       Unless and until the DIP Obligations, Prepetition First Lien Obligations and First

Lien Adequate Protection Obligations are indefeasibly paid in full, in cash or in kind, as applicable,

and all commitments to extend credit under the DIP Facilities are terminated, the Prepetition

Second Lien Lenders shall, in each case solely to the extent provided for in the Prepetition Credit

Documents, the Prepetition Intercreditor Agreement and applicable law: (i) take no action to

foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition

Second Lien Credit Documents, the Interim Order or this Final Order, or otherwise seek to exercise

or enforce any rights or remedies against such DIP Collateral; and (ii) be restricted from exercising

any rights and remedies or taking any other actions in respect of the DIP Collateral to the extent

provided by this Final Order, the DIP Documents, the Prepetition Intercreditor Agreement and applicable law.

(b)      Subject to the Carve Out and the Permitted Liens (if any), other than as set forth in this Final Order, the DIP Revolving Priming Liens shall not be made subject to and/or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and the DIP Revolving Priming Liens shall not be subject or junior to and/or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(c)      Subject to the Carve Out, the Permitted Liens (if any) and the DIP Revolving Priming Liens, other than as set forth in this Final Order, the DIP Term Liens, the First Lien Adequate Protection Liens and the Prepetition First Priority Liens shall not be made subject to and/or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and the Dip Term Liens, the First Lien Adequate Protection Liens and the Prepetition First Priority Liens shall not be subject or junior to and/or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(d)      Subject to the Carve Out, the Permitted Liens (if any), the DIP Liens, the First Lien Adequate Protection Liens and the Prepetition First Priority Liens, other than as set forth in this Final Order, the Second Lien Adequate Protection Liens shall not be made subject to and/or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and the Second Lien Adequate Protection Liens shall not be subject to and/or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(e)     In the event this Final Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, any liens or claims granted to the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges and benefits granted herein, and the Prepetition Secured Parties shall be entitled to the protections afforded in Bankruptcy Code section 363(m) with respect to all uses of the Prepetition Collateral (including the Cash Collateral) and all Adequate Protection Obligations.

(f)     Subject to the Carve Out, unless and until all DIP Obligations, Prepetition First Lien Obligations, Prepetition Second Lien Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash or in kind, as applicable, and all commitments to extend credit under the DIP Facilities are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (i) except as permitted under the DIP Documents and with the prior written consent of the Required DIP Revolving Lenders, the Required DIP Term Lenders, the Required Consenting First Lien Lenders (as defined in that certain Restructuring Support Agreement, dated May 17, 2020 (the "Restructuring Support Agreement")) and the Required Consenting Second Lien Lenders (as defined in the Restructuring Support Agreement) (x) any modification, stay, vacatur or amendment of this Final Order, (y) a priority claim for any administrative expense, secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a) or 507(b)) in any of the Chapter 11 Cases, equal or superior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, the Prepetition First Lien Obligations, and the Prepetition Second

Lien Obligations (or the liens and security interests securing such claims and obligations), or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents, any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens, the Prepetition First Priority Liens or the Prepetition Second Priority Liens, as the case may be; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Final Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to Bankruptcy Code section 546(h) (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Chapter 11 Cases; (vi) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases.

(g)     Notwithstanding any order dismissing any of the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and any other administrative claims granted pursuant to the Interim Order and this Final Order, shall continue in full force and effect and shall maintain their priorities as provided in the Interim Order, this Final Order, the DIP Documents and the Postpetition Pari Passu Intercreditor Agreement until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash or in kind, as applicable, or treated in accordance with the Restructuring Support Agreement (to the extent still in effect) and the Postpetition Pari Passu Intercreditor Agreement (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims and the other administrative claims granted pursuant to the Interim Order and this Final Order, shall, notwithstanding such dismissal, remain binding on all parties in

interest); and (y) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(h)       Except as expressly provided in this Final Order, the DIP Documents and the Postpetition Pari Passu Intercreditor Agreement, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and all other rights and remedies of the DIP Agents, the DIP Lenders, the Prepetition Agents and the Prepetition Secured Lenders granted by the provisions of the Interim Order, this Final Order and the DIP Documents shall survive, shall maintain their priority as provided in the Interim Order and this Final Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to Bankruptcy Code section 363(b) or (iii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Final Order and the DIP Documents shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered or in any superseding chapter 7 cases under the Bankruptcy Code.

(i)       Prior to the Discharge of DIP Revolving Obligations, during any Cash Dominion Period (as defined the DIP Revolving Credit Agreement) from and after the date of the entry of this Final Order, all collections and proceeds of any Collateral or services provided by any Debtor and all Cash Collateral that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly

deposited in the deposit accounts into which the collections and proceeds of the Collateral were deposited under the Prepetition First Lien Credit Documents (or in such other accounts as are designated by the DIP Revolving Facility Collateral Agent from time to time) (collectively, the "Cash Collection Accounts"), which accounts shall be subject to the sole dominion and control of the DIP Revolving Facility Collateral Agent.  Prior to the Discharge of DIP Revolving Obligations, all proceeds and other amounts in the Cash Collection Accounts shall be remitted to the DIP Revolving Facility Collateral Agent for application in accordance with the DIP Revolving Facility Documents and this Final Order.

28.    *Expenses and Indemnification.*

(a)    All (i) reasonable and documented out-of-pocket fees and expenses incurred by professionals or consultants retained by the DIP Agents and the DIP Lenders, including (a) Akin Gump, as counsel to the DIP Term Lenders, (b) Ducera, as financial advisor to the DIP Term Lenders, in accordance with the terms of its engagement agreement, (c) Nixon Peabody, LLP, as counsel to the DIP Term Agent, (d) Latham, as counsel to the DIP Revolving Lenders and the Prepetition First Lien Lenders and (e) MLB, as counsel to the Prepetition First Lien Secured Agent and the DIP Revolving Facility Collateral Agent (collectively, the "DIP Professionals"), incurred in connection with the Chapter 11 Cases (in any capacity) and the DIP Facilities, whether or not the DIP Facilities are successfully consummated, and (ii) reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of DIP Professionals) of the DIP Agents and the DIP Lenders, for enforcement costs and documentary taxes associated with the DIP Facilities and the transactions contemplated thereby, are to be paid by the Debtors in accordance with the procedures described in paragraph 17(c) hereof.  All fees and expenses described above shall be payable by the Debtors (whether accrued or incurred prior

to, on or after the Petition Date) within ten calendar days after the delivery of invoices (which invoices shall not be required to comply with any particular format and may be in summary form only and may be in redacted form to protect privileged and confidential information, except as provided in paragraph 17 with respect to the U.S. Trustee) to the Debtors, the U.S. Trustee and counsel to the Creditors' Committee, without the necessity of filing motions or fee applications and such fees and expenses shall not be subject to any further review, challenge or disgorgement following the expiration of such period.

(b)    As set forth in the DIP Documents, the Debtors will, jointly and severally, indemnify the DIP Agents, the DIP Lenders and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each an "Indemnified Person"), and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including but not limited to reasonable and documented legal fees and expenses) and liabilities arising out of or relating to the execution or delivery of the DIP Credit Agreements and other DIP Documents, transactions contemplated hereby and thereby and any actual or proposed use of the proceeds of any loans made under the DIP Facilities in accordance with the terms of the DIP Credit Agreements; provided that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the actual fraud, gross negligence or willful misconduct of such person (or their related persons).  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in any final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such

Indemnified Person's actual fraud, gross negligence or willful misconduct, and in no event shall any Indemnified Person be liable on any theory for any special, indirect, consequential or punitive damages.

29.    *Limitation on Use of DIP Facilities Proceeds, DIP Collateral and Cash Collateral*

(a)    Notwithstanding anything to the contrary set forth in this Final Order, none of the DIP Facilities, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, or the Carve Out may be used: (a) to investigate (except as expressly provided herein), initiate, prosecute, join or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense or other litigation of any type (i) against any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties (in each case, in their capacities as such) or seeking relief that would impair the rights and remedies of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties (in each case, in their capacities as such) under the DIP Documents, this Final Order or the Prepetition Credit Documents to the extent permitted or provided hereunder, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or the Creditors' Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief that would impair the ability of any of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral, as provided for herein, or seeking affirmative relief against any of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties related to the DIP Obligations, or the Prepetition Secured Obligations, (ii) seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP

Obligations, the DIP Superpriority Claims, or the DIP Agents' and the DIP Lenders' liens or security interests in the DIP Collateral or the Prepetition Collateral, or the Prepetition Secured Obligations, or the Prepetition Secured Parties' liens or security interests in the Prepetition Collateral or (iii) for monetary, injunctive or other affirmative relief against the DIP Agents, the DIP Lenders or the Prepetition Secured Parties (in each case, in their capacities as such), or their respective liens on or security interests in the DIP Collateral or the Prepetition Collateral or the DIP Superpriority Claims, that would impair the ability of any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties to assert or enforce any lien, claim, right or security interest or to realize or recover on the DIP Obligations or the Prepetition Secured Obligations to the extent permitted or provided hereunder; (b) for objecting to or challenging in any way the legality, validity, priority, perfection or enforceability of the claims, liens or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations, or by or on behalf of the DIP Agents and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions (as defined herein) related to the DIP Liens, the DIP Superpriority Claims, the DIP Obligations, the Prepetition Liens or the Prepetition Secured Obligations; and (d) for prosecuting an objection to, contesting in any manner or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of: (x) any of the DIP Liens, the DIP Superpriority Claims, or any other rights or interests of the DIP Agents or the DIP Lenders related to the DIP Obligations or the DIP Liens, or (y) any of the Prepetition Liens, Prepetition Secured Obligations or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Second Lien Obligations; provided that no more than $200,000.00 of the proceeds of the DIP Facilities, the DIP Collateral or the Prepetition

Collateral, including the Cash Collateral, in the aggregate, may be used by the Creditors'
Committee solely to investigate the foregoing matters (the "Committee Investigation Matters")
with respect to the Prepetition Liens or the Prepetition Secured Obligations within the Challenge
Period (as defined herein) (the "Challenge Budget") and nothing in this Paragraph 29 shall
preclude the Debtors from conducting an investigation of all other estate causes of action other
than the Committee Investigation Matters and bringing any causes of action as a result of such
investigation (the "Estate Claims Investigation").

(b)      All fees and expenses of the Committee Professionals incurred in connection with
the Committee Investigation Matters described in paragraph 29(a) in excess of the Challenge
Budget shall not be entitled to administrative expense priority pursuant to section 503(b) of the
Bankruptcy Code or otherwise.

30.    *Effect of Stipulations on Third Parties*.

(a)      The Debtors' acknowledgments, stipulations, admissions, waivers and releases set
forth in the Interim Order and this Final Order shall be binding on the Debtors, their respective
representatives, successors and assigns.  The acknowledgments, stipulations, admissions, waivers
and releases contained in the Interim Order and this Final Order shall also be binding upon the
Debtors' estates and all other parties in interest, including the Creditors' Committee, or any chapter
7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), unless (a) such
party with requisite standing, has duly filed an adversary proceeding or contested matter
(1) challenging the validity, perfection, priority, extent or enforceability of the Prepetition Liens,
or the Prepetition Secured Obligations, (2) challenging the repayment of the 2020 Term Loans or
the roll up of the obligations and commitments under the Prepetition First Lien Revolving Facility
into the Roll-Up Revolving Loans, or (3) otherwise asserting or prosecuting any Avoidance

Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Collateral, the Prepetition Liens or the Prepetition Secured Obligations by no later than (i) with respect to the Creditors' Committee, the date that is 60 days after entry of this Final Order or (ii) with respect to other parties in interest, no later than the date that is 75 days after the entry of this Final Order (the time period established by the later of the foregoing clauses (i) and (ii), the "Challenge Period"); provided that in the event that, prior to the expiration of the Challenge Period, (x) these Chapter 11 Cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these Chapter 11 Cases, then, in each such case, the Challenge Period shall be extended for a period of 60 days solely with respect to any Trustee, commencing on the occurrence of either of the events described in the foregoing clauses (x) and (y); and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding or contested matter.  If, during the Challenge Period, the Creditors' Committee or another party in interest files a motion for standing with a draft complaint identifying and describing all challenges to the stipulations, admissions, waivers and releases set forth herein or identifying any claims or causes of action on behalf of the estates, the Challenge Period will be tolled for the Creditors' Committee or such other party in interest seeking standing solely with respect to the matters asserted in the draft complaint until three (3) business days from the entry of an order granting the motion for standing; provided that all parties agree to an expedited hearing on the standing motion subject to the availability of the Court.  If standing is denied by this Court, the Challenge Period shall be deemed to have expired.  If no such adversary proceeding, contested matter or motion for standing, as applicable, is timely filed prior to the expiration of the Challenge

Period, or the Court denies standing as set forth in the immediately preceding sentence, without

further order of this Court: (x) the Prepetition Secured Obligations shall constitute allowed claims,

not subject to any Claims and Defenses (whether characterized as a counterclaim, setoff,

subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment,

reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined

by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual

or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-

bankruptcy law), for all purposes in these Chapter 11 Cases and any subsequent chapter 7 cases,

if any; (y) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid,

binding, perfected and of the priority specified in paragraphs 4(b) and 4(d), not subject to setoff,

subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction,

recoupment or recovery; and (z) the Prepetition Secured Obligations, the Prepetition Liens on the

Prepetition Collateral and the Prepetition Secured Parties (solely in their capacities as such) shall

not be subject to any other or further challenge and any party in interest shall be forever enjoined

and barred from seeking to exercise the rights of the Debtors' estates or taking any such action,

including any successor thereto (including any estate representative or a Trustee, whether such

Trustee is appointed or elected prior to or following the expiration of the Challenge Period).  If

any such adversary proceeding is timely filed prior to the expiration of the Challenge Period,

(a) the stipulations and admissions contained in the Interim Order and this Final Order shall

nonetheless remain binding and preclusive on the Creditors' Committee and any other party in

these Chapter 11 Cases, including any Trustee, except as to any stipulations or admissions that are

specifically and expressly challenged in such adversary proceeding or contested matter and (b) any

Claims and Defenses not brought in such adversary proceeding or contested matter shall be forever

barred; _provided_ that, if and to the extent any challenges to a particular stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such stipulation also shall be binding on the Debtors' estates and all parties in interest.  For the avoidance of doubt and notwithstanding anything in this Final Order to the contrary, all rights of the Creditors' Committee arising under the Bankruptcy Code with respect to the Adequate Protection Superpriority Claims are expressly reserved except as to whether any such allowed claims are entitled to superpriority administrative expense status.

(b)    Nothing in this Final Order vests or confers on any person (as defined in the Bankruptcy Code), including the Creditors' Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge with respect to the Prepetition Credit Documents, the Prepetition Liens or the Prepetition Secured Obligations.  For the avoidance of doubt, the Debtors retain the exclusive right, standing and authority to pursue, commence and prosecute any and all Avoidance Actions and any other claims and causes of action belonging to the Debtors or their estates unless and until such time as may otherwise be ordered by the Court or consensually agreed by the Debtors and the Creditors' Committee.

(c)    The Debtors agree to negotiate in good faith with the Creditors' Committee to establish reasonable and good faith protocols to keep the Creditors' Committee informed as to the scope and procedures of the Debtors' Estate Claims Investigation as to (i) whether the Debtors have any colorable claims that should be pursued against any subjects of the Estate Claims Investigation and (ii) the appropriateness of the releases set forth in the Plan, including but not limited to soliciting the Creditors' Committee's input as to the subjects, scope and topics of such Estate Claims Investigation.  In the event that the Debtors and Creditors' Committee do not agree

on such protocols within seven (7) days of the entry of this Final Order (the "Protocol Deadline"),

the Creditors' Committee may seek judicial intervention on shortened notice as it deems necessary

and appropriate; provided, however, that the Protocol Deadline may be extended upon mutual

consent of the Debtors and the Creditors' Committee. Notwithstanding the foregoing, the

Creditors' Committee (i) shall have standing to conduct the investigation contemplated by

paragraph 29(a) of this Final Order (*i.e.*, the Committee Investigation Matters) and (ii) reserves the

right to file a motion to seek standing to bring any claims on behalf of the Debtors' estates (a

"Standing Motion") consistent with this Final Order and the precedent of this Court, and the

Debtors and all parties in interest reserve all rights to contest any such Standing Motion.  In the

event that the Creditors' Committee obtains standing to pursue claims or causes of action that are

subject to the Committee Investigation Matters or obtains standing to pursue any claims or causes

of action that are subject to the Estate Claims Investigation against the DIP Agents, the DIP

Lenders or the Prepetition Secured Parties (in each case, in their capacities as such), then no part

of the Committee Fee and Expense Cap may be used by the Creditors' Committee to pursue such

claims or causes of action.  In the event that the Creditors' Committee obtains standing to pursue

claims or causes of action that are subject to the Committee Investigation Matters or obtains

standing to pursue any claims or causes of action that are subject to the Estate Claims Investigation

against the DIP Agents, the DIP Lenders or the Prepetition Secured Parties (in each case, in their

capacities as such), nothing in this Final Order shall prohibit the Creditors' Committee from

seeking administrative expense status for any fees and expenses incurred in connection with the

successful prosecution or settlement approved by the Creditors' Committee of such claims or

causes of action resulting in a final non-appealable order, or limit the rights of other parties in

interest to challenge or contest the allowance or priority of such fees and expenses; provided that,

unless otherwise agreed to in writing by the Creditors' Committee, the DIP Lenders and the Debtors, any fees and expenses incurred in connection with the pursuit of any such claims or causes of action shall not constitute an allowed administrative expense claim under the Plan[10] for purposes of section 1129(a)(9) of the Bankruptcy Code, and any such fees and expenses allowed by a final order of this Court shall be paid solely from any remaining proceeds of Avoidance Actions and other unencumbered assets, if any, after payment in full of all DIP Superpriority Claims, allowed Adequate Protection Superpriority Claims, and the superpriority claims granted pursuant to the Securitization Orders; provided, however, that nothing contained in this Final Order shall prevent the Debtors from waiving any and all Avoidance Actions under a chapter 11 plan in these cases or selling such actions under section 363 of the Bankruptcy Code.

31.    *Release*.  Subject to the rights and limitations set forth in paragraphs 29 and 30 of this Final Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors and assigns shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Agents, the DIP Lenders, the Prepetition Secured Parties (in each case, in their capacities as such) and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights,

---

[10]    The term "Plan" as used in this paragraph 30(c) shall not include any Plan that is materially modified in a manner that adversely affects unsecured creditors or the Creditors' Committee's rights under this Final Order.

assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof solely with respect to or relating to the DIP Liens, the DIP Superpriority Claims, the DIP Obligations, the Prepetition Liens and the Prepetition Secured Obligations, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties.

32.      *Intercreditor Agreements.*  The rights of the Prepetition Secured Parties shall at all times remain subject to the Postpetition Pari Passu Intercreditor Agreement, the Prepetition First Lien Lenders' Agreement and the Prepetition Intercreditor Agreement, as applicable.

33.      *Credit Bidding*.  (a) Subject to paragraph 12 of this Final Order, and consistent with section 363(k) of the Bankruptcy Code and applicable law, the DIP Revolving Facility Collateral Agent, or any assignee or designee of the DIP Revolving Facility Collateral Agent, acting at the direction of the Required DIP Revolving Lenders and on behalf of the DIP Revolving Parties, shall have the right to credit bid up to the full amount of the DIP Revolving Loans in the sale of any of the Debtors' assets, including pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129 or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725, (b) subject

to paragraph 12 of this Final Order and the Postpetition Pari Passu Intercreditor Agreement and subject to the Discharge of DIP Revolving Obligations, and consistent with section 363(k) of the Bankruptcy Code and applicable law, the DIP Term Agent and the Prepetition First Lien Agents (in accordance with the Postpetition Pari Passu Intercreditor Agreement) or any assignee or designee thereof, on behalf of the DIP Term Parties and Prepetition First Lien Parties, shall have the right to credit bid up to the full amount of the DIP Term Commitments and the Prepetition First Lien Obligations in the sale of any of the Debtors' assets, including pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129 or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725, and (c) subject to the Discharge of the DIP Revolving Obligations and the indefeasible payment in full of the DIP Obligations and the Prepetition First Lien Obligations, and subject to the Intercreditor Agreement, and consistent with section 363(k) of the Bankruptcy Code and applicable law, the Prepetition Second Lien Agent (on behalf of the Prepetition Second Lien Lenders) shall have the right to credit bid up to the full amount of the Prepetition Second Lien Obligations in the sale of any of the Debtors' assets, including, but not limited to, pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129 or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725.  The DIP Agents and the Prepetition First Lien Agents (in accordance with the DIP Documents, this Final Order and the Postpetition Pari Passu Intercreditor Agreement), shall have the absolute right to assign, sell or otherwise dispose of their respective rights to credit bid in connection with any credit bid by or on behalf of the DIP Parties to any acquisition entity or joint venture formed in connection with such bid.

34.     *Proof of Claim.*  The DIP Agents, the DIP Lenders, and the Prepetition Secured Parties will not be required to file proofs of claim in any of the Chapter 11 Cases or successor cases for any claim allowed herein.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or successor cases to the contrary, each of the Prepetition First Lien Agents and the Prepetition Second Lien Agent on behalf of themselves and each of the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit a proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or successor cases for any claim allowed herein.  Any proof of claim filed by the Prepetition First Lien Agents or Prepetition Second Lien Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition Secured Parties.  Any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or successor cases shall not apply to any claim of the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties.

35.     *Chubb Reservation of Rights.*  For the avoidance of doubt, nothing, including the DIP Credit Agreements, DIP Documents and/or this Final Order, alters or modifies the terms and conditions of any insurance policies or related agreements issued by ACE American Insurance Company, Westchester Fire Insurance Company, Federal Insurance Company and/or any of their affiliates.

36.     *Treatment of Proceeds from Sale of Certain Assets.*  As adequate protection for the claims of the Texas Taxing Authorities,[11] the Debtors will fund a segregated  account (the "Texas

---

[11]   "Texas Taxing Authorities" means (i) Guadalupe County, (ii) Comal County, (iii) City of Mercedes, (iv) Mercedes Independent School District, (v) Tyler Independent School District, (vi) Arlington Independent School District, (vii) Crowley Independent School District, (viii) Frisco Independent School District, (ix) Harris County MUD 358, (x) Harris County WCID 155, (xi) Spring Branch Independent School District, (xii) City of

Tax Account") in an amount not to exceed $374,998.80 from the proceeds of the non-ordinary course sale of any of the Debtors' assets located in the state of Texas that occurs after the Petition Date. The liens asserted by the Texas Taxing Authorities (and all other liens junior to those of the Texas Taxing Authorities) shall attach to the Texas Tax Account to the same extent and with the same priority as the liens the Texas Taxing Authorities assert against such assets of the Debtors. The Texas Tax Account shall be maintained solely for the purpose of providing adequate protection for the Texas Taxing Authorities prior to the distribution of any proceeds to any other creditor and shall constitute neither the allowance of the claims of the Texas Taxing Authorities, nor a floor or cap on the amount the Texas Taxing Authorities may be entitled to receive. All parties' rights to object to the priority, validity, amount and extent of the claims and liens asserted by the Texas Taxing Authorities are fully preserved. Funds in the Texas Tax Account may be distributed upon agreement between the Texas Taxing Authorities and the Debtors, with the consent of the DIP Agents or by subsequent order of the Court, duly noticed to the Texas Taxing Authorities and the DIP Agents. Notwithstanding any other provisions included in the Interim Order or this Final Order, or any agreements approved hereby, any statutory liens (collectively, the "Tax Liens") of the Texas Taxing Authorities shall not be primed by nor made subordinate to any liens granted to any party hereby to the extent such Tax Liens are valid, senior, perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount, and extent of the claims and liens asserted by the Texas Taxing Authorities are fully preserved.

---

Houston, (xiii) Clear Creek Independent School District, (xiv) Lubbock Central Appraisal District, (xv) Bexar County, (xvi) Cameron County, (xvii) Cypress-Fairbanks Independent School District, (xviii) City of El Paso, (xix) Harris County, (xx) Hidalgo County, (xxi) City of McAllen, (xxii) McLennan County, (xxiii) Nueces County, (xxiv) San Marcos Consolidated Independent School District, (xxv) City of Allen, (xxvi) Allen Independent School District, (xxvii) City of Frisco, (xxviii) Smith County, (xxix) Tarrant County, (xxx) Dallas County, and (xxxi) any other entities represented by Perdue Brandon Fielder Collins and Mott LLP that may not yet be identified.

37.    *XPO Logistics*.  Notwithstanding anything in the Interim Order or this Final Order, or any agreements approved hereby, any warehouseman's lien of XPO Logistics Supply Chain, Inc. shall not be primed by nor made subordinate to any liens granted to any party hereby to the extent such warehouseman's lien was valid, senior, perfected, and unavoidable as of the Petition Date or at such later date as may be permitted in accordance with applicable law.

38.    *Final Order Governs*.  In the event of any inconsistency between the provisions of the Interim Order, the DIP Documents and this Final Order, the provisions of this Final Order shall govern.

39.    *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including without limitation, the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, the Creditors' Committee and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104 or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties, provided that, except to the extent expressly set forth in this Final Order, the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

40.    *Limitation of Liability*.  In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral or exercising any rights or remedies as and when permitted pursuant to this Final Order, the DIP Documents or the Prepetition Credit Documents, the DIP

Agents, the DIP Lenders and the Prepetition Secured Parties (in each case, solely in their capacities as such) shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute), nor shall they owe any fiduciary duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.  Furthermore, nothing in this Final Order, the DIP Documents or the Prepetition Credit Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents, the DIP Lenders or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their direct or indirect subsidiaries.

41.    *Effectiveness*.  This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

Dated: June 22, 2020

**/s/ Sean H. Lane**
THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit 1**

**DIP Budget**

**Centric Brands**

**13 Week Cash Flow Forecast**

**Through the week ended August 14, 2020**

| $ in thousands | FORECAST 5/22/2020 | FORECAST 5/29/2020 | FORECAST 6/5/2020 | FORECAST 6/12/2020 | FORECAST 6/19/2020 | FORECAST 6/26/2020 | FORECAST 7/3/2020 | FORECAST 7/10/2020 | FORECAST 7/17/2020 | FORECAST 7/24/2020 | FORECAST 7/31/2020 | FORECAST 8/7/2020 | FORECAST 8/14/2020 | FORECAST Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | | |
| Spring Advance | (44,984) | 2,649 | 1,784 | 289 | 5,388 | 12,686 | 16,896 | 3,503 | (13,065) | (812) | 11,935 | 25,003 | 4,005 | 25,277 |
| Customer Collections (Wholesale) | 7,185 | 12,115 | 9,769 | 14,461 | 10,414 | 10,027 | 9,624 | 11,351 | 31,627 | 16,496 | 15,321 | 10,188 | 19,964 | 178,542 |
| Retail Cash Receipts | 505 | 505 | 438 | 438 | 438 | 1,619 | 542 | 542 | 542 | 542 | 5,712 | 591 | 591 | 13,005 |
| **Total Cash Receipts** | **(37,295)** | **15,268** | **11,991** | **15,187** | **16,240** | **24,333** | **27,063** | **15,397** | **19,104** | **16,225** | **32,968** | **35,782** | **24,561** | **216,824** |
| **Operating Cash Disbursements** | | | | | | | | | | | | | | |
| Merchandise | (2,983) | (2,300) | (2,353) | (3,683) | (4,110) | (3,726) | (2,681) | (3,920) | (4,392) | (3,585) | (2,847) | (7,190) | (10,939) | (54,710) |
| Duty & Freight | (382) | (382) | (634) | (634) | (634) | (4,092) | (736) | (736) | (736) | (9,372) | (736) | (1,083) | (1,083) | (21,240) |
| Royalties | - | - | - | - | - | - | (29,070) | (7,203) | - | - | (243) | - | - | (36,516) |
| Payroll | (408) | (5,363) | (340) | (5,435) | (375) | (5,400) | (357) | (799) | (4,971) | (1,156) | (4,971) | (1,105) | (4,754) | (35,435) |
| Rent | (2,819) | - | (2,170) | - | - | - | (2,156) | - | - | - | (2,151) | - | - | (9,296) |
| Warehouse & Distribution | (903) | (903) | (1,574) | (1,574) | (1,574) | (1,574) | (1,422) | (1,422) | (1,422) | (1,422) | (1,422) | (1,894) | (1,894) | (19,003) |
| Others (Mktg, Samples, IT, Prof Fees) | - | - | - | - | (1,397) | (1,397) | (2,606) | (1,169) | (1,169) | (1,169) | (1,169) | (2,922) | (1,485) | (14,483) |
| **Total Operating Cash Disbursements** | **(7,496)** | **(8,949)** | **(7,071)** | **(11,326)** | **(8,090)** | **(16,190)** | **(39,028)** | **(15,249)** | **(12,690)** | **(16,704)** | **(11,146)** | **(16,589)** | **(20,155)** | **(190,683)** |
| **Net Operating Cash Flow** | **(44,791)** | **6,320** | **4,920** | **3,861** | **8,150** | **8,143** | **(11,965)** | **148** | **6,414** | **(478)** | **21,822** | **19,193** | **4,405** | **26,142** |
| **One Time Costs** | | | | | | | | | | | | | | |
| Professional Fees | - | (1,763) | - | - | - | - | (3,921) | - | - | - | - | (2,000) | - | (7,684) |
| One Time Expense | (16,101) | (16,952) | (17,565) | (18,926) | (11,161) | (12,164) | (11,451) | (12,015) | (423) | (423) | (961) | (1,021) | (996) | (120,161) |
| **Total One Time Cash Disbursements** | **(16,101)** | **(18,715)** | **(17,565)** | **(18,926)** | **(11,161)** | **(12,164)** | **(15,372)** | **(12,015)** | **(423)** | **(423)** | **(961)** | **(3,021)** | **(996)** | **(127,845)** |
| **Financing & Debt Service** | | | | | | | | | | | | | | |
| Revolver | - | - | (1,255) | - | - | - | (1,323) | - | - | - | (1,568) | - | - | (4,146) |
| 1L | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2L | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Hudson | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Securitization Interest | (8,300) | (637) | - | - | - | (6,773) | - | - | - | - | (1,570) | - | - | (17,280) |
| Term Loan Principal Payment | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debtor in Possession Financing | 120,000 | - | - | 40,000 | - | - | - | - | - | - | - | - | - | 160,000 |
| Bridge Financing | (20,000) | - | - | - | - | - | - | - | - | - | - | - | - | (20,000) |
| LC Cash Collateral | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Financing Service Disbursements** | **91,700** | **(637)** | **(1,255)** | **40,000** | **-** | **(6,773)** | **(1,323)** | **-** | **-** | **-** | **(3,138)** | **-** | **-** | **118,574** |
| **Total Net Cash Flow** | **30,808** | **(13,033)** | **(13,901)** | **24,935** | **(3,010)** | **(10,794)** | **(28,660)** | **(11,867)** | **5,991** | **(902)** | **17,723** | **16,171** | **3,409** | **16,871** |
| **Cash & Liquidity** | | | | | | | | | | | | | | |
| Beginning Cash | 8,755 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 8,755 |
| Change in Cash | 30,808 | (13,033) | (13,901) | 24,935 | (3,010) | (10,794) | (28,660) | (11,867) | 5,991 | (902) | 17,723 | 16,171 | 3,409 | 16,871 |
| Revolver Draw / (Paydown) | (19,563) | 13,033 | 13,901 | (24,935) | 3,010 | 10,794 | 28,660 | 11,867 | (5,991) | 902 | (17,723) | (16,171) | (3,409) | (5,626) |
| **Ending Cash** | **20,000** | **20,000** | **20,000** | **20,000** | **20,000** | **20,000** | **20,000** | **20,000** | **20,000** | **20,000** | **20,000** | **20,000** | **20,000** | **20,000** |
| LCs Outstanding | 22,600 | 22,600 | 22,600 | 22,600 | 22,600 | 22,600 | 22,600 | 22,600 | 22,600 | 22,600 | 22,600 | 22,600 | 22,600 | 22,600 |
| Total Authorized Revolver (Incl. LCs) | 172,311 | 172,311 | 172,600 | 172,600 | 188,055 | 188,055 | 205,916 | 205,916 | 205,916 | 205,916 | 205,916 | 225,329 | 225,329 | 225,329 |
| Outstanding Revolver Balance (Incl. LCs) | 143,037 | 156,070 | 169,970 | 145,035 | 148,045 | 158,840 | 187,500 | 199,367 | 193,376 | 194,278 | 176,555 | 160,383 | 156,974 | 156,974 |
| **Net Available Revolver** | **29,274** | **16,242** | **2,630** | **27,565** | **40,010** | **29,215** | **18,416** | **6,549** | **12,540** | **11,638** | **29,361** | **64,946** | **68,355** | **68,355** |
| **Total Liquidity** | **49,274** | **36,242** | **22,630** | **47,565** | **60,010** | **49,215** | **38,416** | **26,549** | **32,540** | **31,638** | **49,361** | **84,946** | **88,355** | **88,355** |

## **Exhibit 2**

**DIP Revolving Credit Agreement**

*Execution Version*

**SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION ASSET-BASED REVOLVING CREDIT, GUARANTY AND SECURITY AGREEMENT**

**dated as of May 20, 2020,**

Among

CENTRIC BRANDS INC.,
as Debtor, Debtor-in-Possession and Borrower,

THE GUARANTORS PARTY HERETO,
each as a Debtor and Debtor-in-Possession,

THE LENDERS PARTY HERETO,

ACF FINCO I LP
as Administrative Agent and Collateral Agent

and

HPS INVESTMENT PARTNERS, LLC
as Documentation Agent

## Table of Contents

**Page**

### ARTICLE I

### DEFINITIONS

Section 1.01    Defined Terms ...............................................................................2
Section 1.02    Terms Generally ...........................................................................54
Section 1.03    [Reserved]....................................................................................55
Section 1.04    Currency Translation ...................................................................55
Section 1.05    Letter of Credit Amounts .............................................................55
Section 1.06    [Reserved]....................................................................................55
Section 1.07    Cashless Rolls..............................................................................55

### ARTICLE II

### THE CREDITS

Section 2.01    Commitments ...............................................................................56
Section 2.02    Loans and Borrowings..................................................................56
Section 2.03    [Reserved]....................................................................................57
Section 2.04    Revolving Borrowing Procedures and Settlements ...........................57
Section 2.05    Letters of Credit...........................................................................62
Section 2.06    Collections...................................................................................69
Section 2.07    Interest Elections .........................................................................69
Section 2.08    Termination and Reduction of Commitments ....................................71
Section 2.09    Repayment of Loans; Evidence of Debt..........................................71
Section 2.10    Repayment of Loans.....................................................................72
Section 2.11    Prepayment of Loans ...................................................................73
Section 2.12    Fees.............................................................................................73
Section 2.13    Interest ........................................................................................75
Section 2.14    Alternate Rate of Interest..............................................................76
Section 2.15    Increased Costs............................................................................77
Section 2.16    Break Funding Payments...............................................................78
Section 2.17    Taxes...........................................................................................78
Section 2.18    Payments Generally; Pro Rata Treatment; Sharing of Set-offs ..........82
Section 2.19    Mitigation Obligations; Replacement of Lenders .............................84
Section 2.20    [Reserved]....................................................................................86
Section 2.21    Illegality ......................................................................................86
Section 2.22    Cash Collateral ............................................................................86
Section 2.23    Defaulting Lenders .......................................................................87
Section 2.24    Roll-Up. ......................................................................................89
Section 2.25    Conversion to Exit Facility Agreement. ..........................................89

i

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.01    Organization; Powers ...................................................................90
Section 3.02    Authorization ...............................................................................91
Section 3.03    Enforceability ..............................................................................91
Section 3.04    Governmental Approvals...............................................................92
Section 3.05    Financial Statements......................................................................92
Section 3.06    No Material Adverse Effect............................................................92
Section 3.07    Title to Properties; Possession Under Leases ...................................92
Section 3.08    Subsidiaries...................................................................................93
Section 3.09    Litigation; Commercial Tort Claims; Compliance with Laws ..........93
Section 3.10    Federal Reserve Regulations ..........................................................94
Section 3.11    Investment Company Act ...............................................................95
Section 3.12    Use of Proceeds ............................................................................95
Section 3.13    Tax Returns ..................................................................................95
Section 3.14    No Material Misstatements.............................................................96
Section 3.15    Employee Benefit Plans .................................................................96
Section 3.16    Environmental Matters...................................................................97
Section 3.17    Security Documents........................................................................97
Section 3.18    Location of Real Property...............................................................98
Section 3.19    [Reserved].....................................................................................99
Section 3.20    Labor Matters ...............................................................................99
Section 3.21    Insurance.......................................................................................99
Section 3.22    Inventory Matters ..........................................................................99
Section 3.23    Material Agreements; No Violation; No Default ..............................99
Section 3.24    [Reserved]...................................................................................100
Section 3.25    PATRIOT Act, etc........................................................................100
Section 3.26    Sanctions Laws............................................................................100
Section 3.27    Anti-Corruption Laws and Sanctions Laws ...................................101
Section 3.28    Compliance With Collateral and Guarantee Requirement ...............101
Section 3.29    Reorganization Matters. ...............................................................101

# ARTICLE IV

## CONDITIONS OF LENDING

Section 4.01    All Credit Events ........................................................................102
Section 4.02    Closing Date ...............................................................................103

# ARTICLE V

## AFFIRMATIVE COVENANTS

Section 5.01    Existence; Businesses and Properties.............................................106
Section 5.02    Insurance.....................................................................................107

Section 5.03    Taxes..................................................................................................108
Section 5.04    Financial Statements, Reports, etc...........................................................109
Section 5.05    Litigation and Other Notices ..................................................................112
Section 5.06    Compliance with Laws ...........................................................................113
Section 5.07    Maintaining Records; Inspections, Field Exams and Appraisals. ..................113
Section 5.08    Payment of Obligations ..........................................................................114
Section 5.09    Use of Proceeds ...................................................................................114
Section 5.10    Compliance with Environmental Laws .....................................................114
Section 5.11    Further Assurances; Additional Security....................................................114
Section 5.12    Fiscal Year; Accounting .........................................................................115
Section 5.13    [Reserved]...........................................................................................115
Section 5.14    Lender Meetings...................................................................................115
Section 5.15    Securitization Matters............................................................................116
Section 5.16    Compliance with Anti-Corruption Laws and Sanctions Laws ......................116
Section 5.17    Post-Closing Matters .............................................................................116
Section 5.18    Location of Collateral .............................................................................116
Section 5.19    Board Observers ...................................................................................117
Section 5.20    Compliance with Collateral and Guarantee Requirement ...............................117
Section 5.21    Collateral Reporting ..............................................................................117
Section 5.22    Cash Management. Maintain the cash management of the Loan Parties
                in accordance in all material respects with the Cash Management Order.......118
Section 5.23    Milestones............................................................................................118
Section 5.24    Chief Restructuring Officer and Transformation Office .................................118

ARTICLE VI

NEGATIVE COVENANTS

Section 6.01    Indebtedness ........................................................................................119
Section 6.02    Liens ...................................................................................................123
Section 6.03    Sale and Lease-Back Transactions ...........................................................127
Section 6.04    Investments, Loans and Advances ...........................................................127
Section 6.05    Mergers, Consolidations, Sales of Assets and Acquisitions............................130
Section 6.06    Dividends and Distributions ...................................................................132
Section 6.07    Transactions with Affiliates ....................................................................133
Section 6.08    Business of the Borrower and the Subsidiaries .............................................134
Section 6.09    Limitation    on    Modifications    and    Payments    of    Indebtedness;
                Modifications of Certificate of Incorporation, By-Laws and Certain
                Other Agreements; etc. ...........................................................................135
Section 6.10    Financial Covenants ..............................................................................138
Section 6.11    Limitations on Change in Fiscal Periods ....................................................138
Section 6.12    KEIP Plan ...........................................................................................138
Section 6.13    Communications with Bankruptcy Court ....................................................138
Section 6.14    Bankruptcy Actions ..............................................................................138

## ARTICLE VII

## EVENTS OF DEFAULT

Section 7.01      Events of Default ............................................................................138

## ARTICLE VIII

## THE AGENTS

Section 8.01      Appointment and Authority..........................................................145
Section 8.02      Rights as a Lender .......................................................................146
Section 8.03      Exculpatory Provisions................................................................146
Section 8.04      Reliance by Administrative Agent ...............................................147
Section 8.05      Delegation of Duties....................................................................147
Section 8.06      Resignation of the Administrative Agent .....................................147
Section 8.07      Non-Reliance on Administrative Agent and Other Lenders ..........148
Section 8.08      No Other Duties, Etc ...................................................................148
Section 8.09      Administrative Agent May File Proofs of Claim ..........................148
Section 8.10      Security Agreement......................................................................149
Section 8.11      Withholding Tax...........................................................................150
Section 8.12      Certain ERISA Matters................................................................150

## ARTICLE IX

## MISCELLANEOUS

Section 9.01      Notices.........................................................................................151
Section 9.02      Survival of Agreement.................................................................154
Section 9.03      Binding Effect .............................................................................154
Section 9.04      Successors and Assigns ...............................................................154
Section 9.05      Expenses; Indemnity ...................................................................159
Section 9.06      Right of Set-off............................................................................161
Section 9.07      Payments Set Aside .....................................................................162
Section 9.08      Applicable Law............................................................................162
Section 9.09      Waivers; Amendment ..................................................................162
Section 9.10      Interest Rate Limitation ...............................................................166
Section 9.11      [Reserved]....................................................................................166
Section 9.12      Entire Agreement.........................................................................166
Section 9.13      WAIVER OF JURY TRIAL ........................................................166
Section 9.14      Severability..................................................................................167
Section 9.15      Counterparts ................................................................................167
Section 9.16      Headings ......................................................................................167
Section 9.17      Jurisdiction; Consent to Service of Process..................................167
Section 9.18      Confidentiality.............................................................................168
Section 9.19      Direct Website Communications..................................................168
Section 9.20      Release of Liens and Guarantees..................................................170

iv

Section 9.21    Power of Attorney ........................................................................171
Section 9.22    PATRIOT Act Notice ..................................................................171
Section 9.23    No Advisory or Fiduciary Relationship .......................................171
Section 9.24    Acknowledgement and Consent to Bail-In of EEA Financial Institutions......172
Section 9.25    Parties Including Trustees; Bankruptcy Court Proceedings ..........................172
Section 9.26    Inconsistency ...............................................................................173
Section 9.27    Pre-Petition First Lien Lender Consent ........................................173
Section 9.28    Lender Consent to Credit Bid ......................................................173

### ARTICLE X
### **COLLATERAL**

Section 10.01    Grant of Security Interest ...........................................................173
Section 10.02    Perfection of Security Interest ....................................................175
Section 10.03    Right to Cure ..............................................................................175
Section 10.04    The Collateral Agent's and Lenders' Rights, Duties, and Liabilities..............176
Section 10.05    Rights in Respect of Investment Property ....................................176
Section 10.06    Remedies ....................................................................................177

### ARTICLE XI
### **GUARANTY**

Section 11.01    Guaranty, Limitation of Liability ................................................179
Section 11.02    Guaranty Absolute......................................................................180
Section 11.03    Waivers and Acknowledgments ..................................................181
Section 11.04    Subrogation.................................................................................182
Section 11.05    Continuing Guaranty; Assignments ............................................183

### ARTICLE XII
### **APPLICATION OF PROCEEDS**

Section 12.01    Application of Proceeds. .............................................................183

US-DOCS\115808185.26

## Exhibits and Schedules

| | |
|---|---|
| Exhibit A | Form of Assignment and Acceptance |
| Exhibit B | Form of Borrowing Base Certificate |
| Exhibit C | Form of Borrowing Request |
| Exhibit D | [Reserved] |
| Exhibit E | Form of Variance Report |
| Exhibit F | Tax Compliance Certificates |
| Exhibit G | Form of Interim Order |
| Exhibit H-1 | Initial 13-Week DIP Budget |
| Exhibit H-2 | Initial Monthly DIP Budget |
| | |
| Schedule A-1 | Authorized Persons |
| Schedule A-2 | Administrative Agent's Account |
| Schedule D-1 | Designated Account |
| Schedule E | Existing Letters of Credit |
| Schedule F | Existing Earn Out Obligations |
| Schedule G | Hudson Notes |
| Schedule 1.01(b) | Immaterial Subsidiaries |
| Schedule 1.01(g) | Subsidiary Loan Parties |
| Schedule 2.01 | Commitments and Lenders |
| Schedule 3.01 | Organization and Good Standing |
| Schedule 3.04 | Governmental Approvals |
| Schedule 3.05(b) | Liabilities/Long-Term Obligations |
| Schedule 3.07(b) | Possession under Leases |
| Schedule 3.08(a) | Subsidiaries |
| Schedule 3.08(c) | Subscriptions |
| Schedule 3.09(a) | Litigation and Commercial Tort Claims |
| Schedule 3.13 | Taxes |
| Schedule 3.15 | Employee Benefit Plans |
| Schedule 3.16 | Environmental Matters |
| Schedule 3.18 | Real Property |
| Schedule 3.21 | Insurance |
| Schedule 3.23 | Material Agreements |
| Schedule 5.17 | Post-Closing Matters |
| Schedule 5.18 | Inventory Locations |
| Schedule 6.01 | Indebtedness |
| Schedule 6.02(a) | Liens |
| Schedule 6.04 | Investments; Intercompany Loans |
| Schedule 6.07 | Transactions with Affiliates |
| Schedule 6.09(c) | Contractual Encumbrances and Restrictions |
| Schedule 9.01(a)(i) | Loan Party Notice Information |
| Schedule 9.01(a)(ii) | Agent Notice Information |

US-DOCS\115808185.26

This **SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION ASSET-BASED REVOLVING CREDIT, GUARANTY AND SECURITY AGREEMENT**, dated as of May 20, 2020, (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "***Agreement***"), is made by and among, CENTRIC BRANDS INC., a Delaware corporation, as a debtor and debtor-in-possession (the "***Borrower***"), the Guarantors (as hereinafter defined) from time to time party hereto, as debtors and debtors-in-possession, the Lenders (as hereinafter defined) from time to time party hereto (including any financial institution party to this Agreement as a "Pre-Petition First Lien Lender"), ACF FINCO I LP as administrative agent (together with any successor administrative agent appointed pursuant hereto, in such capacity, the "***Administrative Agent***") for the Revolving Lenders, and ACF FINCO I LP as collateral agent (together with any successor collateral agent appointed pursuant hereto, in such capacity, the "***Collateral Agent***") for all Lenders and HPS INVESTMENT PARTNERS, LLC, as documentation agent (the "***Documentation Agent***").

WHEREAS, on May 18, 2020 (the "***Petition Date***"), the Loan Parties filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court (the "***Chapter 11 Cases***");

WHEREAS, from and after the Petition Date, the Loan Parties are continuing to operate their business and manage their properties as debtors in possession under <u>Sections</u> 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that the Lenders extend credit in the form of Loans, subject to the terms and conditions set forth herein, at any time and from time to time on and after the Closing Date and prior to the Maturity Date, in an aggregate principal amount at any one time outstanding (when taken together with the face amount of Letters of Credit then outstanding) not to exceed $275,000,000, which amount shall include the amount of "*Revolving Obligations*" under and as defined in the Pre-Petition Credit Agreement "rolled up" pursuant to <u>Section 2.24</u> hereof. The proceeds of the Loans will be used in accordance with <u>Section 3.12</u> hereof; provided that until the Delayed Funding Date, no loans or advances under the Revolving Credit Facility shall be made, other than Loans in an aggregate principal amount or face amount, as applicable, not to exceed the Initial Funding Amount;

WHEREAS, the Borrower, the Persons named therein as loan parties, ARES CAPITAL CORPORATION, as the administrative agent (the "***Pre-Petition First Lien Administrative Agent***"), ACF FINCO I LP, as the revolving agent (the "***Pre-Petition First Lien Revolving Agent***") and as the collateral agent (the "***Pre-Petition First Lien Collateral Agent***") and HPS INVESTMENT PARTNERS, LLC, as documentation agent (the "***Pre-Petition First Lien Documentation Agent***") and the financial institutions party thereto as lenders are parties to that certain First Lien Credit Agreement, dated as of October 29, 2018 (as amended by that certain Amendment No. 1 and Waiver to Credit Agreement, dated as of April 17, 2019, as amended by that certain Amendment No. 2 and Waiver to Credit Agreement, dated as of April 20, 2020, that certain Amendment No. 3 and Waiver to Credit Agreement, dated as of May 11, 2020, and as further amended, restated, supplemented or otherwise modified from time to time, the "***Pre-Petition First Lien Credit Agreement***");

**WHEREAS**, the Borrower and each other Loan Party desire to secure all of the Obligations by granting to the Collateral Agent, for the benefit of the Secured Parties, a security interest in and Lien upon substantially all of the property and assets of the Borrower and the other Loan Parties, subject to the limitations described herein and in the Security Documents and the DIP Orders; and

**WHEREAS**, the Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein and in the DIP Orders.

**NOW, THEREFORE**, in consideration of the above premises and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

ARTICLE I

Definitions

Section 1.01    Defined Terms. As used in this Agreement, the following terms shall have the meanings specified below:

"*ABR*" shall mean, for any day, a fluctuating interest rate *per annum* in effect from time to time, which rate *per annum* shall at all times be equal to the highest of (a) the Federal Funds Rate *plus* 1/2 of 1%, (b) the Prime Rate in effect on such date and (c) the Eurocurrency Base Rate (after giving effect to any Eurocurrency Base Rate "floor") (which rate shall be calculated based on an Interest Period of one month) plus 1.00%. Any change in the ABR due to a change in the Prime Rate, the Federal Funds Rate or the Eurocurrency Base Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate, the Federal Funds Rate or the Eurocurrency Base Rate, respectively.

"*ABR Borrowing*" shall mean a Borrowing comprised of ABR Loans.

"*ABR Loan*" shall mean any Loan bearing interest at a rate determined by reference to the ABR in accordance with the provisions of *Article II*.

"*Accrued Pre-Petition Interest*" means the portion of the Pre-Petition Revolving Obligations constituting accrued and unpaid interest and fees as of the Closing Date.

"*ACF*" shall mean ACF FINCO I LP.

"*Acquisition*" and "*Acquisitions*" shall mean, with respect to any Person, (a) the acquisition by such Person, in a single transaction or in a series of related transactions, of all or substantially all of the property of another Person, or any division, line of business or other business unit of another Person or (b) at least a majority of the voting Equity Interests of another Person, in each case whether or not involving a merger or consolidation with such other Person and whether for cash, property, services, assumption of Indebtedness, securities or otherwise; *provided* that the acquisition of assets and the assumption of liabilities in connection with entering into licensing agreements in the ordinary course of business shall not be deemed an "Acquisition".

US-DOCS\115808185.26

"**_Adjusted Eurocurrency Rate_**" shall mean for any Interest Period with respect to a Eurocurrency Loan, a rate *per annum* equal to the higher of, (a) 1.00% and (b) a rate *per annum* determined by the Administrative Agent pursuant to the following formula:

$$\text{Adjusted Eurocurrency Rate } = \frac{\text{Eurocurrency Base Rate}}{1.00 - \text{Eurocurrency Reserve Percentage}}$$

"**_Administrative Agent_**" shall have the meaning assigned to such term in the _preamble_ hereto.

"**_Administrative Agent's Account_**" shall mean the deposit account of Administrative Agent identified on _Schedule A-2_ (or such other deposit account of Administrative Agent that has been designated as such, in writing, by Administrative Agent to Borrower and the Revolving Lenders).

"**_Administrative Questionnaire_**" shall mean an Administrative Questionnaire in a form supplied by the Administrative Agent and any sub-agents.

"**_Advance Ratio_**" shall mean, with respect to any Securitization Financing, the ratio of upfront cash compensation to deferred payments.

"**_Affiliate_**" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified _provided_, _however_, that, for purposes of the definition of "Excluded Subsidiary", _Section 6.05_, _6.07_, _6.09_ and _9.04_ the term "Affiliate" or "Affiliated Lender" shall also include (i) any person that directly or indirectly owns 10% or more of any class of Equity Interests of the person specified or that is an officer or director of the Person, (ii) GSO, (iii) Blackstone Tactical Opportunities Fund and (iv) any portfolio company of Tengram.

"**_Affiliated Lender_**" shall mean any Affiliate of the Borrower other than the Borrower and its Subsidiaries.

"**_Agent Parties_**" shall have the meaning assigned to such term in _Section 9.19(c)_.

"**_Agents_**" shall mean the collective reference to the Administrative Agent, Collateral Agent and Documentation Agent.

"**_Aggregate Commitment_**" shall mean the aggregate amount of Commitments as such commitment may be (a) reduced from time to time pursuant to _Section 2.08_ and (b) reduced or increased from time to time pursuant to assignments pursuant to _Section 9.04_.

"**_Agreement_**" shall have the meaning assigned to such term in the preamble hereto, as amended from time to time in accordance with the terms hereof.

"**_Agreement Among Lenders_**" shall mean that certain "_Agreement Among Lenders_" as defined in the Pre-Petition First Lien Credit Agreement.

"**_AHYDO Payment_**" shall mean any interest payment, mandatory prepayment or redemption pursuant to the terms of any Indebtedness in an amount that is intended or designed to

US-DOCS\115808185.26

cause such Indebtedness not to be treated as an "applicable high yield discount obligation" within the meaning of Section 163(i) of the Code.

"*Allowed Professional Fees*" shall have the meaning set forth in the DIP Order.

"*Anti-Corruption Laws*" shall mean all laws, rules, and regulations of any jurisdiction applicable to the Borrower or any of its Subsidiaries concerning or relating to bribery or corruption, including, without limitation: (a) the FCPA; (b) the UK Bribery Act 2010; (c) any activity prohibited by any resolution of the U.N. Security Council under Chapter VII of the U.N. Charter or the Organization for Economic Cooperation and Development's Good Practice Guidance on Internal Controls, Ethics, and Compliance; (d) any laws implementing the principles described in the Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, signed in Paris on 17 December 1997, which entered into force on 15 February 1999, and the Convention's Commentaries; and (e) any other applicable anti-corruption or anti-bribery laws.

"*Applicable Margin*" shall mean for any day, (i) 6.50% *per annum* in the case of any Eurocurrency Loan, and 5.50% *per annum* in the case of any ABR Loan, *plus*, (ii) in either case, with respect to any Overadvance Loans, an additional 1.50% *per annum*. The principal amount of Overadvance Loans shall be redetermined on each date that a Borrowing Base Certificate is delivered in accordance with this Agreement and any change in the "Applicable Margin" shall be effective on and after the first Business Day following such delivery. To the extent any Borrowing Base Certificate is not delivered when due, Administrative Agent may redetermine the principal amount of Overadvance Loans in its Permitted Discretion.

"*Applicable Percentage*" shall mean, with respect to any Revolving Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitments represented by such Revolving Lender's Commitment at such time. If the commitment of each Revolving Lender to make Loans and the obligation of the Issuing Bank to issue Letters of Credit and of Revolving Lenders to fund participations in Letters of Credit have been terminated pursuant to *Section 7.01*, or if the Commitments have expired, then the Applicable Percentage of each Revolving Lender in respect of the Loans shall be determined based on the relative amounts of the Revolving Facility Exposures of such Revolving Lender in respect of the total Revolving Facility Exposure most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on *Schedule 2.01* or in the Assignment and Acceptance pursuant to which such Lender becomes a party hereto, as applicable.

"*Approved Fund*" shall have the meaning assigned to such term in *Section 9.04(b)*.

"*Ares*" shall mean Ares Capital Management LLC and/or its managed funds or Affiliates.

"*Asset Sale*" shall mean any loss, damage, destruction or condemnation of, or any sale, assignment, conveyance, exclusive or perpetual license, transfer or other Disposition (including any sale and leaseback of assets and any mortgage, lease or sublease of real property (including by allocation of assets by division or allocation of assets to any series of a limited liability company)) to any person of any asset or assets of any of the Borrower or any Subsidiary.

"***Assignee***" shall have the meaning assigned to such term in *Section 9.04(b)*.

"***Assignment and Acceptance***" shall mean an assignment and acceptance entered into by a Lender and an assignee, and accepted by the Administrative Agent and acknowledged by the Borrower (if required by *Section 9.04*), in substantially the form of *Exhibit A* or such other form as shall be approved by the Administrative Agent.

"***Authorized Person***" shall mean any one of the individuals identified on *Schedule A-1*, as such schedule is updated from time to time by written notice from Borrower to Administrative Agent.

"***Availability***" shall mean, as of any date of determination, the amount that Borrower is entitled to borrow as Loans under *Section 2.01* (after giving effect to the then outstanding Revolving Facility Exposure).

"***Available Unused Commitment***" shall mean, with respect to a Revolving Lender at any time, an amount equal to the amount by which (a) the aggregate amount of the Commitment of such Revolving Lender at such time exceeds (b) the Revolving Facility Exposure of such Revolving Lender at such time.

"***Bail-In Action***" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"***Bail-In Legislation***" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"***Bankruptcy Code***" means the Federal Bankruptcy Reform Act of 1978.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of New York.

"***Beneficial Ownership Certification***" shall mean a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"***Beneficial Ownership Regulation***" shall mean 31 C.F.R. § 1010.230.

"***Benefit Plan***" shall mean any (a) "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, or (b) "plan" as defined in and subject to Section 4975 of the Code.

"***Board***" shall mean the Board of Governors of the Federal Reserve System of the United States of America, or any successor thereto.

"***Board of Directors***" shall mean, as to any Person, the board of directors or managers or other applicable governing body of such Person (or, if such person is a partnership, the board of directors or other governing body of the general partner of such person) or any duly authorized committee thereof.

US-DOCS\115808185.26

"***Borrower***" shall have the meaning assigned to such term in the <u>*preamble*</u> hereto.

"***Borrowing***" shall mean a group of Loans of a single Type and currency and made on a single date to a single Borrower and, in the case of Eurocurrency Loans, as to which a single Interest Period is in effect.

"***Borrowing Base***" shall mean, as of any date of determination, the result of:

(i)      the lesser of (A) the product of 70% multiplied by the value (calculated at the lower of cost or market on a basis consistent with Borrower's historical accounting practices) of Eligible Inventory at such time, and (B) the product of 90% multiplied by the Net Orderly Liquidation Percentage of Eligible Inventory (such determination may be made as to different categories of Eligible Inventory based upon the Net Orderly Liquidation Percentage applicable to such categories) at such time;

<u>plus</u>

(ii)      solely from the period commencing on the Closing Date to and including April 1, 2021, the lesser of (x) $50,000,000 and (y) the product of the percentage set forth in the table below corresponding to such date of determination multiplied by the value (calculated at the lower of cost or market on a basis consistent with Borrower's historical accounting practices) of Eligible Inventory, at such time (this clause (ii), the "***Enhanced Liquidity Line***"):

| Date | Percentage |
|---|---|
| Closing Date through July 31, 2020 | 11% |
| August 1, 2020 through August 31, 2020 | 10% |
| September 1, 2020 through September 30, 2020 | 9% |
| October 1, 2020 through October 31, 2020 | 8% |
| November 1, 2020 through November 30, 2020 | 7% |
| December 1, 2020 through December 31, 2020 | 6% |
| January 1, 2021 through January 31, 2021 | 5% |
| February 1, 2021 through February 28, 2021 | 4% |
| March 1, 2021 through March 31, 2021 | 3% |
| April 1, 2021 and thereafter | 0% |

<u>plus</u>

(iii)      $50,000,000 (this clause (iii), the "***Overadvance Line***");

<u>minus</u>

(iv)      without duplication, the aggregate amount of all Reserves in effect at such time.

"***Borrowing Base Certificate***" shall mean a certificate in the form of <u>*Exhibit B*</u>.

"***Borrowing Minimum***" shall mean $5,000,000.

-6-

"***Borrowing Multiple***" shall mean $1,000,000.

"***Borrowing Request***" shall mean a request by the Borrower in accordance with the terms of *Section 2.04* and substantially in the form of and containing the information prescribed by *Exhibit C* or such other form that is reasonably acceptable to the Administrative Agent and the Borrower.

"***Business Day***" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; *provided*, that when used in connection with a Eurocurrency Loan, the term "*Business Day*" shall also exclude any day on which banks are not open for dealings in deposits in the applicable currency in the London interbank market.

"***Business Plan***" shall mean the business plan prepared and delivered by the Borrower pursuant to Section 2(c)(ii) of that certain (i) Amendment No. 2 and Waiver to the First Lien Credit Agreement and (ii) Amendment No. 2 and Waiver to the Second Lien Credit Agreement, in each case, dated as of April 20, 2020, and as further amended or modified from time to time in form and substance reasonably satisfactory to the Required Lenders.

"***Capital Lease***" shall mean, with respect to any person, any lease of, or other arrangement conveying the right to use, any property by such Person as lessee that are required to be accounted for as a capital lease on a balance sheet of such person prepared in accordance with GAAP.

"***Capitalized Lease Obligations***" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP; *provided* that all obligations of any Person that would be characterized as operating lease obligations in accordance with GAAP without giving effect to Accounting Standards Codification Topic No. 842, *Leases* (whether or not such operating lease obligations were in effect on the Closing Date) shall be accounted for as operating lease obligations (and not as Capitalized Lease Obligations or Indebtedness) for purposes of the Agreement regardless of the effectiveness of Accounting Standards Codification Topic No. 842, *Leases* or any other change in GAAP following the Closing Date that would otherwise require such obligations to be recharacterized (on a prospective or retroactive basis or otherwise) as Capitalized Lease Obligations.

"***Cash Collateralize***" shall mean to pledge and deposit with or deliver to the Collateral Agent, for the benefit of the Administrative Agent or any applicable Issuing Bank and the Lenders, as collateral for unreimbursed L/C Disbursements, or obligations of Lenders to fund participations in respect thereof (as the context may require), cash or deposit account balances in the amount of 101% of the outstanding L/C Exposure with respect thereto, or, if the applicable Issuing Bank benefitting from such collateral shall agree in its sole discretion, other credit support, in each case pursuant to documentation in form and substance satisfactory to (a) the Administrative Agent and (b) the applicable Issuing Bank.

"***Cash Collateral***" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"***Carve Out***" shall have the meaning set forth in the applicable DIP Order.

"***Cash Dominion Event***" shall mean the occurrence of any of the following (a) an Event of Default pursuant to Section 7.01(a) (solely as a result of a breach of the representations and warranties in Section 3.22, or any representation or warranty made in any Borrowing Base Certificate that results in an overstatement of the Borrowing Base by more than two percent (2%) of the value of Eligible Inventory set forth therein), (b) an Event of Default under Section 7.01(b) or 7.01(c) (in each case, with respect to Obligations in respect of the Revolving Credit Facility), (c) an Event of Default under Section 7.01(d) (with respect to a failure to comply with Section 6.05(d), Section 5.21(a) or Section 5.21(c)), (d) an Event of Default under Section 7.01(e) (with respect to a failure to comply with any of Sections 2.06, 5.04(a), 5.04(b), 5.04(c) or 5.04(e)), (e) a failure to comply with Section 6.10(b) or (f) a failure to comply with Section 2.11(b).

"***Cash Dominion Period***" shall mean the period commencing upon the occurrence of a Cash Dominion Event and ending upon the date when the applicable Cash Dominion Event that commenced such Cash Dominion Period is cured or waived.

"***Cash Equivalents***" shall mean:

(a)     U.S. Dollars, Sterling, or Euros or, in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

(b)     securities issued or directly and fully guaranteed or insured by the government of, or any agency or instrumentality thereof, the United States of America or any member state of the European Union, in each case, with maturities not exceeding two years after the date of acquisition;

(c)     in the case of any Foreign Subsidiary, securities issued or directly and fully guaranteed or insured by the government of, or any agency or instrumentality thereof, in each case with maturities not exceeding 365 days after the date of acquisition and held by it from time to time in the ordinary course of business;

(d)     certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances, in each case with maturities not exceeding one year and overnight bank deposits and demand deposits (in their respective local currencies), in each case with any commercial bank having capital and surplus in excess of $500,000,000 or the foreign currency equivalent thereof and whose long-term debt is rated "AA-" or "*Aa3*" or the equivalent thereof by Moody's or S&P, respectively (or, in the case of an obligor domiciled outside of the United States, reasonably equivalent ratings of another internationally recognized credit rating agency);

(e)     repurchase obligations for underlying securities of the types described in _clauses (b)_ and _(c)_ above entered into with any financial institution meeting the qualifications specified in _clause (d)_ above;

(f)     commercial paper issued by a corporation (other than an Affiliated Lender) rated at least "P-1" or "*A-1*" or the equivalent thereof by Moody's or S&P (or, in the case

of an obligor domiciled outside of the United States, reasonably equivalent ratings of another internationally recognized credit rating agency) and in each case maturing within one year after the date of acquisition;

(g)    readily marketable direct obligations issued by any state of the United States of America or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P in each case with maturities not exceeding two years from the date of acquisition;

(h)    Indebtedness issued by persons with a rating of "*A*" or higher from S&P or "*A-2*" or higher from Moody's (or, in the case of an obligor domiciled outside of the United States, reasonably equivalent ratings of another internationally recognized credit rating agency) in each case with maturities not exceeding two years from the date of acquisition; and

(i)    investment funds investing at least 95% of their assets in securities of the types described in *clauses (a)* through *(g)* above.

"***Cash Management Order***" shall mean that certain order the cash management order of the Bankruptcy Court in the Chapter 11 Cases, in form and substance reasonably satisfactory to the Borrower, the Administrative Agent and the Required Lenders.

"***CFC***" shall mean a "controlled foreign corporation" pursuant to Section 957 of the Code.

A "***Change in Control***" shall be deemed to occur if (a) except to the extent arising as a result of the entry into this Agreement or occasioned by the filing of the Chapter 11 Cases, a "change of control" or other similar provision shall occur under or with respect to any Material Indebtedness or (b) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act(but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan)) other than the Permitted Holders, is or becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of more than 35% (on a fully diluted basis) of the issued and outstanding Voting Stock of the Borrower aggregate ordinary voting power of the Borrower. It is understood that, for purposes of this definition, no person shall be deemed to have beneficial ownership of Equity Interests solely by virtue of a stock purchase agreement, merger agreement, or similar agreement (or voting agreement entered into in connection with a stock purchase agreement, merger agreement or similar agreement) until the consummation of the transfer of the applicable Equity Interests to such person.

"***Change in Law***" shall mean the occurrence, after the date of this Agreement or, if later, the date on which the applicable Lender becomes a Lender hereunder, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street

US-DOCS\115808185.26

Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"*Chapter 11 Cases*" shall have the meaning assigned to such term in the *preamble* hereto.

"*Charge*" shall mean any fee, loss, charge, expense, cost, accrual or reserve of any kind (in each case, if applicable, as defined under GAAP).

"*Chief Restructuring Officer*" shall have the meaning set forth in *Section 5.24(a)*.

"*Closing Date*" shall mean May 20, 2020.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"*Collateral*" shall have the meaning set forth in *Section 10.01* and shall include all other property that is or is intended to be subject to any Lien in favor of the Collateral Agent for the benefit of the Lenders but in all cases excluding any Excluded Assets.

"*Collateral Agent*" shall have the meaning assigned to such term in the *preamble* hereto.

"*Collateral and Guarantee Requirement*" shall mean, at any time, subject to (x) the applicable limitations set forth in this Agreement, the DIP Orders and any other Loan Document and (y) the time periods (and extensions thereof) set forth in *Section 5.11*, the requirement that:

(a)     the Obligations shall have be secured by a perfected security interest with the priority required by the Security Documents (subject in all respects to the Carve Out and the DIP Orders) through the provisions of the Interim Order and the Final Order, as applicable, in the Collateral to the extent such security interest may be perfected by virtue of the DIP Order or by filings of Uniform Commercial Code financing statements or any other method of perfection referred to in this definition;

(b)     [reserved];

(c)     other than with respect to Excluded Assets, (i) all Indebtedness of the Borrower and each Subsidiary (other than any Indebtedness in an initial aggregate principal amount not exceeding $5,000,000 that is owing to any Loan Party shall be evidenced by a promissory note, a master intercompany note or an instrument in form reasonably satisfactory to the Administrative Agent and shall have been pledged pursuant to the DIP Order and this Agreement (or other applicable Security Document), and (ii) the Collateral Agent (or a bailee for the Collateral Agent pursuant to the First Lien Pari Passu Intercreditor Agreement or the DIP Orders) shall have received all such promissory notes or instruments, together with note powers or other instruments of transfer with respect thereto endorsed in blank (other than with respect to any such intercompany debt the perfection of the pledge of which is not achieved by delivery to the Collateral Agent);

-10-

(d)      other than with respect to Excluded Assets and except as otherwise contemplated by any Security Document or elsewhere in this definition of Collateral and Guarantee Requirement (including with regard to deposit accounts), all documents and instruments, (including, in the United States of America, filings of Uniform Commercial Code financing statements and filings with the United States Copyright Office and the United States Patent and Trademark Office) reasonably requested by the Lenders, as applicable to be filed, registered or recorded to create the Liens intended to be created by the Security Documents (in each case, including any supplements thereto) and perfect such Liens to the extent required by, and with the priority required by, the Security Documents shall have been filed, registered or recorded or delivered to the Administrative Agent or Collateral Agent, as requested, for filing, registration or the recording or taken concurrently with, or promptly following, the execution and delivery of each such Security Document;

(e)      except as set forth in the DIP Order, herein or pursuant to any other Security Document, each Loan Party shall have obtained all consents and approvals required to be obtained by it in connection with (i) the execution and delivery of this Agreement and all other Security Documents (or supplements thereto) to which it is a party and the granting by it of the Liens hereunder or thereunder and (ii) the performance of its obligations thereunder; and

(f)      subject to *Section 5.11(g)*, in the case of any person that (i) becomes a Loan Party after the Closing Date, the Administrative Agent shall have received from such Loan Party, (A) a supplement or joinder to this Agreement, in form and substance reasonably satisfactory to the Collateral Agent and the Administrative Agent, duly executed and delivered on behalf of such person, (B) such other Security Documents as may be required to be delivered pursuant to *Section 5.11*, and (C) evidence that any other requirements of *Section 5.11* shall have been complied with and (ii) becomes such a Subsidiary Loan Party, the Administrative Agent shall have received from the parent of such Subsidiary Loan Party, supplements to the applicable Security Documents pursuant to which it shall have pledged the Equity Interests in the other Subsidiaries owned by it (other than Excluded Equity Interests), or other Security Documents, effecting the pledge of such Equity Interests in favor of the Collateral Agent, subject to the same exceptions and limitations as set forth in *paragraph (a)* above.

The foregoing definition shall not require the creation or perfection of pledges of or security interests in particular assets if and for so long as the Collateral Agent (at the direction of the Required Lenders) and the Borrower reasonably agree in writing (which may be in the form of electronic mail) that the cost of creating or perfecting such pledges or security interests in such assets shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, (a) with respect to leases of real property entered into by any Loan Party, such Loan Party shall not be required to take any action with respect to creation or perfection of security interests with respect to such leases, (b) Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in the Security Documents and the DIP Orders and, to the extent appropriate in the applicable jurisdiction, as agreed between the Collateral Agent (at the direction of the Required Lenders) and the Borrower, (c) the Collateral shall not include any Excluded Assets, (d) share certificates of Immaterial Subsidiaries and any other person that is only minority

-11-

owned by the Loan Parties shall not be required to be delivered, (e) no perfection actions shall be required with respect to (i) motor vehicles and other assets and personal property subject to certificates of title except to the extent perfection is accomplished by the filing of a UCC financing statement or equivalent under applicable Law and letter of credit rights, except to the extent constituting a supporting obligation for other Collateral as to which perfection is accomplished by the filing of a UCC financing statement or equivalent under applicable Law (it being understood that no actions shall be required to perfect a security interest in assets subject to certificates of title or letter of credit rights, other than the filing of a UCC financing statement or equivalent under applicable Law) and (ii) commercial tort claims with an individual value of less than $5,000,000 and (f) no actions in any non-U.S. jurisdiction or required by the Laws of any non-U.S. jurisdiction shall be required to be taken to create any security interests in assets located or titled outside of the U.S. or to perfect or make enforceable any security interests in any assets (it being understood that there shall be no Security Document (or other security agreements or pledge agreements) or other perfection instruments governed under the laws of any non U.S. jurisdiction).

"***Commitment Fee***" shall have the meaning assigned to such term in *Section 2.12(a)*.

"***Commitments***" shall mean, with respect to any Revolving Lender, such Lender's commitment to make Loans pursuant to *Section 2.01*, expressed as an amount representing the maximum aggregate permitted amount of such Lender's Revolving Facility Exposure hereunder, as such commitment may be (a) reduced from time to time pursuant to *Section 2.08*, and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to *Section 9.04*. The amount of each Lender's Commitment is set forth on *Schedule 2.01*, or in the Assignment and Acceptance pursuant to which such Lender shall have assumed its Commitment, as applicable. As of the Closing Date, the aggregate amount of Commitments is $275,000,000, of which (x) $111,055,245.21 constitutes "New Money Commitments" as set forth on Schedule 2.01 and (y) $163,944,754.79 constitutes "Rolled-Up Commitments" as set forth on Schedule 2.01.

"***Communications***" shall have the meaning assigned to such term in *Section 9.19(a)*.

"***Compliance Certificate***" shall have the meaning assigned to such term in *Section 5.04(e)*.

"***Connection Income Taxes***" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"***Consolidated Total Assets***" shall mean, as of any date, the total assets of the Borrower and the Subsidiaries, determined on a consolidated basis in accordance with GAAP, as set forth on the consolidated balance sheet of the Borrower as of the last day of the fiscal quarter most recently ended and Reported.

"***Consummation Date***" means the date of the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date of the Acceptable Plan) of a Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court.

"***Contractual Obligation***" shall mean, with respect to any person, any provision of any security issued by such person or of any agreement, instrument or other undertaking to which such person is a party or by which it or any of its Property is bound.

"***Control***" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and "***Controlling***" and "***Controlled***" shall have meanings correlative thereto.

"***Control Agreement***" shall mean, with respect to any deposit account, any securities account, commodity account, securities entitlement or commodity contract, an agreement, in form and substance reasonably satisfactory to the Collateral Agent, among the Collateral Agent, the financial institution or other person at which such account is maintained or with which such entitlement or contract is carried and the Loan Party maintaining such account, effective to grant "control" (as defined under the applicable UCC) over such account to the Collateral Agent (or a bailee for the Collateral Agent pursuant to the First Lien Pari Passu Intercreditor Agreement and in the DIP Orders); it being understood that unless specifically specified in this Agreement, any reference to a Control Agreement shall mean a Control Agreement subject to springing dominion pursuant to which the applicable Loan Party shall maintain control unless and until the notice of spring control has been given by the Collateral Agent to the financial institution or other person at which such account is maintained or with which such entitlement or contract is carried.

"***Copyright Licenses***" shall mean all written agreements, licenses and covenants providing for the grant to or from a Loan Party of any right in or to any Copyright or otherwise providing for a covenant not to sue for infringement or other violation of any Copyright.

"***Copyrights***" shall mean, with respect to any Loan Party, all of such Loan Party's right, title and interest in and to all works of authorship and all intellectual property rights therein, all United States and foreign copyrights (whether or not the underlying works of authorship have been published), including but not limited to copyrights in software and databases, all designs (including but not limited to all industrial designs, "Protected Designs" within the meaning of 17 U.S.C. 1301 et. Seq. and Community designs), and all "Mask Works" (as defined in 17 U.S.C. 901 of the U.S. Copyright Act), whether registered or unregistered, and with respect to any and all of the foregoing: (i) all registrations and applications for registration thereof, (ii) all extensions, renewals, and restorations thereof, (iii) all rights to sue or otherwise recover for any past, present and future infringement or other violation thereof, (iv) all proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages and proceeds of suit now or hereafter due and/or payable with respect thereto, and (v) all other rights of any kind accruing thereunder or pertaining thereto throughout the world.

"***Credit Bid Transaction***" shall have the meaning assigned to such term in *Section 9.27*.

"***Credit Event***" shall have the meaning assigned to such term in *Article IV*.

"***Credit Extension***" shall mean the making of a Loan.

-13-

"*Credit Servicers*" and "*Credit Servicer*" shall mean each of the Initial CIT Servicers and each other person designed by the Borrower as a "*Credit Servicer*" pursuant to a Permitted Credit Support Arrangement from time to time.

"*Credit Support Assets*" shall mean (a) the Receivables and other Collateral (as defined in the Permitted CIT Agreements as of the date hereof) pledged or sold pursuant to the terms of the Permitted CIT Agreements and (b) in respect of any other Permitted Credit Support Arrangement, the accounts receivable and supporting obligations and proceeds in respect thereof and other ancillary property and rights related to such accounts receivable pledged or sold pursuant to the terms of such Permitted Credit Support Arrangement.

"*Customary Intercreditor Agreement*" shall mean (a) to the extent executed in connection with the incurrence of secured Indebtedness incurred by a Loan Party, the Liens on the Collateral securing which are intended to rank equal in priority to the Liens on the Collateral securing the Obligations, at the option of the Borrower and the Administrative Agent acting together in good faith, a customary intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank equal in priority to the Liens on the Collateral securing the Obligations, (b) to the extent executed in connection with the incurrence of secured Indebtedness incurred by a Loan Party, the Liens on the Collateral securing which are intended to rank junior in priority to the Liens on the Collateral securing the Obligations, at the option of the Borrower and the Administrative Agent acting together in good faith, a customary intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent, the Required Lenders and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior in priority to the Liens on the Collateral securing the Obligations, and (c) to the extent executed in connection with the incurrence of secured Indebtedness incurred by a Loan Party, the Liens on the Collateral securing which are intended to be split in priority to the Liens on the Collateral securing the Obligations, at the option of the Borrower and the Administrative Agent acting together in good faith, a customary intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall be split in priority to the Liens on the Collateral securing the Obligations.

"*Debtor Relief Laws*" shall mean Title 11 of the United States Code entitled "Bankruptcy" as now and hereafter in effect, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States of America or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"*Default*" shall mean any event or condition that upon notice, lapse of time or both would constitute an Event of Default.

"*Defaulting Lender*" shall mean, subject to *Section 2.23(b)*, any Lender that, as determined by the Required Lenders, (a) has failed to perform any of its funding obligations hereunder, including in respect of its Loans or participations in respect of Letters of Credit, Extraordinary Advances, within three Business Days of the date required to be funded by it hereunder, (b) has notified the Borrower or the Administrative Agent that it does not intend to comply with its funding

-14-

obligations or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by the Administrative Agent or the Borrower to confirm in a manner satisfactory to the Administrative Agent and the Borrower that it will comply with its funding obligations, or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar person charged with reorganization or liquidation of its business or a custodian appointed for it, or (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority.

"***Defaulting Lender Rate***" shall mean (a) for the first 3 days from and after the date the relevant payment is due, the Prime Rate, and (b) thereafter, the interest rate then applicable to Loans as if the Prime Rate were applicable thereto.

"***Delayed Funding Date***" shall mean the later of (i) the date on which the Final Order shall have been entered by the Bankruptcy Court and (ii) the date on which the $160,000,000 of loans under the Second Lien DIP Term Loan Credit Agreement shall have been fully drawn and funded to the Borrower.

"***Designated Account***" shall mean the deposit account of Borrower identified on *Schedule D-1* (as such schedule may be updated in writing by Borrower to Agent) or such other account of the Borrower as set forth in a Borrowing Request.

"***DIP ABL Replacement Facility***" shall mean an asset based credit facility entered into after the Closing Date by and among the Loan Parties, the lenders and administrative agents and collateral agents party thereto, which facility (i) shall provide for advances solely against the accounts receivable of the Loan Parties, (ii) shall provide for commitments in an amount not to exceed the amount of commitments under the PNC Securitization that have been, or simultaneously with the incurrence of such facility will be, permanently terminated or reduced since the Closing Date, (iii) shall be subject to intercreditor arrangements reasonably satisfactory to the Required Lenders, (iv) shall be on terms reasonably satisfactory to the Required Lenders, (v) shall be subject to a borrowing base (including advance rates) no less favorable in all material respects to the Secured Parties, and other terms (taken as a whole) no less favorable to the Borrower and its Subsidiaries in all material respects, in each case other than (x) those contained in the facility refinanced or replaced by such DIP ABL Replacement Facility or (y) those that apply after the Maturity Date or also apply to the Revolving Credit Facility via and amendment to this Agreement, (vi) shall have a maturity date no shorter than that with respect to the Loans, (vii) shall be secured only by Collateral, (viii) shall have been first offered to Ares, ACF and HPS on a pro rata basis before being offered to any other Person and (ix) may not be provided by GSO or any of its Affiliates.

"***DIP Budget***" means, collectively, (a) the 13-week operating budget of the Loan Parties attached as Exhibit H-1 hereto (the "***Initial 13-Week DIP Budget***") detailing the Loan Parties' anticipated weekly cash receipts and disbursements (including a line item for Allowed Professional

-15-

Fees) and anticipated weekly cash flow projections, on a consolidated basis for the Loan Parties, together with a written set of assumptions supporting such projections, for the thirteen week period commencing with the week that the Petition Date occurs in form and substance satisfactory to the Required Lenders in their sole discretion (provided that it is understood that the budgets attached as Exhibit H-1 and H-2 to this Agreement are satisfactory to the Required Lenders) and (b) the most recent supplement to the Initial DIP Budget and supplement to such forecast, and all intervening supplements to such forecast, delivered in accordance with *Section 5.04(o)* as approved by the Required Lenders in sole reasonable discretion; <u>provided</u>, that no such supplements to such forecast under clause (b) above shall become the DIP Budget unless the Required Lenders in their sole discretion approve such supplement to such forecast becoming the DIP Budget (and to the extent that such supplement to such forecast is not approved, the DIP Budget that is then in effect shall continue to constitute the DIP Budget for all purposes of this Agreement); provided, <u>further</u>, that during a Monthly Budget Testing Period, the DIP Budget shall be the monthly operating budget of the Loan Parties attached as <u>Exhibit H-2</u> hereto (the "***Initial Monthly DIP Budget***" and, together with the Initial 13-Week DIP Budget, the "***Initial DIP Budget***") detailing the Loan Parties' anticipated monthly cash receipts and disbursements (including a line item for Allowed Professional Fees) and anticipated monthly cash flow projections, on a consolidated basis for the Loan Parties, together with a written set of assumptions supporting such projections for the period commencing with the week that the Petition Date occurs and ending on December 31, 2020.

"***DIP Order***" shall mean the Interim Order or the Final Order, as applicable, based on which such order is then in effect.

"***Disposition***" or "***Dispose***" shall mean the sale, lease, sublease, transfer, swap or other disposition of any property of any person (including by allocation of assets by division or allocation of assets to any series of a limited liability company).

"***Disqualified Stock***" shall mean, with respect to any person, any Equity Interests of such person that, by their terms (or by the terms of any security into which such Equity Interests are convertible or for which such Equity Interests are redeemable or exchangeable), or upon the happening of any event, (i) mature or are mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (other than as a result of a change of control or asset sale), (ii) are convertible or exchangeable other than at the option of the issuer thereof for Indebtedness or Disqualified Stock or (iii) are redeemable at the option of the holder thereof (other than upon the occurrence of a Change in Control (or similar event), sale or Disposition of all or substantially all of the assets of the Borrower and its Subsidiaries, or the acceleration of the Loans, subject, in each case, to the prior Payment In Full), in whole or in part, in each case prior to 91 days after the Maturity Date; <u>provided</u>, <u>however</u>, that only the portion of the Equity Interests that so mature or are mandatorily redeemable, are so convertible or exchangeable or are so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; <u>provided</u>, <u>further</u>, that if such Equity Interests are issued to any employee or to any plan for the benefit of employees of the Borrower or the Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Stock solely because they may be required to be repurchased by the Borrower in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; <u>provided</u>, <u>further</u>, that any class of Equity Interests of

-16-

such person that by its terms authorizes such person to satisfy its obligations thereunder by delivery of Equity Interests that are not Disqualified Stock shall not be deemed to be Disqualified Stock.

"***Dividends***" shall have the meaning assigned to such term in <u>*Section 6.06*</u>.

"***Documentation Agent***" shall mean the documentation agent identified in the cover page.

"***Dollar***," "***U.S.$***" and "***$***" shall mean lawful money of the United States of America.

"***Domestic Subsidiary***" shall mean any Subsidiary that is not a Foreign Subsidiary.

"***Drawing Document***" shall mean any Letter of Credit or other document presented for purposes of drawing under any Letter of Credit.

"***EEA Financial Institution***" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in <u>*clause (a)*</u> of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in <u>*clauses (a)*</u> or <u>*(b)*</u> of this definition and is subject to consolidated supervision with its parent;

"***EEA Member Country***" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"***EEA Resolution Authority***" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"***Eligible Assignee***" shall mean (a) any Lender, (b) any commercial bank, insurance company, or finance company, financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), (c) any Affiliate of any Lender, (d) any Approved Fund of any Lender, (e) Ares, (f) ACF and (g) HPS; provided that in any event, "Eligible Assignee" shall not include (i) any natural person, (ii) the Borrower or any of its Affiliates or (iii) any Affiliated Lender.

"***Eligible Inventory***" shall mean Inventory consisting of first quality finished goods held for sale in the ordinary course of the Loan Parties' business as conducted on the Closing Date, that complies with each of the representations and warranties respecting Eligible Inventory made in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; *provided*, *however*, that such criteria may be revised from time to time by Administrative Agent in Administrative Agent's Permitted Discretion, including to address the results of any audit or appraisal performed by Administrative Agent from time to time after the Closing Date. An item of Inventory shall not be included in Eligible Inventory of a Loan Party if:

(a)    the Loan Parties does not have good, valid, and marketable title thereto,

(b)    the Loan Parties does not have actual and exclusive possession thereof (either directly or through a bailee or agent of such Loan Party),

-17-

(c)      it is not located (x) at one of the locations in the continental United States or Canada (excluding Quebec) set forth on *Schedule 5.18* (or in-transit from one such location to another such location), or (y) at, or in transit to, any retail store of a Loan Party located within the continental United States and Canada (excluding Quebec),

(d)      it is In-Transit Inventory;

(e)      it is located on real property leased by a Loan Party or in a contract warehouse, in each case, unless Administrative Agent has established a Landlord Reserve with respect to such location, as the case may be, and unless it is segregated or otherwise separately identifiable from goods of others, if any, stored on the premises,

(f)      it is the subject of a bill of lading or other document of title,

(g)      it is not subject to a valid and perfected first priority lien in favor of the Collateral Agent,

(h)      it consists of goods returned or rejected by a customer of the Loan Parties as a result of being defective or unmerchantable,

(i)      it consists of goods that are obsolete, restrictive or custom items, work-in-process, raw materials, or goods that constitute spare parts, packaging supplies, labels and shipping materials, maintenance items, supplies used or consumed in the Loan Parties' business, bill and hold goods, defective goods, "seconds" or Inventory on consignment,

(j)      it shall have been in the Loan Parties' possession or control for a period of 365-days or longer; *provided*, that Inventory (other than Inventory that has been assigned a "replenishment" code by the Loan Parties) that has been in the Loan Parties possession for greater than 180-days shall not be Eligible Inventory unless the Net Orderly Liquidation Percentage in respect thereof has been included in an appraisal satisfactory to Collateral Agent in its Permitted Discretion;

(k)      it is subject to a claim, lien or security interest (other than a Permitted Lien);

(l)      it is produced in violation of the Fair Labor Standards Act and subject to the "hot goods" provisions contained in Title 29 U.S.C. §215;

(m)      it is not salable in the United States or is manufactured specifically for a non-U.S. customer;

(n)      if it is represented or covered by any Certificate Of Title, Instrument, Document or Chattel Paper (each as defined in the NYUCC), or a Loan Party is not the sole owner of each such Certificate Of Title, Instrument, Document or Chattel Paper (in the possession of such Loan Party), or it has been sold, assigned or otherwise transferred, and or it is subject to any claim, lien or security interest;

(o)      it exhibits, includes or is identified by any trademark, tradename or other Intellectual Property right which trademark, tradename or other Intellectual Property right

-18-

(i) is subject to a restriction that could reasonably be expected to adversely affect the Collateral Agent's ability to liquidate such Inventory or (ii) the relevant Loan Party does not have the right to use in connection with the sale of such Inventory, either through direct ownership or through a written license or sublicense; or

(p)      Administrative Agent shall have determined in its Permitted Discretion that it is unacceptable due to age, type, category, quality and/or quantity.

"*EMU Legislation*" shall mean the legislative measures of the European Union for the introduction of, changeover to or operation of the euro in one or more member states.

"*Enhanced Liquidity Line*" has the meaning set forth in the definition of Borrowing Base.

"*environment*" shall mean ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources such as flora and fauna, the workplace or as otherwise defined in any Environmental Law.

"*Environmental Laws*" shall mean all applicable laws (including common law), rules, regulations, codes, ordinances, orders, decrees, directives, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by or with any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the generation, management, Release or threatened Release of, or exposure to, any Hazardous Material or to health and safety matters (to the extent relating to the environment or Hazardous Materials).

"*Equity Interests*" of any person shall mean any and all shares, interests, membership interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however designated) equity or ownership of such person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder.

"*ERISA Affiliate*" shall mean any trade or business (whether or not incorporated) that, together with the Borrower or a Subsidiary, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 or 303 of ERISA or Section 412 or 430 of the Code, is treated as a single employer under Section 414 of the Code.

"*ERISA Event*" shall mean (a) any Reportable Event; (b) the failure to meet the minimum funding standard of Sections 412 or 430 of the Code or Sections 302 or 303 of ERISA with respect to any Plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the failure to make by its due date a required contribution under Section 412(m) of the Code with respect to any Plan; (e) the failure to make any required contribution to a Multiemployer Plan; (f) the incurrence by the Borrower, a Subsidiary or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any

-19-

Plan; (g) the receipt by the Borrower, a Subsidiary or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention, or the institution by the PBGC of proceedings, to terminate any Plan or to appoint a trustee to administer any Plan; (h) the incurrence by the Borrower, a Subsidiary or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (i) the receipt by the Borrower, a Subsidiary or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower, a Subsidiary or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, (I) in "critical" or "endangered" status under Section 432 of the Code or Section 305 of ERISA, (II) in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA) or (III) insolvent within the meaning of Title IV of ERISA.

"*EU Bail-In Legislation Schedule*" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"*euro*" or "*€*" shall mean the currency constituted by the Treaty on the European Union and as referred to in the EMU Legislation.

"*Eurocurrency Base Rate*" shall mean, for such Interest Period, the rate *per annum* equal to the ICE Benchmark Administration LIBOR Rate ("*LIBOR*"), as published by Reuters (or other commercially available source providing quotations of LIBOR as designated by the Administrative Agent from time to time) at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period, for U.S. Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period (such rate the, "*LIBO Screen Rate*"). If the LIBO Screen Rate is not available at such time for any reason for such Interest Period (an "*Impacted Interest Period*"), then the "Eurocurrency Base Rate" for such Interest Period shall be the Interpolated Rate. If such Interpolated Rate is unavailable at such time for any reason, then LIBOR for such Interest Period shall be the rate per annum determined by Administrative Agent to be the rate per annum equal to the offered quotation rate for first class banks in the London interbank market for deposits (for delivery on the first day of the relevant period) in Dollars of amounts in same day funds comparable to the principal amount of the applicable Eurocurrency Loan of 3 major London banks for which LIBOR is then being determined with maturities comparable to such Interest Period as of approximately 11:00 a.m. London time, two (2) Business Days prior to the commencement of such Interest Period, which determination shall be conclusive absent manifest error. Notwithstanding the foregoing, if the Eurocurrency Base Rate determined based on the foregoing is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"*Eurocurrency Borrowing*" shall mean a Borrowing comprised of Eurocurrency Loans.

"*Eurocurrency Loan*" shall mean any Loan bearing interest at a rate determined by reference to the Adjusted Eurocurrency Rate in accordance with the provisions of *Article II*.

"*Eurocurrency Reserve Percentage*" shall mean, for any day during any Interest Period, the reserve percentage (expressed as a decimal, carried out to five decimal places) in effect on such day, whether or not applicable to any Lender, under regulations issued from time to time by the

-20-

Board for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to Eurocurrency funding (currently referred to as "Eurocurrency Liabilities"). The Adjusted Eurocurrency Rate for each outstanding Eurocurrency Loan shall be adjusted automatically as of the effective date of any change in the Eurocurrency Reserve Percentage.

"*Event of Default*" shall have the meaning assigned to such term in <u>Section 7.01</u>.

"*Exchange Act*" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Excluded Accounts*" shall mean (a) deposit accounts, securities accounts, or commodity accounts (each as defined in the Uniform Commercial Code) which in the aggregate contain less than $5,000,000 at any one time, including the market value of any securities, commodities, contracts or other assets therein, (b) any other deposit account, securities account or commodity account that is or used exclusively as a (i) payroll, healthcare or other employee wage benefits account, (ii) withholding tax account (including sales tax account), (iii) escrow or permitted defeasance and redemption account, (iv) fiduciary or trust account, together with the funds or other property held in or maintained in any such account (including, without limitation) any fiduciary accounts required to be maintained by any regulatory or quasi-regulatory body) or (v) zero balance account and (c) deposit accounts, securities accounts, or commodity accounts maintained in the ordinary course of business with depositary banks outside the United States.

"*Excluded Assets*" shall mean:

(i)      all leasehold interests (other than the Headquarters);

(ii)     all fee-owned real property with a fair market value of less than $5,000,000;

(iii)    except to the extent a security interest therein can be perfected by the filing of UCC financing statements, motor vehicles and other assets subject to certificates of title;

(iv)    letter of credit rights less than $5,000,000 (individually) (except to the extent a security interest therein can be perfected by the filing of UCC financing statements);

(v)     commercial tort claims below $5,000,000 (individually);

(vi)    Excluded Equity Interests;

(vii)   a security interest to the extent the Borrower and the Required Lenders reasonably determine that the burden or cost of perfecting such security interest outweighs the benefit of such security to the Lenders;

(viii)  any intent to use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application or any registration issuing therefrom under applicable Federal Law;

-21-

(ix)    Margin Stock;

(x)    any non-US assets or assets of the Borrower and its Subsidiaries that require action under the Law of any non-US jurisdiction to create or perfect a security interest in such assets, including any Intellectual Property in any non-US jurisdiction (and no security agreements or pledge agreements governed under the Laws of any non-US jurisdiction shall be required in respect of such assets);

(xi)    (1) property subject to a purchase money security agreement, Capital Lease or similar arrangement to the extent the granting of a security interest therein is prohibited thereby or otherwise requires consent, unless such consent is obtained, and/or (2) any lease, license, contract, instrument or other agreements or any property (including personal property) subject to a purchase money security interest, Capitalized Lease Obligation or similar arrangements, in each case to the extent permitted under the Loan Documents, to the extent that a pledge thereof or a security interest therein would violate or invalidate such lease, license, contract, instrument or agreement, purchase money, Capitalized Lease or similar arrangement, or create a right of termination or acceleration of payment or performance obligations in favor of any other party thereto (other than the Borrower or a Guarantor) after giving effect to the applicable anti-assignment clauses of the Uniform Commercial Code and other applicable Laws, other than the proceeds and accounts receivables thereof the assignment of which is expressly deemed effective under the Uniform Commercial Code and other applicable Laws notwithstanding such prohibition;

(xii)    any Governmental licenses, permits, franchises, charters, authorizations and other regulated assets, to the extent the grant of such security interest (1) is prohibited or restricted thereby, (2) requires prior notice to any regulatory authority which has not been made (or any required waiting period associated therewith has not expired) or (3) requires the consent, approval, license or authorization of any regulatory authority which has not been received, in each case, after giving effect to the applicable anti-assignment provisions of the UCC or other applicable Law;

(xiii)    any Securitization Assets (solely to the extent subject to a non-recourse Qualified Securitization Financing made to a Securitization Subsidiary transferred in accordance with *Section 6.05* hereof);

(xiv)    any asset or personal property held directly or indirectly by an Excluded Foreign Subsidiary;

(xv)    assets and personal property to the extent a security interest in such assets or personal property would result in material adverse tax consequences to the Borrower or any Subsidiary as reasonably determined by the Borrower and the Required Lenders; and

(xvi)    Excluded Accounts, except, in the case of the Excluded Accounts described in *clauses (a)*, *(b)(v)* and *(c)* of the definition of "*Excluded Accounts*", to the extent a security interest therein can be perfected by the filing of UCC financing statements.

"***Excluded Equity Interests***" shall mean:

(a)       any Equity Interests with respect to which, in the reasonable judgment of the Required Lenders and the Borrower, the cost of pledging such Equity Interests shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom,

(b)       Voting Stock in excess of 65% of the issued and outstanding Voting Stock of any first tier subsidiary that is an Excluded Foreign Subsidiary (provided, that any, first-tier foreign subsidiary that is a disregarded entity for tax purposes shall be deemed to be a Domestic Subsidiary for purposes of this clause (b)),

(c)       any Equity Interests in any Subsidiary to the extent, and for so long as, the pledge thereof would be prohibited by any applicable Law (including any legally effective requirement to obtain the consent of any Governmental Authority unless such consent has been obtained),

(d)       any Equity Interests of any Subsidiary (other than as described in *clause (b)*) to the extent that the pledge of such Equity Interests would result in material adverse tax consequences to the Borrower or any Subsidiary as reasonably determined by the Borrower and the Required Lenders; and

(e)       any Equity Interests issued by any entity other than a Wholly Owned Subsidiary (other than any Domestic Subsidiary that becomes a non-Wholly Owned Subsidiary after the Closing Date as a result of (i) the disposition or issuance of Equity Interests of such Domestic Subsidiary in either case to a Person that is not an unaffiliated third party, (ii) any transaction entered into in contemplation hereof or primarily in contemplation of such Domestic Subsidiary's ceasing to constitute a Subsidiary Guarantor or (iii) the disposition or issuance of Equity Interests of such Domestic Subsidiary for less than the fair market value of such shares as reasonably determined by the Borrower) to the extent prohibited by the Organizational Documents or other Contractual Obligation applicable to such person requiring third party consent (other than the consent of Borrower or any of its Subsidiaries).

"***Excluded Foreign Subsidiary***" shall mean (i) any Foreign Subsidiary that is a CFC and (ii) any Subsidiary that has no material assets other than Equity Interests of, or Equity Interests and indebtedness of, one or more CFCs.

"***Excluded Subsidiary***" shall mean (with the exception of any Subsidiary that owns any material Intellectual Property that is used in the business of any of the Loan Parties or any Subsidiary that is party to any Material License Agreement):

(a)       any Subsidiary that is not a Wholly Owned Subsidiary on any date such Subsidiary would otherwise be required to become a Guarantor pursuant to the requirements of *Section 5.11* (for so long as such Subsidiary remains a non-Wholly Owned Subsidiary); provided that any Domestic Subsidiary that becomes a non-Wholly Owned Subsidiary after the Closing Date, as a result of (i) any disposition or issuance of Equity Interests of such Domestic Subsidiary in either case to a Person that is an Affiliate of such Person, (ii) any transaction entered into primarily in contemplation of such Domestic Subsidiary's ceasing to constitute a Subsidiary Loan Party or (iii) any disposition or

-23-

issuance of Equity Interests of such Domestic Subsidiary for less than the fair market value of such Equity Interests (as reasonably determined by the Borrower), shall not, in any case, be an Excluded Subsidiary solely by virtue of this *clause (a)*,

(b)    any Subsidiary that is prohibited by (x) subject to *clause (g)* below, applicable Law or (y) Contractual Obligation from guaranteeing or securing the Obligations (and for so long as such restriction is in effect); *provided* that in the case of *clause (y)*, such Contractual Obligation existed on the Closing Date or, with respect to any Subsidiary acquired by the Borrower or a Subsidiary after the Closing Date (and so long as such Contractual Obligation was not incurred in contemplation of such acquisition), on the date such Subsidiary is so acquired,

(c)    (i) any direct or indirect Foreign Subsidiary, (ii) any Subsidiary that is described in *clause (ii)* of the defined term "Excluded Foreign Subsidiary", (iii) any direct or indirect Subsidiary of an Excluded Foreign Subsidiary, or (iv) any other Subsidiary for which the provision of a Guarantee or granting a security interest in respect of such Subsidiary would result in a material adverse tax consequence to Borrower or one of its Subsidiaries (as reasonably determined by the Borrower in consultation with the Required Lenders),

(d)    any Immaterial Subsidiary for so long as such Subsidiary remains an Immaterial Subsidiary,

(e)    any other Subsidiary with respect to which, in the reasonable judgment of the Required Lenders and the Borrower, the cost of providing a Guarantee or granting a security interest shall be excessive in view of the benefits to be obtained by the Lenders therefrom,

(f)    any Subsidiary that would require any consent, approval, license or authorization from any Governmental Authority to provide a Guarantee or grant a security interests unless such consent, approval, license or authorization has been received, or is received after commercially reasonable efforts by the Borrower and/or such Subsidiary to obtain the same, and

(g)    any captive insurance Subsidiaries, any special purpose factoring entities or any special purpose securitization vehicle or any Securitization Subsidiary (in each case, solely to the extent subject to a Qualified Securitization Financing or a Permitted Credit Support Arrangement), any broker-dealer subsidiaries, bank or trust company subsidiaries or a not-for-profit Subsidiary.

"*Excluded Taxes*" shall mean, with respect to any Recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, the following Taxes:

(a)    Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes,

(b)    in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under *Section 2.19(b)*) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to *Section 2.17*, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office,

(c)    Taxes attributable to such Recipient's failure to comply with *Section 2.17(g)* and

(d)    any withholding Taxes imposed under FATCA.

"*Exit Facility*" shall mean the commitments and deemed extensions of credit under the credit facility or credit facilities referred to in *Section 2.25*.

"*Exit Facility Documentation*" shall mean the definitive documentation for the Exit Facility, including any loan agreement, collateral agreements, mortgages and other security agreements, and other related documents and instruments.

"*Existing Earn Out Obligations*" shall mean those earn out obligations existing on the Closing Date and described on *Schedule F*.

"*Existing Letters of Credit*" shall mean each existing letter issued under the Pre-Petition First Lien Credit Agreement and described on *Schedule E*.

"*Extraordinary Advance*" shall have the meaning as assigned in *Section 2.04(c)(iii)*.

"*fair market value*" shall mean, with respect to any asset or property, the price that could be negotiated in an arms' length transaction between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction.

"*FATCA*" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"*FCPA*" shall mean the Foreign Corrupt Practices Act of 1977, as amended.

"*Federal Funds Rate*" shall mean, for any day, the rate *per annum* equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so

published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (charged on such day on such transactions as determined by the Administrative Agent).

"*Fees*" shall mean the Commitment Fees, the Upfront Fees, the L/C Participation Fees, the Issuing Bank Fees, and any other fees due hereunder (including, without limitation, pursuant to *Section 2.12*).

"*Field Exam*" shall have the meaning as assigned in *Section 5.07(b)*.

"*Final Order*" means an order of the Bankruptcy Court in the Chapter 11 Cases, in form and substance satisfactory to the Borrower, Administrative Agent and the Required Lenders in their sole discretion, authorizing and approving this Agreement on a final basis, as the same may be amended or modified from time to time, with the consent of the Required Lenders.

"*Financial Officer*" of any person shall mean the Chief Financial Officer, principal accounting officer, Treasurer, Assistant Treasurer, Controller, Chief Restructuring Officer or officer with similar duties of such person.

"*First-Second Intercreditor Agreement*" shall mean (x) that Intercreditor Agreement dated as of October 29, 2018 among the Pre-Petition First Lien Collateral Agent as Senior Agent, U.S. Bank National Association, as Junior Agent and the representatives for purposes thereof for holders of one or more other classes of Indebtedness, the Borrower, the other Loan Parties and the other parties thereto and (y) any other intercreditor agreement entered into from time to time by the holders of one or more classes of Indebtedness, the Loan Parties and the Collateral Agent and any lender or agent from time to time and designated by the Collateral Agent and the Borrower as a "First-Second Intercreditor Agreement", in each case, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and which term shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"*First Day Orders*" has the meaning set forth in *Section 4.02(q)*.

"*Foreign Lender*" shall mean any Lender which for U.S. federal income tax purposes (i) is regarded as a separate entity and is not a U.S. Person or (ii) is disregarded as a separate entity and has a regarded owner that is not a U.S. Person.

"*Foreign Subsidiary*" shall mean any Subsidiary (together with its successors) that is incorporated or organized under the laws of any jurisdiction other than the United States of America, any State thereof or the District of Columbia.

"*Fronting Exposure*" shall mean, at any time there is a Defaulting Lender, (a) with respect to each Issuing Bank, such Defaulting Lender's Applicable Percentage of the outstanding Letter of Credit obligations other than Letter of Credit obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof, and (b) with respect to the Administrative Agent, such Defaulting Lender's Applicable Percentage of Extraordinary Advances (other than Extraordinary Advances as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders).

-26-

"*Funding Date*" shall mean the date on which a Revolving Borrowing occurs.

"*GAAP*" shall mean generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis, subject to the provisions of *Section 1.02*; *provided*, that any reference to the application of GAAP in *Sections 3.13(a)*, *3.13(b)*, *3.20*, *5.03*, *5.07* and *6.02(e)*, to a Foreign Subsidiary (and not as a consolidated Subsidiary of the Borrower) shall mean generally accepted accounting principles in effect from time to time in the jurisdiction of organization of such Foreign Subsidiary.

"*Governmental Authority*" shall mean the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including (i) any supra-national bodies or public international organizations such as the European Union or the European Central Bank, or World Bank and (ii) the National Association of Insurance Commissioners).

"*GSO*" shall mean GSO Capital Partners LP and/or its managed funds or Affiliates.

"*Guarantee*" of or by any person (the "*guarantor*") shall mean (a) any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep well, to purchase assets, goods, securities or services, to take-or-pay or otherwise) or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, (iv) entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part) or (v) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation, or (b) any Lien on any assets of the guarantor securing any Indebtedness or other obligation (or any existing right, contingent or otherwise, of the holder of Indebtedness or other obligation to be secured by such a Lien) of any other person, whether or not such Indebtedness or other obligation is assumed by the guarantor; *provided*, *however*, that the term "*Guarantee*" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted under this Agreement. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (1) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (2) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such

guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof. The term "Guarantee" as a verb has a corresponding meaning.

"***Guaranteed Obligations***" shall have the meaning assigned to such term in Section 11.01.

"***Guarantor***" shall mean each party signatory hereto as a "Guarantor".

"***Guaranty***" shall mean the Guarantee of the Obligations provided herein pursuant to Article XI.

"***Hazardous Materials***" shall mean all pollutants, contaminants, wastes, chemicals, materials, substances and constituents, including explosive or radioactive substances or petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls or radon gas, of any nature subject to regulation or which can give rise to liability under any Environmental Law.

"***Headquarters***" shall mean the Borrower's headquarters located at 350 Fifth Ave, Empire State Building, New York, NY 10118.

"***Highest Lawful Rate***" shall mean the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"***Honor Date***" shall have the meaning assigned to such term in *Section 2.05*.

"***HPS***" shall mean HPS Investment Partners, LLC and/or its managed funds or Affiliates.

"***Hudson Notes***" shall mean the notes set forth on *Schedule G*.

"***Immaterial Subsidiary***" shall mean any Subsidiary that did not, as of the last day of the fiscal quarter of the Borrower most recently ended and Reported, have assets with a value in excess of 2.5% of the Consolidated Total Assets or have gross revenues for the period of four consecutive fiscal quarters of the Borrower then most recently ended and Reported (taken as one accounting period) in excess of 2.5% of the consolidated gross revenues of the Borrower and its Subsidiaries for such period (as determined in accordance with GAAP on the financial statements of the Borrower) and, when taken together with all other Immaterial Subsidiaries as of the last day of the fiscal quarter of the Borrower most recently ended and Reported, did not have assets with a value in excess of 5.0% of the Consolidated Total Assets or did not have gross revenues in excess of 5.0% of total revenue for the period of four consecutive fiscal quarters of the Borrower then most recently ended and Reported (taken as one accounting period) (as determined in accordance with GAAP on the financial statements of the Borrower) (the "***Excluded Subsidiary Limit***").  In the

-28-

event that the Immaterial Subsidiaries, taken together, as of the last day of the fiscal quarter of the Borrower most recently ended and Reported have assets representing in excess of 5.0% of the Consolidated Total Assets or have gross revenues in excess of 5.0% of total revenue (as determined in accordance with GAAP on the financial statements of the Borrower), the Borrower shall designate, in its reasonable discretion, one or more Immaterial Subsidiaries to no longer be Immaterial Subsidiaries as may be necessary such that the foregoing Excluded Subsidiary Limit shall not be exceeded, and any such Subsidiary shall thereafter not be deemed to be an Immaterial Subsidiary hereunder (each such change, an "***Immaterial Subsidiary Update***"). Each Immaterial Subsidiary as of the Closing Date shall be set forth on *Schedule 1.01(b)*, and to the extent that there is an Immaterial Subsidiary Update from time to time, in connection with such update (but not more frequently than the delivery of a quarterly Compliance Certificate is required pursuant to ***Error! Reference source not found.***) the Borrower shall provide the Required Lenders with an updated *Schedule 1.01(b)* which reflect the Immaterial Subsidiaries at such time. Notwithstanding the foregoing, no Subsidiary shall constitute an Immaterial Subsidiary if such Subsidiary (i) owns or possesses rights to any material Intellectual Property used in the business of the Borrower or its Subsidiaries, (ii) is a party to any Material License Agreement or (iii) is not an "Immaterial Subsidiary" as defined under the Second Lien DIP Term Loan Credit Agreement.

"***Impacted Interest Period***" shall have the meaning set forth in the definition of "Eurocurrency Base Rate."

"***In-Transit Inventory***" shall mean Inventory that is being shipped or otherwise transported to a Loan Party from a point of origin within the continental United States or is being shipped or otherwise transported to or from a point of origin outside of the continental United States (other than Inventory in transit (x) between locations set forth on *Schedule 5.18* or (y) to any retail store of a Loan Party located within the United States and Canada (excluding Quebec)).

"***Indebtedness***" of any person shall mean, without duplication:

(a)    all obligations of such person for borrowed money and all obligations of such person evidenced by bonds (other than performance, surety or statutory bonds or other similar instruments issued in the ordinary course of business), debentures, notes or similar instruments;

(b)    all obligations of such person under conditional sale or other title retention agreements relating to property or assets purchased by such person (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business);

(c)    all obligations of such person (other than intercompany items) issued or assumed as the deferred purchase price of property or services incurred in the ordinary course of business and maturing within 365 days after the incurrence thereof (other than (x) accrued expense obligations and trade accounts payable in the ordinary course of business, (y) trade accounts payable that are past due and relate to purchases or services incurred prior to the Petition Date and (z) earn outs (including the Existing Earn Out Obligations) or similar deferred or contingent purchase price obligations that are not yet

due and payable and are not expected to be due and payable in accordance with the documentation giving rise thereto);

(d)    all Guarantees by such person of Indebtedness of others treated as Indebtedness pursuant to another clause of this definition;

(e)    all Capitalized Lease Obligations of such person;

(f)    all net payments that such person would have to make in the event of an early termination, on the date Indebtedness of such person is being determined, in respect of outstanding Swap Agreements;

(g)    the principal component of all obligations, contingent or otherwise, of such person as an account party in respect of letters of credit;

(h)    the principal component of all obligations of such person in respect of bankers' acceptances; and

(i)    the amount of all obligations of such person with respect to the redemption, repayment or other repurchase of any Disqualified Stock (excluding accrued dividends that have not increased the liquidation preference of such Disqualified Stock).

The Indebtedness of any person shall include the Indebtedness of any partnership in which such person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness expressly limits the liability of such person in respect thereof in which case such Indebtedness shall not be more than the amount of such Indebtedness that is recourse to such person; *provided*, *however*, that, notwithstanding the foregoing, Indebtedness for purposes of this Agreement and the other Loan Documents, including for the purposes of calculating any financial ratio, shall be deemed not to include (i) contingent obligations incurred in the ordinary course of business, (ii) deferred or prepaid revenues, (iii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller, (iv) [reserved], (v) obligations to make payments in respect of money backed guarantees offered to customers in the ordinary course of business, (vi) obligations to make payments to one or more insurers in respect of profit sharing arrangements entered into in the ordinary course of business, (vii) any amounts available and not drawn under any available commitments or (viii) the obligations of any person to pay rent or other amounts under any lease (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations would be required to be classified and accounted for as an operating lease under GAAP as in effect on the Closing Date, or in excess of the amount of such Indebtedness that would be recourse to such person.

"*Indemnified Taxes*" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"*Indemnitee*" shall have the meaning assigned to such term in *Section 9.05(b)*.

"*Information*" shall have the meaning assigned to such term in *Section 3.14(a)*.

-30-

"*Initial 13-Week DIP Budget*" shall have the meaning set forth in the definition of "*DIP Budget*".

"*Initial DIP Budget*" shall have the meaning set forth in the definition of "*DIP Budget*".

"*Initial Funding Amount*" shall mean $10,000,000.

"*Initial Monthly DIP Budget*" shall have the meaning set forth in the definition of "*DIP Budget*".

"*Intellectual Property*" shall mean, with respect to any Loan Party, the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks, Trademark Licenses, Trade Secrets and Trade Secret Licenses, and all rights to sue or otherwise recover for any past, present and future infringement, dilution, misappropriation, or other violation or impairment thereof, including the right to receive all proceeds therefrom, including without limitation license fees, royalties, income payments, claims, damages and proceeds of suit, now or hereafter due and/or payable with respect thereto.

"*Intercreditor Agreement*" shall mean each of the Pari Passu Intercreditor Agreement, the First-Second Intercreditor Agreement, the PNC Intercreditor Agreement, any other Customary Intercreditor Agreement or any other agreement designated by the Borrower and the Administrative Agent from time to time as an "*Intercreditor Agreement*", and "*Intercreditor Agreements*" means any two or more of each of the foregoing, in each case, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"*Interest Election Request*" shall mean a request by the Borrower to convert or continue a Revolving Borrowing in accordance with *Section 2.07*.

"*Interest Payment Date*" shall mean, (a) with respect to any Eurocurrency Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurocurrency Borrowing with an Interest Period of more than three months' duration each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Borrowing and, in addition, the date of any refinancing or conversion of such Borrowing with or to a Borrowing of a different Type and (b) with respect to any ABR Loan, the last Business Day of each calendar quarter (being the last Business Day of March, June, September and December of each year).

"*Interest Period*" shall mean, as to any Eurocurrency Borrowing, the period commencing on the date of such Borrowing or on the last day of the immediately preceding Interest Period applicable to such Borrowing, as applicable, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is 1, 3 or 6 months thereafter (or 12 months thereafter, a period shorter than 1 month or such other period, in each case, if at the time of the relevant Borrowing, all Lenders agree to make interest periods of such length available), as the Borrower may elect, or the date any Eurocurrency Borrowing is converted to an ABR Borrowing in accordance with *Section 2.07* or repaid or prepaid in accordance with *Section 2.09*, *2.10* or *2.11*; *provided*, *however*, that if any Interest Period would

end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"*Interim Order*" shall have the meaning set forth in *Section 4.02(o)*.

"*Interpolated Rate*" shall mean, at any time, for any Interest Period, the rate *per annum* (rounded to the same number of decimal places as the LIBO Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the LIBO Screen Rate for the longest period (for which the LIBO Screen Rate is available) that is shorter than the Impacted Interest Period and (b) the LIBO Screen Rate for the shortest period (for which the LIBO Screen Rate is available) that exceeds the Impacted Interest Period, in each case, at such time.

"*Inventory*" shall have the meaning as assigned in the NYUCC.

"*Inventory Appraisal*" shall have the meaning as assigned in *Section 5.07(b)*.

"*Investment*" shall have the meaning set forth in *Section 6.04*.

"*ISP*" shall mean, with respect to any Letter of Credit, the International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"*Issuing Bank*" shall mean Administrative Agent or any Revolving Lender (for the avoidance of doubt, other than HPS unless agreed to in writing in its sole discretion) or any bank or financial institution selected by Administrative Agent in Administrative Agent's sole discretion and that agrees to act as an Issuing Bank, in each case that issues a Letter of Credit. For the avoidance of doubt, HPS shall not act as an Issuing Bank unless agreed to in writing in its sole discretion. An Issuing Bank may, in its sole discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such Issuing Bank or through unaffiliated financial institutions and such Letters of Credit shall be treated as issued by such Issuing Bank. For the avoidance of doubt, each reference to "Issuing Bank" shall mean the applicable "Issuing Bank" or each of the "Issuing Banks" as the context may require.

"*Issuing Bank Fees*" shall have the meaning assigned to such term in *Section 2.12(b)*.

"*Junior Indebtedness*" shall mean, collectively, Indebtedness of the Borrower or any of its Subsidiaries that is (x) secured by a Lien that is junior in priority to the Lien securing the Obligations, or (y) by its terms contractually subordinated in right of payment to all or any portion of the Obligations or (z) unsecured, in each case, other than intercompany Indebtedness among the Borrower and its Subsidiaries and Indebtedness incurred under *Section 6.01(e)*; which for the avoidance of doubt, as of the Closing Date includes, the Indebtedness and obligations under the Pre-Petition First Lien Credit Agreement, the Pre-Petition Second Lien Credit Agreement, the

-32-

Hudson Notes, the Subordinated Convertible Note and the Second Lien DIP Term Loan Credit Agreement.

"***KEIP***" shall have the meaning assigned to such term in <u>*Section 6.12*</u>.

"***Laws***" shall mean, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"***L/C Borrowing***" shall mean an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Borrowing.

"***L/C Disbursement***" shall mean each payment or distribution made by an Issuing Bank to the beneficiary of a Letter of Credit under or in connection with such Letter of Credit.

"***L/C Exposure***" shall mean (i) with respect to an individual Letter of Credit, the undrawn face amount of such Letter of Credit at such time (as such face amount may have been reduced after issuance), plus the aggregate amount of all L/C Disbursements in connection with such Letter of Credit that have not been paid or reimbursed to the Issuing Bank or converted to Loans at such time, less the amount Cash Collateralized, and (ii) with respect to all Letters of Credit, the aggregate undrawn face amount of all Letters of Credit plus the aggregate amount of all L/C Disbursements in connection with all Letters of Credit that have not been paid or reimbursed to the Issuing Bank or converted to Loans, less the amount Cash Collateralized.

"***L/C Participation Fee***" shall have the meaning assigned such term in <u>*Section 2.12(b)*</u>.

"***Landlord Reserve***" shall mean, as to each location at which the Loan Parties have Collateral or books and records located, a reserve, which initially shall be in an amount equal to (such amount, the "***Initial Landlord Reserve***") the greater of (a) the number of months' rent for which the landlord has, under applicable Law, a Lien in the Collateral of the Loan Parties to secure the payment of rent or other amounts under the lease relative to such location, or (b) 1 month's rent under the lease relative to such location, which reserve may be adjusted by the Administrative Agent in its Permitted Discretion (but in no event in an amount greater than the Initial Landlord Reserve); provided that no Landlord Reserves shall implemented with respect to locations in which the underlying lease has been rejected in the Chapter 11 Cases by the Debtors pursuant to the Bankruptcy Code, so long as no Inventory of any Loan Party is located at such locations.

"***Lead Arrangers***" shall mean Ares Capital Management LLC and HPS Investments Partners, LLC.

"***Lender***" shall mean each Revolving Lender and, unless the context requires otherwise, each Issuing Bank.

"*Lender Advisors*" shall mean the advisors to the Lenders consisting of Latham & Watkins LLP.

"*Lender Observers*" shall have the meaning assigned to such term in *Section 5.19*.

"*Letter of Credit*" shall mean each letter of credit, if any, deemed issued to the account of the Borrower pursuant to Section 2.05.

"*Letter of Credit Indemnified Costs*" shall have the meaning as assigned in *Section 2.05(i)*.

"*Letter of Credit Related Person*" shall have the meaning as assigned in *Section 2.05(i)*.

"*LIBO Screen Rate*" shall have the meaning set forth in the definition of "Eurocurrency Base Rate".

"*Lien*" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, encumbrance, charge or security interest in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities (other than securities representing an interest in a joint venture that is not a Subsidiary), any purchase option, call or similar right of a third party with respect to such securities; *provided*, that in no event shall an operating lease or an agreement to sell be deemed to constitute a Lien.

"*Liquidity*" shall mean, as of any date of determination, the sum of (x) the aggregate amount of all cash and Cash Equivalents on the consolidated balance sheet of the Borrower and its Subsidiaries that are Loan Parties that are not "restricted" for purposes of GAAP and (y) "*Availability*" as defined hereunder.

"*Loan Documents*" shall mean this Agreement, the Letters of Credit, the Security Documents, each Borrowing Base Certificate, each Compliance Certificate, any promissory note issued under *Section 2.09(e)*, solely for the purposes of *Section 7.01(c)* hereof, and all other documents, certificates, instruments or agreements executed and delivered by or on behalf of a Loan Party for the benefit of any Agent, Issuing Bank or Lender in connection herewith on or after the date hereof.

"*Loan Parties*" shall mean the Borrower and the Subsidiary Loan Parties.

"*Loans*" shall mean any revolving loan made by the Revolving Lenders to the Borrower pursuant to *Section 2.01(b)*, including any Protective Advance with respect to the Commitments, including for the avoidance of doubt, the Rolled-Up Loans.

"*Local Time*" shall mean New York City time.

"*Margin Stock*" shall have the meaning assigned to such term in Regulation U.

"*Material Adverse Effect*" shall mean the existence of any event, development or circumstance that, has had or would reasonably be expected to have a material adverse effect on

-34-

(i) the business, property, operations or financial condition of the Borrower and the Subsidiaries, taken as a whole, other than any change, event or occurrence, arising individually or in the aggregate, from (A) the Chapter 11 Cases or events leading up to the commencement of the Chapter 11 Cases, (B) events that would reasonably be expected to result from the filing or commencement of the Chapter 11 Cases or the announcement of the filing or commencement of the Chapter 11 Cases, (C) the impact of the COVID-19 pandemic (the breadth and extent of which are unknown as of the date hereof), (D) any matters publically disclosed prior to the Closing Date, (E) any matters disclosed in the First Day Orders and (F) any matters disclosed on the schedules hereto, (ii) the ability of the Loan Parties, taken as whole, to fully and timely perform their Obligations or (iii) the validity or enforceability of this Agreement or any other Loan Document or the security interest of the Collateral Agent in any material Collateral or the rights and remedies of the Administrative Agent, Collateral Agent or any of the Lenders thereunder.

"*Material Agreement*" shall mean any agreement, contract or instrument to which any Loan Party is a party or by which any Loan Party or any of its properties is bound (including, without limitation with respect to customers and/or suppliers) (i) pursuant to which the Loan Parties receive or will receive revenue (as determined in accordance with GAAP on the financial statements of the Borrower), in excess of $50,000,000 in any Test Period, (ii) governing, creating, evidencing or relating to Material Indebtedness of any Loan Party, (iii) the termination or suspension of which, or the failure of any party thereto to perform its obligations thereunder, would reasonably be expected to have a Material Adverse Effect, (iv) which constitutes a Material License Agreement or (v) any Qualified Securitization Financing Documentation.

"*Material Indebtedness*" shall mean any (i) Indebtedness (other than Loans, Letters of Credit and the Subordinated Convertible Note) of any one or more of the Borrower or any Subsidiary in an aggregate principal amount exceeding $25,000,000, (ii) the Hudson Notes and (iii) the Indebtedness and obligations under the Pre-Petition First Lien Credit Agreement, the Pre-Petition Second Lien Credit Agreement, and the Second Lien DIP Term Loan Credit Agreement.

"*Material License Agreements*" shall mean license agreements, (i) the termination or suspension of which, or the failure of any party thereto to perform its obligations thereunder, would reasonably be expected to have a Material Adverse Effect or (ii) pursuant to which the Borrower and its Subsidiaries receive or will receive revenue, in excess of $50,000,000 in any Test Period.

"*Material Subsidiary*" shall mean any Subsidiary other than Immaterial Subsidiaries.

"*Maturity Date*" shall mean the earliest of (a) the Scheduled Maturity Date, (b) the Consummation Date, (c) the closing of any sale of assets pursuant to Section 363 of the Bankruptcy Code, which when taken together with all asset sales completed since the Closing Date, constitutes a sale of all or substantially all of the assets of the Loan Parties and (d) the date on which all amounts owed hereunder become due and payable and the Commitments are terminated under the Loan Documents, whether by acceleration or otherwise.

"*Maximum Revolver Amount*" shall mean, as of any date of determination, the lesser of:

(A)    the Commitments, and

(B)     the Borrowing Base as of such date (based upon the most recent Borrowing Base Certificate delivered by Borrower to Administrative Agent).

"*Minimum Retained Amounts*" shall mean payments from Securitization Providers, Credit Support Providers and Account Debtors (x) that constitute Securitization Assets (including Permitted Securitization Cash Collateral) and (y) amounts necessary to maintain minimum account balances, current operations and debt service in respect of a Qualified Securitization Financing; provided that amounts described in this _clause (y)_ (other than those amounts pending onward payment to third parties) shall not at any one time exceed $2,000,000 for a period of more than 3 Business Days.

"*Moody's*" shall mean Moody's Investors Service, Inc.

"*Monthly Budget Testing Period*" means any time that the applicable 13-week DIP Budget does not cover the applicable Variance Testing Period.

"*Multiemployer Plan*" shall mean a multiemployer plan as defined in Section 3(37) or 4001(a)(3) of ERISA to which the Borrower or any Subsidiary or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding six plan years made or accrued an obligation to make contributions.

"*Net Orderly Liquidation Percentage*" shall mean, as of any date, the percentage of value of Eligible Inventory that is estimated to be recoverable in an orderly liquidation of such Eligible Inventory as evidenced by an appraisal satisfactory to the Collateral Agent in its Permitted Discretion.

"*New Money Commitment Amount*" shall mean $111,055,245.21.

"*Non-Consenting Lender*" shall have the meaning assigned to such term in _Section 2.19(c)_.

"*Non-Defaulting Lender*" shall mean each Lender other than a Defaulting Lender.

"*Note*" shall have the meaning assigned to such term in _Section 2.09(e)_.

"*NYUCC*" shall mean Article 9 of the UCC as in effect in New York.

"*Obligations*" shall mean (i) the unpaid principal of and interest (including, without limitation, interest accruing after the filing of any petition in bankruptcy, or the commencement of any proceeding under any Debtor Relief Law, relating to the Borrower or any other Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) and premium (if any) on all Loans made or deemed to have been made pursuant to the Agreement (including, without limitation, with respect to the Rolled-Up Obligations), (ii) all reimbursement obligations (if any) and interest thereon (including, without limitation, interest accruing after the filing of any petition in bankruptcy, or the commencement of any preceding under any Debt Relief Law, relating to the Borrower or any other Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) with respect to any Letter of Credit issued or deemed to have been issued pursuant to this Agreement (including, without limitation, with respect

-36-

to the Existing Letters of Credit) and (iii) all guarantee obligations, fees, expenses and all other obligations owed by a Loan Party to an Agent, the Lenders or any other Secured Party, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or the Letters of Credit, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, with respect to the Rolled-Up Obligations) (including, without limitation, all fees, charges and disbursements of counsel to the Lead Arrangers, the Agents or any Lender to the extent required to be paid by the Borrower pursuant hereto) or otherwise.

"**OFAC**" shall mean the Office of Foreign Asset Control of the Department of the Treasury of the United States of America.

"**Organizational Documents**" shall mean, collectively, with respect to any Person, (i) in the case of any corporation, the certificate of incorporation or articles of incorporation and by-laws (or similar constitutive documents) of such Person, (ii) in the case of any limited liability company, the certificate or articles of formation or organization and operating agreement or memorandum and articles of association (or similar constitutive documents) of such Person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar constitutive documents) of such Person (and, where applicable, the equity holders or shareholders registry of such Person), (iv) in the case of any general partnership, the partnership agreement (or similar constitutive document) of such Person, (v) in any other case, the functional equivalent of the foregoing, and (vi) any shareholder, voting trust or similar agreement between or among any holders of Equity Interests of such Person.

"**Other Connection Taxes**" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to _Section 2.19(b)_).

"**Overadvance**" shall mean, as of any date of determination, that the Revolving Facility Exposure is greater than the Maximum Revolver Amount.

"**Overadvance and Enhanced Liquidity Termination**" shall mean the later of (i) the date the Overadvance Line has been permanently terminated and (ii) the date the Enhanced Liquidity Line has been permanently terminated.

"**Overadvance Line**" has the meaning set forth in the definition of Borrowing Base.

US-DOCS\115808185.26

"*Overadvance Loan Amount*" shall mean, as of any date of determination (or redetermination in accordance with the most recently received Borrowing Base Certificate in accordance with Section 5.21 hereof), an amount equal to (x) the Revolver Facility Exposure as of such date less (y) the Borrowing Base (without giving effect to clause (iii) in the definition thereof) as of such date.

"*Overadvance Loans*" shall mean, as of any date of determination (or redetermination in accordance with the most recently received Borrowing Base Certificate in accordance with Section 5.21 hereof), Loans in an aggregate principal amount equal to the Overadvance Loan Amount.

"*Pari-Passu Intercreditor Agreement*" shall mean (x) that Intercreditor Agreement dated as of the Closing Date among the Pre-Petition First Lien Collateral Agent as Senior Agent, U.S. Bank National Association, as Junior Agent and the representatives for purposes thereof for holders of one or more other classes of Indebtedness, the Borrower, the other Loan Parties and the other parties thereto and (y) any other intercreditor agreement entered into from time to time by the holders of one or more classes of Indebtedness, the Loan Parties and the Collateral Agent and any lender or agent from time to time and designated by the Collateral Agent and the Borrower as a "Pari Passu Intercreditor Agreement", in each case, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and which term shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"*Participant*" shall have the meaning assigned to such term in *Section 9.04(c)*.

"*Participant Register*" shall have the meaning specified in *Section 9.04(c)*.

"*Patent Licenses*" shall mean all written agreements, licenses and covenants providing for the grant to or from a Loan Party of any right in or to any Patent or otherwise providing for a covenant not to sue for infringement or other violation of any Patent.

"*Patents*" shall mean, with respect to any Loan Party, all of such Loan Party's right, title and interest in and to all patentable inventions and designs, all United States, foreign, and multinational patents, certificates of invention, and similar industrial property rights, and applications for any of the foregoing, including, without limitation, (i) all reissues, substitutes, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof, (ii) all inventions and improvements described and claimed therein, (iii) all rights to sue or otherwise recover for any past, present and future infringement or other violation thereof, (iv) all proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages, proceeds of suit and other payments now or hereafter due and/or payable with respect thereto, and (v) all other rights accruing thereunder or pertaining thereto throughout the world.

"*PATRIOT Act*" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

US-DOCS\115808185.26

"***Payment in Full***" or "***Paid in Full***" shall mean (a) the termination of all Commitments, (b) the cancellation or expiration of each Letter of Credit (except to the extent cash collateralized or backstopped, in each case, in a manner agreed to by the Borrower and the applicable Issuing Bank or as to which other arrangements satisfactory to the applicable Issuing Bank shall have been made) and (c) the payment in full in cash of all Loans and other amounts owing to any Lender or any Agent in respect of the Obligations (other than contingent or indemnification obligations not then due), which shall include the conversion of the Loans into obligations under the Exit Facilities pursuant to *Section 2.25* of this Agreement (but which, for the avoidance of doubt, shall not permit the conversion of the Exit Fees).

"***PBGC***" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"***Permitted Credit Support Arrangement***" shall mean the sale by a Loan Party or its Subsidiaries of Receivables to (i) The CIT Group/Commercial Services, Inc. (the "Initial US CIT Servicer") pursuant to (A) (1) that certain Deferred-Purchase Factoring Agreement by and between the Initial CIT Servicer and Differential Brands Group Inc., American Marketing Enterprises Inc.; Briefly Stated, Inc.; F&T Apparel LLC; GBG-BCBG LLC; GBG Accessories Group LLC; GBG Beauty LLC; GBG Denim USA LLC; GBG Jewelry Inc.; GBG Socks LLC; GBG West LLC; KHQ Investments LLC; Rossetti Handbags and Accessories, Ltd. and VZI Investment Corp. (collectively, the "Differential Companies") dated on or about the date of this Agreement; (2) that certain Deferred Purchase Export Factoring Agreement by and between the Initial CIT Servicer and the Differential Companies; (3) that certain Second Amended and Restated Deferred Purchase Factoring by and between Robert Graham Designs, LLC, Hudson Clothing, LLC and DFBG Swims LLC dated on or about the date of this Agreement and (ii) the sale of Receivables under the Canadian Sales Factoring Agreement by and between CIT Financial (Canada) ULC (the "Initial Canadian CIT Servicer" and together with the Initial US CIT Servicer, the "Initial CIT Servicers" and each, an "Initial CIT Servicer") and GBG Denim Canada ULC, dated December 24, 2015, as amended by that certain amendment dated on or about the date of this Agreement or (B) any other deferred purchase price factoring agreement/credit servicing and insurance arrangement entered into between a Loan Party and the Initial CIT Servicer, substantially in the form of one of the agreements described in clause (A); as each such agreement in (A) and (B) may be amended, restated, amended and restated, supplemented or otherwise modified from time to time (collectively, the "Permitted CIT Agreements" and each, a "Permitted CIT Agreement") and (ii) the factor or servicer under any other similar deferred purchase price factoring agreement/credit servicing and insurance arrangement entered into after the date hereof by any Loan Party or any Subsidiary for the factoring of Receivables, in form and substance reasonably satisfactory to the Administrative Agent (it being understood that any agreement substantially in the form of a Permitted CIT Agreement shall be deemed to be reasonably satisfactory to the Administrative Agent), as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time.

"***Permitted Credit Support Services***" shall mean (i) cash collateral or letters of credit in respect of or as part of the borrowing base for a Qualified Securitization Financing in a maximum principal amount at any one time outstanding not to exceed the lesser (x) the amount needed to support borrowings and other advances under a Qualified Securitization Financing (as determined by the Borrower) and (y) $30,000,000 ("***Permitted Securitization Cash Collateral***"), (ii) service

fees, expenses and other Charges in respect of the Permitted CIT Arrangements or other similar credit insurance and servicing arrangements entered into from time to time in an aggregate amount not to exceed 1.00% of annual sales at any one time outstanding as determined by the Borrower.

"***Permitted Discretion***" shall mean a determination made by the Administrative Agent in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"***Permitted Expenses***" means reasonable and documented legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and other reasonable out of pocket expenses of the Agents in connection with the Chapter 11 Case, this Agreement, the Loan Documents, and all documents related thereto, and all costs and expenses of the Agents (including reasonable, documented attorney expenses in accordance herewith) in connection with the enforcement of remedies under the Loan Documents to be reimbursed on a current basis by the Loan Parties from the proceeds of Loans hereunder.

"***Permitted Holder***" shall mean each of (i) GSO and Tengram, (ii) one or more investments funds, investment partnerships or managed accounts controlled or managed by the persons named in *clause (i)* or one of their Affiliates (other than the Borrower and its Subsidiaries) and (iii) any "group" (as such term is used in Section 13(d) and 14(d) of the Exchange Act) with respect to which any such persons described in *clauses (i)* and *(ii)* above collectively exercise a majority of the voting power.

"***Permitted Liens***" shall mean the collective reference to Liens permitted by *Section 6.02*.

"***Person***" or "***person***" shall mean any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company (or series thereof) or government, individual or family trusts, or any agency or political subdivision thereof.

"***Petition Date***" shall have the meaning assigned to such term in the *preamble* hereto.

 "***Plan***" shall mean any employee pension benefit plan (as defined Section 3(2) of ERISA, but excluding any Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code and in respect of which the Borrower, any Subsidiary or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"***Platform***" shall have the meaning assigned to such term in *Section 9.19(b)*.

"***Pledged Collateral***" shall have the meaning set forth in *Section 10.05*.

"***PNC Purchase and Sale Agreement***" means that certain Purchase and Sale Agreement dated as of October 29, 2018 among the SPV, the Borrower and the various entities party thereto as originators.

"***PNC Securitization***" and "***PNC Securitization Documents***" shall mean that certain Amended and Restated Receivables Purchase Agreement, dated as of the Closing Date (as the same may be amended, restated, supplemented, replaced or otherwise modified from time to time,

-40-

"***PNC Receivables Purchase Agreement***") among Spring Funding, LLC, as seller (the "***SPV***"), the Borrower, as servicer, the various purchasers from time to time party thereto (the "***PNC Securitization Purchasers***"), PNC Capital Markets LLC, as structuring agent (the "***PNC Securitization Structuring Agent***") and PNC Bank, National Association, as administrative agent (the "PNC Securitization Administrative Agent"; together with the PNC Securitization Purchasers and the PNC Securitization Structuring Agent, each a "***PNC Securitization Secured Party***" and collectively, the "***PNC Securitization Secured Parties***") and the related agreements and documents executed and delivered in connection with the PNC Receivables Purchase Agreement, in each case, as the same may be amended, restated, supplemented, replaced or otherwise modified from time to time in accordance with the terms of this Agreement.

"***PNC Intercreditor Agreement***" shall mean (x) that Letter Agreement re Pledge of SPV Interests dated as of October 29, 2018 among the administrative agent under the Pre-Petition Second Lien Credit Agreement, the Pre-Petition First Lien Revolving Agent, the PNC Securitization Administrative Agent and the Borrower and (y) any other intercreditor agreement entered into from time to time by the holders of one or more classes of Indebtedness, the Loan Parties and the Collateral Agent and any lender or agent from time to time and designated by the Collateral Agent and the Borrower as a "***PNC Intercreditor Agreement***", in each case, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and which term shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"***Post-Petition***" means the time period beginning immediately upon the filing of the Chapter 11 Case and ending upon the closing of the Chapter 11 Case.

"***Post-Petition***" means the time period prior and ending upon the filing of the Chapter 11 Case.

"***Pre-Petition First Lien Administrative Agent***" shall have the meaning assigned to such term in _preamble_ hereto.

"***Pre-Petition First Lien Collateral Agent***" shall have the meaning assigned to such term in _preamble_ hereto.

"***Pre-Petition First Lien Credit Agreement***" shall have the meaning assigned to such term in _preamble_ hereto.

"***Pre-Petition First Lien Credit Agreement Agents***" shall mean, collectively, the Pre-Petition First Lien Administrative Agent, the Pre-Petition First Lien Revolving Agent, the Pre-Petition First Lien Collateral Agent and the Pre-Petition First Lien Documentation Agent.

"***Pre-Petition First Lien Documentation Agent***" shall have the meaning assigned to such term in _preamble_ hereto.

"***Pre-Petition First Lien Revolving Agent***" shall have the meaning assigned to such term in _preamble_ hereto.

-41-

"***Pre-Petition First Lien Lenders***" shall have the meaning assigned the term "*Lenders*" in the Pre-Petition First Lien Credit Agreement.

"***Pre-Petition First Lien Loan Documents***" shall mean the "*Loan Documents*" as such term is defined in the Pre-Petition First Lien Credit Agreement, as such documents may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time in accordance with the terms of the applicable Intercreditor Agreement.

"***Pre-Petition First Lien Obligations***" shall mean collectively the "*Revolving Obligations*" and the "*Term Loan Obligations*", in each case as defined in the Pre-Petition First Lien Credit Agreement.

"***Pre-Petition First Lien Secured Parties***" shall have the meaning assigned to the term "*Secured Parties*" in the Pre-Petition First Lien Credit Agreement.

"***Pre-Petition Indebtedness***" shall mean any Indebtedness of the Loan Parties incurred prior to the Petition Date and outstanding as of the Petition Date.

"***Pre-Petition Prior Liens***" shall have the meaning assigned to such term in the DIP Order.

"***Pre-Petition Revolving Obligations***" shall mean all interest, fees, principal and other "*Obligations*" owing with respect to "*Revolving Loans*", "*Revolving Facility Commitments*", "*Letters of Credit*" (in each case as such term is defined in the Pre-Petition First Lien Credit Agreement).

"***Pre-Petition Second Lien Credit Agreement***" shall mean the Second Lien Credit Agreement dated as of October 29, 2018 among the Borrower, U.S. Bank National Association, as administrative and as collateral agent, and the several banks and other financial institutions from time to time parties thereto as lenders, as such agreement may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time in accordance with terms of the First-Second Intercreditor Agreement.

"***Pre-Petition Second Lien Credit Facility***" shall mean the "*Credit Facility*" under and as defined in the Pre-Petition Second Lien Credit Agreement as of the date hereof and any similar term in the Second Lien Credit Agreement as the Second Lien Credit Agreement may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time.

"***Pre-Petition Second Lien Lenders***" shall mean each of the "*Lenders*" under and as defined in the Pre-Petition Second Lien Credit Agreement from time to time, or, as the context may require.

"***Pre-Petition Second Lien Loan Documents***" shall mean the "*Loan Documents*" as such term is defined in the Pre-Petition Second Lien Credit Agreement, as such documents may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time in accordance with the terms of the applicable Intercreditor Agreement.

US-DOCS\115808185.26

"***Pre-Petition Term Loan Obligations***" shall mean all interest, fees, principal and other "*Obligations*" owing with respect to "*Term Loans*" and "*Term Loan Commitments*" (in each case as such term is defined in the Pre-Petition First Lien Credit Agreement).

"***primary obligor***" shall have the meaning assigned to such term in the definition of the term "*Guarantee.*"

"***Prime Rate***" shall mean the rate of interest quoted in the print edition of *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75% of the nation's 30 largest banks), as in effect from time to time (or, if such rate is or becomes unavailable, another national publication selected by the Administrative Agent (at the direction of the Required Lenders)). The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. The Administrative Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"***Projections***" shall mean any projections and any forward-looking statements (including statements with respect to booked business) of such entities furnished to the Lenders or the Administrative Agent by or on behalf of the Borrower or any of the Subsidiaries prior to the Closing Date.

"***PTE***" shall mean a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"***Public Lender***" shall have the meaning assigned to such term in <u>Section 9.19(b)</u>.

"***Qualified Securitization Financing***" shall mean (i) the PNC Securitization as in effect on the Closing Date and (ii) any Securitization Financing that refinances or replaces the PNC Securitization and any amendment to the PNC Securitization, in each case that meets the following conditions:  (a) such Securitization Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Borrower and, if applicable, the Securitization Subsidiary, (b) all sales and/or contributions of Securitization Assets are made at fair market value and are either (x) non-recourse to the Loan Parties or (y) if recourse to the Loan Parties, (A) such recourse is limited solely to the Securitization Assets, Permitted Securitization Cash Collateral or to payments made by a Credit Support Provider in respect of such Securitization Assets and (B) and applicable Securitization Provider shall have entered into a customary pari passu intercreditor with the Collateral Agent on terms reasonably acceptable to the Collateral Agent, (c) the only assets of the Loan Parties involved in such Securitization Financing shall be accounts receivable generated in the ordinary course of business and related Securitization Assets, Permitted Securitization Cash Collateral and payments made by a Credit Support Provider in respect of such Securitization Asset, (d) the Secured Parties shall have received a pledge of equity in the Securitization Subsidiary party to such Securitization Financing in accordance with the Collateral and Guarantee Requirement, (e) all amounts received by the Loan Parties from counterparties to such Securitization Financing from the sale of Receivables shall be deposited directly in a bank account owned by a Loan Party, (f) the Loan Parties shall have granted to the Collateral Agent, for the benefit of the Secured Parties, a security interest in their rights arising under any such Securitization Financing Documentation (including, without

-43-

limitation, all rights to payments received thereunder), and (g) any Securitization Financing that amends, amends and restates, refinances or replaces the PNC Securitization (or any refinancing thereof) shall be on terms that when taken as a whole are not materially less favorable to the interests of the Borrower or the Secured Parties than those set forth in the PNC Securitization on the Closing Date (except with respect to fees, pricing, covenant and dilution levels, advance rates and other payment terms, which may be adjusted to reflect then current market terms for a similar business of similar size, credit quality and financial condition operating in the same geographic areas; *provided*, *however*, that unless consented to by the Required Lenders, no such refinancing shall result (x) in a degradation of the average Advance Ratio for accounts receivable in excess of 20% as compared to the average Advance Ratio for the same month in the prior year under the then existing Securitization Financing or (y) an increase of more than 2.00% on the interest rate spread for the then existing Securitization Financing other than with respect to any interest rate spread attributable to a last out tranche added to the PNC Securitization after the Closing Date; *provided*, *further* that any changes to pricing resulting from "dynamic pricing" provisions contained in the Qualified Securitization Financing Documentation then in effect shall not constitute an amendment to the pricing of such Securitization Financing; it being understood that the maximum amount of Indebtedness of the Borrower and its Subsidiaries and its Securitization Subsidiaries pursuant to all Qualified Securitization Financing Documents shall at no time exceed a maximum aggregate principal amount outstanding in excess of the greater of (i) $375,000,000 and (ii) $450,000,000 but only if the PNC Securitization Documents are amended to include a last out purchaser in accordance with Section 13.24 of the PNC Receivables Purchase Agreement.

"***Qualified Purchaser***" means a Person (i) designated by the Required Lenders as a "Qualified Purchaser" in connection with any Credit Bid Transaction, (ii) whose stock is owned pro rata by the Lenders (based upon the obligations owing to such Lenders and utilized to consummate such Credit Bid Transaction and the obligations owing to all Lenders and utilized to consummate such Credit Bid Transaction) and (iii) whose actions are controlled by the Required Lenders.

"***Qualified Securitization Financing Documentation***" shall mean the documentation evidencing any Qualified Securitization Financing.

"***Rate***" shall have the meaning assigned to such term in the definition of the term "*Type*."

"***Receivable***" shall mean all Accounts and any other right to payment for goods or other property sold, leased, licensed or otherwise disposed of or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper or classified as a Payment Intangible and whether or not it has been earned by performance. References herein to Receivables shall include any Supporting Obligation or collateral securing such Receivable.

"***Recipient***" shall mean (a) the Administrative Agent, (b) the Collateral Agent (c) any Lender or (d) any Issuing Bank, as applicable.

"***Register***" shall have the meaning assigned to such term in *Section 9.04(b)*.

"***Regulation T***" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

-44-

"***Regulation U***" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"***Regulation X***" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"***Regulatory Agreement***" shall have the meaning assigned to such term in *Section 3.09(c)*.

"***Related Fund***" shall mean, with respect to any Lender that is a fund that invests in bank or commercial loans and similar extensions of credit, any other fund that invests in bank or commercial loans and similar extensions of credit and is advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity (or an Affiliate of such entity) that administers, advises or manages such Lender.

"***Related Parties***" shall mean, with respect to any specified person, such person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such person and of such person's Affiliates.

"***Release***" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, emanating or migrating in, into, onto or through the environment.

"***Reorganization Plan***" means a chapter 11 plan of reorganization in any of the Chapter 11 Cases of the Borrower or the other Loan Parties.

"***Report***" shall have the meaning assigned in *Section 9.15*.

"***Reportable Event***" shall mean any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Plan (other than a Plan maintained by an ERISA Affiliate that is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code).

"***Reported***" shall mean, with respect to any fiscal quarter of the Borrower, the delivery to the Administrative Agent of the financial statements required to be delivered with respect to the end of such fiscal quarter under *Section 5.04(a)* or *(b)*, as applicable.

"***Required Lenders***" shall mean, at any time, (1) the Lenders having (a) Loans outstanding, (b) L/C Exposure, and (c) Available Unused Commitments that, taken together, represent more than 50% of the *sum* of (w) all Loans outstanding, (x) L/C Exposure, and (y) the total Available Unused Commitments at such time; together with (2)(a) Ares, but only if Ares at such time is a Lender under this Agreement and continues to hold Commitments in an aggregate amount equal to at least 50% of the aggregate amount of Commitments it held as of the Closing Date, (b) HPS, but only if HPS at such time is a Lender under this Agreement and continues to hold Commitments in an aggregate amount equal to at least 50% of the aggregate amount of Commitments it held as of the Closing Date and (c) ACF, but only if ACF at such time is a Lender under this Agreement and continues to hold Commitments in an aggregate amount equal to at least 50% of the aggregate amount of Commitments it held as of the Closing Date. The Loans, L/C Exposure, and Available

-45-

Unused Commitment of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"**Requirements of Law**" shall mean, as to any Person, any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Reserves**" shall mean, as of any date of determination, those reserves against the Borrowing Base that Administrative Agent deems necessary or appropriate, in its Permitted Discretion, including, without limitation, Landlord Reserves and reserves in respect of duties and freight costs and royalties, in each case as established in Administrative Agent's Permitted Discretion. A Reserve may limit the Borrowing capacity, reduce the Borrowing Base (by reduction of an advance rate set forth in the Borrowing Base or otherwise), or otherwise restrict Borrower's ability to borrow under the Revolving Credit Facility. The amount of any Reserve established by the Administrative Agent shall have a reasonable relationship to the event, condition or other matter which is the basis for such Reserve as determined by the Administrative Agent in its Permitted Discretion and shall not be duplicative of any eligibility criteria, and, prior to establishing and imposing any such Reserve, the Administrative Agent shall endeavor to provide the Borrower prior notice of the creation or modification of any such Reserve but shall not be liable for the failure to do so and the failure to do so shall not affect the validity of any such Reserve.

"**Responsible Officer**" of any person shall mean any chief executive officer, president, executive officer, Financial Officer or, if any, Chief Restructuring Officer of such person and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement.

"**Restructuring Support Agreement**" means the Restructuring Support Agreement, dated as of May 17, 2020, among the Borrower, the Loan Parties, the Consenting First Lien Lenders, the Consenting Second Lien Lenders, the Consenting DIP Term Loan Lenders, the Consenting Creditors and the Consenting Stakeholders (in each case, as defined therein) party thereto, as amended, restated, supplemented or modified from time to time.

"**Revolving Availability Period**" shall mean, with respect to the Commitments, the period from and including Closing Date to but excluding the earlier of the Maturity Date and the date of termination of the Commitments.

"**Revolving Borrowing**" shall mean a Borrowing comprised of Loans.

"**Revolving Credit Facility**" shall mean the revolving credit facilities represented by the Commitments.

"**Revolving Facility Exposure**" shall mean, as of any date of determination, the sum of (a) the aggregate principal amount of outstanding Loans (inclusive of Extraordinary Advances) plus (b) the amount of the L/C Exposure. The Revolving Facility Exposure of any Lender at any time shall be such Lender's Applicable Percentage of the total Revolving Facility Exposure at such time (as such amount may be adjusted due to the existence of any Defaulting Lenders). As of the Closing Date, immediately after giving effect to (i) the "roll-up" pursuant to Section 2.24 and (ii) the

-46-

deemed issuance of the Existing Letters of Credit hereunder pursuant to Section 2.05, but prior to giving effect to the Borrowing of the Initial Funding Amount, the aggregate Revolving Facility Exposure shall be $163,944,754.79, of which (x) $142,000,000.00 shall constitute the aggregate principal amount of outstanding Loans and (y) $21,944,754.79 shall constitute the aggregate amount of the L/C Exposure.

"*Revolving Lender*" shall mean a Lender with a Commitment or with outstanding Revolving Facility Exposure.

"*Revolving Loan Account*" shall have the meaning as assigned in *Section 2.04(h)*.

"*Revolving Obligations Roll-Up Effective Time*" shall mean the moment in time immediately following the entry of the Interim Order by the Bankruptcy Court.

"*Rolled-Up Commitments*" shall have the meaning as assigned in *Section 2.24*.

"*Rolled-Up Loans*" shall have the meaning as assigned in *Section 2.24*.

"*Rolled-Up Obligations*" shall have the meaning as assigned in *Section 2.24*.

"*RSA Plan*" means the "Plan" as contemplated by and as defined in the Restructuring Support Agreement.

"*S&P*" shall mean S&P Global Ratings, a business unit of Standard & Poor's Financial Services LLC, a subsidiary of S&P Global Inc.

"*Sanctioned Country*" shall mean, at any time, a country or territory which is itself the subject or target of any Sanctions Laws (as of the date of this Agreement, Cuba, Iran, North Korea, Syria, and the Crimea region of Ukraine).

"*Sanctioned Person*" shall mean, at any time, (a) any Person listed in any Sanctions-related list of designated Persons, (b) any Person headquartered, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by, or acting for or on behalf of, any Person described in *clauses (a)* or *(b)* or *(d)* otherwise the subject or target of Sanctions.

"*Sanctions Laws*" shall mean laws, rules or regulations relating to economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or any other relevant sanctions authority with jurisdiction over the Borrower or any of its Subsidiaries.

"*Scheduled Maturity Date*" shall mean the one year anniversary of the Petition Date.

"*SEC*" shall mean the Securities and Exchange Commission or any successor thereto.

"*Second Lien DIP Term Loan Credit Agreement*" shall mean that certain Debtor-In-Possession Credit, Security and Guaranty Agreement, dated as of the date hereof, by and among

US-DOCS\115808185.26

Centric Brands, Inc., as Borrower, the Guarantors party thereto, U.S. Bank, National Association, as administrative agent and collateral agent and the lenders from time to time party thereto.

"*Second Lien DIP Term Loan Documents*" shall mean the "*Loan Documents*" as defined in the Second Lien DIP Term Loan Credit Agreement.

"*Second Lien DIP Term Loan Lenders*" shall mean the "Lenders" under and as defined in the Second Lien DIP Term Loan Credit Agreement.

"*Second Lien DIP Term Loan Obligations*" shall mean the "*Obligations*" under and as defined in the Second Lien DIP Term Loan Credit Agreement.

"*Secured Parties*" shall mean, collectively, the Administrative Agent, the Collateral Agent, the Documentation Agent, the Lenders, the Issuing Banks, each Indemnitee pursuant to Section 9.05 and each co-agent or sub-agent appointed by any Agent from time to time pursuant to this Agreement.

"*Securitization Assets*" shall mean (x) in respect of the PNC Securitization, the accounts receivable of the Loan Parties and other Supporting Assets (as defined in the PNC Receivables Purchase Agreement and any other assets of the Securitization Subsidiary pledged or sold pursuant to the terms of the Receivables Purchase Agreement and the other PNC Securitization Documents and (y) in respect to any other Qualified Securitization Financing, (i) the accounts receivable of one or more of the Loan Parties sold or contributed to a Securitization Subsidiary pursuant and subject to such Qualified Securitization Financing (all "*Pool Receivables*"), the related security with respect to such Pool Receivables, (iii) all collections with respect to such Pool Receivables, (iv) the cash collateral accounts, the lock boxes and collection accounts owned by such Securitization Subsidiary and all amounts on deposit therein, and all certificates and instruments, if any, from time to time evidencing such lock-boxes and collection accounts and amounts on deposit therein, (v) all rights (but none of the obligations) of the Securitization Subsidiary transferred under the applicable purchase and sale agreement, (vi) all other personal and fixture property or assets of the applicable Securitization Subsidiary of every kind and nature including, without limitation, all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts, chattel paper (whether tangible or electronic), deposit accounts, securities accounts, securities entitlements, letter-of-credit rights, commercial tort claims, securities and all other investment property, supporting obligations, money, any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (including all payment intangibles) (each as defined in the UCC) and (vii) all proceeds of, and all amounts received or receivable under any or all of, the foregoing.

"*Securitization Fees*" shall mean distributions or payments made directly or by means of discounts with respect to any participation interest issued or sold in connection with, and other fees paid in connection with any Qualified Securitization Financing.

"*Securitization Financing*" shall mean any transaction or series of transactions that may be entered into by the Borrower or any of its Subsidiaries pursuant to which the Borrower or any of its Subsidiaries may sell, convey or otherwise transfer to (a) a Securitization Subsidiary (in the case of a transfer by the Borrower or any of its Subsidiaries) or (b) any other Person (in the case

of a transfer by a Securitization Subsidiary), or may grant a security interest in, any Securitization Assets of the Borrower or any of its Subsidiaries. For the avoidance of doubt, a "Securitization Financing" for the purposes of this agreement shall include any on- or off-balance sheet receivables securitization arrangement (including the PNC Securitization), as well as, any factoring arrangement, receivables financing or vendor financing arrangement.

"*Securitization Order*" shall means an interim or final order, as applicable, based on which such order is then in effect, of the Bankruptcy Court in the Chapter 11 Cases, in form and substance satisfactory to the Borrower, Administrative Agent and the Required Lenders in their sole discretion, regarding the PNC Securitization, as the same may be amended or modified from time to time, with the consent of the Required Lenders.

"*Securitization Provider*" shall mean (a) the PNC Securitization Parties for so long as the PNC Securitization is in effect and (b) any other person designated by the Borrower as a "Securitization Provider" in connection with a Securitization Financing entered into by the Borrower or any of its subsidiaries or a Securitization Subsidiary from time to time.

"*Securitization Subsidiary*" shall mean a Wholly Owned Subsidiary of the Borrower (or another Person formed for the purposes of engaging in a Qualified Securitization Financing in which the Borrower or any Subsidiary of the Borrower makes an Investment and to which the Borrower or any Subsidiary of the Borrower transfers Securitization Assets and related assets) that engages in no activities other than in connection with the financing of Securitization Assets of the Borrower or its Subsidiaries, all proceeds thereof and all rights (contingent and other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and which is designated by the board of directors of the Borrower or such other Person (as provided below) as a Securitization Subsidiary and (a) no portion of the Indebtedness or any other obligations (contingent or otherwise) of which (i) is guaranteed by the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary (excluding guarantees of obligations (other than the principal of, and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is recourse to or obligates the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary, in any way other than pursuant to Standard Securitization Undertakings (other than with respect any repayment obligations under any "*Eligible Supporting Letter of Credit*" (as defined in the related Qualified Securitization Documents)) or (iii) subjects any property or asset of the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings, (b) with which none of the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary, has any material contract, agreement, arrangement or understanding other than on terms which the Borrower reasonably believes to be no less favorable to the Borrower or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Borrower and (c) to which none of the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary, has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results. Any such designation by the board of directors of the Borrower or such other Person shall be evidenced to the Administrative Agent by delivery to the Administrative Agent of a certified copy of the resolution of the board of directors of the Borrower or such other Person giving effect to such

-49-

designation and a certificate executed by a Responsible Officer certifying that such designation complied with the foregoing conditions.

"***Security Documents***" shall mean the DIP Order, this Agreement (including, without limitation, ***Error! Reference source not found.*** hereto), any mortgages, the Guaranty, any intellectual property security agreements and each of the security agreements, mortgages and other instruments and documents executed and delivered in connection with this Agreement or pursuant to ***Error! Reference source not found.***, in each case, as amended from time to time in accordance with the terms hereof and thereof.

"***Settlement***" shall have the meaning as assigned in *Section 2.04(d)(i)*.

"***Settlement Date***" shall have the meaning as assigned in *Section 2.04(d)(i)*.

"***Similar Business***" shall mean any business or activity of the Borrower or any of its Subsidiaries currently conducted or proposed as of the Closing Date, or any business or activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof, or is synergistic with or complementary, incidental, ancillary or related thereto.

"***Standard Letter of Credit Practice***" shall mean, for Issuing Bank, any domestic or foreign law or letter of credit practices applicable in the city in which Issuing Bank issued the applicable Letter of Credit or, for its branch or correspondent, such laws and practices applicable in the city in which it has advised, confirmed or negotiated such Letter of Credit, as the case may be, in each case, (a) which letter of credit practices are of banks that regularly issue letters of credit in the particular city, and (b) which laws or letter of credit practices are required or permitted under ISP or UCP, as chosen in the applicable Letter of Credit.

"***Standard Securitization Undertakings***" means representations, warranties, covenants and indemnities entered into by the Borrower or any Subsidiary of the Borrower that are customary in a Securitization Financing.

"***Sterling***" shall mean the lawful money of the United Kingdom.

"***Subordinated Convertible Note***" shall mean, collectively, each subordinated convertible promissory note, dated as of October 29, 2018, issued by the Borrower for the benefit of the parties listed therein and identified to the Administrative Agent, as investors, as the same may be amended, amended and restated, restated, supplemented or otherwise modified in accordance with the terms hereof.

"***subsidiary***" shall mean, with respect to any person (herein referred to as the "***parent***"), any corporation, partnership, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, directly or indirectly, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent; *provided* that in no event shall any Securitization Subsidiary be deemed a subsidiary hereunder unless otherwise specified herein.

-50-

"*Subsidiary*" shall mean, unless the context otherwise requires, a subsidiary of the Borrower.

"*Subsidiary Loan Party*" shall mean (i) each of the Wholly Owned Subsidiaries of the Borrower set forth on *Schedule 1.01(g)* hereto on the Closing Date and (ii) each other Domestic Subsidiary of the Borrower formed or acquired after the Closing Date (other any Excluded Subsidiary).

"*Superpriority Claim*" means a claim against a Loan Party in any of the Chapter 11 Cases that is a superpriority administrative expense claim having priority over any or all administrative expenses and other claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546, 726, 1113 and/or 1114 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.

"*Swap Agreement*" shall mean any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; *provided*, that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of the Subsidiaries shall be a Swap Agreement.

"*Takings or Casualty Event*" shall mean any loss of, damage to or destruction of, or any condemnation or other taking for public use by any Governmental Authority of, any property of any Loan Party or any of its Subsidiaries.

"*Taxes*" shall mean any and all present or future taxes, levies, imposts, duties (including stamp duties), deductions, withholdings (including backup withholding), assessments, fees or other similar charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Tengram*" shall mean Tengram Capital Partners, LP.

"*Term SOFR*" means the forward-looking term rate based on SOFR that has been selected or recommended by the relevant Governmental Authority.

"*Test Period*" shall mean, as of any date of determination, the period of four consecutive fiscal quarters of the Borrower then most recently ended and Reported (taken as one accounting period).

"*Trade Secret Licenses*" shall mean all agreements, licenses and covenants providing for the grant to or from a Loan Party of any right in or to any Trade Secret or otherwise providing for a covenant not to sue for misappropriation or other violation of a Trade Secret, including those in which a Loan Party is a licensor or licensee thereunder.

US-DOCS\115808185.26

"*Trade Secrets*" shall mean, with respect to any Loan Party, all of such Loan Party's right, title and interest in and to all trade secrets and with respect to any and all of the foregoing (i) all rights to sue or otherwise recover for any past, present and future misappropriation or other violation thereof, (ii) all proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages, proceeds of suit and other payments now or hereafter due and/or payable with respect thereto, and (iii) all other rights of any kind accruing thereunder or pertaining thereto throughout the world.

"*Trademark Licenses*" shall mean all written agreements, licenses and covenants providing for the grant to or from a Loan Party of any right in or to any Trademark or otherwise providing for a covenant not to sue for infringement, dilution, or other violation of any Trademark or permitting co-existence with respect to a Trademark.

"*Trademarks*" shall mean, with respect to any Loan Party, all of such Loan Party's right, title and interest in and to all domestic, foreign and multinational trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade dress, trade styles, logos, Internet domain names, other indicia of origin or source identification, and general intangibles of a like nature, whether registered or unregistered, and, with respect to any and all of the foregoing, (i) all extensions and renewals thereof, (ii) all of the goodwill of the business connected with the use of and symbolized by any of the foregoing, (iii) all rights to sue or otherwise recover for any past, present and future infringement, dilution, or other violation thereof, (iv) all proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages, proceeds of suit and other payments now or hereafter due and/or payable with respect thereto, and (v) all other rights of any kind accruing thereunder or pertaining thereto throughout the world.

"*Transaction Costs*" shall mean fees, premiums, expenses, closing payments and other similar transaction costs (including original issue discount or upfront fees) payable or otherwise borne by Borrower and/or its subsidiaries in connection with the Transactions and the transactions contemplated thereby.

"*Transactions*" shall mean, collectively, (a) the execution, delivery and the performance by the Loan Parties on the Closing Date of the Loan Documents and the Second Lien DIP Term Loan Documents, (b) the repayment of the 2020 Term Loans (as defined in the Pre-Petition First Lien Credit Agreement) and (c) the payment of the Transaction Costs.

"*Transformation Office*" shall have the meaning set forth in ***Error! Reference source not found.***.

"*Transformation Office Plan*" shall have the meaning set forth in ***Error! Reference source not found.***.

"*Type*," when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined. For purposes hereof, the term "*Rate*" shall include the Adjusted Eurocurrency Rate and ABR.

"*UCP*" shall mean, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600

and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"*Uniform Commercial Code*" and "*UCC*" shall mean the Uniform Commercial Code in effect in the State of New York; *provided* that if by reason of mandatory provisions of applicable law, the perfection, non-perfection or priority of a security interest is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of New York, the term "*Uniform Commercial Code*" means the Uniform Commercial Code in effect in such other jurisdiction for the purposes of the provisions in the Loan Documents relating to such perfection or priority.

"*Upfront Fee*" shall have the meaning specified in *Section 2.12(c)*.

"*U.S. Dollars*" or "*$*" shall mean lawful money of the United States of America.

"*U.S. Lending Office*" shall mean, as to any Lender, the applicable branch, office or Affiliate of such Lender designated by such Lender to make Loans to the Borrower.

"*U.S. Person*" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"*U.S. Tax Compliance Certificate*" shall have the meaning specified in *Section 2.17(g)*.

"*Variance Report*" means a report, in each case certified by a Responsible Officer of Borrower, in substantially the form of the attached Exhibit E and otherwise in form and substance reasonably satisfactory to the Required Lenders, delivered in accordance with ==*Error! Reference source not found.5.04(n)*==, showing (i) actual disbursements, actual cash receipts and professional fees as reported by such professionals in accordance with the DIP Orders, actual net cash flow for the applicable Variance Test Period as of the end of the week immediately preceding the week during which such Variance Report is delivered and the variance (as a percentage) on a cumulative basis for the entire Variance Test Period of such amounts from the corresponding anticipated amounts therefor set forth in the applicable DIP Budget and (ii) analysis and explanations for all material violations and setting forth the actions which the Borrower has taken or intends to take with respect thereto.

"*Variance Test Period*" means, the period commencing on May 22, 2020 through and including the most recently ended calendar week in the then current DIP Budget; *provided* that during a Monthly Budget Testing Period the Variance Test Period shall be the period commencing on the beginning of the most recently ended calendar month to the end of the month most recently ended calendar month.

"*Voting Stock*" shall mean, as to any entity, all classes of Equity Interests of such entity then outstanding and normally entitled to vote in the election of directors of such entity.

"*Wholly Owned Subsidiary*" of any person shall mean a subsidiary of such person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such person or another Wholly Owned Subsidiary of such person.

US-DOCS\115808185.26

"*Withdrawal Liability*" shall mean liability to a Multiemployer Plan as a result of a "complete withdrawal" or "partial withdrawal" from such Multiemployer Plan, as such terms are defined in Section 4201(b) of ERISA.

"*Withholding Agent*" shall mean any Loan Party and the Administrative Agent.

"*Write-Down and Conversion Powers*" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Terms Generally. (a) The definitions set forth or referred to in *Section 1.01* shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "*include*," "*includes*" and "including" shall be deemed to be followed by the phrase "*without limitation*." All references herein to *Articles*, *Sections*, *Exhibits* and *Schedules* shall be deemed references to *Articles* and *Sections* of, and *Exhibits* and *Schedules* to, this Agreement unless the context shall otherwise require. Except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document or other document or agreement shall mean such document as amended, restated, amended and restated, supplemented or otherwise modified from time to time. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided*, that, although all financial statements required to be delivered in accordance with *Sections 5.04(a)* and *5.04(b)* will be prepared in accordance with GAAP as in effect at such time such audit is performed, if a change in GAAP (or in the interpretation of GAAP) after the Closing Date would affect the computation of any financial ratio or requirement set forth in any Loan Document, the Borrower may request an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. For purposes of determining compliance with amounts and ratios contained herein (including for the purposes of calculating compliance with any financial covenant) contained herein, (i) with respect to accounting for revenue recognition from contracts with customers and the impact of such accounting in accordance with FASB ASC 606 on the definitions and the calculation of amounts and ratios contained herein, GAAP as in effect on the Closing Date shall be applied and (ii) Indebtedness of the Borrower and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and without giving effect to any election under FASB ASC 825 and FASB ASC 470-20 (or any other financial accounting standard having a similar result or effect) to value any Indebtedness of the Borrower or its Subsidiaries at "fair value" as defined therein.

Any restriction, condition or prohibition applicable to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, set forth herein shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a

-54-

series of a limited liability company, as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, as applicable.

(b)    All terms used in this Agreement which are defined in Article 8 or Article 9 of the NYUCC as in effect from time to time and which are not otherwise defined herein shall have the same meanings herein as set forth therein, provided that terms used herein which are defined in the UCC as in effect on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Required Lenders and the Borrower may otherwise agree.

(c)    For purposes of determining compliance with any provision of this Agreement which requires a determination of whether a certain action or transaction is included in the DIP Budget, permitted under the DIP Budget, or any other analogous phrase, the projections set forth in the DIP Budget as in effect at the time of the applicable action or transaction shall be used to determine compliance.

Section 1.03    [Reserved].

Section 1.04    Currency Translation. For purposes of determining compliance as of any date with *Section 6.01*, *6.02*, *6.04*, *6.05*, *6.06* or *6.07*, amounts incurred or outstanding in currencies other than U.S. Dollars shall be translated into U.S. Dollars at the exchange rates in effect on the first Business Day of the fiscal quarter in which such determination occurs or in respect of which such determination is being made, as such exchange rates shall be determined in good faith by the Borrower. No Default or Event of Default shall arise as a result of any limitation or threshold set forth in U.S. Dollars in *Section 6.01*, *6.02*, *6.04*, *6.05*, *6.06* or *6.07* or *paragraph (f)* or *(j)* of *Section 7.01* being exceeded solely as a result of changes in currency exchange rates from those applicable on the first day of the fiscal quarter in which such determination occurs or in respect of which such determination is being made.

Section 1.05    Letter of Credit Amounts. Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the stated amount of such Letter of Credit in effect at such time; *provided*, *however*, that with respect to any Letter of Credit that, by its terms or the terms of any document related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall at all times be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such times.

Section 1.06    [Reserved].

Section 1.07    Cashless Rolls. Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, any Lender may exchange, continue or roll over all or a portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrower, the Administrative Agent and such Lender.

US-DOCS\115808185.26

ARTICLE II

The Credits

Section 2.01    Commitments. Subject to the terms and conditions set forth herein:

(a)        [Reserved].

(b)        Subject to the terms and conditions of this Agreement, including, without limitation, the requirements of *Article IV* and the DIP Order, during the Revolving Availability Period, each Revolving Lender agrees (severally, not jointly or jointly and severally) to make revolving loans to Borrower, (i) on the Closing Date, in an amount not to exceed the Initial Funding Amount, and (ii) commencing on the Delayed Funding Date, in an amount at any one time outstanding not to exceed such Lender's Commitment; *provided* that the aggregate principal amount of Revolving Facility Exposure at any time outstanding shall not exceed the Maximum Revolver Amount.

(c)        The outstanding principal amount of the Loans, together with interest accrued and unpaid thereon, shall constitute Obligations and shall be due and payable on the Maturity Date or, if earlier, on the date on which they are declared due and payable pursuant to the terms of this Agreement or the date on which Commitments with respect thereto have been terminated pursuant to the terms of this Agreement.

(d)        Anything to the contrary in this *Section 2.01* notwithstanding, Administrative Agent shall have the right (but not the obligation), in the exercise of its Permitted Discretion, to establish and increase or decrease Reserves against the Borrowing Base. The amount of any Reserve established by Administrative Agent shall have a reasonable relationship to the event, condition, other circumstance, or fact that is the basis for such Reserve and shall not be duplicative of any other reserve established and currently maintained.

(e)        Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and, subject to the terms and conditions of this Agreement, reborrow Loans.

Section 2.02    Loans and Borrowings.

(a)        Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type made by the Lenders ratably in accordance with their respective Commitments.

(b)        Subject to *Section 2.14*, each Borrowing shall be comprised entirely of ABR Loans or Eurocurrency Loans as the Borrower may request in accordance herewith. Each Lender at its option may make any ABR Loan or Eurocurrency Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided*, that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement and such Lender shall not be entitled to any amounts payable under *Section 2.15* or *2.17* solely in respect of increased costs or taxes resulting from such exercise and existing at the time of such exercise.

US-DOCS\115808185.26

(c)     At the commencement of each Interest Period for any Eurocurrency Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum. At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum; *provided*, that an ABR Borrowing may be in an aggregate amount that is equal to the entire unused balance of the Commitments. Borrowings of more than one Type may be outstanding at the same time; *provided*, that there shall not at any time be more than a total of three Eurocurrency Borrowings outstanding under the Revolving Credit Facility.

(d)     [Reserved].

(e)     If no election as to the Type of Borrowing or is specified, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested Eurocurrency Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

Section 2.03     [Reserved].

Section 2.04     <u>Revolving Borrowing Procedures and Settlements</u>.

(a)     <u>Procedure for Borrowing Loans</u>. Each Revolving Borrowing shall be made by a written Borrowing Request by an Authorized Person delivered to Administrative Agent and received by Administrative Agent no later than 10:00 a.m. on the Business Day that is five (5) Business Days prior to the requested Funding Date.

(b)     <u>Making of Loans</u>.

(i)     After receipt of a request for a Revolving Borrowing pursuant to *Section 2.04(a)*, Administrative Agent shall notify the Lenders by telecopy, telephone, email, or other electronic form of transmission, of the requested Revolving Borrowing. If Administrative Agent has notified the Revolving Lenders of a requested Revolving Borrowing five (5) Business Days prior to the Funding Date, then each Revolving Lender shall make the amount of such Lender's Applicable Percentage of the requested Revolving Borrowing available to Administrative Agent in immediately available funds, to Administrative Agent's Account, not later than 12.00 p.m. on the Business Day that is the requested Funding Date. After Administrative Agent's receipt of the proceeds of such Loans from the Revolving Lenders, Administrative Agent shall make the proceeds thereof available to Borrower on the applicable Funding Date by transferring immediately available funds equal to such proceeds received by Agent to the Designated Account; *provided*, that, subject to the provisions of *Section 2.04(c)(ii)*, no Revolving Lender shall have an obligation to make any Loan to the extent the requested Revolving Borrowing would exceed the Availability on such Funding Date. Administrative Agent shall charge to the Loan Account usual and customary fees for the wire transfer of each Revolving Borrowing.

(ii)     Unless Administrative Agent receives notice from a Revolving Lender prior to 9:30 a.m. on the Business Day that is the requested Funding Date relative to a requested

-57-

Revolving Borrowing as to which Administrative Agent has notified the Revolving Lenders of a requested Revolving Borrowing that such Revolving Lender will not make available as and when required hereunder to Administrative Agent for the account of Borrower the amount of that Revolving Lender's Applicable Percentage of the Revolving Borrowing, Administrative Agent may assume that each Revolving Lender has made or will make such amount available to Administrative Agent in immediately available funds on the Funding Date and Administrative Agent may (but shall not be so required), in reliance upon such assumption, make available to Borrower a corresponding amount. If, on the requested Funding Date, any Revolving Lender shall not have remitted the full amount that it is required to make available to Administrative Agent in immediately available funds and if Administrative Agent has made available to Borrower such amount on the requested Funding Date, then such Revolving Lender shall make the amount of such Revolving Lender's Applicable Percentage of the requested Revolving Borrowing available to Administrative Agent in immediately available funds, to Administrative Agent's Account, no later than 10:00 a.m. on the Business Day that is the first Business Day after the requested Funding Date (in which case, the interest accrued on such Revolving Lender's portion of such Revolving Borrowing for the Funding Date shall be for Administrative Agent's separate account). If any Revolving Lender shall not remit the full amount that it is required to make available to Administrative Agent in immediately available funds as and when required hereby and if Administrative Agent has made available to Borrower such amount, then that Revolving Lender shall be obligated to immediately remit such amount to Administrative Agent, together with interest at the Defaulting Lender Rate for each day until the date on which such amount is so remitted. A notice submitted by Administrative Agent to any Revolving Lender with respect to amounts owing under this _Section 2.04(c)(ii)_ shall be conclusive, absent manifest error. If the amount that a Revolving Lender is required to remit is made available to Administrative Agent, then such payment to Administrative Agent shall constitute such Revolving Lender's Loan for all purposes of this Agreement. If such amount is not made available to Administrative Agent on the Business Day following the Funding Date, Administrative Agent will notify Borrower of such failure to fund and, upon demand by Administrative Agent, Borrower shall pay such amount to Administrative Agent for Administrative Agent's account, together with interest thereon for each day elapsed since the date of such Borrowing, at a rate per annum equal to the interest rate applicable at the time to the Loans composing such Revolving Borrowing.

(c)        Protective Advances and Optional Overadvances.

(i)        Any contrary provision of this Agreement or any other Loan Document notwithstanding, but subject to _Section 2.04(c)(iv)_, at any time (A) after the occurrence and during the continuance of a Default or an Event of Default, or (B) that any of the other applicable conditions precedent set forth in _Article IV_ are not satisfied, Administrative Agent hereby is authorized by Borrower and the Revolving Lenders, from time to time, in Administrative Agent's sole discretion, to make Loans to, or for the benefit of, Borrower, on behalf of the Revolving Lenders, that Administrative Agent in its Permitted Discretion deems necessary or desirable (1) to preserve or protect the Collateral or any portion thereof, or (2) to enhance the likelihood of repayment of the Obligations (the Loans described in this _Section 2.04(c)(i)_ shall be referred to as "**_Protective Advances_**"). Notwithstanding the

US-DOCS\115808185.26

foregoing, no Protective Advance shall be made which would cause the aggregate amount of all Protective Advances outstanding at any one time to exceed 10% of the Aggregate Commitment unless the Required Lenders otherwise agree.

(ii)    Any contrary provision of this Agreement or any other Loan Document notwithstanding, but subject to *Section 2.04(c)(iv)*, the Revolving Lenders hereby authorize Administrative Agent, and Administrative Agent may, but is not obligated to, knowingly and intentionally, continue to make Loans to Borrower notwithstanding that an Overadvance exists or would be created thereby, so long as (A) after giving effect to such Loans, the outstanding Revolving Facility Exposure does not exceed the Borrowing Base by more than 10% of the Aggregate Commitment (unless the Required Lenders agree to a higher amount), and (B) after giving effect to such Loans, the outstanding Revolving Facility Exposure does not exceed the Aggregate Commitment. In the event Administrative Agent obtains actual knowledge that an Overadvance exists, regardless of the amount of, or reason for, such excess, Administrative Agent shall notify the Lenders as soon as practicable and the Lenders with Commitments thereupon shall, together with Administrative Agent, jointly determine the terms of arrangements that shall be implemented with Borrower intended to eliminate the Overadvance within thirty (30) days. In such circumstances, if any Lender with a Commitment objects to the proposed terms of reduction or repayment of any Overadvance, the terms of reduction or repayment thereof shall be implemented according to the determination of the Required Lenders. The foregoing provisions are meant for the benefit of the Revolving Lenders and Administrative Agent and are not meant for the benefit of Borrower. Each Lender with a Commitment shall be obligated to make Loans in accordance with *Section 2.04(b)* in, or settle Overadvances made by Administrative Agent with Administrative Agent as provided in *Section 2.04(d)* (or *Section 2.23*, as applicable) for, the amount of such Lender's Applicable Percentage of any unintentional Overadvances by Administrative Agent reported to such Revolving Lender, any intentional Overadvances made as permitted under this *Section 2.04(c)(ii)*, and any Overadvances resulting from the charging to the Revolving Loan Account of interest, fees, or expenses of the Administrative Agent.

(iii)    Each Protective Advance and each Overadvance (each, an "***Extraordinary Advance***") shall be deemed to be a Loan hereunder. Prior to Settlement with respect to Extraordinary Advances, all payments on the Extraordinary Advances made by Administrative Agent, including interest thereon, shall be payable to Administrative Agent solely for its own account. The Extraordinary Advances shall be repayable on demand, be secured by the Liens of the Collateral Agent, constitute Obligations hereunder, and bear interest at the rate applicable from time to time to Loans. The provisions of this *Section 2.04(c)* are for the exclusive benefit of Administrative Agent and the Revolving Lenders and are not intended to benefit Borrower (or any other Loan Party) in any way.

(iv)    Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary: (A) no Extraordinary Advance may be made by Administrative Agent if such Extraordinary Advance would cause the aggregate principal amount of Extraordinary Advances outstanding to exceed an amount equal to 10% or more of the Aggregate Commitment; and (B) to the extent that the making of any Extraordinary Advance causes the aggregate Revolving Facility Exposure to exceed the Aggregate

-59-

Commitment, such portion of such Extraordinary Advance shall be for Administrative Agent's sole and separate account and not for the account of any Revolving Lender.

(d)    _Settlement_. It is agreed that each Revolving Lender's funded portion of the Loans is intended by the Revolving Lenders to equal, at all times, such Revolving Lender's Applicable Percentage of the outstanding Loans. Such agreement notwithstanding, Administrative Agent and the Revolving Lenders agree (which agreement shall not be for the benefit of Borrower) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among the Revolving Lenders as to the Loans (including Extraordinary Advances) shall take place on a periodic basis in accordance with the following provisions:

(i)    Administrative Agent shall request settlement ("**_Settlement_**") with the Revolving Lenders on a weekly basis (or, on a more or less frequent basis if so determined by Administrative Agent in its reasonable discretion but not less frequently than once per month) (A) for itself, with respect to Extraordinary Advances, and (B) with respect to Borrower's or its Subsidiaries' payments or other amounts received, as to each by notifying the Revolving Lenders by telecopy, telephone, or other similar form of transmission, of such requested Settlement, no later than five (5) Business Days immediately prior to the date of such requested Settlement (the date of such requested Settlement being the "**_Settlement Date_**"). Such notice of a Settlement Date shall include a summary statement of the amount of outstanding Loans (including Extraordinary Advances) for the period since the prior Settlement Date. Subject to the terms and conditions contained herein (including _Section 2.23_): (1) if the amount of the Loans (including Extraordinary Advances) made by a Revolving Lender that is not a Defaulting Lender exceeds such Lender's Applicable Percentage of the Loans (including Extraordinary Advances) as of a Settlement Date, then Administrative Agent shall, by no later than 12:00 p.m. on the Settlement Date, transfer in immediately available funds to a deposit account of such Revolving Lender (as such Revolving Lender may designate), an amount such that each such Revolving Lender shall, upon receipt of such amount, have as of the Settlement Date, its Applicable Percentage of the Loans (including Extraordinary Advances), and (2) if the amount of the Loans (including Extraordinary Advances) made by a Revolving Lender is less than such Revolving Lender's Applicable Percentage of the Loans (including Extraordinary Advances) as of a Settlement Date, such Revolving Lender shall no later than 12:00 p.m. on the Settlement Date transfer in immediately available funds to Administrative Agent's Account, an amount such that each such Revolving Lender shall, upon transfer of such amount, have as of the Settlement Date, its Applicable Percentage of the Loans (including Extraordinary Advances). Such amounts made available to Agent under _clause (2)_ of the immediately preceding sentence shall be applied against the amounts of the applicable Extraordinary Advances and shall constitute Loans of such Lenders. If any such amount is not made available to Administrative Agent by any Revolving Lender on the Settlement Date applicable thereto to the extent required by the terms hereof, Administrative Agent shall be entitled to recover for its account such amount on demand from such Revolving Lender together with interest thereon at the Defaulting Lender Rate.

(ii)    In determining whether a Revolving Lender's balance of the Loans (including Extraordinary Advances) is less than, equal to, or greater than such Revolving

Lender's Applicable Percentage of the Loans (including Extraordinary Advances) as of a Settlement Date, Administrative Agent shall, as part of the relevant Settlement, apply to such balance the portion of payments actually received in good funds by Administrative Agent with respect to principal, interest, fees payable by Borrower and allocable to the Revolving Lenders hereunder, and proceeds of Collateral.

(iii)    Between Settlement Dates, Administrative Agent, to the extent Extraordinary Advances for the account of Administrative Agent are outstanding, may apply any payments or other amounts received by Administrative Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the Loans, to the Extraordinary Advances. During the period between Settlement Dates, Administrative Agent with respect to Extraordinary Advances, and each Revolving Lender with respect to the Loans other than Extraordinary Advances, shall be entitled to interest at the applicable rate or rates payable under this Agreement on the daily amount of funds employed by Administrative Agent, or the Revolving Lenders, as applicable.

(iv)    Anything in this _Section 2.04(d)_ to the contrary notwithstanding, in the event that a Revolving Lender is a Defaulting Lender, Administrative Agent shall be entitled to refrain from remitting settlement amounts to the Defaulting Lender and, instead, shall be entitled to elect to implement the provisions set forth in _Section 2.23_. In furtherance of the foregoing, each Revolving Lender hereby acknowledges that its obligation to provide Settlement pursuant to this _Section 2.04(d)_ is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or Event of Default, or the reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever. The Settlement provisions set forth in this _Section 2.04(d)_ shall not relieve the Borrower of any default in the payment thereof.

(e)    Notation. Administrative Agent, as a non-fiduciary agent for Borrower, shall maintain a register showing the principal amount of the Loans owing to each Lender, and Extraordinary Advances owing to Administrative Agent, and the interests therein of each Lender, from time to time and such register shall, absent manifest error, be presumed to be correct and accurate. In the event of any conflict between the entries made in the register maintained by the Administrative Agent pursuant to this _Section 2.04(e)_ and entries made in the Register maintained by the Administrative Agent pursuant to _Section 9.04(b)(ii),_ the entries made in the Register maintained by the Administrative Agent shall govern and control absent manifest error.

(f)    Crediting Payments. The receipt of any payment item in respect of the Revolving Credit Facility by Administrative Agent shall not be required to be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to Administrative Agent's Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrower shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Administrative Agent only if it is received into Administrative Agent's Account on a Business Day on or before 1:30 p.m. (Local Time). If any payment item is received into Administrative Agent's Account on a non-Business Day or after 1:30 p.m. (Local Time) on a

US-DOCS\115808185.26

Business Day (unless Administrative Agent, in its sole discretion, elects to credit it on the date received), it shall be deemed to have been received by Administrative Agent as of the opening of business on the immediately following Business Day.

(g)    Designated Account. Administrative Agent is authorized to make the Loans, and each Issuing Bank is authorized to issue the Letters of Credit, under this Agreement based upon telephonic or other instructions received from anyone purporting to be an Authorized Person. Borrower agrees to establish and maintain the Designated Account for the purpose of receiving the proceeds of the Loans requested by Borrower and made by Administrative Agent or the Revolving Lenders hereunder. Unless otherwise agreed by Administrative Agent and Borrower, any Loan requested by Borrower and made by Administrative Agent or the Revolving Lenders hereunder shall be made to the Designated Account.

(h)    Maintenance of Revolving Loan Account; Statements of Obligations. Administrative Agent shall maintain an account on its books in the name of Borrower (the "***Revolving Loan Account***") on which Borrower will be charged with the Loans (including Extraordinary Advances) made by Administrative Agent or the Revolving Lenders to Borrower or for Borrower's account, the Letters of Credit issued or arranged by each Issuing Bank for Borrower's account, and with all other payment Obligations on account of the Revolving Credit Facility hereunder or under the other Loan Documents, including, accrued interest and fees on account thereof. In accordance with ***Section 2.04(f)***, the Revolving Loan Account will be credited with all payments received by Administrative Agent from Borrower or for Borrower's account in respect of the Revolving Credit Facility. Administrative Agent shall make available to Borrower monthly statements regarding the Revolving Loan Account, including the principal amount of the Loans and interest and fees accrued with respect thereto, and each such statement, absent manifest error, shall be conclusively presumed to be correct and accurate unless, within 30 days after Administrative Agent first makes such a statement available to Borrower, Borrower shall deliver to Administrative Agent written objection thereto describing the error or errors contained in such statement.

Section 2.05    Letters of Credit.

(a)    Effective upon the occurrence of the Closing Date, without any further action by any party to this Agreement, the Bankruptcy Court or any other Person, to the extent set forth in the Interim Order, the Existing Letters of Credit shall be deemed issued under this Agreement and shall be subject to the terms of this Agreement. Notwithstanding anything else to the contrary in this Agreement, no Letter of Credit shall be issued, amended, renewed or replaced without the prior written consent of each of the Administrative Agent and the Issuing Bank, each of which may be withheld in their sole discretion, and in any event no Letter of Credit may be extended to have an expiration date later than five Business Days prior to the Maturity Date. No Letters of Credit shall be issued or deemed issued under this Agreement, other than the Existing Letters of Credit, without the consent of each of the Administrative Agent and the Issuing Bank. For the avoidance of doubt, (i) no Issuing Bank shall be required to issue any Letters of Credit and (ii) the expiration, termination or cancellation of any Existing Letter of Credit shall not create any obligation for any Issuing Bank to issue any new Letter of Credit.

(b)    [Reserved].

US-DOCS\115808185.26

(c)    The Borrower may request the Administrative Agent to issue or cause to be issued under the Revolving Credit Facility one or more Letters of Credit for its own account in such form as is acceptable to Administrative Agent and the Issuing Bank (if not Administrative Agent) in the Issuing Bank's or Administrative Agent's sole discretion, respectively. Each Letter of Credit (including the Existing Letters of Credit) shall constitute a utilization of the Commitment in an amount equal to the L/C Exposure attributable to such Letter of Credit.

(d)    To request the issuance, amendment, renewal or extension of a Letter of Credit Borrower shall deliver to Administrative Agent a notice requesting for issuance of a Letter of Credit or requesting the amendment, renewal or extension of an Existing Letter of Credit, identifying the Letter of Credit to be amended, renewed or extended, if applicable, and specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (in compliance with paragraph (e), below), the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit as applicable. Borrower also shall submit a letter of credit application on the Issuing Bank's standard form in connection with any request for a Letter of Credit or any request to amend, renew or extend a Letter of Credit, and copies of all invoices, purchase orders and shipping documents relating to the Inventory to be covered by such Letter of Credit as Administrative Agent and the Issuing Bank may request. In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by Borrower to, or entered into by Borrower with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.

(e)    [Reserved].

(f)    Each Letter of Credit issued hereunder shall expire at or prior to the close of business on the earlier of (A) the date which is twelve (12) months after the date of the issuance of such Letter of Credit (or, in the case of any amendment, renewal or extension thereof, twelve (12) months after the then-current expiration date of such Letter of Credit, so long as such amendment, renewal or extension occurs within three (3) months of such then-current expiration date), and (B) the Maturity Date, unless such Letter of Credit shall have been fully Cash Collateralized on or prior to the Maturity Date.

(g)    If the Issuing Bank shall make any L/C Disbursement in respect of a Letter of Credit, Borrower shall reimburse the Issuing Bank and/or Administrative Agent in respect of such L/C Disbursement as directed by the Issuing Bank and Administrative Agent in a joint written instruction, by paying to the Issuing Bank and/or Administrative Agent, as so directed, an amount equal to such L/C Disbursement not later than 1:30 p.m., Eastern Time, on (A) the Business Day that Borrower receives notice of such L/C Disbursement, if such notice is received prior to 10:00 a.m., Eastern Time, or (B) the Business Day immediately following the day that Borrower receives such notice, if such notice is not received prior to such time; *provided* that, Borrower may, subject to the conditions to borrowing set forth in this Agreement, request in accordance with the applicable provisions of this Agreement that such payment be financed with a Borrowing of Loans in an equivalent amount and, to the extent so financed, Borrower's obligation to make such payment in connection with an L/C Disbursement shall be discharged and replaced by the resulting Borrowing. Each such request for a Borrowing of Loans shall be subject to all applicable terms

-63-

and conditions of *Section 2.04*; *provided further* that, neither the reimbursement of an L/C Disbursement nor the cancellation of a Letter of Credit shall under any circumstances be deemed to grant the Borrower the right to request the issuance of any new Letters of Credit. With respect to any amount advanced by Administrative Agent and/or any Revolving Lenders and required to be reimbursed by Borrower pursuant to the foregoing provisions of this *paragraph (g)*, Borrower agrees that Administrative Agent may charge any such amount to the Revolving Loan Account on the dates such reimbursement is made.

(h)    Promptly following receipt of a notice of a L/C Disbursement, each Revolving Lender agrees to fund its Applicable Percentage of any Borrowing deemed made pursuant to paragraph (g) above, on the same terms and conditions as if Borrower, on behalf of the other Loan Parties, had requested the amount thereof as a Borrowing pursuant to *Section 2.04* and Administrative Agent shall promptly pay to the applicable Issuing Bank the amounts so received by it from the Revolving Lenders. By the issuance of a Letter of Credit and without any further action on the part of the applicable Issuing Bank or the Revolving Lenders, such Issuing Bank shall be deemed to have granted to each Revolving Lender, and each Revolving Lender shall be deemed to have purchased, a participation in each Letter of Credit issued by such Issuing Bank, in an amount equal to its Applicable Percentage of such Letter of Credit, and each such Revolving Lender agrees to pay to Administrative Agent, for the account of such Issuing Bank, such Revolving Lender's Applicable Percentage of any L/C Disbursement made by Issuing Bank under the applicable Letter of Credit. In consideration and in furtherance of the foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to pay to Administrative Agent, for the account of the applicable Issuing Bank, such Revolving Lender's Applicable Percentage of each L/C Disbursement made by such Issuing Bank and not reimbursed by the Borrower on the date due or of any reimbursement payment required to be refunded to the Borrower for any reason. Each Revolving Lender acknowledges and agrees that its obligation to deliver to Administrative Agent, for the account of the Issuing Bank, an amount equal to its respective Applicable Percentage of each Letter of Credit Disbursement pursuant to this *Section 2.05* shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of an Event of Default or Default or the failure to satisfy any condition set forth in Article IV. If any such Revolving Lender fails to make available to Administrative Agent the amount of such Revolving Lender's Applicable Percentage of a L/C Disbursement as provided in this *Section 2.05*, then Administrative Agent (for the account of the applicable Issuing Bank) shall be entitled to recover such amount on demand from such Revolving Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(i)    Borrower agrees to indemnify, defend and hold harmless (to the fullest extent permitted by law) each Lender and each Issuing Bank (including the branches, Affiliates, and correspondents of each Issuing Bank) and each other Indemnitee (each, including Issuing Bank, a "***Letter of Credit Related Person***") from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable out-of-pocket fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification, which may be incurred by or awarded against any such Letter of Credit Related Person (other than Taxes, which shall be governed by *Section 2.17*, unless such Taxes are imposed pursuant to a non-Tax claim on amounts payable pursuant to this *Section 2.05*) (the "***Letter of Credit Indemnified Costs***"), and which arise out of or in connection with, or as a result of:

-64-

(i)    any Letter of Credit or any pre-advice of its issuance;

(ii)    any transfer, sale, delivery, surrender or endorsement of any Drawing Document at any time(s) held by any such Letter of Credit Related Person in connection with any Letter of Credit;

(iii)    any action or proceeding arising out of, or in connection with, any Letter of Credit (whether administrative, judicial or in connection with arbitration), including any action or proceeding to compel or restrain any presentation or payment under any Letter of Credit, or for the wrongful dishonor of, or honoring a presentation under, any Letter of Credit;

(iv)    any independent undertakings issued by the beneficiary of any Letter of Credit;

(v)    any unauthorized instruction or request made to Issuing Bank in connection with any Letter of Credit or requested Letter of Credit or error in computer or electronic transmission;

(vi)    an adviser, confirmer or other nominated person seeking to be reimbursed, indemnified or compensated;

(vii)    any third party seeking to enforce the rights of an applicant, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds or holder of an instrument or document;

(viii)    the fraud, forgery or illegal action of parties other than the Letter of Credit Related Person;

(ix)    Issuing Bank's performance of the obligations of a confirming institution or entity that wrongfully dishonors a confirmation; or

(x)    the acts or omissions, whether rightful or wrongful, of any present or future de jure or de facto governmental or regulatory authority or cause or event beyond the control of the Letter of Credit Related Person;

in each case, including that resulting from the Letter of Credit Related Person's own negligence; *provided*, *however*, that such indemnity shall not be available to any Letter of Credit Related Person claiming indemnification under *clauses (i)* through *(x)* above to the extent that such Letter of Credit Indemnified Costs (x) are determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence, bad faith or willful misconduct of the Letter of Credit Related Person claiming indemnity, (y) result from a material breach by such Letter of Credit Related Person claiming indemnification at a time when the Borrower has not breached its obligations under the Loan Documents or (z) result from a dispute solely among Letter of Credit Related Persons. Borrower hereby agrees to pay the Letter of Credit Related Person claiming indemnity on demand from time to time all amounts owing under this *Section 2.05(i)*. If and to the extent that the obligations of Borrower under this *Section 2.05(i)* are unenforceable for any reason, Borrower agrees to make the maximum contribution to the Letter of

-65-

Credit Indemnified Costs permissible under applicable law. This indemnification provision shall survive termination of this Agreement and all Letters of Credit.

(j)      The liability of Issuing Bank (or any other Letter of Credit Related Person) under, in connection with or arising out of any Letter of Credit (or pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by Borrower that are caused directly by Issuing Bank's gross negligence or willful misconduct in (i) honoring a presentation under a Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such Letter of Credit, (ii) failing to honor a presentation under a Letter of Credit that strictly complies with the terms and conditions of such Letter of Credit or (iii) retaining Drawing Documents presented under a Letter of Credit. Issuing Bank shall be deemed to have acted with due diligence and reasonable care if Issuing Bank's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement. Borrower's aggregate remedies against Issuing Bank and any Letter of Credit Related Person for wrongfully honoring a presentation under any Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by Borrower to Issuing Bank in respect of the honored presentation in connection with such Letter of Credit under *Section 2.05(h)*, plus interest at the rate then applicable to Loans hereunder. Borrower shall take action to avoid and mitigate the amount of any damages claimed against Issuing Bank or any other Letter of Credit Related Person, including by enforcing its rights against the beneficiaries of the Letters of Credit. Any claim by Borrower under or in connection with any Letter of Credit shall be reduced by an amount equal to the sum of (x) the amount (if any) saved by Borrower as a result of the breach or alleged wrongful conduct complained of; and (y) the amount (if any) of the loss that would have been avoided had Borrower taken all reasonable steps to mitigate any loss, and in case of a claim of wrongful dishonor, by specifically and timely authorizing Issuing Bank to effect a cure.

(k)      Borrower is responsible for preparing or approving the final text of the Letter of Credit as issued by Issuing Bank, irrespective of any assistance Issuing Bank may provide such as drafting or recommending text or by Issuing Bank's use or refusal to use text submitted by Borrower. Borrower is solely responsible for the suitability of the Letter of Credit for Borrower's purposes. With respect to any Letter of Credit containing an "automatic amendment" to extend the expiration date of such Letter of Credit, Issuing Bank, in its sole discretion, may give notice of nonrenewal of such Letter of Credit and, if Borrower does not at any time want such Letter of Credit to be renewed, Borrower will so notify Administrative Agent and Issuing Bank at least 15 calendar days before Issuing Bank is required to notify the beneficiary of such Letter of Credit or any advising bank of such nonrenewal pursuant to the terms of such Letter of Credit.

(l)      Borrower's reimbursement and payment obligations under this *Section 2.05* are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever, including:

(i)      any lack of validity, enforceability or legal effect of any Letter of Credit or this Agreement or any term or provision therein or herein;

(ii)      payment against presentation of any draft, demand or claim for payment under any Drawing Document that does not comply in whole or in part with the terms of

-66-

the applicable Letter of Credit or which proves to be fraudulent, forged or invalid in any respect or any statement therein being untrue or inaccurate in any respect, or which is signed, issued or presented by a Person or a transferee of such Person purporting to be a successor or transferee of the beneficiary of such Letter of Credit;

(iii)    Issuing Bank or any of its branches or Affiliates being the beneficiary of any Letter of Credit;

(iv)    Issuing Bank or any correspondent honoring a drawing against a Drawing Document up to the amount available under any Letter of Credit even if such Drawing Document claims an amount in excess of the amount available under the Letter of Credit;

(v)    the existence of any claim, set-off, defense or other right that Borrower or any other Person may have at any time against any beneficiary, any assignee of proceeds, Issuing Bank or any other Person;

(vi)    any other event, circumstance or conduct whatsoever, whether or not similar to any of the foregoing that might, but for this *Section 2.05(l)*, constitute a legal or equitable defense to or discharge of, or provide a right of set-off against, Borrower's reimbursement and other payment obligations and liabilities, arising under, or in connection with, any Letter of Credit, whether against Issuing Bank, the beneficiary or any other Person; or

(vii)    the fact that any Default or Event of Default shall have occurred and be continuing;

*provided*, *however*, that subject to *Section 2.05(j)* above, the foregoing shall not release Issuing Bank from such liability to Borrower as may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against Issuing Bank following reimbursement or payment of the obligations and liabilities, including reimbursement and other payment obligations, of Borrower to Issuing Bank arising under, or in connection with, this *Section 2.05* or any Letter of Credit.

(m)    Without limiting any other provision of this Agreement, Issuing Bank and each other Letter of Credit Related Person (if applicable) shall not be responsible to Borrower for, and Issuing Bank's rights and remedies against Borrower and the obligation of Borrower to reimburse Issuing Bank for each drawing under each Letter of Credit shall not be impaired by:

(i)    honor of a presentation under any Letter of Credit that on its face substantially complies with the terms and conditions of such Letter of Credit, even if the Letter of Credit requires strict compliance by the beneficiary;

(ii)    honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

(iii)    acceptance as a draft of any written or electronic demand or request for payment under a Letter of Credit, even if nonnegotiable or not in the form of a draft or

-67-

notwithstanding any requirement that such draft, demand or request bear any or adequate reference to the Letter of Credit;

(iv)    the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than Issuing Bank's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of the Letter of Credit);

(v)    acting upon any instruction or request relative to a Letter of Credit or requested Letter of Credit that Issuing Bank in good faith believes to have been given by a Person authorized to give such instruction or request;

(vi)    any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to Borrower;

(vii)    any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between the beneficiary and Borrower or any of the parties to the underlying transaction to which the Letter of Credit relates;

(viii)    assertion or waiver of any provision of the ISP or UCP that primarily benefits an issuer of a letter of credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

(ix)    payment to any paying or negotiating bank (designated or permitted by the terms of the applicable Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

(x)    acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where Issuing Bank has issued, confirmed, advised or negotiated such Letter of Credit, as the case may be;

(xi)    honor of a presentation after the expiration date of any Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by Issuing Bank if subsequently Issuing Bank or any court or other finder of fact determines such presentation should have been honored;

(xii)    dishonor of any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(xiii)    honor of a presentation that is subsequently determined by Issuing Bank to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

-68-

(n)      Unless otherwise expressly agreed by Issuing Bank and Borrower when a Letter of Credit is issued (including any such agreement applicable to an Letter of Credit), the rules of the ISP and the UCP shall apply to each standby Letter of Credit.

Section 2.06    Collections.    The Loan Parties shall establish and maintain cash management services of a type, number, number with a financial institution and on terms, in each case, reasonably satisfactory to the Administrative Agent (it being understood that the cash management services of the Loan Parties in effect on the Closing Date are satisfactory to the Administrative Agent). Each Loan Party shall take commercially reasonable steps to ensure that, net cash proceeds in excess of Minimum Retained Amounts received from payments by (i) Securitization Providers and Credit Support Providers in respect of the purchase of Receivables from Loan Parties and (ii) Account Debtors that are not paid directly into a deposit account of a Loan Party subject to a Control Agreement of a Loan Party (each, a "***Controlled Account***"), shall be deposited promptly (and in no event later than the third Business Day after the date of receipt thereof) into a Controlled Account. The Administrative Agent may sweep the Controlled Accounts (x) as set forth in the DIP Orders or the cash management order entered by the Bankruptcy Court or (y) during a Cash Dominion Event, subject to the requirements of this *Section 2.06(b)*, as set forth in the applicable Control Agreements. Notwithstanding anything to the contrary herein, the Loan Parties shall have 60 days after the Closing Date (or such later date as the Administrative Agent may agree in its reasonable discretion) to enter into Control Agreements and the failure to comply with this <u>*Section 2.06*</u> shall not cause a Default or Event of Default until such period has expired (as extended).

(b) Each Control Agreement, the Cash Management Order and the DIP Orders shall provide, that following written notice from Administrative Agent to the applicable bank or securities intermediary after the occurrence of a Cash Dominion Event the applicable bank or securities intermediary will forward, by daily sweep, all amounts in such account to the Administrative Agent's Account, provided, that, notwithstanding the foregoing, after the occurrence of a Cash Dominion Event, (x) unless an Event of Default pursuant to Section 7.01(b) or 7.01(c) is continuing or Availability is less than $5,000,000, the Administrative Agent shall direct the applicable bank or securities intermediary to forward, by daily sweep, only amounts in excess of $15,000,000 (across all such accounts in the aggregate) to the Administrative Agent's Account and (y) Administrative Agent may direct the applicable bank or securities intermediary that, in lieu of forwarding by daily sweep from such accounts any amounts that constitute proceeds of Loans, instead such amounts would only be permitted to be disbursed from such accounts in accordance with the instructions of Administrative Agent. To the extent a Cash Dominion Period terminates the, Administrative Agent shall work in good faith with the applicable bank or securities intermediary to restore springing control as promptly as possible. For the avoidance of doubt, amounts forwarded to the Administrative Agent's Account pursuant to the Administrative Agent's exercise of cash dominion during any Cash Dominion Period shall be applied to pay the Obligations owing to the Administrative Agent and/or the Revolving Lenders until Paid in Full (including, without limitation, any costs or expenses of the Administrative Agent and to Cash Collateralize all then outstanding L/C Exposure).

Section 2.07    <u>Interest Elections</u>. (a) Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurocurrency Borrowing, shall have an initial Interest Period as specified in such Borrowing Request. Thereafter, the Borrower

-69-

may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurocurrency Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans resulting from an election made with respect to any such portion shall be considered a separate Borrowing.

(b)    To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election (as provided in *Section 9.01*) in writing (in a form as the Administrative Agent may reasonably request) (which may be by electronic mail or telecopy), in the case of an election that would result in a Borrowing, by the time that a Borrowing Request would be required under *Section 2.03* if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Notwithstanding any other provision of this Section, the Borrower shall not be permitted to (i) change the currency of any Borrowing, (ii) [reserved] or (iii) convert any Borrowing to a Borrowing not available under the Commitments pursuant to which such Borrowing was made.

(c)    Each written Interest Election Request shall specify the following information in compliance with *Section 2.02*:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to *clauses (iii)* and *(iv)* below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting outstanding credit extension is to be an ABR Borrowing or a Eurocurrency Borrowing; and

(iv)    if the resulting Borrowing is a Eurocurrency Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "*Interest Period*."

If any such Interest Election Request requests a Eurocurrency Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)    Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender to which such Interest Election Request relates of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurocurrency Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an

US-DOCS\115808185.26

Event of Default has occurred and is continuing and the Administrative Agent, at the written request (including a request through electronic means) of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing of Loans, may be converted to or continued as a Eurocurrency Borrowing and (ii) unless repaid, each Eurocurrency Borrowing of Loans shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.08    Termination and Reduction of Commitments. (a) Unless previously terminated the Commitment shall terminate on the Maturity Date.

(b)    The Borrower may at any time terminate, or from time to time reduce, the Commitments; *provided*, that (i) each reduction of the Commitments shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 (or, if less, the remaining amount of the Commitments), (ii) such reduction shall be without premium or penalty (but subject to *Section 2.16*) and (iii) the Borrower shall not terminate or reduce the Commitments to an amount that would be less than the sum of (A) the Revolving Facility Exposure as of such date, plus (B) the principal amount of all Loans not yet made as to which a request has been given by Borrower under *Section 2.04(a)*, plus (C) the amount of all Letters of Credit not yet issued as to which a request has been given by Borrower and accepted by the Administrative Agent and Issuing Banks in their sole discretion pursuant to *Section 2.05*; *provided further* that, the Borrower may terminate the unused Commitments of any Defaulting Lender at any time, or from time to time, in any amounts and without a pro rata reduction of the Commitments of the other Lenders.

(c)    The Borrower shall notify the Administrative Agent in writing (which may be by electronic mail or telecopy) of any election to terminate or reduce the Commitments under *paragraph (b)* of this Section at least three (3) Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the applicable Revolving Lenders, of the contents thereof. Each notice delivered by the Borrower pursuant to this Section shall be irrevocable; *provided*, that a notice of termination of the Commitments delivered by the Borrower may state that such notice is conditioned upon the effectiveness of an event or other financing, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Any termination or reduction of the Commitments pursuant to this *Section 2.08* shall be permanent. Each reduction of the Commitments shall be made ratably among the Lenders in accordance with their respective Commitments.

(d)    The Borrower may at any time terminate (by reducing to $0) the Overadvance Line and/or the Enhanced Liquidity Line. The Borrower shall notify the Administrative Agent in writing (which may be by electronic mail or telecopy) of any election to terminate the Overadvance Line and/or the Enhanced Liquidity Lien at least three (3) Business Days prior to the effective date of such termination.

Section 2.09    Repayment of Loans; Evidence of Debt. (a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Revolving Lender, the then unpaid principal amount of each Loan and each L/C Disbursement of such Lender on the Maturity Date.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period (if any) applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) any amount received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to *paragraph (b)* or *(c)* of this *Section 2.09* shall be prima facie evidence of the existence, currencies and amounts of the obligations recorded therein; *provided*, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement and in the event of any conflict between the entries made in the accounts maintained pursuant to *Section 2.09(b)* and the accounts maintained pursuant to *Section 2.09(c)*, the accounts maintained pursuant to *Section 2.09(c)* shall govern and control absent manifest error.

(e)     Any Lender may request that Loans made by it be evidenced by a promissory note (a "*Note*"). In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns and in a form approved by the Administrative Agent and reasonably acceptable to the Borrower.

Section 2.10    Repayment of Loans.

(a)     [Reserved].

(b)     To the extent not previously paid, outstanding Loans shall be due and payable on the Maturity Date. If any payment under this *clause (b)* shall be due on a day that is not a Business Day, the date for payment shall be the next preceding Business Day.

(c)     [Reserved].

(d)     Prior to any repayment of any Loan or Loans hereunder, the Borrower shall select the Borrowing or Borrowings constituting such Loan or Loans to be repaid or reduced and shall notify the Administrative Agent in writing by electronic mail or telecopy of such selection, (i) in the case of a Eurocurrency Borrowing, not later than 12:00 p.m., Local Time, three Business Days before the scheduled date of such repayment or reduction and (ii) in the case of an ABR Borrowing, not later than 10:00 a.m. Local Time, one Business Day prior to the day of such repayment. Repayments of Borrowings shall be accompanied by accrued interest on the amount repaid and reasonably documented out-of-pocket expenses with respect to such repayments to the extent required to be reimbursed pursuant to the terms of this Agreement. Notwithstanding anything herein to the contrary (but in any event subject to *Section 2.16*), the Borrower may rescind any notice of prepayment pursuant to *Section 2.11(a)*, if such prepayment would have resulted from a refinancing or repayment of the facilities under this Agreement (whether through the incurrence of other Indebtedness, issuance of Equity Interests or otherwise), which refinancing or repayment

-72-

shall not be consummated or shall otherwise be delayed, or condition such prepayment pursuant to *Section 2.11(a)* on the consummation of such refinancing or repayment. Any prepayments required to be made under *Sections 2.11(b)*, or *(d)* shall be accompanied by a written notice of such prepayment in accordance with the timing in this *Section 2.10(d)*, and shall include the sub-section of *Section 2.11* that such payment is being made pursuant to.

Section 2.11    Prepayment of Loans. (a) The Borrower shall have the right, in its sole discretion at any time and from time to time to prepay any Borrowing in whole or in part, in accordance with *paragraph (c)* of *Section 2.10*, without premium or penalty (but subject to *Section 2.16*), in an aggregate principal amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum or, if less, the amount outstanding, subject to prior written notice in accordance with *Section 2.10(d)*.

(b)    Commencing on and after the Delayed Funding Date, in the event and on each such occasion that Availability shall be less than $40,000,000, the Borrower shall prepay Revolving Borrowings in an amount equal to, on any such date of determination, (i) the amount in Loan Parties' deposit accounts constituting cash proceeds received from payments by (x) Securitization Providers and Credit Support Providers in respect of the purchase of Receivables from Loan Parties and (y) Account Debtors, in each case at the close of business on such date, less (ii) $15,000,000.

(c)    [Reserved].

(d)    In the event and on such occasion that the total Revolving Facility Exposure exceeds the lesser of (x) the Commitments and (y) the Borrowing Base, the Borrower shall prepay Revolving Borrowings (or, if no such Borrowings are outstanding, deposit Cash Collateral in an account with the Collateral Agent pursuant to *Section 2.22*) in an aggregate amount equal to such excess.

Section 2.12    Fees. (a) The Borrower agrees to pay to each Revolving Lender (other than any Defaulting Lender), through the Administrative Agent, three Business Days after the last day of March, June, September and December in each year, and three Business Days after the date on which the Commitments of all the Revolving Lenders shall be terminated as provided herein (which, if said day is not a Business Day, then the next Business Day thereafter), a commitment fee (a "***Commitment Fee***") on the average daily amount of the Available Unused Commitment of such Revolving Lender during the preceding quarter (or shorter period commencing with the Closing Date or ending with the date on which the last of the Commitments of such Lender shall be terminated), which shall accrue at a rate equal to 2.00% per annum. All Commitment Fees shall be computed on the basis of the actual number of days elapsed in a year of 360 days. The Commitment Fees due to each Revolving Lender shall commence to accrue on the Closing Date and shall cease to accrue on the date on which the last of the Commitments of such Lender shall be terminated as provided herein.

(b)    The Borrower from time to time agrees to pay (i) to Administrative Agent, for its own account, three Business Days after the last day of March, June, September and December of each year and three Business Days after the date on which the Commitments of all the Lenders shall be terminated as provided herein, a fee (an "***L/C Participation Fee***") on the daily aggregate

L/C Exposure (excluding the portion thereof attributable to unreimbursed L/C Disbursements), during the preceding quarter (or shorter period commencing with the Closing Date or ending with the Maturity Date or the date on which the Commitments shall be terminated) at the rate *per annum* equal to the Applicable Margin for Eurocurrency Borrowings effective for each day in such period and (ii) to each Issuing Bank, for its own account, (x) three Business Days after the last day of March, June, September and December of each year and three Business Days after the date on which the Commitments of all the Lenders shall be terminated as provided herein, a fronting fee in respect of each Letter of Credit issued by such Issuing Bank for the period from and including the date of issuance of such Letter of Credit to and including the termination of such Letter of Credit, computed at a rate to be agreed between the Issuing Bank and the Borrower *per annum* of the daily average stated amount of such Letter of Credit (or as otherwise agreed with such Issuing Bank), <u>*plus*</u> (y) concurrent with (and in any event no later than the next following Business Day) the issuance, amendment or transfer of any such Letter of Credit or any L/C Disbursement thereunder, such Issuing Bank's customary documentary and processing charges (collectively, "***Issuing Bank Fees***"). All L/C Participation Fees and Issuing Bank Fees that are payable on a *per annum* basis shall be computed on the basis of the actual number of days elapsed in a year of 360 days.

(c)    The Borrower agrees to pay to each Revolving Lender, through the Administrative Agent, an exit fee in cash on the New Money Commitment Amount of each Revolving Lender, in an amount equal to 1.69 % of its pro rata share of the New Money Commitment Amounts of such Revolving Lender as of the Closing Date (the "***Exit Fee***"). The Exit Fee shall be fully earned as of the Closing Date, but shall be payable on the Maturity Date.

(d)    [Reserved]

(e)    [Reserved]

(f)    Borrower shall pay to Administrative Agent $25,000 per month in addition to third party field examination, appraisal, and valuation fees and charges as and when incurred or chargeable; <u>*provided*</u>, that for so long as no Event of Default shall have occurred and be continuing, Borrower shall not be obligated to reimburse Administrative Agent for more than (i) two (2) Field Exams and Inventory Appraisals in any twelve month period; <u>*provided*</u> that any additional Field Exams or Inventory Appraisals required by Administrative Agent in any given twelve month period shall be performed at the expense of Administrative Agent; and, <u>*provided*</u>, <u>*further*</u>, that if an Event of Default shall have occurred and be continuing, Administrative Agent may conduct additional Field Exams and Inventory Appraisals at Borrower's expense. For the avoidance of doubt, the reimbursement limitations set forth in this <u>*clause (f)*</u> shall not apply to Field Exams and Inventory Appraisals conducted in connection with a Permitted Business Acquisition (provided that unless agreed otherwise with the Borrower, there shall not be more than one such exam per Permitted Business Acquisition).

(g)    All Fees and expenses shall be paid on the dates due, in immediately available funds, to the Administrative Agent, for distribution, if and as appropriate, among the applicable Lenders, except that Issuing Bank Fees shall be paid directly to the applicable Issuing Banks. Once paid, none of the Fees shall be refundable under any circumstances.

Section 2.13    Interest. (a) The Loans comprising each ABR Borrowing shall bear interest at the ABR *plus* the Applicable Margin.

(b)    The Loans comprising each Eurocurrency Borrowing shall bear interest at the Adjusted Eurocurrency Rate for the Interest Period in effect for such Borrowing *plus* the Applicable Margin.

(c)    Notwithstanding the foregoing, if any Event of Default exists or is continuing, then all such amounts outstanding under the Loan Documents shall bear interest, after as well as before judgment, at a rate *per annum* equal to (A) in the case of principal of any Loan, 2.00% *plus* the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (B) in the case of any other amount, 2.00% *plus* the interest rate that would have applied had such amount, during the period of non-payment, constituted an ABR Loan; *provided*, that this *paragraph (c)* shall not apply to any Event of Default that has been waived by the Lenders pursuant to *Section 9.09*.

(d)    Accrued interest on each Loan shall be payable in arrears and in cash (i) on each Interest Payment Date for such Loan, and (ii) Loans, upon the earlier of the termination of the Commitments and the Maturity Date; *provided*, that (A) interest accrued pursuant to *paragraph (c)* of this Section shall be payable on demand, (B) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Loan prior to the end of the Revolving Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, and (C) in the event of any conversion of any Eurocurrency Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion. In addition, on the first Interest Payment Date following the Closing Date, Borrower shall pay in full in cash the Accrued Pre-Petition Interest together with all other interest and fees that have accrued from the Petition Date through Closing Date.

(e)    All computations of interest for ABR Loans shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year). Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, *provided* that any Loan that is repaid on the same day on which it is made shall, subject to *Section 2.18(a)*, bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

US-DOCS\115808185.26

Section 2.14    <u>Alternate Rate of Interest</u>: If prior to the commencement of any Interest Period for a Eurocurrency Borrowing denominated in any currency, on any day:

(a)      the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining any applicable Adjusted Eurocurrency Rate for such currency for such Interest Period for such day; or

(b)      the Administrative Agent is advised by the Required Lenders that any applicable Adjusted Eurocurrency Rate for such currency for such Interest Period for such day will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing, for such Interest Period or such day;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by electronic mail or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurocurrency Borrowing denominated in such currency shall be ineffective and such Borrowing shall be converted to or continued as on the last day of the Interest Period applicable thereto, an ABR Borrowing and (ii) if any Borrowing Request requests a Eurocurrency Borrowing in such currency, such Borrowing shall be made as an ABR Borrowing.

If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in <u>*clause (a)*</u> above have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in <u>*clause (a)*</u> above have not arisen but the supervisor for administrator of LIBOR or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which LIBOR shall no longer be used for determining interest rates for loans, then the Administrative Agent and the Borrower shall endeavor to establish an alternate rate of interest to LIBOR that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the U.S. at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable (but, for the avoidance of doubt, such related changes shall not include a reduction in the Applicable Margin). Notwithstanding anything to the contrary in <u>*Section 9.09*</u>, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five (5) Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from the Required Lenders stating that such Required Lenders object to such amendment. From and after the making of a determination described in this paragraph until an alternate rate of interest shall be determined in accordance with this paragraph (but in the case of the circumstances described in <u>*clause (ii)*</u>, only to the extent LIBOR for the applicable Interest Period is not available or published at such time on a current basis) any Interest Election Request that requests the conversion of Borrowing to, or continuation of any Borrowing as, a LIBOR Borrowing for the applicable Interest Period shall be ineffective.

US-DOCS\115808185.26

Section 2.15    <u>Increased Costs</u>. (a) If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any such reserve requirement reflected in the Adjusted Eurocurrency Rate) or any Issuing Bank;

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in <u>*clauses (b)*</u> through <u>*(d)*</u> of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or Issuing Bank or the London interbank market any other condition, cost or expense affecting this Agreement or Eurocurrency Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurocurrency Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or Issuing Bank of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any <u>*sum*</u> received or receivable by such Lender or Issuing Bank hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or Issuing Bank, as applicable, such additional amount or amounts as will compensate such Lender or Issuing Bank, as applicable, for such additional costs incurred or reduction suffered.

(b)    If any Lender or Issuing Bank determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or Issuing Bank's capital or on the capital of such Lender's or Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by such Issuing Bank, to a level below that which such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such Issuing Bank's policies and the policies of such Lender's or such Issuing Bank's holding company with respect to capital adequacy), then from time to time the Borrower shall pay to such Lender or such Issuing Bank, as applicable, such additional amount or amounts as will compensate such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company for any such reduction suffered.

(c)    A certificate of a Lender or an Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or Issuing Bank or its holding company, as applicable, as specified in <u>*paragraph (a)*</u> or <u>*(b)*</u> of this Section shall be delivered to the Borrower (attaching reasonable supporting back-up evidence with respect to such calculations) and shall be conclusive absent manifest error. The Borrower shall pay such Lender or Issuing Bank, as applicable, the amount shown as due on any such certificate within 30 days after receipt thereof.

US-DOCS\115808185.26

(d)        Promptly after any Lender or any Issuing Bank has determined that it will make a request for increased compensation pursuant to this *Section 2.15*, such Lender or Issuing Bank shall notify the Borrower thereof. Failure or delay on the part of any Lender or Issuing Bank to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's or Issuing Bank's right to demand such compensation; *provided*, that the Borrower shall not be required to compensate a Lender or an Issuing Bank pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender or Issuing Bank, as applicable, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or Issuing Bank's intention to claim compensation therefor; *provided*, *further*, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.16    Break Funding Payments. In the event of (a) the payment of any principal of any Eurocurrency Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurocurrency Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurocurrency Loan on the date specified in any notice delivered pursuant hereto or (d) the assignment of any Eurocurrency Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to *Section 2.19*, then, in any such event, the Borrower shall compensate each Lender for their actual, reasonable and documented out-of-pocket loss, cost and expense attributable to such event. In the case of a Eurocurrency Loan, such loss, cost or expense to any Lender shall be deemed to be the amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted Eurocurrency Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue a Eurocurrency Loan, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate that such Lender would bid were it to bid, at the commencement of such period, for deposits in the applicable currency of a comparable amount and period from other banks in the Eurocurrency market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section (together with reasonable supporting backup calculations) in respect thereof shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

Section 2.17    Taxes.

(a)        Defined Terms. For purposes of this *Section 2.17*, the term "Lender" includes any Issuing Bank and the term "applicable law" includes FATCA.

(b)        Payments Free of Taxes. Any and all payments by or on account of any obligation of the Borrower or any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable

-78-

Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower or the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)    Payment of Other Taxes by the Borrower. The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)    Indemnification by the Borrower. The Loan Parties shall jointly and severally indemnify each Recipient, within 30 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17(d)) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    Evidence of Payments. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.17, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)    Indemnification by the Lenders. Each Lender shall severally indemnify the Administrative Agent, within 30 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower or any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent, to the Lender from any other source against any amount due to the Administrative Agent under this Section 2.17(f).

(g)    Status of Lenders and Agents.

(i)        Each Lender and Agent, that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, each Lender and Agent, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender or Agent is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in *Section 2.17(g)(ii)(A)*, *(ii)(B)* and *(ii)(D))* shall not be required if, in the reasonable judgment of (as applicable) the Lender or Agent (if the applicable Agent is the Administrative Agent and is providing the documentation on its own behalf to the Borrower), such completion, execution or submission would subject such Person to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Person.

(ii)       Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)        each Lender and Agent, that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Person becomes a party to this Agreement or other applicable Loan Document (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Person is exempt from U.S. federal backup withholding Tax;

(B)        each Foreign Lender and each Agent that is not a U.S. Person (a "***Foreign Agent***") shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Person becomes a party to this Agreement or other applicable Loan Document (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)        in the case of a Foreign Lender or Foreign Agent claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal

-80-

withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed copies of IRS Form W-8ECI;

(3)      in the case of a Foreign Lender or Foreign Agent claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of *Exhibit F-1* to the effect that such Foreign Lender or Foreign Agent is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "*U.S. Tax Compliance Certificate*") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(4)      to the extent a Foreign Lender or Foreign Agent is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of *Exhibit F-2* or *Exhibit F-3*, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender or Foreign Agent is a partnership and one or more direct or indirect partners of such Foreign Lender or Foreign Agent are claiming the portfolio interest exemption, such Foreign Lender of Foreign Agent may provide a U.S. Tax Compliance Certificate substantially in the form of *Exhibit F-4* on behalf of each such direct and indirect partner;

(C)      each Foreign Lender or Foreign Agent shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender or Foreign Agent becomes a party to this Agreement or other applicable Loan Document (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)      if a payment made to a Lender or an Agent under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if the Lender or the Agent (as applicable) were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), the Lender or the Agent (as applicable) shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law

-81-

(including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that the Lender or the Agent (as applicable) has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this *clause (D)*, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender and each Agent agree that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, the Lender or the Agent (as applicable) shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)    *Treatment of Certain Refunds*. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this *Section 2.17* (including by the payment of additional amounts pursuant to this *Section 2.17*), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this *Section 2.17* with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this *paragraph (h)* (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this *paragraph (h)*, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this *paragraph (h)* the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This *paragraph (h)* shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)    *Survival*. Each party's obligations under this *Section 2.17* shall survive the resignation or replacement of the Administrative Agent, or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 2.18    *Payments Generally; Pro Rata Treatment; Sharing of Set-offs*. (a) Unless otherwise specified herein, the Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of L/C Disbursements, or of amounts payable under *Section 2.15*, *2.16* or *2.17*, or otherwise) prior to 2:00 p.m., Local Time, on the date when due, in immediately available funds, without condition or deduction for any defense, recoupment, set-off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent be deemed to have been received on the next

-82-

succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent to the applicable account designated to the Borrower by the Administrative Agent except payments to be made directly to the applicable Issuing Bank as expressly provided herein and except that payments pursuant to *Sections 2.15*, *2.16*, *2.17* and *9.05* shall be made directly to the persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof. Unless otherwise specified herein, if any payment hereunder shall be due on a day that is not a Business Day or the date for any delivery or performance of an obligation shall be required on a date that is not a Business Day, the date for payment, performance or delivery, as applicable, shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments under each Loan Document of principal or interest in respect of any Loan (or of any breakage indemnity in respect of any Loan) shall be made in the currency of such Loan; all other payments hereunder and under each other Loan Document shall be made in U.S. Dollars, except as otherwise expressly provided herein. Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)      If at any time insufficient funds are received by and available to the Administrative Agent from the Borrower to pay fully all amounts of principal, unreimbursed L/C Disbursements, interest and fees then due from the Borrower hereunder, such funds shall be applied (i) *first*, towards payment of interest and fees then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, (ii) *second*, towards unreimbursed L/C Disbursements then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal, and unreimbursed L/C Disbursements then due to such parties, and (iii) *third*, towards payment of principal then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)      If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or participations in L/C Disbursements resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and participations in L/C Disbursements and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in L/C Disbursements of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and participations in L/C Disbursements; *provided*, that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this *paragraph (c)* shall not be construed to apply to (x) any payment made pursuant to and in accordance with the express terms of this Agreement, (y) the application of Cash Collateral provided for in *Section 2.22*, or (z) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or subparticipations in L/C Disbursements to any assignee or participant. The Borrower

US-DOCS\115808185.26

consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the applicable Issuing Bank hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the applicable Issuing Bank, as applicable, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the applicable Issuing Bank, as applicable, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of (A)(1) in the case of Loans, the Federal Funds Effective Rate, (2) in the case of any other amounts denominated in U.S. Dollars, the Federal Funds Effective Rate, and (3) in the case of any other amount denominated in a currency other than U.S. Dollars, the rate reasonably determined by the Administrative Agent to be the cost to it of funding such amount, and (B) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this *Article II*, and such funds are not made available to the Borrower by the Administrative Agent because the applicable conditions set forth in *Article IV* are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(f)     The obligations of the Lenders hereunder to make Loans, to fund participations in Letters of Credit and to make payments pursuant to *Section 9.05(d)* are several and not joint. The failure of any Lender to make any Loan, to fund any such participation or to make any payment under *Section 9.05(d)* on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under *Section 9.05(d)*.

Section 2.19    Mitigation Obligations; Replacement of Lenders. (a) If any Lender requests compensation under *Section 2.15*, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to *Section 2.17*, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to *Section 2.15* or *2.17*, as applicable, in the future and (ii) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material respect.

-84-

The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    If any Lender requests compensation under *Section 2.15*, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to *Section 2.17*, or is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require any such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in *Section 9.04*), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided*, that (i) the Borrower shall have received the prior written consent of the Administrative Agent (and, if in respect of any Commitment or Loan, the Administrative Agent and the Issuing Bank), which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in L/C Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) (iii) in the case of any such assignment resulting from a claim for compensation under *Section 2.15* or payments required to be made pursuant to *Section 2.17*, such assignment will result in a reduction in such compensation or payments, (iv) the Borrower shall have paid to the Administrative Agent the assignment fee specified in *Section 9.04*, and (v) such assignment does not conflict with any applicable laws. A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment cease to apply. Nothing in this *Section 2.19* shall be deemed to prejudice any rights that the Borrower may have against any Lender that is a Defaulting Lender.

(c)    If any Lender has failed to consent to a proposed amendment, waiver, discharge or termination that pursuant to the terms of *Section 9.09* requires the consent of all the Lenders affected or each Lender and with respect to which the Required Lenders (as may be required by *Section 9.09* in any given case) shall have granted their consent (any such Lender referred to above, a "***Non-Consenting Lender***"), then so long as no Event of Default then exists, the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) to (i) replace any such Non-Consenting Lender by requiring such Non-Consenting Lender to assign its Loans and Commitments hereunder to one or more assignees reasonably acceptable to the Required Lenders (and, if in respect of any Commitment or Loan, the Required Lenders and Issuing Bank) or (ii) require such Non-Consenting Lender to assign all of its Commitments or Loans hereunder to one or more assignees reasonably acceptable to the Administrative Agent and the Issuing Bank; *provided*, that (i) all Obligations of the Borrower owing to such Non-Consenting Lender being replaced, including obligations arising under *Section 2.16* as a result of such replacement, and/or all Obligations of the Borrower owing to such Non-Consenting Lender in respect of any Loans required to be assigned shall be paid in full to such Non-Consenting Lender concurrently with such assignment including all fees payable to such Non-Consenting Lender in accordance with *Sections 2.12(b)*, and (ii) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof *plus* accrued and unpaid interest thereon. In connection with any such assignment the Borrower, the Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with *Section 9.04*.

-85-

Section 2.20    [Reserved].

Section 2.21    Illegality. If any Lender reasonably determines that any change in law has made it unlawful, or that any Governmental Authority has asserted after the Closing Date that it is unlawful, for any Lender or its applicable lending office to make or maintain any Eurocurrency Loans, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligations of such Lender to make or continue Eurocurrency Loans or to convert ABR Borrowings to Eurocurrency Borrowings shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrower shall upon demand from such Lender (with a copy to the Administrative Agent), either convert all Eurocurrency Borrowings of such Lender to ABR Borrowings, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Borrowings to such day, or immediately, if such Lender may not lawfully continue to maintain such Loans. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

Section 2.22    Cash Collateral.

(a)    Certain Credit Support Events. Following the request of the Administrative Agent or any Issuing Bank if, as of the Maturity Date, any L/C Exposure for any reason remains outstanding, the Borrower shall, in each case, immediately following demand Cash Collateralize the then outstanding amount of all L/C Exposure.

(b)    Grant of Security Interest. All Cash Collateral required to be deposited pursuant to *clause (a)* above (other than credit support not constituting funds subject to deposit) shall be maintained in blocked, non-interest bearing deposit accounts at a bank to be reasonably agreed between the Administrative Agent, Collateral Agent and the Borrower. The Borrower, and to the extent provided by any Lender, such Lender, hereby grants to (and subjects to the control of) the Collateral Agent, for the benefit of the Collateral Agent, the applicable Issuing Bank and the Lenders, and agrees to maintain, a first priority security interest in all such cash, deposit accounts and all balances therein, and all other property so provided as collateral pursuant hereto, and in all proceeds of the foregoing, all as security for the obligations to which such Cash Collateral may be applied pursuant to *Section 2.23(c)*. If at any time the Administrative Agent or the Collateral Agent determines that Cash Collateral is subject to any right or claim of any person other than the Collateral Agent as herein provided, or that the total amount of such Cash Collateral is less than the applicable Fronting Exposure and other obligations secured thereby, then (i) the Borrower (solely to the extent that the applicable Cash Collateral was provided by the Borrower), or (ii) the relevant Defaulting Lender (solely to the extent that the applicable Cash Collateral was provided by such Defaulting Lender) will, promptly upon demand by the Administrative Agent or Collateral Agent, pay or provide to the Collateral Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency.

(c)    Application. Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under any of this *Section 2.23* or *Sections 2.04*, *2.05*, *2.11(d)*, *2.23* or *7.01* in respect of Letters of Credit shall be held and applied to the satisfaction of the specific Letter of Credit obligations, obligations to fund participations therein (including, as to Cash Collateral provided by a Defaulting Lender, any interest accrued on such obligation) and other obligations

-86-

for which the Cash Collateral was so provided, prior to any other application of such property as may be provided for herein.

(d)    Release. Cash Collateral (or the appropriate portion thereof) provided to reduce Fronting Exposure or other obligations shall be released promptly following (i) the elimination of the applicable Fronting Exposure or other obligations giving rise thereto (including by the termination of Defaulting Lender status of the applicable Lender (or, as appropriate, its assignee following compliance with *Section 9.04(b)(ii)*)) or (ii) the Administrative Agent's good faith determination that there exists excess Cash Collateral; *provided*, *however*, (x) that Cash Collateral furnished by or on behalf of a Loan Party shall not be released during the continuance of a Default or Event of Default (and following application as provided in this *Section 2.23* may be otherwise applied in accordance with *Section 7.01*), and (y) the person providing Cash Collateral and the Issuing Bank may agree that Cash Collateral shall not be released but instead held to support future anticipated Fronting Exposure or other obligations.

Section 2.23    Defaulting Lenders.

(a)    Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    Waivers and Amendments. That Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in *Section 9.09*.

(ii)    Reallocation of Payments. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to *Article VII* or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to *Section 9.06*), shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; *second*, to the payment on a pro rata basis of any amounts owing by that Defaulting Lender to the Issuing Bank; *third*, if so determined by the Administrative Agent or Collateral Agent or requested by the Issuing Bank, to be held as Cash Collateral for future funding obligations of that Defaulting Lender of any participation in any Letter of Credit; *fourth*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fifth*, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; *sixth*, to the payment of any amounts owing to the Lenders, the Issuing Bank as a result of any judgment of a court of competent jurisdiction obtained by any Lender, Issuing Bank against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; *seventh*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that

Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans or L/C Borrowings in respect of which that Defaulting Lender has not fully funded its appropriate share and (y) such Loans or L/C Borrowings were made at a time when the conditions set forth in *Section 4.01* were satisfied or waived, such payment shall be applied solely to pay the Loans of, and L/C Borrowings owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or L/C Borrowings to, that Defaulting Lender. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this *Section 2.23(a)(ii)* shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    <u>Certain Fees</u>. The Defaulting Lender shall not be entitled to receive any Commitment Fees pursuant to *Section 2.12(a)* for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(iv)    <u>Letter of Credit Provisions</u>. If any Letter of Credit is outstanding at the time that a Lender becomes a Defaulting Lender then:

(A)    Borrower shall within one Business Day following notice by Administrative Agent Cash Collateralize such Defaulting Lender's L/C Exposure (after giving effect to any partial reallocation pursuant to *clause (A)* above), pursuant to a cash collateral agreement to be entered into in form and substance reasonably satisfactory to Administrative Agent, for so long as such L/C Exposure is outstanding; *provided*, that Borrower shall not be obligated to Cash Collateralize any Defaulting Lender's L/C Exposure if such Defaulting Lender is also the Issuing Bank;

(B)    if Borrower Cash Collateralizes any portion of such Defaulting Lender's L/C Exposure pursuant to this *Section 2.23(a)(iv)*, Borrower shall not be required to pay any L/C Participation Fees to Administrative Agent pursuant to *Section 2.12(b)* with respect to such Cash Collateralized portion the L/C Exposure during the period such L/C Exposure is Cash Collateralized;

(C)    [reserved];

(D)    to the extent any Defaulting Lender's L/C Exposure is not Cash Collateralized, then, without prejudice to any rights or remedies of the Issuing Bank or any Lender hereunder, all L/C Participation Fees that would have otherwise been payable under *Section 2.12(b)* with respect to such portion of such L/C Exposure shall instead be payable to the Issuing Bank until such portion of the L/C Exposure is Cash Collateralized or reallocated;

-88-

(E)    so long as any Lender is a Defaulting Lender, the Issuing Bank shall not be required to issue, amend, or increase any Letter of Credit to the extent the Issuing Bank has not otherwise entered into arrangements reasonably satisfactory to the Issuing Bank and Borrower to eliminate the Issuing Bank's risk with respect to the Defaulting Lender's participation in Letters of Credit; and

(F)    Administrative Agent may release any cash collateral provided by Borrower pursuant to this _Section 2.23(a)(iv)_ to the Issuing Bank and the Issuing Bank may apply any such cash collateral to the payment of such Defaulting Lender's Applicable Percentage of any L/C Disbursement that is not reimbursed by Borrower pursuant to _Section 2.05_.

(b)    <u>Defaulting Lender Cure</u>. If the Borrower, the Administrative Agent, and the Issuing Bank agree in writing in their reasonable discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages (without giving effect to _Section 2.23(a)(iv)_), whereupon that Lender will cease to be a Defaulting Lender; _provided_ that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and _provided_, _further_, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.24    <u>Roll-Up.</u>

Effective upon the occurrence of the Revolving Obligations Roll-Up Effective Time, without any further action by any party to this Agreement, the Bankruptcy Court or any other Person, to the extent set forth in the Interim Order, all Pre-Petition Revolving Obligations, including owing to each Revolving Lender (or in its capacity or its Affiliates or Approved Funds) in its capacity (or in the respective capacities of its Affiliates or Approved Funds) as a "_Revolving Lender_" under the Pre-Petition First Lien Credit Agreement, at the Revolving Obligations Roll-Up Effective Time (the "**_Rolled-Up Obligations_**" and such loans, the "**_Rolled-Up Loans_**", letter of credit obligations, "**_Rolled-Up LC Obligations_**" and such commitments, the "**_Rolled-Up Commitments_**") shall be deemed made hereunder and shall constitute a portion of the outstanding amount of the Obligations owing to the Revolving Lender (or its Affiliates or Approved Funds) hereunder. The amount of each Revolving Lender's Rolled-Up Commitments is set forth on Schedule 2.01. The aggregate amount of Rolled-Up Commitments is $163,944,754.79.

Section 2.25    <u>Conversion to Exit Facility Agreement</u>.

(a)    So long as the Restructuring Support Agreement is in full force and effect, at the option of the Borrower, which option shall be exercised no later than 10 days prior to the

confirmation hearing for an RSA Plan, the Loan Parties, in their capacity as reorganized Debtors, to the extent such Loan Parties as reorganized are required under the Exit Facility Documentation to continue to be obligors under the Exit Facilities, may (A) repay the Loans and Obligations hereunder in full in cash or (B) assume all Obligations in respect of the Loans and L/C Obligations (excluding for the avoidance of doubt, the Exit Fees) hereunder and all other monetary obligations in respect of the Loans and L/C Obligations in accordance with the RSA Plan, so long as in the case of any conversion (i) all, but not less than all, outstanding Loans and L/C Obligations are continued or converted, as the case may be, as loans under the Exit Facilities in accordance with the RSA Plan, (ii) each Lender hereunder is a lender under the Exit Facilities in accordance with the RSA Plan, (iii) accrued and unpaid interest on the Loans and fees in respect of L/C Obligations are capitalized into principal as term loans under the Exit Facilities on the consummation date of the RSA Plan and (iv) the Revolving Credit Facility is terminated and is superseded and replaced in its entirety by the Exit Facilities in accordance with the RSA Plan; and

(b)    The effectiveness of the Exit Facilities shall be subject to the following conditions precedent:

(i)    Negotiation, execution and/or delivery of definitive Exit Facility Documentation, consistent in all material respects with the terms set forth in the RSA Plan and otherwise in form and substance reasonably satisfactory to the Required Lenders and the Borrower and the satisfaction of the conditions precedent set forth therein;

(ii)    The Reorganization Plan shall be in form and substance consistent in all material respects with the Restructuring Support Agreement and the confirmation order for such Reorganization Plan shall be entered in form and substance reasonably satisfactory to the Required Lenders; and

(iii)    the consummation of the RSA Plan shall have occurred on a date to be agreed by the Required Lenders.

ARTICLE III

Representations and Warranties

The Borrower represents and warrants on the Closing Date (after giving effect to the Transactions occurring on the Closing Date) and upon each Credit Extension thereafter and subject in all respects to the entry of the DIP Order and the First Day Orders and the terms thereto that:

Section 3.01   Organization; Powers. Except as set forth on *Schedule 3.01*, the Borrower and each of the Subsidiaries (a) is a limited liability company, private limited company, unlimited liability company, corporation or partnership duly organized, validly existing and in good standing (or, if applicable in a foreign jurisdiction, enjoys the equivalent status under the laws of any jurisdiction of organization outside the United States) under the laws of the jurisdiction of its organization, (b) subject to any restriction arising on account of the Borrower's or any Subsidiary's status as a "debtor" under the Bankruptcy Code or any restriction as a result of any required approvals of the entry and terms of the DIP Order and other orders of the Bankruptcy Court, has all requisite corporate or other organizational power and authority to own its property and assets

-90-

and to carry on its business as now conducted, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, (c) is qualified to do business in each jurisdiction and licensed and, as applicable, in good standing under the laws of each jurisdiction where such qualification or license or, if applicable, good standing is required, except where the failure so to qualify would not reasonably be expected to have a Material Adverse Effect, (d) has the corporate or other organizational power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Borrower, to borrow and otherwise obtain credit hereunder and (e) unless stayed by the Chapter 11 Cases, has all requisite governmental licenses, authorizations, consents and approvals to own its property and assets and to carry on its business as now conducted, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

Section 3.02    Authorization. The execution, delivery and performance by the Borrower and each of the other Loan Parties of each of the Loan Documents to which it is a party, and the borrowings hereunder and the transactions forming a part of the Transactions, (a) have been duly authorized by all corporate, stockholder or limited liability company or partnership action required to be obtained by the Borrower and such Loan Parties and (b) will not (i) violate (A) any provision of law, statute, rule or regulation, (B) the certificate or articles of incorporation or other constitutive documents (including any limited liability company or operating agreements) or by-laws of the Borrower or any such Loan Parties, (C) any applicable order of any court or any rule, regulation or order of any Governmental Authority or (D) any provision of any indenture, certificate of designation for preferred stock, agreement or other instrument to which the Borrower or any such Loan Parties is a party or by which any of them or any of their property is or may be bound, in each case, not subject to the automatic stay under the Chapter 11 Cases or executed after the Petition Date, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, give rise to a right of or result in any cancellation or acceleration of any right or obligation (including any payment) or to a loss of a material benefit under any such indenture, certificate of designation for preferred stock, agreement or other instrument, where any such conflict, violation, breach or default referred to in *clause (i)* or *(ii)* of this <u>Section 3.02,</u> would <u></u>reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by the Borrower or any such Loan Parties, other than the Liens created by the Loan Documents and Liens permitted by Section 6.02 and the DIP Orders.

Section 3.03    Enforceability. Subject to the entry of the DIP Order, this Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Loan Document when executed and delivered by each Loan Party that is party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against each such Loan Party in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), (iii) implied covenants of good faith and fair dealing and (iv) any foreign laws, rules and regulations as they relate to pledges of Equity Interests or granting of Liens pursuant to such agreements.

Section 3.04    <u>Governmental Approvals</u>. Except for the entry of the DIP Order, no action, consent or approval of, registration or filing with or any other action by any Governmental Authority is or will be required in connection with the Transactions, except for (a) filings necessary to perfect or maintain the perfection or priority of the Liens created by the Security Documents (including, for the avoidance of doubt, the filing of Uniform Commercial Code financing statements and equivalent filings in foreign jurisdictions), (b) filings with the United States Patent and Trademark Office and the United States Copyright Office and comparable offices in foreign jurisdictions and equivalent filings in foreign jurisdictions, (c) recordation of any mortgages,(d) such as have been made or obtained and are in full force and effect, (e) such other actions, consents, approvals, registrations or filings with respect to which the failure to be obtained or made would not reasonably be expected to have a Material Adverse Effect and (f) filings or other actions listed on Schedule 3.04.

Section 3.05    <u>Financial Statements</u>. (a) The Borrower has heretofore furnished to the Lenders:

(b)    [Reserved]

(c)    The audited consolidated balance sheets of the Borrower and its subsidiaries as at December 31, 2018 and the related statements of operations, changes in combined equity and cash flows of the Borrower and its subsidiaries for the fiscal year ended December 31, 2018, in each such case, copies of which have heretofore been furnished or otherwise made available to each Lender, which have been prepared in accordance with GAAP applied consistently throughout the periods involved, and present fairly, in all material respects, the financial position and results of operations of the Borrower and its subsidiaries, as of and on such dates set forth on such financial statements.

(d)    The unaudited quarterly consolidated balance sheets of the Borrower and its combined Subsidiaries and the related statements of operations and cash flows showing the financial position of the Borrower and its combined Subsidiaries, in each such case, which have been prepared in accordance with GAAP applied consistently throughout the periods involved, and present fairly, in all material respects, the financial position and results of operations of the Borrower and its Subsidiaries, for the most recent fiscal quarter ended December 31, 2019, subject to normal year-end audit adjustments and the absence of footnotes.

(e)    The unaudited monthly summary income statement information in a form consistent with what is delivered to the Board of Directors and summary balance sheet information in the form agreed to between the Required Lenders and the Borrower prior to the Closing Date, for the most recent month ended February 29, 2020.

Section 3.06    <u>No Material Adverse Effect</u>. Since the Petition Date, there has been no event, development or circumstance that has had or would reasonably be expected to have a Material Adverse Effect.

Section 3.07    <u>Title to Properties; Possession Under Leases</u>. (a) Each of the Borrower and the Subsidiaries has good and valid record fee simple title to, or valid leasehold interests in, or easements or other limited property interests in, all its properties and assets, except for minor

-92-

defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and except where the failure to have such title, interests or easements would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    Each of the Borrower and the Subsidiaries has complied with all obligations under all leases to which it is a party, except where the failure to comply would not reasonably be considered to have Material Adverse Effect, and all such leases are in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have a Material Adverse Effect. Except as set forth on *Schedule 3.07(b)*, as of the Closing Date, the Borrower and each of the Subsidiaries enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    Each of the Borrower and the Subsidiaries owns or possesses or has valid licenses to all patents, trademarks, service marks, trade names, copyrights, domain names, trade secrets, and all applications or registrations for patents, trademarks, service marks, trade names, copyrights, and domain names and other intellectual property rights with respect thereto necessary for the present conduct of its business, without any conflict (of which the Borrower has been notified in writing) with the rights of others, and there has been no infringement of any Intellectual Property, except where such failure to own or possess or have a valid license to such intellectual property rights or where such conflicts and restrictions, in each case would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.08    Subsidiaries. (a) *Schedule 3.08(a)* sets forth as of the Closing Date the name and jurisdiction of incorporation, formation or organization of each direct and indirect subsidiary of Borrower. Except as set forth on *Schedule 3.08(a)*, as of the Closing Date, all of the issued and outstanding Equity Interests of each subsidiary of Borrower is owned directly by Borrower or by another subsidiary.

(b)    Each Loan Party is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by (or purported to be pledged by) it under the Security Documents, free of any and all Liens other than Liens permitted by *Section 6.02*.

(c)    As of the Closing Date, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Equity Interests of any Subsidiaries of the Borrower which are Loan Parties, and there are no other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any Equity Interests pledged by (or purported to be pledged) under the Security Documents, except rights of employees to purchase Equity Interests of Borrower or as set forth on *Schedule 3.08(c)*.

Section 3.09    Litigation; Commercial Tort Claims; Compliance with Laws. (a) Except for the Chapter 11 Cases, as of the Closing Date, there are no actions, suits or proceedings at law or in equity or, to the knowledge of the Borrower, investigations by or on behalf of any Governmental

Authority or in arbitration now pending, or, to the knowledge of the Borrower, threatened in writing against or affecting the Borrower or any of its subsidiaries or any business, property or rights of any such person (i) that involve any Loan Document or the Transactions or (ii) would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Except for the Chapter 11 cases, as of the date of any Borrowing after the Closing Date, (A) there are no actions, suits or proceedings at law or in equity or, to the knowledge of the Borrower, investigations by or on behalf of any Governmental Authority or in arbitration now pending, or, to the knowledge of the Borrower, threatened in writing against or affecting the Borrower or any of its Subsidiaries or any business, property or rights of any such person which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and (B) there are no actions, suits or proceedings at law or in equity against any of the vendors of the Borrower or any of its Subsidiaries that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. As of the Closing Date, Schedule 3.09(a), set forth the complete list of commercial tort claims of the Borrower or any other Loan Party and, to the Borrower's knowledge, a complete list of all material actions, suits and proceedings against the Borrower or any Subsidiary.

(b)     Except as permitted by an order of the Bankruptcy Court, none of the Borrower, the Subsidiaries or their respective properties or assets is in violation of (nor will the continued operation of their material properties and assets as currently conducted violate) any law, rule or regulation (including any zoning, building, Environmental Law, ordinance, code or approval or any building permit), or is in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)     Agreements with Regulatory Agencies.  Except to the extent resulting from the filing of the Chapter 11 Cases, neither the Borrower nor any of its Subsidiaries is subject to any cease-and-desist or enforcement action issued by, or is a party to any written agreement, consent agreement or memorandum of understanding with, or is a party to any commitment letter or similar undertaking to, any Governmental Authority that currently restricts the conduct of its business (each item in this sentence, a "*Regulatory Agreement*") in a manner that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, nor has the Borrower or any of its Subsidiaries been advised since March 31, 2018 by any Governmental Authority that it is issuing, initiating, ordering, or requesting any such Regulatory Agreement that would reasonably be expected to have a Material Adverse Effect. The Borrower and each of its Subsidiaries is in compliance with each Regulatory Agreement to which it is party or subject, other than to the extent such noncompliance would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and neither the Borrower nor any of its Subsidiaries has received any notice from any Governmental Authority indicating that either the Borrower or any of its Subsidiaries is not in compliance with any such Regulatory Agreement, other than to the extent such noncompliance would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.10    Federal Reserve Regulations. (a) None of the Borrower or the Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

US-DOCS\115808185.26

(b)    No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock or to refund indebtedness originally incurred for such purpose, or (ii) for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation T, Regulation U or Regulation X.

Section 3.11    <u>Investment Company Act</u>. None of the Borrower or the Subsidiaries is an "*investment company*" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 3.12    <u>Use of Proceeds</u>. Unless otherwise agreed by the Administrative Agent (acting at the direction of the Required Lenders), the proceeds of the Loans will be used in accordance with the terms of the DIP Budget (subject to permitted variances) and the terms of the DIP Orders or any other order entered by the Bankruptcy Court that is not inconsistent with the Restructuring Support Agreement, the DIP Orders and this Agreement, including, without limitation: (i) the payment of fees and expenses incurred through the Closing Date in connection with the Loan Documents, (ii) general corporate purposes of the Loan Parties substantially in accordance with the DIP Budget (subject to the permitted variances) and (iii) obligations benefiting from the Carve Out.  Notwithstanding anything to the contrary herein or in any other Loan Document, neither this Agreement nor any other Loan Document shall restrict the payment of Allowed Professional Fees benefitting from the Carve Out.  No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry any margin stock (within the meaning of Regulation U) or to refinance any Debt originally incurred for such purpose, or for any other purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation T, U and X. Notwithstanding the foregoing, except as required herein, no proceeds of the Loans may be used to pay any obligation arising prior to the Petition Date unless such payment is provided for in the DIP Budget and approved by the First Day Orders or any second day orders reasonably acceptable to the Required Lenders.

Section 3.13    <u>Tax Returns</u>. Except as set forth on *<u>Schedule 3.13</u>*:

(a)    Each of the Borrower and the Subsidiaries (i) has timely filed or caused to be timely filed all federal, state, local and non-U.S. Tax returns required to have been filed by it that are material to such companies taken as a whole and each such Tax return is true and correct in all material respects, including, without limitation, relating to all periods or portions thereof ending on or prior to the Closing Date and (ii) has timely paid or caused to be timely paid all Taxes shown thereon to be due and payable by it and all other material Taxes or assessments, except Taxes or assessments, including, without limitation, relating to all periods or portions thereof ending on or prior to the Closing Date that are being contested in good faith by appropriate proceedings in accordance with *<u>Section 5.03</u>* and for which the Borrower or any of the Subsidiaries (as the case may be) has set aside on its books adequate reserves in accordance with GAAP or the payment of which is stayed by the Chapter 11 Cases; and

(b)    Other than as could not be, individually or in the aggregate, reasonably expected to have a Material Adverse Effect: as of the Closing Date, with respect to each of the Borrower and

-95-

the Subsidiaries, (i) there are no claims being asserted in writing with respect to any Taxes, (ii) no presently effective waivers or extensions of statutes of limitation with respect to Taxes have been given or requested and (iii) no Tax returns are being examined by, and no written notification of intention to examine has been received from, the Internal Revenue Service or any other Taxing authority.

Section 3.14    No Material Misstatements. (a) All written factual information, but excluding, in each case, projected financial information, the Projections, budgets, estimates and information of a general economic or industry specific nature) (the "***Information***") concerning the Borrower, the Subsidiaries, the Transactions and any other transactions contemplated hereby and made available to any Lenders or the Administrative Agent in connection with the Transactions, when taken as a whole (as modified or supplemented by other information so furnished), were accurate and complete in all material respects, as of the date such Information was furnished to the Lenders and as of the Closing Date and did not contain any untrue statement of a material fact as of any such date or omit to state a material fact necessary in order to make the statements contained therein not materially misleading (after giving effect to all modifications, supplements and updates thereto from time to time) in light of the circumstances under which such statements were made.

(b)    Any Projections and estimates prepared by or on behalf of the Borrower or any of its representatives and that have been made available to any Lenders or the Administrative Agent in connection with the Transactions have been prepared in good faith based upon assumptions believed by the Borrower to be reasonable as of the date thereof and as of the Closing Date (it being understood that (i) Projections and estimates by their nature are inherently uncertain, (ii) that actual results may differ significantly from the Projections or estimated results and that such differences may be material, (iii) no assurances are being given that the results reflected in the Projections and estimates will be achieved and (iv) where Projections expressly or implicitly take into account the current market volatility and widespread impact of the COVID-19 outbreak, the extent of the impact of these developments on the Loan Parties' and their Subsidiaries' operational and financial performance will depend on future developments, including the duration and spread of the outbreak and related governmental advisories and restrictions, and the impact of the COVID-19 outbreak on overall demand for the Loan Parties' and their Subsidiaries' products and services, all of which are outside of the control of the Loan Parties and their Subsidiaries, highly uncertain and cannot be predicted).

Section 3.15    Employee Benefit Plans. (a) Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect or as set forth on *Schedule 3.15*: (i) each of the Borrower and the Subsidiaries is in compliance with the applicable provisions of ERISA and the provisions of the Code relating to the Plans; (ii) no Reportable Event has occurred during the past five years as to which the Borrower, a Subsidiary or any ERISA Affiliate was required to file a report with the PBGC, other than reports that have been filed; (iii) the present value of all accumulated benefit obligations under each Plan (based on those assumptions used to fund such Plan), as of the last annual valuation date applicable thereto for which a valuation is available, does not exceed the fair market value of the assets of such Plan; (iv) no ERISA Event has occurred; and (v) none of the Borrower, the Subsidiaries or the ERISA Affiliates has received any written notification that any Multiemployer Plan is in reorganization or has been terminated within the meaning of Title IV of ERISA, or has knowledge that any Multiemployer Plan is reasonably expected to be terminated.

-96-

(b)      Each of the Borrower and the Subsidiaries is in compliance (i) with all applicable provisions of law and all applicable regulations and published interpretations thereunder with respect to any employee pension benefit plan or other employee benefit plan governed by the laws of a jurisdiction other than the United States and (ii) with the terms of any such plan, except, in each case, for such noncompliance that would not reasonably be expected to have a Material Adverse Effect.

Section 3.16    Environmental Matters. Except as disclosed on *Schedule 3.16* and except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (i) no written notice, request for information, order, complaint or penalty has been received by the Borrower or any of the Subsidiaries, and there are no judicial, administrative or other actions, suits or proceedings pending or threatened, that allege a violation of or liability under any applicable Environmental Laws, in each case relating to the Borrower or any of the Subsidiaries, (ii) each of the Borrower and the Subsidiaries has obtained and maintained all permits, licenses and other approvals necessary for its operations to comply with all applicable Environmental Laws and is, and during the term of all applicable statutes of limitation, has been, in compliance with the terms of such permits, licenses and other approvals and with all other applicable Environmental Laws, (iii) to Borrower's knowledge, there has been no material written environmental assessment or audit conducted of any property currently owned or leased by the Borrower or any of the Subsidiaries that has not been made available to the Administrative Agent prior to the date hereof, (iv) no Hazardous Material is located at, on or under any property currently or, to the knowledge of the Borrower, formerly owned, operated or leased by the Borrower or any of its Subsidiaries that would reasonably be expected to give rise to any cost, liability or obligation of the Borrower or any of the Subsidiaries under any applicable Environmental Laws, and no Hazardous Material has been generated, owned, treated, stored, handled or controlled by the Borrower or any of its Subsidiaries and transported to or Released at any location in a manner that would reasonably be expected to give rise to any cost, liability or obligation of the Borrower or any of the Subsidiaries under any Environmental Laws and (v) there are no written agreements in which the Borrower or any of the Subsidiaries has expressly assumed or undertaken responsibility, and such assumption or undertaking of responsibility has not expired or otherwise terminated, for any liability or obligation of any other person arising under or relating to applicable Environmental Laws.

Section 3.17    Security Documents. (a) This Agreement and the other Loan Documents, upon execution and delivery thereof by the parties thereto and entry of the applicable DIP Order (and subject to the terms therein), will create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and the proceeds thereof, which security interest shall be deemed valid and perfected as of the Closing Date by entry of the DIP Order with respect to each Loan Party and which shall constitute continuing Liens on the Collateral having priority over all other Liens on the Collateral and securing all the Obligations, other than the Carve Out and as otherwise set forth in the applicable DIP Order.  The Collateral Agent and Lenders shall not be required to file or record (but shall have the option and authority to file or record) any financing statements, mortgages, notices of Lien or similar instruments, in any jurisdiction or filing office or to take any other action in order to validate, perfect or establish the priority of the Liens and security interest granted by or pursuant to this Agreement, any other Loan Document or the DIP Orders.

US-DOCS\115808185.26

(b)      Pursuant to Section 364(c)(1) of the Bankruptcy Code, the Obligations of the Loan Parties shall at all times constitute allowed senior administrative expenses against each of the Loan Parties in the Chapter 11 Cases (without the need to file any proof of claim or request for payment of administrative expense), with priority over any and all other administrative expenses, adequate protection claims, diminution claims and all other claims against the Loan Parties, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the United States Bankruptcy Code, and over any and all other administrative expense claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c) (with any claims arising under Section 506(c) only subject to the entry of the Final Order), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the United States Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the United States Bankruptcy Code, and which shall be payable from and have recourse to all pre- and post-petition property of the Loan Parties and their estates and all proceeds thereof, including, without limitation, and subject to entry of the Final Order, any proceeds of Avoidance Actions, subject, as to priority, only to the Carve Out and as otherwise set forth in the applicable DIP Order.

(c)      [Reserved].

(d)      [Reserved].

(e)      [Reserved].

(f)      After taking the actions specified for perfection therein, each Security Document, when executed and delivered, will be effective under applicable law to create in favor of the Collateral Agent (for the benefit of the Secured Parties) a legal, valid and enforceable security interest in the Collateral subject thereto (to the extent intended to be created thereby), and will constitute a fully perfected Lien on and security interest in all right, title and interest of the Loan Parties in the Collateral subject thereto (to extent required thereby), prior and superior to the rights of any other person, except for rights secured by Liens expressly provided by ***Error! Reference source not found.*** and subject to the lien priority set forth in the First Lien Pari Passu Intercreditor Agreement and DIP Order.

(g)      Notwithstanding anything herein (including this ***Error! Reference source not found.***) or in any other Loan Document to the contrary, none of the Borrower or any other Loan Party makes any representation or warranty as to the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Equity Interests or any assets of any Foreign Subsidiary or any assets in a foreign jurisdiction, or as to the rights and remedies of the Lenders with respect thereto, under foreign law.

Section 3.18   Location of Real Property. *Schedule 3.18* lists as of the Closing Date all material real property owned or leased by the Borrower and the Loan Parties and the addresses thereof. As of the Closing Date, the Borrower and the Loan Parties (i) own in fee all the real property set forth as being owned by them on such *Schedule 3.18* and (ii) have in all material respects, valid leases in a material real property set forth as being leased by them on *Schedule 3.18*.

US-DOCS\115808185.26

Section 3.19    [Reserved].

Section 3.20    Labor Matters. Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes, lockouts, stoppages, slowdowns or other labor disputes pending or threatened against the Borrower or any of the Subsidiaries; (b) the hours worked and payments made to employees of the Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable law dealing with such matters; (c) all payments due from the Borrower or any of the Subsidiaries or for which any claim may be made against the Borrower or any of the Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Borrower or such Subsidiary to the extent required by GAAP; (d) the Borrower and the Subsidiaries are in compliance with all applicable laws, agreements, policies, plans and programs relating to employment and employment practices and (e) to the Borrower's knowledge, all the vendors of the Borrower and the Subsidiaries are in compliance with all applicable laws, agreements, policies, plans and programs relating to employment and employment practices.

Section 3.21    Insurance. As of the Closing Date, _Schedule 3.21_ sets forth a true, complete and correct description of all material insurance maintained by or on behalf of the Borrower or the Subsidiaries and such insurance is in full force and effect. Such insurance complies with the requirements of this Agreement and the other Loan Documents and the Borrower believes (in the good faith judgment of the management of Borrower) that the insurance maintained by or on behalf of the Borrower and the Subsidiaries is in at least such amounts as is adequate, reasonable and prudent in light of the size and nature of its business.

Section 3.22    Inventory Matters.

(a)    As to each item of Inventory that is identified by Borrower as Eligible Inventory in a Borrowing Base Certificate submitted to the Administrative Agent, such Inventory is (a) of good and merchantable quality, free from known defects, and (b) not excluded as ineligible by virtue of one or more of the excluding criteria (other than any Administrative Agent-discretionary criteria) set forth in the definition of Eligible Inventory;

(b)    [reserved]; and

(c)    Each Loan Party keeps correct and accurate records itemizing and describing the type, quality, and quantity of its and its Subsidiaries' Inventory and the book value thereof.

Section 3.23    Material Agreements; No Violation; No Default.

(a)    Except as resulting from or in connection with the Chapter 11 Cases, none of the Borrower or any Subsidiary is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which any of the Borrower or any Subsidiary is a party that, individually or in the aggregate, has resulted, or would reasonably be expected to result, in a Material Adverse Effect.

(b)    As of the Closing Date, no Loan Party has any Material Agreement other than those specifically disclosed on _Schedule 3.23_.

-99-

(c)     Except as resulting from or in connection with the Chapter 11 Cases, as of the Closing Date, none of the Borrower or any Subsidiary is in material violation of any Material Agreement and all the Material Agreements are enforceable and valid in all material respects.

(d)     Except as resulting from or in connection with the Chapter 11 Cases, no Default or Event of Default has occurred and is continuing.

Section 3.24    [Reserved].

Section 3.25    PATRIOT Act, etc. (a) To the extent applicable, each Loan Party is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) the PATRIOT Act.

(b)     As of the Closing Date, the information provided by Borrower in a Beneficial Ownership Certification delivered to any Lender is true and correct in all respects.

Section 3.26    Sanctions Laws (a) None of the Loan Parties or Subsidiaries is in violation of any applicable Sanctions Laws, engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any applicable Sanctions Laws.

(b)     None of the Loan Parties or Subsidiaries is any of the following (each a "***Blocked Person***"):

(i)     a Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(ii)     a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(iii)     a Person with which any Agent or any Lender is prohibited from dealing or otherwise engaging in any transaction by any Sanctions Laws;

(iv)     a Person that commits, threatens or conspires to commit or supports "terrorism" (as defined in Executive Order No. 13224); or

(v)     a Person that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or any replacement website or other replacement official publication of such list.

(c)     No Loan Party or, to the knowledge of any Loan Party, any of its agents acting in any capacity in connection with the Loans, Letters of Credit or the transactions hereunder (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person or (ii) deals in, or otherwise engages in any

-100-

transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224.

Section 3.27    Anti-Corruption Laws and Sanctions Laws. The Borrower, its Subsidiaries and, to the knowledge of the Borrower, their respective officers, employees, directors and agents that act in any capacity in connection with the credit facility established hereby, are in compliance with Anti-Corruption Laws and applicable Sanctions Laws in all material respects. None of (a) the Borrower, any Subsidiary or, to the knowledge of Borrower, any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that act in any capacity in connection with the credit facility established hereby, is a Sanctioned Person. No Borrowing, use of proceeds or other transaction contemplated by this Agreement will violate any Anti-Corruption Law or applicable Sanctions Laws.

Section 3.28    Compliance With Collateral and Guarantee Requirement. The Borrower and each other Loan Party is in compliance with the Collateral and Guarantee Requirement applicable to each such Loan Party.

Section 3.29    Reorganization Matters.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance in all material respects with applicable law and proper notice thereof and the proper notice of (x) the motion seeking approval of the Loan Documents and the Interim Order and, as applicable, the Final Order, (y) the hearing for the approval of the Interim Order, and (z) when applicable, the hearing for the approval of the Final Order will be given; provided that the Borrower shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b)    After the entry of the Interim Order (and subject to the terms therein) and pursuant to and to the extent provided in the Interim Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, subject, as to priority only, to the Carve Out, DIP Revolving Credit Agreement, the First Lien Credit Agreement and as otherwise set forth in the applicable DIP Order.

(c)    The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, or, without the Required Lenders' consent, modified or amended in an adverse manner.

(d)    Each DIP Budget and all projected consolidated balance sheets, income statements and cash flow statements of the Borrower and its Subsidiaries delivered to the Administrative Agent and the Lenders were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed in good faith by the Borrower to be fair in light of the conditions existing at the time of delivery of such report or projection.

US-DOCS\115808185.26

ARTICLE IV

Conditions of Lending

The obligations of (a) the Lenders to make Loans and (b) any Issuing Bank to amend, extend or renew Letters of Credit hereunder (each, a "**Credit Event**") are subject to the satisfaction (or waiver) of the following conditions:

Section 4.01    All Credit Events. On the date of each Credit Event (in the case of _clause (g)_, other than on the Closing Date):

(a)    (A) The Lenders and the Administrative Agent shall have received a Borrowing Request as required by _Section 2.04(a)_ and (B) the Administrative Agent shall have received a Borrowing Base Certificate no later than 12:00 p.m. on the date of such request.

(b)    The representations and warranties of the Loan Parties set forth in the Loan Documents that are qualified by materiality shall be true and correct, and the representations and warranties that are not so qualified shall be true and correct in all material respects, in each case on and as of the date of such Borrowing with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties that are qualified by materiality shall be true and correct, and the representations and warranties that are not so qualified shall be true and correct in all material respects, as of such earlier date).

(c)    At the time of and immediately after the applicable Credit Event, no Event of Default or Default shall have occurred and be continuing or would result immediately therefrom.

(d)    The making of the funding shall not violate any material requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(e)    The DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any adverse respect without the consent of the Required Lenders.

(f)    [Reserved].

(g)    The Delayed Funding Date shall have occurred.

(h)    Solely with respect to any Credit Event on a pro forma basis for which there shall be any utilization of the Overadvance Line, no event or condition has occurred under the terms of the documents relating to the applicable Qualified Securitization Financing that terminates the Qualified Securitization Financing or that would permit the providers thereof to terminate such financing or arrangement or commitments or availability with respect thereto or would result from such Credit Event.

Each Credit Extension shall be deemed to constitute a representation and warranty by the Borrower on the date of such Borrowing, issuance, amendment, extension or renewal as applicable, as to the matters specified in _paragraphs (b)_, _(c)_, _(d)_ and _(e)_ of this _Section 4.01_.

US-DOCS\115808185.26

Section 4.02    <u>Closing Date</u>. On the Closing Date:

(a)    The Administrative Agent (or its counsel) shall have received from each party thereto a counterpart of (i) this Agreement, (ii) each other Loan Document, (iii) the Second Lien DIP Term Loan Credit Agreement, (iv) the Pari Passu Intercreditor Agreement and (v) the PNC Receivables Purchase Agreement signed on behalf of each party thereto and the documents listed in _clauses (ii)_ through _(iv)_ shall become effective substantially concurrently with this Agreement.

(b)    [Reserved].

(c)    The Administrative Agent shall have received a completed Borrowing Base Certificate.

(d)    The Administrative Agent shall have received in the case of each Loan Party each of the items referred to in _clauses (i)_, _(ii)_ and _(iii)_ below:

(i)    a copy of the certificate or articles of incorporation or formation, limited liability agreement, partnership agreement or other constituent or governing documents, including all amendments thereto, of each Loan Party, (a) if applicable in such jurisdiction, certified as of a recent date by the Secretary of State (or other similar official) of the jurisdiction of its organization, and a certificate as to the good standing (to the extent such concept or a similar concept exists under the laws of such jurisdiction) of each such Loan Party as of a recent date from such Secretary of State (or other similar official), and (b) otherwise, (i) certified by the Secretary or Assistant Secretary of each such Loan Party or other person duly authorized by the constituent documents of such Loan Party or (ii) otherwise in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders;

(ii)    a certificate of the Secretary or Assistant Secretary or similar officer of each Loan Party or other person duly authorized by the constituent documents of such Loan Party dated the Closing Date and certifying (solely in his or her capacity as an officer of such Loan Party):

(A)    that attached thereto is a true and complete copy of the by-laws (or limited liability company agreement, articles of association, partnership agreement or other equivalent constituent and governing documents) of such Loan Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in _clause (B)_ below;

(B)    that attached thereto is a true and complete copy of resolutions (or equivalent authorizing actions) duly adopted by the Board of Directors (or equivalent governing body) of such Loan Party (or its managing general partner or managing member), authorizing the execution, delivery and performance of each of the Loan Documents to which such person is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect on the Closing Date;

-103-

(C)      that the certificate or articles of incorporation, by-laws, limited liability company agreement, articles of association, partnership agreement or other equivalent constituent and governing documents of such Loan Party have not been amended since the date of the last amendment thereto disclosed pursuant to *clause (i)* above;

(D)      as to the incumbency and specimen signature of each officer or other duly authorized person executing any Loan Document or any other document delivered in connection herewith on behalf and in the name of such Loan Party;

(E)      as to the absence of any pending proceeding for the dissolution of liquidation of such Loan Party or, to the knowledge of such person, threatening in writing the existence of such Loan Party; and

(iii)      a certification of another officer or other duly authorized person as to the incumbency and specimen signature of the Secretary or Assistant Secretary or similar officer or other person duly authorized by such Loan Party executing the certificate pursuant to *clause (ii)* above.

(e)      The Lenders shall have received a certificate from a Responsible Officer of the Borrower, dated the Closing Date, confirming satisfaction with *Sections 4.01(b)* and *(c)* and *Section 4.02(i)*.

(f)      The "*Initial Term Loans*" as defined in the Second Lien DIP Term Loan Credit Agreement, which shall not be in an amount less than $120,0000,000, shall have been funded substantially concurrently with the initial funding of the Loans on the Closing Date.

(g)      The Lenders and the Administrative Agent shall have received the Initial DIP Budget (it being understood that the condition set forth in this clause *(g)* has been satisfied by the delivery of the DIP Budget to the Lender Advisors on May 19, 2020).

(h)      The elements of the Collateral and Guarantee Requirement shall have been satisfied.

(i)      [Reserved].

(j)      The Agents shall have received payment of all fees and expenses of the Lenders, the Agents and the Lead Arrangers required to be paid by the Borrower on the Closing Date or evidence that such fees and expenses will be paid substantially concurrently with the initial funding of the Loans on the Closing Date.

(k)      The Loan Parties have paid in full all pre-petition interest and pre-petition fees that have accrued pursuant to the Pre-Petition First Lien Credit Agreement for which an invoice has been delivered to the Borrower at least one (1) Business Days prior to the Closing Date, (including fees and expenses of their legal counsel and financial advisors, including, for the avoidance of doubt, in relation to the "*Second Amendment*" and "*Third Amendment*" as defined in the Pre-Petition First Lien Credit Agreement) and any amendments thereof (whether or not consummated)

or work related thereto but remain unpaid and for which payment thereof is provided for in the DIP Budget.

(l)     The Loan Parties shall have repaid the 2020 Term Loans (as defined in the Pre-Petition First Lien Credit Agreement) substantially concurrently with the initial funding of the Loans on the Closing Date.

(m)     Prior to the Closing Date, the Administrative Agent and the Lenders shall have received all documentation and other information required by bank regulatory authorities or reasonably requested by the Administrative Agent or any Lender under or in respect of applicable "know-your-customer" and anti-money laundering rules and regulations, including the PATRIOT Act, and including a duly executed W-9 tax form (or such other applicable IRS tax form) of the Borrower that was requested at least three days prior to the Closing Date.

(n)     Prior to the Closing Date, any Borrower that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall deliver a Beneficial Ownership Certification in relation to such Borrower.

(o)     Each Loan Party shall be a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

(p)     The Administrative Agent and Lenders shall have received a certified copy of an order entered by the Bankruptcy Court in substantially the form of Exhibit G or with such changes as may be acceptable to the Administrative Agent and the Required Lenders in their sole discretion, on the one hand, and Borrower, on the other hand (the "***Interim Order***"), which Interim Order (x) shall have been entered on the docket of the Bankruptcy Court no later than four (4) Business Days after the Petition Date and (y) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any adverse respect without the written consent of the Required Lenders.

(q)     No motion, pleading or application seeking relief affecting the provision of the financing contemplated hereunder shall have been filed in the Bankruptcy Court by any Loan Party without the prior written consent of the Agents and the Required Lenders in their sole discretion;

(r)     The "first day" orders (including, without limitation, any motions related to the Loan Documents, cash management and any critical vendor or supplier motions, but excluding retention applications), in form and substance reasonably satisfactory to the Required Lenders and their counsel, on the one hand, and the Loan Parties, on the other hand, shall have been entered in the Chapter 11 Cases in form and substance reasonably satisfactory to the Required Lenders (the "***First Day Orders***") (it being understood that the form and substance of the First Day Orders delivered to the Lender Advisors on May 17, 2020 are in form and substance reasonably acceptable to the Required Lenders).

(s)     The Cash Management Order and all motions and other documents filed and submitted to, the Bankruptcy Court in connection with the Loan Parties' cash management shall be in form and substance reasonably satisfactory to the Required Lenders (it being understood that the form and substance of such orders, motions and other documents delivered to the Lender

-105-

Advisors on May 17, 2020 are in form and substance reasonably acceptable to the Required Lenders).

(t)    [reserved];

(u)    The DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any adverse respect without the consent of the Required Lenders.

(v)    The funding shall not cause the aggregate amount of the Loans to exceed the amount authorized by the DIP Order, and any order modifying, reversing, staying or vacating either such order shall not have been entered.

(w)    The Restructuring Support Agreement shall be in full force and effect and shall not have been amended or modified without the Required Lenders' prior written consent.

(x)    The Debtors shall have provided a press release relating to the Chapter 11 Cases and the restructuring contemplated thereunder, to be in form and substance satisfactory to the Required Lenders (it being understood that the press release relating to the Chapter 11 Cases delivered to the Required Lenders on May 17, 2020 is satisfactory to the Required Lenders).

(y)    Each Loan Party shall be a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code.

(z)    All other conditions to borrowing in the Interim Order shall have been satisfied.

(aa)    The Administrative Agent shall have received the unaudited pro forma consolidated balance sheet of the Borrower and its Subsidiaries as of the Closing Date after giving effect to the Transactions.

Without limiting the generality of the provisions of the last paragraph of *Section 8.03*, for purposes of determining compliance with the conditions specified in this *Section 4.02*, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender.

ARTICLE V

Affirmative Covenants

The Borrower covenants and agrees with each Lender that until Payment in Full, the Borrower will, and will cause each of the Subsidiaries to:

Section 5.01    Existence; Businesses and Properties. (a) Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization, (i) except as otherwise expressly permitted under *Section 6.05* or (with respect to any Subsidiary that is not a Loan Party) to the extent that a failure to do so would not reasonably be expected to have a Material Adverse Effect and (ii) except

-106-

for the liquidation or dissolution of Subsidiaries if the assets of such Subsidiaries to the extent they exceed estimated liabilities are acquired by the Borrower or a Wholly Owned Subsidiary of the Borrower in such liquidation or dissolution; *provided*, that Subsidiaries that are Subsidiary Loan Parties may not be liquidated into Subsidiaries that are not Subsidiary Loan Parties, unless such liquidation is otherwise permitted by *Section 6.05(b)*.

(b)     Do or cause to be done all things necessary to (i) obtain, preserve, renew, extend and keep in full force and effect the permits, franchises, authorizations, patents, trademarks, service marks, trade names, copyrights, domain names, trade secrets, applications or registrations for patents, trademarks, service marks, trade names, copyrights, domain names, licenses, rights, privileges and other intellectual property used in and material to the normal conduct of its business, (ii) comply in all material respects with all material applicable laws, rules, regulations and judgments, writs, injunctions, decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, and (iii) at all times maintain and preserve all material property necessary to the normal conduct of its business and keep such property in good repair, working order and condition (ordinary wear and tear excepted) and from time to time use commercially reasonable efforts make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted at all times (in each case except as expressly permitted by this Agreement; unless, in each case, the failure to do so would not be likely to have a Material Adverse Effect).

Section 5.02    Insurance. (a) Keep its insurable properties insured at all times by financially sound and reputable insurers in such amounts as shall be customary for similar businesses of a similar size owning similar properties in the same localities where the Borrower and its Subsidiaries operate and maintain such reasonable insurance (including, to the extent consistent with past practices or industry practices for Similar Businesses, self-insurance), of such types, to such extent and against such risks, as is customary with companies in the same or similar businesses, taking into account the general degree to which such companies are leveraged, and maintain such other insurance as may be required by law or any other Loan Document.

(b)     Cause all such property and property casualty insurance policies to be endorsed or otherwise amended to include appropriate loss payable endorsements, in form and substance reasonably satisfactory to the Administrative Agent, which endorsement shall provide that, from and after the Closing Date, if the insurance carrier shall have received written notice from the Administrative Agent of the occurrence of an Event of Default, the insurance carrier shall pay all proceeds otherwise payable to the Borrower or the other Loan Parties under such policies directly to the Collateral Agent; cause all such policies to provide that none of the Borrower, the Administrative Agent or any other party shall be a coinsurer thereunder and to contain a "*Replacement Cost Endorsement*," without any deduction for depreciation, and such other provisions as the Administrative Agent may reasonably (in light of a Default or a material development in respect of the insured property) require from time to time to protect their interests; deliver original or certified copies of all such policies or a certificate of an insurance broker to the Administrative Agent; cause each such policy to provide that it shall not be canceled, lapsed (including for nonrenewal) or terminated upon advance notice, to the extent available on commercially reasonable terms, not less than 30 days' prior written notice (or 10 days' prior written notice in the case of any failure to pay any premium due thereunder) thereof by the insurer

-107-

to the Administrative Agent; deliver to the Administrative Agent, prior to the cancellation, lapse (including for nonrenewal) or termination of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Administrative Agent), or insurance certificate with respect thereto, together with evidence satisfactory to the Administrative Agent of payment of the premium therefor.

(c)    Notify the Administrative Agent promptly after any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this _Section 5.02_ is taken out by the Borrower or any of the Subsidiaries; and promptly deliver to the Administrative Agent a duplicate original copy of such policy or policies, or an insurance certificate with respect thereto.

(d)    In connection with the covenants set forth in this _Section 5.02_, it is understood and agreed that:

(i)    none of the Administrative Agent, the Lenders, the Issuing Bank and their respective agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this _Section 5.02_, it being understood that (A) the Loan Parties shall look solely to their insurance companies or any other parties other than the aforesaid parties for the recovery of such loss or damage and (B) such insurance companies shall have no rights of subrogation against the Administrative Agent, the Lenders, any Issuing Bank or their agents or employees. If, however, the insurance policies, as a matter of the internal policy of such insurer, do not provide waiver of subrogation rights against such parties, as required above, then the Borrower, on behalf of itself and behalf of each of its subsidiaries, hereby agrees, to the extent permitted by law, to waive, and further agrees to cause each of its Subsidiaries to waive, its right of recovery after the occurrence and during the continuance of an Event of Default, if any, against the Administrative Agent, the Lenders, any Issuing Bank and their respective agents and employees; and

(ii)    the designation of any form, type or amount of insurance coverage by the Administrative Agent under this _Section 5.02_ shall in no event be deemed a representation, warranty or advice by the Administrative Agent or the Lenders that such insurance is adequate for the purposes of the business of the Borrower and the Subsidiaries or the protection of their properties.

Section 5.03    Taxes. In accordance with the Bankruptcy Code and subject to any required approval by an applicable order of the Bankruptcy Court, pay and discharge promptly when due all material Taxes imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise that, if unpaid, might give rise to a Lien upon such properties or any part thereof; _provided_, _however_, that such payment and discharge shall not be required with respect to any such Tax or claim so long as (a) the validity or amount thereof shall be contested in good faith by appropriate proceedings, (b) the Borrower or the affected Subsidiary, as applicable, shall have set aside on its books adequate reserves in accordance with GAAP with respect thereto, and (c) the failure to make such payment and discharge would not reasonably be expected to result in a Material Adverse Effect.

-108-

Section 5.04    <u>Financial Statements, Reports, etc.</u> Furnish to the Administrative Agent (which will promptly furnish such information to the Lenders):

(a)    as soon as available, but in any event within 90 days after the end of each fiscal year (or, if applicable, such shorter period as the SEC shall specify for the filing of Annual Reports on Form 10-K or, if applicable, such longer period permitted under Rule 12b-25 under the Exchange Act), (i) a consolidated balance sheet and related statements of operations and comprehensive income, cash flows and owners' equity showing the financial position of the Borrower and its subsidiaries as of the close of such fiscal year and the consolidated results of its operations during such year and, commencing with the fiscal year ending December 31, 2020, setting forth in comparative form the corresponding figures for the prior fiscal year, and (ii) management's discussion and analysis of significant operational and financial developments during such fiscal year and a "key performance indicator" report with such content as may be mutually agreed by the Administrative Agent and the Borrower, which consolidated balance sheet and related statements of operations and comprehensive income, cash flows and owners' equity shall be audited by an independent certified public accounting firm of recognized national standing reasonably acceptable to the Administrative Agent (it being understood that any of the "big four" or other nationally recognized accounting firms shall be acceptable to the Administrative Agent) and accompanied by an opinion of such accountants to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of the Borrower and its subsidiaries on a consolidated basis in accordance with GAAP (it being understood that the delivery by the Borrower of Annual Reports on Form 10-K of the Borrower and its consolidated subsidiaries shall satisfy the requirements of this Section 5.04(a) to the extent such Annual Reports include the information specified herein)

(b)    as soon as available, but in any event within 45 days after the first three fiscal quarters of each fiscal year (or, if applicable, such shorter period as the SEC shall specify for the filing of Quarterly Reports on Form 10-Q or, if applicable, such longer period permitted under Rule 12b-25 under the Exchange Act), (i) a consolidated balance sheet and related statements of operations and comprehensive income and cash flows showing the financial position of the Borrower and its subsidiaries as of the close of such fiscal quarter and the consolidated results of its operations during such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, and (ii) management's discussion and analysis of significant operational and financial developments during such quarterly period and a "key performance indicator" report with such content as may be reasonably agreed by the Required Lenders and the Borrower, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and comprehensive income and cash flows shall be certified by a Responsible Officer of the Borrower on behalf of the Borrower as fairly presenting, in all material respects, the financial position and results of operations of the Borrower and its subsidiaries on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes (it being understood that the delivery by the Borrower of Quarterly Reports on Form 10-Q of the Borrower and its consolidated subsidiaries shall satisfy the requirements of this <u>*Section 5.04(b)*</u> to the extent such Quarterly Reports include the information specified herein));

(c)    as soon as available, but in any event within 45 days after the end of each fiscal month of any fiscal quarter a consolidated balance sheet and related statements of operations and

comprehensive income and cash flows showing the financial position of the Borrower and its subsidiaries as of the close of such month and the consolidated results of its operations during such month;

(d)    [Reserved];

(e)    concurrently with any delivery of financial statements under *paragraph (a)* or *(b)* above, a certificate of a Responsible Officer of the Borrower (the "**Compliance Certificate**") certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

(f)    promptly after the same become publicly available, copies of all periodic and other publicly available reports, proxy statements and, to the extent requested by the Administrative Agent, other reports and statements filed by the Borrower or any of its subsidiaries with the SEC on a non-confidential basis, or after public offering, distributed to its stockholders generally, as applicable; *provided*, *however*, that such reports, proxy statements, filings and other materials required to be delivered pursuant to this *clause (f)* shall be deemed delivered for purposes of this Agreement when posted to the website of the Borrower or any website operated by the SEC containing "EDGAR" database information;

(g)    if, as a result of any material change in accounting principles and policies from those applied in the preparation of the financial statements referred to in *Section 3.05(a)(ii)* for the fiscal year ended December 31, 2018, the consolidated financial statements of the Borrower and its subsidiaries delivered pursuant to *paragraph (a)* above will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such clauses had no such change in accounting principles and policies been made, then, together with the first delivery of financial statements pursuant to *paragraph (a)* above following such change, a schedule prepared by a Responsible Officer on behalf of the Borrower reconciling such changes to what the financial statements would have been without such changes;

(h)    as soon as available, but in any event within 90 days after the beginning of each fiscal year, commencing with the fiscal year ending December 31, 2021, detailed consolidated monthly budgets for such fiscal year and, as soon as available, significant revisions approved by the Board of Directors, if any, of such budget and monthly projections with respect to such fiscal year, including a description of underlying assumptions with respect thereto (and including monthly balance sheet, profit and loss and cash flow figures);

(i)    promptly following the reasonable request of the Administrative Agent (but not more than once per quarter in connection with the delivery of a Compliance Certificate), an updated perfection certificate (or, to the extent such request relates to specified information contained in such perfection certificate, such information), reflecting such changes to Collateral granted pursuant to a Security Document since the date of the information most recently received pursuant to this *paragraph (i)* or *Section 5.11(f)*;

(j)    concurrently with the delivery of such information under the PNC Receivables Purchase Agreement (or other applicable Securitization Financing Documents), such material

information and reporting required under *Sections 7.01(c)(i)*, *7.01(c)(ii)* and *7.01(d)* of the PNC Receivables Purchase Agreement (or any analogous provisions of any other Qualified Securitization Financing Documentation);

(k)    promptly, from time to time, such other information regarding the operations, business affairs and financial condition of the Borrower or any of its subsidiaries (including, without limitation, the Transformation Office Plan), or compliance with the terms of any Loan Document, or such consolidating financial statements, as in each case the Administrative Agent may reasonably request in writing (for itself or on behalf of any Lender);

(l)    promptly following request by the Administrative Agent, copies of: (i) each Schedule B (Actuarial Information) to the most recent annual report (Form 5500 Series) filed with the Internal Revenue Service with respect to a Plan; (ii) the most recent actuarial valuation report for any Plan; and (iii) all notices received from a Multiemployer Plan sponsor, a plan administrator or any governmental agency, or provided to any Multiemployer Plan by Borrower, a Subsidiary or any ERISA Affiliate, concerning an ERISA Event;

(m)    promptly upon request by the Administrative Agent or any Lender, information and documentation for purposes of compliance with Beneficial Ownership Regulations or any applicable "know your customer" requirements under the PATRIOT Act or other applicable anti-money laundering laws;

(n)    as soon as available, but in any event no later than the Thursday of each calendar week (commencing with the calendar week ending May 29, 2020), deliver or make available to the Administrative Agent, the Lenders and the Lender Advisors a Variance Report for the applicable Variance Test Period as of the end of the immediately preceding calendar week;

(o)    as soon as available, but in any event no later than the Thursday of every fourth calendar week (commencing with the calendar week ending June 12, 2020), deliver to the Administrative Agent, the Lenders, and the Lender Advisors a proposed updated 13-week forecast (in the form of the most recently approved DIP Budget) setting forth on a weekly basis for the next thirteen weeks (commencing with the calendar week in which such DIP Budget is delivered) an updated forecast of the information contained in the Initial 13-Week DIP Budget or the previously delivered DIP Budget for such period and a written set of supporting assumptions;

(p)    as soon as available, but in any event no later than (i) the Thursday of each week (commencing with the calendar week ending May 29, 2020), deliver to the Administrative Agent and the Lender Advisors an operational report in form and substance reasonably satisfactory to the Required Lenders in their sole discretion, including (1) a statement of weekly sales on a cumulative basis presented against the sales figures projected in the DIP Budget on a monthly basis, (2) an inventory statement reasonably acceptable to the Required Lenders, including inventory purchases and related information as compared to the inventory management plan developed pursuant to *Section 5.24(b)*, as applicable (3) a retail and corporate headcount, (4) Liquidity on the last Business Day of the prior week, (5) an order booking report in a format reasonably acceptable to the Required Lenders, and (6) payments to general unsecured claims (and such other information with respect to general unsecured claims reasonably satisfactory to the Required Lenders), in each case, as of the end of the immediately preceding calendar week and (ii) the Thursday of each two

-111-

week period (commencing with the calendar week ending May 29, 2020), make available to the Administrative Agent and the Lender Advisors a written update to the Transformation Office Plan in form and substance satisfactory to the Required Lenders in their sole discretion; and

(q)    deliver to counsel to the Administrative Agent and the Lender Advisors copies of all monthly reports, projections, or other written information respecting each of the Loan Parties' business or financial condition or prospects as well as all pleadings, motions, applications and judicial information filed by or on behalf of the Borrower with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or the Committee, at the time such document is filed with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or Committee, as applicable.

Notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, no Loan Party shall be required to disclose to any Agent or any Lender (or any authorized representative or independent contractor of any of them) any information that (w) is prohibited by Law to be disclosed, (x) is subject to attorney-client privilege or constitutes attorney work product, (y) the disclosure of which would cause a breach of a binding non-disclosure agreement with any Governmental Authority or any other third party to the extent such agreement is not made in contemplation of the avoidance of this Agreement or (z) that constitutes non-financial trade secrets or non-financial proprietary information of the Borrower or its Subsidiaries and/or any of their respective customers and/or suppliers (provided such confidentiality obligations were not entered into solely in contemplation of the requirements of this *Section 5.04*); *provided*, that in the event the Borrower does not provide any certificate, report or information requested pursuant to this *Section 5.04* in reliance on the preceding proviso, the Borrower shall provide notice to the Administrative Agent and each Lender that such certificate, report or information is being withheld and the Borrower shall use commercially reasonable efforts to describe, to the extent both feasible and permitted under the applicable Law or confidentiality obligations, or without waiving such privilege, as applicable, the applicable certificate, report or information.

Section 5.05    Litigation and Other Notices. Furnish to the Administrative Agent and each Lender written notice of the following promptly after any Responsible Officer of the Borrower obtains actual knowledge thereof:

(a)    any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) proposed to be taken with respect thereto;

(b)    the filing or commencement of, or any written threat or written notice of intention of any person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority or in arbitration, against the Borrower or any of its subsidiaries as to which would reasonably be expected to have a Material Adverse Effect;

(c)    any other development specific to the Borrower or any of its subsidiaries that is not a matter of general public knowledge and that has had, or would reasonably be expected to have, a Material Adverse Effect;

(d)      the occurrence of any ERISA Event that, together with all other ERISA Events that have occurred, would reasonably be expected to have a Material Adverse Effect;

(e)      any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiaries thereof; and

(f)      any (i) degradation in advance rates under a Qualified Securitization Financing which results in a change in the average Advance Ratio for accounts receivable under such Qualified Securitization Financing of more than 20% as compared to the average Advance Ratio for the same month in the prior year or (ii) an increase of more than 2.00% on the interest rate spread for the then existing Securitization Financing; provided further that any changes to pricing resulting from "dynamic pricing" provisions contained in the Qualified Securitization Financing Documents as in effect on the Closing Date (or such the PNC Securitization has been refinanced, the Qualified Securitization Financing Documents then in effect) shall not constitute an amendment to the pricing of such Qualified Securitization Financing.

Section 5.06    Compliance with Laws. Comply with all laws, rules, regulations and orders of any Governmental Authority (including any order of the Bankruptcy Court) as applicable to it or its property, except in each case, where the failure to do so would not reasonably be expected to result in a Material Adverse Effect; _provided_, that this _Section 5.06_ shall not apply to Environmental Laws, which are the subject of _Section 5.10_, or to laws related to Taxes, which are the subject of _Section 5.03_.

Section 5.07    Maintaining Records; Inspections, Field Exams and Appraisals.

(a)      Maintenance of Records; Inspections. Maintain all financial records in accordance with GAAP and permit any persons designated by the Administrative Agent or Administrative Agent or, upon the occurrence and during the continuance of an Event of Default, the Lenders to visit and inspect the financial records and, subject to the terms of applicable leases with third parties, the properties of the Borrower or any of the Subsidiaries at reasonable times, upon reasonable prior notice to the Borrower (_provided_, _however_, that such visits and inspections shall be coordinated through the Agents), and as often as requested; and to make extracts from and copies of such financial records, and permit any persons designated by the Administrative Agent or any Lender upon reasonable prior notice to the Borrower to discuss the affairs, finances and condition of the Borrower or any of the Subsidiaries with the officers thereof and independent accountants therefor (the Agents and the Lenders shall give the Loan Parties a reasonable opportunity to participate in any discussions with the Loan Parties' independent public accountants and any such discussions and inspections shall be subject to reasonable requirements of confidentiality, including requirements imposed by law or by contract and any reasonable costs and expenses of such inspection being reimbursed by the Borrower); _provided_ that, notwithstanding anything in this _Section 5.07(a)_ to the contrary, the Borrower and its Subsidiaries will not be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (i) constitutes trade secrets or proprietary information, (ii) in respect of which disclosure is prohibited by applicable law or binding contractual arrangement and such contractual arrangement was not created or made binding in contemplation of this provision, or (iii) is subject to attorney-client or similar privilege or constitutes attorney work product; provided that in the case of the foregoing _clauses (i)-(iii)_, the

US-DOCS\115808185.26

Borrower shall inform the Lenders that information is being withheld and shall use commercially reasonable efforts to provide the Lenders such information without revealing such trade secrets, proprietary information or information subject to such privilege or to obtain such consent, as applicable.

(b)     Field Exams, Appraisals. Each Loan Party will, and will permit each of its Subsidiaries to, permit representatives of Administrative Agent to (i) conduct field examinations and audits of Inventory (collectively "*Field Exams*") and other personal property of the Loan Parties and their Subsidiaries and (ii) conduct appraisals of Inventory ("*Inventory Appraisals*") of the Loan Parties and their Subsidiaries, which shall, unless an Event of Default is continuing, be at such reasonable times during normal business hours and upon reasonable advance notice to the Borrower.

Section 5.08   Payment of Obligations. Unless being properly contested or subject to the automatic stay under the Chapter 11 Cases, pay its material Indebtedness and other material obligations, including material Tax liabilities, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, and (c) the failure to make such payment would not reasonably be expected to result in a Material Adverse Effect.

Section 5.09   Use of Proceeds. Use the proceeds of the Loans and the Letters of Credit only as contemplated in *Section 3.12*. The Borrower will not request any Borrowing, and the Borrower shall not use, and shall procure that its Subsidiaries and, to its knowledge, none of their respective directors, officers, employees and agents shall use, the proceeds of any Borrowing (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws in any material respect, (b) for the purpose of funding, financing or facilitating any unauthorized activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (c) knowingly in any manner that would result in the violation of any Sanctions Laws applicable to any party hereto.

Section 5.10   Compliance with Environmental Laws. Comply with all Environmental Laws applicable to its operations and properties; and comply with and obtain and renew all material permits, licenses and other approvals required pursuant to Environmental Law for its operations and properties, except, in each case with respect to this *Section 5.10*, to the extent the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.11   Further Assurances; Additional Security. (a) Execute any and such further documents, financing statements, agreements and instruments, and take such further actions (including the filing and recording of financing statements, fixture filings, and other documents and recordings of Liens in stock registries), that may be required under any applicable law, or that the Administrative Agent or Collateral Agent may reasonably request, to cause the Collateral and Guarantee Requirement to be and remain satisfied, all at the expense of the Loan Parties, and provide to the Administrative Agent, from time to time following the Administrative Agent's reasonable request, evidence reasonably satisfactory to the Administrative Agent as to the

-114-

perfection and priority of the Liens created or intended to be created in the Collateral by the Security Documents.

(b)    [Reserved]

(c)    [Reserved]

(d)    In connection with (i) the formation or acquisition of any direct or indirect Subsidiary of the Borrower that is a Domestic Subsidiary (other than an Excluded Subsidiary) or (ii) any existing direct or indirect subsidiary of the Borrower becoming a Subsidiary of the Borrower that is a Domestic Subsidiary (other than an Excluded Subsidiary), within 15 Business Days after the date of such formation, acquisition or Subsidiary becoming a Subsidiary of the Borrower that is a Domestic Subsidiary (other than an Excluded Subsidiary), notify the Administrative Agent and the Lenders thereof and, within 30 Business Days after such date or such longer period as the Administrative Agent shall agree (at the direction of the Required Lenders) or as set forth in the definition of Collateral and Guarantee Requirement for such class of assets, cause the Collateral and Guarantee Requirement to be satisfied with respect to such subsidiary and with respect to any Equity Interest in or Indebtedness of such subsidiary owned by or on behalf of any Loan Party, subject to *clause* **Error! Reference source not found.**.

(e)    [Reserved]

(f)    (i) Furnish to the Administrative Agent prompt written notice following any change (A) in any Loan Party's corporate or organization name, (B) in any Loan Party's identity or (C) in any Loan Party's organizational identification number, provided, that to the extent required to maintain perfection of such Collateral, within 30 days after such change (or such later period agreed by the Administrative Agent in its discretion (acting at the direction of the Required Lenders)), the Borrower will file (or direct an agent to file on its behalf) such Uniform Commercial Code financing statements that are required in order for the Collateral Agent to continue following such change to have a valid, legal and perfected security interest such Collateral (to the extent intended to be created by the Security Documents by a filing of an "all assets" financing statement) and (ii) promptly notify the Administrative Agent and the Lenders if any material portion of the Collateral is damaged or destroyed.

(g)    The Collateral and Guarantee Requirement and the other provisions of this *Section 5.11* need not be satisfied with respect to Excluded Assets.

For the avoidance of doubt, and without limitation, *Section 5.11* shall apply to any division of a Loan Party required to become a Loan Party pursuant to the terms of the Loan Documents and to any allocation of assets to a series of a limited liability company.

Section 5.12    Fiscal Year; Accounting. In the case of the Borrower, cause its fiscal year to end on December 31.

Section 5.13    [Reserved].

Section 5.14    Lender Meetings. (A) No less frequently than weekly from and after the Petition Date, cause the Chief Restructuring Officer and advisors to Debtors to be available for a

-115-

telephonic meeting with all Lenders, senior management and members of the Transformation Office regarding, among other things, financial results, operations, inventory planning, cost saving initiatives, the Transformation Office Plan, information provided under Section 5.04(p), compliance of the Loan Parties with this Agreement, and developments in the Chapter 11 Cases and (B) promptly upon any request of the Required Lenders and any other Person the Required Lenders reasonably request to be included in such meeting hold a telephonic meeting with all Lenders senior management and members of the Transformation Office regarding, among other things, financial results, operations, any modifications to the mandate of the Chief Restructuring Officer as set forth in Section 5.24(b), compliance of the Loan Parties with this Agreement, and developments in the Chapter 11 Cases.

Section 5.15    <u>Securitization Matters</u>. Each of the Loan Parties party to any of the Qualified Securitization Documents shall enforce all of their rights and obligations under such Qualified Securitization Document.

Section 5.16    <u>Compliance with Anti-Corruption Laws and Sanctions Laws</u>. (A) Maintain policies and procedures reasonably designed to ensure compliance by the Borrower, the Subsidiaries, and their respective directors, officers, employees, and agents with the Anti-Corruption Laws and (B) within 90 days of the Closing Date (or such later date as may be agreed to by Administrative Agent in its sole discretion) and thereafter maintain policies and procedures reasonably designed to ensure compliance by the Borrower, the Subsidiaries, and their respective directors, officers, employees, and agents with Sanctions Laws.

Section 5.17    <u>Post-Closing Matters</u>. Deliver to Administrative Agent, in form and substance reasonably satisfactory to the Administrative Agent, the items described on <u>Schedule 5.17</u> hereof or take such actions described on <u>Schedule 5.17</u>, in each case, on or before the dates specified with respect to such items on <u>Schedule 5.17</u> (or, in each case, such later date as may be agreed to by Administrative Agent in its sole discretion). All conditions, covenants, representations and warranties contained in this Agreement and the other Loan Documents will be deemed modified to the extent necessary to effect the foregoing (and to permit the taking of the actions described on <u>Schedule 5.17</u> within the time periods specified thereon, rather than as elsewhere provided in the Loan Documents).

Section 5.18    <u>Location of Collateral</u>. Borrower will, and will cause each of its Subsidiaries to, keep its Inventory (other than (i) Inventory in transit, (ii) under repair or being manufactured or constructed at third party manufacturing locations or (iii) on-consignment in progress at third party locations, jobs or contracts, in each case in the ordinary course of business) (x) located at a retailor or (y) with an aggregate value at such location on an average monthly basis in excess of $500,000, in each case with respect to <u>clauses (x)</u> and <u>(y)</u> only at the locations identified on <u>Schedule 5.18</u> (or any supplement thereof) and their chief executive offices only at the locations identified on <u>Schedule 5.18</u> (or any supplement thereof); <u>provided</u>, that (x) Borrower may amend <u>Schedule 5.18</u> so long as such amendment occurs by written notice to Administrative Agent not less than ten (10) days prior to the date on which such Inventory is moved to such new location and (y) Borrower may move Inventory to a location not set forth <u>Schedule 5.18</u> on a temporary basis not to exceed 15 consecutive days (or such longer period agreed by the Administrative Agent) without prior notice or the need to amend <u>Schedule 5.18</u> to the extent that (A) such Inventory has an aggregate value of less than $2,000,000 or (B) exigent circumstances exist; <u>provided that</u> in

-116-

such circumstances described in (y)(A) or (B) above, the Borrower shall notify the Administrative Agent as promptly as practical following such move; and *provided further*, that the location of any such relocated chief executive office shall be within the continental United States.

Section 5.19    Board Observers.    At the request of the Required Lenders, invite two representatives of the Lenders to attend in a non-voting observer capacity (the "***Lender Observers***") all meetings of the Board of Directors of the Borrower and any meetings of any committees of the Board of Directors of the Borrower.  The Borrower shall reimburse the Lender Observers for their reasonable and documented out-of-pocket expenses in connection with attending any such meetings, in a manner consistent with the Borrower's reimbursement of similar expenses of the directors of the Borrower.  Notice of any such meetings shall be given to the Lender Observers in the same manner and at the same time as is given to the members of the Board of Directors or committee members, as the case may be.  The Lender Observers shall be provided with copies of all information (including a meeting agenda and board package, if any such materials are prepared) that is provided to such directors or committee members (whether prior to, at, or subsequent to any such meetings), at the same time as such materials are provided to such directors or committee members, and copies of the minutes (both drafts and final versions) of all meetings of such directors or committee members, concurrently with the distribution of such minutes to such directors or committee members.  Notwithstanding anything to the contrary contained herein, in the event that (i) in the reasonable judgment of the Board of Directors of the Borrower, an issue is to be discussed at a meeting of such Board of Directors (or material is to be distributed at such meeting) which is not appropriate to be discussed in the presence of (or provided to) the Lender Observers due to an actual or potential conflict of interest (including any matters related to this Agreement, the other Loan Documents or any transactions contemplated hereby), or (ii) the Lender Observers' attendance at such meeting (or receipt of material to be distributed at such meeting) may jeopardize, adversely affect or otherwise impair the attorney-client privilege or any recognized accountant-client privilege, then, in each case, (x) the Borrower shall provide notice of such fact to the Lender Observers and the Lender Observers shall not have the right to participate in any portion of such meeting that involves the matters described in *clauses (i)* or *(ii)* above, and (y) the Borrower shall have the right to withhold from the Lender Observers all applicable board meeting material and copies of minutes with respect to the matters described in *clauses (i)* or *(ii)* above.  Notwithstanding the foregoing, the provisions of this Section 5.19 shall only apply if Required Lenders under the Second Lien DIP Term Loan Credit Agreement have exercised their board observer rights as set forth in Section 5.19 of the Second Lien DIP Term Loan Credit Agreement.

Section 5.20    Compliance with Collateral and Guarantee Requirement. Comply in all respects with the Collateral and Guarantee Requirement with respect to each such Loan Party.

Section 5.21    Collateral Reporting. Deliver, on behalf of each Loan Party, to the Administrative Agent (and if so requested by the Administrative Agent, with copies to each Revolving Lender) each of the documents set forth below at the following times in form satisfactory to Administrative Agent:

(a)    weekly (no later than Tuesday of each week), and with each request for a Borrowing, an executed Borrowing Base Certificate;

-117-

(b)        promptly upon its receipt thereof, each Bi-Weekly Statement (as defined in the DIP Orders) and Final Statement (as defined in the DIP Orders); and

(c)        from and after the tenth Business Day following the Closing Date, the Administrative Agent shall be provided with read-only access to Loan Parties' deposit accounts into which cash proceeds received from payments by Securitization Providers and Credit Support Providers are deposited.

Section 5.22    <u>Cash Management</u>. Maintain the cash management of the Loan Parties in accordance in all material respects with the Cash Management Order.

Section 5.23    <u>Milestones.</u>

Comply with the following milestones (each of which, as applicable, shall be automatically extended to the extent a delay occurs as a result of the availability of the Bankruptcy Court):

(a)        On or prior to four (4) days after the Petition Date, entry of the Interim Order by the Bankruptcy Court;

(b)        On or prior to thirty (30) days after the Petition Date, the Debtors shall file a Reorganization Plan that is in form and substance substantially in accordance with the Restructuring Support Agreement plan term sheet and otherwise on term reasonably acceptable to the Required Lenders and the Debtors (as amended, modified or supplemented with the consent of the Required Lenders, the "***Acceptable Plan***") and disclosure statement with respect to the Acceptable Plan (as amended, modified or supplemented with the consent of the Required Lenders, the "***Disclosure Statement***") with the Bankruptcy Court (such consent not to be unreasonably withheld, delayed or conditioned);

(c)        On or prior to thirty-five (35) days after the Petition Date, entry of Final Order by the Bankruptcy Court;

(d)        On or prior to ninety (90) days after the Petition Date, entry by the Bankruptcy Court of an order approving the Disclosure Statement;

(e)        On or prior to one hundred twenty-five (125) days after the Petition Date, entry by the Bankruptcy Court of an order approving the Acceptable Plan in form and substance reasonably acceptable to the Required Lenders; and

(f)        On or prior to one hundred sixty (160) days after the Petition Date, the Consummation Date of the Acceptable Plan.

Section 5.24    <u>Chief Restructuring Officer and Transformation Office</u>.

(a)        Within five (5) Business Days after the Closing Date, the Borrower shall retain a chief restructuring officer reasonably acceptable to the Required Lenders (the "***Chief Restructuring Officer***") who shall report directly to the special committee of the Board of Directors of the Borrower, and whose scope of engagement and fees shall be reasonably acceptable

-118-

to the Required Lenders (it being understood that Joseph J. Sciametta is reasonably acceptable to the Required Lenders). Upon the resignation or termination of the Chief Restructuring Officer or other occurrence rendering the Chief Restructuring Officer incapacitated or unavailable, subject to the approvals required under the Bankruptcy Court, the Borrower shall promptly (and no later than fifteen (15) Business Days after such resignation, termination or such other occurrence) retain a replacement Chief Restructuring Officer reasonably acceptable to the Required Lenders and the scope of the engagement of such replacement Chief Restructuring Officer and fees shall be reasonably acceptable to the Required Lenders.

(b)        Within three (3) Business Days of the Petition Date, the Borrower shall form a restructuring working group led by the Chief Operating Officer of the Borrower, the Chief Restructuring Officer and advisors from Alvarez & Marsal, Inc. (the "***Transformation Office***") with a mandate reasonably acceptable to the Required Lenders and as modified pursuant to ***Error! Reference source not found.(B)***, including, (i) within ten (10) Business Days of the Petition Date, to develop an inventory statement and inventory management plan in form and substance consistent with statements and plans provided during due diligence prior to the Closing Date and otherwise reasonably acceptable to the Required Lenders (ii) to reevaluate and make changes to such inventory management plan at least every two weeks based on ongoing business developments; provided that any changes to the inventory management plan shall be in form and substance reasonably acceptable to the Required Lenders, (iii) within thirty (30) Business Days of the Petition Date, to develop and implement a cost savings plan in form and substance reasonably acceptable to the Required Lenders, which is projected to achieve at least as much cost savings as outlined in the Business Plan; provided that the Transformation Office shall update the Lenders within fifteen (15) Business Days of the Petition Date on the status of such cost savings plan, (iv) within fifteen (15) Business Days of the Petition Date, to develop a plan regarding the management of critical vendors, key counter-parties, payables and general unsecured claims and supervise the management of critical vendors, key counter-parties, payables and general unsecured claims in form and substance reasonably acceptable to the Required Lenders (collectively, the plans set forth in clauses (i), (ii), (iii) and (iv), together with any changes or supplements to such plans approved by the Required Lenders in their sole discretion, the "***Transformation Office Plan***").

(c)        The Borrower will, and will cause each of the Subsidiaries, to comply with the Transformation Office Plan in all respects.

ARTICLE VI

Negative Covenants

The Borrower covenants and agrees with each Lender that until Payment in Full, the Borrower will not, and will not cause or permit any of the Subsidiaries to:

Section 6.01    Indebtedness. Incur, create, assume or permit to exist any Indebtedness, except:

(a)        Indebtedness (other than intercompany Indebtedness) of the Borrower and its Subsidiaries existing, or incurred pursuant to facilities existing, on the Closing Date and set forth on *Schedule 6.01*;

-119-

(b)      Indebtedness created hereunder and under the other Loan Documents;

(c)      Indebtedness of the Borrower and the Subsidiaries pursuant to Swap Agreements consisting of (i) non-speculative Swap Agreements entered into in the ordinary course of business to hedge or mitigate risks to which the Borrower or any Subsidiary is exposed in the conduct of its business or the management of its liabilities (including currency risks), and (ii) non-speculative Swap Agreements entered into in the ordinary course of business in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary;

(d)      Indebtedness of the Borrower and the Subsidiaries owed to (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) any person providing workers' compensation, health, disability or other employee benefits or property, warehouse receipts or similar instruments, casualty or liability insurance to the Borrower or any Subsidiary, pursuant to reimbursement or indemnification obligations to such person, in each case, provided in the ordinary course of business; *provided*, that that any reimbursement obligations in respect thereof are reimbursed within 60 days following the incurrence thereof (or such longer period as is permitted without interest or other charges under the benefit plan or other instrument under which reimbursement is to be made);

(e)      Indebtedness of the Borrower to any Subsidiary and of any Subsidiary to the Borrower or any other Subsidiary, in each case in the ordinary course of business; *provided*, that (i) Indebtedness of any Subsidiary that is not a Subsidiary Loan Party owing to the Borrower or any Subsidiary Loan Party shall be subject to ***Error! Reference source not found.***, and (ii) Indebtedness of the Borrower owing to any Subsidiary and Indebtedness of any other Loan Party owing to any Subsidiary that is not a Subsidiary Loan Party shall be subordinated in right of payment to the Obligations on terms reasonably satisfactory to the Required Lenders;

(f)      Indebtedness of the Borrower and the Subsidiaries in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations, in each case, including those incurred to secure health, safety, insurance and environmental obligations of the Borrower and its Subsidiaries as conducted in accordance with good and prudent business industry practice and otherwise as permitted by the Loan Documents, in an aggregate principal amount not to exceed $1,000,000 at any one time outstanding;

(g)      Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services in the ordinary course of business and in good faith; *provided*, that (i) such Indebtedness (other than credit or purchase cards) is extinguished within 30 Business Days of notification to the Borrower of its incurrence; and (ii) such Indebtedness in respect of credit or purchase cards is extinguished within 90 days from its incurrence;

(h)      [Reserved];

(i)      Capitalized Lease Obligations, mortgage financings and purchase money Indebtedness incurred by the Borrower or any Subsidiary prior to or within 365 days after the

acquisition, lease or improvement of the respective asset permitted under this Agreement in order to finance such acquisition or improvement, in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof would not be in an aggregate outstanding principal amount that exceeds the greater of $1,500,000;

(j)      Indebtedness in respect of (i) the Second Lien DIP Term Loan Credit Agreement, in an aggregate principal amount at any one time outstanding not to exceed $160,000,000, *provided* that such amount may increase solely with respect to any "payment in kind" interest that accrues pursuant to the Second Lien DIP Term Loan Credit Agreement; *provided* further, that such Indebtedness is secured only by the Liens permitted under *Section 6.02* and shall be subject to the intercreditor and other provisions of the DIP Order and the Pari Passu Intercreditor Agreement, (ii) the Pre-Petition First Lien Credit Agreement, in an aggregate principal amount at any one time outstanding not to exceed $665,000,000; *provided* that such amount may increase solely with respect to any "payment in kind" interest that accrues pursuant to the Pre-Petition First Lien Credit Agreement; *provided* further, that such Indebtedness is secured only by the Liens permitted under *Section 6.02* and shall be subject to the Agreement Among Lenders and the Pari Passu Intercreditor Agreement, (iii) the Pre-Petition Second Lien Credit Agreement, in an aggregate principal amount at any one time outstanding not to exceed $668,000,000; *provided* that such amount may increase solely with respect to any "payment in kind" interest that accrues pursuant to the Pre-Petition Second Lien Credit Agreement; *provided* further, that such Indebtedness is secured only by the Liens permitted under *Section 6.02* and shall be subject to the First-Second Intercreditor Agreement; and (iv) a DIP ABL Replacement Facility; *provided* that Indebtedness incurred under this *clause (iv)* and *Section 6.01(cc)* in the aggregate shall not exceed $450,000,000.

(k)      Other unsecured Indebtedness of the Borrower or any Subsidiary, in an aggregate principal amount at any one time outstanding pursuant to this paragraph (k) not in excess of $1,500,000;

(l)      Guarantees by the Borrower or any Subsidiary of any Indebtedness of the Borrower or any Subsidiary permitted to be incurred under this Agreement; provided, that, notwithstanding anything to the contrary in this ***Error! Reference source not found.***, (i) the Borrower and the Loan Parties shall not Guarantee the Indebtedness of any Subsidiary that is not a Loan Party unless such Guarantee is permitted under ***Error! Reference source not found.***, (ii) any Guarantees by the Borrower or any Loan Party under this *Section 6.01(l)* of any other Indebtedness of a person that is subordinated in right of payment to other Indebtedness of such person shall be expressly subordinated in right of payment to the Obligations on terms not materially less favorable to the Lenders than the subordination terms of such other Indebtedness, and (iii) no Subsidiary shall Guarantee any Junior Indebtedness, unless such Subsidiary is also is or becomes a Guarantor and Loan Party hereunder;

(m)      [Reserved];

(n)      So long as permitted and tested as a disbursement pursuant to the DIP Budget (subject to permitted variances), reimbursement and similar obligations of Subsidiaries in respect of letters of credit or bank guarantees (other than Letters of Credit issued hereunder); provided that any reimbursement obligations in respect thereof have an aggregate face amount at any one time outstanding not in excess of the amounts set forth on *Schedule 6.01(n)*;

-121-

(o)    [Reserved];

(p)    [Reserved];

(q)    Indebtedness consisting of (x) the financing of insurance premiums or (y) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(r)    To the extent constituting Indebtedness, all premium (if any), interest (including interest paid in kind and post-petition interest), fees, expenses, charges and additional or contingent interest on Indebtedness otherwise permitted to be incurred pursuant to this _Section 6.01_ and the intercreditor and other provisions of the DIP Orders;

(s)    [Reserved];

(t)    [Reserved];

(u)    [Reserved];

(v)    Indebtedness in respect of (i) netting services and similar services in connection with deposit accounts to the extent incurred in the ordinary course of business or other contingent liabilities arising out of the endorsement of checks, drafts and other instruments or other payment items for deposit or collection in the ordinary course of business and (ii) obligations arising under customary indemnity agreements to title insurers to cause such title insurers to issue title insurance policies;

(w)    Indebtedness in respect of judgments, orders, attachments or awards not resulting in an Event of Default under _Section 7.01(j)_ or in respect of appeal or other surety bonds relating to, and settlements in connection with, such judgments, orders, attachments or awards;

(x)    Indebtedness consisting of unfunded pension fund and other employee benefit obligations and liabilities incurred in the ordinary course of business to the extent they are permitted to remain unfunded under applicable law;

(y)    Indebtedness of the Borrower and its Subsidiaries consisting of (i) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business and/or (ii) liabilities in respect of customer deposits and advance payments received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business;

(z)    [Reserved];

(aa)    Indebtedness in respect of license agreements, to the extent constituting guaranteed minimum revenues and similar obligations in the ordinary course of business;

(bb)    The Subordinated Convertible Note in an amount not to exceed $25,000,000; provided that such amount may increase solely with respect to any "payment in kind" interest that accrues pursuant to the Subordinated Convertible Note; and

(cc)   Indebtedness incurred pursuant to a Qualified Securitization Financing in an aggregate principal amount not to exceed $450,000,000 at any one time outstanding (it being understood that to the extent a Qualified Securitization Financing is entered into by a Securitization Subsidiary or a DIP ABL Replacement Facility, the amount of Indebtedness available under this clause (cc) shall be reduced dollar-for-dollar by the principal amount then outstanding under such Qualified Securitization Financing entered into by a Securitization Subsidiary or DIP ABL Replacement Facility); provided that Indebtedness incurred under this *clause (cc)* and *Section 6.01(j)(iv)* in the aggregate shall not exceed $450,000,000.

Section 6.02   Liens. Create, incur, assume or permit to exist any Lien on any property or assets (including stock or other securities of any person, including the Borrower or any Subsidiary of the Borrower) at the time owned by it, except, to the extent permitted by the DIP Orders and the DIP Budget:

(a)   Liens on property or assets of the Subsidiaries existing on the Closing Date and set forth on *Schedule 6.02(a)* and any Lien granted as a replacement or substitute therefor; provided, that any such replacement or substitute; Liens shall secure only those obligations that they secure on the Closing Date and shall not subsequently apply to any other property or assets of the Borrower or any Subsidiary other than the property and assets subject thereto on the Closing Date (plus improvements and accessions to such property and assets);

(b)   Any Lien created under the Loan Documents;

(c)   Any Lien on any property or asset of the Borrower or any Subsidiary securing Indebtedness permitted by Section 6.01(i); provided, that (i) such security interests are incurred, and the Indebtedness secured thereby is created, within 365 days after such acquisition, (ii) the Indebtedness secured thereby does not exceed 100% of the cost of such equipment or other property or improvements at the time of such acquisition or construction, including transaction costs incurred by the Borrower or any Subsidiary in connection with such acquisition and (iii) such security interests do not apply to any other property or assets of the Borrower or any Subsidiary (other than to improvements and accessions to such equipment or other property or improvements but not to other parts of the property to which any such improvements are made); provided, further, that individual financings of equipment provided by a single lender may be cross-collateralized to other financings of equipment provided solely by such lender;

(d)   Liens for Taxes, assessments and governmental charges the payment of which is not required under *Section 5.03*;

(e)   Landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's, construction or other like Liens arising in the ordinary course of business and securing obligations (including those other than for borrowed money) that are not overdue by more than 60 days or that are being contested in good faith by appropriate proceedings and in respect of which, if applicable, the Borrower or any Subsidiary shall have set aside on its books reserves in accordance with GAAP;

(f)   (i) Pledges or deposits and other Liens made in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workers' compensation,

unemployment insurance and other social security laws or regulations and deposits securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations and (ii) pledges or deposits and other Liens securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to, the Borrower or any Subsidiary;

(g)       Deposits and other Liens to secure the performance of bids, trade contracts (other than for Indebtedness for borrowed money), leases (other than Capitalized Lease Obligations), statutory obligations, surety and appeal bonds, performance and return of money bonds, bids, leases, government contracts, trade contracts, agreements with public utilities, and other obligations of a like nature (including letters of credit in lieu of any such bonds or to support the issuance thereof) incurred by the Borrower or any Subsidiary in the ordinary course of business, including those incurred to secure health, safety, insurance and environmental obligations in the ordinary course of business;

(h)       Zoning restrictions, survey exceptions, easements, trackage rights, leases (other than Capitalized Lease Obligations), licenses, special assessments, rights-of-way, restrictions on or agreements dealing with the use of real property, servicing agreements, development agreements, site plan agreements and other similar encumbrances incurred in the ordinary course of business and title defects or irregularities that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of the Borrower or any Subsidiary (taken as a whole);

(i)       [Reserved];

(j)       Liens on the Collateral securing Indebtedness incurred pursuant to (x) _Section 6.01(j)(i)_ subject to the intercreditor and other provisions of the DIP Orders and the Pari Passu Intercreditor Agreement, (y) _Section 6.01(j)(ii)_ subject to the Agreement Among Lenders and the Pari Passu Intercreditor Agreement, and (z) _Section 6.01(j)(iii)_ subject to the First-Second Lien Intercreditor Agreement;

(k)       Liens securing judgments that do not constitute an Event of Default under _Section 7.01(j)_;

(l)       Liens on the Securitization Assets arising in connection with a Qualified Securitization Financing;

(m)       Liens disclosed by the title insurance policies delivered on or subsequent to the Closing Date and pursuant to _Section 5.11_ and any replacement, extension or renewal of any such Lien; _provided_, that such replacement, extension or renewal Lien shall not cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal _plus_ any improvements and accessions to such property; _provided_, _further_, that the Indebtedness and other obligations secured by such replacement, extension or renewal Lien are permitted by this Agreement;

(n)       Any interest or title of a lessor under any leases or subleases entered into by the Borrower or any Subsidiary in the ordinary course of business;

-124-

(o)    Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and the Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Subsidiary in the ordinary course of business;

(p)    Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(q)    [reserved];

(r)    Licenses of software that are not material to the conduct of any of the business lines of the Borrower and the Subsidiaries and the value of which does not constitute a material portion of the assets of the Borrower and its Subsidiaries, taken as a whole, and such license does not materially interfere with the ordinary course of conduct of the business of the Borrower or any of its Subsidiaries;

(s)    Liens (x) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods or (y) on specific items of inventory or other goods and the proceeds thereof securing the relevant Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(t)    Liens on the assets of a Foreign Subsidiary that secure Indebtedness of such Foreign Subsidiary that is permitted to be incurred under ***Error! Reference source not found.***;

(u)    Liens solely on any cash earnest money deposits made by the Borrower or any of the Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder with respect to any acquisition that would constitute an Investment permitted by this Agreement;

(v)    Liens (i) arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any Loan Party or Subsidiary thereof in the ordinary course of business or (ii) incurred by the Borrower or its Subsidiaries arising under Section 2-505 of the UCC;

(w)    Liens in favor of the Borrower or any Loan Party;

(x)    Liens arising from precautionary Uniform Commercial Code financing statements or consignments entered into in connection with any transaction otherwise permitted under this Agreement;

(y)    Liens of licensors and franchisors in the ordinary course of business not securing Indebtedness (other than in respect of licenses, to the extent constituting Indebtedness with respect to guaranteed minimum revenues and similar obligations in the ordinary course of business permitted under *Section 6.01(z)*); provided that such liens of licensors shall not extend to any assets other than the licenses subject to such agreement any payments in respect thereof;

(z)     Liens on not more than $10,000,000 of deposits securing Swap Agreements permitted to be incurred under *Section 6.01(c)*;

(aa)     Liens (x) on insurance policies and the proceeds thereof or securing the financing of premiums with respect thereto and/or (y) securing other insurance premium financing arrangements; *provided*, that such Liens are limited to the applicable unearned insurance premiums;

(bb)     Liens incurred to secure cash management services in the ordinary course of business and in good faith; *provided*, that such Liens are not incurred in connection with, and do not secure, any borrowings or Indebtedness;

(cc)     (i) Liens in favor of the prepetition indebtedness holders as adequate protection granted pursuant to the DIP Orders and (ii) Liens in favor of Securitization Providers and Credit Servicer as a result of the Chapter 11 Cases and set forth in the DIP Orders and the Securitization Order;

(dd)     Leases and subleases not constituting Capitalized Lease Obligations of real property not material to the conduct of any business line of the Borrower and its Subsidiaries granted to others in the ordinary course of business that do not materially and adversely interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries (taken as a whole);

(ee)     [Reserved];

(ff)     Liens consisting of (i) customary rights of first refusal, options, tag, drag and similar rights in joint venture agreements and agreements with respect to non-wholly owned Subsidiaries and (ii) encumbrances or restrictions (including put and call arrangements) in favor of a party to a joint venture agreement with respect to Equity Interests of, or assets owned by, any joint venture or similar arrangement pursuant to any joint venture agreement or similar agreement;

(gg)     [Reserved];

(hh)     Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(ii)     Liens on cash securing obligations in respect of standby letters of credit or on the goods (or the documents of title in respect of such goods) financed by trade letters of credit and the proceeds and products thereof in the case of trade letters of credit securing obligations in respect of such trade related letters of credit in each case permitted under *Section 6.01(n)*; provided that any cash collateral supporting such letters of credit shall not at any time exceed 105% of the amount of Indebtedness permitted under *Section 6.01(n)*;

(jj)     Liens on cash or Cash Equivalents used to defease or to satisfy and discharge Indebtedness; *provided* that such defeasance or satisfaction and discharge is permitted by this Agreement;

-126-

(kk)   (i) Licenses or sublicenses granted by the Borrower and/or its Subsidiaries permitted in accordance with the terms of this Agreement, (ii) leases or subleases granted by the Borrower or any of its Subsidiaries to other Persons not materially interfering with the conduct of the business of the Borrower or any Guarantor, (iii) any interest or title of a lessor, sublessor or licensor under any lease, (iv) restriction or encumbrance to which the interest or title of such lessor or sublessor may be subject, (v) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding *clause (iv)* and (vi) royalty, revenue, profit sharing or buy/sell arrangements arising out of joint ventures, purchase and sale contracts, development contracts or other arrangements permitted hereunder;

(ll)   [Reserved];

(mm)   Liens on Credit Support Assets sold or pledged pursuant to the terms of a Permitted Credit Support Arrangement; and

(nn)   Extensions, renewals, refinancings and replacements of the Liens described above, so long as (i) the Indebtedness or other obligations secured by any such Lien at the time of any such extension, renewal, refinancing or replacement is not increased to any amount greater than the sum of (A) the outstanding principal amount (or accreted value, if applicable) of such Indebtedness or obligations and (B) an amount necessary to pay any unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions and expenses related to such extension, renewal, refinancing or replacement and (ii) no additional property (other than accessions, improvements, and replacements in respect of such property) is subject to such Lien.

Notwithstanding anything to the contrary contained in this *Section 6.02*, only Liens pursuant to *Sections 6.02(l)* and *6.02(cc)(ii)* shall be permitted in favor of any PNC Securitization Secured Party.

Section 6.03   Sale and Lease-Back Transactions. Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

Section 6.04   Investments, Loans and Advances. Purchase, hold or acquire (including pursuant to any merger with a person that is not a Wholly Owned Subsidiary immediately prior to such merger; and including in one transaction or a series of transactions) any Equity Interests, Indebtedness, other securities of or of all or substantially all of the property and assets or business of another person or assets constituting a business unit, line of business or division of such person, make or permit to exist any loans, advances or capital contributions to or Guarantees of the obligations of, or make or permit to exist any investment or any other interest in (each, an "***Investment***"), in any other person, except, to the extent permitted by the DIP Orders and the DIP Budget:

(a)   The consummation of the Transactions pursuant to and in accordance with the Loan Documents;

-127-

(b)        (i) Investments by (x) the Borrower or the Subsidiaries in other Subsidiaries effective as of the Closing Date as set forth on *Schedule 6.04*, and (y) any modification, renewal or extension thereof, so long as the aggregate amount of all Investments pursuant to *clause (x)* is not increased at any time above the amount of such Investment existing or committed on the Closing Date (other than pursuant to an increase as required by the terms of any such Investment as in existence on the Closing Date or to the extent that such increase utilizes another available `basket under this *Section 6.04*), (ii) Investments by the Borrower or any Subsidiary Loan Party in the Borrower or any Subsidiary Loan Party; (iii) [reserved]; and (iv) Investments by any Subsidiary that is not a Loan Party in any other Subsidiary that is not a Loan Party; *provided*, that intercompany current liabilities incurred in the ordinary course of business and in good faith in connection with cash management operations shall not be included in calculating the limitation in this *Section 6.04(b)* at any time;

(c)        Investments in cash and Cash Equivalents;

(d)        Investments arising out of the receipt by the Borrower or any Subsidiary of non-cash consideration for the sale of assets in the ordinary course of business permitted under *Section 6.05*;

(e)        (i) Advances of payroll payments and expenses to employees of the Borrower or any Subsidiary in the ordinary course of business and (ii) commissions, travel, and similar advances to officers and employees of the Borrower or any Subsidiary made in the ordinary course of business not to exceed $2,500,000 at any one time outstanding;

(f)        (i) Accounts, accounts receivable arising, notes receivable, and trade credit granted, in the ordinary course of business, (ii) any securities received in satisfaction or partial satisfaction of defaulted accounts receivable from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss, (iii) any prepayments and other credits to suppliers made in the ordinary course of business;

(g)        Investments in respect of (i) Swap Agreements permitted pursuant to *Section 6.01(c)* and (ii) vendor financing permitted pursuant to *Section 6.01(r)*;

(h)        Investments existing on the Closing Date and set forth on *Schedule 6.04* and any modification, replacement, renewal or extension thereof; *provided* that the amount of the original Investment (or as the context may require, commitment to invest) is not increased except by the terms of such original Investment disclosed to the Administrative Agent and the Lenders in writing prior to the Closing Date or as otherwise permitted by another clause in this *Section 6.04*;

(i)        Investments resulting from (i) pledges and deposits referred to in *Sections 6.02(f)*, *(g)*, *(k)*, *(s)* and *(u)* and (ii) indemnities made in the ordinary course of business or in the Loan Documents;

(j)        Additional Investments by the Borrower or any of its Subsidiaries having an aggregate amount at any one time outstanding not to exceed $1,500,000  (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

-128-

(k)     [Reserved];

(l)     Investments consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other persons;

(m)     Intercompany loans and other Investments between Foreign Subsidiaries;

(n)     Investments consisting of purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of intellectual property in each case in the ordinary course of business;

(o)     [Reserved];

(p)     Investments (including Indebtedness and Equity Interests) received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising, in each case, in the ordinary course of business or Investments acquired by the Borrower as a result of a foreclosure by the Borrower or any of the Subsidiaries with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(q)     [Reserved];

(r)     [Reserved];

(s)     Guarantees by (i) the Borrower or any Subsidiary of operating leases (other than Capitalized Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case, entered into by the Borrower or any Subsidiary in the ordinary course of business and (ii) any Foreign Subsidiary of operating leases (other than Capitalized Lease Obligations) or of obligations that do not constitute Indebtedness, in each case, entered into by any Foreign Subsidiary in the ordinary course of business;

(t)     [Reserved];

(u)     Investments made by Subsidiaries that are not Loan Parties solely to the extent such Investments are made with the proceeds received by such Subsidiary from an Investment in such Subsidiary made pursuant to *Section 6.04(j)*;

(v)     Guarantees permitted under *Section 6.01* (except to the extent such Guarantee is expressly subject to *Section 6.04*);

(w)     [Reserved];

(x)     (i) Investments in a Securitization Subsidiary to the extent required by the applicable Qualified Securitization Financing Documentation therefor or resulting from the transfers of Securitization Assets pursuant to the terms of such Qualified Securitization Financing Documentation; *provided*, however, that any such Investment in a Securitization Subsidiary is in the form of a contribution of additional Securitization Assets or as equity (other than Disqualified

-129-

Stock), (ii) Investments in any Securitization Subsidiary in the form of Permitted Credit Support Services provided to or on behalf of such Securitization Subsidiary (provided any such Investments (x) may not exceed $30,000,000 in the aggregate at any one time outstanding and (y) on an individual basis may not be more than the amount needed to prevent or cure any associated default under the Qualified Securitization Financing Documents) and (iii) distributions or payments of Securitization Fees in connection with a Qualified Securitization Financing;

(y)    Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(z)    Investments for which no consideration is provided by any Loan Party or any Subsidiary; and

(aa)    Investments resulting from the sale of Credit Support Assets pursuant to any Permitted Credit Support Arrangement.

Notwithstanding anything to the contrary contained in *Section 6.04* above, the Borrower and its Subsidiaries shall not, directly (and shall cause their Subsidiaries not to, directly or indirectly) make any Investments pursuant to *clauses (j)* and *(s)* above in order to make Dividends not otherwise permitted under *Section 6.06* or Junior Indebtedness Payments not otherwise permitted under *Section 6.09(b)*.

(bb)    For purposes of this *Section 6.04*, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment, and shall be net of returns of capital, repayment of principal or net disposition proceeds in respect thereof (up to the aggregate amount actually invested).

Section 6.05    Mergers, Consolidations, Sales of Assets and Acquisitions. Merge into or consolidate with any other person, or permit any other person to merge into or consolidate with it (including by division), or sell, transfer, lease or otherwise Dispose of (in one transaction or in a series of transactions including by allocation of any assets to a series of a limited liability company) all or any part of its assets (whether now owned or hereafter acquired), or issue, sell, transfer or otherwise dispose of any Equity Interests of any Subsidiary or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all of any division, unit or business of any other person, except, to the extent permitted by the DIP Orders and the DIP Budget, that this Section shall not prohibit:

(a)    (i) The lease, purchase and sale of inventory, in each case, in the ordinary course of business by the Borrower or any Subsidiary and sales of Credit Support Assets pursuant to the terms of a Permitted Credit Support Arrangement, (ii) the acquisition of any other asset in the ordinary course of business by the Borrower or any Subsidiary, (iii) the sale or other Dispositions of (x) inventory, goods held for sale or immaterial assets, in each case, in the ordinary course of business and (y) worn out, obsolete, scrap or surplus assets or assets no longer useful in the conduct of the business of the Loan Parties and their Subsidiaries or otherwise economically impracticable to maintain, or (iv) the sale of Cash Equivalents in the ordinary course of business;

-130-

(b)     If at the time thereof and immediately thereafter no Event of Default shall have occurred and be continuing or would result therefrom, (i) the merger of any Subsidiary into the Borrower in a transaction in which the Borrower is the survivor, (ii) the merger or consolidation of (x) any Domestic Subsidiary into or with any Subsidiary Loan Party in a transaction in which the surviving or resulting entity is a Subsidiary Loan Party or (y) any Foreign Subsidiary into or with any Subsidiary Loan Party in a transaction in which the surviving or resulting entity is a Subsidiary Loan Party, and, in the case of each of *clauses (i)* and *(ii)*, no person other than the Borrower or Subsidiary Loan Party receives any consideration, (iii) the merger or consolidation of any Subsidiary that is not a Loan Party into or with any other Subsidiary that is not a Loan Party or (iv) the liquidation or dissolution or change in form of entity of any Subsidiary (other than the Borrower) in accordance with *Section 5.01(a)(ii)* if the Borrower determines in good faith that such liquidation, change in form or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders;

(c)     [Reserved];

(d)     Any Disposition of Securitization Assets, and to the extent constituting a Disposition, any furnishing of Permitted Securitization Cash Collateral to a Securitization Subsidiary or the PNC Securitization Parties, in each case, solely to the extent subject to a Qualified Securitization Financing; *provided*, that in the case of a Disposition pursuant to the PNC Securitization, such Disposition shall be permitted solely to the extent such Disposition is prior to the "*Purchase and Sale Termination Date*" (as defined in the PNC Purchase and Sale Agreement as in effect on the Closing Date);

(e)     Investments permitted by *Section 6.04* (other than *Section 6.04(v)*), Liens permitted by *Section 6.02* and Dividends permitted by *Section 6.06*;

(f)     [Reserved];

(g)     the sale of defaulted receivables in the ordinary course of business and not as part of an accounts receivables financing transaction;

(h)     [Reserved];

(i)     [Reserved];

(j)     Licensing and cross-licensing arrangements (other than any perpetual or royalty free licensing arrangements) involving any technology, intellectual property or other intellectual property rights of the Borrower or any Subsidiary in the ordinary course of business and other licensing and cross-licensing arrangements involving any technology, intellectual property or other intellectual property rights of the Borrower or any Subsidiary that do not materially and adversely interfere with the ordinary course of the business of the Borrower or any of its Subsidiaries, taken as a whole and/or that are not material and adverse to the ordinary course of conduct of the business of the Borrower or any of its Subsidiaries, taken as a whole;

(k)     The lease, assignment or sublease of any real or personal property in the ordinary course of business;

(l)        [Reserved];

(m)        [Reserved];

(n)        Any transfer of property or assets that represents a surrender or waiver of a contract right or a settlement, surrender or release of a contract or tort claim; *provided*, that such surrender or waiver is not materially adverse to the Lenders and would not reasonably be expected to result in a Material Adverse Effect;

(o)        [Reserved];

(p)        The unwinding of any Swap Agreement or hedging contract; and

(q)        The lapse or abandonment in the ordinary course of business of any Intellectual Property no longer material to the business.

Notwithstanding anything to the contrary contained in this *Section 6.05*, no sale, transfer or other disposition of assets shall be permitted by this *Section 6.05* (except as permitted to Loan Parties pursuant to *Section 6.05(c)*) unless such disposition is for fair market value (as reasonably determined in good faith by the Borrower); provided, that, any such sale or transfer or other disposition shall not include any material Intellectual Property or Material License Agreements.

To the extent that any Collateral is sold or otherwise disposed of as permitted by this *Section 6.05* to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, which Liens shall be automatically released upon the consummation of such Disposition; it being understood and agreed that the Agents shall be authorized to take, and shall take, any actions reasonably requested by the Borrower in order to effect the foregoing in accordance with *Section 9.20* hereof.

Section 6.06    Dividends and Distributions. Declare or pay, directly or indirectly, any dividend or make, directly or indirectly, any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its Equity Interests (other than dividends and distributions on Equity Interests payable solely by the issuance of additional Equity Interests (other than Disqualified Stock) of the person paying such dividends or distributions) or directly or indirectly redeem, purchase, retire or otherwise acquire for value (or permit any subsidiary of the Borrower to purchase or acquire) any of its Equity Interests or set aside any amount for any such purpose (other than through the issuance of additional Equity Interests of the person redeeming, purchasing, retiring or acquiring such shares) (any of the foregoing dividends, distributions, redemptions, repurchases, retirements, other acquisitions or setting aside of amounts, "***Dividends***"); *provided*, *however*, that:

(a)        Any Subsidiary may declare and pay dividends to, or make other distributions to, the Borrower or any Subsidiary that is a direct parent of such Subsidiary and, if not a Wholly Owned Subsidiary, to each other direct owner of Equity Interests of such Subsidiary on a *pro rata* basis (or more favorable basis from the perspective of the Borrower or such Subsidiary) based on their relative ownership interests;

(b)   Any person may make noncash repurchases of Equity Interests deemed to occur upon exercise of stock options, warrants or other securities convertible or exchangeable for Equity Interests if such Equity Interests represent a portion of the exercise, conversion or exchange price thereof;

(c)   [Reserved];

(d)   [Reserved];

(e)   [Reserved];

(f)   The Borrower may declare and pay Dividends with respect to its Equity Interests payable solely in additional shares of its Equity Interests (other than Disqualified Stock);

(g)   [Reserved];

(h)   [Reserved]; and

(i)   To the extent constituting a Dividend or distribution, any payments of cash and/or Equity Interests (other than Disqualified Stock) of the Borrower to a holder of the Subordinated Convertible Note (or for the benefit of a holder of the Subordinated Convertible Note) upon the conversion thereof in accordance with the terms thereof; provided that any payments in cash, either must be (x) from proceeds of issuances after the Closing Date of Equity Interests (other than Disqualified Stock and to the extent not otherwise applied) in the Borrower or (y) permitted to be paid pursuant to *Section 6.09(b)(i)(F)*.

Section 6.07   Transactions with Affiliates. (a) [reserved]; or (b) sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transaction, with a value in excess of $500,000 for any single transaction or series of related transactions, with, any of its Affiliates, unless such transaction is upon terms not materially less favorable to the Borrower or such Subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate, except that this Section shall not prohibit:

(i)   any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, equity purchase agreements, deferred compensation agreements, bonuses, stock options and stock ownership plans or health, disability, insurance, severance or similar employee benefit plans approved by the Board of Directors of Borrower;

(ii)   any other transactions permitted pursuant to *Section 6.04(x)(ii)*, *6.05(b)*, *6.05(d)*, or *6.06*;

(iii)   transactions among the Borrower and the Loan Parties and transactions among the Loan Parties;

(iv)   the payment of fees and indemnities to directors, officers, employees and consultants of the Borrower and the Subsidiaries in the ordinary course of business;

-133-

(v)    the existence of, or the performance by the Borrower or any of its Subsidiaries of its obligations under the terms of, agreements set forth on *Schedule 6.07*; *provided*, *however*, that the existence of, or the performance by the Borrower or any of its Subsidiaries of its obligations under, any future amendment to any such existing agreement or under any similar agreement entered into after the Closing Date shall only be permitted by this *clause (v)* to the extent that the terms of any such existing agreement together with all amendments thereto, taken as a whole, or new agreement are not otherwise more disadvantageous to the Lenders in any material respect than the original agreement as in effect on the Closing Date;

(vi)    [reserved];

(vii)    any employment agreements entered into by the Borrower or any of the Subsidiaries in the ordinary course of business;

(viii)    [reserved];

(ix)    transactions with Wholly Owned Subsidiaries for the purchase or sale of goods, products, parts and services entered into in the ordinary course of business;

(x)    [reserved];

(xi)    [reserved];

(xii)    [reserved];

(xiii)    [reserved];

(xiv)    any transaction set forth on Schedule 6.07;

(xv)    to the extent there is no material adverse impact on the Collateral and Guaranty; intercompany transactions for the purpose of improving the consolidated tax efficiency of the Borrower and the Subsidiaries; and

(xvi)    the termination of management agreements and payments in connection therewith at the net present value of future payments or as required by such the terms of such agreements.

Section 6.08    <u>Business of the Borrower and the Subsidiaries</u>. Notwithstanding any other provisions hereof, engage at any time in any business or business activity other than, (i) any business or business activity conducted by any of them on the Closing Date and any business or business activities incidental or related thereto, (ii) any business or business activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof or ancillary or complementary thereto, including the consummation of the Transactions, or (iii) any business or business activity that the senior management of the Borrower deems beneficial for the Borrower or such Subsidiary.

US-DOCS\115808185.26

Section 6.09    <u>Limitation on Modifications and Payments of Indebtedness; Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements; etc.</u> (a) Amend or modify in any manner materially adverse to the Lenders (taken as a whole and solely in their capacities as Lenders) (i) the articles or certificate of incorporation or by-laws or limited liability company operating agreement or other Organizational Documents and (ii) the Material Agreements (other than any Material License Agreements), except (x) any such amendments, modifications or changes that are necessary to consummate or implement the Transactions (including any transactions incidental thereto) and (y) in the case of any Qualified Securitization Financing Documentation, any such amendments, modifications or changes so long as the applicable Securitization Financing will remain a "Qualified Securitization Financing".

(b)      (i) Make, or agree or offer to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities (other than newly issued Equity Interests) or other property) of or in respect of principal of or interest on any Junior Indebtedness, having an aggregate principal amount outstanding in excess of $500,000 individually or in the aggregate or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Junior Indebtedness (collectively, a "***Junior Indebtedness Payment***"), except for: (A) payments made in compliance with the DIP Budget (subject to permitted variances), (B) regularly scheduled interest payments and payments of fees, expenses and indemnification obligations in respect of Indebtedness (including for the avoidance of doubt, the accretion of interest paid-in-kind and the capitalization of such interest to the principal amount of such Indebtedness), in each case when due and in amounts not to exceed the amounts required to be paid with respect thereto, in each case, other than payments in respect of the Indebtedness prohibited by the applicable Intercreditor Agreement or subordinated in right of payment to the Obligations prohibited by the subordination provisions thereof, (C) [reserved], (D) purchases, redemptions, retirement, conversions, acquisition, cancellation or termination of Junior Indebtedness with the proceeds of contributions to common capital, or issuances of Equity Interests of the Borrower, conversion of Junior Indebtedness to (or payments of such Indebtedness in whole or in part with) Equity Interests of the Borrower or exchange of Junior Indebtedness for Equity Interests of the Borrower, in each case, other than Disqualified Stock of the Borrower or in exchange for Equity Interests of the Borrower (other than Disqualified Stock), (E) if such Indebtedness would otherwise constitute an "applicable high yield discount obligation" within the meaning of Section 163(i) of the Code, on each interest payment date ending on or after the fifth anniversary of the issue date of such Indebtedness, the Borrower and/or its Subsidiaries shall make such AHYDO Payments in cash as shall be necessary to ensure that such Indebtedness will not be considered an "applicable high yield discount obligation", (F) mandatory prepayments of Indebtedness under the Pre-Petition Second Lien Credit Agreement, (G) the termination of Capital Leases or other asset-specific financings in respect of assets no longer used or useful in the business of any Loan Party or otherwise being sold as part of an Asset Sale permitted under <u>*Section 6.05*</u> hereunder and (H) to the extent this Agreement is then in effect, principal on the scheduled maturity date thereof, subject to any subordination provisions applicable thereto; provided that notwithstanding the foregoing, no payments of principal or cash interest shall be made with respect to any Junior Indebtedness unless no Loans under the Overadvance Line are then outstanding or have been outstanding at any time during the 90 day period immediately prior to such payment;

US-DOCS\115808185.26

(ii)    Amend or modify, or permit the amendment or modification of, any provision of any Junior Indebtedness documentation, or any agreement relating thereto, other than, to the extent permitted by the DIP Orders and the DIP Budget, amendments or modifications that are not in any manner materially adverse to Lenders (solely in their capacity as Lenders taken as a whole) and that do not materially and adversely affect the subordination provisions thereof (if any) in a manner adverse to the Lenders (solely in their capacity as Lenders hereunder taken as a whole).

(c)    Enter into any agreement or instrument that by its terms restricts (i) the payment of dividends or distributions or the making of cash advances by any Material Subsidiary to the Borrower or any Subsidiary that is a direct or indirect parent of such Subsidiary or (ii) the granting of Liens by the Borrower or any Loan Party, or any Subsidiary required to be a Loan Party, pursuant to the Security Documents, in each case, other than those arising under any Loan Document or those restrictions that are not material and adverse to the interests of the Lenders (solely in their capacity as Lenders and taken as a whole), except, in each case, to the extent permitted by the DIP Orders and the DIP Budget, restrictions existing by reason of:

(A)    restrictions imposed by applicable Law;

(B)    contractual encumbrances or restrictions (1) in effect on the Closing Date with respect to Liens permitted under *Section 6.02(a)* or as otherwise disclosed on *Schedule 6.09(c)*, (2) pursuant to documentation related to any Indebtedness permitted pursuant to *Section 6.01* as long as such encumbrances or restrictions are not materially more restrictive, taken as a whole, than those contained in this Agreement, (3) pursuant to documentation related to any permitted renewal, extension or refinancing of any Indebtedness described in *clause (1)* that does not expand the scope of any such encumbrance or restriction or make such restriction materially more onerous to the Lenders (in their capacity as such and taken as a whole) or (4) contained in an agreement acquired in connection with the Transactions;

(C)    any restriction on the Equity Interests or assets of a Subsidiary imposed pursuant to an agreement entered into for the sale or Disposition of such Equity Interests or assets permitted under *Section 6.05* pending the closing of such sale or Disposition;

(D)    customary provisions in joint venture agreements and other similar agreements applicable to the assets of, or the Equity Interests in, joint ventures entered into in the ordinary course of business;

(E)    any restrictions imposed by any agreement relating to Indebtedness permitted by *Section 6.01* and/or secured by a Lien permitted by *Section 6.02* to secure such Indebtedness to the extent that such restrictions apply only to the property or assets securing such Indebtedness;

-136-

(F)    customary provisions contained in leases or licenses of intellectual property and other similar agreements entered into in the ordinary course of business;

(G)    customary provisions restricting subletting or assignment of any lease governing a leasehold interest;

(H)    customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(I)    customary restrictions and conditions contained in any agreement relating to the sale of any asset permitted under *Section 6.05* applicable to the asset to be sold pending the consummation of such sale;

(J)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(K)    customary provisions contained in leases, licenses, contracts and other similar agreements entered into in the ordinary course of business that impose restrictions on the property subject to such lease;

(L)    customary provisions contained in any Permitted Credit Support Arrangement; or

(M)    any agreement in effect at the time such subsidiary becomes a Subsidiary, so long as such agreement was not entered into in contemplation of such person becoming a Subsidiary and such restriction does not apply to the Borrower or any other Material Subsidiary or any of their respective assets.

(d)    With respect to the PNC Securitization Documents, directly or indirectly make any true up payments prior to the date on which such true up payment is due and no such true up payments may be made, other than with internally generated cash or in connection with a termination in full of the facility, without the prior written consent of the Required Lenders or (ii) other than true up payments permitted by the foregoing clause (i), make any prepayments in respect thereof unless an Overadvance and Enhanced Liquidity Termination has occurred.

(e)    Except as otherwise allowed pursuant to the DIP Orders or First Day Orders or in compliance with the DIP Budget (subject to permitted variances), (i) (x) make any payment or prepayment or redemption or acquisition for value or any cancellation or other retirement of any Prepetition Indebtedness or other obligations arising prior to the Petition Date of any Loan Party in excess of $500,000 in the aggregate during the term of this Agreement or (y) file a motion or other pleading or support a motion or other pleading filed by any other Person requesting the foregoing unless the relief sought under such motion or pleading is expressly conditioned on obtaining the consent of the Required Lenders, (ii) pay any interest on any Prepetition Indebtedness of any Loan Party (whether in cash, in kind securities or otherwise), or (iii) make any payment or create or permit any Lien pursuant to section 361 of the Bankruptcy Code (or pursuant to any other provision of the Bankruptcy Code authorizing adequate protection) on property of the Loan Parties; provided that this Section 6.09(e) shall not apply with respect to the 2020 Term Loans (as

-137-

defined in the Pre-Petition First Lien Credit Agreement). In addition, no Loan Party shall permit any of its Subsidiaries to make any payment, redemption or acquisition on behalf of such Loan Party which such Loan Party is prohibited from making under the provisions of this *Section 6.09(e)*.

Section 6.10    Financial Covenants.

(a)    Minimum Liquidity. On the last Business Day of each week commencing with the week ending on May 29, 2020, maintain less than $5,000,000 of Liquidity on such date.

(b)    (i) As of the last day of each Variance Test Period, other than during a Monthly Budget Testing Period, permit actual total disbursements, excluding professional fees, on a cumulative basis for the entire Variance Test Period, to be greater than 115% of the projected "total disbursements" as set forth in the DIP Budget as of such date.

(ii) From the date on which a Monthly Budget Testing Period begins until such period has ended permit, on the last day of each Variance Test Period, actual total disbursements, excluding professional fees, on a cumulative basis for the entire Variance Test Period, to be greater than 115% of the projected "total disbursements" for such Variance Test Period as set forth in the Initial Monthly DIP Budget.

Section 6.11    Limitations on Change in Fiscal Periods. Allow the fiscal year of the Borrower to end on a day other than December 31 or change the Borrower's method of determining fiscal quarters.

Section 6.12    KEIP Plan. No Loan Party shall, and no Loan Party shall permit any of its Subsidiaries to, enter into any key employee incentive or retention plan, or other similar plan or agreement (any such agreement, a "***KEIP***"), unless such KEIP has been approved in writing by the Required Lenders and the Agents.

Section 6.13    Communications with Bankruptcy Court.  Except where not reasonably practicable, fail to provide prior notice and copies of any material motions or other material documents to be filed with the Bankruptcy Court.

Section 6.14    Bankruptcy Actions.  Seek, consent to, or permit to exist, any order granting authority to take any action that is prohibited by the terms of this Agreement, the DIP Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of the DIP Order or any of the other Loan Documents.


ARTICLE VII

Events of Default

Section 7.01    Events of Default. Notwithstanding the provisions of Section 362 of the Bankruptcy Code to the extent provided in the DIP Order, with respect to the Debtors and without notice, application or motion, hearing before, order of the Bankruptcy Court or any notice to any

-138-

Loan Party, any of the following events shall constitute an event of default (each, an "***Event of Default***"):

(a)    any representation, warranty, certification or statement of fact made or deemed made by the Borrower or any other Loan Party in any Loan Document or Variance Report, shall prove to have been incorrect or misleading in any material respect when so made, deemed made or furnished by the Borrower or any other Loan Party and such representation, warranty, certification or statement of fact made or deemed made by the Borrower or any other Loan Party in any Loan Document or Variance Report is not cured within five (5) Business Days of the making of such representation, warranty, certificate or statement of fact;

(b)    default shall be made in the payment of any principal of any Loan or the reimbursement with respect to any L/C Disbursement when and as the same shall become due and payable in accordance with the terms hereof, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)    default shall be made in the payment of any interest on any Loan or on any L/C Disbursement or in the payment of any Fee or any other amount (other than an amount referred to in *paragraph (b)* above) due under any Loan Document, when and as the same shall become due and payable;

(d)    any default shall be made in the due observance or performance by the Borrower of (i) any covenant or agreement contained in *Section 5.01(a)* (with respect to the Borrower only), *Section 5.04, Section 5.05(a), Section 5.09, Section 5.14, Section 5.21(a), Section 5.21(c), Section 5.22, Section 5.23, Section 5.24* or in *Article VI* (other than *Section 6.10(a)*) or (ii) *Section 6.10(a)* and such default shall continue unremedied for a period of 2 Business Days;

(e)    default shall be made in the due observance or performance by the Borrower or any Loan Party of any covenant or agreement contained in any Loan Document (other than those specified in *paragraphs (b)*, *(c)* and *(d)* above) provided that such default under this paragraph (e) shall continue unremedied for a period of 30 days after the earlier of (1) notice thereof from the Administrative Agent to the Borrower and (2) knowledge of a Responsible Officer of the Borrower or any Loan Party of such default;

(f)    except for defaults or events of default arising as a result of the entry into this Agreement or occasioned by the filing of the Chapter 11 Cases, unless the payment, acceleration and/or exercise of remedies with respect to any such Indebtedness is stayed by the Bankruptcy Court or unless any of the following results from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply, (i) any event or condition occurs that (a) results in any Material Indebtedness incurred after the Petition Date becoming due prior to its scheduled maturity (with all applicable grace periods having expired), (b) enables or permits (with all applicable grace periods having expired) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity (including, in the case of a Qualified Securitization Financing, any event or condition occurs under the terms of the documents relating to the applicable Qualified Securitization Financing that terminates the Qualified Securitization

-139-

Financing or that would permit the providers thereof to terminate such financing or arrangement or commitments or availability with respect thereto in each case regardless of whether or not subsequently cured or waived thereunder, without entering into a DIP ABL Replacement Facility which refinances in full such Qualified Securitization Financing substantially concurrently with the termination of such Qualified Securitization Financing Documentation), provided that no such event or condition pursuant to *Section 6.10(b)* of the Second Lien DIP Term Loan Credit Agreement shall result in an Event of Default pursuant to this *Section 7.01(f)* until such event or condition has been continuing for two (2) Business Days; or (ii) the Borrower or any Subsidiary shall fail to pay the principal of any Material Indebtedness at the stated final maturity thereof (with all applicable grace periods having expired); *provided*, that this *clause (f)* shall not apply (and no Default or Event of Default shall result) to Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness;

(g)    there shall have occurred a Change in Control;

(h)    [reserved];

(i)    [reserved];

(j)    except for any order of the Bankruptcy Court or the amount of any claim in the Chapter 11 Cases, the failure by the Borrower or any Loan Party or any Material Subsidiary to pay one or more final judgments aggregating in excess of $25,000,000 (to the extent not paid, and not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and does not dispute coverage), which judgments are not stayed by the Chapter 11 Cases or any Debtor Relief Law, discharged or effectively waived or stayed for a period of 60 consecutive days, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of the Borrower or any Subsidiary to enforce such judgment;

(k)    (i) an ERISA Event shall have occurred, (ii) a trustee shall be appointed by a United States district court to administer any Plan, or (iii) the Borrower, a Subsidiary or any ERISA Affiliate shall engage in any non-exempt "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan; and in each case in *clauses (i)* through *(iii)* above, such event or condition, together with all other such events or conditions, if any, would reasonably be expected to have a Material Adverse Effect;

(l)    (i) any Loan Document (other than in accordance with its terms or the terms of the other Loan Documents or upon Payment in Full) shall for any reason be asserted in writing by the Borrower or any Loan Party not to be a legal, valid and binding obligation of any party thereto, (ii) the DIP Order, together with the Loan Documents, shall cease to create a valid and perfected Lien with such priority required by this Agreement and the DIP Order or (iii) the Guarantees pursuant to the Guaranty and the Security Documents by the Borrower or any material Loan Parties of any material portion of the Obligations shall cease to be in full force and effect (other than in accordance with the terms thereof), or shall be asserted in writing by the Borrower or any Loan Party not to be in effect or not to be legal, valid and binding obligations;

(m)    any Indebtedness under the Pre-Petition Second Lien Credit Agreement shall cease to be validly subordinated to the Obligations pursuant to the First-Second Lien Intercreditor Agreement or any other Junior Indebtedness or any guarantees thereof that is subordinated in right of payment or liens to the Obligations, shall cease for any reason to be validly subordinated to the Obligations as provided in the documentation governing such Junior Indebtedness or any Loan Party shall contest the subordination of any Junior Indebtedness or any guarantees thereof, if such Indebtedness is not subject to the automatic stay;

(n)    any order, judgment or decree shall be entered against any Loan Party decreeing the dissolution, split up or cessation or restraint from conducting a material part of the business of business of such Loan Party and such order shall remain undischarged or unstayed for a period in excess of 60 consecutive days;

(o)    any failure to comply with Environmental Laws or Release of Hazardous Materials, that shall cause, individually or in the aggregate, a Material Adverse Effect;

(p)    the holders of all or any part of the Indebtedness incurred by the Loan Parties under the Pre-Petition First Lien Credit Agreement and any other Junior Indebtedness shall not be granted adequate protection other than as consented to by the Agents and the Required Lenders and as set forth in the DIP Orders;

(q)    Bankruptcy Related Events of Default

(i)    any of the Chapter 11 Cases concerning the Loan Parties shall be dismissed without an order entered by the Bankruptcy Court containing a provision for termination of all Commitments, and Payment in Full of all Obligations upon entry thereof (other than contingent indemnification obligation as to which no claim has been asserted); or

(ii)    any of the Chapter 11 Cases concerning the Loan Parties shall be converted to a case under chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading or support a motion or other pleading filed by any other Person seeking the conversion of any of the Chapter 11 Cases concerning the Loan Parties under section 1112 of the Bankruptcy Code or otherwise; or

(iii)    an order shall be entered by the Bankruptcy Court appointing a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in any of the Chapter 11 Cases or any Loan Party shall file a motion or other pleading or shall consent to a motion or other pleading filed by any other Person seeking any of the foregoing without the consent of the Required Lenders; or

(iv)    an order of the Bankruptcy Court shall be entered granting any Superpriority Claim or any Lien (other than the Carve Out or as otherwise set forth in the DIP Orders) which is senior to the claims of the Administrative Agent, the Collateral Agent and the other Secured Parties against any Loan Party hereunder, or there shall arise or be granted any such senior Superpriority Claim (other than the Carve Out, or as set forth in

-141-

the DIP Orders) or any Loan Party shall file a motion or other pleading or support a motion or other pleading filed by any other Person requesting any of the foregoing (other than in connection with any financing which would repay the Obligations in full in cash); or

(v)     the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code (i) to the holder or holders of any security interest to proceed against, including foreclosure (or the granting of a deed in lieu of foreclosure or the like) on, any assets of any of the Loan Parties that have a value in excess of $500,000 in the aggregate or (ii) to state or local environmental or regulatory agency or authority to proceed against, including foreclose (or the granting of a deed in lieu of foreclosure or the like) on, any assets of any of the Loan Parties that have a value in excess of $500,000; or

(vi)     subject to entry of the Final Order, the Bankruptcy Court shall enter an order imposing, surcharging or assessing against the Collateral Agent's or Lenders' interest in the Collateral, any costs of expenses, whether pursuant to 506(c) or 552 of the Bankruptcy Code or otherwise, or any Loan Party shall file a motion or other pleading or support a motion or other pleading filed by any other Person requesting the foregoing; or

(vii)     an order of the Bankruptcy Court (or any other court of competent jurisdiction) shall be entered, whether on appeal or otherwise, (A) without the written consent of the Required Lenders, reversing, staying or vacating either of the DIP Orders, (B) without the written consent of the Required Lenders, amending, supplementing or modifying either of the DIP Orders in a manner adverse to the Lenders, (C) denying or terminating the use of cash collateral by the Loan Parties pursuant to either of the DIP Orders or granting authority to use any cash proceeds of any of the Collateral without the Collateral Agent's and Required Lenders' consent or (D) authorizing or approving any other action or actions adverse to the Administrative Agent, the Collateral Agent and Lenders or their rights and remedies hereunder, under any other Loan Documents, or their interest in the Collateral; or any Loan Party shall file a motion or other pleading or shall support a motion or other pleading filed by any other Person seeking any of the foregoing; or

(viii)     default shall be made by any of the Loan Parties in the due observance or performance of any term, condition or obligation contained in the DIP Orders beyond any grace period for such specific default set forth therein or herein, other than any such default that is of an administrative or procedural nature which is cured within 3 days after the earlier of (x) notice by the Administrative Agent or the Required Lenders or (y) knowledge of such default by any of the Loan Parties; or

(ix)     the Bankruptcy Court shall terminate or reduce the period pursuant to section 1121 of the Bankruptcy Code during which the Loan Parties have the exclusive right to file a Reorganization Plan and solicit acceptances thereof or such exclusive right shall have expired, without the prior written consent of the Required Lenders; or

(x)     any Loan Party contests the validity or enforceability of any provision of any Loan Document or the validity, extent, perfection or priority of a Lien in

-142-

favor of the Collateral Agent or the Lenders on the Collateral or shall support or consent to any other Person contenting the foregoing; or

(xi)    the Loan Parties, or any Person claiming by or through the Loan Parties, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent, the Collateral Agent or any of the Lenders, other than in accordance with the DIP Orders; or

(xii)    an order of the Bankruptcy Court (or any other court of competent jurisdiction) shall be entered approving any financing under Section 364 of the Bankruptcy Code other than the Revolving Credit Facility, the Second Lien DIP Term Loan Credit Agreement or the DIP ABL Replacement Facility without the written consent of the Required Lenders that does not repay the Obligations in full in cash or any Loan Party shall file a motion or other pleading or shall support a motion or other pleading filed by any other Person seeking any of the foregoing; or

(xiii)    the filing by any Loan Party of any Reorganization Plan or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, that is not an Acceptable Plan or does not propose to satisfy in full in cash all Obligations under the Loan Documents on the effective date of such plan without the prior written consent of the Required Lenders; or

(xiv)    the Acceptable Plan or the order by the Bankruptcy Court approving the Acceptable Plan is withdrawn, amended, supplemented or otherwise modified pursuant to a pleading filed with the Bankruptcy Court that is not withdrawn in three days, in a manner that materially adversely affects the rights and duties of the Lenders, the Administrative Agent and/or the Collateral Agent, without the prior written consent of the Required Lenders, the Administrative Agent or the Collateral Agent, as applicable; or

(xv)    the Borrower or any other Loan Party attempts to consummate a sale of all or substantially all of its assets via a Reorganization Plan or sales occurring pursuant to Section 363 of the Bankruptcy Code without consent of the Required Lenders; or

(xvi)    the termination of the Restructuring Support Agreement, whether or not the Restructuring Support Agreement is then in effect, or the failure to achieve or satisfy any milestone in the Restructuring Support Agreement or the DIP Order; or

(xvii)    the DIP Order shall cease to create a valid and perfected Lien (which creation and perfection shall not require any further action other than the entry of the DIP Order) on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Required Lenders; or

(xviii) (A) the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents, (B) any Loan Party shall challenge, support or encourage a challenge of any payments made to the Administrative

-143-

Agent or any Lender with respect to the Obligations and (C) without the consent of the Administrative Agent and the Required Lenders, the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any pre-petition agent or lender that is inconsistent with the DIP Order; or

(xix)    the remittance, use or application of any proceeds of the Collateral other than in accordance with cash management procedures and as permitted by ***Error! Reference source not found.***; or

(xx)    if, unless otherwise approved by the Administrative Agent and the Required Lenders, an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to the Chapter 11 Cases and such order shall not be reversed or vacated within 10 days; or

(xxi)    any Debtor shall be enjoined from conducting any material portion of its business, any disruption of the material business operations of the Debtors shall occur, or any material damage to or loss of material assets of any Debtor shall occur; or

(xxii)    any Loan Party or any Subsidiary thereof or any Debtor shall take any action in support of any matter set forth in this *Section 7.01(q)* or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal; or

(r)    Credit Bid.    Subject to the DIP Order and the First Lien Pari Passu Intercreditor Agreement, the inability of the Lenders, either individually or together with one or more Lenders, to credit bid the full amount of their claims in the Chapter 11 Cases in connection with any asset sale process or plan sponsorship process or any sale of assets (in whole or part) by any Loan Party, including without limitation sales occurring pursuant to Section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under Section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code;

(s)    the holders of all or any part of the Indebtedness incurred by the Loan Parties under the Pre-Petition First Lien Credit Agreement and any other Junior Indebtedness shall not be granted adequate protection other than as consented to by the Agents and the Required Lenders and as set forth in the DIP Orders;

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent, at the request of the Required Lenders, shall, by notice to the Borrower, take any or all of the following actions, at the same or different times and upon written notice thereof by Agents (which such notice shall be made to the Loan Parties, the official committee(s) of creditors of the Loan Parties and the United States Trustee for the Southern District of New York and shall be referred to herein as a "***Termination Declaration***" and the date which is the earliest to occur of any such Termination Declaration (excluding the notice period) being herein referred to as the "***Termination Declaration Date***"): (i) terminate forthwith the Commitments, (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans then outstanding so declared to be due and payable, together with

accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document constituting Obligations, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding and (iii) declare a restriction or termination of the Loan Parties' ability to use Cash Collateral.

In addition, five (5) Business Days following the Termination Declaration Date (such 5 Business Day period, the "***Remedies Notice Period***"), absent the Loan Parties curing all such existing Events of Default during such Remedies Notice Period, the Agents shall have automatic relief from the automatic stay and may foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the Obligations, occupy the Loan Parties' premises to sell or otherwise dispose of the Collateral or otherwise exercise remedies against the Collateral permitted by applicable nonbankruptcy law. During the Remedies Notice Period, the Loan Parties and any statutory committee shall be entitled to an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred. Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing, the automatic stay, as to the Lenders and the Agents, shall automatically terminate at the end of the Remedies Notice Period, without further notice or order. During the Remedies Notice Period, the Loan Parties may not use the proceeds of Loans hereunder, Cash Collateral, or other Collateral proceeds except to the limited extent permitted by the DIP Orders.

ARTICLE VIII

The Agents

Section 8.01    Appointment and Authority. (a) Each of the Revolving Lenders and the Issuing Banks hereby appoints ACF FINCO I LP to act on its behalf as Administrative Agent hereunder and under the other Loan Documents, and authorizes Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the Collateral Agent, the Lenders and the Issuing Banks, and the Borrower shall not have rights as a third party beneficiary of any of such provisions.

(b)    Each of the Lenders and each Issuing Bank hereby irrevocably appoints ACF FINCO I LP to act on its behalf as the "Collateral Agent" under the Loan Documents, and each of the Lenders and the Issuing Bank hereby irrevocably appoints and authorizes the Collateral Agent to act as the agent of such Lender and the Issuing Bank for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Collateral Agent and any co-agents, sub-agents and attorneys-in-fact appointed by the Collateral Agent pursuant to _Section 8.05_ for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this _Article VIII_ and _Article IX_ (including _Section 9.04(d)_, as though

such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 8.02    Rights as a Lender. (a) The person(s) serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the person serving as the Administrative Agent hereunder in its individual capacity. Such person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 8.03    Exculpatory Provisions. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents or that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), *provided* that neither the Administrative Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in *Sections 7.01* and *9.09*) or (ii) in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower, a Lender or an Issuing Bank.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set

-146-

forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in *Article IV* or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 8.04    Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or an Issuing Bank or Administrative Agent, as applicable, may presume that such condition is satisfactory to such Lender or an Issuing Bank unless the Administrative Agent shall have received notice to the contrary from such Lender or an Issuing Bank prior to the making of such Loan or the issuance of such Letter of Credit. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by them, and shall not be liable for any action taken or not taken by them in accordance with the advice of any such counsel, accountants or experts.

Section 8.05    Delegation of Duties. The Administrative Agent may perform any and all of its respective duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of their respective duties and exercise their respective rights and powers by or through their respective Related Parties. The exculpatory provisions of this *Article VIII* shall apply to any such sub-agent and to the Related Parties of the Administrative Agent, and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Section 8.06    Resignation of the Administrative Agent or Collateral Agent. The Administrative Agent and/or Collateral Agent may each at any time by giving ten days' written notice to the Lenders, the Issuing Banks and the Borrower notice of its resignation as Administrative Agent and/or Collateral Agent. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank with an office in the United States or an Affiliate of any such bank with an office in the United States, and the Administrative Agent and/or Collateral Agent, as applicable, further agrees that for the 30 day period immediately following its notice of resignation, it will not appoint a successor unless the Borrower shall have consented to such successor, such consent not to be unreasonably withheld or delayed. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent and/or Collateral Agent gives notice of its resignation, then the retiring Administrative Agent and/or Collateral Agent may on behalf of the Lenders and the Issuing Banks, appoint a successor Administrative Agent and/or Collateral Agent meeting the qualifications set

-147-

forth above; _provided_ that if the Administrative Agent and/or Collateral Agent shall notify the Borrower and the Lenders that no qualifying person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent and/or Collateral Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except in its capacity as Collateral Agent holding collateral security on behalf of any Secured Parties, it shall continue to hold such collateral security as nominee until such time as a successor Collateral Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Revolving Lender and the Issuing Banks directly, until such time as the Required Lenders appoint a successor Administrative Agent and/or Collateral Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Administrative Agent and/or Collateral Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent and/or Collateral Agent, and the retiring Administrative Agent and/or Collateral Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrower to a successor Administrative Agent and/or Collateral Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's and/or Collateral Agent's resignation hereunder and under the other Loan Documents, the provisions of this _Article VIII_ and _Section 9.05_ shall continue in effect for the benefit of such retiring Administrative Agent and/or Collateral Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent and/or Collateral Agent was acting as Collateral Agent.

Section 8.07    Non-Reliance on Administrative Agent and Other Lenders. Each Lender and the Issuing Banks acknowledges that it has, independently and without reliance upon the Administrative Agent or Collateral Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and each Issuing Bank also acknowledges that it will, independently and without reliance upon the Administrative Agent or Collateral Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 8.08    No Other Duties, Etc. Anything herein to the contrary notwithstanding, none of the Lead Arrangers or Agents listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, the Collateral Agent, a Lender or an Issuing Bank hereunder.

Section 8.09    Administrative Agent May File Proofs of Claim. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, Administrative Agent (irrespective of whether the principal of any Loan or L/C Borrowing shall then be due and payable as herein expressed or by declaration or otherwise and irrespective

of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, Letters of Credit and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuing Banks, or Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Issuing Banks, the Administrative Agent and their respective agents and counsel and all other amounts due to the Lenders, the Issuing Banks, and the Administrative Agent under *Sections 2.12* and *9.05*) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the Issuing Banks to make such payments to the Administrative Agent and, in the event that the Administrative Agent, shall consent to the making of such payments directly to the Lenders and the Issuing Banks, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due to the Administrative Agent under *Sections 2.12* and *9.05*.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or the Issuing Banks any specific plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or the Issuing Banks to authorize the Administrative Agent to vote in respect of the claim of any Lender or the Issuing Banks in any such proceeding.

Section 8.10    Security Agreement. (a) The Lenders and the Issuing Banks irrevocably authorize the Collateral Agent, at its option and in its discretion, (i) to release (and deliver evidence of such release) any Lien on any property granted to or held by the Collateral Agent under any Loan Document (A) upon Payment in Full, (B) that is sold or to be sold to a party that is not a Loan Party or otherwise disposed of as part of or in connection with any sale or other Disposition permitted hereunder or under any other Loan Document, or (C) subject to *Section 9.09*, if approved, authorized or ratified in writing by the Required Lenders or such other number or percentage of Lenders required hereby and (ii) to subordinate any Lien on any property granted to or held by the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by *clause (i)* of *Section 6.02*.

(b)    The Lenders and the Issuing Banks irrevocably authorize the Collateral Agent, at its option and in its discretion, to release (and deliver evidence of such release) any guarantor from its obligations hereunder (including, without limitation, the Guaranty) and the other Security Documents upon Payment in Full or if person ceases to be a Loan Party as a result of a transaction permitted hereunder and under the other Loan Documents (as the context may require).

-149-

(c)        Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Collateral Agent and each Lender hereby agree that no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce its rights pursuant to *Article X* and *XI* or any other Security Document, it being understood and agreed that all powers, rights and remedies under any of the Security Documents may be exercised solely by the Collateral Agent, for the benefit of the Secured Parties in accordance with the terms thereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent for the benefit of the Secured Parties in accordance with the terms thereof.

Upon request by the Administrative Agent at any time, each of the Required Lenders will confirm in writing the Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any guarantor from its obligations hereunder (including the Guaranty) and the other Security Documents.

Section 8.11    Withholding Tax. To the extent required by any applicable laws (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender or under any Loan Document an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of *Section 2.17*, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payment in respect thereof within 10 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent, of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent or shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this *Section 8.11*. The agreements in this *Section 8.11* shall survive the resignation and/or replacement of the Administrative Agent any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

Section 8.12    Certain ERISA Matters.

(a)        Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of the Administrative Agent, the Collateral Agent and the Lead Arrangers and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)       such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Commitments,

(ii)      the prohibited transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable so as to exempt from the prohibitions of ERISA Section 406 and Section 4975 of the Code such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iii)     (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement.

(b)       In addition, unless *sub-clause (i)* in the immediately preceding *clause (a)* is true with respect to a Lender, such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Collateral Agent and the Lead Arrangers and their respective Affiliates, and for the benefit of the Borrower and any other Loan Party, that none of the Administrative Agent, the Collateral Agent or any other Lead Arranger or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender involved in the Loans, the Letters of Credit, the Commitments, and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent or the Collateral Agent under this Agreement, any Loan Document or any documents related to hereto or thereto).

ARTICLE IX

Miscellaneous

Section 9.01   Notices. (a) Except in the case of notices and other communications permitted to be given by telephone (and except as provided in *subsection (b)* below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand

-151-

or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)      if to any Loan Party, to its address set forth on *Schedule 9.01(a)(i)*;

with a copy (which shall not constitute notice) to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Attention: Leonard Klingbaum and Max Silverstein
Email: Leonard.Klingbaum@ropesgray.com;
Max.Silverstein@ropesgray.com

(ii)      if to the Administrative Agent, Collateral Agent or Documentation Agent, to the applicable address as set forth on *Schedule 9.01(a)(ii)* and including copies to any sub-agents as set forth therein; and

(iii)      if to any Issuing Bank, to it at the address or telecopy number set forth separately in writing.

Notwithstanding anything to the contrary set forth herein, any notice or communication provided or required to be provided to the Administrative Agent and/or Collateral Agent by any party hereto or under any other Loan Document shall also be communicated to the Documentation Agent in a like manner contemporaneously therewith.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in *subsection (b)* below shall be effective as provided in such *subsection (b)*.

(b)      Notices and other communications to the Lenders and each Issuing Bank hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender or any Issuing Bank pursuant to *Article II* if such Lender or any Issuing Bank, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

-152-

(c)    Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing *clause (i)* of notification that such notice or communication is available and identifying the website address therefor.

(d)    Each of the Borrower, the Administrative Agent, the Collateral Agent, each Issuing Bank may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower, the Administrative Agent, the Collateral Agent and each Issuing Bank. In addition, each Lender agrees to notify the Administrative Agent and the Collateral Agent from time to time to ensure that the Administrative Agent and the Collateral Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to the Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

(e)    The Administrative Agent, the Collateral Agent, each Issuing Bank and the Lenders shall be entitled to rely and act upon any notices (including telephonic Borrowing Requests) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify the Administrative Agent, the Collateral Agent, each Issuing Bank, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such person on each notice purportedly given by or on behalf of the Borrower. All telephonic notices to and other telephonic communications with the Administrative Agent and the Collateral Agent may be recorded by the Administrative Agent and Collateral Agent, and each of the parties hereto hereby consents to such recording.

(f)    Nothing in this Agreement or in any other Loan Document shall be construed to limit or affect the obligation of the Loan Parties or any other Person to serve upon the Administrative Agent, the Collateral Agent and the Lenders in the manner prescribed by the Bankruptcy Code any pleading or notice required to be given to the Administrative Agent, the Collateral Agent and the Lenders pursuant to the Bankruptcy Code.

-153-

Section 9.02    Survival of Agreement. All covenants, agreements, representations and warranties made by the Borrower and the other Loan Parties herein, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and each Issuing Bank and shall survive the making by the Lenders of the Loans, the execution and delivery of the Loan Documents and the issuance of the Letters of Credit, regardless of any investigation made by such persons or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or L/C Disbursement or any Fee or any other Obligations (other than yet unasserted contingent Obligations) under this Agreement or any other Loan Document is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not been expired or terminated. Without prejudice to the survival of any other agreements contained herein, indemnification and reimbursement obligations contained herein (including pursuant to *Sections 2.15*, *2.17* *8.11*, and *9.05*) shall survive the Payment in Full, the expiration of the Letters of Credit and the termination of the Commitments or this Agreement.

Section 9.03    Binding Effect. This Agreement shall become effective when it shall have been executed by the Borrower and the Administrative Agent and when the Administrative Agent shall have received copies hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the Borrower, each Issuing Bank, the Administrative Agent and each Lender and their respective permitted successors and assigns.

Section 9.04    Successors and Assigns. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of an Issuing Bank that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section (and any attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of an Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in *paragraph (c)* of this Section), and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents, the Issuing Banks and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement or the other Loan Documents.

(b)        (i) Subject to the conditions set forth in *paragraph (b)(ii)* below, any Lender may at any time assign to one or more Eligible Assignees (each, an "**Assignee**") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans (including for purposes of this *Section 9.04(b)*, participations in Letter of Credit obligations) at the time owing to it) with the prior written consent of:

(A)        the Administrative Agent; *provided*, that the consent of the Administrative Agent shall not be required if such assignment is an assignment

-154-

from one Revolving Lender to another Revolving Lender, an Affiliate of a Revolving Lender or an Approved Fund of a Revolving Lender;

(B)        [reserved]; and

(C)        each Issuing Bank.

(ii)        Assignments shall be subject to the following additional conditions:

(A)        except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans to related Approved Funds, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (as of the date such Assignment and Acceptance is recorded in the Register by the Administrative Agent) shall not be less than $5,000,000, unless the Administrative Agent otherwise expressly consent to such assignment; *provided* that simultaneous assignments to two or more Related Funds or by two or more Related Funds to a single Assignee shall be treated as one assignment for purposes of the minimum assignment requirement, and shall be in an amount that is an integral multiple of $1,000,000 (or the entire remaining amount of such Lender's Commitment);

(B)        the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500 (which may be waived or reduced at the Administrative Agent's sole discretion); *provided*, that (i) assignments pursuant to *Section 2.19* shall not require the signature of the assigning Lender to become effective and (ii) any such processing and recordation fee in connection with assignments pursuant to *Section 2.19* shall be paid by the assignee;

(C)        the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and all documentation and other information with respect to the assignee that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, including any tax forms required to be provided pursuant to *Section 2.17(g)*; and

(D)        in connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay

-155-

and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

For the purposes of this *Section 9.04*, "***Approved Fund***" means any person (other than a natural person) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to *paragraph (b)(v)* below, from and after the effective date specified in each Assignment and Acceptance (which shall be the date of such recordation) the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of *Sections 2.15*, *2.16*, *2.17* and *9.05*). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this *Section 9.04* shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with *paragraph (c)* of this Section.

(iv)    The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices in the United States of America a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans and L/C Exposure owing to, each Lender pursuant to the terms hereof from time to time (the "***Register***"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, Issuing Bank and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower, the Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, all documents required under *Section 9.04(b)(ii)(C)* (unless the Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in *paragraph (b)* of this Section and any written consent to such assignment required by *paragraph (b)* of this Section, the Administrative

-156-

Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless and until it has been recorded in the Register as provided in this paragraph, provided that for the avoidance of doubt, the date that is the later of (i) the trade date specified (if any) in the Assignment and Acceptance and (ii) the day such Assignment and Acceptance has been recorded in the Register shall be the effective date of the assignment.

(c)     (i) Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (other than a natural person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person, a Defaulting Lender, or the Borrower or any of the Affiliated Lenders) (a "***Participant***") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); *provided*, that (a) such Lender's obligations under this Agreement shall remain unchanged, (b) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (c) the Borrower, the Administrative Agent, the Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt, each Lender shall be responsible for the indemnity under *Section 9.05(b)* with respect to any payments made by such Lender to its Participants. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents; *provided*, that (x) such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly and adversely affected thereby pursuant to *Section 9.04(a)(i)* or *clause (i)*, *(ii)*, *(iii)*, *(iv)*, *(v)* or *(vi)* of the first proviso to *Section 9.09(b)* and (2) directly and adversely affects such Participant and (y) no other agreement with respect to such Participant may exist between such Lender and such Participant.

(ii)     The Borrower agrees that each Participant shall be entitled to the benefits of *Sections 2.16* and *2.17* (subject to the requirements and limitations therein, including the requirements under *Section 2.17(g)* (it being understood that the documentation required under *Section 2.17(g)* shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to *paragraph (b)* of this Section; *provided* that such Participant (A) agrees to be subject to the provisions of *Section 2.19* as if it were an assignee under *paragraph (b)* of this Section; and (B) shall not be entitled to receive any greater payment under *Sections 2.16* or *2.17*, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of *Section 2.19* with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of *Section 9.06* as though it were a Lender; *provided* that such Participant agrees to be subject to *Section 2.18(c)* as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the

-157-

principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "***Participant Register***"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the Proposed United States Treasury Regulations (or, in each case, any amended or successor version). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     Any Lender may, without the consent of the Administrative Agent or the Borrower, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; *provided*, that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)     The Borrower, at its expense and following receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in *paragraph (d)* above.

(f)     [Reserved].

(g)     Notwithstanding the foregoing, no assignment may be made or participation sold to (i) a natural person, (ii) any Defaulting Lender or any of its subsidiaries, or any person who, upon becoming a Lender hereunder, would constitute any of the foregoing persons described in this *clause (ii)* or (iii) any Affiliated Lenders.

(h)     [Reserved].

(i)     <u>Resignation as an Issuing Bank</u>. Notwithstanding anything to the contrary contained herein, if at any time Issuing Bank assigns all of its Commitment and Loans pursuant to *Section 9.04(b)*, such Issuing Bank may, upon 30 days' notice to the Borrower and the Lenders, resign as an Issuing Bank. In the event of any such resignation as an Issuing Bank, the Borrower shall be entitled to appoint from among the Lenders a successor Issuing Bank hereunder (subject to such Lender's consent); *provided, however*, that no failure by the Borrower to appoint any such successor shall affect the resignation of such Issuing Bank. If such Issuing Bank resigns, it shall retain all the rights, powers, privileges and duties of an Issuing Bank hereunder with respect to all Letters of Credit issued by it and outstanding as of the effective date of its resignation as an Issuing Bank and all unreimbursed L/C Disbursements with respect thereto including the right to require

-158-

the Lenders to make ABR Loans or fund risk participations in unreimbursed amounts pursuant to _Section 2.05_. Upon the appointment of a successor Issuing Bank, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of a retiring Issuing Bank, as the case may be, and (b) the successor Issuing Banks shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the resigning Issuing Bank to effectively assume the obligations of such Issuing Bank with respect to such Letters of Credit.

Notwithstanding anything to the contrary in this _Section 9.04_, no Lenders may assign or otherwise transfer its rights or obligations hereunder to any "_Lender_" under and as defined in the Second Lien DIP Term Loan Credit Agreement.

Section 9.05   Expenses; Indemnity. (a) Subject to the DIP Order, the Borrower agrees to pay, whether accrued or incurred prior to, on or after the Petition Date, (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Documentation Agent, the Collateral Agent and their respective Affiliates in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution and delivery and administration of this Agreement and the other Loan Documents, the Pre-Petition First Lien Credit Agreement, any Pre-Petition First Lien Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) (including reasonable and documented fees, charges and disbursements of counsel for the Administrative Agent, Documentation Agent and Collateral Agent) (including, without limitation, with respect to the Rolled-Up Obligations), (ii) all reasonable and documented out-of-pocket expenses incurred by each Issuing Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder (including, without limitation, with respect to the Rolled-Up Obligations) and (iii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Documentation Agent, the Collateral Agent, any Lender and each Issuing Bank (including the fees, charges and disbursements of any counsel for the Administrative Agent, the Documentation Agent, the Collateral Agent, any Lender or any Issuing Bank), in connection with the enforcement or protection of their rights (including, without limitation, with respect to the Rolled-Up Obligations) (A) in connection with this Agreement, the other Loan Documents, the Pre-Petition First Lien Credit Agreement or Pre-Petition First Lien Loan Documents and the Chapter 11 Case, including its rights under this Section, or (B) in connection with the Loans made or deemed to have been made pursuant to the Agreement (including, without limitation, with respect to the Rolled-Up Loans) or the Letters of Credit issued hereunder or deemed to have been issued pursuant to this Agreement (including, without limitation, with respect to the Existing Letters of Credit), including all such out-of-pocket costs incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit; _provided_ that, the Borrower's obligations under this _Section 9.05(a)_ for fees and expenses of legal counsel shall be limited to reasonable and documented fees and expenses of (x) one primary outside legal counsel for the Administrative Agent and Documentation Agent and one primary outside legal counsel for the Collateral Agent for all persons described in _clauses (i)_ through _(iii)_ above, taken as a whole, (y) in the case of any actual or perceived conflict of interest, one outside legal counsel for each group of affected persons similarly situated, taken as a whole, in each appropriate jurisdiction and (z) if necessary, one local or foreign legal counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all persons described in clauses _(i)_ through _(iii)_ above,

-159-

taken as a whole. For the avoidance of doubt, the Borrower's obligations under this _Section 9.05(a)_ for fees and expenses of legal counsel shall exclude allocated costs of internal counsel to all persons described in _clauses (i)_ through _(iii)_ above.

(b)    The Borrower shall indemnify the Administrative Agent, the Documentation Agent, the Collateral Agent, Lead Arrangers, the Agents, each Issuing Bank, each Lender, their respective Affiliates and each of their respective directors, trustees, officers, employees and agents and other respective successors and assigns (each such person being called an "_**Indemnitee**_") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related reasonable out-of-pocket costs and expenses, including reasonable counsel fees, charges and disbursements (except the allocated costs of internal counsel and limited to the fees and expenses of (x) one primary outside legal counsel to the Indemnitees, taken as a whole, (y) in the case of any actual or perceived conflict of interest where the Indemnitee affected by such conflict has informed the Borrower of such conflict and thereafter retains its own counsel, one outside legal counsel for each group of affected Indemnitees similarly situated, taken as a whole, in each appropriate jurisdiction and (z) if necessary, one local or foreign legal counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) to the Indemnitees, taken as a whole), incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document, the Pre-Petition First Lien Credit Agreement or any Pre-Petition First Lien Loan Documents, the Chapter 11 Case, including its rights under this Section or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto and thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated hereby, (ii) any Loans made or deemed to have been made pursuant to the Agreement (including, without limitation, with respect to the Rolled-Up Loans) or the Letters of Credit issued hereunder or deemed to have been issued pursuant to this Agreement (including, without limitation, with respect to the Existing Letters of Credit) or the proposed use of proceeds therefrom (including any refusal by any Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by you, a third party, by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, or (iv) any violation of Environmental Law or presence or Release of Hazardous Materials related in any way to the Borrower or any other Loan Party; _provided_, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are (x) determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Indemnitee (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (z) any dispute solely among Indemnitees (other than any claims against an Indemnitee in its capacity or in fulfilling its role as an agent or arranger or any similar role hereunder or under any other Loan Document and other than any claims arising out of any act or omission of the Borrower or any of its Affiliates). The provisions of this _Section 9.05_ shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement,

-160-

the consummation of the transactions contemplated hereby, the repayment, satisfaction and discharge of any of the Obligations, the resignation of the Administrative Agent, the Documentation Agent, the Collateral Agent or any Issuing Bank, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Documentation Agent, the Collateral Agent, any Issuing Bank or any Lender. All amounts due under this _Section 9.05_ shall be payable no later than ten Business Days after written demand therefor, accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested. This _Section 9.05(b)_ shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     To the fullest extent permitted by applicable law, no party shall assert, and each party hereby waives, any claim against any other Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof. No Indemnitee referred to in _subsection (b)_ above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than as a result of the gross negligence, bad faith, fraud or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(d)     To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under _subsection (a)_ or _(b)_ of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), the Documentation Agent (or any sub-agent thereof), the Collateral Agent (or any sub-agent thereof), any Issuing Bank or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the Documentation Agent (or any sub-agent thereof), the Collateral Agent (or any sub-agent thereof), the applicable Issuing Bank or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, _provided_ that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), the Documentation Agent (or any sub-agent thereof), the Collateral Agent (or any sub-agent thereof), or the applicable Issuing Bank in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), the Documentation Agent (or any sub-agent thereof), the Collateral Agent (or any sub-agent thereof), or applicable Issuing Bank in connection with such capacity. The obligations of the Lenders under this _subsection (d)_ are subject to the provisions of _Section 2.18(f)_.

Section 9.06   Right of Set-off. If an Event of Default shall have occurred and be continuing, subject to the DIP Orders and the First Day Orders (including the Carve Out), and each Lender and each Issuing Bank is hereby authorized at any time and from time to time thereafter, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special,

time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or such Issuing Bank to or for the credit or the account of the Borrower or any other Subsidiary against any of and all the obligations of the Borrower now or hereafter existing under this Agreement or any other Loan Document held by such Lender or such Issuing Bank, irrespective of whether or not such Lender or such Issuing Bank shall have made any demand under this Agreement or such other Loan Document and although the obligations may be unmatured; *provided*, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of *Section 2.23* and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. Subject to the DIP Orders and First Day Orders, the rights of each Lender and each Issuing Bank under this *Section 9.06* are in addition to other rights and remedies (including other rights of set-off) that such Lender or such Issuing Bank may have.

Section 9.07  Payments Set Aside. To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent, the Collateral Agent, any Issuing Bank or any Lender, or the Administrative Agent, the Collateral Agent, any Issuing Bank or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, the Collateral Agent, such Issuing Bank or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Laws or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and each Issuing Bank severally agrees to pay to the Administrative Agent or the Collateral Agent, as applicable, upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent or the Collateral Agent (as applicable), *plus* interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.

Section 9.08  Applicable Law. TO THE EXTENT NOT GOVERNED BY THE PROVISIONS OF THE BANKRUPTCY CODE, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN LETTERS OF CREDIT TO THE EXTENT SET FORTH THEREIN) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Section 9.09  Waivers; Amendment. (a) None of the Lead Arrangers, the Agents or the Lenders shall by any act (except by a written instrument pursuant to *clause (b)* below), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. No failure to exercise, nor any delay in exercising, on the part of any Lead Arranger, Agent or Lender, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other

-162-

right, power or privilege. A waiver by any Lead Arranger, Agent or Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which such Lead Arranger, Agent or Lender would otherwise have on any future occasion. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

(b)    Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified, other than (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders (or the Administrative Agent with the consent of the Required Lenders) or (y) in the case of any other Loan Document (other than any waiver, amendment or modification to effectuate any modification thereto expressly contemplated by the terms of such other Loan Document), pursuant to an agreement or agreements in writing entered into by each party thereto and any of the Administrative Agent or Collateral Agent that may be a party thereto, as applicable and consented to by the Required Lenders (or such other requisite parties expressly provided for therein); *provided*, *however*, that no such agreement shall:

(i)    decrease or forgive the principal amount of, or decrease the rate of interest on, any Loan or any L/C Disbursement of a Lender without the prior written consent of each Lender directly affected thereby; *provided* that any amendment to the financial covenant definitions or any component of the definitions thereof in this Agreement shall not constitute a reduction in the rate of interest for purposes of this *clause (i)*; it being understood that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate,

(ii)    increase or extend the Commitment of any Lender or decrease the Commitment Fees or L/C Participation Fees or other fees of any Lender without the prior written consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory prepayment or reduction in the aggregate Commitments shall not constitute an increase of the Commitments of any Lender or a decrease of fees of any Lender),

(iii)    extend, waive or reduce the amount of any scheduled installment of principal or extend any date on which payment of interest on any Loan or any L/C Disbursement or any Fees is due, without the prior written consent of each Lender adversely affected thereby (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory prepayment or reduction in the aggregate Commitments shall not constitute an extension, waiver or reduction of the amount of a scheduled installment of principal or date of payment of interest or fees),

(iv)    amend or modify the provisions of *Section 2.18(b)* or *(c)* in a manner that would by its terms alter the *pro rata* sharing of payments required thereby, or require any Lender to make available Interest Periods longer than six months without its consent, without the prior written consent of each Lender adversely affected thereby,

US-DOCS\115808185.26

(v)    amend or modify the provisions of this Section or the definition of the term "*Required Lenders*" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the prior written consent of each Lender adversely affected thereby (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the applicable Loans and Commitments),

(vi)    release all or substantially all the Collateral or release any of the Borrower or any other Loan Party from its Guarantee under the Guaranty, unless, in the case of a Loan Party, (x) such transaction is otherwise permitted by the Loan Documents or (y) all or substantially all of the Equity Interests of such Loan Party are sold or otherwise disposed of in a transaction permitted by this Agreement, without the prior written consent of each Lender,

(vii)    except as provided by law or the DIP Order, subordinate the Liens in favor of the Administrative Agent or Collateral Agent, as applicable, securing the Obligations, with respect to all or substantially all of the Collateral, without the prior written consent of each Lender adversely affected thereby,

(viii)    [reserved],

(ix)    [reserved],

(x)    no amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents pertaining to any Issuing Bank, or any other rights or duties of any Issuing Bank under this Agreement or the other Loan Documents, without the written consent of such Issuing Bank,

(xi)    no amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents pertaining to Administrative Agent, or any other rights or duties of Administrative Agent under this Agreement or the other Loan Documents, without the written consent of Administrative Agent, and

(xii)    effect any waiver, amendment or modification of *Article X*, or any comparable provision of any other Security Document, in a manner that materially adversely affects the rights in respect of payments or collateral of Lenders, without the consent of each Lender so affected;

*provided* *further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent, the Collateral Agent, the Administrative Agent, or an Issuing Bank hereunder without the prior written consent of the Administrative Agent, the Collateral Agent, or such Issuing Bank acting as such at the effective date of such agreement, as applicable. Each Lender shall be bound by any waiver, amendment or modification authorized by this *Section 9.09* and any consent by any Lender pursuant to this *Section 9.09* shall bind any Assignee of such Lender.

US-DOCS\115808185.26

(c)     Without the consent of any Lender, the Loan Parties and the Administrative Agent may (in their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment, modification or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law.

(d)     Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any other waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

(e)     Subject to the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of Required Lenders.

(f)     Notwithstanding anything to the contrary herein, the Maturity Date may be extended with the written consent of the Required Lenders and the Borrower.

(g)     Notwithstanding anything to the contrary contained in this *Section 9.09*, if at any time after the Closing Date, the Administrative Agent and the Borrower shall have unanimously identified an obvious error, ambiguity, defect, inconsistency or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders within five Business Days following receipt of notice thereof.

(h)     [Reserved]

(i)     Notwithstanding anything to the contrary contained in this *Section 9.09*, this Agreement and the other Loan Documents may be amended, restated, supplemented and/or otherwise modified with the written consent of the Administrative Agent, the Borrower and the Required Lenders, in order to (i) increase the interest rate or yield applicable to the Revolving Credit Facility, including by increasing the Applicable Margin or similar component of the interest rate, by modifying the method of computing interest applicable to the Revolving Credit Facility

-165-

(including by creating any new interest rate "floors") or paying additional upfront fees, consent fees or original issue discount on or with respect to the Revolving Credit Facility and (ii) increase a letter of credit, unused commitment, facility or utilization fee or other fees having similar effect under the Revolving Credit Facility.

Section 9.10    <u>Interest Rate Limitation</u>. Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable Requirements of Law, shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrower shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of the Lenders and the Borrower to conform strictly to any applicable usury laws. Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to the Borrower.

Section 9.11    <u>[Reserved]</u>.

Section 9.12    <u>Entire Agreement</u>. This Agreement and the other Loan Documents represent the entire agreement of the parties hereto with respect to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof. There are no promises, undertakings, representations or warranties by the Lead Arranger, any Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

Section 9.13    <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS

BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.14    Severability. In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions. Without limiting the foregoing provisions of this *Section 9.14*, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent or any Issuing Bank, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 9.15    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute but one contract, and shall become effective as provided in *Section 9.03*. Delivery of an executed counterpart to this Agreement by facsimile (or other electronic) transmission pursuant to procedures approved by the Administrative Agent shall be as effective as delivery of a manually signed original.

Section 9.16    Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 9.17    Jurisdiction; Consent to Service of Process. (a) Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court or, if the Bankruptcy Court does not have or does not exercise jurisdiction, any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any Lender or any Issuing Bank may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against the Borrower or any other Loan Party or their properties in the courts of any jurisdiction.

(b)    Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or federal court. Each of the parties hereto

hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

Section 9.18    Confidentiality. Each of the Lenders, each Issuing Bank and each of the Agents agrees that it shall maintain in confidence any Information relating to the Borrower and the other Loan Parties furnished to it by or on behalf of the Borrower or the other Loan Parties (other than information that (a) has become generally available to the public other than as a result of a disclosure by such party, (b) has been independently developed by such Lender, such Issuing Bank or such Agent without violating this *Section 9.18* or (c) was available to such Lender, such Issuing Bank or such Agent from a third party having, to such person's knowledge, no obligations of confidentiality to the Borrower or any other Loan Party) and shall not reveal the same other than to its directors, trustees, officers, employees and advisors with a need to know or to any person that approves or administers the Loans on behalf of such Lender (so long as each such person shall have been instructed to keep the same confidential in accordance with this *Section 9.18*), except: (a) to the extent necessary to comply with law or any legal process or the requirements of any Governmental Authority, the National Association of Insurance Commissioners or of any securities exchange on which securities of the disclosing party or any Affiliate of the disclosing party are listed or traded, (b) as part of normal reporting or review procedures to Governmental Authorities or the National Association of Insurance Commissioners, (c) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors and representatives (so long as each such person shall have been instructed to keep the same confidential in accordance with this *Section 9.18*), (d) in order to enforce its rights under any Loan Document in a legal proceeding, (e) to any prospective assignee of, or prospective Participant in, any of its rights under this Agreement (so long as such person shall have been instructed to keep the same confidential in accordance with this *Section 9.18*), (f) to any direct or indirect contractual counterparty in Swap Agreements or such contractual counterparty's professional advisor (g) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder (h) to existing and prospective investors and funding sources, (i) any rating agency in connection with rating of the Borrower or its Subsidiaries or the Revolving Credit Facility or (j) with the consent of the Borrower. For purposes of this *Section 9.18*, "*Information*" shall mean all information received from the Borrower or any of its Subsidiaries relating to the Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to any Agent, any Lender or any Issuing Bank on a non-confidential basis prior to disclosure by the Borrower or any of its Subsidiaries; *provided* that, in the case of information received from the Borrower or any of its Subsidiaries after the Closing Date, all such information shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential.

Section 9.19    Direct Website Communications.

(a)    Delivery. (i) Each Loan Party hereby agrees that it will use commercially reasonable efforts to provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to this Agreement and any other Loan Document, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (a) relates to a request for a new, or a conversion of an existing, borrowing or other extension of

-168-

credit (including any election of an interest rate or interest period relating thereto), (b) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (c) provides notice of any Default or Event of Default under this Agreement or (d) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any borrowing or other extension of credit hereunder (all such non-excluded communications collectively, the "***Communications***"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent. In addition, each Loan Party agrees to continue to provide the Communications to the Administrative Agent in the manner specified in this Agreement or any other Loan Document but only to the extent requested by the Administrative Agent. Nothing in this *Section 9.19* shall prejudice the right of the Agents, the Lead Arrangers or any Lender or any Loan Party to give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document.

(ii)    The Administrative Agent agrees that receipt of the Communications by the Administrative Agent at its e-mail address set forth in *Section 9.01* shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform (as defined below) shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees (a) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (b) that the foregoing notice may be sent to such e-mail address. Notwithstanding the foregoing or anything else contained herein or in the other Loan Documents to the extent and such Communications, materials, notices and/or documents, in each case required to be delivered pursuant to *Section 5.04(a)*, *(b)*, *(c)* and *(f)* are included in materials otherwise publicly filed with the SEC or otherwise there shall be no further delivery requirement for notice purposes hereunder and any such Communications, materials, notices and/or documents shall be deemed to be delivered on the earliest of (i) the date on which the Borrower post such Communications, materials, notices and/or documents or provides a link thereto on Borrower's website on the Internet or (ii) on which date such documents are posted on the Borrower's behalf on an Internet or internet website, if any, to which, each Lender and the Agents have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent).

(b)    Posting. The Borrower hereby acknowledges that (a) the Administrative Agent and/or the Lead Arrangers will make the Communications available to the Lenders and each Issuing Bank by posting the Communications on IntraLinks or another similar electronic system (the "***Platform***") and (b) certain of the Lenders (each, a "***Public Lender***") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such person's securities. The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Communications that may be distributed to the Public Lenders and that (w) all such Communications shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by

-169-

marking Communications "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Lead Arrangers, each Issuing Bank and the Lenders to treat such Communications as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (*provided*, *however*, that to the extent such Communications constitute Information, they shall be treated as set forth in *Section 9.18*); (y) all Communications marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (z) the Administrative Agent and the Lead Arrangers shall be entitled to treat any Communications that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

(c)    Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. In no event shall the Administrative Agent, the Collateral Agent or any of their respective Related Parties (collectively, the "***Agent Parties***") have any liability to the Borrower, any Lender, any Issuing Bank or any other person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's, or the Administrative Agent's, or the Collateral Agent's, transmission of Communications through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; *provided*, *however*, that in no event shall any Agent Party have any liability to the Borrower, any Lender, any Issuing Bank or any other person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

Section 9.20    Release of Liens and Guarantees. In the event that any Loan Party conveys, sells, leases, assigns, transfers or otherwise disposes of all or any portion of any of the Equity Interests or assets of any Loan Party (other than the Equity Interests of the Borrower) to a person that is not (and is not required to become) a Loan Party in a transaction permitted by this Agreement, then the Administrative Agent and the Collateral Agent shall promptly (and the Lenders hereby authorize the Administrative Agent and the Collateral Agent to) take such action and execute any such documents as may be requested by the Borrower (without further action or consent by the Lenders) and at the Borrower's expense to release (or evidence the release) or permit the Borrower (or its agent or designee to take) such actions to release any Liens created by any Loan Document in respect of such assets or Equity interests, and, in the case of a Disposition of the Equity Interests of any Loan Party in a transaction permitted by this Agreement or the other Loan Documents and as a result of which such Loan Party would cease to be a Subsidiary, terminate such Loan Party's obligations under *Article X* and *XI* and any other applicable Security Document; provided that the release of any Subsidiary because it ceases to be a Wholly Owned Subsidiary shall constitute an Investment in an amount equal to the fair market value of the net assets of such relevant Subsidiary and must be permitted under *Section 6.04*. In addition, the

Administrative Agent agrees to take such actions as are reasonably requested by the Borrower and at the Borrower's expense (or where applicable permit the Borrower (or its agent or representative to take such actions) to terminate (or to evidence the termination) the Liens and security interests created by the Loan Documents when all the Obligations are Paid in Full. Any representation, warranty or covenant contained in any Loan Document relating to any such Equity Interests, asset or subsidiary of the Borrower shall no longer be deemed to be made once such Equity Interests or asset or subsidiary is so conveyed, sold, leased, assigned, transferred or disposed of.

Section 9.21    Power of Attorney. Each Lender and each Issuing Bank hereby (i) authorizes the Administrative Agent as its agent and attorney-in-fact to execute and deliver, on behalf of and in the name of such Lender or Issuing Bank (or Affiliate), all and any Loan Documents (including Security Documents) and related documentation, (ii) authorizes the Administrative Agent to appoint any further agents or attorneys-in-fact to execute and deliver, or otherwise to act, on behalf of and in the name of the Administrative Agent for any such purpose and (iii) authorizes the Administrative Agent to delegate its powers under this power of attorney and to do any and all acts and to make and receive all declarations that are deemed necessary or appropriate to the Administrative Agent.

Section 9.22    PATRIOT Act Notice. Each Lender, each Issuing Bank, the Administrative Agent (for itself and not on behalf of any Lender) and the Collateral Agent hereby notifies each Loan Party that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name, address and taxpayer information number of each Loan Party and other information that will allow such Lender, such Issuing Bank, the Administrative Agent or the Collateral Agent, as applicable, to identify such Loan Party in accordance with the PATRIOT Act. The Borrower shall, promptly following a request by any Lender, any Issuing Bank, the Administrative Agent or the Collateral Agent, provide such documentation and other information that such Lender, such Issuing Bank, the Administrative Agent or the Collateral Agent, as applicable, reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money-laundering rules and regulations, including the PATRIOT Act.

Section 9.23    No Advisory or Fiduciary Relationship. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent, the Lead Arrangers, and the other Agents are arm's length commercial transactions between the Borrower and its Affiliates, on the one hand, and the Administrative Agent, the Lead Arrangers, and the other Agents, on the other hand, (B) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent, the Lead Arrangers, and the other Agents each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any of its Affiliates, or any other person and (B) neither the Administrative Agent, the Lead Arrangers, nor any of the other Agents has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the

-171-

other Loan Documents; and (iii) the Administrative Agent, the Lead Arrangers, and the other Agents and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and neither the Administrative Agent, the Lead Arrangers, nor any of the other Agents has any obligation to disclose any of such interests to the Borrower or its Affiliates. To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Administrative Agent, the Lead Arrangers, and the other Agents with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 9.24    <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 9.25    <u>Parties Including Trustees; Bankruptcy Court Proceedings</u>. This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon the Loan Parties, the estate of each Loan Party, and any trustee, other estate representative or any successor in interest of each Loan Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Agents and the Secured Parties and their respective assigns, transferees and endorsees. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of the Loan Parties to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Collateral Agent file financing statements or otherwise perfect its Liens under applicable law. The terms and provisions of this Agreement are for the purpose of defining the

-172-

relative rights and obligations of the Loan Parties, the Agents and Secured Parties with respect to the transactions contemplated hereby and no Person (other than the Indemnitees) shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

Section 9.26    Inconsistency. In the event of any inconsistency between the terms and conditions of this Agreement and of the DIP Orders, the provisions of the DIP Orders shall govern and control.

Section 9.27    Pre-Petition First Lien Lender Consent. Each Pre-Petition First Lien Lender signatory hereto hereby irrevocably (x) consents, in their capacity as a Pre-Petition First Lien Lender, to the terms of this Agreement and the other Loan Documents and the entry of the Interim Order and the Final Order, (y) authorizes and directs the Administrative Agent, acting at the direction of the Required Lenders, to, in a manner determined by the Administrative Agent, credit bid all or any portion of the Pre-Petition First Lien Obligations in connection with any proposed sale of all or any portion of the assets of any or all of the Loan Parties (a "***Credit Bid Transaction***") and (z) in connection with any Credit Bid Transaction, consents to the assignment and delegation to a Qualified Purchaser of such rights and obligations under the Pre-Petition First Lien Credit Agreement, the other Pre-Petition First Lien Loan Documents, this Agreement and the other Loan Documents, in each case as the Administrative Agent determines at the direction of the Required Lenders in order to consummate such Credit Bid Transaction (and each such Pre-Petition First Lien Lender shall execute and deliver such documents as the Agents reasonably requests to evidence such assignment and delegation).

Section 9.28    Lender Consent to Credit Bid. Each Lender hereby irrevocably (x) authorizes and directs the Administrative Agent to, in a manner determined by the Administrative Agent at the direction of the Required Lenders, credit bid all or any portion of the Obligations in connection with any Credit Bid Transaction and (y) in connection with any Credit Bid Transaction, consents to the assignment and delegation to a Qualified Purchaser of such rights and obligations under this Agreement and the other Loan Documents, in each case as the Administrative Agent determines in order to consummate such Credit Bid Transaction (and each such Lender shall execute and deliver such documents as the Administrative Agent reasonably requests to evidence such assignment and delegation).

## ARTICLE X
### Collateral

Section 10.01    Grant of Security Interest.   As collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of all Obligations, each Loan Party hereby collaterally assigns, pledges and grants to the Collateral Agent, for the benefit of the Secured Parties, a continuing first priority (subject to the Superpriority Carveout and as otherwise set forth in the applicable DIP Order) security interest in all property and assets of such Loan Party, whether now owned or existing or hereafter acquired or arising, or in which such Loan Party now has or at any time in the future may acquire any right, title or interest, regardless of where located, including the following:

(i)        all Accounts, including all Receivables;

(ii)      all contract rights;

(iii)     all chattel paper;

(iv)     all documents;

(v)      all instruments;

(vi)     all supporting obligations and letter-of-credit rights;

(vii)    all General Intangibles (including payment intangibles, intercompany accounts, Intellectual Property and software);

(viii)   all inventory and other goods;

(ix)     all motor vehicles, equipment and fixtures;

(x)      all Investment Property, financial assets and all securities accounts;

(xi)     all money, cash, cash equivalents, securities, and other property of any kind;

(xii)    all deposit accounts;

(xiii)   all notes, and all documents of title;

(xiv)    all commercial tort claims;

(xv)     all real property owned or leased by such Loan Party;

(xvi)    all deposit accounts;

(xvii)   all books, records and other property related to or referring to any of the foregoing, including books, records, account ledgers, customer lists, supplier lists, data processing records, computer software and other property, and General Intangibles at any time evidencing or relating to any of the foregoing or are otherwise necessary or helpful in the collection thereof or realization thereupon;

(xviii)  all other personal property of such Loan Party, including, subject to entry of the Final Order, proceeds from any avoidance actions under Chapter 5 of the United States Bankruptcy Code ("**Avoidance Actions**") and recoveries therefrom (but not the actions thereunder); and

(xix)    all accessions to, substitutions for, and replacements, products and proceeds of any of the foregoing, including, but not limited to, dividends or distributions on Investment Property, rents, profits, income and benefits, proceeds of any insurance policies, claims against third parties, and condemnation or requisition payments with respect to all or any of the foregoing.

-174-

All of the foregoing is herein collectively referred to as the "***Collateral***"; <u>provided</u> that the Collateral shall exclude Excluded Assets.  For the avoidance of doubt, any lien or security interest created herein in favor of the Collateral Agent, for the benefit of the Secured Parties, in (x) any Securitization Assets shall be automatically released immediately upon and concurrently with the sale thereof pursuant to a Qualified Securitization Financing, to the extent, with respect to the PNC Securitization, transferred prior to the Purchase and Sale Termination Date (as defined in the PNC Purchase and Sale Agreement as in effect on the date hereof) but giving effect to any extension thereof (y) any Credit Support Assets shall be automatically released immediately upon and concurrently with the sale thereof pursuant to a Permitted Credit Support Arrangement; provided; however; that in each case the lien and security interest of the Collateral Agent shall attach to any consideration received by any Loan Party for the assets so disposed of.

Section 10.02  <u>Perfection of Security Interest</u>.

(a)     Notwithstanding the perfection of any security interest granted hereunder pursuant to the order of the Bankruptcy Court under the applicable DIP Order, each Loan Party agrees that the Collateral Agent, to the fullest extent permitted by applicable law and the Collateral and Guarantee Requirement, may file or authorize the filing of one or more financing statements disclosing the Collateral Agent's Liens on the Collateral.  Each Loan Party agrees that such financing statements may describe the Collateral in the same manner as described herein or as "all assets" or "all personal property" of the such Loan Party, whether now owned or hereafter existing or acquired by the such Loan Party or such other description as the Collateral Agent, in its sole judgment, determines is necessary or advisable.

(b)     In the event that a motion for dismissal from any of the Chapter 11 Cases is filed with respect to any Subsidiary and Equity Interests of such Subsidiary are owned by a Loan Party, to the extent such Equity Interests are in certificated form and are not already in the Collateral Agent's possession, and the extent permitted by the Collateral and Guarantee Requirement, such Loan Party shall promptly deliver all certificates or instruments at any time representing or evidencing such Equity Interests to the Collateral Agent, and shall be in suitable form for transfer by delivery, or shall be accompanied by instruments of transfer or assignment, duly executed in blank, all in form and substance sufficient to transfer such instruments to the Collateral Agent (or otherwise reasonably satisfactory to the Collateral Agent).  The Collateral Agent shall have the right, at any time, after the occurrence and during the continuance of an Event of Default, to transfer to or to register in the name of the Collateral Agent or its nominee any Equity Interests in such Subsidiary.  In addition, the Collateral Agent shall have the right at any time to exchange certificates or instruments representing or evidencing Equity Interests of such Subsidiaries for certificates or instruments of smaller or larger denominations during the continuance of an Event of Default.

Section 10.03  <u>Right to Cure</u>.  The Collateral Agent shall have the right (but not the obligation), to pay any amount or do any act required of any Loan Party hereunder or under any other Loan Document (other than in respect of principal, interest or fees on the Loans) in order to preserve, protect, maintain, or enforce the Obligations, the Collateral, or the Collateral Agent's Liens on the Collateral, and which any Loan Party fails to pay or do, including payment of any judgment against any Loan Party, any insurance premium, any warehouse charge, any finishing or processing charge, any landlord's or bailee's claim, and any other obligation secured by a Lien

-175-

upon or with respect to the Collateral; *provided, however,* that unless an Event of Default has occurred and is continuing or time is of the essence, the Collateral Agent shall not exercise this power without first making demand on the applicable Loan Party and such Loan Party failing to promptly comply therewith.  All payments that the Collateral Agent or any Lender makes under this *Section 10.03* and all out-of-pocket costs and reasonable expenses that the Collateral Agent pays or incurs in connection with any action taken by it hereunder shall be considered part of the Obligations.  Any payment made or other action taken by the Collateral Agent under this *Section 10.03* shall be without prejudice to any right to assert an Event of Default hereunder and to proceed thereafter as herein provided.

Section 10.04  <u>The Collateral Agent's and Lenders' Rights, Duties, and Liabilities</u>.  The Loan Parties assume all responsibility and liability arising from or relating to the use, sale, or other disposition of the Collateral.  The Obligations shall not be affected by any failure of the Secured Parties to take any steps to perfect the Collateral Agent's Liens on the Collateral or to collect or realize upon the Collateral, nor shall loss of or damage to the Collateral release any Loan Party from any of the Obligations.  Nothing in this Agreement shall be interpreted as giving the Collateral Agent responsibility for or any duty concerning the validity, perfection, priority or enforceability of the Liens granted hereunder or giving the Collateral Agent any obligation to take any action to procure or maintain such validity, perfection, priority or enforceability, including, without limitation, any duty to file any financing statements, amendments, continuation statements or other documents to perfect or maintain the perfection of the security interest granted hereunder.

Section 10.05  <u>Rights in Respect of Investment Property</u>.  During the existence of an Event of Default, subject to any order of the Bankruptcy Court (including the DIP Orders), the Collateral Agent may, upon written notice to the relevant Loan Party, (i) transfer or register in the name of the Collateral Agent or any of its nominees, for the benefit of the Secured Parties, any or all of the Collateral consisting of Investment Property, the proceeds thereof (in cash or otherwise), and all liens, security, rights, remedies and claims of any Loan Party with respect thereto (as used in this *Section 10.05* collectively, the "***Pledged Collateral***") held by the Collateral Agent hereunder, and the Collateral Agent or its nominee, and (ii) exercise all voting and corporate rights at any meeting of any corporation, partnership, or other business entity issuing any of the Pledged Collateral and any and all rights of conversion, exchange, subscription, or any other rights, privileges, or options pertaining to any of the Pledged Collateral as if it were the absolute owner thereof, including the right to exchange at its discretion any and all of the Pledged Collateral upon the merger, amalgamation, consolidation, reorganization, recapitalization, or other readjustment of any corporation, partnership, or other business entity issuing any of such Pledged Collateral or upon the exercise by any such issuer or the Collateral Agent of any right, privilege or option pertaining to any of the Pledged Collateral, and in connection therewith, to deposit and deliver any and all of the Pledged Collateral with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as it may determine, all without liability except to account for property actually received by it, but the Collateral Agent shall have no duty to exercise any of the aforesaid rights, privileges or options, and the Collateral Agent shall not be responsible for any failure to do so or delay in so doing, (iii) to the extent permitted under applicable law, after the Collateral Agent's giving of the notice specified in this *Section 10.05*, all rights of any Loan Party to exercise the voting and other consensual rights which it would otherwise be entitled to exercise and to receive the dividends, interest and other distributions which it would otherwise be authorized to receive and retain thereunder shall be suspended until such Event of Default shall no

-176-

longer exist, and all such rights shall, until such Event of Default shall no longer exist, thereupon become vested in the Collateral Agent which shall thereupon have the sole right to exercise such voting and other consensual rights and to receive and hold as Pledged Collateral such dividends, interest, and other distributions (provided that any such Pledged Collateral the Collateral Agent shall collect shall promptly be returned to each applicable Loan Party after such Event of Default is cured or waived to the extent such Pledged Collateral was not applied to repay the Obligations), and (iv) each Loan Party shall promptly execute and deliver (or cause to be executed and delivered) to the Collateral Agent all such proxies and other instruments as are necessary or that the Collateral Agent or a Secured Party may reasonably request for the purpose of enabling the Collateral Agent to exercise the voting and other rights which it is entitled to exercise pursuant to this _Section 10.05_ and to receive the dividends, interest, and other distributions which it is entitled to receive and retain pursuant to this _Section 10.05_.

Section 10.06  Remedies.

(a)    Each Loan Party recognizes that the Collateral Agent may be unable to effect a public sale of any or all of the Collateral that constitutes Equity Interests to be sold by reason of certain prohibitions contained in the laws of any jurisdiction outside the United States or in applicable federal, provincial, territorial or state securities laws but may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such Collateral to be sold for their own account for investment and not with a view to the distribution or resale thereof. Each Loan Party acknowledges and agrees that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall, to the extent permitted by law, be deemed to have been made in a commercially reasonable manner. Unless required by applicable law, the Collateral Agent shall not be under any obligation to delay a sale of any of such Collateral to be sold for the period of time necessary to permit the issuer of such Equity Interests to register such Equity Interests under the laws of any jurisdiction outside the United States or under any applicable federal, provincial, territorial or state securities laws, even if such issuer would agree to do so. Each Loan Party further agrees to do or cause to be done, to the extent that such Loan Party may do so under applicable law, all such other acts and things as may be necessary to make such sales or resales of any portion or all of such Collateral or other property to be sold valid and binding and in compliance with any and all applicable laws at the Loan Parties' expense. Each Loan Party further agrees that a breach of any of the covenants contained in this _Section 10.06(a)_ will cause irreparable injury to the Secured Parties for which there is no adequate remedy at law and, as a consequence, agrees that each covenant contained in this _Section 10.06(a)_ shall be specifically enforceable against such Loan Party, and each Loan Party hereby waives and agrees, to the fullest extent permitted by law, not to assert as a defense against an action for specific performance of such covenants that (i) such Loan Party's failure to perform such covenants will not cause irreparable injury to the Secured Parties or (ii) the Secured Parties have an adequate remedy at law in respect of such breach. Each Loan Party further acknowledges the impossibility of ascertaining the amount of damages which would be suffered by the Secured Parties by reason of a breach of any of the covenants contained in this _Section 10.06(a)_ and, consequently, agrees that, if such Loan Party shall breach any of such covenants and the Secured Parties shall sue for damages for such breach, such Loan Party shall pay to the Collateral Agent, for the benefit of the Secured Parties, as liquidated damages and not

-177-

as a penalty, an aggregate amount equal to the value of the Collateral or other property to be sold on the date the Collateral Agent shall demand compliance with this *Section 10.06(a)*.

(b)      Subject to the terms of the DIP Orders, if an Event of Default has occurred and is continuing, the Collateral Agent shall have for the benefit of the Secured Parties, in addition to all other rights of the Secured Parties, the rights and remedies of a secured party under the UCC, and without limiting the generality of the foregoing, the Collateral Agent shall be empowered and entitled to: (i) take possession of, foreclose on and/or request a receiver of the Collateral and keep it on any Loan Party's premises at any time, at no cost to the Secured Parties, or remove any part of it to such other place or places as the Collateral Agent may desire, or the Loan Parties shall, upon the Collateral Agent's or the Required Lenders' demand, at the Loan Parties' cost, assemble the Collateral and make it available to the Collateral Agent at a place reasonably convenient to the Collateral Agent; (ii) exercise set-off rights on cash collateral or deposits (other than, for the avoidance of doubt, with respect to Excluded Accounts); (iii) sell and deliver any Collateral at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as the Collateral Agent deems advisable, in its sole discretion, and postpone or adjourn any sale of the Collateral by an announcement at the time and place of sale or of such postponed or adjourned sale; (iv) hold, lease, develop, manage, operate, control and otherwise use the Collateral upon such terms and conditions as may be reasonable under the circumstances (making such repairs, alterations, additions and improvements and taking other actions, from time to time, as may be reasonably necessary or desirable), exercise all such rights and powers of each Loan Party with respect to the Collateral, whether in the name of such Loan Party or otherwise, including without limitation the right to make, cancel, enforce or modify leases, obtain and evict tenants, and demand, sue for, collect and receive all rents, in each case, in accordance with the standards applicable to the Collateral Agent under the Loan Documents, and (v) take any other actions, as may be reasonably necessary or desirable, in connection with the Collateral (including preparing for the disposition thereof), and all actual, reasonable, out-of-pocket fees and expenses incurred in connection therewith shall be borne by the Loan Parties.  Promptly following written demand from the Collateral Agent, the applicable Loan Party shall direct the grantor or licensor of, or the contracting party to, any property agreement with respect to any property to recognize and accept the Collateral Agent, for the benefit of and on behalf of the Secured Parties, as the party to such agreement for any and all purposes as fully as it would recognize and accept such Loan Party and the performance of such Loan Party thereunder and, in such event, without further notice or demand and at such Loan Party's sole cost and expense, the Collateral Agent, for the benefit of and on behalf of the Secured Parties, may exercise all rights of such Loan Party arising under such agreements.  Without in any way requiring notice to be given in the following manner, each Loan Party agrees that any notice by the Collateral Agent of sale, disposition or other intended action hereunder or in connection herewith, whether required by the UCC or otherwise, shall constitute reasonable notice to such Loan Party if such notice is mailed by registered or certified mail, return receipt requested, postage prepaid, or is delivered personally against receipt, at least five (5) Business Days prior to such action to the Loan Parties' address specified in or pursuant to ***Error! Reference source not found.***.  If any Collateral is sold on terms other than payment in full at the time of sale, no credit shall be given against the Obligations until the Collateral Agent receives payment, and if the buyer defaults in payment, the Collateral Agent may resell the Collateral.  In the event the Collateral Agent seeks to take possession of all or any portion of the Collateral by judicial process, each Loan Party irrevocably waives (to the extent permitted by applicable law): (A) the posting of any bond, surety or security with respect thereto which might otherwise be

-178-

required; (B) any demand for possession prior to the commencement of any suit or action to recover the Collateral; and (C) any requirement that the Collateral Agent retain possession and not dispose of any Collateral until after trial or final judgment.  Each Loan Party agrees that the Collateral Agent has no obligation to preserve rights to the Collateral or marshal any Collateral for the benefit of any Person.  The Collateral Agent is hereby granted a license or other right to use, without charge, each Loan Party's labels, patents, copyrights, name, trade secrets, trade names, trademarks and advertising matter, or any similar property, in completing production of, advertising or selling any Collateral, and each such Loan Party's rights under all licenses and all franchise agreements shall inure to the Collateral Agent's benefit for such purpose.  The Collateral Agent will return any excess to the applicable Loan Party and the Loan Parties shall remain liable for any deficiency.  The proceeds of sale shall be applied as required pursuant to *Sections 2.18* and *12.01* hereof.

(c)     Notwithstanding anything herein to the contrary, (i) neither the Collateral Agent nor any Lender shall take any action under this *Section 10.06(c)* (or similar provisions of any Loan Document) except after compliance with any applicable notice requirements applicable thereto set forth in accordance with the DIP Orders and (ii) following the occurrence and during the continuance of an Event of Default, all amounts received by the Collateral Agent on account of the Obligations, from the Loan Parties and/or all amounts with respect to the proceeds of any Collateral shall be (subject to the proviso below) promptly disbursed by the Collateral Agent as required pursuant to *Sections 2.18* and *12.01* hereof.

## ARTICLE XI
### Guaranty

Section 11.01  Guaranty, Limitation of Liability

(a)     Each Guarantor, jointly and severally, hereby absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, to the Administrative Agent, for the benefit of the Secured Parties and their respective successors, endorsees, transferees and assigns, the performance and punctual payment when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Obligations of each other Loan Party now or hereafter existing under or in respect of the Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such Obligations being the "**Guaranteed Obligations**"), and agrees to pay any and all reasonable out-of-pocket expenses (including reasonable out-of-pocket fees and expenses of counsel to the extent reimbursable pursuant to **Error! Reference source not found.** but excluding allocated costs of in-house counsel) incurred by the Administrative Agent in enforcing any rights under this Guaranty or any other Loan Document.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Loan Party to the Administrative Agent or any Secured Party under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization, winding-up or similar proceeding involving such other Loan Party.

US-DOCS\115808185.26

(b)     Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to the Administrative Agent or any Secured Party under this Guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor so as to maximize the aggregate amount paid to the Administrative Agent and the Lenders under or in respect of the Loan Documents.

Section 11.02   <u>Guaranty Absolute</u>.   Each Guarantor Guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Administrative Agent or any Secured Party with respect thereto.   The Obligations of each Guarantor under or in respect of this Guaranty are independent of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Guaranty, irrespective of whether any action is brought against the Borrower or any other Loan Party or whether the Borrower or any other Loan Party is joined in any such action or actions.   The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)     any lack of validity or enforceability of any provision under this Agreement, any Loan Document, any agreement or instrument relating thereto, any of the Guaranteed Obligations or any guarantee or right of offset with respect thereto at any time or from time to time held by any Secured Party;

(b)     any renewal, extension or acceleration or other change in the time, manner or place of payment of, or in any other term of, or any increase in the amount of, all or any of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents, or any other amendment, supplement, modification or waiver of or any consent to or departure from any Loan Document, including any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise;

(c)     the validity, perfection, non-perfection or lapse in perfection, priority or avoidance of any security interest or lien, the release of any or all collateral securing, or purporting to secure, the Guaranteed Obligations or any other impairment of such collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

(d)     any manner of application of Collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral for all or any of the Guaranteed Obligations or any other Obligations of any Loan Party under the Loan Documents or any other assets of any Loan Party;

(e)     any change, restructuring, reorganization or termination of the corporate structure or existence of any Loan Party or any of their Subsidiaries and any corresponding restructuring of the Guaranteed Obligations;

-180-

(f)    any failure of the Administrative Agent or any Secured Party to disclose to any Loan Party any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party now or hereafter known to the Administrative Agent or such Secured Party, as the case may be (each Guarantor waiving any duty on the part of the Administrative Agent and the Secured Parties to disclose such information);

(g)    the failure of any other Person to execute or deliver this Guaranty or the release or reduction of liability of any Guarantor or surety with respect to the Guaranteed Obligations;

(h)    any failure or omission to assert or enforce or agreement or election not to assert or enforce, delay in enforcement, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under any Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations;

(i)    any settlement, compromise, release, or discharge of, or acceptance or refusal of any offer of payment or performance with respect to, or any substitutions for, the Guaranteed Obligations or any subordination of the Guaranteed Obligations to any other obligations;

(j)    any exercise of remedies with respect to any security for the Guaranteed Obligations (including, without limitation, any collateral, including the Collateral securing or purporting to secure any of the Guaranteed Obligations) at such time and in such order and in such manner as the Administrative Agent and the Secured Parties may decide and whether or not every aspect thereof is commercially reasonable and whether or not such action constitutes an election of remedies and even if such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy that any Guarantor would otherwise have and without limiting the generality of the foregoing or any other provisions hereof, each Guarantor hereby expressly waives any and all benefits which might otherwise be available to such Guarantor under applicable law; and

(k)    any other circumstance (including any statute of limitations) or any existence of or reliance on any representation by the Administrative Agent or any Secured Party that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety, in its capacity as a guarantor or surety (other than payment or performance).

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Administrative Agent or any Secured Party or any other Person, for whatever reason, all as though such payment had not been made.

Section 11.03    Waivers and Acknowledgments.

-181-

(a)       Each Guarantor hereby unconditionally and irrevocably waives (to the extent permitted by applicable law) any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(b)       Each Guarantor hereby unconditionally and irrevocably waives (to the extent permitted by applicable law) (i) any defense arising by reason of any claim or defense based upon an election of remedies by the Administrative Agent or any Lender that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Loan Parties, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the Obligations of such Guarantor hereunder.

(c)       Each Guarantor acknowledges that the Administrative Agent may, to the extent permitted by applicable law and the DIP Orders, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Guaranty, foreclose under any Loan Document by non-judicial sale, and each Guarantor hereby waives (to the extent permitted by applicable law) any defense to the recovery by the Administrative Agent and the Secured Parties against such Guarantor of any deficiency after such non-judicial sale and any defense or benefits that may be afforded by applicable law.

(d)       Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of the Administrative Agent or any Secured Party to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party or any of its Subsidiaries now or hereafter known by the Administrative Agent or such Secured Party, as the case may be.

(e)       Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in _Section 11.02_ and this _Section 11.03_ are knowingly made in contemplation of such benefits.

Section 11.04    Subrogation.    Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against the Borrower or any other Loan Party that arise from the existence, payment, performance or enforcement of such Guarantor's Obligations under or in respect of this Guaranty or any other Loan Document, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Administrative Agent or any Secured Party against the Borrower or any other Loan Party, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from the Borrower or any other Loan Party, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until Payment in Full. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of (a) Payment in Full and (b) the Maturity Date, such amount shall be received and held in trust for the benefit of the Administrative Agent and the Secured Parties, shall be segregated from other property and funds of such Guarantor

and shall forthwith be paid or delivered to the Administrative Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Loan Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising. If Payment in Full and the Maturity Date shall have occurred, the Administrative Agent will, at any Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Guaranty.

Section 11.05  <u>Continuing Guaranty; Assignments</u>.  This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until Payment in Full, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Administrative Agent and the Secured Parties and their respective successors, transferees and assigns.  Without limiting the generality of clause (c) of the immediately preceding sentence, any Eligible Assignee that has been assigned or transferred all or any portion of a Lender's Loans, Commitments or rights and obligations under this Agreement in accordance with **Error! Reference source not found.**, shall thereupon become vested with all the benefits granted to such transferring Lender under this Guaranty.  No Guarantor shall have the right to assign its rights hereunder or any interest herein or delegate any of its duties, liabilities or obligations hereunder or under any other Loan Document without the prior written consent of the Required Lenders, except as otherwise permitted hereby.


ARTICLE XII
**Application of Proceeds**

Section 12.01  <u>Application of Proceeds.</u>

(a)  Subject to clause (b) of this <u>*Section 12.01*</u> and the DIP Orders, if (x) the Obligations have been accelerated in accordance with <u>*Section 7.01*</u> or (y) an Event of Default shall have occurred and be continuing and the Required Lenders shall direct the Collateral Agent to apply any funds received in accordance with this <u>*Section 12.01*</u>, then in each case the Collateral Agent shall apply all monies or any part of the Collateral and/or net proceeds thereof (after deducting fees and expenses as applicable) realized through the exercise by the Collateral Agent of its remedies hereunder, whether or not held in any Controlled Account, and all other payments received by any Secured Party, in the following order:

<u>First</u>, to the Agents ratably to pay incurred and unpaid costs and expenses (including expense reimbursement) or indemnities then due, in each case under the Loan Documents (including with respect to any Rolled-Up Obligations), until paid in full;

<u>Second</u>, to the Agents ratably to pay incurred and unpaid fees then due under the Loan Documents (including with respect to any Rolled-Up Obligations), until paid in full;

US-DOCS\115808185.26

<u>Third</u>, to pay interest due in respect of all Protective Advances (including with respect to any Rolled-Up Obligations), until paid in full;

<u>Fourth</u>, to pay principal due in respect of all Protective Advances (including with respect to any Rolled-Up Obligations), until paid in full;

<u>Fifth</u>, to the Lenders, ratably, to pay any costs and expenses (including expense reimbursement) or indemnities then due under the Loan Documents (including with respect to any Rolled-Up Obligations), until paid in full;

<u>Sixth</u>, to the Lenders, ratably, to pay any fees or premiums then due under the Loan Documents (including with respect to any Rolled-Up Obligations), until paid in full;

<u>Seventh</u>, ratably, to pay interest due in respect of the Obligations (including with respect to any Rolled-Up Obligations), until paid in full;

<u>Eighth</u>, ratably, (i) to pay the principal due in respect of the Obligations (including with respect to any Rolled-Up Obligations) until paid in full and (ii) to or as directed by the Collateral Agent, to Cash Collateralize the outstanding Letters of Credit until the aggregate L/C Exposure has been Cash Collateralized;

<u>Ninth</u>, ratably, to pay any other Obligations (including with respect to any Rolled-Up Obligations), until paid in full; and

<u>Tenth</u>, to the Borrower (to be wired to the Borrower's designated account) or such other Person entitled thereto under applicable Law.

(b)        Notwithstanding the foregoing, with respect to any Letters of Credit issued by an Issuing Bank, if such Issuing Bank, or the Collateral Agent on behalf of such Issuing Bank, shall have received any Collateral to "cash collateralize" any such Letter of Credit, all such Collateral shall first be applied to satisfy any reimbursement obligations and other obligations owing to the Issuing Bank in respect of such Letter of Credit before it may be applied as set forth in clause (a), above.

*[Remainder of page left intentionally blank.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

CENTRIC BRANDS INC.,
as Borrower


By:
Name:
Title:

ACF FINCO I LP, as
Administrative Agent and Collateral Agent


By:
Name:
Title:

[Signature Page to Senior Secured Priming and Superpriority Debtor-In-Possession Asset-Based
Revolving Credit Agreement]

US-DOCS\115808185.26  Centric - Option A - ABL DIP Credit Agreement [Execution Version]                05-20-2020

HPS INVESTMENT PARTNERS, LLC, as
Documentation Agent


By:
Name:
Title:

[ ● ], as Lender

By:
Name:
Title:

## **Exhibit 3**

**DIP Term Loan Credit Agreement**

**$160,000,000**

**SENIOR SECURED**

**DEBTOR-IN-POSSESSION CREDIT, SECURITY AND GUARANTY AGREEMENT**

Dated as of May 20, 2020,

among

CENTRIC BRANDS INC.,
as Debtor, Debtor-in-Possession and Borrower,

THE GUARANTORS PARTY HERETO,

each as a Debtor and Debtor-in-Possession,

THE LENDERS PARTY HERETO,

and

U.S. BANK NATIONAL ASSOCIATION,
as Administrative Agent and Collateral Agent

# TABLE OF CONTENTS

**Page**

## ARTICLE I
### Definitions

SECTION 1.01    Defined Terms ...................................................................................1
SECTION 1.02    Terms Generally................................................................................46
SECTION 1.03    [Reserved .........................................................................................47
SECTION 1.04    Currency Translation ........................................................................47
SECTION 1.05    [Reserved] ........................................................................................47
SECTION 1.06    Cashless Rolls ..................................................................................47

## ARTICLE II
### The Credits

SECTION 2.01    Loans.................................................................................................47
SECTION 2.02    Loans and Borrowings ......................................................................48
SECTION 2.03    Requests for Borrowings...................................................................48
SECTION 2.04    [Reserved .........................................................................................49
SECTION 2.05    [Reserved .........................................................................................49
SECTION 2.06    [Reserved] ........................................................................................49
SECTION 2.07    Interest Elections..............................................................................49
SECTION 2.08    Termination and Reduction of Commitments....................................50
SECTION 2.09    Repayment of Loans; Evidence of Debt ...........................................50
SECTION 2.10    Repayment of Loans .........................................................................51
SECTION 2.11    Prepayment of Loans ........................................................................52
SECTION 2.12    Fees ..................................................................................................52
SECTION 2.13    Interest...............................................................................................52
SECTION 2.14    Alternate Rate of Interest .................................................................53
SECTION 2.15    Increased Costs ................................................................................54
SECTION 2.16    Break Funding Payments .................................................................56
SECTION 2.17    Taxes.................................................................................................56
SECTION 2.18    Payments Generally; Pro Rata Treatment; Sharing of Set-offs ..........60
SECTION 2.19    Mitigation Obligations; Replacement of Lenders................................62
SECTION 2.20    Inability to Determine Rates ..............................................................63
SECTION 2.21    Illegality.............................................................................................65
SECTION 2.22    [Reserved] ........................................................................................65
SECTION 2.23    Defaulting Lenders............................................................................65
SECTION 2.24    Conversion to Exit Facility Agreement ..............................................67

## ARTICLE III
### Representations and Warranties

SECTION 3.01    Organization; Powers.........................................................................67
SECTION 3.02    Authorization .....................................................................................68

SECTION 3.03    Enforceability................................................................................68
SECTION 3.04    Governmental Approvals ...............................................................69
SECTION 3.05    Financial Statements ......................................................................69
SECTION 3.06    No Material Adverse Effect ............................................................69
SECTION 3.07    Title to Properties; Possession Under Leases ......................................70
SECTION 3.08    Subsidiaries ...................................................................................70
SECTION 3.09    Litigation; Commercial Tort Claims; Compliance with Laws ...........71
SECTION 3.10    Federal Reserve Regulations...........................................................72
SECTION 3.11    Investment Company Act ................................................................72
SECTION 3.12    Use of Proceeds..............................................................................72
SECTION 3.13    Tax Returns....................................................................................72
SECTION 3.14    No Material Misstatements .............................................................73
SECTION 3.15    Employee Benefit Plans ..................................................................74
SECTION 3.16    Environmental Matters....................................................................74
SECTION 3.17    Security Documents ........................................................................75
SECTION 3.18    Location of Real Property ...............................................................76
SECTION 3.19    [Reserved] .....................................................................................76
SECTION 3.20    Labor Matters.................................................................................76
SECTION 3.21    Insurance .......................................................................................76
SECTION 3.22    [Reserved] .....................................................................................76
SECTION 3.23    Material Agreements; No Violation; No Default................................77
SECTION 3.24    [Reserved] .....................................................................................77
SECTION 3.25    PATRIOT Act, etc .........................................................................77
SECTION 3.26    Sanctions Laws ..............................................................................77
SECTION 3.27    Anti-Corruption Laws and Sanctions Laws.......................................78
SECTION 3.28    Compliance With Collateral and Guarantee Requirement..................78
SECTION 3.29    Reorganization Matters...................................................................78

### ARTICLE IV
### Conditions of Lending

SECTION 4.01    All Credit Events............................................................................79
SECTION 4.02    Closing Date...................................................................................80
SECTION 4.03    Delayed Draw Term Loans ..............................................................83

### ARTICLE V
### Affirmative Covenants

SECTION 5.01    Existence; Businesses and Properties ................................................83
SECTION 5.02    Insurance .......................................................................................84
SECTION 5.03    Taxes .............................................................................................85
SECTION 5.04    Financial Statements, Reports, etc ...................................................86
SECTION 5.05    Litigation and Other Notices............................................................89
SECTION 5.06    Compliance with Laws ....................................................................90
SECTION 5.07    Maintaining Records; Inspections.....................................................90
SECTION 5.08    Payment of Obligations...................................................................91
SECTION 5.09    Use of Proceeds..............................................................................91

SECTION 5.10    Compliance with Environmental Laws..................................................91
SECTION 5.11    Further Assurances; Additional Security.............................................91
SECTION 5.12    Fiscal Year; Accounting.......................................................................92
SECTION 5.13    [Reserved].............................................................................................92
SECTION 5.14    Lender Meetings....................................................................................93
SECTION 5.15    Securitization Matters...........................................................................93
SECTION 5.16    Compliance with Anti-Corruption Laws and Sanctions Laws...........93
SECTION 5.17    Post-Closing Matters.............................................................................93
SECTION 5.18    [Reserved].............................................................................................93
SECTION 5.19    Board Observers.....................................................................................93
SECTION 5.20    Compliance with Collateral and Guarantee Requirement.................94
SECTION 5.21    Cash Management...................................................................................94
SECTION 5.22    Milestones...............................................................................................94
SECTION 5.23    Chief Restructuring Officer and Transformation Office...................95

## ARTICLE VI
## Negative Covenants

SECTION 6.01    Indebtedness...........................................................................................96
SECTION 6.02    Liens.......................................................................................................99
SECTION 6.03    Sale and Lease-Back Transactions......................................................103
SECTION 6.04    Investments, Loans and Advances.......................................................104
SECTION 6.05    Mergers, Consolidations, Sales of Assets and Acquisitions..............107
SECTION 6.06    Dividends and Distributions................................................................109
SECTION 6.07    Transactions with Affiliates................................................................110
SECTION 6.08    Business of the Borrower and the Subsidiaries..................................111
SECTION 6.09    Limitation on Modifications and Payments of Indebtedness;
                Modifications of Certificate of Incorporation, By-Laws and
                Certain Other Agreements; etc............................................................111
SECTION 6.10    Financial Covenants.............................................................................114
SECTION 6.11    Limitations on Change in Fiscal Periods............................................114
SECTION 6.12    KEIP Plan.............................................................................................114
SECTION 6.13    Communications with Bankruptcy Court...........................................115
SECTION 6.14    Bankruptcy Actions.............................................................................115

## ARTICLE VII
## Events of Default

SECTION 7.01    Events of Default..................................................................................115

## ARTICLE VIII
## The Agents

SECTION 8.01    Appointment and Authority..................................................................121
SECTION 8.02    Rights as a Lender................................................................................123
SECTION 8.03    Exculpatory Provisions........................................................................123
SECTION 8.04    Reliance by Administrative Agent.......................................................124

SECTION 8.05    Delegation of Duties ........................................................................125
SECTION 8.06    Resignation of the Administrative Agent or Collateral Agent..........125
SECTION 8.07    Non-Reliance on Administrative Agent and Other Lenders..............126
SECTION 8.08    Notice of Default..............................................................................126
SECTION 8.09    Administrative Agent May File Proofs of Claim...............................126
SECTION 8.10    Indemnification .................................................................................127
SECTION 8.11    Collateral Release and Subordination ...............................................127
SECTION 8.12    Withholding Tax ................................................................................128
SECTION 8.13    Certain ERISA Matters .....................................................................128
SECTION 8.14    No Reliance on Collateral Agent's Customer Identification
                Program ...........................................................................................129
SECTION 8.15    No Other Duties, etc .........................................................................130
SECTION 8.16    Credit Agreement Controls ...............................................................130
SECTION 8.17    Actions of the Administrative Agent and the Collateral Agent.........130
SECTION 8.18    Regarding Collateral .........................................................................130

## ARTICLE IX
### Miscellaneous

SECTION 9.01    Notices ..............................................................................................132
SECTION 9.02    Survival of Agreement ......................................................................134
SECTION 9.03    Binding Effect...................................................................................135
SECTION 9.04    Successors and Assigns......................................................................135
SECTION 9.05    Expenses; Indemnity .........................................................................140
SECTION 9.06    Right of Set-off .................................................................................142
SECTION 9.07    Payments Set Aside...........................................................................142
SECTION 9.08    Applicable Law .................................................................................143
SECTION 9.09    Waivers; Amendment ........................................................................143
SECTION 9.10    Interest Rate Limitation ....................................................................146
SECTION 9.11    [Reserved].........................................................................................146
SECTION 9.12    Entire Agreement...............................................................................146
SECTION 9.13    WAIVER OF JURY TRIAL..............................................................146
SECTION 9.14    Severability .......................................................................................147
SECTION 9.15    Counterparts ......................................................................................147
SECTION 9.16    Headings ............................................................................................147
SECTION 9.17    Jurisdiction; Consent to Service of Process ......................................147
SECTION 9.18    Confidentiality ..................................................................................148
SECTION 9.19    Direct Website Communications .......................................................149
SECTION 9.20    Release of Liens and Guarantees .......................................................151
SECTION 9.21    Power of Attorney .............................................................................151
SECTION 9.22    PATRIOT Act Notice ........................................................................151
SECTION 9.23    No Advisory or Fiduciary Relationship.............................................152
SECTION 9.24    Acknowledgement and Consent to Bail-In of EEA Financial
                Institutions.......................................................................................152
SECTION 9.25    Incorporation of DIP Orders by Reference ........................................153
SECTION 9.26    Parties Including Trustees; Bankruptcy Court Proceedings ..............153
SECTION 9.27    Lender Consent to Credit Bid ...........................................................153

## ARTICLE X
### Collateral

SECTION 10.01  Grant of Security Interest .................................................................154
SECTION 10.02  Perfection of Security Interest .........................................................155
SECTION 10.03  Right to Cure ......................................................................................156
SECTION 10.04  The Collateral Agent's and Lenders' Rights, Duties, and
Liabilities ..........................................................................................156
SECTION 10.05  Rights in Respect of Investment Property ........................................156
SECTION 10.06  Remedies .............................................................................................157

## ARTICLE XI
### Guaranty

SECTION 11.01  Guaranty; Limitation of Liability ......................................................159
SECTION 11.02  Guaranty Absolute ..............................................................................160
SECTION 11.03  Waivers and Acknowledgments .........................................................162
SECTION 11.04  Subrogation .........................................................................................162
SECTION 11.05  Continuing Guaranty; Assignments ..................................................163

Exhibits and Schedules

Exhibit A          Form of Assignment and Acceptance
Exhibit B          Form of Interim Order
Exhibit C          Form of Borrowing Request
Exhibit D          Form of Variance Report
Exhibit E          [Reserved]
Exhibit F          Tax Compliance Certificates
Exhibit G-1        Initial 13-Week DIP Budget
Exhibit G-2        Initial Monthly DIP Budget

Schedule A          [Reserved]
Schedule B          Existing Earn Out Obligations
Schedule C          Hudson Notes
Schedule 1.01(b)    Immaterial Subsidiaries
Schedule 1.01(g)    Loan Parties
Schedule 2.01(a)    Initial Commitments and Lenders
Schedule 2.01(b)    Delayed Draw Commitments and Lenders
Schedule 3.01       Organization and Good Standing
Schedule 3.04       Governmental Approvals
Schedule 3.07(b)    Possession under Leases
Schedule 3.08(a)    Subsidiaries
Schedule 3.08(c)    Subscriptions
Schedule 3.09(a)    Litigation and Commercial Tort Claims
Schedule 3.13       Taxes
Schedule 3.15       Employee Benefit Plans

Schedule 3.16        Environmental Matters
Schedule 3.18        Real Property
Schedule 3.21        Insurance
Schedule 3.23        Material Agreements
Schedule 5.17        Post-Closing Matters
Schedule 6.01        Indebtedness
Schedule 6.02(a)     Liens
Schedule 6.04        Investments; Intercompany Loans
Schedule 6.07        Transactions with Affiliates
Schedule 6.09(c)     Contractual Encumbrances and Restrictions
Schedule 9.01(a)(i)  Loan Party Notice Information
Schedule 9.01(a)(ii) Administrative Agent and Collateral Agent Notice Information

This **SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT, SECURITY AND GUARANTY AGREEMENT,** dated as of May 20, 2020, (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "***Agreement***"), is made by and among, CENTRIC BRANDS INC., a Delaware corporation, as a debtor and debtor-in-possession (the "***Borrower***"), the Guarantors (as hereinafter defined) from time to time party hereto, each as a debtor and debtor-in-possession, the Lenders (as hereinafter defined) from time to time party hereto, U.S. BANK NATIONAL ASSOCIATION, as administrative agent (together with any successor administrative agent appointed pursuant hereto, in such capacity, the "***Administrative Agent***") and collateral agent (together with any successor collateral agent appointed pursuant hereto, in such capacity, the "***Collateral Agent***") for all Lenders.

**WHEREAS**, on May 18, 2020 (the "***Petition Date***"), the Borrower and certain of its Subsidiaries (collectively, the "***Debtors***" and, each individually, a "***Debtor***") commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***");

**WHEREAS**, from and after the Petition Date, each of the Debtors continues to operate its business and manage its property as a debtor and a debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code; and

**WHEREAS**, Borrower has requested that the Lenders make post-petition loans and advances and provide other financial or credit accommodations to the Debtors, and the Lenders have agreed, subject to the conditions set forth herein, to extend a senior secured credit facility to the Borrower, in an aggregate principal amount equal to $160,000,000.

**NOW, THEREFORE**, in consideration of the above premises and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

## ARTICLE I
## Definitions

SECTION 1.01    Defined Terms.  As used in this Agreement, the following terms shall have the meanings specified below:

"***ABR***" shall mean, for any day, a fluctuating interest rate *per annum* in effect from time to time, which rate *per annum* shall at all times be equal to the highest of (a) the Federal Funds Rate *plus* 1/2 of 1%, (b) the Prime Rate in effect on such date, (c) the Eurocurrency Base Rate (after giving effect to any Eurocurrency Base Rate "floor") (which rate shall be calculated based on an Interest Period of one month) *plus* 1.00% and (d) 2.00%.  Any change in the ABR due to a change in the Prime Rate, the Federal Funds Rate or the Eurocurrency Base Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate, the Federal Funds Rate or the Eurocurrency Base Rate, respectively.

"***ABR Borrowing***" shall mean a Borrowing comprised of ABR Loans.

"**_ABR Loan_**" shall mean any Loan bearing interest at a rate determined by reference to the ABR in accordance with the provisions of _Article II_.

"**_Acceptable Plan_**" shall have the meaning assigned to such term in _Section 5.22(b)_.

"**_Acquisition_**" and "**_Acquisitions_**" shall mean, with respect to any Person, (a) the acquisition by such Person, in a single transaction or in a series of related transactions, of all or substantially all of the property of another Person, or any division, line of business or other business unit of another Person or (b) at least a majority of the voting Equity Interests of another Person, in each case, whether or not involving a merger or consolidation with such other Person and whether for cash, property, services, assumption of Indebtedness, securities or otherwise; _provided_ that the acquisition of assets and the assumption of liabilities in connection with entering into licensing agreements in the ordinary course of business shall not be deemed an "Acquisition".

"**_Adjusted Eurocurrency Rate_**" shall mean for any Interest Period with respect to a Eurocurrency Loan, a rate _per annum_ equal to the higher of (a) 1.00% and (b) a rate _per annum_ determined by the Administrative Agent pursuant to the following formula:

$$\text{Adjusted Eurocurrency Rate} = \frac{\text{Eurocurrency Base Rate}}{1.00 - \text{Eurocurrency Reserve Percentage}}$$

"**_Administrative Agent_**" shall have the meaning assigned to such term in the _preamble_ hereto.

"**_Administrative Questionnaire_**" shall mean an Administrative Questionnaire in a form supplied by the Administrative Agent and any sub-agents.

"**_Advance Ratio_**" shall mean, with respect to any Securitization Financing, the ratio of upfront cash compensation to deferred payments.

"**_Affiliate_**" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified _provided_, _however_, that, for purposes of _Section 6.07_ and _Section 9.04_ the term "**_Affiliate_**" or "**_Affiliated Lender_**" shall also include (i) any person that directly or indirectly owns 10% or more of any class of Equity Interests of the person specified or that is an officer or director of the Person and (ii) any portfolio company of Tengram; _provided_ that for the avoidance of doubt, for purposes of this Agreement and the other Loan Documents, GSO, in its capacity as a Lender, shall not be deemed an Affiliate of any Loan Party.

"**_Affiliated Lender_**" shall mean any Affiliate of the Borrower other than the Borrower and its Subsidiaries.

"**_Agency Fee Letter_**" shall mean that certain Fee Letter, dated as of the date hereof, by and among U.S. Bank National Association and the Borrower.

"**_Agent Fees_**" shall have the meaning assigned to such term in _Section 2.12(a)_.

"**_Agent Parties_**" shall have the meaning assigned to such term in _Section 9.19(c)_.

"***Agreement***" shall have the meaning assigned to such term in the preamble hereto, as amended from time to time in accordance with the terms hereof.

"***AHYDO Payment***" shall mean any interest payment, mandatory prepayment or redemption pursuant to the terms of any Indebtedness in an amount that is intended or designed to cause such Indebtedness not to be treated as an "applicable high yield discount obligation" within the meaning of Section 163(i) of the Code.

"***Allowed Professional Fees***" shall have the meaning set forth in the DIP Order.

"***Anti-Corruption Laws***" shall mean all laws, rules, and regulations of any jurisdiction applicable to the Borrower or any of its Subsidiaries concerning or relating to bribery or corruption, including, without limitation:  (a) the FCPA; (b) the UK Bribery Act 2010; (c) any activity prohibited by any resolution of the U.N. Security Council under Chapter VII of the U.N. Charter or the Organization for Economic Cooperation and Development's Good Practice Guidance on Internal Controls, Ethics, and Compliance; (d) any laws implementing the principles described in the Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, signed in Paris on 17 December 1997, which entered into force on 15 February 1999, and the Convention's Commentaries; and (e) any other applicable anti-corruption or anti-bribery laws.

"***Applicable Margin***" shall mean for any day, 8.00% *per annum* in the case of any Eurocurrency Loan, and 7.00% *per annum* in the case of any ABR Loan.

"***Applicable Percentage***" shall mean, in respect of the Loans, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the total Commitments and outstanding Loans represented by (i) such Lender's Commitment at such time and (ii) without duplication, the principal amount of such Lender's outstanding Loans at such time. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on *Schedule 2.01(a)* and *Schedule 2.01(b)*, as applicable, or in the Assignment and Acceptance pursuant to which such Lender becomes a party hereto, as applicable.

"***Approved Fund***" shall have the meaning assigned to such term in *Section 9.04(b)*.

"***Asset Sale***" shall mean any loss, damage, destruction or condemnation of, or any sale, assignment, conveyance, exclusive or perpetual license, transfer or other Disposition (including any sale and leaseback of assets and any mortgage, lease or sublease of real property (including by allocation of assets by division or allocation of assets to any series of a limited liability company)) to any person of any asset or assets of any of the Borrower or any Subsidiary.

"***Assignee***" shall have the meaning assigned to such term in *Section 9.04(b)*.

"***Assignment and Acceptance***" shall mean an assignment and acceptance entered into by a Lender and an assignee, and acknowledged by the Administrative Agent and accepted by the Borrower (if required by *Section 9.04*), in substantially the form of *Exhibit A* or such other form as shall be approved by the Administrative Agent.

"***Avoidance Action***" shall have the meaning set forth in *Section 10.01*.

3

"***Bail-In Action***" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"***Bail-In Legislation***" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"***Bankruptcy Code***" is defined in the recitals to this Agreement.

"***Bankruptcy Court***" is defined in the recitals to this Agreement.

"***Benchmark Replacement***" means the sum of: (a) the alternate benchmark rate (which may include Term SOFR) that has been selected by the Required Lenders and the Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the relevant Governmental Authority or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to the Eurocurrency Base Rate for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; *provided* that, if the Benchmark Replacement as so determined would be less than zero, the Benchmark Replacement will be deemed to be zero for the purposes of this Agreement.

"***Benchmark Replacement Adjustment***" means, with respect to any replacement of the Eurocurrency Base Rate with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Required Lenders and the Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the Eurocurrency Base Rate with the applicable Unadjusted Benchmark Replacement by the relevant Governmental Authority or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the Eurocurrency Base Rate with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time.

"***Benchmark Replacement Conforming Changes***" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Required Lenders decides may be appropriate, with the reasonable consent of the Borrower, to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as

the Administrative Agent decides is reasonably necessary with the reasonable consent of the Borrower in connection with the administration of this Agreement).

"***Benchmark Replacement Date***" means the earlier to occur of the following events with respect to the Eurocurrency Base Rate:

(a)     in the case of _clause (a)_ or _(b)_ of the definition of "***Benchmark Transition Event***," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of the Eurocurrency Base Rate permanently or indefinitely ceases to provide the Eurocurrency Base Rate; or

(b)     in the case of _clause (c)_ of the definition of "***Benchmark Transition Event***," the date of the public statement or publication of information referenced therein.

"***Benchmark Transition Event***" means the occurrence of one or more of the following events with respect to the Eurocurrency Base Rate:

(a)     a public statement or publication of information by or on behalf of the administrator of the Eurocurrency Base Rate announcing that such administrator has ceased or will cease to provide the Eurocurrency Base Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Eurocurrency Base Rate;

(b)     a public statement or publication of information by the regulatory supervisor for the administrator of the Eurocurrency Base Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for the Eurocurrency Base Rate, a resolution authority with jurisdiction over the administrator for the Eurocurrency Base Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the Eurocurrency Base Rate, which states that the administrator of the Eurocurrency Base Rate has ceased or will cease to provide the Eurocurrency Base Rate permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Eurocurrency Base Rate; or

(c)     a public statement or publication of information by the regulatory supervisor for the administrator of the Eurocurrency Base Rate announcing that the Eurocurrency Base Rate is no longer representative.

"***Benchmark Transition Start Date***" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Required Lenders by notice to the Borrower, the Administrative Agent and the Lenders.

"***Benchmark Unavailability Period***" means, if the Required Lenders determine that a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the Eurocurrency Base Rate and solely to the extent that the Eurocurrency Base Rate has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the Eurocurrency Base Rate for all purposes hereunder in accordance with the Section titled "Effect of Benchmark Transition Event" and (y) ending at the time that a Benchmark Replacement has replaced the Eurocurrency Base Rate for all purposes hereunder pursuant to *Section 2.20*.

"***Beneficial Ownership Certification***" shall mean a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"***Beneficial Ownership Regulation***" shall mean 31 C.F.R. § 1010.230.

"***Benefit Plan***" shall mean any (a) "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, or (b) "plan" as defined in and subject to Section 4975 of the Code.

"***Board***" shall mean the Board of Governors of the Federal Reserve System of the United States of America, or any successor thereto.

"***Board of Directors***" shall mean, as to any Person, the board of directors or managers or other applicable governing body of such Person (or, if such person is a partnership, the board of directors or other governing body of the general partner of such person) or any duly authorized committee thereof.

"***Bona Fide Debt Fund***" shall mean, with respect to any Company Competitor or any Affiliate thereof, any debt fund, investment vehicle, regulated bank entity or unregulated lending entity (in each case, other than any Disqualified Institution) that is primarily (i) engaged in or advises funds or other investment vehicles that are engaged in making, purchasing, holding or otherwise investing in commercial loans, commitments and similar extensions of credit in the ordinary course of business and (ii) managed, sponsored or advised by any Person that is controlling, controlled by or under common control with the relevant Company Competitor or Affiliate thereof, but only to the extent that no personnel involved with the investment in the relevant Company Competitor (other than a limited number of senior employees in connection with the relevant Person's internal legal, compliance, risk management and/or credit practices) (A) directly or indirectly makes (or has the right to make or participate with others in making) investment decisions on behalf of such debt fund, investment vehicle, regulated bank entity or unregulated entity or (B) has access to any information (other than information that is publicly available) relating to the Borrower or any entity that forms a part of its businesses (including any of its subsidiaries); it being understood and agreed that the term "***Bona Fide Debt Fund***" shall not include any Person that is separately identified to the Administrative Agent and the Lenders in accordance with *clause (a)* of the definition of "***Disqualified Institution***" or any Affiliate of any such Person that is reasonably identifiable as an Affiliate of such Person on the basis of such Affiliate's name.

"**_Borrower_**" shall have the meaning assigned to such term in the _preamble_ hereto.

"**_Borrowing_**" shall mean a group of Loans of a single Type and currency and made on a single date to a single Borrower and, in the case of Eurocurrency Loans, as to which a single Interest Period is in effect

"**_Borrowing Minimum_**" shall mean $5,000,000.

"**_Borrowing Multiple_**" shall mean $1,000,000.

"**_Borrowing Request_**" shall mean a request by the Borrower in accordance with the terms of _Section 2.03_ and substantially in the form of _Exhibit C_. Each such written Borrowing Request shall specify the following information:

(i)    the aggregate amount of the requested Borrowing;

(ii)    the date of such Borrowing, which shall be a Business Day;

(iii)    whether such Borrowing is to be an ABR Borrowing or a Eurocurrency Borrowing;

(iv)    in the case of a Eurocurrency Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "**_Interest Period_**"; and

(v)    the location and number of the Borrower's account(s) to which funds are to be disbursed.

"**_Business Day_**" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; _provided_, that when used in connection with a Eurocurrency Loan, the term "**_Business Day_**" shall also exclude any day on which banks are not open for dealings in deposits in the applicable currency in the London interbank market.

"**_Business Plan_**" shall mean the business plan prepared and delivered by the Borrower pursuant to Section 2(c)(ii) of that certain (i) Amendment No. 2 and Waiver to the First Lien Credit Agreement and (ii) Amendment No. 2 and Waiver to the Second Lien Credit Agreement, in each case, dated as of April 20, 2020, and as further amended or modified from time to time in form and substance reasonably satisfactory to the Required Lenders.

"**_Capital Lease_**" shall mean, with respect to any person, any lease of, or other arrangement conveying the right to use, any property by such Person as lessee that are required to be accounted for as a capital lease on a balance sheet of such person prepared in accordance with GAAP.

"**_Capitalized Lease Obligations_**" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto)

prepared in accordance with GAAP; *provided* that all obligations of any Person that would be characterized as operating lease obligations in accordance with GAAP without giving effect to Accounting Standards Codification Topic No. 842, *Leases* (whether or not such operating lease obligations were in effect on the Closing Date) shall be accounted for as operating lease obligations (and not as Capitalized Lease Obligations or Indebtedness) for purposes of the Agreement regardless of the effectiveness of Accounting Standards Codification Topic No. 842, *Leases* or any other change in GAAP following the Closing Date that would otherwise require such obligations to be recharacterized (on a prospective or retroactive basis or otherwise) as Capitalized Lease Obligations.

"***Carve Out***" shall have the meaning set forth in the applicable DIP Order.

"***Cash Equivalents***" shall mean:

(a)    U.S. Dollars, Sterling, or Euros or, in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

(b)    securities issued or directly and fully guaranteed or insured by the government of, or any agency or instrumentality thereof, the United States of America or any member state of the European Union, in each case, with maturities not exceeding two years after the date of acquisition;

(c)    in the case of any Foreign Subsidiary, securities issued or directly and fully guaranteed or insured by the government of, or any agency or instrumentality thereof, in each case with maturities not exceeding 365 days after the date of acquisition and held by it from time to time in the ordinary course of business;

(d)    certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances, in each case with maturities not exceeding one year and overnight bank deposits and demand deposits (in their respective local currencies), in each case with any commercial bank having capital and surplus in excess of $500,000,000 or the foreign currency equivalent thereof and whose long-term debt is rated "AA-" or "*Aa3*" or the equivalent thereof by Moody's or S&P, respectively (or, in the case of an obligor domiciled outside of the United States, reasonably equivalent ratings of another internationally recognized credit rating agency);

(e)    repurchase obligations for underlying securities of the types described in *clauses (b)* and *(c)* above entered into with any financial institution meeting the qualifications specified in *clause (d)* above;

(f)    commercial paper issued by a corporation (other than an Affiliated Lender) rated at least "P-1" or "*A-1*" or the equivalent thereof by Moody's or S&P (or, in the case of an obligor domiciled outside of the United States, reasonably equivalent ratings of another internationally recognized credit rating agency) and in each case maturing within one year after the date of acquisition;

(g)      readily marketable direct obligations issued by any state of the United States of America or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P in each case with maturities not exceeding two years from the date of acquisition;

(h)      Indebtedness issued by persons with a rating of "*A*" or higher from S&P or "*A-2*" or higher from Moody's (or, in the case of an obligor domiciled outside of the United States, reasonably equivalent ratings of another internationally recognized credit rating agency) in each case with maturities not exceeding two years from the date of acquisition; and

(i)      investment funds investing at least 95% of their assets in securities of the types described in *clauses (a)* through *(g)* above.

"***Cash Management Order***" means the cash management order of the Bankruptcy Court in the Chapter 11 Cases, in form and substance reasonably satisfactory to the Borrower, the Administrative Agent and the Required Lenders.

"***CFC***" shall mean a "***controlled foreign corporation***" pursuant to Section 957 of the Code.

A "***Change in Control***" shall be deemed to occur if:

(a)      except to the extent arising as a result of the entry into this Agreement or occasioned by the filing of the Chapter 11 Cases, a "***change of control***" or other similar provision shall occur under or with respect to any Material Indebtedness or the DIP Revolving Credit Agreement; or

(b)      any "***person***" or "***group***" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act (but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan)) other than the Permitted Holders, is or becomes the "***beneficial owner***" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of more than 35% (on a fully diluted basis) of the issued and outstanding Voting Stock of the Borrower aggregate ordinary voting power of the Borrower.  It is understood that, for purposes of this definition, no person shall be deemed to have beneficial ownership of Equity Interests solely by virtue of a stock purchase agreement, merger agreement, or similar agreement (or voting agreement entered into in connection with a stock purchase agreement, merger agreement or similar agreement) until the consummation of the transfer of the applicable Equity Interests to such person.

"***Change in Law***" shall mean the occurrence, after the date of this Agreement or, if later, the date on which the applicable Lender becomes a Lender hereunder, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall

Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "*Change in Law*", regardless of the date enacted, adopted or issued.

"*Chapter 11 Cases*" means the chapter 11 cases of the Borrower and the Guarantors which are being jointly administered under the Bankruptcy Code and are pending in the Bankruptcy Court.

"*Charge*" shall mean any fee, loss, charge, expense, cost, accrual or reserve of any kind (in each case, if applicable, as defined under GAAP).

"*Chief Restructuring Officer*" shall have the meaning set forth in *Section 5.23(a)*.

"*Closing Date*" shall mean May 20, 2020.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"*Collateral*" shall have the meaning set forth in *Section 10.01* and shall include all other property that is or is intended to be subject to any Lien in favor of the Collateral Agent for the benefit of the Lenders but in all cases excluding any Excluded Assets.

"*Collateral Agent*" shall have the meaning assigned to such term in the *preamble* hereto.

"*Collateral and Guarantee Requirement*" shall mean, at any time, subject to (x) the applicable limitations set forth in this Agreement, the DIP Orders and any other Loan Document and (y) the time periods (and extensions thereof) set forth in *Section 5.11*, the requirement that:

(a)    the Obligations shall have be secured by a perfected security interest with the priority required by the Security Documents (subject in all respects to the Carve Out and the DIP Orders) through the provisions of the Interim Order and the Final Order, as applicable, in the Collateral to the extent such security interest may be perfected by virtue of the DIP Order or by filings of Uniform Commercial Code financing statements or any other method of perfection referred to in this definition;

(b)    [reserved];

(c)    other than with respect to Excluded Assets, (i) all Indebtedness of the Borrower and each Subsidiary (other than any Indebtedness in an initial aggregate principal amount not exceeding $5,000,000 that is owing to any Loan Party shall be evidenced by a promissory note, a master intercompany note or an instrument in form reasonably satisfactory to the Required Lenders and shall have been pledged pursuant to the DIP Order and this Agreement (or other applicable Security Document), and (ii) the Collateral Agent

(or a bailee for the Collateral Agent pursuant to the First Lien Pari Passu Intercreditor Agreement or the DIP Orders) shall have received all such promissory notes or instruments, together with note powers or other instruments of transfer with respect thereto endorsed in blank (other than with respect to any such intercompany debt the perfection of the pledge of which is not achieved by delivery to the Collateral Agent);

(d)    other than with respect to Excluded Assets and except as otherwise contemplated by any Security Document or elsewhere in this definition of Collateral and Guarantee Requirement (including with regard to deposit accounts), all documents and instruments (including, in the United States of America, filings of Uniform Commercial Code financing statements and filings with the United States Copyright Office and the United States Patent and Trademark Office), reasonably requested by the Lenders, as applicable to be filed, registered or recorded to create the Liens intended to be created by the Security Documents (in each case, including any supplements thereto) and perfect such Liens to the extent required by, and with the priority required by, the Security Documents shall have been filed, registered or recorded or delivered to the Administrative Agent or Collateral Agent, as requested, for filing, registration or the recording or taken concurrently with, or promptly following, the execution and delivery of each such Security Document;

(e)    except as set forth in the DIP Order, herein or pursuant to any other Security Document, each Loan Party shall have obtained all consents and approvals required to be obtained by it in connection with (i) the execution and delivery of this Agreement and all other Security Documents (or supplements thereto) to which it is a party and the granting by it of the Liens hereunder and (ii) the performance of its obligations thereunder; and

(f)    subject to _Section 5.11(g)_, in the case of any person that (i) becomes a Loan Party after the Closing Date, the Administrative Agent shall have received from such Loan Party, (A) a supplement or joinder to this Agreement, in form and substance reasonably satisfactory to the Collateral Agent and the Administrative Agent, duly executed and delivered on behalf of such person, (B) such other Security Documents as may be required to be delivered pursuant to _Section 5.11_, and (C) evidence that any other requirements of _Section 5.11_ shall have been complied with and (ii) becomes such a Subsidiary Loan Party, the Administrative Agent shall have received from the parent of such Subsidiary Loan Party, supplements to the applicable Security Documents pursuant to which it shall have pledged the Equity Interests in the other Subsidiaries owned by it (other than Excluded Equity Interests), or other Security Documents, effecting the pledge of such Equity Interests in favor of the Collateral Agent, subject to the same exceptions and limitations as set forth in _paragraph (a)_ above;

The foregoing definition shall not require the creation or perfection of pledges of or security interests in particular assets if and for so long as the Collateral Agent (at the direction of the Required Lenders) and the Borrower reasonably agree in writing (which may be in the form of electronic mail) that the cost of creating or perfecting such pledges or security interests in such assets shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, (a) with respect to leases of real property

11

entered into by any Loan Party, such Loan Party shall not be required to take any action with respect to creation or perfection of security interests with respect to such leases, (b) Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in the Security Documents and the DIP Orders and, to the extent appropriate in the applicable jurisdiction, as agreed between the Collateral Agent (at the direction of the Required Lenders) and the Borrower, (c) the Collateral shall not include any Excluded Assets, (d) share certificates of Immaterial Subsidiaries and any other person that is only minority owned by the Loan Parties shall not be required to be delivered, (e) no perfection actions shall be required with respect to (i) motor vehicles and other assets and personal property subject to certificates of title except to the extent perfection is accomplished by the filing of a UCC financing statement or equivalent under applicable Law and letter of credit rights, except to the extent constituting a supporting obligation for other Collateral as to which perfection is accomplished by the filing of a UCC financing statement or equivalent under applicable Law (it being understood that no actions shall be required to perfect a security interest in assets subject to certificates of title or letter of credit rights, other than the filing of a UCC financing statement or equivalent under applicable Law) and (ii) commercial tort claims with an individual value of less than $5,000,000 and (f) no actions in any non-U.S. jurisdiction or required by the Laws of any non-U.S. jurisdiction shall be required to be taken to create any security interests in assets located or titled outside of the U.S. or to perfect or make enforceable any security interests in any assets (it being understood that there shall be no Security Document (or other security agreements or pledge agreements) or other perfection instruments governed under the laws of any non U.S. jurisdiction).

"*Commitments*" shall mean, with respect to each Lender, the Initial Commitments and the Delayed Draw Commitments, as applicable, of such Lender.

"*Committee*" means, collectively, if applicable, the official committee of unsecured creditors and any other official committee formed, appointed or approved in any Chapter 11 Case and each of such committees shall be referred to herein as a "*Committee*".

"*Communications*" shall have the meaning assigned to such term in *Section 9.19(a)*.

"*Company Competitor*" shall mean any person that is a competitor of the Borrower and/or any of its Subsidiaries and identified in writing to the Administrative Agent by the Borrower.

"*Compliance Certificate*" shall have the meaning assigned to such term in *Section 5.04(e)*.

"*Connection Income Taxes*" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"*Consolidated Total Assets*" shall mean, as of any date, the total assets of the Borrower and the Subsidiaries, determined on a consolidated basis in accordance with GAAP, as

set forth on the consolidated balance sheet of the Borrower as of the last day of the fiscal quarter most recently ended and Reported.

"*Consummation Date*" means the date of the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date of the Acceptable Plan) of a Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court.

"*Contractual Obligation*" shall mean, with respect to any person, any provision of any security issued by such person or of any agreement, instrument or other undertaking to which such person is a party or by which it or any of its Property is bound.

"*Control*" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and "*Controlling*" and "*Controlled*" shall have meanings correlative thereto.

"*Credit Bid Transaction*" shall have the meaning assigned to such term in Section 9.27.

"*Credit Event*" shall have the meaning assigned to such term in *Article IV*.

"*Credit Extension*" shall mean the making of a Loan.

"*Credit Facility*" shall mean the term facility represented by the Loans.

"*Credit Servicers*" and "*Credit Servicer*" shall mean each of the Initial CIT Servicers and each other person designed by the Borrower as a "*Credit Servicer*" pursuant to a Permitted Credit Support Arrangement from time to time.

"*Credit Support Assets*" shall mean (a) the Receivables and other Collateral (as defined in the Permitted CIT Agreements as of the date hereof) pledged or sold pursuant to the terms of the Permitted CIT Agreements and (b) in respect of any other Permitted Credit Support Arrangement, the accounts receivable and supporting obligations and proceeds in respect thereof and other ancillary property and rights related to such accounts receivable pledged or sold pursuant to the terms of such Permitted Credit Support Arrangement.

"*Customary Intercreditor Agreement*" shall mean to the extent executed in connection with the incurrence of secured Indebtedness incurred by a Loan Party, the Liens on the Collateral securing which are intended to rank junior in priority to the Liens on the Collateral securing the Obligations, at the option of the Borrower and the Administrative Agent acting together in good faith, a customary intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent, the Required Lenders and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior in priority to the Liens on the Collateral securing the Obligations.

"*Debtor*" shall have the meaning assigned to such term in the *preamble* hereto.

"***Debtor Relief Laws***" shall mean Title 11 of the United States Code entitled "Bankruptcy" as now and hereafter in effect, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States of America or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"***Default***" shall mean any event or condition that upon notice, lapse of time or both would constitute an Event of Default.

"***Defaulting Lender***" shall mean, subject to *Section 2.23(b)*, any Lender that, as determined by the Required Lenders, (a) has failed to perform any of its funding obligations hereunder, including in respect of its Loans, within three Business Days of the date required to be funded by it hereunder, (b) has notified the Borrower or the Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by the Administrative Agent or the Borrower to confirm in a manner satisfactory to the Administrative Agent and the Borrower that it will comply with its funding obligations, or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar person charged with reorganization or liquidation of its business or a custodian appointed for it, or (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority.

"***Delayed Draw Commitments***" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make Delayed Draw Term Loans hereunder pursuant to *Section 2.01(b)*, expressed as an amount representing the maximum aggregate permitted principal amount of the Delayed Draw Term Loans to be made by such Lender. The amount of each Lender's Delayed Draw Commitment is set forth on *Schedule 2.01(b)*, or in the Assignment and Acceptance pursuant to which such Lender shall have assumed its Delayed Draw Commitment, as applicable. The aggregate amount of the Lenders' Delayed Draw Commitments as of the Closing Date is $40,000,000.

"***Delayed Draw Term Loans***" shall mean any term loan made by the Lenders to the Borrower pursuant to *Section 2.01(b)*.

"***DIP ABL Replacement Facility***" shall mean an asset based credit facility entered into after the Closing Date by and among the Loan Parties the lenders and administrative agents and collateral agents party thereto, which facility (i) shall provide for advances solely against the accounts receivable of the Loan Parties, (ii) shall provide for commitments in an amount not to exceed the amount of commitments under the PNC Securitization that have been, or simultaneously with the incurrence of such facility will be, permanently terminated or reduced since the Closing Date, (iii) shall be on terms reasonably satisfactory to the Required Lenders and (iv) shall be subject to intercreditor arrangements reasonably satisfactory to the Required Lenders, (v) shall be subject to a borrowing base (including advance rates) no less favorable in all material

14

respects to the Secured Parties, and other terms (taken as a whole) no less favorable to the Borrower and its Subsidiaries, in each case other than (x) those contained in the facility refinanced or replaced by such DIP ABL Replacement Facility or (y) those that apply after the Maturity Date or also apply to the Revolving Credit Agreement via an amendment thereto, (vi) shall have a maturity date no shorter than that with respect to the Loans, and (vii) shall be secured only by Collateral.

"***DIP Budget***" means, collectively, (a) the 13-week operating budget of the Loan Parties attached as <u>Exhibit G-1</u> hereto (the "***Initial 13-Week DIP Budget***") detailing the Loan Parties' anticipated weekly cash receipts and disbursements (including a line item for Allowed Professional Fees) and anticipated weekly cash flow projections, on a consolidated basis for the Loan Parties, together with a written set of assumptions supporting such projections, for the thirteen week period commencing with the week that the Petition Date occurs and (b) the most recent supplement to the Initial DIP Budget and to such forecast, and all intervening supplements to such forecast, delivered in accordance with <u>*Section 5.04(o)*</u> as approved by the Required Lenders in their sole discretion; <u>provided</u>, that such supplement shall be deemed to be approved by the Required Lenders unless the Required Lenders (or the Lender Advisors on behalf of the Required Lenders) object in writing (including by e-mail) to such supplement forecast within three (3) Business Days of receipt of such supplement forecast; <u>provided</u>, further that no such supplements to such forecast under clause (b) above shall become the DIP Budget unless the Required Lenders in their sole discretion approve such supplement to such forecast becoming the DIP Budget (and to the extent that such supplement to such forecast is not approved, the DIP Budget that is then in effect shall continue to constitute the DIP Budget for all purposes of this Agreement); <u>provided</u>, <u>further</u>, that during a Monthly Budget Testing Period, the DIP Budget shall be the monthly operating budget of the Loan Parties attached as <u>Exhibit G-2</u> hereto (the "***Initial Monthly DIP Budget***" and, together with the Initial 13-Week DIP Budget, the "***Initial DIP Budget***") detailing the Loan Parties' anticipated monthly cash receipts and disbursements (including a line item for Allowed Professional Fees) and anticipated monthly cash flow projections, on a consolidated basis for the Loan Parties, together with a written set of assumptions supporting such projections for the period commencing with the week that the Petition Date occurs and ending on December 31, 2020.

"***DIP Order***" shall mean the Interim Order or the Final Order, as applicable, based on which such order is then in effect.

"***DIP Revolving Credit Agreement***" shall mean that certain Senior Secured Priming and Superpriority Debtor-in-Possession Asset-Based Revolving Credit Credit, Guaranty and Security Agreement, dated as of the date hereof, among the Loan Parties, the lenders party thereto, ACF Finco I LP, as administrative agent and collateral agent, and HPS Investment Partners, LLC, as documentation agent, as amended, amended and restated, waived, supplemented or otherwise modified from time to time.

"***DIP Revolving Credit Agreement Permitted Amendment***" shall mean an amendment, amendment and restatement or other modification to the DIP Revolving Credit Agreement to (i) change the borrowing base to provide for advances against accounts receivable of the Loan Parties as acceptable to the Required Lenders, (ii) increase the commitments available under the DIP Revolving Credit Agreement in an amount equal to the amount of commitments that have been, or simultaneously with the incurrence of such facility will be, terminated or reduced under the PNC Securitization since the Closing Date as acceptable to the Required Lenders, and

15

(iii) such other amendments necessary to implement the amendments referred to in clauses (i) and (ii) above.

"*DIP Revolving Loan Documents*" shall mean the "Loan Documents" as such term is defined in the DIP Revolving Credit Agreement, as such documents may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time.

"*DIP Revolving Loans*" shall have the meaning given to the term "Loans" in the DIP Revolving Credit Agreement.

"*Disposition*" or "*Dispose*" shall mean the sale, lease, sublease, transfer, swap or other disposition of any property of any person (including by allocation of assets by division or allocation of assets to any series of a limited liability company).

"*Disqualified Institution*" shall mean:

(a)    any person identified in writing to the Administrative Agent on or before the Closing Date; and/or

(b)    any Company Competitor; and/or

(c)    any Affiliate of any person described in *clauses (a)* or *(b)* above that is reasonably identifiable as an Affiliate of such person on the basis of such Affiliate's name, other than, in the case of *clause (b)* above, a Bona Fide Debt Fund;

it being understood and agreed that the identification of any person as a Disqualified Institution after the Closing Date (i) shall not be effective until two days after delivery to the Administrative Agent, (ii) shall not apply to retroactively disqualify any person that has previously acquired an assignment or participation interest in any Loan, subject, in the case of assignments and participations made after the date on which any such person is identified as a Disqualified Institution, to the provisions of *Section 9.04(f)*, and (iii) "*Disqualified Institutions*" shall exclude any person that the Borrower has designated as no longer being a "*Disqualified Institution*" by written notice delivered to the Administrative Agent from time to time.

"*Disqualified Stock*" shall mean, with respect to any person, any Equity Interests of such person that, by their terms (or by the terms of any security into which such Equity Interests are convertible or for which such Equity Interests are redeemable or exchangeable) or, upon the happening of any event, (i) mature or are mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (other than as a result of a change of control or asset sale), (ii) are convertible or exchangeable other than at the option of the issuer thereof for Indebtedness or Disqualified Stock or (iii) are redeemable at the option of the holder thereof (other than upon the occurrence of a Change in Control (or similar event), sale or Disposition of all or substantially all of the assets of the Borrower and its Subsidiaries, or the acceleration of the Loans, subject, in each case, to the prior Payment in Full), in whole or in part, in each case prior to 91 days after the Latest Maturity Date; *provided*, *however*, that only the portion of the Equity Interests that so mature or are mandatorily redeemable, are so convertible or exchangeable or are so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; *provided, further*, that if such Equity Interests are issued to any employee or to any plan for the benefit of employees

of the Borrower or the Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Stock solely because they may be required to be repurchased by the Borrower in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; *provided*, *further*, that any class of Equity Interests of such person that by its terms authorizes such person to satisfy its obligations thereunder by delivery of Equity Interests that are not Disqualified Stock shall not be deemed to be Disqualified Stock.

"***Dividends***" shall have the meaning assigned to such term in *Section 6.06*.

"***Domestic Subsidiary***" shall mean any Subsidiary that is not a Foreign Subsidiary.

"***Early Opt-in Election***" means the occurrence of:

(a)     a notification by the Required Lenders to the Administrative Agent (with a copy to the Borrower) that the Required Lenders have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in *Section 2.20*, are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace the Eurocurrency Base Rate; and

(b)     the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Administrative Agent at the discretion of the Required Lenders of written notice of such election to the Borrower and the Lenders.

"***EEA Financial Institution***" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in *clause (a)* of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in *clauses (a)* or *(b)* of this definition and is subject to consolidated supervision with its parent;

"***EEA Member Country***" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"***EEA Resolution Authority***" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"***Eligible Assignee***" shall mean (a) any Lender, (b) any commercial bank, insurance company, or finance company, financial institution, any fund that invests in loans or any other "***accredited investor***" (as defined in Regulation D of the Securities Act), (c) any Affiliate of any Lender, (d) any Approved Fund of any Lender, (e) GSO and (f) to the extent permitted under *Section 9.04(g)*, any Affiliated Lender; *provided* that in any event, "***Eligible Assignee***" shall not include (i) any natural person, (ii) any Disqualified Institution (*provided* that the list of Disqualified Institutions (other than any "***reasonably identifiable affiliate***" (on the basis of such Affiliate's name) included in the definition of "***Disqualified Institution***" is permitted to be made available to

any Lender who specifically requests a copy thereof)) or (iii) except as permitted under *Section 9.04(g)*, the Borrower or any of its Affiliates.

"*EMU Legislation*" shall mean the legislative measures of the European Union for the introduction of, changeover to or operation of the euro in one or more member states.

"*environment*" shall mean ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources such as flora and fauna, the workplace or as otherwise defined in any Environmental Law.

"*Environmental Laws*" shall mean all applicable laws (including common law), rules, regulations, codes, ordinances, orders, decrees, directives, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by or with any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the generation, management, Release or threatened Release of, or exposure to, any Hazardous Material or to health and safety matters (to the extent relating to the environment or Hazardous Materials).

"*Equity Interests*" of any person shall mean any and all shares, interests, membership interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however designated) equity or ownership of such person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder.

"*ERISA Affiliate*" shall mean any trade or business (whether or not incorporated) that, together with the Borrower or a Subsidiary, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 or 303 of ERISA or Section 412 or 430 of the Code, is treated as a single employer under Section 414 of the Code.

"*ERISA Event*" shall mean (a) any Reportable Event; (b) the failure to meet the minimum funding standard of Sections 412 or 430 of the Code or Sections 302 or 303 of ERISA with respect to any Plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the failure to make by its due date a required contribution under Section 412(m) of the Code with respect to any Plan; (e) the failure to make any required contribution to a Multiemployer Plan; (f) the incurrence by the Borrower, a Subsidiary or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower, a Subsidiary or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention, or the institution by the PBGC of proceedings, to terminate any Plan or to appoint a trustee to administer any Plan; (g) the incurrence by the Borrower, a Subsidiary or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (h) the receipt by the Borrower, a Subsidiary or any ERISA Affiliate of any notice, or the receipt by any Multiemployer

Plan from the Borrower, a Subsidiary or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, (I) in "***critical***" or "***endangered***" status under Section 432 of the Code or Section 305 of ERISA, (II) in "***at risk***" status (as defined in Section 430 of the Code or Section 303 of ERISA) or (III) insolvent within the meaning of Title IV of ERISA.

"***EU Bail-In Legislation Schedule***" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"***euro***" or "**€**" shall mean the currency constituted by the Treaty on the European Union and as referred to in the EMU Legislation.

"***Eurocurrency Base Rate***" shall mean, for such Interest Period, the rate per annum equal to the ICE Benchmark Administration LIBOR Rate ("***LIBOR***"), as published by Reuters (or other commercially available source providing quotations of LIBOR as designated by the Blackstone Representative from time to time) at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period, for U.S. Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period (such rate, the "***LIBO Screen Rate***"). If the LIBO Screen Rate is not available at such time for any reason for such Interest Period (an "***Impacted Interest Period***"), then the "***Eurocurrency Base Rate***" for such Interest Period shall be the Interpolated Rate. If such Interpolated Rate is unavailable at such time for any reason, then LIBOR for such Interest Period shall be the rate per annum determined in accordance with the procedures set forth in *Section 2.14*. Notwithstanding the foregoing, if the Eurocurrency Base Rate determined based on the foregoing is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"***Eurocurrency Borrowing***" shall mean a Borrowing comprised of Eurocurrency Loans.

"***Eurocurrency Loan***" shall mean any Loan bearing interest at a rate determined by reference to the Adjusted Eurocurrency Rate in accordance with the provisions of *Article II*.

"***Eurocurrency Reserve Percentage***" shall mean, for any day during any Interest Period, the reserve percentage (expressed as a decimal, carried out to five decimal places) in effect on such day, whether or not applicable to any Lender, under regulations issued from time to time by the Board for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to Eurocurrency funding. The Adjusted Eurocurrency Rate for each outstanding Eurocurrency Loan shall be adjusted automatically as of the effective date of any change in the Eurocurrency Reserve Percentage.

"***Event of Default***" shall have the meaning assigned to such term in *Section 7.01*.

"***Exchange Act***" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"***Excluded Accounts***" shall mean (a) deposit accounts, securities accounts, or commodity accounts (each as defined in the Uniform Commercial Code) which in the aggregate

contain less than $5,000,000 at any one time, including the market value of any securities, commodities, contracts or other assets therein, (b) any other deposit account, securities account or commodity account that is or used exclusively as a (i) payroll, healthcare or other employee wage benefits account, (ii) withholding tax account (including sales tax account), (iii) escrow or permitted defeasance and redemption account, (iv) fiduciary or trust account, together with the funds or other property held in or maintained in any such account (including, without limitation) any fiduciary accounts required to be maintained by any regulatory or quasi-regulatory body) or (v) zero balance account and (c) deposit accounts, securities accounts, or commodity accounts maintained in the ordinary course of business with depositary banks outside the United States.

"***Excluded Assets***" shall mean:

(a)    all leasehold interests (other than the Headquarters);

(b)    all fee-owned real property with a fair market value of less than $5,000,000;

(c)    except to the extent a security interest therein can be perfected by the filing of UCC financing statements, motor vehicles and other assets subject to certificates of title;

(d)    letter of credit rights less than $5,000,000 (individually) (except to the extent a security interest therein can be perfected by the filing of UCC financing statements);

(e)    commercial tort claims below $5,000,000 (individually);

(f)    Excluded Equity Interests;

(g)    a security interest to the extent the Borrower and the Required Lenders reasonably determine that the burden or cost of perfecting such security interest outweighs the benefit of such security to the Lenders;

(h)    any intent to use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application or any registration issuing therefrom under applicable Federal Law;

(i)    Margin Stock;

(j)    any non-US assets or assets of the Borrower and its Subsidiaries that require action under the Law of any non-US jurisdiction to create or perfect a security interest in such assets, including any Intellectual Property in any non-US jurisdiction (and no security agreements or pledge agreements governed under the Laws of any non-US jurisdiction shall be required in respect of such assets);

(k)    (1) property subject to a purchase money security agreement, Capital Lease or similar arrangement to the extent the granting of a security interest therein is prohibited thereby or otherwise requires consent, unless such consent is obtained, and/or (2) any lease,

20

license, contract, instrument or other agreements or any property (including personal property) subject to a purchase money security interest, Capitalized Lease Obligation or similar arrangements, in each case to the extent permitted under the Loan Documents, to the extent that a pledge thereof or a security interest therein would violate or invalidate such lease, license, contract, instrument or agreement, purchase money, Capitalized Lease or similar arrangement, or create a right of termination or acceleration of payment or performance obligations in favor of any other party thereto (other than the Borrower or a Guarantor) after giving effect to the applicable anti-assignment clauses of the Uniform Commercial Code and other applicable Laws, other than the proceeds and accounts receivables thereof the assignment of which is expressly deemed effective under the Uniform Commercial Code and other applicable Laws notwithstanding such prohibition;

(l)       any Governmental licenses, permits, franchises, charters, authorizations and other regulated assets, to the extent the grant of such security interest (1) is prohibited or restricted thereby, (2) requires prior notice to any regulatory authority which has not been made (or any required waiting period associated therewith has not expired) or (3) requires the consent, approval, license or authorization of any regulatory authority which has not been received, in each case, after giving effect to the applicable anti-assignment provisions of the UCC or other applicable Law;

(m)      any Securitization Assets (solely to the extent subject to a non-recourse Qualified Securitization Financing made to a Securitization Subsidiary transferred in accordance with *Section 6.05* hereof);

(n)      any asset or personal property held directly or indirectly by an Excluded Foreign Subsidiary;

(o)      assets and personal property to the extent a security interest in such assets or personal property would result in material adverse tax consequences to the Borrower or any Subsidiary as reasonably determined by the Borrower and the Required Lenders; and

(p)      Excluded Accounts, except, in the case of the Excluded Accounts described in *clauses (a)*, *(b)(v)* and *(c)* of the definition of "***Excluded Accounts***", to the extent a security interest therein can be perfected by the filing of UCC financing statements.

"***Excluded Equity Interests***" shall mean:

(a)      any Equity Interests with respect to which, in the reasonable judgment of the Required Lenders and the Borrower, the cost of pledging such Equity Interests shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom,

(b)      Voting Stock in excess of 65% of the issued and outstanding Voting Stock of any first tier subsidiary that is an Excluded Foreign Subsidiary (provided, that any, first-tier foreign subsidiary that is a disregarded entity for tax purposes shall be deemed to be a Domestic Subsidiary for purposes of this clause (b)),

(c)      any Equity Interests in any Subsidiary to the extent, and for so long as, the pledge thereof would be prohibited by any applicable Law (including any legally effective

requirement to obtain the consent of any Governmental Authority unless such consent has been obtained),

(d)     any Equity Interests of any Subsidiary (other than as described in *clause (b)*) to the extent that the pledge of such Equity Interests would result in material adverse tax consequences to the Borrower or any Subsidiary as reasonably determined by the Borrower and the Required Lenders; and

(e)     any Equity Interests issued by any entity other than a Wholly Owned Subsidiary (other than any Domestic Subsidiary that becomes a non-Wholly Owned Subsidiary after the Closing Date as a result of (i) the disposition or issuance of Equity Interests of such Domestic Subsidiary in either case to a Person that is not an unaffiliated third party, (ii) any transaction entered into in contemplation hereof or primarily in contemplation of such Domestic Subsidiary's ceasing to constitute a Subsidiary Guarantor or (iii) the disposition or issuance of Equity Interests of such Domestic Subsidiary for less than the fair market value of such shares as reasonably determined by the Borrower) to the extent prohibited by the Organizational Documents or other Contractual Obligation applicable to such person requiring third party consent (other than the consent of Borrower or any of its Subsidiaries).

"***Excluded Foreign Subsidiary***" shall mean (i) any Foreign Subsidiary that is a CFC and (ii) any Subsidiary that has no material assets other than Equity Interests of, or Equity Interests and indebtedness of, one or more CFCs.

"***Excluded Subsidiary***" shall mean (with the exception of any Subsidiary that owns any material Intellectual Property that is used in the business of any of the Loan Parties or any Subsidiary that is party to any Material License Agreement):

(a)     any Subsidiary that is not a Wholly Owned Subsidiary on any date such Subsidiary would otherwise be required to become a Guarantor pursuant to the requirements of *Section 5.11* (for so long as such Subsidiary remains a non-Wholly Owned Subsidiary), other than any Domestic Subsidiary that becomes a non-Wholly Owned Subsidiary after the Closing Date as a result of (i) the disposition or issuance of Equity Interests of such Domestic Subsidiary in either case to a Person that is not an unaffiliated third party, (ii) any transaction entered into primarily in contemplation of such Domestic Subsidiary's ceasing to constitute a Subsidiary Loan Party or (iii) the disposition or issuance of Equity Interests of such Domestic Subsidiary for less than the fair market value of such Equity Interests as reasonably determined by the Borrower),

(b)     any Subsidiary that is prohibited by (x) subject to *clause (g)* below, applicable Law or (y) Contractual Obligation from guaranteeing or securing the Obligations (and for so long as such restriction is in effect); *provided* that in the case of *clause (y)*, such Contractual Obligation existed on the Closing Date or, with respect to any Subsidiary acquired by the Borrower or a Subsidiary after the Closing Date (and so long as such Contractual Obligation was not incurred in contemplation of such acquisition), on the date such Subsidiary is so acquired,

(c)      (i) any direct or indirect Foreign Subsidiary, (ii) any Subsidiary that is described in *clause (ii)* of the defined term "***Excluded Foreign Subsidiary***", (iii) any direct or indirect Subsidiary of an Excluded Foreign Subsidiary, or (iv) any other Subsidiary for which the provision of a Guarantee or granting a security interest in respect of such Subsidiary would result in a material adverse tax consequence to Borrower or one of its Subsidiaries (as reasonably determined by the Borrower in consultation with the Required Lenders),

(d)      any Immaterial Subsidiary for so long as such Subsidiary remains an Immaterial Subsidiary,

(e)      any other Subsidiary with respect to which, in the reasonable judgment of the Required Lenders and the Borrower, the cost of providing a Guarantee or granting a security interest shall be excessive in view of the benefits to be obtained by the Lenders therefrom,

(f)      any Subsidiary that would require any consent, approval, license or authorization from any Governmental Authority to provide a Guarantee or grant a security interests unless such consent, approval, license or authorization has been received, or is received after commercially reasonable efforts by the Borrower and/or such Subsidiary to obtain the same, and

(g)      any captive insurance Subsidiaries, any special purpose factoring entities or any special purpose securitization vehicle or any Securitization Subsidiary (in each case, solely to the extent subject to a Qualified Securitization Financing or a Permitted Credit Support Arrangement), any broker-dealer subsidiaries, bank or trust company subsidiaries or a not-for-profit Subsidiary.

"***Excluded Taxes***" shall mean, with respect to any Recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, the following Taxes:

(a)      Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes,

(b)      in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under *Section 2.19(a)*) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to *Section 2.17*, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office,

(c)      Taxes attributable to such Recipient's failure to comply with *Section 2.17(g)* and

(d)        any withholding Taxes imposed under FATCA.

"*Existing Earn Out Obligations*" shall mean those earn out obligations existing on the Closing Date and described on *Schedule B*.

"*Exit Facility*" shall mean the commitments and deemed extensions of credit under the credit facility or credit facilities referred to in *Section 2.24*.

"*Exit Facility Documentation*" shall mean the definitive documentation for the Exit Facility, including any loan agreement, collateral agreements, mortgages and other security agreements, and other related documents and instruments.

"*fair market value*" shall mean, with respect to any asset or property, the price that could be negotiated in an arms' length transaction between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction.

"*FATCA*" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"*FCPA*" shall mean the Foreign Corrupt Practices Act of 1977, as amended.

"*Federal Funds Rate*" shall mean, for any day, the rate *per annum* equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (charged on such day on such transactions as determined by the Administrative Agent).

"*Federal Reserve Bank of New York's Website*" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"*Fees*" shall mean the Agent Fees and any other fees due hereunder (including, without limitation, pursuant to *Section 2.12*).

"*Final Order*" means an order of the Bankruptcy Court in the Chapter 11 Cases, in form and substance satisfactory to the Borrower, Administrative Agent and the Required Lenders in their sole discretion, authorizing and approving this Agreement on a final basis, as the same may be amended or modified from time to time, with the consent of the Required Lenders.

"***Financial Officer***" of any person shall mean the Chief Financial Officer, principal accounting officer, Treasurer, Assistant Treasurer, Controller, Chief Restructuring Officer or officer with similar duties of such person.

"***First-Second Intercreditor Agreement***" shall mean (x) that Intercreditor Agreement dated as of October 29, 2018 among ACF FINCO I LP as Senior Agent, the Second Lien Administrative Agent as Junior Agent and the representatives for purposes thereof for holders of one or more other classes of Indebtedness, the Borrower, the other Loan Parties and the other parties thereto and (y) any other intercreditor agreement entered into from time to time by the holders of one or more classes of Indebtedness, the Loan Parties and the Collateral Agent and any lender or agent from time to time and designated by the Collateral Agent and the Borrower as a "***First-Second Intercreditor Agreement***", in each case, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and which term shall also include any replacement intercreditor agreement entered into in accordance with the terms hereof.

"***First Day Orders***" has the meaning set forth in <u>*Section 4.02(m)*</u>.

"***First Lien Credit Agreement***" shall mean the First Lien Credit Agreement dated as of October 29, 2018, *inter alia*, among the Borrower, Ares Capital Corporation as administrative agent, ACF FINCO I LP as collateral agent and the several banks and other financial institutions from time to time parties thereto as lenders, as such agreement may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time in accordance with terms of the First Lien Pari Passu Intercreditor Agreement.

"***First Lien Credit Facilities***" shall mean the "Credit Facilities" under and as defined in the First Lien Credit Agreement dated as of October 29, 2018 and any similar term in the First Lien Credit Agreement as the First Lien Credit Agreement may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time.

"***First Lien Loan Documents***" shall mean the "Loan Documents" as such term is defined in the First Lien Credit Agreement and, as the context may require as such documents may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time in accordance with the terms of the First Lien Pari Passu Intercreditor Agreement.

"***First Lien Pari Passu Intercreditor Agreement***" shall mean that certain Pari Passu Intercreditor Agreement dated as of the date hereof, among ACF Finco I LP, as initial first lien representative and initial first lien collateral agent, and Collateral Agent, as initial other representative and initial other collateral agent, and each additional representative a collateral agent from time to time party thereto and acknowledged by the Borrower and the other Loan Parties.

"***Foreign Lender***" shall mean any Lender which for U.S. federal income tax purposes (i) is regarded as a separate entity and is not a U.S. Person or (ii) is disregarded as a separate entity and has a regarded owner that is not a U.S. Person.

"***Foreign Subsidiary***" shall mean any Subsidiary (together with its successors) that is incorporated or organized under the laws of any jurisdiction other than the United States of America, any State thereof or the District of Columbia.

"***GAAP***" shall mean generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis, subject to the provisions of _Section 1.02_; provided, that any reference to the application of GAAP in _Section 3.13(a)_, _Section 3.13(b)_, _Section 3.20_, _Section 5.03_, _Section 5.07_ and _Section 6.02(e)_, to a Foreign Subsidiary (and not as a consolidated Subsidiary of the Borrower) shall mean generally accepted accounting principles in effect from time to time in the jurisdiction of organization of such Foreign Subsidiary.

"***Governmental Authority***" shall mean the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including (i) any supra-national bodies or public international organizations such as the European Union or the European Central Bank, or World Bank and (ii) the National Association of Insurance Commissioners).

"***GSO***" shall mean GSO Capital Partners LP and/or its managed funds or Affiliates.

"***Blackstone Representative***" shall mean GSO Capital Partners LP and Blackstone Tactical Opportunities Advisors L.L.C.

"***Guarantee***" of or by any person (the "***guarantor***") shall mean (a) any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other person (the "***primary obligor***") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep well, to purchase assets, goods, securities or services, to take-or-pay or otherwise) or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, (iv) entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part) or (v) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation, or (b) any Lien on any assets of the guarantor securing any Indebtedness or other obligation (or any existing right, contingent or otherwise, of the holder of Indebtedness or other obligation to be secured by such a Lien) of any other person, whether or not such Indebtedness or other obligation is assumed by the guarantor; _provided_, _however_, that the term "***Guarantee***" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted under this Agreement.  The

26

amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (1) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (2) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof.  The term "*Guarantee*" as a verb has a corresponding meaning.

"*Guaranteed Obligations*" shall have the meaning set forth in *Section 11.01(a)*.

"*Guarantor*" shall mean the Loan Parties other than the Borrower, including each of the parties signatory hereto as Gurantors.

"*Guaranty*" shall mean the guaranty in *Article XI*.

"*Hazardous Materials*" shall mean all pollutants, contaminants, wastes, chemicals, materials, substances and constituents, including explosive or radioactive substances or petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls or radon gas, of any nature subject to regulation or which can give rise to liability under any Environmental Law.

"*Headquarters*" shall mean the Borrower's headquarters located at 350 Fifth Ave, Empire State Building, New York, NY 10118.

"*Highest Lawful Rate*" shall mean the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"*Hudson Notes*" shall mean the notes set forth on *Schedule C*.

"*Immaterial Subsidiary*" shall mean any Subsidiary that did not, as of the last day of the fiscal quarter of the Borrower most recently ended and Reported, have assets with a value in excess of 2.5% of the Consolidated Total Assets or have gross revenues for the period of four consecutive fiscal quarters of the Borrower then most recently ended and Reported (taken as one accounting period) in excess of 2.5% of the consolidated gross revenues of the Borrower and its Subsidiaries for such period (as determined in accordance with GAAP on the financial statements of the Borrower) and, when taken together with all other Immaterial Subsidiaries as of the last day of the fiscal quarter of the Borrower most recently ended and Reported, did not have assets with a value in excess of 5.0% of the Consolidated Total Assets or did not have gross revenues in excess of 5.0% of total revenue for the period of four consecutive fiscal quarters of the Borrower then most recently ended and Reported (taken as one accounting period) (as determined in accordance

with GAAP on the financial statements of the Borrower) (the "***Excluded Subsidiary Limit***").  In the event that the Immaterial Subsidiaries, taken together, as of the last day of the fiscal quarter of the Borrower most recently ended and Reported have assets representing in excess of 5.0% of the Consolidated Total Assets or have gross revenues in excess of 5.0% of total revenue (as determined in accordance with GAAP on the financial statements of the Borrower), the Borrower shall designate, in its reasonable discretion, one or more Immaterial Subsidiaries to no longer be Immaterial Subsidiaries as may be necessary such that the foregoing Excluded Subsidiary Limit shall not be exceeded, and any such Subsidiary shall thereafter not be deemed to be an Immaterial Subsidiary hereunder (each such change, an "***Immaterial Subsidiary Update***"). Each Immaterial Subsidiary as of the Closing Date shall be set forth on *Schedule 1.01(b)*, and to the extent that there is an Immaterial Subsidiary Update from time to time, in connection with such update (but not more frequently than the delivery of a quarterly Compliance Certificate is required pursuant to *Section 5.04(e)*) the Borrower shall provide the Administrative Agent and the Lenders with an updated *Schedule 1.01(b)* which reflect the Immaterial Subsidiaries at such time.  Notwithstanding the foregoing, no Subsidiary shall constitute an Immaterial Subsidiary if such Subsidiary (i) owns or possesses rights to any material Intellectual Property used in the business of the Borrower or its Subsidiaries, (ii) is a party to any Material License Agreement or (iii) is not an "Immaterial Subsidiary" as defined under the DIP Revolving Credit Agreement.

"***Impacted Interest Period***" shall have the meaning set forth in the definition of "***Eurocurrency Base Rate***."

"***Indebtedness***" of any person shall mean, without duplication:

(a)    all obligations of such person for borrowed money and all obligations of such person evidenced by bonds (other than performance, surety or statutory bonds or other similar instruments issued in the ordinary course of business), debentures, notes or similar instruments;

(b)    all obligations of such person under conditional sale or other title retention agreements relating to property or assets purchased by such person (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business);

(c)    all obligations of such person (other than intercompany items) issued or assumed as the deferred purchase price of property or services incurred in the ordinary course of business and maturing within 365 days after the incurrence thereof (other than (x) accrued expense obligations and trade accounts payable in the ordinary course of business, (y) trade accounts payable that are past due and relate to purchases or services incurred prior to the Petition Date and (z) earn outs (including the Existing Earn Out Obligations) or similar deferred or contingent purchase price obligations that are not yet due and payable and are not expected to be due and payable in accordance with the documentation giving rise thereto);

(d)    all Guarantees by such person of Indebtedness of others treated as Indebtedness pursuant to another clause of this definition;

(e)    all Capitalized Lease Obligations of such person;

(f)    all net payments that such person would have to make in the event of an early termination, on the date Indebtedness of such person is being determined, in respect of outstanding Swap Agreements;

(g)    the principal component of all obligations, contingent or otherwise, of such person as an account party in respect of letters of credit;

(h)    the principal component of all obligations of such person in respect of bankers' acceptances; and

(i)    the amount of all obligations of such person with respect to the redemption, repayment or other repurchase of any Disqualified Stock (excluding accrued dividends that have not increased the liquidation preference of such Disqualified Stock).

The Indebtedness of any person shall include the Indebtedness of any partnership in which such person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness expressly limits the liability of such person in respect thereof in which case such Indebtedness shall not be more than the amount of such Indebtedness that is recourse to such person; *provided*, *however*, that, notwithstanding the foregoing, Indebtedness for purposes of this Agreement and the other Loan Documents, including for the purposes of calculating any financial ratio, shall be deemed not to include (i) contingent obligations incurred in the ordinary course of business, (ii) deferred or prepaid revenues, (iii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller, (iv) [reserved], (v) obligations to make payments in respect of money backed guarantees offered to customers in the ordinary course of business, (vi) obligations to make payments to one or more insurers in respect of profit sharing arrangements entered into in the ordinary course of business, (vii) any amounts available and not drawn under any available commitments or (viii) the obligations of any person to pay rent or other amounts under any lease (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations would be required to be classified and accounted for as an operating lease under GAAP as in effect on the Closing Date, or in excess of the amount of such Indebtedness that would be recourse to such person.

"***Indemnified Taxes***" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"***Indemnitee***" shall have the meaning assigned to such term in *Section 9.05(b)*.

"***Information***" shall have the meaning assigned to such term in *Section 3.14(a)*.

"***Initial 13-Week DIP Budget***" shall have the meaning set forth in the definition of "***DIP Budget***".

"***Initial Commitments***" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make Initial Term Loans hereunder on the Closing Date, expressed as an

amount representing the maximum aggregate permitted principal amount of the Initial Term Loans to be made by such Lender.  The amount of each Lender's Initial Commitment is set forth on *Schedule 2.01(a)*, or in the Assignment and Acceptance pursuant to which such Lender shall have assumed its Initial Commitment, as applicable.  The aggregate amount of the Lenders' Initial Commitments as of the Closing Date is $120,000,000.

"***Initial Monthly DIP Budget***" shall have the meaning set forth in the definition of "***DIP Budget***".

"***Initial DIP Budget***" shall have the meaning set forth in the definition of "***DIP Budget***".

"***Initial Term Loans***" shall mean any term loan made by the Lenders to the Borrower pursuant to *Section 2.01(a)*.

"***Intellectual Property***" shall mean property constituting under any applicable Laws a patent, patent application, copyright, trademark, service mark, trade name, mask work, trade secret or license or other right to use any of the foregoing.

"***Intercreditor Agreement***" shall mean each of the First Lien Pari Passu Intercreditor Agreement, the First-Second Intercreditor Agreement, the Non-Petition Letter, any other Customary Intercreditor Agreement or any other agreement designated by the Borrower and the Administrative Agent from time to time as an "***Intercreditor Agreement***", and "***Intercreditor Agreements***" means any two or more of each of the foregoing, in each case, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"***Interest Election Request***" shall mean a request by the Borrower to convert or continue a Borrowing in accordance with *Section 2.07*.

"***Interest Payment Date***" shall mean, (a) with respect to any Eurocurrency Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurocurrency Borrowing with an Interest Period of more than three months' duration each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Borrowing and, in addition, the date of any refinancing or conversion of such Borrowing with or to a Borrowing of a different Type and (b) with respect to any ABR Loan, the last Business Day of each calendar quarter (being the last Business Day of March, June, September and December of each year).

"***Interest Period***" shall mean, as to any Eurocurrency Borrowing, the period commencing on the date of such Borrowing or on the last day of the immediately preceding Interest Period applicable to such Borrowing, as applicable, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is 1, 3 or 6 months thereafter (or 12 months thereafter, a period shorter than 1 month or such other period, in each case, if at the time of the relevant Borrowing, all Lenders agree to make interest periods of such length available), as the Borrower may elect, or the date any Eurocurrency Borrowing is converted to an ABR Borrowing in accordance with *Section 2.07* or repaid or prepaid in accordance with *Section 2.09*, *Section 2.10* or *Section 2.11*; *provided*, *however*, that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be

extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day.  Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"*Interim Order*" shall have the meaning set forth in *Section 4.02(l)*.

"*Interpolated Rate*" shall mean, at any time, for any Interest Period, the rate *per annum* (rounded to the same number of decimal places as the LIBO Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between:  (a) the LIBO Screen Rate for the longest period (for which the LIBO Screen Rate is available) that is shorter than the Impacted Interest Period and (b) the LIBO Screen Rate for the shortest period (for which the LIBO Screen Rate is available) that exceeds the Impacted Interest Period, in each case, at such time.

"*Investment*" shall have the meaning set forth in *Section 6.04*.

"*Junior Indebtedness*" shall mean, collectively, Indebtedness of the Borrower or any of its Subsidiaries that is (x) secured by a Lien that is junior in priority to the Lien securing the Obligations, or (y) by its terms contractually subordinated in right of payment to all or any portion of the Obligations or (z) unsecured, in each case, other than intercompany Indebtedness among the Borrower and its Subsidiaries and Indebtedness incurred under *Section 6.01(e)*; which for the avoidance of doubt, as of the Closing Date includes the Hudson Notes, the Subordinated Note, the obligations under the Second Lien Loan Documents and excludes any Existing Earn Out Obligations.

"*KEIP*" shall have the meaning assigned to such term in *Section 6.12*.

"*Latest Maturity Date*" shall mean, as of any date of determination, the latest final stated maturity date applicable to any Loans or Commitments hereunder at such time, in each case as extended in accordance with this Agreement from time to time.

"*Laws*" shall mean, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"*Lender*" shall mean any lender with a Commitment or an outstanding Loan.

"*Lender Advisors*" shall mean the advisors to the Lenders consisting of Akin Gump Strauss Hauer & Feld LLP and Ducera Partners LLC.

"*Lender Observers*" shall have the meaning assigned to such term in *Section 5.19*.

31

"*LIBO Screen Rate*" shall have the meaning set forth in the definition of "*Eurocurrency Base Rate*".

"*Lien*" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, encumbrance, charge or security interest in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities (other than securities representing an interest in a joint venture that is not a Subsidiary), any purchase option, call or similar right of a third party with respect to such securities; *provided*, that in no event shall an operating lease or an agreement to sell be deemed to constitute a Lien.

"*Liquidity*" shall mean, as of any date of determination, the sum of (x) the aggregate amount of all cash and Cash Equivalents on the consolidated balance sheet of the Borrower and its Subsidiaries that are Loan Parties that are not "restricted" for purposes of GAAP and (y) "Availability" as defined under the DIP Revolving Credit Agreement.

"*Loan Documents*" shall mean this Agreement, the Security Documents, the First Lien Pari Passu Intercreditor Agreement, the Non-Petition Letter, each Compliance Certificate, any promissory note issued under *Section 2.09(e)*, solely for the purposes of *7.01(c)* hereof, the Agency Fee Letter and all other documents, certificates, instruments or agreements executed and delivered by or on behalf of a Loan Party for the benefit of the Administrative Agent, the Collateral Agent or Lender in connection herewith on or after the date hereof.

"*Loan Parties*" shall mean the Borrower and the Subsidiary Loan Parties.

"*Loans*" or "*Loan*" shall mean the Initial Term Loans and the Delayed Draw Term Loans, as applicable.

"*Local Time*" shall mean New York City time.

"*Margin Stock*" shall have the meaning assigned to such term in Regulation U.

"*Material Adverse Effect*" shall mean the existence of any event, development or circumstance that, has had or would reasonably be expected to have a material adverse effect on (i) the business, property, operations or financial condition of the Borrower and the Subsidiaries, taken as a whole, other than any change, event or occurrence, arising individually or in the aggregate, from (A) the Chapter 11 Cases or events leading up to the commencement of the Chapter 11 Cases, (B) events that would reasonably be expected to result from the filing or commencement of the Chapter 11 Cases or the announcement of the filing or commencement of the Chapter 11 Cases, (C) the impact of the COVID-19 pandemic (the breadth and extent of which are unknown as of the date hereof), (D) any matters publically disclosed prior to the Closing Date, (E) any matters disclosed in the First Day Orders and (F) any matters disclosed on the schedules hereto, (ii) the ability of the Loan Parties, taken as whole, to fully and timely perform their Obligations or (iii) the validity or enforceability of this Agreement or any other Loan Document or the security interest of the Collateral Agent in any material Collateral or the rights and remedies of the Administrative Agent, Collateral Agent or any of the Lenders thereunder.

"***Material Agreement***" shall mean any agreement, contract or instrument to which any Loan Party is a party or by which any Loan Party or any of its properties is bound (including, without limitation with respect to customers and/or suppliers) (i) pursuant to which any Loan Party receives or will receive revenue (as determined in accordance with GAAP on the financial statements of the Borrower), in excess of $50,000,000 in any the period of four consecutive fiscal quarters of the Borrower then most recently ended and Reported (taken as one accounting period), (ii) governing, creating, evidencing or relating to Material Indebtedness of any Loan Party, (iii) the termination or suspension of which, or the failure of any party thereto to perform its obligations thereunder, would reasonably be expected to have a Material Adverse Effect, (iv) which constitutes a Material License Agreement or (v) any Qualified Securitization Financing Documentation.

"***Material Indebtedness***" shall mean any (i) Indebtedness (other than Loans and the Subordinated Note) of any one or more of the Borrower or any Subsidiary in an aggregate principal amount exceeding $28,750,000, (ii) the Hudson Notes and (iii) the Indebtedness and obligations under the Pre-Petition First Lien Credit Agreement, the Pre-Petition Second Lien Credit Agreemetn and the DIP Revolving Credit Agreement.

"***Material License Agreements***" shall mean license agreements, (i) the termination or suspension of which, or the failure of any party thereto to perform its obligations thereunder, would reasonably be expected to have a Material Adverse Effect or (ii) pursuant to which the Borrower and its Subsidiaries receive or will receive revenue, in excess of $50,000,000 in any the period of four consecutive fiscal quarters of the Borrower then most recently ended and Reported (taken as one accounting period).

"***Material Subsidiary***" shall mean any Subsidiary other than Immaterial Subsidiaries.

"***Maturity Date***" shall mean the earliest of (a) the Scheduled Maturity Date, (b) the Consummation Date, (c) the closing of any sale of assets pursuant to Section 363 of the Bankruptcy Code, which when taken together with all asset sales completed since the Closing Date, constitutes a sale of all or substantially all of the assets of the Loan Parties and (d) the date on which all amounts owed hereunder become due and payable and the Commitments are terminated under the Loan Documents, whether by acceleration or otherwise.

"***Monthly Budget Testing Period***" means any time that the applicable 13-week DIP Budget does not cover the applicable Variance Testing Period.

"***Moody's***" shall mean Moody's Investors Service, Inc.

"***Multiemployer Plan***" shall mean a multiemployer plan as defined in Section 3(37) or 4001(a)(3) of ERISA to which the Borrower or any Subsidiary or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding six plan years made or accrued an obligation to make contributions.

"***Non-Consenting Lender***" shall have the meaning assigned to such term in <u>Section 2.19(c)</u>.

"***Non-Defaulting Lender***" shall mean each Lender other than a Defaulting Lender.

"***Non-Petition Letter***" shall mean that certain Letter Agreement re Pledge of SPV Interests, dated as of the date hereof from PNC Securitization Administrative Agent to and acknowledged by Administrative Agent and ACF Finco I LP as administrative agent and collateral agent under the DIP Revolving Credit Agreement.

"***Note***" shall have the meaning assigned to such term in *Section 2.09(e)*.

"***NYUCC***" shall mean the UCC as in effect in New York.

"***Obligations***" shall mean (i) the unpaid principal of and interest (including, without limitation, interest accruing after the filing of any petition in bankruptcy, or the commencement of any proceeding under any Debtor Relief Law, relating to the Borrower or any other Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) and premium (if any) on all Loans made pursuant to this Agreement and (ii) all guarantee obligations, fees, expenses and all other obligations owed by a Loan Party to the Administrative Agent, the Collateral Agent, the Lenders or any other Secured Party, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement or any other Loan Document, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel to any Lender to the extent required to be paid by the Borrower pursuant hereto) or otherwise.

"***OFAC***" shall mean the Office of Foreign Asset Control of the Department of the Treasury of the United States of America.

"***Organizational Documents***" shall mean, collectively, with respect to any Person, (i) in the case of any corporation, the certificate of incorporation or articles of incorporation and by-laws (or similar constitutive documents) of such Person, (ii) in the case of any limited liability company, the certificate or articles of formation or organization and operating agreement or memorandum and articles of association (or similar constitutive documents) of such Person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar constitutive documents) of such Person (and, where applicable, the equity holders or shareholders registry of such Person), (iv) in the case of any general partnership, the partnership agreement (or similar constitutive document) of such Person, (v) in any other case, the functional equivalent of the foregoing, and (vi) any shareholder, voting trust or similar agreement between or among any holders of Equity Interests of such Person.

"***Other Connection Taxes***" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"***Other Taxes***" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of

a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to *Section 2.19(a)*.

"*Participant*" shall have the meaning assigned to such term in *Section 9.04(c)*.

"*Participant Register*" shall have the meaning specified in *Section 9.04(c)*.

"*PATRIOT Act*" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"*Payment in Full*" shall mean (a) the termination of all Commitments and (b) the payment in full in cash of all Loans and other amounts owing to any Lender or the Administrative Agent or the Collateral Agent in respect of the Obligations (other than contingent or indemnification obligations not then due), which shall include the conversion of the Loans into obligations under the Exit Facilities pursuant to *Section 2.24* of this Agreement.

"*PBGC*" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"*Permitted Credit Support Arrangement*" shall mean the sale by a Loan Party or its Subsidiaries of Receivables to (i) The CIT Group/Commercial Services, Inc. (the "*Initial US CIT Servicer*") pursuant to (A) (1) that certain Deferred-Purchase Factoring Agreement by and between the Initial CIT Servicer and Differential Brands Group Inc., American Marketing Enterprises Inc.; Briefly Stated, Inc.; F&T Apparel LLC; GBG-BCBG LLC; GBG Accessories Group LLC; GBG Beauty LLC; GBG Denim USA LLC; GBG Jewelry Inc.; GBG Socks LLC; GBG West LLC; KHQ Investments LLC; Rossetti Handbags and Accessories, Ltd. and VZI Investment Corp. (collectively, the "*Differential Companies*") dated on or about the date of this Agreement; (2) that certain Deferred Purchase Export Factoring Agreement by and between the Initial CIT Servicer and the Differential Companies; (3) that certain Second Amended and Restated Deferred Purchase Factoring by and between Robert Graham Designs, LLC, Hudson Clothing, LLC and DFBG Swims LLC dated on or about the date of this Agreement and (ii) the sale of Receivables under the Canadian Sales Factoring Agreement by and between CIT Financial (Canada) ULC (the "*Initial Canadian CIT Servicer*" and together with the Initial US CIT Servicer, the "*Initial CIT Servicers*" and each, an "*Initial CIT Servicer*") and GBG Denim Canada ULC, dated December 24, 2015, as amended by that certain amendment dated on or about the date of this Agreement or (B) any other deferred purchase price factoring agreement/credit servicing and insurance arrangement entered into between a Loan Party and the Initial CIT Servicer, substantially in the form of one of the agreements described in *clause (A)*; as each such agreement in (A) and (B) may be amended, restated, amended and restated, supplemented or otherwise modified from time to time (collectively, the "*Permitted CIT Agreements*" and each, a "*Permitted CIT Agreement*") and (ii) the factor or servicer under any other similar deferred purchase price factoring agreement/credit servicing and insurance arrangement entered into after the date hereof by any Loan Party or any Subsidiary for the factoring of Receivables, in form and substance reasonably satisfactory to the Administrative Agent (it being understood that any agreement

substantially in the form of a Permitted CIT Agreement shall be deemed to be reasonably satisfactory to the Administrative Agent), as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time.

"*Permitted Credit Support Services*" shall mean (i) cash collateral or letters of credit in respect of or as part of the borrowing base for a Qualified Securitization Financing in a maximum principal amount at any one time outstanding not to exceed the lesser (x) the amount needed to support borrowings and other advances under a Qualified Securitization Financing (as determined by the Borrower) and (y) $30,000,000 ("*Permitted Securitization Cash Collateral*"), (ii) service fees, expenses and other Charges in respect of the Permitted CIT Arrangements or other similar credit insurance and servicing arrangements entered into from time to time in an aggregate amount not to exceed 1.00% of annual sales at any one time outstanding as determined by the Borrower.

"*Permitted Holder*" shall mean each of (i) GSO and Tengram, (ii) one or more investments funds, investment partnerships or managed accounts controlled or managed by the persons named in *clause (i)* or one of their Affiliates (other than the Borrower and its Subsidiaries) and (iii) any "group" (as such term is used in Section 13(d) and 14(d) of the Exchange Act) with respect to which any such persons described in *clauses (i)* and *(ii)* above collectively exercise a majority of the voting power.

"*Person*" or "*person*" shall mean any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company (or series thereof) or government, individual or family trusts, or any agency or political subdivision thereof.

"*Petition Date*" is defined in the recitals to this Agreement.

"*Plan*" shall mean any employee pension benefit plan (as defined Section 3(2) of ERISA, but excluding any Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code and in respect of which the Borrower, any Subsidiary or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "*employer*" as defined in Section 3(5) of ERISA.

"*Platform*" shall have the meaning assigned to such term in *Section 9.19(b)*.

"*Pledged Collateral*" shall have the meaning set forth in *Section 10.05*.

"*PNC Purchase and Sale Agreement*" means that certain Purchase and Sale Agreement dated as of October 29, 2018 among the SPV, the Borrower and the various entities party thereto as originators.

"*PNC Securitization*" and "*PNC Securitization Documents*" shall mean that certain Amended and Restated Receivables Purchase Agreement, dated as of May 17, 2020 (as the same may be amended, restated, supplemented, replaced or otherwise modified from time to time, "*PNC Receivables Purchase Agreement*") among Spring Funding, LLC, as seller (the "*SPV*"), the Borrower, as servicer, the various purchasers from time to time party thereto (the "*PNC Securitization Purchasers*"), PNC Capital Markets LLC, as structuring agent (the "*PNC Securitization Structuring Agent*") and PNC Bank, National Association, as administrative agent

(the "**PNC Securitization Administrative Agent**"; together with the PNC Securitization Purchasers and the PNC Securitization Structuring Agent, each a "**PNC Securitization Secured Party**" and collectively, the "**PNC Securitization Secured Parties**") and the related agreements and documents executed and delivered in connection with the PNC Receivables Purchase Agreement, in each case, as the same may be amended, restated, supplemented, replaced or otherwise modified from time to time in accordance with the terms of this Agreement.

"**Pre-Petition Indebtedness**" shall mean the Indebtedness of the Loan Parties incurred prior to the Petition Date and outstanding as of the Petition Date.

"**primary obligor**" shall have the meaning assigned to such term in the definition of the term "**Guarantee**."

"**Prime Rate**" shall mean the rate of interest quoted in the print edition of *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75% of the nation's 30 largest banks), as in effect from time to time (or, if such rate is or becomes unavailable, another national publication selected by the Administrative Agent (at the direction of the Required Lenders)). The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. The Administrative Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Projections**" shall mean any projections and any forward-looking statements (including statements with respect to booked business) of such entities furnished to the Lenders or the Administrative Agent by or on behalf of the Borrower or any of the Subsidiaries prior to the Closing Date.

"**PTE**" shall mean a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Lender**" shall have the meaning assigned to such term in *Section 9.19(b)*.

"**Qualified Purchaser**" means a Person (i) designated by the Required Lenders as a "Qualified Purchaser" in connection with any Credit Bid Transaction, (ii) whose stock is owned pro rata by the Lenders (based upon the obligations owing to such Lenders and utilized to consummate such Credit Bid Transaction and the obligations owing to all Lenders and utilized to consummate such Credit Bid Transaction) and (iii) whose actions are controlled by the Required Lenders.

"**Qualified Securitization Financing**" shall mean (i) the PNC Securitization as in effect on the Closing Date and (ii) any Securitization Financing that refinances or replaces the PNC Securitization and any amendment to the PNC Securitization, in each case that meets the following conditions: (a) such Securitization Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Borrower and, if applicable, the Securitization Subsidiary, (b) all sales and/or contributions of Securitization Assets are made at fair market value and are either (x) non-recourse to the Loan Parties or (y) if recourse to the Loan Parties, (A) such recourse is limited solely to the Securitization Assets, Permitted Securitization Cash Collateral or to payments made by a Credit Support Provider

in respect of such Securitization Assets and (B) and applicable Securitization Provider shall have entered into a customary pari passu intercreditor with the Agents on terms reasonably acceptable to the Agents, (c) the only assets of the Loan Parties involved in such Securitization Financing shall be accounts receivable generated in the ordinary course of business and related Securitization Assets, Permitted Securitization Cash Collateral and payments made by a Credit Support Provider in respect of such Securitization Asset, (d) the Secured Parties shall have received a pledge of equity in the Securitization Subsidiary party to such Securitization Financing in accordance with the Collateral and Guarantee Requirement, (e) all amounts received by the Loan Parties from counterparties to such Securitization Financing from the sale of Receivables shall be deposited directly in a bank account owned by a Loan Party, (f) the Loan Parties shall have granted to the Collateral Agent, for the benefit of the Secured Parties, a security interest in their rights arising under any such Securitization Financing Documentation (including, without limitation, all rights to payments received thereunder), and (h) any Securitization Financing that amends, amends and restates, refinances or replaces the PNC Securitization (or any refinancing thereof) shall be on terms that when taken as a whole are not materially less favorable to the interests of the Borrower or the Secured Parties than those set forth in the PNC Securitization on the Closing Date (except with respect to fees, pricing, covenant and dilution levels, advance rates and other payment terms, which may be adjusted to reflect then current market terms for a similar business of similar size, credit quality and financial condition operating in the same geographic areas; _provided_, _however_, that unless consented to by the Required Lenders, no such refinancing shall result (x) in a degradation of the average Advance Ratio for accounts receivable in excess of 20% as compared to the average Advance Ratio for the same month in the prior year under the then existing Securitization Financing or (y) an increase of more than 2.00% on the interest rate spread for the then existing Securitization Financing other than with respect to any interest rate spread attributable to a last out tranche added to the PNC Securitization after the Closing Date; _provided_, _further_ that any changes to pricing resulting from "dynamic pricing" provisions contained in the Qualified Securitization Financing Documentation then in effect shall not constitute an amendment to the pricing of such Securitization Financing; it being understood that the maximum amount of Indebtedness of the Borrower and its Subsidiaries and its Securitization Subsidiaries pursuant to all Qualified Securitization Financing Documents shall at no time exceed a maximum aggregate principal amount outstanding in excess of the greater of (i) $431,250,000 and (ii) $517,500,000 but only if the PNC Securitization Documents are amended to include a last out purchaser in accordance with Section 13.24 of the PNC Receivables Purchase Agreement.

"**Qualified Securitization Financing Documentation**" shall mean the documentation evidencing any Qualified Securitization Financing.

"**Rate**" shall have the meaning assigned to such term in the definition of the term "**Type**."

"**Receivable**" shall mean all Accounts and any other right to payment for goods or other property sold, leased, licensed or otherwise disposed of or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper or classified as a Payment Intangible and whether or not it has been earned by performance. References herein to Receivables shall include any Supporting Obligation or collateral securing such Receivable.

"*Recipient*" shall mean (a) the Administrative Agent, (b) the Collateral Agent or (c) any Lender, as applicable.

"*Register*" shall have the meaning assigned to such term in *Section 9.04(b)*.

"*Regulation T*" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"*Regulation U*" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"*Regulation X*" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"*Regulatory Agreement*" shall have the meaning assigned to such term in *Section 3.09(c)*.

"*Related Fund*" shall mean, with respect to any Lender that is a fund that invests in bank or commercial loans and similar extensions of credit, any other fund that invests in bank or commercial loans and similar extensions of credit and is advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity (or an Affiliate of such entity) that administers, advises or manages such Lender.

"*Related Parties*" shall mean, with respect to any specified person, such person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such person and of such person's Affiliates.

"*Release*" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, emanating or migrating in, into, onto or through the environment.

"*Reorganization Plan*" means a chapter 11 plan of reorganization in any of the Chapter 11 Cases of the Borrower or the other Loan Parties.

"*Reportable Event*" shall mean any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Plan (other than a Plan maintained by an ERISA Affiliate that is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code).

"*Reported*" shall mean, with respect to any fiscal quarter of the Borrower, the delivery to the Administrative Agent of the financial statements required to be delivered with respect to the end of such fiscal quarter under *Section 5.04(a)* or *(b)*, as applicable.

"*Required Lenders*" shall mean, at any time, the Lenders having Loans outstanding, that, taken together, represent more than 50% of the *sum* of all Commitments and outstanding Loans; *provided* that, notwithstanding the foregoing, as long as Blackstone Representative or any of its Affiliates is a Lender under this Agreement and continues to hold

Loans in an aggregate amount equal to at least 50% of the aggregate amount of Loans it held as of the Closing Date, Required Lenders shall mean the Blackstone Representative.

"*Requirements of Law*" shall mean, as to any Person, any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Responsible Officer*" of any person shall mean any chief executive officer, president, executive officer, Financial Officer or, if any, Chief Restructuring Officer of such person and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement.

"*Restructuring Support Agreement*" means the Restructuring Support Agreement, dated as of May 17, 2020, among the Borrower, the Loan Parties, the Consenting First Lien Lenders, the Consenting Second Lien Lenders, the Consenting DIP Term Loan Lenders, the Consenting Creditors and the Consenting Stakeholders (in each case, as defined therein) party thereto, as amended, restated, supplemented or modified from time to time.

"*RSA Plan*" means the "Plan" as contemplated by and as defined in the Restructuring Support Agreement.

"*S&P*" shall mean S&P Global Ratings, a business unit of Standard & Poor's Financial Services LLC, a subsidiary of S&P Global Inc.

"*Sanctioned Country*" shall mean, at any time, a country or territory which is itself the subject or target of any Sanctions Laws (as of the date of this Agreement, Cuba, Iran, North Korea, Syria, and the Crimea region of Ukraine).

"*Sanctioned Person*" shall mean, at any time, (a) any Person listed in any Sanctions-related list of designated Persons, (b) any Person headquartered, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by, or acting for or on behalf of, any Person described in _clauses (a)_ or _(b)_ or _(d)_ otherwise the subject or target of Sanctions.

"*Sanctions Laws*" shall mean laws, rules or regulations relating to economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or any other relevant sanctions authority with jurisdiction over the Borrower or any of its Subsidiaries.

"*Scheduled Maturity Date*" shall mean the one year anniversary of the Petition Date.

"*SEC*" shall mean the Securities and Exchange Commission or any successor thereto.

"**Second Lien Administrative Agent**" shall mean (x) the "**administrative agent**" and "**collateral agent**" in each case under and as defined in the Second Lien Credit Agreement, (y) any successor administrative agent permitted by the terms of the Second Lien Credit Agreement.

"**Second Lien Credit Agreement**" shall mean the Second Lien Credit Agreement dated as of October 29, 2018 among the Borrower, U.S. Bank National Association as administrative agent and collateral agent and the several banks and other financial institutions from time to time parties thereto as lenders, as such agreement may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time in accordance with terms of the First-Second Intercreditor Agreement.

"**Second Lien Credit Facilities**" shall mean the "Credit Facilities" under and as defined in the Second Lien Credit Agreement and any similar term in the Second Lien Credit Agreement as the Second Lien Credit Agreement may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time.

"**Second Lien Loan Documents**" shall mean the "Loan Documents" as such term is defined in the Second Lien Credit Agreement, as such documents may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time in accordance with the terms of the First-Second Intercreditor Agreement.

"**Secured Parties**" shall mean the Administrative Agent, the Collateral Agent, the Lenders and their Related Parties.

"**Securitization Assets**" shall mean (x) in respect of the PNC Securitization, the accounts receivable of the Loan Parties and other Supporting Assets (as defined in the PNC Receivables Purchase Agreement and any other assets of the Securitization Subsidiary pledged or sold pursuant to the terms of the Receivables Purchase Agreement and the other PNC Securitization Documents and (y) in respect to any other Qualified Securitization Financing, (i) the accounts receivable of one or more of the Loan Parties sold or contributed to a Securitization Subsidiary pursuant and subject to such Qualified Securitization Financing (all "**Pool Receivables**"), the related security with respect to such Pool Receivables, (iii) all collections with respect to such Pool Receivables, (iv) the cash collateral accounts, the lock boxes and collection accounts owned by such Securitization Subsidiary and all amounts on deposit therein, and all certificates and instruments, if any, from time to time evidencing such lock-boxes and collection accounts and amounts on deposit therein, (v) all rights (but none of the obligations) of the Securitization Subsidiary transferred under the applicable purchase and sale agreement, (vi) all other personal and fixture property or assets of the applicable Securitization Subsidiary of every kind and nature including, without limitation, all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts, chattel paper (whether tangible or electronic), deposit accounts, securities accounts, securities entitlements, letter-of-credit rights, commercial tort claims, securities and all other investment property, supporting obligations, money, any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (including all payment intangibles) (each as defined in the UCC) and (vii) all proceeds of, and all amounts received or receivable under any or all of, the foregoing.

"*Securitization Fees*" shall mean distributions or payments made directly or by means of discounts with respect to any participation interest issued or sold in connection with, and other fees paid in connection with any Qualified Securitization Financing.

"*Securitization Financing*" shall mean any transaction or series of transactions that may be entered into by the Borrower or any of its Subsidiaries pursuant to which the Borrower or any of its Subsidiaries may sell, convey or otherwise transfer to (a) a Securitization Subsidiary (in the case of a transfer by the Borrower or any of its Subsidiaries) or (b) any other Person (in the case of a transfer by a Securitization Subsidiary), or may grant a security interest in, any Securitization Assets of the Borrower or any of its Subsidiaries.  For the avoidance of doubt, a "*Securitization Financing*" for the purposes of this agreement shall include any on- or off-balance sheet receivables securitization arrangement (including the PNC Securitization), as well as, any factoring arrangement, receivables financing or vendor financing arrangement.

"*Securitization Provider*" shall mean (a) the PNC Securitization Parties for so long as the PNC Securitization is in effect and (b) any other person designated by the Borrower as a "*Securitization Provider*" in connection with a Securitization Financing entered into by the Borrower or any of its subsidiaries or a Securitization Subsidiary from time to time.

"*Securitization Subsidiary*" shall mean a Wholly Owned Subsidiary of the Borrower (or another Person formed for the purposes of engaging in a Qualified Securitization Financing in which the Borrower or any Subsidiary of the Borrower makes an Investment and to which the Borrower or any Subsidiary of the Borrower transfers Securitization Assets and related assets) that engages in no activities other than in connection with the financing of Securitization Assets of the Borrower or its Subsidiaries, all proceeds thereof and all rights (contingent and other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and which is designated by the board of directors of the Borrower or such other Person (as provided below) as a Securitization Subsidiary and (a) no portion of the Indebtedness or any other obligations (contingent or otherwise) of which (i) is guaranteed by the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary (excluding guarantees of obligations (other than the principal of, and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is recourse to or obligates the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary, in any way other than pursuant to Standard Securitization Undertakings (other than with respect any repayment obligations under any Eligible Supporting Letter of Credit (as defined in the related Qualified Securitization Documents)) or (iii) subjects any property or asset of the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings, (b) with which none of the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary, has any material contract, agreement, arrangement or understanding other than on terms which the Borrower reasonably believes to be no less favorable to the Borrower or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Borrower and (c) to which none of the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary, has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.  Any such designation by the board of directors of the Borrower or such other Person shall be evidenced to the Administrative Agent by delivery to the Administrative Agent of a certified

copy of the resolution of the board of directors of the Borrower or such other Person giving effect to such designation and a certificate executed by a Responsible Officer certifying that such designation complied with the foregoing conditions.

"*Security Documents*" shall mean the DIP Order, this Agreement (including, without limitation, *Article X* hereto), any mortgages, the Guaranty, any intellectual property security agreements and each of the security agreements, mortgages and other instruments and documents executed and delivered in connection with this Agreement or pursuant to *Section 5.11*, in each case, as amended from time to time in accordance with the terms hereof and thereof.

"*Similar Business*" shall mean any business or activity of the Borrower or any of its Subsidiaries currently conducted or proposed as of the Closing Date, or any business or activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof, or is synergistic with or complementary, incidental, ancillary or related thereto.

"*SOFR*" means, with respect to any day, the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark (or a successor administrator), on the Federal Reserve Bank of New York's Website.

"*Standard Securitization Undertakings*" means representations, warranties, covenants and indemnities entered into by the Borrower or any Subsidiary of the Borrower that are customary in a Securitization Financing.

"*Sterling*" shall mean the lawful money of the United Kingdom.

"*Subordinated Note*" shall have the meaning assigned to the term "*Closing Date Subordinated Convertible Note*" in the Second Lien Credit Agreement.

"*subsidiary*" shall mean, with respect to any person (herein referred to as the "*parent*"), any corporation, partnership, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, directly or indirectly, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent; *provided* that in no event shall any Securitization Subsidiary be deemed a subsidiary hereunder unless otherwise specified herein.

"*Subsidiary*" shall mean, unless the context otherwise requires, a subsidiary of the Borrower.

"*Subsidiary Loan Party*" shall mean (i) each of the Wholly Owned Subsidiaries of the Borrower set forth on *Schedule 1.01(g)* hereto on the Closing Date and (ii) each other Domestic Subsidiary of the Borrower formed or acquired after the Closing Date (other any Excluded Subsidiary).

"*Superpriority Claim*" means a claim against a Loan Party in any of the Chapter 11 Cases that is a superpriority administrative expense claim having priority over any or all

administrative expenses and other claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546, 726, 1113 and/or 1114 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.

"***Swap Agreement***" shall mean any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; *provided*, that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of the Subsidiaries shall be a Swap Agreement.

"***Takings or Casualty Event***" shall mean any loss of, damage to or destruction of, or any condemnation or other taking for public use by any Governmental Authority of, any property of any Loan Party or any of its Subsidiaries.

"***Taxes***" shall mean any and all present or future taxes, levies, imposts, duties (including stamp duties), deductions, withholdings (including backup withholding), assessments, fees or other similar charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"***Tengram***" shall mean Tengram Capital Partners, LP.

"***Term SOFR***" means the forward-looking term rate based on SOFR that has been selected or recommended by the relevant Governmental Authority.

"***Transaction Costs***" shall mean fees, premiums, expenses, closing payments and other similar transaction costs (including original issue discount or upfront fees) payable or otherwise borne by Borrower and/or its subsidiaries in connection with the Transactions and the transactions contemplated thereby.

"***Transactions***" shall mean, collectively, (a) the execution, delivery and the performance by the Loan Parties on the Closing Date of the Loan Documents and the DIP Revolving Loan Documents, (b) the repayment of the 2020 Term Loans (as defined in the First Lien Credit Agreement) and (c) the payment of the Transaction Costs.

"***Transformation Office***" shall have the meaning set forth in *Section 5.23(b)*.

"***Transformation Office Plan***" shall have the meaning set forth in *Section 5.23(b)*.

"***Type***," when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined. For purposes hereof, the term "***Rate***" shall include the Adjusted Eurocurrency Rate and ABR.

"***Unadjusted Benchmark Replacement***" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"***Uniform Commercial Code***" and "***UCC***" shall mean the Uniform Commercial Code in effect in the State of New York; *provided* that if by reason of mandatory provisions of applicable law, the perfection, non-perfection or priority of a security interest is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of New York, the term "***Uniform Commercial Code***" means the Uniform Commercial Code in effect in such other jurisdiction for the purposes of the provisions in the Loan Documents relating to such perfection or priority.

"***U.S. Dollars***" or "***$***" shall mean lawful money of the United States of America.

"***U.S. Lending Office***" shall mean, as to any Lender, the applicable branch, office or Affiliate of such Lender designated by such Lender to make Loans to the Borrower.

"***U.S. Person***" shall mean any Person that is a "***United States Person***" as defined in Section 7701(a)(30) of the Code.

"***U.S. Tax Compliance Certificate***" shall have the meaning specified in *Section 2.17(g)*.

"***U.S. Trustee***" means the United States Trustee for the Chapter 11 Cases assigned by the Bankruptcy Court.

"***Variance Report***" means a report, in each case certified by a Responsible Officer of Borrower, in substantially the form of the attached Exhibit D and otherwise in form and substance reasonably satisfactory to the Required Lenders, delivered in accordance with *Section 5.04(n)*, showing (i) actual disbursements, actual cash receipts and professional fees as reported by such professionals in accordance with the DIP Orders, actual net cash flow for the applicable Variance Test Period as of the end of the week immediately preceding the week during which such Variance Report is delivered and the variance (as a percentage) on a cumulative basis for the entire Variance Test Period of such amounts from the corresponding anticipated amounts therefor set forth in the applicable DIP Budget and (ii) analysis and explanations for all material violations and setting forth the actions which the Borrower has taken or intends to take with respect thereto.

"***Variance Test Period***" means the period commencing on May 22, 2020 through and including the most recently ended calendar week in the then current DIP Budget; provided that during a Monthly Budget Testing Period the Variance Test Period shall be the period from the beginning of the most recently ended calendar month to the end of such month.

"***Voting Stock***" shall mean, as to any entity, all classes of Equity Interests of such entity then outstanding and normally entitled to vote in the election of directors of such entity.

"***Wholly Owned Subsidiary***" of any person shall mean a subsidiary of such person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such person or another Wholly Owned Subsidiary of such person.

"*Withdrawal Liability*" shall mean liability to a Multiemployer Plan as a result of a "*complete withdrawal*" or "*partial withdrawal*" from such Multiemployer Plan, as such terms are defined in Section 4201(b) of ERISA.

"*Withholding Agent*" shall mean any Loan Party and the Administrative Agent.

"*Write-Down and Conversion Powers*" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

SECTION 1.02        Terms Generally.  (a) The definitions set forth or referred to in *Section 1.01* shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "*include*," "*includes*" and "*including*" shall be deemed to be followed by the phrase "*without limitation*."  All references herein to *Articles, Sections, Exhibits* and *Schedules* shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  Except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document or other document or agreement shall mean such document as amended, restated, amended and restated, supplemented or otherwise modified from time to time.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided*, that, although all financial statements required to be delivered in accordance with *Section 5.04(a)* and *Section 5.04(b)* will be prepared in accordance with GAAP as in effect at such time such audit is performed, if a change in GAAP (or in the interpretation of GAAP) after the Closing Date would affect the computation of any financial ratio or requirement set forth in any Loan Document, the Borrower may request an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  For purposes of determining compliance with amounts and ratios contained herein (including for the purposes of calculating compliance with any financial covenant) contained herein, (i) with respect to accounting for revenue recognition from contracts with customers and the impact of such accounting in accordance with FASB ASC 606 on the definitions and the calculation of amounts and ratios contained herein, GAAP as in effect on the Closing Date shall be applied and (ii) Indebtedness of the Borrower and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and without giving effect to any election under FASB ASC 825 and FASB ASC 470-20 (or any other financial accounting standard having a similar result or effect) to value any Indebtedness of the Borrower or its Subsidiaries at "fair value" as defined therein.

Any restriction, condition or prohibition applicable to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, set forth herein shall be deemed to apply to a division of or by a limited liability company, or an allocation

of assets to a series of a limited liability company, as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, as applicable.

(b)    All terms used in this Agreement which are defined in Article 8 or Article 9 of the NYUCC as in effect from time to time and which are not otherwise defined herein shall have the same meanings herein as set forth therein, provided that terms used herein which are defined in the UCC as in effect on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Required Lenders and the Borrower may otherwise agree.

(c)    For purposes of determining compliance with any provision of this Agreement which requires a determination of whether a certain action or transaction is included in the DIP Budget, permitted under the DIP Budget, or any other analogous phrase, the projections set forth in the DIP Budget as in effect at the time of the applicable action or transaction shall be used to determine compliance.

SECTION 1.03    [Reserved].

SECTION 1.04    Currency Translation.  For purposes of determining compliance as of any date with *Section 6.01*, *Section 6.02*, *Section 6.04*, *Section 6.05*, *Section 6.06* or *Section 6.07*, amounts incurred or outstanding in currencies other than U.S. Dollars shall be translated into U.S. Dollars at the exchange rates in effect on the first Business Day of the fiscal quarter in which such determination occurs or in respect of which such determination is being made, as such exchange rates shall be determined in good faith by the Borrower.  No Default or Event of Default shall arise as a result of any limitation or threshold set forth in U.S. Dollars in *Section 6.01*, *Section 6.02*, *Section 6.04*, *Section 6.05*, *Section 6.06* or *Section 6.07* or *paragraph (f)* or *(j)* of *Section 7.01* being exceeded solely as a result of changes in currency exchange rates from those applicable on the first day of the fiscal quarter in which such determination occurs or in respect of which such determination is being made.

SECTION 1.05    [Reserved].

SECTION 1.06    Cashless Rolls.  Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, any Lender may exchange, continue or roll over all or a portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrower, the Administrative Agent and such Lender.

## ARTICLE II
### The Credits

SECTION 2.01    Loans.

(a)    Subject to the terms and conditions set forth herein, including, without limitation, the requirements of *Article IV*, and the DIP Order, each Lender agrees, severally and not jointly, to make Initial Term Loans in a single drawing to the Borrower in U.S. Dollars on the Closing Date from its U.S. Lending Office in an aggregate principal amount equal to its Initial Commitment.  Amounts repaid in respect of Initial Term Loans may not be reborrowed.

(b)    Subject to the terms and conditions set forth herein, including, without limitation, the requirements of *Article IV*, and the DIP Order, each Lender agrees, severally and not jointly, on or after the entry of the Final Order, to make Delayed Draw Term Loans in a single drawing to the Borrower in U.S. Dollars from its U.S. Lending Office in an aggregate principal amount equal to its Delayed Draw Commitment.  Amounts repaid in respect of Delayed Draw Term Loans may not be reborrowed.

SECTION 2.02        Loans and Borrowings.

(a)    The Loans shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their respective Commitments.

(b)    Subject to *Section 2.14*, each Loan shall be comprised entirely of ABR Loans or Eurocurrency Loans as the Borrower may request in accordance herewith.  Each Lender at its option may make any ABR Loan or Eurocurrency Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided*, that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement and such Lender shall not be entitled to any amounts payable under *Section 2.15* or *Section 2.17* solely in respect of increased costs or taxes resulting from such exercise and existing at the time of such exercise.

(c)    Borrowings of more than one Type may be outstanding at the same time; *provided*, that there shall not at any time be more than a total of five Eurocurrency Borrowings outstanding under the Loans.

(d)    Notwithstanding any other provision of this Agreement, Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Scheduled Maturity Date.

(e)    If no election as to the Type of Borrowing or is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurocurrency Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

SECTION 2.03        Requests for Borrowings.  To request a Borrowing, the Borrower shall notify the Administrative Agent of such request (as provided in *Section 9.01*) in writing by providing a Borrowing Request in the form of *Exhibit C* hereto (a) in the case of a Eurocurrency Borrowing, not later than 12:00 p.m. (Local Time) three (3) Business Days prior to such Eurocurrency Borrowing and (b) in the case of an ABR Borrowing, not later than 12:00 p.m. (Local Time) one (1) Business Day prior to such ABR Borrowing.  Each such written Borrowing Request shall be irrevocable and shall be provided by electronic mail or telecopy to the Administrative Agent.  Each such written Borrowing Request shall specify the following information in compliance with *Section 2.02*:

(i)    the aggregate amount of the requested Borrowing;

(ii)    the date of such Borrowing, which shall be a Business Day;

(iii)    whether such Borrowing is to be an ABR Borrowing or a Eurocurrency Borrowing;

(iv)    in the case of a Eurocurrency Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "*Interest Period*"; and

(v)    the location and number of the account specified by the Borrower to which funds are to be disbursed.

Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04        [Reserved].

SECTION 2.05        [Reserved].

SECTION 2.06        [Reserved].

SECTION 2.07        Interest Elections.  (a) Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurocurrency Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurocurrency Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans resulting from an election made with respect to any such portion shall be considered a separate Borrowing.

(b)    To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election (as provided in *Section 9.01*) in writing (in a form as the Administrative Agent may reasonably request) (which may be by electronic mail or telecopy), in the case of an election that would result in a Borrowing, by the time that a Borrowing Request would be required under *Section 2.03* if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Notwithstanding any other provision of this Section, the Borrower shall not be permitted to (i) change the currency of any Borrowing or (ii) elect an Interest Period for Eurocurrency Loans that does not comply with *Section 2.02(d)*.

(c)    Each written Interest Election Request shall specify the following information in compliance with *Section 2.02*:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to *clauses (iii)* and *(iv)* below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting outstanding credit extension is to be an ABR Borrowing or a Eurocurrency Borrowing; and

(iv)    if the resulting Borrowing is a Eurocurrency Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "***Interest Period***."

If any such Interest Election Request requests a Eurocurrency Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)    Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender to which such Interest Election Request relates of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurocurrency Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the written request (including a request through electronic means) of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing of Loans, may be converted to or continued as a Eurocurrency Borrowing and (ii) unless repaid, each Eurocurrency Borrowing of Loans shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.08    Termination and Reduction of Commitments.    The Initial Commitments shall automatically terminate on the earlier of (i) three (3) Business Days after the Closing Date and (ii) immediately after the incurrence of the Initial Term Loans.  The Delayed Draw Commitments shall automatically terminate upon the earlier of (i) making of the Delayed Draw Term Loans in accordance with *Section 2.01(b)* and 10 Business Days after the entry of the Final Order by the Bankruptcy Court.

SECTION 2.09    Repayment of Loans; Evidence of Debt.

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in *Section 2.10*.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period (if any) applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) any amount received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to *paragraph  (b)* or *(c)* of this *Section 2.09* shall be prima facie evidence of the existence, currencies and amounts of the obligations recorded therein; *provided*, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement and in the event of any conflict between the entries made in the accounts maintained pursuant to *Section 2.09(b)* and the accounts maintained pursuant to *Section 2.09(c)*, the accounts maintained pursuant to *Section 2.09(c)* shall govern and control absent manifest error.

(e)    Any Lender may request that Loans made by it be evidenced by a promissory note (a "***Note***").  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns and in a form approved by the Required Lenders (with respect to Loans) and reasonably acceptable to the Borrower.

SECTION 2.10        Repayment of Loans.

(a)    The outstanding Loans shall be due and payable on the Maturity Date.  If any payment under this *clause (a)* shall be due on a day that is not a Business Day, the date for payment shall be the next preceding Business Day.

(b)    Prior to any repayment of any Loan or Loans hereunder, the Borrower shall select the Borrowing or Borrowings constituting such Loan or Loans to be repaid or reduced and shall notify the Administrative Agent in writing by electronic mail or telecopy) of such selection (i) in the case of an ABR Borrowing, not later than 12:00 p.m., Local Time, one Business Day before the scheduled date of such repayment and (ii) in the case of a Eurocurrency Borrowing, not later than 12:00 p.m., Local Time, three Business Days before the scheduled date of such repayment or reduction.  Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing.  Notwithstanding anything to the contrary in the immediately preceding sentence, the Borrower shall select the Borrowing or Borrowings to be repaid and shall notify the Administrative Agent in writing (by electronic mail or telecopy) of such selection not later than 12:00 p.m., Local Time, on the scheduled date of such repayment.  Repayments of Borrowings shall be accompanied by accrued interest on the amount repaid (which interest may be paid in kind in accordance with *Section 2.13(f)*) and reasonably documented out-of-pocket expenses with respect to such repayments to the extent required to be reimbursed pursuant to the terms of this Agreement.  Notwithstanding anything herein to the contrary (but in any event subject to *Section 2.16*), the Borrower may (x) rescind any notice of prepayment pursuant to *Section 2.11* if such prepayment would have resulted from a refinancing or repayment of the facilities under this Agreement (whether through the incurrence of other Indebtedness, issuance of Equity Interests or otherwise), which refinancing or repayment shall not be consummated or shall otherwise be delayed, or (y) condition such prepayment pursuant to *Section 2.11* on the consummation of such refinancing or repayment.

SECTION 2.11        Prepayment of Loans.

The Borrower shall have the right, in its sole discretion at any time and from time to time to prepay any Borrowing in whole or in part, in accordance with *Section 2.10(b)*, without premium or penalty (but subject to *Section 2.16*), in an aggregate principal amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum or, if less, the amount outstanding, subject to prior written notice in accordance with *Section 2.10(b)*.

SECTION 2.12        Fees.

(a)        The Borrower agrees to pay to the Administrative Agent and the Collateral Agent, for the account of the Administrative Agent and the Collateral Agent, the fees set forth in the Agency Fee Letter (the "***Agent Fees***").

(b)        All Fees and expenses shall be paid on the dates due, in immediately available funds, to the Administrative Agent, for distribution, if and as appropriate, among the applicable Lenders.  Once paid, none of the Fees shall be refundable under any circumstances.

SECTION 2.13        Interest.

(a)        The Loans comprising each ABR Borrowing shall bear interest at the ABR *plus* the Applicable Margin, which interest shall be capitalized on each Interest Payment Date as set forth in *Section 2.13(f)* by adding such amount to the outstanding principal amount of the applicable Loans.

(b)        The Loans comprising each Eurocurrency Borrowing shall bear interest at the Adjusted Eurocurrency Rate for the Interest Period in effect for such Borrowing *plus* the Applicable Margin, which interest shall be capitalized on each Interest Payment Date as set forth in *Section 2.13(f)* by adding such amount to the outstanding principal amount of the applicable Loans.

(c)        Notwithstanding the foregoing, if any Event of Default exists or is continuing, then all such amounts outstanding under the Loan Documents shall bear interest, after as well as before judgment, at a rate per annum equal to (A) in the case of principal of any Loan, 2.00% plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (B) in the case of any other amount, 2.00% *plus* the interest rate that would have applied had such amount, during the period of non-payment, constituted an ABR Loan; *provided*, that this *paragraph (c)* shall not apply to any Event of Default that has been waived by the Lenders pursuant to *Section 9.09*.

(d)        Accrued interest on each Loan shall be payable in arrears (i) on each Interest Payment Date for such Loan as set forth in *Section 2.13(f)* and (ii) on the Maturity Date; *provided*, that (A) interest accrued pursuant to *paragraph (c)* of this Section shall be payable on demand, (B) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable in kind in accordance with *Section 2.13(f)* on the date of such repayment or prepayment, and (C) in the event of any conversion of any Eurocurrency Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion in kind in accordance with *Section 2.13(f)*.

(e)        All computations of interest for ABR Loans shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, *provided* that any Loan that is repaid on the same day on which it is made shall, subject to *Section 2.18(a)*, bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(f)        Interest shall be paid by increasing the principal amount of the applicable outstanding Loans, which increase shall be evidenced on the Register and, if such outstanding Loan is evidenced by a Note with respect to any Lender, shall also be evidenced by a new Note if requested by such Lender.  Interest shall accrue and be capitalized and added to the outstanding principal balance of the applicable Loans on each Interest Payment Date or such other date that interest is payable under *Section 2.13(d)*. From and after each applicable Interest Payment Date or such other date that interest is payable under *Section 2.13(d)*, the outstanding principal amount of the applicable Loans shall without further action by any party hereto be deemed to be increased by the aggregate amount of interest so capitalized and added to the applicable Loans in accordance with the immediately preceding sentence, whereupon such amount of interest so capitalized and added shall also accrue interest in accordance with the terms of this *Section 2.13*. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.  Interest that accrues pursuant to *Section 2.13(c)* shall be payable on demand.  Subject to *Section 2.13(c)*, no interest hereunder shall be payable in cash prior to the applicable Maturity Date.

SECTION 2.14        Alternate Rate of Interest.  If prior to the commencement of any Interest Period for a Eurocurrency Borrowing denominated in any currency, on any day:

(a)        the Blackstone Representative determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining any applicable Adjusted Eurocurrency Rate for such currency for such Interest Period for such day; or

(b)        the Blackstone Representative determines that any applicable Adjusted Eurocurrency Rate for such currency for such Interest Period for such day will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing, for such Interest Period or such day;

then the Blackstone Representative shall direct the Administrative Agent to give notice thereof to the Borrower and the Lenders by electronic mail or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurocurrency Borrowing denominated in such currency shall be ineffective and such Borrowing shall be converted to or continued as on the last day of the Interest Period applicable thereto, an ABR Borrowing and (ii)

if any Borrowing Request requests a Eurocurrency Borrowing in such currency, such Borrowing shall be made as an ABR Borrowing.

If at any time the Blackstone Representative determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in *clause (a)* above have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in *clause (a)* above have not arisen but the supervisor for administrator of LIBOR or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which LIBOR shall no longer be used for determining interest rates for loans, then the Blackstone Representative and the Borrower shall endeavor to establish an alternate rate of interest to LIBOR that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the U.S. at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable (but, for the avoidance of doubt, such related changes shall not include a reduction in the Applicable Margin).  Notwithstanding anything to the contrary in *Section 9.09*, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five (5) Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from the Required Lenders stating that such Required Lenders object to such amendment.  From and after the making of a determination described in this paragraph until an alternate rate of interest shall be determined in accordance with this paragraph (but in the case of the circumstances described in *clause (ii)*, only to the extent LIBOR for the applicable Interest Period is not available or published at such time on a current basis) any Interest Election Request that requests the conversion of Borrowing to, or continuation of any Borrowing as, a LIBOR Borrowing for the applicable Interest Period shall be ineffective.

The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to the administration, submission or any other matter related to the rates in the definition of Eurocurrency Base Rate or with respect to any rate that is an alternative or replacement for or successor to any of such rates or the effect of any of the foregoing, or of any LIBOR successor rate. The Administrative Agent shall not be under any obligation to monitor, determine or verify the unavailability or cessation of LIBOR (or any other alternate rate) or to select, determine or designate any alternate rate, or other successor or replacement rate, or whether any conditions to the designation of such a rate have been satisfied. The Administrative Agent shall not be liable for any inability, failure or delay on its part to perform any of its duties set forth in this Agreement as a result of the unavailability of LIBOR or other applicable alternate benchmark rate) or absence of any replacement successor or replacement rate, including as a result of any inability, delay, error or inaccuracy on the part of any other transaction party, including without limitation the Blackstone Representative or the Required Lenders, in providing any direction, instruction, notice or information required or contemplated by the terms of this Agreement and reasonably required for the performance of such duties.

SECTION 2.15    <u>Increased Costs</u>.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any such reserve requirement reflected in the Adjusted Eurocurrency Rate);

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in *clauses (b)* through *(d)* of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurocurrency Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurocurrency Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any *sum* received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    If any Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower shall pay to such Lender, as applicable, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in *paragraph (a)* or *(b)* of this Section shall be delivered to the Borrower (attaching reasonable supporting back-up evidence with respect to such calculations) and shall be conclusive absent manifest error. The Borrower shall pay such the amount shown as due on any such certificate within 30 days after receipt thereof.

(d)    Promptly after any Lender has determined that it will make a request for increased compensation pursuant to this *Section 2.15*, such Lender shall notify the Borrower thereof. Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; *provided*, that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender, as applicable, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; *provided*, *further*, that if the Change in Law giving rise to such increased costs or reductions is retroactive,

then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.16    Break Funding Payments.  In the event of (a) the payment of any principal of any Eurocurrency Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurocurrency Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurocurrency Loan on the date specified in any notice delivered pursuant hereto or (d) the assignment of any Eurocurrency Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to *Section 2.19*, then, in any such event, the Borrower shall compensate each Lender for their actual, reasonable and documented out-of-pocket loss, cost and expense attributable to such event.  In the case of a Eurocurrency Loan, such loss, cost or expense to any Lender shall be deemed to be the amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted Eurocurrency Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue a Eurocurrency Loan, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate that such Lender would bid were it to bid, at the commencement of such period, for deposits in the applicable currency of a comparable amount and period from other banks in the Eurocurrency market.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section (together with reasonable supporting backup calculations) in respect thereof shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

SECTION 2.17    Taxes.

(a)    *Defined Terms*.  For purposes of this *Section 2.17*, the term "applicable law" includes FATCA.

(b)    *Payments Free of Taxes*.  Any and all payments by or on account of any obligation of the Borrower or any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower or the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)     Payment of Other Taxes by the Borrower.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)     Indemnification by the Borrower.  The Loan Parties shall jointly and severally indemnify each Recipient, within 30 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this *Section 2.17(d)*) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)     Evidence of Payments.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this *Section 2.17*, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)     Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 30 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower or any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of *Section 9.04(c)* relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this *Section 2.17(f)*.

(g)     Status of Lenders.

(i)     Each Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, each Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably

requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in *(ii)(A)*, *(ii)(B)* and *(ii)(D))* shall not be required if, in the reasonable judgment of the Lender, such completion, execution or submission would subject such Person to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Person.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)    each Lender, that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Person becomes a party to this Agreement or other applicable Loan Document (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Person is exempt from U.S. federal backup withholding Tax;

(B)    each Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Person becomes a party to this Agreement or other applicable Loan Document (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed copies of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "***U.S. Tax Compliance Certificate***") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(4)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner;

(C)      each Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a party to this Agreement or other applicable Loan Document (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)      if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if the Lender or the Agent (as applicable) were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), the Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that the Lender has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this *clause (D)*, "**FATCA**" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender and each Agent agree that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, the Lender shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)      Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this *Section 2.17* (including by the payment of additional amounts

pursuant to this *Section 2.17*), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this *Section 2.17* with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this *paragraph (h)* (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this *paragraph (h)*, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this *paragraph (h)* the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This *paragraph (h)* shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)    Survival.  Each party's obligations under this *Section 2.17* shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 2.18    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)    Unless otherwise specified herein, the Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts payable under *Section 2.15*, *2.16* or *2.17*, or otherwise) prior to 2:00 p.m., Local Time, on the date when due, in immediately available funds, without condition or deduction for any defense, recoupment, set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent to the applicable account designated to the Borrower by the Administrative Agent and except that payments pursuant to *Section 2.15*, *2.16*, *2.17* and *9.05* shall be made directly to the persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof.  Unless otherwise specified herein, if any payment hereunder shall be due on a day that is not a Business Day or the date for any delivery or performance of an Obligation shall be required on a date that is not a Business Day, the date for payment, performance or delivery, as applicable, shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document of principal or interest in respect of any Loan (or of any breakage indemnity in respect of any Loan) shall be made in the currency of such Loan; all other payments hereunder and under each other Loan Document shall be made in U.S. Dollars, except as otherwise expressly provided herein.  Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance

with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)    If at any time insufficient funds are received by and available to the Administrative Agent from the Borrower to pay fully all amounts of principal, interest and fees then due from the Borrower hereunder, such funds shall be applied (i) *first*, towards payment of interest and fees then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) *second*, the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)    If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (participations in the Loans to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; *provided*, that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this *paragraph (c)* shall not be construed to apply to (x) any payment made pursuant to and in accordance with the express terms of this Agreement (including, without limitation, the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant.  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of (A) (1) in the case of Loans, the Federal Funds Effective Rate, (2) in the case of any other amounts denominated in U.S. Dollars, the Federal Funds Effective Rate, and (3) in the case of any other amount denominated in a currency other than U.S. Dollars, the rate reasonably determined by the Administrative Agent to be the cost to it of funding such amount, and (B) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)    If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this *Article II*, and

such funds are not made available to the Borrower by the Administrative Agent because the applicable conditions set forth in *Article IV* are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(f)     The obligations of the Lenders hereunder to make Loans and to make payments pursuant to *Section 9.05(d)* are several and not joint.  The failure of any Lender to make any Loan, to fund any such participation or to make any payment under *Section 9.05(d)* on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under *Section 9.05(d)*.

SECTION 2.19     Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under *Section 2.15*, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to *Section 2.17*, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to *Section 2.15* or *2.17*, as applicable, in the future and (ii) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material respect.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If any Lender requests compensation under *Section 2.15*, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to *Section 2.17*, or is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require any such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in *Section 9.04*), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided*, that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, delayed or conditioned, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) (iii) in the case of any such assignment resulting from a claim for compensation under *Section 2.15* or payments required to be made pursuant to *Section 2.17*, such assignment will result in a reduction in such compensation or payments, (iv) the Borrower shall have paid to the Administrative Agent the assignment fee specified in *Section 9.04*, and (v) such assignment does not conflict with any applicable laws.  A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment cease to apply.  Nothing in this *Section 2.19* shall be deemed to prejudice any rights that the Borrower may have against any Lender that is a Defaulting Lender.

(c)    If any Lender has failed to consent to a proposed amendment, waiver, discharge or termination that pursuant to the terms of *Section 9.09* requires the consent of all the Lenders affected or each Lender and with respect to which the Required Lenders (as may be required by *Section 9.09* in any given case) shall have granted their consent (any such Lender referred to above, a "***Non-Consenting Lender***"), then so long as no Event of Default then exists, the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) to (i) replace any such Non-Consenting Lender by requiring such Non-Consenting Lender to assign its Loans and Commitments hereunder to one or more assignees reasonably acceptable to the Required Lenders or (ii) require such Non-Consenting Lender to assign all of its Loans hereunder to one or more assignees reasonably acceptable to the Required Lenders; *provided*, that (i) all Obligations of the Borrower owing to such Non-Consenting Lender being replaced, including obligations arising under *Section 2.16* as a result of such replacement, and/or all Obligations of the Borrower owing to such Non-Consenting Lender in respect of any Loans required to be assigned shall be paid in full to such Non-Consenting Lender concurrently with such assignment, and (ii) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof *plus* accrued and unpaid interest thereon.  In connection with any such assignment the Borrower, the Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with *Section 9.04*.

SECTION 2.20    Inability to Determine Rates.

(a)    If the Required Lenders determine after the Closing Date that for any reason adequate and reasonable means do not exist for determining the applicable Eurocurrency Base Rate for any requested Interest Period with respect to a proposed Eurocurrency Loan, or that the Eurocurrency Base Rate for any requested Interest Period with respect to a proposed Eurocurrency Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that Dollar deposits are not being offered to banks in the London interbank eurodollar, or other applicable, market for the applicable amount and the Interest Period of such Eurocurrency Loan, the Required Lenders will promptly direct the Administrative Agent to notify the Borrower in writing and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain Eurocurrency Loans shall be suspended and (y) in the event a determination described in the preceding sentence with respect to the Eurocurrency Base Rate component of the ABR, the utilization of the Eurocurrency Base Rate component in determining the ABR shall be suspended, in each case until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of such Eurocurrency Loans or, failing that, will be deemed to have converted such request, if applicable, into a request for a Borrowing of ABR Loans in the amount specified therein.

(b)    Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent (acting at the direction of the Required Lenders) and the Borrower may amend this Agreement to replace the Eurocurrency Base Rate with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event or an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders accept such

amendment. No replacement of the Eurocurrency Base Rate with a Benchmark Replacement pursuant to this *Section 2.20* will occur prior to the applicable Benchmark Transition Start Date.

(c)     In connection with the implementation of a Benchmark Replacement, the Required Lenders and the Borrower will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement, which are reasonably acceptable to each of the Borrower and the Required Lenders; *provided* that, with respect to any such amendment effected after the implementation of a Benchmark Replacement, the Administrative Agent shall post each such amendment implementing such Benchmark Replacement Conforming Changes to the Lenders promptly after such amendment becomes effective.

(d)     The Administrative Agent acting at the direction of the Required Lenders will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Required Lenders pursuant to this *Section 2.20*, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this *Section 2.20*.

(e)     Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Borrowing of, conversion to or continuation of Eurocurrency Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans. During any Benchmark Unavailability Period, the component of the ABR based upon the Eurocurrency Base Rate will not be used in any determination of the ABR.

(f)     Neither the Administrative Agent nor the Collateral Agent shall be under any obligation (i) to monitor, determine or verify the unavailability or cessation of the Eurocurrency Base Rate or LIBOR (or other applicable benchmark index), or whether or when there has occurred, or to give notice to any other transaction party of the occurrence of, any Benchmark Transition Event, Benchmark Replacement Date, Benchmark Transition Start Date or Benchmark Unavailability Period, (ii) to select, determine or designate any Benchmark Replacement, or other successor or replacement benchmark index, or whether any conditions to the designation of such a rate have been satisfied, (iii) to select, determine or designate any Benchmark Replacement Adjustment, or other modifier to any replacement or successor index, or (iv) to determine whether or what Benchmark Replacement Conforming Changes are necessary or advisable, if any, in connection with any of the foregoing.

(g)    Neither the Administrative Agent nor the Collateral Agent shall be liable for any inability, failure or delay on its part to perform any of its duties set forth in this Agreement as a result of the unavailability of the Eurocurrency Base Rate or LIBOR (or other applicable benchmark index) and absence of a designated Benchmark Replacement (or other successor or replacement benchmark index), including as a result of any inability, delay, error or inaccuracy on the part of any other transaction party, including without limitation the Blackstone Representative and/or Required Lenders, in providing any direction, instruction, notice or information required or contemplated by the terms of this Agreement and reasonably required for the performance of such duties.

(h)    Neither the Administrative Agent nor the Collateral Agent shall have any liability for any interest rate published by any publication that is the source for determining the interest rates of the Borrowings, including but not limited to the Reuters Screen (or other commercially available source designated by the Required Lenders from time to time, or any successor source), or for any rates compiled by the ICE Benchmark Administration or any successor thereto, or for any rates published on any publicly available source, including without limitation the Federal Reserve Bank of New York's Website, or in any of the foregoing cases for any delay, error or inaccuracy in the publication of any such rates, or for any subsequent correction or adjustment thereto.

SECTION 2.21    <u>Illegality</u>.  If any Lender reasonably determines that any change in law has made it unlawful, or that any Governmental Authority has asserted after the Closing Date that it is unlawful, for any Lender or its applicable lending office to make or maintain any Eurocurrency Loans, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligations of such Lender to make or continue Eurocurrency Loans or to convert ABR Borrowings to Eurocurrency Borrowings shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall upon demand from such Lender (with a copy to the Administrative Agent), either convert all Eurocurrency Borrowings of such Lender to ABR Borrowings, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Borrowings to such day, or immediately, if such Lender may not lawfully continue to maintain such Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

SECTION 2.22    [Reserved].

SECTION 2.23    <u>Defaulting Lenders</u>.

(a)    <u>Adjustments</u>.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    <u>Waivers and Amendments</u>.  That Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in <u>*Section 9.09*</u>.

(ii)    _Reallocation of Payments_.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to _Article VII_ or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to _Section 9.06_), shall be applied at such time or times as follows:  _first_, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; _second_, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement; _third_, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; _fourth_, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; _fifth_, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and _sixth_, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; _provided_ that if (x) such payment is a payment of the principal amount of any Loans in respect of which that Defaulting Lender has not fully funded its appropriate share and (y) such Loans were made at a time when the conditions set forth in _Section 4.01_, _Section 4.02_ and _Section 4.03_ were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of that Defaulting Lender.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    [Reserved].

(iv)    [Reserved].

(v)    [Reserved].

(b)    _Defaulting Lender Cure_.  If the Borrower and the Administrative Agent agree in writing in their reasonable discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages, whereupon that Lender will cease to be a Defaulting Lender; _provided_ that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and _provided_, _further_, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from

Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

SECTION 2.24    Conversion to Exit Facility Agreement.

(a)    So long as the Restructuring Support Agreement is in full force and effect, at the option of the Borrower, which option shall be exercised no later than 10 days prior to the confirmation hearing for an RSA Plan, the Loan Parties, in their capacity as reorganized Debtors, to the extent such Loan Parties as reorganized are required under the Exit Facility Documentation to continue to be obligors under the Exit Facilities, may (A) repay the Loans hereunder in cash or (B) assume all Obligations in respect of the Loans hereunder and all other monetary obligations in respect of the Loans in accordance with the RSA Plan, so long as in the case of any conversion (i) all, but not less than all, outstanding Loans are continued or converted, as the case may be, as loans under the Exit Facilities in accordance with the RSA Plan, (ii) each Lender hereunder is a lender under the Exit Facilities in accordance with the RSA Plan, (iii) accrued and unpaid interest on the Loans is capitalized into principal as term loans under the Exit Facilities on the consummation date of the RSA Plan and (iv) the Credit Facility is terminated and is superseded and replaced in its entirety by the Exit Facilities in accordance with the RSA Plan; and

(b)    The effectiveness of the Exit Facilities shall be subject to the following conditions precedent:

(i)    Negotiation, execution and/or delivery of definitive Exit Facility Documentation, consistent in all material respects with the terms set forth in the RSA Plan and otherwise in form and substance reasonably satisfactory to the Required Lenders and the Borrower and the satisfaction of the conditions precedent set forth therein;

(ii)    The Reorganization Plan shall be in form and substance consistent in all material respects with the Restructuring Support Agreement and the confirmation order for such Reorganization Plan shall be entered in form and substance reasonably satisfactory to the Required Lenders; and

(iii)    the consummation of the RSA Plan shall have occurred on a date to be agreed by the Required Lenders.

**ARTICLE III**
**Representations and Warranties**

The Borrower represents and warrants on the Closing Date (after giving effect to the Transactions occurring on the Closing Date) and upon each Credit Extension thereafter and subject in all respects to the entry of the DIP Order and the First Day Orders and the terms thereto that:

SECTION 3.01    Organization; Powers.  Except as set forth on *Schedule 3.01*, the Borrower and each of the Subsidiaries (a) is a limited liability company, private limited company, unlimited liability company, corporation or partnership duly organized, validly existing and in good standing (or, if applicable in a foreign jurisdiction, enjoys the equivalent status under the laws of any jurisdiction of organization outside the United States) under the laws of the jurisdiction

of its organization, (b) subject to any restriction arising on account of the Borrower's or any Subsidiary's status as a "debtor" under the Bankruptcy Code or any restriction as a result of any required approvals of the entry and terms of the DIP Order and other orders of the Bankruptcy Court, has all requisite corporate or other organizational power and authority to own its property and assets and to carry on its business as now conducted, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, (c) is qualified to do business in each jurisdiction and licensed and, as applicable, in good standing under the laws of each jurisdiction where such qualification or license or, if applicable, good standing is required, except where the failure so to qualify would not reasonably be expected to have a Material Adverse Effect, (d) has the corporate or other organizational power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Borrower, to borrow and otherwise obtain credit hereunder and (e) unless stayed by the Chapter 11 Cases, has all requisite governmental licenses, authorizations, consents and approvals to own its property and assets and to carry on its business as now conducted, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.02    Authorization.  The execution, delivery and performance by the Borrower and each of the other Loan Parties of each of the Loan Documents to which it is a party, and the borrowings hereunder and the transactions forming a part of the Transactions, (a) have been duly authorized by all corporate, stockholder or limited liability company or partnership action required to be obtained by the Borrower and such Loan Parties and (b) will not (i) violate (A) any provision of law, statute, rule or regulation, (B) the certificate or articles of incorporation or other constitutive documents (including any limited liability company or operating agreements) or by-laws of the Borrower or any such Loan Parties, (C) any applicable order of any court or any rule, regulation or order of any Governmental Authority or (D) any provision of any indenture, certificate of designation for preferred stock, agreement or other instrument to which the Borrower or any such Loan Parties is a party or by which any of them or any of their property is or may be bound, in each case, not subject to the automatic stay under the Chapter 11 Cases or executed after the Petition Date, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, give rise to a right of or result in any cancellation or acceleration of any right or obligation (including any payment) or to a loss of a material benefit under any such indenture, certificate of designation for preferred stock, agreement or other instrument, where any such conflict, violation, breach or default referred to in _clause (i)_ or _(ii)_ of this _Section 3.02_, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by the Borrower or any such Loan Parties, other than the Liens created by the Loan Documents and Liens permitted by _Section 6.02_ and the DIP Orders.

SECTION 3.03    Enforceability.  Subject to the entry of the DIP Order, this Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Loan Document when executed and delivered by each Loan Party that is party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against each such Loan Party in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered

in a proceeding in equity or at law), (iii) implied covenants of good faith and fair dealing and (iv) any foreign laws, rules and regulations as they relate to pledges of Equity Interests or granting of Liens pursuant to such agreements.

SECTION 3.04    Governmental Approvals.  Except for the entry of the DIP Order, no action, consent or approval of, registration or filing with or any other action by any Governmental Authority is or will be required in connection with the Transactions, except for (a) filings necessary to perfect or maintain the perfection or priority of the Liens created by the Security Documents (including, for the avoidance of doubt, the filing of Uniform Commercial Code financing statements and equivalent filings in foreign jurisdictions), (b) filings with the United States Patent and Trademark Office and the United States Copyright Office and comparable offices in foreign jurisdictions and equivalent filings in foreign jurisdictions, (c) recordation of any mortgages, (d) such as have been made or obtained and are in full force and effect, (e) such other actions, consents, approvals, registrations or filings with respect to which the failure to be obtained or made would not reasonably be expected to have a Material Adverse Effect and (f) filings or other actions listed on *Schedule 3.04*.

SECTION 3.05    Financial Statements.  (a) The Borrower has heretofore furnished to the Lenders:

(i)    [Reserved].

(ii)    The audited consolidated balance sheets of the Borrower and its subsidiaries as at December 31, 2018 and the related statements of operations, changes in combined equity and cash flows of the Borrower and its subsidiaries for the fiscal year ended December 31, 2018, in each such case, copies of which have heretofore been furnished or otherwise made available to each Lender, which have been prepared in accordance with GAAP applied consistently throughout the periods involved, and present fairly, in all material respects, the financial position and results of operations of the Borrower and its subsidiaries, as of and on such dates set forth on such financial statements.

(iii)    The unaudited quarterly consolidated balance sheets of the Borrower and its combined Subsidiaries and the related statements of operations and cash flows showing the financial position of the Borrower and its combined Subsidiaries, in each such case, which have been prepared in accordance with GAAP applied consistently throughout the periods involved, and present fairly, in all material respects, the financial position and results of operations of the Borrower and its Subsidiaries, for the most recent fiscal quarter ended December 31, 2019, subject to normal year-end audit adjustments and the absence of footnotes.

(iv)    The unaudited monthly summary income statement information in a form consistent with what is delivered to the Board of Directors and summary balance sheet information in the form agreed to between the Required Lenders and the Borrower prior to the Closing Date, for the most recent month ended February 29, 2020.

SECTION 3.06    No Material Adverse Effect.  Except for the Chapter 11 Cases and the facts disclosed in the filings made in connection therewith (including any filing with the SEC

prior to the Petition Date), since the Petition Date, there has been no event, development or circumstance that has had or would reasonably be expected to have a Material Adverse Effect.

SECTION 3.07        Title to Properties; Possession Under Leases.   (a) Each of the Borrower and the Subsidiaries has good and valid record fee simple title to, or valid leasehold interests in, or easements or other limited property interests in, all its properties and assets, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and except where the failure to have such title, interests or easements would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)        Each of the Borrower and the Subsidiaries has complied with all obligations under all leases to which it is a party, except where the failure to comply would not reasonably be considered to have Material Adverse Effect, and all such leases are in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have a Material Adverse Effect.  Except as set forth on *Schedule 3.07(b)*, as of the Closing Date, the Borrower and each of the Subsidiaries enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)        Each of the Borrower and the Subsidiaries owns or possesses or has valid licenses to all patents, trademarks, service marks, trade names, copyrights, domain names, trade secrets, and all applications or registrations for patents, trademarks, service marks, trade names, copyrights, and domain names and other intellectual property rights with respect thereto necessary for the present conduct of its business, without any conflict (of which the Borrower has been notified in writing) with the rights of others, and there has been no infringement of any Intellectual Property, except where such failure to own or possess or have a valid license to such intellectual property rights or where such conflicts and restrictions, in each case would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.08        Subsidiaries.  (a) *Schedule 3.08(a)* sets forth as of the Closing Date the name and jurisdiction of incorporation, formation or organization of each direct and indirect subsidiary of Borrower.  Except as set forth on *Schedule 3.08(a)*, as of the Closing Date, all of the issued and outstanding Equity Interests of each subsidiary of Borrower is owned directly by Borrower or by another subsidiary.

(b)        Each Loan Party is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by (or purported to be pledged by) it under the Security Documents, free of any and all Liens other than Liens permitted by *Section 6.02*.

(c)        As of the Closing Date, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Equity Interests of any Subsidiaries of the Borrower which are Loan Parties, and there are no other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any Equity Interests

pledged by (or purported to be pledged) under the Security Documents, except rights of employees to purchase Equity Interests of Borrower or as set forth on *Schedule 3.08(c)*.

SECTION 3.09        Litigation; Commercial Tort Claims; Compliance with Laws.

(a)        Except for the Chapter 11 Cases, as of the Closing Date, there are no actions, suits or proceedings at law or in equity or, to the knowledge of the Borrower, investigations by or on behalf of any Governmental Authority or in arbitration now pending, or, to the knowledge of the Borrower, threatened in writing against or affecting the Borrower or any of its subsidiaries or any business, property or rights of any such person (i) that involve any Loan Document or the Transactions or (ii) would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Except for the Chapter 11 cases, as of the date of any Borrowing after the Closing Date, (A) there are no actions, suits or proceedings at law or in equity or, to the knowledge of the Borrower, investigations by or on behalf of any Governmental Authority or in arbitration now pending, or, to the knowledge of the Borrower, threatened in writing against or affecting the Borrower or any of its Subsidiaries or any business, property or rights of any such person which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and (B) there are no actions, suits or proceedings at law or in equity against any of the vendors of the Borrower or any of its Subsidiaries that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. As of the Closing Date,  Schedule 3.09(a), set forth the complete list of commercial tort claims of the Borrower or any other Loan Party and, to the Borrower's knowledge, a complete list of all material actions, suits and proceedings against the Borrower or any Subsidiary.

(b)        Except as permitted by an order of the Bankruptcy Court, none of the Borrower, the Subsidiaries or their respective properties or assets is in violation of (nor will the continued operation of their material properties and assets as currently conducted violate) any law, rule or regulation (including any zoning, building, Environmental Law, ordinance, code or approval or any building permit), or is in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)        Agreements with Regulatory Agencies.  Except to the extent resulting from the filing of the Chapter 11 Cases, neither the Borrower nor any of its Subsidiaries is subject to any cease-and-desist or enforcement action issued by, or is a party to any written agreement, consent agreement or memorandum of understanding with, or is a party to any commitment letter or similar undertaking to, any Governmental Authority that currently restricts the conduct of its business (each item in this sentence, a "***Regulatory Agreement***") in a manner that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, nor has the Borrower or any of its Subsidiaries been advised since March 31, 2018 by any Governmental Authority that it is issuing, initiating, ordering, or requesting any such Regulatory Agreement that would reasonably be expected to have a Material Adverse Effect.  The Borrower and each of its Subsidiaries is in compliance with each Regulatory Agreement to which it is party or subject, other than to the extent such noncompliance would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and neither the Borrower nor any of its Subsidiaries has received any notice from any Governmental Authority indicating that either the Borrower or any of its Subsidiaries is not in compliance with any such Regulatory Agreement,

other than to the extent such noncompliance would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.10        Federal Reserve Regulations.  (a) None of the Borrower or the Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

(b)        No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock or to refund indebtedness originally incurred for such purpose, or (ii) for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation T, Regulation U or Regulation X.

SECTION 3.11        Investment Company Act.  None of the Borrower or the Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

SECTION 3.12        Use of Proceeds.  The Borrower will use the proceeds of the Loans borrowed on the Closing Date solely for (i) the payment of fees and expenses incurred through the Closing Date in connection with the Loan Documents, (ii) general corporate purposes of the Loan Parties substantially in accordance with the DIP Budget (subject to the variances permitted by *Section 6.10(b)* hereof), (iii) obligations benefiting from the Carve Out, (iv) repayment of the 2020 Term Loans (as defined in the First Lien Credit Agreement) and (v) payment of other amounts permitted under the DIP Budget (subject to the variances permitted by *Section 6.10(b)* hereof).  In accordance with the DIP Budget (subject to the variances permitted by *Section 6.10(b)* hereof), the Borrower will use the proceeds of the Loans on or after the Closing Date for (i) payment of administrative expenses for goods and services in the ordinary course of business (other than Allowed Professional Fees) and other expenses (other than Allowed Professional Fees) in accordance with the DIP Budget (subject to the variances permitted by *Section 6.10(b)* hereof), (ii) payment of amounts owing to the Administrative Agent, the Lenders (including fees and expenses reimbursable under this Agreement or the other Loan Documents), and (iii) payment of obligations benefiting from (x) the Carve Out and (y) other agreements of the Loan Parties as may be agreed to by the Required Lenders, to the extent such obligations are approved by the Bankruptcy Court. Notwithstanding anything to the contrary herein, in any other Loan Documents or elsewhere, neither this Agreement nor any other Loan Document shall restrict the payment of Allowed Professional Fees benefitting from the Carve Out.  No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry any margin stock (within the meaning of Regulation U) or to refinance any Debt originally incurred for such purpose, or for any other purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation T, U and X.  Notwithstanding the foregoing, except as required herein, no proceeds of the Loans may be used to pay any obligation arising prior to the Petition Date unless such payment is provided for in the DIP Budget and approved by the Bankruptcy Court First Day Orders; provided that the foregoing limitation shall not apply with respect to obligations benefiting from the Carve Out.

SECTION 3.13        Tax Returns.  Except as set forth on *Schedule 3.13*:

(a)     Each of the Borrower and the Subsidiaries (i) has timely filed or caused to be timely filed all federal, state, local and non-U.S. Tax returns required to have been filed by it that are material to such companies taken as a whole and each such Tax return is true and correct in all material respects, including, without limitation, relating to all periods or portions thereof ending on or prior to the Closing Date and (ii) has timely paid or caused to be timely paid all Taxes shown thereon to be due and payable by it and all other material Taxes or assessments, except Taxes or assessments, including, without limitation, relating to all periods or portions thereof ending on or prior to the Closing Date that are being contested in good faith by appropriate proceedings in accordance with *Section 5.03* and for which the Borrower or any of the Subsidiaries (as the case may be) has set aside on its books adequate reserves in accordance with GAAP or the payment of which is stayed by the Chapter 11 Cases; and

(b)     Other than as could not be, individually or in the aggregate, reasonably expected to have a Material Adverse Effect:  as of the Closing Date, with respect to each of the Borrower and the Subsidiaries, (i) there are no claims being asserted in writing with respect to any Taxes, (ii) no presently effective waivers or extensions of statutes of limitation with respect to Taxes have been given or requested and (iii) no Tax returns are being examined by, and no written notification of intention to examine has been received from, the Internal Revenue Service or any other Taxing authority.

SECTION 3.14     No Material Misstatements.  (a) All written factual information, but excluding, in each case, projected financial information, the Projections, budgets, estimates and information of a general economic or industry specific nature) (the "*Information*") concerning the Borrower, the Subsidiaries, the Transactions and any other transactions contemplated hereby and made available to any Lenders or the Administrative Agent in connection with the Transactions, when taken as a whole (as modified or supplemented by other information so furnished), were accurate and complete in all material respects, as of the date such Information was furnished to the Lenders and as of the Closing Date and did not contain any untrue statement of a material fact as of any such date or omit to state a material fact necessary in order to make the statements contained therein not materially misleading (after giving effect to all modifications, supplements and updates thereto from time to time) in light of the circumstances under which such statements were made.

Any Projections and estimates prepared by or on behalf of the Borrower or any of its representatives and that have been made available to any Lenders or the Administrative Agent in connection with the Transactions have been prepared in good faith based upon assumptions believed by the Borrower to be reasonable as of the date thereof (it being understood that (i) Projections and estimates by their nature are inherently uncertain, (ii) that actual results may differ significantly from the Projections or estimated results and that such differences may be material, (iii) no assurances are being given that the results reflected in the Projections and estimates will be achieved and (iv) where Projections expressly or implicitly take into account the current market volatility and widespread impact of the COVID-19 outbreak, the extent of the impact of these developments on the Loan Parties' and their Subsidiaries' operational and financial performance will depend on future developments, including the duration and spread of the outbreak and related governmental advisories and restrictions, and the impact of the COVID-19 outbreak on overall demand for the Loan Parties' and their Subsidiaries' products and services, all of which are outside of the control of the Loan Parties and their Subsidiaries, highly uncertain and cannot be predicted).

SECTION 3.15    Employee Benefit Plans.  (a) Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect or as set forth on *Schedule 3.15*:  (i) each of the Borrower and the Subsidiaries is in compliance with the applicable provisions of ERISA and the provisions of the Code relating to the Plans; (ii) no Reportable Event has occurred during the past five years as to which the Borrower, a Subsidiary or any ERISA Affiliate was required to file a report with the PBGC, other than reports that have been filed; (iii) the present value of all accumulated benefit obligations under each Plan (based on those assumptions used to fund such Plan), as of the last annual valuation date applicable thereto for which a valuation is available, does not exceed the fair market value of the assets of such Plan; (iv) no ERISA Event has occurred; and (v) none of the Borrower, the Subsidiaries or the ERISA Affiliates has received any written notification that any Multiemployer Plan is in reorganization or has been terminated within the meaning of Title IV of ERISA, or has knowledge that any Multiemployer Plan is reasonably expected to be terminated.

(b)    Each of the Borrower and the Subsidiaries is in compliance (i) with all applicable provisions of law and all applicable regulations and published interpretations thereunder with respect to any employee pension benefit plan or other employee benefit plan governed by the laws of a jurisdiction other than the United States and (ii) with the terms of any such plan, except, in each case, for such noncompliance that would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.16    Environmental Matters.  Except as disclosed on *Schedule 3.16* and except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (i) no written notice, request for information, order, complaint or penalty has been received by the Borrower or any of the Subsidiaries, and there are no judicial, administrative or other actions, suits or proceedings pending or threatened, that allege a violation of or liability under any applicable Environmental Laws, in each case relating to the Borrower or any of the Subsidiaries, (ii) each of the Borrower and the Subsidiaries has obtained and maintained all permits, licenses and other approvals necessary for its operations to comply with all applicable Environmental Laws and is, and during the term of all applicable statutes of limitation, has been, in compliance with the terms of such permits, licenses and other approvals and with all other applicable Environmental Laws, (iii) to Borrower's knowledge, there has been no material written environmental assessment or audit conducted of any property currently owned or leased by the Borrower or any of the Subsidiaries that has not been made available to the Administrative Agent prior to the date hereof, (iv) no Hazardous Material is located at, on or under any property currently or, to the knowledge of the Borrower, formerly owned, operated or leased by the Borrower or any of its Subsidiaries that would reasonably be expected to give rise to any cost, liability or obligation of the Borrower or any of the Subsidiaries under any applicable Environmental Laws, and no Hazardous Material has been generated, owned, treated, stored, handled or controlled by the Borrower or any of its Subsidiaries and transported to or Released at any location in a manner that would reasonably be expected to give rise to any cost, liability or obligation of the Borrower or any of the Subsidiaries under any Environmental Laws and (v) there are no written agreements in which the Borrower or any of the Subsidiaries has expressly assumed or undertaken responsibility, and such assumption or undertaking of responsibility has not expired or otherwise terminated, for any liability or obligation of any other person arising under or relating to applicable Environmental Laws.

SECTION 3.17          Security Documents.  (a)  This Agreement and the other Loan Documents, upon execution and delivery thereof by the parties thereto and entry of the applicable DIP Order (and subject to the terms therein), will create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and the proceeds thereof, which security interest shall be deemed valid and perfected as of the Closing Date by entry of the DIP Orders with respect to each Loan Party and which shall constitute continuing Liens on the Collateral having priority over all other Liens on the Collateral and securing all the Obligations, other than the Carve Out, the DIP Revolving Credit Agreement and as otherwise set forth in the applicable DIP Order.  The Collateral Agent and Lenders shall not be required to file or record (but shall have the option and authority to file or record) any financing statements, mortgages, notices of Lien or similar instruments, in any jurisdiction or filing office or to take any other action in order to validate, perfect or establish the priority of the Liens and security interest granted by or pursuant to this Agreement, any other Loan Document or the DIP Orders.

Pursuant to Section 364(c)(1) of the Bankruptcy Code, the Obligations of the Loan Parties shall at all times constitute allowed senior administrative expenses against each of the Loan Parties in the Chapter 11 Cases (without the need to file any proof of claim or request for payment of administrative expense), with priority over any and all other administrative expenses, adequate protection claims, diminution claims and all other claims against the Loan Parties, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the United States Bankruptcy Code, and over any and all other administrative expense claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c) (with any claims arising under Section 506(c) only subject to the entry of the Final Order), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the United States Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the United States Bankruptcy Code, and which shall be payable from and have recourse to all pre- and post-petition property of the Loan Parties and their estates and all proceeds thereof, including, without limitation, and subject to entry of the Final Order, any proceeds of Avoidance Actions, subject, as to priority, only to the Carve Out, the DIP Revolving Credit Agreement and as otherwise set forth in the applicable DIP Order.

(b)        [Reserved].

(c)        [Reserved].

(d)        [Reserved].

(e)        [Reserved].

(f)        After taking the actions specified for perfection therein, each Security Document, when executed and delivered, will be effective under applicable law to create in favor of the Collateral Agent (for the benefit of the Secured Parties) a legal, valid and enforceable security interest in the Collateral subject thereto (to the extent intended to be created thereby), and will constitute a fully perfected Lien on and security interest in all right, title and interest of the

Loan Parties in the Collateral subject thereto (to extent required thereby), prior and superior to the rights of any other person (other than with respect to the DIP Revolving Credit Agreement), except for rights secured by Liens expressly provided by *Section 6.02* and subject to the lien priority set forth in the First Lien Pari Passu Intercreditor Agreement and the DIP Orders.

(g)    Notwithstanding anything herein (including this *Section 3.17*) or in any other Loan Document to the contrary, none of the Borrower or any other Loan Party makes any representation or warranty as to the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Equity Interests or any assets of any Foreign Subsidiary or any assets in a foreign jurisdiction, or as to the rights and remedies of the Lenders with respect thereto, under foreign law.

SECTION 3.18    Location of Real Property.  *Schedule 3.18* lists as of the Closing Date all material real property owned or leased by the Borrower and the Loan Parties and the addresses thereof.  As of the Closing Date, the Borrower and the Loan Parties (i) own in fee all the real property set forth as being owned by them on such *Schedule 3.18* and (ii) have in all material respects, valid leases in a material real property set forth as being leased by them on *Schedule 3.18*.

SECTION 3.19    [Reserved].

SECTION 3.20    Labor Matters.  Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes, lockouts, stoppages, slowdowns or other labor disputes pending or threatened against the Borrower or any of the Subsidiaries; (b) the hours worked and payments made to employees of the Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable law dealing with such matters; (c) all payments due from the Borrower or any of the Subsidiaries or for which any claim may be made against the Borrower or any of the Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Borrower or such Subsidiary to the extent required by GAAP; (d) the Borrower and the Subsidiaries are in compliance with all applicable laws, agreements, policies, plans and programs relating to employment and employment practices and (e) to the Borrower's knowledge, all the vendors of the Borrower and the Subsidiaries are in compliance with all applicable laws, agreements, policies, plans and programs relating to employment and employment practices.

SECTION 3.21    Insurance.  As of the Closing Date, *Schedule 3.21* sets forth a true, complete and correct description of all material insurance maintained by or on behalf of the Borrower or the Subsidiaries and such insurance is in full force and effect.  Such insurance complies with the requirements of this Agreement and the other Loan Documents and the Borrower believes (in the good faith judgment of the management of Borrower) that the insurance maintained by or on behalf of the Borrower and the Subsidiaries is in at least such amounts as is adequate, reasonable and prudent in light of the size and nature of its business.

SECTION 3.22    [Reserved].

SECTION 3.23        Material Agreements; No Violation; No Default.

(a)        Except as resulting from or in connection with the Chapter 11 Cases, none of the Borrower or any Subsidiary is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which any of the Borrower or any Subsidiary is a party that, individually or in the aggregate, has resulted, or would reasonably be expected to result, in a Material Adverse Effect.

(b)        As of the Closing Date, no Loan Party has any Material Agreement other than those specifically disclosed on *Schedule 3.23*.

(c)        Except as resulting from or in connection with the Chapter 11 Cases, as of the Closing Date, none of the Borrower or any Subsidiary is in material violation of any Material Agreement and all the Material Agreements are enforceable and valid in all material respects.

(d)        Except as resulting from or in connection with the Chapter 11 Cases, no Default or Event of Default has occurred and is continuing.

SECTION 3.24        [Reserved].

SECTION 3.25        PATRIOT Act, etc.  (a) To the extent applicable, each Loan Party is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) the PATRIOT Act.

(b)        As of the Closing Date, the information provided by Borrower in a Beneficial Ownership Certification delivered to any Lender is true and correct in all respects.

SECTION 3.26        Sanctions Laws

(a)        None of the Loan Parties or Subsidiaries is in violation of any applicable Sanctions Laws, engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any applicable Sanctions Laws.

(b)        None of the Loan Parties or Subsidiaries is any of the following (each a "***Blocked Person***"):

(i)        a Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(ii)        a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(iii)    a Person with which the Administrative Agent, the Collateral Agent or any Lender is prohibited from dealing or otherwise engaging in any transaction by any Sanctions Laws;

(iv)    a Person that commits, threatens or conspires to commit or supports "terrorism" (as defined in Executive Order No. 13224); or

(v)    a Person that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or any replacement website or other replacement official publication of such list.

(c)    No Loan Party or, to the knowledge of any Loan Party, any of its agents acting in any capacity in connection with the Loans, the Transactions or the other transactions hereunder (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224.

SECTION 3.27    Anti-Corruption Laws and Sanctions Laws.    The Borrower, its Subsidiaries and, to the knowledge of the Borrower, their respective officers, employees, directors and agents that act in any capacity in connection with the credit facility established hereby, are in compliance with Anti-Corruption Laws and applicable Sanctions Laws in all material respects. None of (a) the Borrower, any Subsidiary or, to the knowledge of Borrower, any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that act in any capacity in connection with the credit facility established hereby, is a Sanctioned Person.    No Borrowing, use of proceeds or other transaction contemplated by this Agreement will violate any Anti-Corruption Law or applicable Sanctions Laws.

SECTION 3.28    Compliance With Collateral and Guarantee Requirement.    The Borrower and each other Loan Party is in compliance with the Collateral and Guarantee Requirement applicable to each such Loan Party.

SECTION 3.29    Reorganization Matters.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance in all material respects with applicable law and proper notice thereof and the proper notice of (x) the motion seeking approval of the Loan Documents and the Interim Order and, as applicable, the Final Order, (y) the hearing for the approval of the Interim Order, and (z) when applicable, the hearing for the approval of the Final Order will be given; provided that the Borrower shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b)    After the entry of the Interim Order (and subject to the terms therein) and pursuant to and to the extent provided in the Interim Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, subject, as to priority only, to the Carve Out,

DIP Revolving Credit Agreement, the First Lien Credit Agreement and as otherwise set forth in the applicable DIP Order.

(c)    The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended in an adverse manner without the Required Lenders' consent.

(d)    Each DIP Budget and all projected consolidated balance sheets, income statements and cash flow statements of the Borrower and its Subsidiaries delivered to the Administrative Agent and the Lenders were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed in good faith by the Borrower to be fair in light of the conditions existing at the time of delivery of such report or projection.

## ARTICLE IV
## Conditions of Lending

The obligations of the Lenders to make Loans ("***Credit Event***") are subject to the satisfaction (or waiver) of the following conditions:

SECTION 4.01    <u>All Credit Events</u>.  On the date of each Credit Event:

(a)    the Lenders and the Administrative Agent shall have received a Borrowing Request as required by <u>*Section 2.03*</u>.

(b)    The representations and warranties of the Loan Parties set forth in the Loan Documents that are qualified by materiality shall be true and correct, and the representations and warranties that are not so qualified shall be true and correct in all material respects, in each case on and as of the date of such Borrowing, with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties that are qualified by materiality shall be true and correct, and the representations and warranties that are not so qualified shall be true and correct in all material respects, as of such earlier date).

(c)    At the time of and immediately after the applicable Credit Extension, no Event of Default or Default shall have occurred and be continuing or would result immediately therefrom.

(d)    the making of the funding shall not violate any material requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(e)    the DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any adverse respect without the consent of the Required Lenders.

Each Credit Extension shall be deemed to constitute a representation and warranty by the Borrower on the date of such Borrowing as to the matters specified in <u>*paragraphs (b)*</u>, <u>*(c)*</u>, <u>*(d)*</u>, and <u>*(e)*</u> of this <u>*Section 4.01*</u>.

SECTION 4.02     Closing Date.  On the Closing Date:

(a)     The Lenders (or their counsel) shall have received from each party thereto a counterpart of this Agreement and each other Loan Document (including the First Lien Pari Passu Intercreditor Agreement), the DIP Revolving Credit Agreement, the PNC Receivables Purchase Agreement, in each case signed on behalf of each party thereto.

(b)     The Lenders shall have received in the case of each Loan Party each of the items referred to in *clauses (i)*, *(ii)* and *(iii)* below:

(i)     a copy of the certificate or articles of incorporation or formation, limited liability agreement, partnership agreement or other constituent or governing documents, including all amendments thereto, of each Loan Party, (a) if applicable in such jurisdiction, certified as of a recent date by the Secretary of State (or other similar official) of the jurisdiction of its organization, and a certificate as to the good standing (to the extent such concept or a similar concept exists under the laws of such jurisdiction) of each such Loan Party as of a recent date from such Secretary of State (or other similar official), and (b) otherwise, (i) certified by the Secretary or Assistant Secretary of each such Loan Party or other person duly authorized by the constituent documents of such Loan Party or (ii) otherwise in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders;

(ii)     a certificate of the Secretary or Assistant Secretary or similar officer of each Loan Party or other person duly authorized by the constituent documents of such Loan Party dated the Closing Date and certifying (solely in his or her capacity as an officer of such Loan Party):

(A)     that attached thereto is a true and complete copy of the by-laws (or limited liability company agreement, articles of association, partnership agreement or other equivalent constituent and governing documents) of such Loan Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in *clause (B)* below;

(B)     that attached thereto is a true and complete copy of resolutions (or equivalent authorizing actions) duly adopted by the Board of Directors (or equivalent governing body) of such Loan Party (or its managing general partner or managing member), authorizing the execution, delivery and performance of each of the Loan Documents to which such person is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect on the Closing Date;

(C)     that the certificate or articles of incorporation, by-laws, limited liability company agreement, articles of association, partnership agreement or other equivalent constituent and governing documents of such Loan Party have not been amended since the date of the last amendment thereto disclosed pursuant to *clause (i)* above;

80

(D)    as to the incumbency and specimen signature of each officer or other duly authorized person executing any Loan Document or any other document delivered in connection herewith on behalf and in the name of such Loan Party;

(E)    as to the absence of any pending proceeding for the dissolution of liquidation of such Loan Party or, to the knowledge of such person, threatening in writing the existence of such Loan Party; and

(iii)    a certification of another officer or other duly authorized person as to the incumbency and specimen signature of the Secretary or Assistant Secretary or similar officer or other person duly authorized by such Loan Party executing the certificate pursuant to *clause (ii)* above.

(c)    The elements of the Collateral and Guarantee Requirement (other than *clause (f)* thereof) shall have been satisfied and the Lenders and the Administrative Agent shall have received the results of a recent lien, tax lien, judgment and litigation search in each of the jurisdictions or offices (including, without limitation, in the United States Patent and Trademark Office and the United States Copyright Office) in which UCC financing statement should be made to evidence or perfect security interests in all assets of the Loan Parties, and such search shall reveal no Liens on any of the assets of the Loan Parties, except for Liens permitted by *Section 6.02* or Liens to be terminated on the Closing Date pursuant to documentation reasonably satisfactory to the Required Lenders.

(d)    The "Initial Funding Amount", as defined in the DIP Revolving Credit Agreement, which shall not be in an amount less than $10,000,000, shall have been funded substantially concurrently with the initial funding of the Loans on the Closing Date.

(e)    [Reserved].

(f)    The Lenders shall have received a certificate from a Responsible Officer of the Borrower, dated the Closing Date, confirming satisfaction with *Sections 4.01(b)* and *(c)* and *Section 4.02(e)*.

(g)    Prior to the Closing Date, the Administrative Agent and the Lenders shall have received all documentation and other information required by bank regulatory authorities or reasonably requested by the Administrative Agent or any Lender under or in respect of applicable "know-your-customer" and anti-money laundering rules and regulations, including the PATRIOT Act, and including a duly executed W-9 tax form (or such other applicable IRS tax form) of the Borrower that was requested at least three days prior to the Closing Date.

(h)    Prior to the Closing Date, any Borrower that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall deliver a Beneficial Ownership Certification in relation to such Borrower.

(i)    In the case of a Borrowing, the Administrative Agent shall have received a Borrowing Request as required by *Section 2.03*.

(j)     The Lenders and the Administrative Agent shall have received the Initial DIP Budget (it being understood that the condition set forth in this clause *(j)* has been satisfied by the delivery of the DIP Budget to the Lender Advisors on May 19, 2020).

(k)     The Borrower shall have paid (A) the fees required to be paid to (i) the Administrative Agent, (ii) the Collateral Agent, and (iii) the Lenders, in each case, on the Closing Date, and all invoiced reasonable out-of-pocket other costs and expenses which have been invoiced at least one (1) Business Day prior to the Closing Date and are payable pursuant to *Section 9.05* (including (x) the invoiced reasonable out-of-pocket legal fees and expenses of Akin Gump Strauss Hauer & Feld LLP, counsel to the Lenders, (y) the invoiced reasonable out-of-pocket legal fees and expenses of Nixon Peabody LLP, counsel to the Administrative Agent and the Collateral Agent and (z) the invoiced reasonable out-of-pocket fees and expenses of Ducera Partners LLC, financial advisor to the Lenders) and (B) the fees and all reasonable out-of-pocket costs and expenses to (i) the Administrative Agent, (ii) the Collateral Agent and (iii) the Lenders, each as defined and under the Second Lien Credit Agreement which have been invoiced and are payable pursuant to the Second Lien

(l)     Credit Agreement (net of amounts held on retainer).

(m)     The Administrative Agent and Lenders shall have received a certified copy of an order entered by the Bankruptcy Court in substantially the form of Exhibit B or with such changes as may be acceptable to the Administrative Agent and the Required Lenders in their sole discretion, on the one hand, and Borrower, on the other hand (the "*Interim Order*"), which Interim Order (x) shall have been entered on the docket of the Bankruptcy Court no later than four (4) Business Days after the Petition Date and (y) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any adverse respect without the written consent of the Required Lenders.

(n)     The "first day" orders (including, without limitation, any motions related to the Loan Documents, cash management and any critical vendor or supplier motions, but excluding retention applications), in form and substance reasonably satisfactory to the Required Lenders and their counsel, on the one hand, and the Loan Parties, on the other hand, shall have been entered in the Chapter 11 Cases in form and substance reasonably satisfactory to the Required Lenders (the "*First Day Orders*") (it being understood that the form and substance of the First Day Orders delivered to the Lender Advisors on May 17, 2020 are in form and substance reasonably acceptable to the Required Lenders).

(o)     The Cash Management Order and all motions and other documents filed and submitted to, the Bankruptcy Court in connection with the Loan Parties' cash management shall be in form and substance reasonably satisfactory to the Required Lenders (it being understood that the form and substance of such orders, motions and other documents delivered to the Lender Advisors on May 17, 2020 are in form and substance reasonably acceptable to the Required Lenders).

(p)     The DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any adverse respect without the consent of the Required Lenders.

(q)      The funding shall not cause the aggregate amount of the Loans to exceed the amount then authorized by the DIP Order, as the case may be, and any order modifying, reversing, staying or vacating either such order shall not have been entered.

(r)      [Reserved].

(s)      The Restructuring Support Agreement shall be in full force and effect and shall not have been amended or modified without the Required Lenders' prior written consent.

(t)      The Debtors shall have provided a press release relating to the Chapter 11 Cases and the restructuring contemplated thereunder, to be in form and substance satisfactory to the Required Lenders.

(u)      The DIP Revolving Loan Documents and First Lien Pari Passu Intercreditor Agreement shall be in form and substance satisfactory to the Required Lenders.

(v)      Each Loan Party shall be a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

(w)      No motion, pleading or application seeking relief affecting the provision of the financing contemplated hereunder shall have been filed in the Bankruptcy Court by any Loan Party without the prior written consent of the Required Lenders in their sole discretion.

(x)      All other conditions to borrowing in the Interim Order shall have been satisfied.

Without limiting the generality of the provisions of the last *paragraph* of *Section 8.03*, for purposes of determining compliance with the conditions specified in this *Section 4.02*, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender.

SECTION 4.03      Delayed Draw Term Loans.  On or prior to the date of disbursement of the Delayed Draw Term Loans, the Final Order shall have been approved and entered by the Bankruptcy Court.

## ARTICLE V
## Affirmative Covenants

The Borrower covenants and agrees with each Lender that until Payment in Full, the Borrower will, and will cause each of the Subsidiaries to:

SECTION 5.01      Existence; Businesses and Properties.

(a)      Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization, (i) except as otherwise expressly permitted under *Section 6.05* or (with respect to any Subsidiary that is not a Loan Party) to the extent that a failure to do so would not reasonably

be expected to have a Material Adverse Effect and (ii) except for the liquidation or dissolution of Subsidiaries if the assets of such Subsidiaries to the extent they exceed estimated liabilities are acquired by the Borrower or a Wholly Owned Subsidiary of the Borrower in such liquidation or dissolution; *provided*, that Subsidiaries that are Subsidiary Loan Parties may not be liquidated into Subsidiaries that are not Subsidiary Loan Parties, unless such liquidation is otherwise permitted by *Section 6.05(b)*.

(b)     Do or cause to be done all things necessary to (i) obtain, preserve, renew, extend and keep in full force and effect the permits, franchises, authorizations, patents, trademarks, service marks, trade names, copyrights, domain names, trade secrets, applications or registrations for patents, trademarks, service marks, trade names, copyrights, domain names, licenses, rights, privileges and other intellectual property used in and material to the normal conduct of its business, (ii) comply in all material respects with all material applicable laws, rules, regulations and judgments, writs, injunctions, decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, and (iii) at all times maintain and preserve all material property necessary to the normal conduct of its business and keep such property in good repair, working order and condition (ordinary wear and tear excepted) and from time to time use commercially reasonable efforts make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted at all times (in each case except as expressly permitted by this Agreement; unless, in each case, the failure to do so would not be likely to have a Material Adverse Effect).

SECTION 5.02      Insurance.

(a)     Keep its insurable properties insured at all times by financially sound and reputable insurers in such amounts as shall be customary for similar businesses of a similar size owning similar properties in the same localities where the Borrower and its Subsidiaries operate and maintain such reasonable insurance (including, to the extent consistent with past practices or industry practices for Similar Businesses, self-insurance), of such types, to such extent and against such risks, as is customary with companies in the same or similar businesses, taking into account the general degree to which such companies are leveraged, and maintain such other insurance as may be required by law or any other Loan Document.

(b)     Cause all such property and property casualty insurance policies to be endorsed or otherwise amended to include appropriate loss payable endorsements, in form and substance reasonably satisfactory to the Administrative Agent, which endorsement shall provide that, from and after the Closing Date, if the insurance carrier shall have received written notice from the Administrative Agent of the occurrence of an Event of Default, the insurance carrier shall pay all proceeds otherwise payable to the Borrower or the other Loan Parties under such policies directly to the Collateral Agent; cause all such policies to provide that none of the Borrower, the Administrative Agent or any other party shall be a coinsurer thereunder and to contain a "*Replacement Cost Endorsement*," without any deduction for depreciation, and such other provisions as the Required Lenders may reasonably (in light of a Default or a material development in respect of the insured property) require from time to time to protect their interests; deliver original or certified copies of all such policies or a certificate of an insurance broker to the Administrative Agent; cause each such policy to provide that it shall not be canceled, lapsed

(including for nonrenewal) or terminated upon advance notice, to the extent available on commercially reasonable terms, not less than 30 days' prior written notice (or 10 days' prior written notice in the case of any failure to pay any premium due thereunder) thereof by the insurer to the Administrative Agent; deliver to the Administrative Agent, prior to the cancellation, lapse (including for nonrenewal) or termination of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Administrative Agent), or insurance certificate with respect thereto, together with evidence satisfactory to the Administrative Agent of payment of the premium therefor.

(c)      Notify the Administrative Agent promptly after any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this _Section 5.02_ is taken out by the Borrower or any of the Subsidiaries; and promptly deliver to the Administrative Agent a duplicate original copy of such policy or policies, or an insurance certificate with respect thereto.

(d)      In connection with the covenants set forth in this _Section 5.02_, it is understood and agreed that:

(i)      none of the Administrative Agent, the Lenders and their respective agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this _Section 5.02_, it being understood that (A) the Loan Parties shall look solely to their insurance companies or any other parties other than the aforesaid parties for the recovery of such loss or damage and (B) such insurance companies shall have no rights of subrogation against the Administrative Agent, the Lenders or their agents or employees.  If, however, the insurance policies, as a matter of the internal policy of such insurer, do not provide waiver of subrogation rights against such parties, as required above, then the Borrower, on behalf of itself and behalf of each of its subsidiaries, hereby agrees, to the extent permitted by law, to waive, and further agrees to cause each of their Subsidiaries to waive, its right of recovery after the occurrence and during the continuance of an Event of Default, if any, against the Administrative Agent, the Lenders and their respective agents and employees; and

(ii)      the designation of any form, type or amount of insurance coverage by the Administrative Agent under this _Section 5.02_ shall in no event be deemed a representation, warranty or advice by the Administrative Agent or the Lenders that such insurance is adequate for the purposes of the business of the Borrower and the Subsidiaries or the protection of their properties.

SECTION 5.03      Taxes.  In accordance with the Bankruptcy Code and subject to any required approval by an applicable order of the Bankruptcy Court, pay and discharge promptly when due all material Taxes imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise that, if unpaid, might give rise to a Lien upon such properties or any part thereof; _provided_, _however_, that such payment and discharge shall not be required with respect to any such Tax or claim so long as (a) the validity or amount thereof shall be contested in good faith by appropriate proceedings, (b) the Borrower or the affected Subsidiary, as applicable, shall have set aside on its books adequate reserves in accordance with GAAP with

respect thereto, and (c) the failure to make such payment and discharge would not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.04          Financial Statements, Reports, etc.  Furnish to the Administrative Agent and the Lenders:

(a)        as soon as available, but in any event within 90 days after the end of each fiscal year (or, if applicable, such shorter period as the SEC shall specify for the filing of Annual Reports on Form 10-K or, if applicable, such longer period permitted under Rule 12b-25 under the Exchange Act), (i) a consolidated balance sheet and related statements of operations and comprehensive income, cash flows and owners' equity showing the financial position of the Borrower and its subsidiaries as of the close of such fiscal year and the consolidated results of its operations during such year and, commencing with the fiscal year ending December 31, 2020 (and, in the case of a comparative statement of revenue, commencing with the fiscal year ended December 31, 2020), setting forth in comparative form the corresponding figures for the prior fiscal year, and (ii) management's discussion and analysis of significant operational and financial developments during such fiscal year and a "key performance indicator" report with such content as may be mutually agreed by the Required Lenders and the Borrower, which consolidated balance sheet and related statements of operations and comprehensive income, cash flows and owners' equity shall be audited by an independent certified public accounting firm of recognized national standing reasonably acceptable to the Required Lenders (it being understood that any of the "big four" or other nationally recognized accounting firms shall be acceptable to the Required Lenders) and accompanied by an opinion of such accountants to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of the Borrower and its subsidiaries on a consolidated basis in accordance with GAAP (it being understood that the delivery by the Borrower of Annual Reports on Form 10-K of the Borrower and its consolidated subsidiaries shall satisfy the requirements of this *Section 5.04(a)* to the extent such Annual Reports include the information specified herein);

(b)        as soon as available, but in any event within 45 days after the first three fiscal quarters of each fiscal year (or, if applicable, such shorter period as the SEC shall specify for the filing of Quarterly Reports on Form 10-Q or, if applicable, such longer period permitted under Rule 12b-25 under the Exchange Act), (i) a consolidated balance sheet and related statements of operations and comprehensive income and cash flows showing the financial position of the Borrower and its subsidiaries as of the close of such fiscal quarter and the consolidated results of its operations during such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, and (ii)  management's discussion and analysis of significant operational and financial developments during such quarterly period and a "key performance indicator" report with such content as may be reasonably agreed by the Required Lenders and the Borrower, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and comprehensive income and cash flows shall be certified by a Responsible Officer of the Borrower on behalf of the Borrower as fairly presenting, in all material respects, the financial position and results of operations of the Borrower and its subsidiaries on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes (it being understood that the delivery by the Borrower of Quarterly Reports on Form 10-Q of the

Borrower and its consolidated subsidiaries shall satisfy the requirements of this *paragraph (a)* to the extent such Quarterly Reports include the information specified herein));

(c)    as soon as available, but in any event within 45 days after the end of each fiscal month of any fiscal quarter, a consolidated balance sheet and related statements of operations and comprehensive income and cash flows showing the financial position of the Borrower and its subsidiaries as of the close of such month and the consolidated results of its operations during such month;

(d)    [Reserved];

(e)    concurrently with any delivery of financial statements under *paragraph (a) or (b)* above commencing on or after the fiscal quarter ended June 30, 2020, a certificate of a Responsible Officer of the Borrower (the "**Compliance Certificate**") certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

(f)    promptly after the same become publicly available, copies of all periodic and other publicly available reports, proxy statements and, to the extent requested by the Administrative Agent (acting at the direction of the Required Lenders), other reports and statements filed by the Borrower or any of its subsidiaries with the SEC on a non-confidential basis, or after public offering, distributed to its stockholders generally, as applicable; *provided*, *however*, that such reports, proxy statements, filings and other materials required to be delivered pursuant to this *clause (f)* shall be deemed delivered for purposes of this Agreement when posted to the website of the Borrower or any website operated by the SEC containing "EDGAR" database information;

(g)    if, as a result of any material change in accounting principles and policies from those applied in the preparation of the financial statements referred to in *Section 3.05(ii)* for the fiscal year ended December 31, 2018, the consolidated financial statements of the Borrower and its subsidiaries delivered pursuant to *paragraph (a)* above will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such *clauses* had no such change in accounting principles and policies been made, then, together with the first delivery of financial statements pursuant to *paragraph (a)* above following such change, a schedule prepared by a Responsible Officer on behalf of the Borrower reconciling such changes to what the financial statements would have been without such changes;

(h)    as soon as available, but in any event within 90 days after the beginning of each fiscal year, commencing with the fiscal year ending December 31, 2021, detailed consolidated monthly budgets for such fiscal year and, as soon as available, significant revisions approved by the Board of Directors, if any, of such budget and monthly projections with respect to such fiscal year, including a description of underlying assumptions with respect thereto (and including monthly balance sheet, profit and loss and cash flow figures);

(i)    promptly following the reasonable request of the Administrative Agent (acting at the direction of the Required Lenders) (but not more than once per quarter in connection

with the delivery of a Compliance Certificate), an updated perfection certificate (or, to the extent such request relates to specified information contained in such perfection certificate, such information) reflecting such changes to Collateral granted pursuant to a Security Document since the date of the information most recently received pursuant to this *paragraph (i)* or *Section 5.11(f)*;

(j)     concurrently with the delivery of such information under the PNC Receivables Purchase Agreement (or other applicable Securitization Financing Documents), such material information and reporting required under *Sections 7.01(c)(i)*, *7.01(c)(ii)* and *7.01(d)* of the PNC Receivables Purchase Agreement (or any analogous provisions of any other Qualified Securitization Financing Documentation);

(k)     promptly, from time to time, such other information regarding the operations, business affairs and financial condition of the Borrower or any of its subsidiaries (including, without limitation, the Transformation Office Plan), or compliance with the terms of any Loan Document, or such consolidating financial statements, as in each case the Administrative Agent may reasonably request in writing (for itself or on behalf of any Lender);

(l)     promptly following request by the Administrative Agent (acting at the direction of the Required Lenders), copies of:  (i) each Schedule B (Actuarial Information) to the most recent annual report (Form 5500 Series) filed with the Internal Revenue Service with respect to a Plan; (ii) the most recent actuarial valuation report for any Plan; and (iii) all notices received from a Multiemployer Plan sponsor, a plan administrator or any governmental agency, or provided to any Multiemployer Plan by Borrower, a Subsidiary or any ERISA Affiliate, concerning an ERISA Event;

(m)     promptly upon request by the Administrative Agent or any Lender, information and documentation for purposes of compliance with Beneficial Ownership Regulations or any applicable "know your customer" requirements under the PATRIOT Act or other applicable anti-money laundering laws;

(n)     as soon as available, but in any event no later than the Thursday of each calendar week (commencing with the calendar week ending May 29, 2020), deliver to the Administrative Agent, each Lender, the Lender Advisors and the Blackstone Representative a Variance Report for the applicable Variance Test Period as of the end of the immediately preceding calendar week;

(o)     as soon as available, but in any event no later than the Thursday of every fourth calendar week (commencing with the calendar week ending June 12, 2020), deliver to the Administrative Agent, each Lender, the Lender Advisors and the Blackstone Representative a proposed updated 13-week forecast (in the form of the most recently approved DIP Budget) setting forth on a weekly basis for the next thirteen weeks (commencing with the calendar week in which such DIP Budget is delivered) an updated forecast of the information contained in the Initial 13-Week DIP Budget or the previously delivered DIP Budget for such period and a written set of supporting assumptions;

(p)     as soon as available, but in any event no later than (i) the Thursday of each week (commencing with the calendar week ending May 29, 2020), deliver to the Administrative

Agent and the Lender Advisors and the Blackstone Representative an operational report in form and substance reasonably satisfactory to the Required Lenders in their sole discretion, including (1) a statement of weekly sales on a cumulative basis presented against the sales figures projected in the DIP Budget on a monthly basis, (2) an inventory statement reasonably acceptable to the Required Lenders, including inventory purchases and related information as compared to the inventory management plan developed pursuant to *Section 5.23(b)*, as applicable (3) a retail and corporate headcount, (4) Liquidity on the last Business Day of the prior week, (5) an order booking report in a format reasonably acceptable to the Required Lenders, and (6) payments to general unsecured claims (and such other information with respect to general unsecured claims reasonably satisfactory to the Required Lenders), in each case, as of the end of the immediately preceding calendar week and (ii) the Thursday of each two week period (commencing with the calendar week ending May 29, 2020), make available to the Administrative Agent and the Lender Advisors and the Blackstone Representative a written update to the Transformation Office Plan in form and substance satisfactory to the Required Lenders in their sole discretion; and

(q)     reports filed with the Bankruptcy Court.  Deliver to counsel to the Administrative Agent and the Lender Advisors copies of all monthly reports, projections, or other written information respecting each of the Loan Parties' business or financial condition or prospects as well as all pleadings, motions, applications and judicial information filed by or on behalf of the Borrower with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or the Committee, at the time such document is filed with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or Committee, as applicable.

Notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, no Loan Party shall be required to disclose to the Administrative Agent, the Collateral Agent or any Lender (or any authorized representative or independent contractor of any of them) any information that (w) is prohibited by Law to be disclosed, (x) is subject to attorney-client privilege or constitutes attorney work product, (y) the disclosure of which would cause a breach of a binding non-disclosure agreement with any Governmental Authority or any other third party to the extent such agreement is not made in contemplation of the avoidance of this Agreement or (z) that constitutes non-financial trade secrets or non-financial proprietary information of the Borrower or its Subsidiaries and/or any of their respective customers and/or suppliers (provided such confidentiality obligations were not entered into solely in contemplation of the requirements of this *Section 5.04*); *provided*, that in the event the Borrower does not provide any certificate, report or information requested pursuant to this *Section 5.04* in reliance on the preceding proviso, the Borrower shall provide notice to the Administrative Agent and each Lender that such certificate, report or information is being withheld and the Borrower shall use commercially reasonable efforts to describe, to the extent both feasible and permitted under the applicable Law or confidentiality obligations, or without waiving such privilege, as applicable, the applicable certificate, report or information.

SECTION 5.05     Litigation and Other Notices.  Furnish to the Administrative Agent and each Lender written notice of the following promptly after any Responsible Officer of the Borrower obtains actual knowledge thereof:

(a)    any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) proposed to be taken with respect thereto;

(b)    the filing or commencement of, or any written threat or written notice of intention of any person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority or in arbitration, against the Borrower or any of its subsidiaries as to which would reasonably be expected to have a Material Adverse Effect;

(c)    any other development specific to the Borrower or any of its subsidiaries that is not a matter of general public knowledge and that has had, or would reasonably be expected to have, a Material Adverse Effect;

(d)    the occurrence of any ERISA Event that, together with all other ERISA Events that have occurred, would reasonably be expected to have a Material Adverse Effect;

(e)    any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiaries thereof; and

(f)    any (i) degradation in advance rates under a Qualified Securitization Financing which results in a change in the average Advance Ratio for accounts receivable under such Qualified Securitization Financing of more than 20% as compared to the average Advance Ratio for the same month in the prior year or (ii) an increase of more than 2.00% on the interest rate spread for the then existing Securitization Financing; *provided*, *further* that any changes to pricing resulting from "dynamic pricing" provisions contained in the Qualified Securitization Financing Documents as in effect on the Closing Date (or such the PNC Securitization has been refinanced, the Qualified Securitization Financing Documents then in effect) shall not constitute an amendment to the pricing of such Qualified Securitization Financing.

SECTION 5.06    Compliance with Laws.  Comply with all laws, rules, regulations and orders of any Governmental Authority (including any order of the Bankruptcy Court) as applicable to it or its property, except in each case, where the failure to do so would not reasonably be expected to result in a Material Adverse Effect; *provided*, that this *Section 5.06* shall not apply to Environmental Laws, which are the subject of *Section 5.10*, or to laws related to Taxes, which are the subject of *Section 5.03*.

SECTION 5.07    Maintaining Records; Inspections.  Maintain all financial records in accordance with GAAP and permit any persons designated by the Administrative Agent or, upon the occurrence and during the continuance of an Event of Default, the Lenders to visit and inspect the financial records and, subject to the terms of applicable leases with third parties, the properties of the Borrower or any of the Subsidiaries at reasonable times, upon reasonable prior notice to the Borrower (*provided*, *however*, that such visits and inspections shall be coordinated through the Administrative Agent (acting at the direction of the Required Lenders)), and (i) prior to the existence of a continuing Event of Default no more than two times per year and (ii) after and during any continuing Event of Default as often as requested; and to make extracts from and copies of such financial records, and permit any persons designated by the Administrative Agent or, upon the occurrence and during the continuance of an Event of Default, any Lender upon reasonable prior notice to the Borrower to discuss the affairs, finances and condition of the Borrower or any

of the Subsidiaries with the officers thereof and independent accountants therefor (the Lenders shall give the Loan Parties a reasonable opportunity to participate in any discussions with the Loan Parties' independent public accountants and any such discussions and inspections shall be subject to reasonable requirements of confidentiality, including requirements imposed by law or by contract and any reasonable costs and expenses of such inspection being reimbursed by the Borrower); *provided* that, notwithstanding anything in this *Section 5.07* to the contrary, the Borrower and its Subsidiaries will not be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (i) constitutes trade secrets or proprietary information, (ii) in respect of which disclosure is prohibited by applicable law or binding contractual arrangement and such contractual arrangement was not created or made binding in contemplation of this provision, or (iii) is subject to attorney-client or similar privilege or constitutes attorney work product; *provided* that in the case of the foregoing *clauses (i) – (iii)*, the Borrower shall inform the Lenders that information is being withheld and shall use commercially reasonable efforts to provide the Lenders such information without revealing such trade secrets, proprietary information or information subject to such privilege or to obtain such consent, as applicable.

SECTION 5.08    Payment of Obligations.  Unless being properly contested or subject to the automatic stay under the Chapter 11 Cases, pay its material Indebtedness and other material obligations, including material Tax liabilities, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, and (c) the failure to make such payment would not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.09    Use of Proceeds.   Use the proceeds of the Loans only as contemplated in *Section 3.12*.  The Borrower will not request any Borrowing, and the Borrower shall not use, and shall procure that its Subsidiaries and, to its knowledge, none of their respective directors, officers, employees and agents shall use, the proceeds of any Borrowing (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws in any material respect, (b) for the purpose of funding, financing or facilitating any unauthorized activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (c) knowingly in any manner that would result in the violation of any Sanctions Laws applicable to any party hereto.

SECTION 5.10    Compliance with Environmental Laws.   Comply with all Environmental Laws applicable to its operations and properties; and comply with and obtain and renew all material permits, licenses and other approvals required pursuant to Environmental Law for its operations and properties, except, in each case with respect to this *Section 5.10*, to the extent the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.11    Further Assurances; Additional Security.

(a)    Execute any and such further documents, financing statements, agreements and instruments, and take such further actions (including the filing and recording of financing

statements, fixture filings, and other documents and recordings of Liens in stock registries), that may be required under any applicable law, or that the Required Lenders may request, to cause the Collateral and Guarantee Requirement to be and remain satisfied, all at the expense of the Loan Parties, and provide to the Required Lenders, from time to time following the Required Lenders' request, evidence reasonably satisfactory to the Required Lenders as to the perfection and priority of the Liens created or intended to be created in the Collateral by the Security Documents.

(b)    [Reserved].

(c)    [Reserved].

(d)    In connection with (i) the formation or acquisition of any direct or indirect Subsidiary of the Borrower that is a Domestic Subsidiary (other than an Excluded Subsidiary) or (ii) any existing direct or indirect subsidiary of the Borrower becoming a Subsidiary of the Borrower that is a Domestic Subsidiary (other than an Excluded Subsidiary), within 15 Business Days after the date of such formation, acquisition or Subsidiary becoming a Subsidiary of the Borrower that is a Domestic Subsidiary (other than an Excluded Subsidiary), notify the Administrative Agent and the Lenders thereof and, within 30 Business Days after such date or such longer period as the Administrative Agent shall agree or as set forth in the definition of Collateral and Guarantee Requirement for such class of assets, cause the Collateral and Guarantee Requirement to be satisfied with respect to such subsidiary and with respect to any Equity Interest in or Indebtedness of such subsidiary owned by or on behalf of any Loan Party, subject to *(g)*.

(e)    [Reserved].

(f)    (i) Furnish to the Administrative Agent and the Lenders prompt written notice following any change (A) in any Loan Party's corporate or organization name, (B) in any Loan Party's identity or (C) in any Loan Party's organizational identification number, *provided*, that to the extent required to maintain perfection of such Collateral, within 30 days after such change (or such later period agreed by the Administrative Agent in its discretion (acting at the direction of the Required Lenders)), the Borrower will file (or direct an agent to file on its behalf) such Uniform Commercial Code financing statements that are required in order for the Collateral Agent to continue following such change to have a valid, legal and perfected security interest such Collateral (to the extent intended to be created by the Security Documents by a filing of an "all assets" financing statement) and (ii) promptly notify the Administrative Agent and the Lenders if any material portion of the Collateral is damaged or destroyed.

(g)    The Collateral and Guarantee Requirement and the other provisions of this *Section 5.11* need not be satisfied with respect to Excluded Assets.

For the avoidance of doubt, and without limitation, *Section 5.11* shall apply to any division of a Loan Party required to become a Loan Party pursuant to the terms of the Loan Documents and to any allocation of assets to a series of a limited liability company.

SECTION 5.12    Fiscal Year; Accounting.  In the case of the Borrower, cause its fiscal year to end on December 31.

SECTION 5.13    [Reserved].

SECTION 5.14    Lender Meetings.  (A) No less frequently than weekly from and after the Petition Date, cause the Chief Restructuring Officer and advisors to Debtors to be available for a telephonic meeting with all Lenders, senior management and members of the Transformation Office regarding, among other things, financial results, operations, inventory planning, cost saving initiatives, the Transformation Office Plan, information provided under *Section 5.04(p)*, compliance of the Loan Parties with this Agreement, and developments in the Chapter 11 Cases and (B) promptly upon any request of the Lender Advisors, hold a telephonic meeting with the Lender Advisors and any other Person the Required Lenders reasonably request to be included in such meeting regarding, including senior management and members of the Transformation Office, among other things, financial results, operations, any modifications to the mandate of the Chief Restructuring Office as set forth in *Section 5.23(b)*, compliance of the Loan Parties with this Agreement, and developments in the Chapter 11 Cases.

SECTION 5.15    Securitization Matters.  Each of the Loan Parties party to any of the Qualified Securitization Documents shall enforce all of their rights and obligations under such Qualified Securitization Document.

SECTION 5.16    Compliance with Anti-Corruption Laws and Sanctions Laws.  (A) Maintain policies and procedures reasonably designed to ensure compliance by the Borrower, the Subsidiaries, and their respective directors, officers, employees, and agents with the Anti-Corruption Laws and (B) within 90 days of the Closing Date (or such later date as may be agreed to by Administrative Agent in its sole discretion) and thereafter maintain policies and procedures reasonably designed to ensure compliance by the Borrower, the Subsidiaries, and their respective directors, officers, employees, and agents with Sanctions Laws.

SECTION 5.17    Post-Closing Matters.  Deliver to Administrative Agent and the Lenders, in form and substance reasonably satisfactory to the Required Lenders, the items described on Schedule 5.17 hereof or take such actions described on Schedule 5.17, in each case, on or before the dates specified with respect to such items on Schedule 5.17 (or, in each case, such later date as may be agreed to by Required Lenders in its sole discretion).  All conditions, covenants, representations and warranties contained in this Agreement and the other Loan Documents will be deemed modified to the extent necessary to effect the foregoing (and to permit the taking of the actions described on Schedule 5.17 within the time periods specified thereon, rather than as elsewhere provided in the Loan Documents).

SECTION 5.18    [Reserved].

SECTION 5.19    Board Observers.  At the request of the Required Lenders, invite two representatives of the Lenders to attend in a non-voting observer capacity (the "***Lender Observers***") all meetings of the Board of Directors of the Borrower and any meetings of any committees of the Board of Directors of the Borrower.  The Borrower shall reimburse the Lender Observers for their reasonable and documented out-of-pocket expenses in connection with attending any such meetings, in a manner consistent with the Borrower's reimbursement of similar expenses of the directors of the Borrower.  Notice of any such meetings shall be given to the Lender Observers in the same manner and at the same time as is given to the members of the Board of Directors or committee members, as the case may be.  The Lender Observers shall be provided with copies of all information (including a meeting agenda and board package, if any such

materials are prepared) that is provided to such directors or committee members (whether prior to, at, or subsequent to any such meetings), at the same time as such materials are provided to such directors or committee members, and copies of the minutes (both drafts and final versions) of all meetings of such directors or committee members, concurrently with the distribution of such minutes to such directors or committee members.  Notwithstanding anything to the contrary contained herein, in the event that (i) in the reasonable judgment of the Board of Directors of the Borrower, an issue is to be discussed at a meeting of such Board of Directors (or material is to be distributed at such meeting) which is not appropriate to be discussed in the presence of (or provided to) the Lender Observers due to an actual or potential conflict of interest (including any matters related to this Agreement, the other Loan Documents or any transactions contemplated hereby), or (ii) the Lender Observers' attendance at such meeting (or receipt of material to be distributed at such meeting) may jeopardize, adversely affect or otherwise impair the attorney-client privilege or any recognized accountant-client privilege, then, in each case, (x) the Borrower shall provide notice of such fact to the Lender Observers and the Lender Observers shall not have the right to participate in any portion of such meeting that involves the matters described in _clauses (i)_ or _(ii)_ above, and (y) the Borrower shall have the right to withhold from the Lender Observers all applicable board meeting material and copies of minutes with respect to the matters described in _clauses (i)_ or _(ii)_ above.

SECTION 5.20    Compliance with Collateral and Guarantee Requirement.  Comply in all respects with the Collateral and Guarantee Requirement with respect to each such Loan Party.

SECTION 5.21    Cash Management. Maintain the cash management of the Loan Parties in accordance in all material respects with the Cash Management Order.

SECTION 5.22    Milestones.

Comply with the following milestones (each of which, as applicable, shall be automatically extended to the extent a delay occurs as a result of the availability of the Bankruptcy Court):

(a)    On or prior to four (4) days after the Petition Date, entry of the Interim Order by the Bankruptcy Court;

(b)    On or prior to thirty (30) days after the Petition Date, the Debtors shall file a Reorganization Plan that is in form and substance substantially in accordance with the Restructuring Support Agreement plan term sheet and otherwise on term reasonably acceptable to the Required Lenders and the Debtors (as amended, modified or supplemented with the consent of the Required Lenders, the "**_Acceptable Plan_**") and disclosure statement with respect to the Acceptable Plan (as amended, modified or supplemented with the consent of the Required Lenders, the "**_Disclosure Statement_**") with the Bankruptcy Court (such consent not to be unreasonably withheld, delayed or conditioned);

(c)    On or prior to thirty-five (35) days after the Petition Date, entry of Final Order by the Bankruptcy Court;

(d)    On or prior to ninety (90) days after the Petition Date, entry by the Bankruptcy Court of an order approving the Disclosure Statement;

(e)    On or prior to one hundred twenty-five (125) days after the Petition Date, entry by the Bankruptcy Court of an order approving the Acceptable Plan in form and substance reasonably acceptable to the Required Lenders; and

(f)    On or prior to one hundred sixty (160) days after the Petition Date, the Consummation Date of the Acceptable Plan.

SECTION 5.23    Chief Restructuring Officer and Transformation Office.

(a)    Within five (5) Business Days after the Closing Date, the Borrower shall retain a chief restructuring officer reasonably acceptable to the Required Lenders (the "*Chief Restructuring Officer*") who shall report directly to the special committee of the Board of Directors of the Borrower, and whose scope of engagement and fees shall be reasonably acceptable to the Required Lenders (it being understood that Joseph J. Sciametta is reasonably acceptable to the Required Lenders). Upon the resignation or termination of the Chief Restructuring Officer or other occurrence rendering the Chief Restructuring Officer incapacitated or unavailable, subject to the approvals required under the Bankruptcy Court, the Borrower shall promptly (and no later than fifteen (15) Business Days after such resignation, termination or such other occurrence) retain a replacement Chief Restructuring Officer reasonably acceptable to the Required Lenders and the scope of the engagement of such replacement Chief Restructuring Officer and fees shall be reasonably acceptable to the Required Lenders.

(b)    Within three (3) Business Days of the Petition Date, the Borrower shall form a restructuring working group led by the Chief Operating Officer of the Borrower, the Chief Restructuring Officer and advisors from Alvarez & Marsal, Inc. (the "*Transformation Office*") with a mandate reasonably acceptable to the Required Lenders and as modified pursuant to *Section 5.14(B)*, including, (i) within ten (10) Business Days of the Petition Date, to develop an inventory statement and inventory management plan in form and substance consistent with statements and plans provided during due diligence prior to the Closing Date and otherwise reasonably acceptable to the Required Lenders, (ii) to reevaluate and make changes to such inventory management plan at least every two weeks based on ongoing business developments; provided that any changes to the inventory management plan shall be in form and substance reasonably acceptable to the Required Lenders, (iii) within thirty (30) days of the Petition Date, to develop and implement a cost savings plan in form and substance reasonably acceptable to the Required Lenders, which is projected to achieve at least as much cost savings as outlined in the Business Plan; provided that the Transformation Office shall update the Lenders within fifteen (15) days of the Petition Date on the status of such cost savings plan, and (iv) within fifteen (15) Business Days of the Petition Date, to develop a plan regarding the management of critical vendors, key counter-parties, payables and general unsecured claims and supervise the management of critical vendors, key counter-parties, payables and general unsecured claims in form and substance reasonably acceptable to the Required Lenders (collectively, the plans set forth in clauses (i), (ii), (iii) and (iv), together with any changes or supplements to such plans approved by the Required Lenders in their sole discretion, the "*Transformation Office Plan*").

(c)    The Borrower will, and will cause each of the Subsidiaries, to comply with the Transformation Office Plan in all respects.

## ARTICLE VI
## Negative Covenants

The Borrower covenants and agrees with each Lender that until Payment in Full, the Borrower will not, and will not cause or permit any of the Subsidiaries to:

SECTION 6.01      *Indebtedness*.     Incur, create, assume or permit to exist any Indebtedness, except:

(a)      Indebtedness (other than intercompany Indebtedness) of the Borrower and its Subsidiaries existing, or incurred pursuant to facilities existing, on the Closing Date and set forth on *Schedule 6.01*;

(b)      Indebtedness created hereunder and under the other Loan Documents;

(c)      Indebtedness of the Borrower and the Subsidiaries pursuant to Swap Agreements consisting of (i) non-speculative Swap Agreements entered into in the ordinary course of business to hedge or mitigate risks to which the Borrower or any Subsidiary is exposed in the conduct of its business or the management of its liabilities (including currency risks), and (ii) non-speculative Swap Agreements entered into in the ordinary course of business in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary;

(d)      Indebtedness of the Borrower and the Subsidiaries owed to (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) any person providing workers' compensation, health, disability or other employee benefits or property, warehouse receipts or similar instruments, casualty or liability insurance to the Borrower or any Subsidiary, pursuant to reimbursement or indemnification obligations to such person, in each case, *provided* in the ordinary course of business; provided, that that any reimbursement obligations in respect thereof are reimbursed within 60 days following the incurrence thereof (or such longer period as is permitted without interest or other charges under the benefit plan or other instrument under which reimbursement is to be made);

(e)      Indebtedness of the Borrower to any Subsidiary and of any Subsidiary to the Borrower or any other Subsidiary, in each case in the ordinary course of business; *provided*, that (i) Indebtedness of any Subsidiary that is not a Subsidiary Loan Party owing to the Borrower or any Subsidiary Loan Party shall be subject to *Section 6.04*, and (ii) Indebtedness of the Borrower owing to any Subsidiary and Indebtedness of any other Loan Party owing to any Subsidiary that is not a Subsidiary Loan Party shall be subordinated in right of payment to the Obligations on terms reasonably satisfactory to the Required Lenders;

(f)      Indebtedness of the Borrower and the Subsidiaries in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations, in each case, including those incurred to secure health, safety, insurance and environmental obligations of the Borrower and its Subsidiaries as conducted in accordance with good and prudent business industry practice and otherwise as permitted by the Loan Documents, in an aggregate principal amount not to exceed $1,150,000 at any one time outstanding;

(g)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services in the ordinary course of business and in good faith; *provided*, that (i) such Indebtedness (other than credit or purchase cards) is extinguished within 30 Business Days of notification to the Borrower of its incurrence; and (ii) such Indebtedness in respect of credit or purchase cards is extinguished within 90 days from its incurrence;

(h)    [Reserved];

(i)    Capitalized Lease Obligations, mortgage financings and purchase money Indebtedness incurred by the Borrower or any Subsidiary prior to or within 365 days after the acquisition, lease or improvement of the respective asset permitted under this Agreement in order to finance such acquisition or improvement, in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof would not be in an aggregate outstanding principal amount that exceeds the greater of $1,725,000;

(j)    (i) Indebtedness in respect of the First Lien Credit Agreement in an aggregate principal amount at any one time outstanding not to exceed $665,000,000 of Term Loans (as defined in the First Lien Credit Agreement); *provided* that such amount may increase solely with respect to any "payment in kind" interest that accrues pursuant to the First Lien Credit Agreement; *provided* further that such Indebtedness is secured only by the Liens permitted under *Section 6.02(j)* and shall be subject to the First Lien Pari Passu Intercreditor Agreement and First-Second Intercreditor Agreement; (ii) Indebtedness in respect of the Second Lien Credit Agreement in an aggregate principal amount at any one time outstanding not to exceed $668,000,000 of Term Loans (as defined in the Second Lien Credit Agreement); *provided* that such amount may increase solely with respect to any "payment in kind" interest that accrues pursuant to the Second Lien Credit Agreement; *provided* further that such Indebtedness is secured only by the Liens permitted under *Section 6.02(j)* and shall be subject to the First-Second Intercreditor Agreement; and (iii) Indebtedness in respect of the DIP Revolving Credit Agreement in an aggregate principal amount at any one time outstanding not to exceed $275,000,000, plus any additional Indebtedness incurred pursuant to a DIP Revolving Credit Agreement Permitted Amendment; and (iv) Indebtedness in respect of a DIP ABL Replacement Facility; *provided* that Indebtedness incurred under this clause *(iv)* and *Section 6.01(cc)* in the aggregate shall not exceed $517,500,000.

(k)    Other unsecured Indebtedness of the Borrower or any Subsidiary, in an aggregate principal amount at any one time outstanding pursuant to this paragraph (k) not in excess of $1,725,000;

(l)    Guarantees by the Borrower or any Subsidiary of any Indebtedness of the Borrower or any Subsidiary permitted to be incurred under this Agreement; provided, that, notwithstanding anything to the contrary in this *Section 6.01*, (i) the Borrower and the Loan Parties shall not Guarantee the Indebtedness of any Subsidiary that is not a Loan Party unless such Guarantee is permitted under *Section 6.04*, (ii) any Guarantees by the Borrower or any Loan Party under this *Section 6.01(l)* of any other Indebtedness of a person that is subordinated in right of payment to other Indebtedness of such person shall be expressly subordinated in right of payment to the Obligations on terms not materially less favorable to the Lenders than the subordination

terms of such other Indebtedness, and (iii) no Subsidiary shall Guarantee any Junior Indebtedness, unless such Subsidiary is also is or becomes a Guarantor and Loan Party hereunder;

(m)     [Reserved];

(n)     So long as permitted and tested as a disbursement pursuant to the DIP Budget (subject to permitted variances), reimbursement and similar obligations of Subsidiaries in respect of letters of credit or bank guarantees; provided that any reimbursement obligations in respect thereof have an aggregate face amount at any one time outstanding not in excess of the amounts set forth on *Schedule 6.01(n)*;

(o)     [Reserved];

(p)     [Reserved];

(q)     Indebtedness consisting of (x) the financing of insurance premiums or (y) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(r)     To the extent constituting Indebtedness, all premium (if any), interest (including interest paid in kind and post-petition interest), fees, expenses, charges and additional or contingent interest on Indebtedness otherwise permitted to be incurred pursuant to this *Section 6.01* and the intercreditor and other provisions of the DIP Orders;

(s)     [Reserved];

(t)     [Reserved];

(u)     [Reserved];

(v)     Indebtedness in respect of (i) netting services and similar services in connection with deposit accounts to the extent incurred in the ordinary course of business or other contingent liabilities arising out of the endorsement of checks, drafts and other instruments or other payment items for deposit or collection in the ordinary course of business and (ii) obligations arising under customary indemnity agreements to title insurers to cause such title insurers to issue title insurance policies;

(w)     Indebtedness in respect of judgments, orders, attachments or awards not resulting in an Event of Default under *Section 7.01(j)* or in respect of appeal or other surety bonds relating to, and settlements in connection with, such judgments, orders, attachments or awards;

(x)     Indebtedness consisting of unfunded pension fund and other employee benefit obligations and liabilities incurred in the ordinary course of business to the extent they are permitted to remain unfunded under applicable law;

(y)     Indebtedness of the Borrower and its Subsidiaries consisting of (i) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business and/or (ii) liabilities in respect of customer deposits and advance payments received in the ordinary

course of business from customers for goods and services purchased in the ordinary course of business;

(z)     [Reserved];

(aa)     Indebtedness in respect of license agreements, to the extent constituting guaranteed minimum revenues and similar obligations in the ordinary course of business;

(bb)     The Subordinated Note in an amount not to exceed $25,000,000; *provided* that such amount may increase solely with respect to any "payment in kind" interest that accrues pursuant to the Subordinated Note;

(cc)     Indebtedness incurred pursuant to a Qualified Securitization Financing in an aggregate principal amount not to exceed $517,500,000 at any one time outstanding (it being understood that to the extent a Qualified Securitization Financing is entered into by a Securitization Subsidiary or pursuant to a DIP Revolving Credit Agreement Permitted Amendment or DIP ABL Replacement Facility, the amount of Indebtedness available under this *clause (cc)* shall be reduced dollar-for-dollar by the principal amount then outstanding under such Qualified Securitization Financing entered into by a Securitization Subsidiary or pursuant to a DIP Revolving Credit Agreement Permitted Amendment or DIP ABL Replacement Facility); *provided* that Indebtedness incurred under this clause *clause (cc)* and *Section 6.01(j)(iv)* in the aggregate shall not exceed $517,500,000.

SECTION 6.02     Liens.   Create, incur, assume or permit to exist any Lien on any property or assets (including stock or other securities of any person, including the Borrower or any Subsidiary of the Borrower) at the time owned by it, except, to the extent permitted by the DIP Orders and the DIP Budget:

(a)     Liens on property or assets of the Subsidiaries existing on the Closing Date and set forth on *Schedule 6.02(a)* and any Lien granted as a replacement or substitute therefor; *provided*, that any such replacement or substitute Liens shall secure only those obligations that they secure on the Closing Date and shall not subsequently apply to any other property or assets of the Borrower or any Subsidiary other than the property and assets subject thereto on the Closing Date (plus improvements and accessions to such property and assets);

(b)     Any Lien created under the Loan Documents;

(c)     Any Lien on any property or asset of the Borrower or any Subsidiary securing Indebtedness permitted by *Section 6.01(i)*; *provided*, that (i) such security interests are incurred, and the Indebtedness secured thereby is created, within 365 days after such acquisition, (ii) the Indebtedness secured thereby does not exceed 100% of the cost of such equipment or other property or improvements at the time of such acquisition or construction, including transaction costs incurred by the Borrower or any Subsidiary in connection with such acquisition and (iii) such security interests do not apply to any other property or assets of the Borrower or any Subsidiary (other than to improvements and accessions to such equipment or other property or improvements but not to other parts of the property to which any such improvements are made); *provided*, *further*, that individual financings of equipment provided by a single lender may be cross-collateralized to other financings of equipment provided solely by such lender;

(d)       Liens for Taxes, assessments and governmental charges the payment of which is not required under *Section 5.03*;

(e)       Landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's, construction or other like Liens arising in the ordinary course of business and securing obligations (including those other than for borrowed money) that are not overdue by more than 60 days or that are being contested in good faith by appropriate proceedings and in respect of which, if applicable, the Borrower or any Subsidiary shall have set aside on its books reserves in accordance with GAAP;

(f)       (i) Pledges or deposits and other Liens made in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance and other social security laws or regulations and deposits securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations and (ii) pledges or deposits and other Liens securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to, the Borrower or any Subsidiary;

(g)       Deposits and other Liens to secure the performance of bids, trade contracts (other than for Indebtedness for borrowed money), leases (other than Capitalized Lease Obligations), statutory obligations, surety and appeal bonds, performance and return of money bonds, bids, leases, government contracts, trade contracts, agreements with public utilities, and other obligations of a like nature (including letters of credit in lieu of any such bonds or to support the issuance thereof) incurred by the Borrower or any Subsidiary in the ordinary course of business, including those incurred to secure health, safety, insurance and environmental obligations in the ordinary course of business;

(h)       Zoning restrictions, survey exceptions, easements, trackage rights, leases (other than Capitalized Lease Obligations), licenses, special assessments, rights-of-way, restrictions on or agreements dealing with the use of real property, servicing agreements, development agreements, site plan agreements and other similar encumbrances incurred in the ordinary course of business and title defects or irregularities that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of the Borrower or any Subsidiary (taken as a whole);

(i)       [Reserved];

(j)       (i) Liens on the Collateral securing Indebtedness incurred pursuant to *Section 6.01(j)(i)* subject to the First-Second Intercreditor Agreement and the First Lien Pari Passu Intercreditor Agreement; (ii) Liens on the Collateral securing Indebtedness incurred pursuant to *Section 6.01(j)(ii)* subject to the First-Second Intercreditor Agreement; (iii) Liens on the Collateral securing Indebtedness incurred pursuant to *Section 6.01(j)(iii)*; and (iv) Liens on assets that are Collateral securing Indebtedness incurred pursuant to *Section 6.01(j)(iv)*;

(k)       Liens securing judgments that do not constitute an Event of Default under *Section 7.01(j)*;

(l)     Liens on the Securitization Assets arising in connection with a Qualified Securitization Financing;

(m)     Liens disclosed by the title insurance policies delivered on or subsequent to the Closing Date and pursuant to *Section 5.11* and any replacement, extension or renewal of any such Lien; *provided*, that such replacement, extension or renewal Lien shall not cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal *plus* any improvements and accessions to such property; *provided*, *further*, that the Indebtedness and other obligations secured by such replacement, extension or renewal Lien are permitted by this Agreement;

(n)     Any interest or title of a lessor under any leases or subleases entered into by the Borrower or any Subsidiary in the ordinary course of business;

(o)     Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and the Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Subsidiary in the ordinary course of business;

(p)     Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(q)     [reserved];

(r)     Licenses of software that are not material to the conduct of any of the business lines of the Borrower and the Subsidiaries and the value of which does not constitute a material portion of the assets of the Borrower and its Subsidiaries, taken as a whole, and such license does not materially interfere with the ordinary course of conduct of the business of the Borrower or any of its Subsidiaries;

(s)     Liens (x) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods or (y) on specific items of inventory or other goods and the proceeds thereof securing the relevant Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(t)     Liens on the assets of a Foreign Subsidiary that secure Indebtedness of such Foreign Subsidiary that is permitted to be incurred under *Section 6.01*;

(u)     Liens solely on any cash earnest money deposits made by the Borrower or any of the Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder with respect to any acquisition that would constitute an Investment permitted by this Agreement;

(v)    Liens (i) arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any Loan Party or Subsidiary thereof in the ordinary course of business or (ii) incurred by the Borrower or its Subsidiaries arising under Section 2-505 of the UCC;

(w)    Liens in favor of the Borrower or any Loan Party;

(x)    Liens arising from precautionary Uniform Commercial Code financing statements or consignments entered into in connection with any transaction otherwise permitted under this Agreement;

(y)    Liens of licensors and franchisors in the ordinary course of business not securing Indebtedness (other than in respect of licenses, to the extent constituting Indebtedness with respect to guaranteed minimum revenues and similar obligations in the ordinary course of business permitted under *Section 6.01(aa)*); *provided* that such liens of licensors shall not extend to any assets other than the licenses subject to such agreement any payments in respect thereof;

(z)    Liens on not more than $11,500,000 of deposits securing Swap Agreements permitted to be incurred under *Section 6.01(c)*;

(aa)    Liens (x) on insurance policies and the proceeds thereof or securing the financing of premiums with respect thereto and/or (y) securing other insurance premium financing arrangements; *provided*, that such Liens are limited to the applicable unearned insurance premiums;

(bb)    Liens incurred to secure cash management services in the ordinary course of business and in good faith; *provided*, that such Liens are not incurred in connection with, and do not secure, any borrowings or Indebtedness;

(cc)    (i) Liens in favor of the Pre-Petition Indebtedness holders as adequate protection granted pursuant to the DIP Orders and (ii) Liens in favor of Securitization Providers and Credit Servicers as a result of the Chapter 11 Cases and set forth in an order of the Bankruptcy Court;

(dd)    Leases and subleases not constituting Capitalized Lease Obligations of real property not material to the conduct of any business line of the Borrower and its Subsidiaries granted to others in the ordinary course of business that do not materially and adversely interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries (taken as a whole);

(ee)    [Reserved];

(ff)    Liens consisting of (i) customary rights of first refusal, options, tag, drag and similar rights in joint venture agreements and agreements with respect to non-wholly owned Subsidiaries and (ii) encumbrances or restrictions (including put and call arrangements) in favor of a party to a joint venture agreement with respect to Equity Interests of, or assets owned by, any joint venture or similar arrangement pursuant to any joint venture agreement or similar agreement;

(gg)    [Reserved];

(hh)    Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(ii)    Liens on cash securing obligations in respect of standby letters of credit or on the goods (or the documents of title in respect of such goods) financed by trade letters of credit and the proceeds and products thereof in the case of trade letters of credit securing obligations in respect of such trade related letters of credit in each case permitted under *Section 6.01(n)*; provided that any cash collateral supporting such letters of credit shall not at any time exceed 105% of the amount of Indebtedness permitted under *Section 6.01(n)*;

(jj)    Liens on cash or Cash Equivalents used to defease or to satisfy and discharge Indebtedness; *provided* that such defeasance or satisfaction and discharge is permitted by this Agreement;

(kk)    (i) Licenses or sublicenses granted by the Borrower and/or its Subsidiaries permitted in accordance with the terms of this Agreement, (ii) leases or subleases granted by the Borrower or any of its Subsidiaries to other Persons not materially interfering with the conduct of the business of the Borrower or any Guarantor, (iii) any interest or title of a lessor, sublessor or licensor under any lease, (iv) restriction or encumbrance to which the interest or title of such lessor or sublessor may be subject, (v) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding *clause (iv)* and (vi) royalty, revenue, profit sharing or buy/sell arrangements arising out of joint ventures, purchase and sale contracts, development contracts or other arrangements permitted hereunder;

(ll)    [Reserved];

(mm)    Liens on Credit Support Assets sold or pledged pursuant to the terms of a Permitted Credit Support Arrangement; and

(nn)    Extensions, renewals, refinancings and replacements of the Liens described above, so long as (i) the Indebtedness or other obligations secured by any such Lien at the time of any such extension, renewal, refinancing or replacement is not increased to any amount greater than the *sum* of (A) the outstanding principal amount (or accreted value, if applicable) of such Indebtedness or obligations and (B) an amount necessary to pay any unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions and expenses related to such extension, renewal, refinancing or replacement and (ii) no additional property (other than accessions, improvements, and replacements in respect of such property) is subject to such Lien.

Notwithstanding anything to the contrary contained in this *Section 6.02*, only Liens pursuant to *Section 6.02(l)* and *Section 6.02(cc)(ii)* shall be permitted in favor of any PNC Securitization Secured Party.

SECTION 6.03    Sale and Lease-Back Transactions.    Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal,

used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

SECTION 6.04    <u>Investments, Loans and Advances</u>.  Purchase, hold or acquire (including pursuant to any merger with a person that is not a Wholly Owned Subsidiary immediately prior to such merger; and including in one transaction or a series of transactions) any Equity Interests, Indebtedness, other securities of or of all or substantially all of the property and assets or business of another person or assets constituting a business unit, line of business or division of such person, make or permit to exist any loans, advances or capital contributions to or Guarantees of the obligations of, or make or permit to exist any investment or any other interest in (each, an "***Investment***"), in any other person, except, to the extent permitted by the DIP Orders and the DIP Budget:

(a)    The consummation of the Transactions pursuant to and in accordance with the Loan Documents;

(b)    (i) Investments by (x) the Borrower or the Subsidiaries in other Subsidiaries effective as of the Closing Date as set forth on *Schedule 6.04*, and (y) any modification, renewal or extension thereof, so long as the aggregate amount of all Investments pursuant to *clause (x)* is not increased at any time above the amount of such Investment existing or committed on the Closing Date (other than pursuant to an increase as required by the terms of any such Investment as in existence on the Closing Date or to the extent that such increase utilizes another available basket under this *Section 6.04*), (ii) Investments by the Borrower or any Subsidiary Loan Party in the Borrower or any Subsidiary Loan Party; (iii) [reserved]; and (iv) Investments by any Subsidiary that is not a Loan Party in any other Subsidiary that is not a Loan Party; *provided*, that intercompany current liabilities incurred in the ordinary course of business and in good faith in connection with cash management operations shall not be included in calculating the limitation in this *Section 6.04(b)* at any time;

(c)    Investments in cash and Cash Equivalents;

(d)    Investments arising out of the receipt by the Borrower or any Subsidiary of non-cash consideration for the sale of assets in the ordinary course of business permitted under *Section 6.05*;

(e)    (i) Advances of payroll payments and expenses to employees of the Borrower or any Subsidiary in the ordinary course of business and (ii) commissions, travel, and similar advances to officers and employees of the Borrower or any Subsidiary made in the ordinary course of business not to exceed $2,875,000 at any one time outstanding;

(f)    (i) Accounts, accounts receivable arising, notes receivable, and trade credit granted, in the ordinary course of business, (ii) any securities received in satisfaction or partial satisfaction of defaulted accounts receivable from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss, (iii) any prepayments and other credits to suppliers made in the ordinary course of business;

(g)    Investments in respect of (i) Swap Agreements permitted pursuant to *Section 6.01(c)* and (ii) vendor financing permitted pursuant to *Section 6.01(r)*;

(h)    Investments existing on the Closing Date and set forth on *Schedule 6.04* and any modification, replacement, renewal or extension thereof; *provided* that the amount of the original Investment (or as the context may require, commitment to invest) is not increased except by the terms of such original Investment disclosed to the Required Lenders in writing prior to the Closing Date or as otherwise permitted by another clause in this *Section 6.04*;

(i)    Investments resulting from (i) pledges and deposits referred to in *Sections 6.02(f)*, *(g)*, *(j)*, *(s)* and *(u)* and (ii) indemnities made in the ordinary course of business or in the Loan Documents;

(j)    Additional Investments by the Borrower or any of its Subsidiaries having an aggregate amount at any one time outstanding not to exceed $1,725,000 (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(k)    [Reserved];

(l)    Investments consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other persons;

(m)    Intercompany loans and other Investments between Foreign Subsidiaries;

(n)    Investments consisting of purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of intellectual property in each case in the ordinary course of business;

(o)    [Reserved];

(p)    Investments (including Indebtedness and Equity Interests) received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising, in each case, in the ordinary course of business or Investments acquired by the Borrower as a result of a foreclosure by the Borrower or any of the Subsidiaries with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(q)    [Reserved];

(r)    [Reserved];

(s)    Guarantees by (i) the Borrower or any Subsidiary of operating leases (other than Capitalized Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case, entered into by the Borrower or any Subsidiary in the ordinary course of business and (ii) any Foreign Subsidiary of operating leases (other than Capitalized Lease Obligations) or of

obligations that do not constitute Indebtedness, in each case, entered into by any Foreign Subsidiary in the ordinary course of business;

(t)    [Reserved];

(u)    Investments made by Subsidiaries that are not Loan Parties solely to the extent such Investments are made with the proceeds received by such Subsidiary from an Investment in such Subsidiary made pursuant to *Section 6.04(j)*;

(v)    Guarantees permitted under *Section 6.01* (except to the extent such Guarantee is expressly subject to *Section 6.04*);

(w)    [Reserved];

(x)    (i) Investments in a Securitization Subsidiary to the extent required by the applicable Qualified Securitization Financing Documentation therefor or resulting from the transfers of Securitization Assets pursuant to the terms of such Qualified Securitization Financing Documentation; provided, however, that any such Investment in a Securitization Subsidiary is in the form of a contribution of additional Securitization Assets or as equity (other than Disqualified Stock), (ii) Investments in any Securitization Subsidiary in the form of Permitted Credit Support Services provided to or on behalf of such Securitization Subsidiary (provided any such Investments (x) may not exceed $34,500,000 in the aggregate at any one time outstanding and (y) on an individual basis may not be more than the amount needed to prevent or cure any associated default under the Qualified Securitization Financing Documents) and (iii) distributions or payments of Securitization Fees in connection with a Qualified Securitization Financing;

(y)    Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(z)    Investments for which no consideration is provided by any Loan Party or any Subsidiary; and

(aa)    Investments resulting from the sale of Credit Support Assets pursuant to any Permitted Credit Support Arrangement.

Notwithstanding anything to the contrary contained in *Section 6.04* above, the Borrower and its Subsidiaries shall not, directly (and shall cause their Subsidiaries not to, directly or indirectly) make any Investments pursuant to *clauses (j)* and *(s)* above in order to make Dividends not otherwise permitted under *Section 6.06* or Junior Indebtedness Payments not otherwise permitted under *Section 6.09(b)*.

For purposes of this *Section 6.04*, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment, and shall be net of returns of capital, repayment of principal or net disposition proceeds in respect thereof (up to the aggregate amount actually invested).

SECTION 6.05        Mergers, Consolidations, Sales of Assets and Acquisitions. Merge into or consolidate with any other person, or permit any other person to merge into or consolidate with it (including by division), or sell, transfer, lease or otherwise Dispose of (in one transaction or in a series of transactions including by allocation of any assets to a series of a limited liability company) all or any part of its assets (whether now owned or hereafter acquired), or issue, sell, transfer or otherwise dispose of any Equity Interests of any Subsidiary or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all of any division, unit or business of any other person, except, to the extent permitted by the DIP Orders and the DIP Budget, that this Section shall not prohibit:

(a)        (i) the lease, purchase and sale of inventory, in each case, in the ordinary course of business by the Borrower or any Subsidiary and sales of Credit Support Assets pursuant to the terms of a Permitted Credit Support Arrangement, (ii) the acquisition of any other asset in the ordinary course of business by the Borrower or any Subsidiary, (iii) the sale or other Dispositions of (x) inventory, goods held for sale or immaterial assets, in each case, in the ordinary course of business and (y) worn out, obsolete, scrap or surplus assets or assets no longer useful in the conduct of the business of the Loan Parties and their Subsidiaries or otherwise economically impracticable to maintain, or (iv) the sale of Cash Equivalents in the ordinary course of business;

(b)        if at the time thereof and immediately thereafter no Event of Default shall have occurred and be continuing or would result therefrom, (i) the merger of any Subsidiary into the Borrower in a transaction in which the Borrower is the survivor, (ii) the merger or consolidation of (x) any Domestic Subsidiary into or with any Subsidiary Loan Party in a transaction in which the surviving or resulting entity is a Subsidiary Loan Party or (y) any Foreign Subsidiary into or with any Subsidiary Loan Party in a transaction in which the surviving or resulting entity is a Subsidiary Loan Party, and, in the case of each of *clauses (i)* and *(ii)*, no person other than the Borrower or Subsidiary Loan Party receives any consideration, (iii) the merger or consolidation of any Subsidiary that is not a Loan Party into or with any other Subsidiary that is not a Loan Party or (iv) the liquidation or dissolution or change in form of entity of any Subsidiary (other than the Borrower) in accordance with *Section 5.01(a)(ii)* if the Borrower determines in good faith that such liquidation, change in form or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders;

(c)        [reserved];

(d)        any Disposition of Securitization Assets, and to the extent constituting a Disposition, any furnishing of Permitted Securitization Cash Collateral to a Securitization Subsidiary or the PNC Securitization Parties, in each case, solely to the extent subject to a Qualified Securitization Financing; provided, that in the case of a Disposition pursuant to the PNC Securitization, such Disposition shall be permitted solely to the extent such Disposition is prior to the Purchase and Sale Termination Date (as defined in the PNC Purchase and Sale Agreement as in effect on the Closing Date);

(e)        Investments permitted by *Section 6.04* (other than *Section 6.04(v)*), Liens permitted by *Section 6.02* and Dividends permitted by *Section 6.06*;

(f)        [reserved];

(g)    the sale of defaulted receivables in the ordinary course of business and not as part of an accounts receivables financing transaction;

(h)    [Reserved];

(i)    [Reserved];

(j)    licensing and cross-licensing arrangements (other than any perpetual or royalty free licensing arrangements) involving any technology, intellectual property or other intellectual property rights of the Borrower or any Subsidiary in the ordinary course of business and other licensing and cross-licensing arrangements involving any technology, intellectual property or other intellectual property rights of the Borrower or any Subsidiary that do not materially and adversely interfere with the ordinary course of the business of the Borrower or any of its Subsidiaries, taken as a whole and/or that are not material and adverse to the ordinary course of conduct of the business of the Borrower or any of its Subsidiaries, taken as a whole;

(k)    the lease, assignment or sublease of any real or personal property in the ordinary course of business;

(l)    [reserved];

(m)    [reserved];

(n)    any transfer of property or assets that represents a surrender or waiver of a contract right or a settlement, surrender or release of a contract or tort claim; *provided*, that such surrender or waiver is not materially adverse to the Lenders and would not reasonably be expected to result in a Material Adverse Effect;

(o)    [reserved];

(p)    the unwinding of any Swap Agreement or hedging contract;

(q)    the lapse or abandonment in the ordinary course of business of any Intellectual Property no longer material to the business; and

(r)    [reserved].

Notwithstanding anything to the contrary contained in this *Section 6.05*, no sale, transfer or other disposition of assets shall be permitted by this *Section 6.05* (except as permitted to Loan Parties pursuant to *Section 6.05(c)*) unless such disposition is for fair market value (as reasonably determined in good faith by the Borrower); *provided*, that, any such sale or transfer or other disposition shall not include any material Intellectual Property or Material License Agreements.

To the extent that any Collateral is sold or otherwise disposed of as permitted by this *Section 6.05* to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, which Liens shall be automatically released upon the consummation of such Disposition; it being understood and agreed that the Collateral Agent shall

be authorized to take, and shall take, any actions reasonably requested by the Borrower in order to effect the foregoing in accordance with *Section 9.20* hereof.

SECTION 6.06    Dividends and Distributions.  Declare or pay, directly or indirectly, any dividend or make, directly or indirectly, any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its Equity Interests (other than dividends and distributions on Equity Interests payable solely by the issuance of additional Equity Interests (other than Disqualified Stock) of the person paying such dividends or distributions) or directly or indirectly redeem, purchase, retire or otherwise acquire for value (or permit any subsidiary of the Borrower to purchase or acquire) any of its Equity Interests or set aside any amount for any such purpose (other than through the issuance of additional Equity Interests of the person redeeming, purchasing, retiring or acquiring such shares) (any of the foregoing dividends, distributions, redemptions, repurchases, retirements, other acquisitions or setting aside of amounts, "***Dividends***"); *provided*, *however*, that:

(a)    any Subsidiary may declare and pay dividends to, or make other distributions to, the Borrower or any Subsidiary that is a direct parent of such Subsidiary and, if not a Wholly Owned Subsidiary, to each other direct owner of Equity Interests of such Subsidiary on a pro rata basis (or more favorable basis from the perspective of the Borrower or such Subsidiary) based on their relative ownership interests;

(b)    any person may make noncash repurchases of Equity Interests deemed to occur upon exercise of stock options, warrants or other securities convertible or exchangeable for Equity Interests if such Equity Interests represent a portion of the exercise, conversion or exchange price thereof;

(c)    [reserved];

(d)    [reserved];

(e)    [reserved];

(f)    the Borrower may declare and pay Dividends with respect to its Equity Interests payable solely in additional shares of its Equity Interests (other than Disqualified Stock);

(g)    [reserved];

(h)    [reserved]; and

(i)    to the extent constituting a Dividend or distribution, any payments of cash and/or Equity Interests (other than Disqualified Stock) of the Borrower to a holder of the Subordinated Note (or for the benefit of a holder of the Subordinated Note) upon the conversion thereof in accordance with the terms thereof; *provided* that any payments in cash, either must be (x) from proceeds of issuances after the Closing Date of Equity Interests (other than Disqualified Stock and to the extent not otherwise applied) in the Borrower or (y) permitted to be paid pursuant to *Section 6.09(b)(i)(F)*.

SECTION 6.07      Transactions with Affiliates.  (a) [reserved]; or (b) sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transaction, with a value in excess of $575,000 for any single transaction or series of related transactions, with, any of its Affiliates, unless such transaction is upon terms not materially less favorable to the Borrower or such Subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate, except that this Section shall not prohibit:

(i)      any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, equity purchase agreements, deferred compensation agreements, bonuses, stock options and stock ownership plans or health, disability, insurance, severance or similar employee benefit plans approved by the Board of Directors of Borrower;

(ii)      any other transactions permitted pursuant to *Section 6.04(x)(ii)*, *6.05(b)*, *6.05(d)*, or *6.06*;

(iii)      transactions among the Borrower and the Loan Parties and transactions among the Loan Parties;

(iv)      the payment of fees and indemnities to directors, officers, employees and consultants of the Borrower and the Subsidiaries in the ordinary course of business;

(v)      the existence of, or the performance by the Borrower or any of its Subsidiaries of its obligations under the terms of, the Loan Documents, agreements set forth on *Schedule 6.07*; *provided*, *however*, that the existence of, or the performance by the Borrower or any of its Subsidiaries of its obligations under, any future amendment to any such existing agreement or under any similar agreement entered into after the Closing Date shall only be permitted by this *clause (v)* to the extent that the terms of any such existing agreement together with all amendments thereto, taken as a whole, or new agreement are not otherwise more disadvantageous to the Lenders in any material respect than the original agreement as in effect on the Closing Date;

(vi)      transactions to effect the Transactions and the payment of all fees and expenses related to the Transactions, as described herein or contemplated by the Loan Documents;

(vii)      any employment agreements entered into by the Borrower or any of the Subsidiaries in the ordinary course of business;

(viii)      [reserved];

(ix)      transactions with Wholly Owned Subsidiaries for the purchase or sale of goods, products, parts and services entered into in the ordinary course of business;

(x)      [reserved];

(xi)      [reserved];

110

(xii)    [reserved];

(xiii)   [reserved];

(xiv)    any transaction set forth on *Schedule 6.07*;

(xv)    to the extent there is no material adverse impact on the Collateral and Guaranty, intercompany transactions for the purpose of improving the consolidated tax efficiency of the Borrower and the Subsidiaries; and

(xvi)    the termination of management agreements and payments in connection therewith at the net present value of future payments or as required by such the terms of such agreements.

SECTION 6.08    Business of the Borrower and the Subsidiaries.  Notwithstanding any other provisions hereof, engage at any time in any business or business activity other than, (i) any business or business activity conducted by any of them on the Closing Date and any business or business activities incidental or related thereto, (ii) any business or business activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof or ancillary or complementary thereto, including the consummation of the Transactions, or (iii) any business or business activity that the senior management of the Borrower deems beneficial for the Borrower or such Subsidiary.

SECTION 6.09    Limitation on Modifications and Payments of Indebtedness; Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements; etc.

(a)    Amend or modify in any manner materially adverse to the Lenders (taken as a whole and solely in their capacities as Lenders) (i) the articles or certificate of incorporation or by-laws or limited liability company operating agreement or other Organizational Documents and (ii) the Material Agreements (other than any Material License Agreements), except (x) any such amendments, modifications or changes that are necessary to consummate or implement the Transactions (including any transactions incidental thereto) and (y) in the case of any Qualified Securitization Financing Documentation, any such amendments, modifications or changes so long as the applicable Securitization Financing will remain a "Qualified Securitization Financing".

(b)    (i) Make, or agree or offer to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities (other than newly issued Equity Interests) or other property) of or in respect of principal of or interest on any Junior Indebtedness, having an aggregate principal amount outstanding in excess of $575,000 individually or in the aggregate or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Junior Indebtedness (collectively, a "***Junior Indebtedness Payment***"), except for:  (A) payments made in compliance with the DIP Budget (subject to permitted variances), (B) regularly scheduled interest payments and payments of fees, expenses and indemnification obligations in respect of Indebtedness (including for the avoidance of doubt, the accretion of interest paid-in-kind and the capitalization of such interest to the principal amount of such Indebtedness), in each case when due and in amounts not to exceed the amounts required to be paid with respect thereto, in each case, other than payments in respect of the Indebtedness

prohibited by the applicable Intercreditor Agreement or subordinated in right of payment to the Obligations prohibited by the subordination provisions thereof; (C) to the extent this Agreement is then in effect, principal on the scheduled maturity date thereof, subject to any subordination provisions applicable thereto, (D) purchases, redemptions, retirement, conversions, acquisition, cancellation or termination of Junior Indebtedness with the proceeds of contributions to common capital, or issuances of Equity Interests of the Borrower, conversion of Junior Indebtedness to (or payments of such Indebtedness in whole or in part with) Equity Interests of the Borrower or exchange of Junior Indebtedness for Equity Interests of the Borrower, in each case, other than Disqualified Stock of the Borrower or in exchange for Equity Interests of the Borrower (other than Disqualified Stock), (E) if such Indebtedness would otherwise constitute an "applicable high yield discount obligation" within the meaning of Section 163(i) of the Code, on each interest payment date ending on or after the fifth anniversary of the issue date of such Indebtedness, the Borrower and/or its Subsidiaries shall make such AHYDO Payments in cash as shall be necessary to ensure that such Indebtedness will not be considered an "applicable high yield discount obligation, (F) mandatory prepayments of Indebtedness under the Second Lien Credit Agreement, (G) the termination of Capital Leases or other asset-specific financings in respect of assets no longer used or useful in the business of any Loan Party or otherwise being sold as part of an Asset Sale permitted under _Section 6.05_ hereunder;

(ii)    Amend or modify, or permit the amendment or modification of, any provision of any Junior Indebtedness documentation or any agreement relating thereto, other than, to the extent permitted by the DIP Orders and the DIP Budget, amendments or modifications that are not in any manner materially adverse to Lenders (solely in their capacity as Lenders taken as a whole) and that do not materially and adversely affect the subordination provisions thereof (if any) in a manner adverse to the Lenders (solely in their capacity as Lenders hereunder taken as a whole).

(c)    Enter into any agreement or instrument that by its terms restricts (i) the payment of dividends or distributions or the making of cash advances by any Material Subsidiary to the Borrower or any Subsidiary that is a direct or indirect parent of such Subsidiary or (ii) the granting of Liens by the Borrower or any Loan Party, or any Subsidiary required to be a Loan Party, pursuant to the Security Documents, in each case, other than those arising under any Loan Document or those restrictions that are not material and adverse to the interests of the Lenders (solely in their capacity as Lenders and taken as a whole), except, in each case, to the extent permitted by the DIP Orders and the DIP Budget, restrictions existing by reason of:

(A)    restrictions imposed by applicable Law;

(B)    contractual encumbrances or restrictions (1) in effect on the Closing Date with respect to Liens permitted under _Section 6.02(a)_ or as otherwise disclosed on _Schedule 6.09(c)_, (2) pursuant to documentation related to any Indebtedness permitted pursuant to _Section 6.01_ as long as such encumbrances or restrictions are not materially more restrictive, taken as a whole, than those contained in this Agreement, (3) pursuant to documentation related to any permitted renewal, extension or refinancing of any Indebtedness described in _clause (1)_ that does not expand the scope of any such encumbrance or restriction or make such restriction materially more onerous to the Lenders (in their capacity as such and taken as a

whole), or (4) contained in an agreement acquired in connection with the Transactions;

(C)      any restriction on the Equity Interests or assets of a Subsidiary imposed pursuant to an agreement entered into for the sale or Disposition of such Equity Interests or assets permitted under *Section 6.05* pending the closing of such sale or Disposition;

(D)      customary provisions in joint venture agreements and other similar agreements applicable to the assets of, or the Equity Interests in, joint ventures entered into in the ordinary course of business;

(E)      any restrictions imposed by any agreement relating to Indebtedness permitted by *Section 6.01* and/or secured by a Lien permitted by *Section 6.02* to secure such Indebtedness to the extent that such restrictions apply only to the property or assets securing such Indebtedness;

(F)      customary provisions contained in leases or licenses of intellectual property and other similar agreements entered into in the ordinary course of business;

(G)      customary provisions restricting subletting or assignment of any lease governing a leasehold interest;

(H)      customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(I)      customary restrictions and conditions contained in any agreement relating to the sale of any asset permitted under *Section 6.05* applicable to the asset to be sold pending the consummation of such sale;

(J)      restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(K)      customary provisions contained in leases, licenses, contracts and other similar agreements entered into in the ordinary course of business that impose restrictions on the property subject to such lease;

(L)      customary provisions contained in any Permitted Credit Support Arrangement; or

(M)      any agreement in effect at the time such subsidiary becomes a Subsidiary, so long as such agreement was not entered into in contemplation of such person becoming a Subsidiary and such restriction does not apply to the Borrower or any other Material Subsidiary or any of their respective assets.

(d)      With respect to the PNC Securitization Documents, directly or indirectly make any true up payments prior to the date on which such true up payment is due and no such

true up payments may be made, other than with internally generated cash or in connection with a termination in full of the facility, without the prior written consent of the Required Lenders.

(e)   Except as otherwise allowed pursuant to the DIP Orders or First Day Orders or in compliance with the DIP Budget (subject to permitted variances), (i) (x) make any payment or prepayment or redemption or acquisition for value or any cancellation or other retirement of any Pre-Petition Indebtedness or other obligations arising prior to the Petition Date of any Loan Party in excess of $575,000 in the aggregate during the term of this Agreement or (y) file a motion or other pleading or support a motion or other pleading filed by any other Person requesting the foregoing unless the relief sought under such motion or pleading is expressly conditioned on obtaining the consent of the Required Lenders, (ii) pay any interest on any Pre-Petition Indebtedness of any Loan Party (whether in cash, in kind securities or otherwise), or (iii) make any payment or create or permit any Lien pursuant to section 361 of the Bankruptcy Code (or pursuant to any other provision of the Bankruptcy Code authorizing adequate protection) on property of the Loan Parties; _provided_ that this _Section 6.09(e)_ shall not apply with respect to the 2020 Term Loans (as defined in the First Lien Credit Agreement).  In addition, no Loan Party shall permit any of its Subsidiaries to make any payment, redemption or acquisition on behalf of such Loan Party which such Loan Party is prohibited from making under the provisions of this _Section 6.09(e)_.

SECTION 6.10   Financial Covenants.

(a)   Minimum Liquidity. On the last Business Day of each week commencing with the week ending on May 29, 2020, maintain less than $5,000,000 of Liquidity on such date.

(b)   Budget Variance.

(i)   As of the last day of each Variance Test Period, other than during a Monthly Budget Testing Period, permit actual total disbursements, excluding professional fees, on a cumulative basis for the entire Variance Test Period, to be greater than 110% of the projected "total disbursements" as set forth in the DIP Budget as of such date;

(ii)   From the date on which a Monthly Budget Testing Period begins until such period has ended permit, on the last day of each Variance Test Period, actual total disbursements, excluding professional fees, on a cumulative basis for the entire Variance Test Period, to be greater than 110% of the projected "total disbursements" for such Variance Test Period as set forth in the Initial Monthly DIP Budget.

SECTION 6.11   Limitations on Change in Fiscal Periods.  Allow the fiscal year of the Borrower to end on a day other than December 31 or change the Borrower's method of determining fiscal quarters.

SECTION 6.12   KEIP Plan.  No Loan Party shall, and no Loan Party shall permit any of its Subsidiaries to, enter into any key employee incentive or retention plan, or other similar plan or agreement (any such agreement, a "***KEIP***"), unless such KEIP has been approved in writing by the Required Lenders and the Agents.

SECTION 6.13        Communications with Bankruptcy Court.    Except where not reasonably practicable, fail to provide prior notice and copies of any material motions or other material documents to be filed with the Bankruptcy Court.

SECTION 6.14        Bankruptcy Actions.    Seek, consent to, or permit to exist, any order granting authority to take any action that is prohibited by the terms of this Agreement, the DIP Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of the DIP Order or any of the other Loan Documents.

# ARTICLE VII
## Events of Default

SECTION 7.01        Events of Default.    Notwithstanding the provisions of Section 362 of the Bankruptcy Code to the extent provided in the DIP Order, with respect to the Debtors and without notice, application or motion, hearing before, order of the Bankruptcy Court or any notice to any Loan Party, any of the following events shall constitute an event of default (each, an "***Event of Default***"):

(a)        any representation, warranty, certification or statement of fact made or deemed made by the Borrower or any other Loan Party in any Loan Document or Variance Report, shall prove to have been incorrect or misleading in any material respect when so made, deemed made or furnished by the Borrower or any other Loan Party and such representation, warranty, certification or statement of fact made or deemed made by the Borrower or any other Loan Party in any Loan Document or Variance Report is not cured within five (5) Business Days of the making of such representation, warranty, certificate or statement of fact;

(b)        default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable in accordance with the terms hereof, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)        default shall be made in the payment of any interest on any Loan or in the payment of any Fee or any other amount (other than an amount referred to in paragraph (b) above) due under any Loan Document, when and as the same shall become due and payable;

(d)        any default shall be made in the due observance or performance by the Borrower of (i) any covenant or agreement contained in *Section 5.01(a)* (with respect to the Borrower only), *Section 5.04*, *Section 5.05(a)*, *Section 5.09*, *Section 5.14*, *Section 5.21*, *Section 5.22*, *Section 5.23* or in *Article VI* (other than *Section 6.10(a)*), or (ii) *Section 6.10(a)* and such default shall continue unremedied for a period of 2 Business Days;

(e)        default shall be made in the due observance or performance by the Borrower or any Loan Party of any covenant or agreement contained in any Loan Document (other than those specified in *paragraphs (b)*, *(c)* and *(d)* above), provided that such default under this *paragraph (e)* shall continue unremedied for a period of 30 days after the earlier of (1) notice thereof from the Administrative Agent to the Borrower and (2) knowledge of a Responsible Officer of the Borrower or any Loan Party of such default;

(f)    except for defaults or events of default  arising as a result of the entry into this Agreement or occasioned by the filing of the Chapter 11 Cases, unless the payment, acceleration and/or exercise of remedies with respect to any such Indebtedness is stayed by the Bankruptcy Court or unless any of the following results from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply (i) any event or condition occurs that (a) results in any Material Indebtedness incurred after the Petition Date becoming due prior to its scheduled maturity (with all applicable grace periods having expired), (b) enables or permits (with all applicable grace periods having expired) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity (including, in the case of a Qualified Securitization Financing, any event or condition occurs under the terms of the documents relating to the applicable Qualified Securitization Financing that terminates the Qualified Securitization Financing or that would permit the providers thereof to terminate such financing or arrangement or commitments or availability with respect thereto, in each case regardless of whether or not subsequently cured or waived thereunder, without entering into a DIP ABL Replacement Facility which refinances in full such Qualified Securitization Financing substantially concurrently with the termination of such Qualified Securitization Financing Documentation); or (ii) the Borrower or any Subsidiary shall fail to pay the principal of any Material Indebtedness at the stated final maturity thereof (with all applicable grace periods having expired); _provided_, that this _clause (f)_ shall not apply (and no Default or Event of Default shall result) to Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; _provided_ further, that with respect to the occurrence of any such event or condition under any DIP Revolving Loan Documents, such event or condition shall only constitute a Default or Event of Default under this Agreement (x) to the extent such Default or event of Default has not been cured or waived prior to the date that is 90 days after the occurrence of such Default or Event of Default or (y) if any holders of Indebtedness under the DIP Revolving Loan Documents have caused the same to become due and payable prior to the scheduled maturity thereof;

(g)    there shall have occurred a Change in Control;

(h)    [reserved];

(i)    [reserved];

(j)    except for any order of the Bankruptcy Court or the amount of any claim in the Chapter 11 Cases, the failure by the Borrower or any Loan Party or any Material Subsidiary to pay one or more final judgments aggregating in excess of $28,750,000 (to the extent not paid, and not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and does not dispute coverage), which judgments are not stayed by the Chapter 11 Cases or any Debtor Relief Law, discharged or effectively waived or stayed for a period of 60 consecutive days, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of the Borrower or any Subsidiary to enforce such judgment;

(k)      (i) an ERISA Event shall have occurred, (ii) a trustee shall be appointed by a United States district court to administer any Plan, or (iii) the Borrower, a Subsidiary or any ERISA Affiliate shall engage in any non-exempt "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan; and in each case in *clauses (i)* through *(iii)* above, such event or condition, together with all other such events or conditions, if any, would reasonably be expected to have a Material Adverse Effect;

(l)      (i) any Loan Document (other than in accordance with its terms or the terms of the other Loan Documents or upon Payment in Full) shall for any reason be asserted in writing by the Borrower or any Loan Party not to be a legal, valid and binding obligation of any party thereto, (ii) the DIP Order, together with the Loan Documents, shall cease to create a valid and perfected Lien with such priority required by this Agreement and the DIP Order or (iii) the Guarantees pursuant to the Guaranty and the Security Documents by the Borrower or any material Loan Parties of any material portion of the Obligations shall cease to be in full force and effect (other than in accordance with the terms thereof), or shall be asserted in writing by the Borrower or any Loan Party not to be in effect or not to be legal, valid and binding obligations;

(m)      any Junior Indebtedness or any guarantees thereof that is subordinated in right of payment or liens to the Obligations, shall cease for any reason to be validly subordinated to the Obligations as provided in the documentation governing such Junior Indebtedness or any Loan Party shall contest the subordination of any Junior Indebtedness or any guarantees thereof, if such Indebtedness is not subject to the automatic stay;

(n)      any order, judgment or decree shall be entered against any Loan Party decreeing the dissolution, split up or cessation or restraint from conducting a material part of the business of business of such Loan Party and such order shall remain undischarged or unstayed for a period in excess of 60 consecutive days;

(o)      any failure to comply with Environmental Laws or Release of Hazardous Materials that shall cause, individually or in the aggregate, a Material Adverse Effect;

(p)      <u>Bankruptcy Related Events of Default</u>

(i)      any of the Chapter 11 Cases concerning the Loan Parties shall be dismissed without an order entered by the Bankruptcy Court containing a provision for termination of all Commitments, and Payment in Full of all Obligations upon entry thereof (other than contingent indemnification obligation as to which no claim has been asserted); or

(ii)      any of the Chapter 11 Cases concerning the Loan Parties shall be converted to a case under chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading or support a motion or other pleading filed by any other Person seeking the conversion of any of the Chapter 11 Cases concerning the Loan Parties under section 1112 of the Bankruptcy Code or otherwise; or

(iii)      an order shall be entered by the Bankruptcy Court appointing a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b)

117

of the Bankruptcy Code shall be appointed in any of the Chapter 11 Cases or any Loan Party shall file a motion or other pleading or shall consent to a motion or other pleading filed by any other Person seeking any of the foregoing without the consent of the Required Lenders; or

(iv)    an order of the Bankruptcy Court shall be entered granting any Superpriority Claim or any Lien (other than the Carve Out, DIP Revolving Credit Agreement or as otherwise set forth in the DIP Orders) which is senior to the claims of the Administrative Agent, the Collateral Agent and the other Secured Parties against any Loan Party hereunder, or there shall arise or be granted any such senior Superpriority Claim (other than the Carve Out, DIP Revolving Credit Agreement or as set forth in the DIP Orders) or any Loan Party shall file a motion or other pleading or support a motion or other pleading filed by any other Person requesting any of the foregoing (other than in connection with any financing which would repay the Obligations in full in cash); or

(v)    the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code (i) to the holder or holders of any security interest to proceed against, including foreclosure (or the granting of a deed in lieu of foreclosure or the like) on, any assets of any of the Loan Parties that have a value in excess of $575,000 in the aggregate or (ii) to state or local environmental or regulatory agency or authority to proceed against, including foreclose (or the granting of a deed in lieu of foreclosure or the like) on, any assets of any of the Loan Parties that have a value in excess of $575,000; or

(vi)    subject to entry of the Final Order, the Bankruptcy Court shall enter an order imposing, surcharging or assessing against the Collateral Agent's or Lenders' interest in the Collateral, any costs of expenses, whether pursuant to 506(c) or 552 of the Bankruptcy Code or otherwise, or any Loan Party shall file a motion or other pleading or support a motion or other pleading filed by any other Person requesting the foregoing; or

(vii)    an order of the Bankruptcy Court (or any other court of competent jurisdiction) shall be entered, whether on appeal or otherwise, (A) without the written consent of the Required Lenders, reversing, staying or vacating either of the DIP Orders, (B) without the written consent of the Required Lenders, amending, supplementing or modifying either of the DIP Orders in a manner adverse to the Lenders, (C) denying or terminating the use of cash collateral by the Loan Parties pursuant to either of the DIP Orders or granting authority to use any cash proceeds of any of the Collateral without the Collateral Agent's and Required Lenders' consent or (D) authorizing or approving any other action or actions adverse to the Administrative Agent, the Collateral Agent and Lenders or their rights and remedies hereunder, under any other Loan Documents, or their interest in the Collateral; or any Loan Party shall file a motion or other pleading or shall support a motion or other pleading filed by any other Person seeking any of the foregoing; or

(viii)    default shall be made by any of the Loan Parties in the due observance or performance of any term, condition or obligation contained in the DIP Orders beyond any grace period for such specific default set forth therein or herein, other

than any such default that is of an administrative or procedural nature which is cured within 3 days after the earlier of (x) notice by the Administrative Agent or the Required Lenders or (y) knowledge of such default by any of the Loan Parties; or

(ix)     the Bankruptcy Court shall terminate or reduce the period pursuant to section 1121 of the Bankruptcy Code during which the Loan Parties have the exclusive right to file a Reorganization Plan and solicit acceptances thereof or such exclusive right shall have expired, without the prior written consent of the Required Lenders; or

(x)     any Loan Party contests the validity or enforceability of any provision of any Loan Document or the validity, extent, perfection or priority of a Lien in favor of the Collateral Agent or the Lenders on the Collateral or shall support or consent to any other Person contenting the foregoing; or

(xi)     the Loan Parties, or any Person claiming by or through the Loan Parties, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent, the Collateral Agent or any of the Lenders, other than in accordance with the DIP Orders; or

(xii)     an order of the Bankruptcy Court (or any other court of competent jurisdiction) shall be entered approving any financing under Section 364 of the Bankruptcy Code other than the Credit Facility, the DIP Revolving Credit Agreement, the DIP Revolving Credit Agreement Permitted Amendment or the DIP ABL Replacement Facility without the written consent of the Required Lenders that does not repay the Obligations in full in cash or any Loan Party shall file a motion or other pleading or shall support a motion or other pleading filed by any other Person seeking any of the foregoing; or

(xiii)     the filing by any Loan Party of any Reorganization Plan or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, that is not an Acceptable Plan or does not propose to satisfy in full in cash all Obligations under the Loan Documents on the effective date of such plan without the prior written consent of the Required Lenders; or

(xiv)     the Acceptable Plan or the order by the Bankruptcy Court approving the Acceptable Plan is withdrawn, amended, supplemented or otherwise modified pursuant to a pleading filed with the Bankruptcy Court that is not withdrawn in three days, in a manner that materially adversely affects the rights and duties of the Lenders, the Administrative Agent and/or the Collateral Agent, without the prior written consent of the Required Lenders, the Administrative Agent or the Collateral Agent, as applicable; or

(xv)     the Borrower or any other Loan Party attempts to consummate a sale of all or substantially all of its assets via a Reorganization Plan or sales occurring pursuant to Section 363 of the Bankruptcy Code without consent of the Required Lenders; or

(xvi)     the termination of the Restructuring Support Agreement, whether or not the Restructuring Support Agreement is then in effect, or the failure to achieve or satisfy any milestone in the Restructuring Support Agreement or the DIP Order; or

(xvii)   the DIP Order shall cease to create a valid and perfected Lien (which creation and perfection shall not require any further action other than the entry of the DIP Order) on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Required Lenders; or

(xviii) (A) the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents, (B) any Loan Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent or any Lender with respect to the Obligations and (C) without the consent of the Administrative Agent and the Required Lenders, the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any pre-petition agent or lender that is inconsistent with the DIP Order; or

(xix)   the remittance, use or application of any proceeds of the Collateral other than in accordance with cash management procedures and as permitted by *Section 5.09*; or

(xx)   if, unless otherwise approved by the Administrative Agent and the Required Lenders, an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to the Chapter 11 Cases and such order shall not be reversed or vacated within 10 days; or

(xxi)   any Debtor shall be enjoined from conducting any material portion of its business, any disruption of the material business operations of the Debtors shall occur, or any material damage to or loss of material assets of any Debtor shall occur; or

(xxii)   any Loan Party or any Subsidiary thereof or any Debtor shall take any action in support of any matter set forth in this *Section 7.01(p)* or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal; or

(q)   Credit Bid.  Subject to the DIP Order and the First Lien Pari Passu Intercreditor Agreement, the inability of the Lenders, either individually or together with one or more Lenders, to credit bid the full amount of their claims in the Chapter 11 Cases in connection with any asset sale process or plan sponsorship process or any sale of assets (in whole or part) by any Loan Party, including without limitation sales occurring pursuant to Section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under Section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code;

(r)   the holders of all or any part of the Indebtedness incurred by the Loan Parties under the Second Lien Credit Agreement and any other Junior Indebtedness shall not be granted adequate protection other than as consented to by the Agents and the Required Lenders and as set forth in the DIP Orders;

then, and in every such event, and at any time thereafter during the continuance of such event, but subject to the terms and conditions of the DIP Orders, the Administrative Agent, at the request of the Required Lenders, shall, by notice to the Borrower, take any or all of the following actions, at the same or different times and upon written notice thereof by Agents (which such notice shall be made to the Loan Parties, the official committee(s) of creditors of the Loan Parties and the United States Trustee for the Southern District of New York and shall be referred to herein as a "**Termination Declaration**" and the date which is the earliest to occur of any such Termination Declaration (excluding the notice period) being herein referred to as the "**Termination Declaration Date**"):  (i) terminate forthwith the Commitments, (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans then outstanding so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document constituting Obligations, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding and (iii) declare a restriction or termination of the Loan Parties' ability to use Cash Collateral.

In addition, five (5) Business Days following the Termination Declaration Date (such 5 Business Day period, the "**Remedies Notice Period**"), absent the Loan Parties curing all such existing Events of Default during such Remedies Notice Period, the Agents shall have automatic relief from the automatic stay and may foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the Obligations, occupy the Loan Parties' premises to sell or otherwise dispose of the Collateral or otherwise exercise remedies against the Collateral permitted by applicable nonbankruptcy law. During the Remedies Notice Period, the Loan Parties and any statutory committee shall be entitled to an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred. Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing, the automatic stay, as to the Lenders and the Agents, shall automatically terminate at the end of the Remedies Notice Period, without further notice or order. During the Remedies Notice Period, the Loan Parties may not use the proceeds of Loans hereunder, Cash Collateral, or other Collateral proceeds except to the limited extent permitted by the DIP Orders.

## ARTICLE VIII
### The Agents

SECTION 8.01      Appointment and Authority.  (a) Each of the Lenders hereby irrevocably appoints U.S. Bank National Association to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents, and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Administrative Agent, the Collateral Agent and the Lenders, and the Borrower shall not have rights as a third party beneficiary of any of such provisions.

(b)      Each of the Lenders hereby designates U.S. Bank National Association to act as Collateral Agent for such Lender under this Agreement and the other Loan Documents. Each of the Lenders hereby irrevocably authorizes Collateral Agent to take such action on its behalf under the provisions of this Agreement and the Loan Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Collateral Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and Collateral Agent shall hold all Collateral, payments of principal and interest, fees, charges and collections (without giving effect to any collection days) received pursuant to this Agreement, for the ratable benefit of Lenders.  The Collateral Agent may perform any of its duties hereunder by or through its agents or employees.  The Collateral Agent shall not have any duty to take any discretionary action or exercise any discretionary powers expressly contemplated hereby or under the Loan Documents, except discretionary rights and powers expressly contemplated hereby pursuant to _(c)_ or under the Loan Documents and which the Collateral Agent has been directed in writing by the Required Lenders; _provided_, _however_, that Collateral Agent shall not be required to take any action which exposes Collateral Agent to liability or which is contrary to this Agreement or the Other Documents or applicable law unless Collateral Agent is furnished with an indemnification reasonably satisfactory to Collateral Agent with respect thereto.  Each of the Administrative Agent and the Collateral Agent may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the Loan Documents such Agent is permitted or required to take or to grant.  Whether or not the Administrative Agent or the Collateral Agent makes such a request, at all times except with respect to an express obligation set forth herein, the Administrative Agent and the Collateral Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent or the Collateral Agent shall have received instructions from the Required Lenders, and the Administrative Agent or the Collateral Agent shall not incur liability to any Person by reason of so refraining.  If, in performing its duties under this Agreement, either the Administrative Agent or the Collateral Agent is required to decide between alternative courses of action or has received conflicting directions or any other directions from Lenders who do not satisfy the definition of Required Lenders, such Agent may refrain from taking any action until it receives instructions from the Required Lenders.

(c)      Notwithstanding anything else to the contrary herein, whenever reference is made in this Agreement to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Administrative Agent and/or the Collateral Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Administrative Agent and/or the Collateral Agent, it is understood that the Administrative Agent and/or the Collateral Agent shall be acting at the written direction of the Lenders or Required Lenders, as applicable, and shall be fully protected in acting pursuant to such directions; _provided_ that if the Person required to provide the direction to the Agents is not specified, the Administrative Agent and/or the Collateral Agent shall only act at the direction of the Required Lenders.  In all cases the Administrative Agent and/or the Collateral Agent shall be fully justified in failing or refusing to take any such action under this Agreement if they shall not have received such written instruction, advice or concurrence.  For purposes of clarity, phrases such as "satisfactory to the Administrative Agent and/or the Collateral Agent", "approved", "approved by the Administrative Agent and/or the Collateral Agent", "acceptable to the

Administrative Agent and/or the Collateral Agent", "as determined by the Administrative Agent and/or the Collateral Agent", "in the Administrative Agent's and/or the Collateral Agent's sole discretion", "selected by the Administrative Agent and/or the Collateral Agent", and phrases of similar import, except as otherwise expressly provided herein, authorize and permit the Administrative Agent and/or the Collateral Agent to approve, disapprove, determine, act or decline to act only at the direction of the Required Lenders (it being understood that nothing contained in this Agreement or other Loan Document shall impose a duty on the Administrative Agent or the Collateral Agent to make any such determination or take any action independent of such written direction from the Lenders or the Required Lenders or exercise any discretionary acts.).

SECTION 8.02        Rights as a Lender.  If the Administrative Agent and/or the Collateral Agent shall request instructions from Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any Loan Document, the Administrative Agent and/or the Collateral Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent and/or the Collateral Agent shall have received instructions from the Required Lenders; and the Administrative Agent and/or the Collateral Agent shall not incur liability to any Person by reason of so refraining.  Without limiting the foregoing, Lenders shall not have any right of action whatsoever against the Administrative Agent and/or the Collateral Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders.

SECTION 8.03        Exculpatory Provisions  The Administrative Agent and/or the Collateral Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Loan Documents.  Neither Collateral Agent, the Administrative Agent nor any of their respective officers, directors, employees or agents shall be (i) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), or (ii) responsible in any manner for any recitals, statements, representations or warranties made by the Borrower or any officer thereof contained in this Agreement, or in any of the Loan Documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent and/or the Collateral Agent under or in connection with, this Agreement or any of the Loan Documents or for the value, validity, effectiveness, genuineness, due execution, enforceability or sufficiency of this Agreement, or any of the Loan Documents or for any failure of the Borrower to perform its obligations hereunder.  The Administrative Agent and/or the Collateral Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Loan Documents, or to inspect the properties, books or records of the Borrower.  The duties of the Administrative Agent and/or the Collateral Agent with respect to the Loans to the Borrower shall be mechanical and administrative in nature; the Administrative Agent and/or the Collateral Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender (regardless of whether a Default has occurred and is continuing); and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent and/or the Collateral Agent any obligations in respect of this Agreement except as expressly set forth herein.  The Administrative Agent and/or the Collateral Agent shall not, except as expressly set forth herein and in the Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is

communicated to or obtained by the Person servicing as the Administrative Agent and/or the Collateral Agent or any of their respective Affiliates in any capacity. The Administrative Agent and/or the Collateral Agent will provide copies of notices, certificates and reports that it receives from the Borrower to the Lenders and shall have no obligation to review such notices, certificates or reports except as expressly provided herein.

(a)    Without limiting the foregoing, neither the Administrative Agent nor the Collateral Agent shall be required to act hereunder or to advance its own funds or otherwise incur any financial liability in the performance of its duties or the exercise of its rights hereunder and under any other agreements or documents to which it is a party, and shall in all cases be fully justified in failing or refusing to act hereunder unless it shall receive further assurances to its satisfaction from the Lenders of their indemnification obligations under and in accordance with the provisions of _Section 9.05_ against any and all liability and expense that may be incurred by it by reason of taking or continuing to take or refraining from taking any such action. The Administrative Agent and/or the Collateral Agent shall be fully justified in requesting direction from the Required Lenders in the event this Agreement or any Loan Document is silent or vague with respect to such the Administrative Agent's or the Collateral Agent's duties, rights or obligations. Neither the Administrative Agent nor the Collateral Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Administrative Agent and/or the Collateral Agent shall believe in good faith shall be necessary, under the circumstances) or (ii) in the absence of its own gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final and non-appealable decision. The Administrative Agent and/or the Collateral Agent shall not be deemed to have knowledge of any Default unless and until written notice describing such Default is received by the Administrative Agent and/or the Collateral Agent from the Borrower or a Lender.

(b)    Each party to this Agreement acknowledges and agrees that the Administrative Agent and the Collateral Agent may from time to time use one or more outside service providers for the tracking of all UCC financing statements (and/or other collateral related filings and registrations from time to time) required to be filed or recorded pursuant to the Loan Documents and the notification to the Administrative Agent and the Collateral Agent, of, among other things, the upcoming lapse or expiration thereof, and that each of such service providers will be deemed to be acting at the request and on behalf of Borrower and the other Loan Parties.

(c)    The Administrative Agent and the Collateral Agent shall not be under a duty to examine or independently evaluate, and shall not be charged with knowledge or notice of, the contents of any financial statements or reports delivered to it pursuant to the provisions of this Agreement or the Loan Documents, it being acknowledged that such deliveries are for the purpose of making such materials available to the Lenders.

SECTION 8.04    Reliance by Administrative Agent. The Administrative Agent and/or the Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any notice, request, consent, note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and the Loan Documents and its

duties hereunder, upon advice of counsel selected by it.  The Administrative Agent and/or the Collateral Agent shall not incur liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, each of the Administrative Agent and the Collateral Agent may presume that such condition is satisfactory to such Lender unless each of the Administrative Agent and the Collateral Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent and/or the Collateral Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 8.05      Delegation of Duties.    The Administrative Agent and/or the Collateral Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any Loan Document by or through any one or more sub-agents appointed by such Administrative Agent and/or Collateral Agent.  The Administrative Agent and/or the Collateral Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective agents.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the agents of the Administrative Agent and/or the Collateral Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Credit Facility provided for herein as well as activities as the Administrative Agent and/or the Collateral Agent.  The Administrative Agent and/or the Collateral Agent shall not be responsible for the negligence or misconduct of any agents or attorneys in fact selected by it with reasonable care.

SECTION 8.06      Resignation of the Administrative Agent or Collateral Agent.   The Administrative Agent and/or the Collateral Agent may resign on sixty (60) days' written notice to each of Lenders and upon such resignation, the Required Lenders will promptly designate a successor Administrative Agent and/or Collateral Agent reasonably satisfactory to the Borrower.  Any such successor Administrative Agent and/or Collateral Agent shall succeed to the rights, powers and duties of the Administrative Agent or Collateral Agent, as applicable, and (x) the term "*Collateral Agent*" shall mean such successor Collateral Agent effective upon its appointment and/or (y) the term "*Administrative Agent*" shall mean such successor Administrative Agent effective upon its appointment, and the former Administrative Agent and/or Collateral Agent's rights, powers and duties as Administrative Agent and/or Collateral Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent and/or Collateral Agent, as applicable.  After any Administrative Agent's and/or Collateral Agent's resignation as Administrative Agent and/or collateral Agent, as applicable, the provisions of this *Article VIII* shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent and/or Collateral Agent under this Agreement.  After the retiring Administrative Agent's and/or Collateral Agent's resignation hereunder and under the other Loan Documents, the provisions of this *Article VIII* and *Section 9.05* shall continue in effect for the benefit of such retiring Administrative Agent and/or Collateral Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent and/or Collateral Agent was acting as Administrative Agent and/or Collateral Agent.  Notwithstanding anything to the contrary herein, no Disqualified Institution (nor any Affiliate thereof) may be appointed as a successor Administrative Agent and/or Collateral Agent or sub-agent.

SECTION 8.07        Non-Reliance on Administrative Agent and Other Lenders. Independently and without reliance upon the Administrative Agent and/or the Collateral Agent or any other Lender, each Lender has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of each Loan Party in connection with the making and the continuance of the Loans hereunder and the taking or not taking of Loan action in connection herewith, and (ii) its own appraisal of the creditworthiness of each Loan Party. The Administrative Agent and/or the Collateral Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before making of the Loans or at any time or times thereafter except as shall be provided by any Loan Party pursuant to the terms hereof. The Administrative Agent and/or the Collateral Agent shall not be responsible to any Lender for the financial condition of the Borrower, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Loan Documents or the financial condition of the Borrower, or the existence of any Event of Default or any Default.

SECTION 8.08        Notice of Default. The Administrative Agent and/or the Collateral Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the Loan Documents, unless the Administrative Agent and/or the Collateral Agent has received notice from a Lender or the Borrower referring to this Agreement or the Loan Documents, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent and/or the Collateral Agent receives such a notice, the Administrative Agent and/or the Collateral Agent shall give notice thereof to Lenders. The Administrative Agent and/or the Collateral Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; *provided*, that, unless and until the Administrative Agent and/or the Collateral Agent shall have received such directions, the Administrative Agent and/or the Collateral Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders.

SECTION 8.09        Administrative Agent May File Proofs of Claim. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)        to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders or the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Administrative Agent and their respective agents and counsel and all other amounts due to the Lenders and the Administrative Agent under *Section 2.12* and *9.05*) allowed in such judicial proceeding; and

(b)        to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

126

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent, shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due to the Administrative Agent under *Section 2.12* and *9.05*.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any specific plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

SECTION 8.10    Indemnification.  To the extent the Administrative Agent and/or the Collateral Agent are not reimbursed and indemnified by the Borrower, each Lender will reimburse and indemnify the Administrative Agent and/or the Collateral Agent in proportion to its respective portion of the Loans, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, fees (including reasonable legal fees, costs and expenses), costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Administrative Agent and/or the Collateral Agent in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Loan Document and (whether brought by or involving any third party, the Borrower or the Lenders) (in all cases, whether or not caused or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Administrative Agent, the Collateral Agent or Related Parties); *provided* that, Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's and/or the Collateral Agent's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment).

SECTION 8.11    Collateral Release and Subordination.

(a)    (i) The Lenders irrevocably authorize the Collateral Agent to release (and deliver evidence of such release) any Lien on any property granted to or held by the Collateral Agent under any Loan Document (A) upon Payment in Full, (B) that is sold or to be sold to a party that is not a Loan Party or otherwise disposed of as part of or in connection with any sale or other Disposition permitted hereunder or under any other Loan Document, or (C) subject to *Section 9.09*, if approved, authorized or ratified in writing by the Required Lenders or such other number or percentage of Lenders required hereby.

(ii)    to subordinate any Lien on any property granted to or held by the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by *clauses (i)* or *(j)* of *Section 6.02*.

(b)    The Lenders irrevocably authorize the Administrative Agent or Collateral Agent, as applicable to release (and deliver evidence of such release) any guarantor from its obligations hereunder (including the Guaranty) and under the other Security Documents upon

Payment in Full or if person ceases to be a Loan Party as a result of a transaction permitted hereunder and under the other Loan Documents (as the context may require).

(c)    Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Administrative Agent, the Collateral Agent and each Lender hereby agree that no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty or any other Security Document, it being understood and agreed that all powers, rights and remedies under any of the Security Documents may be exercised solely by the Administrative Agent or the Collateral Agent, as applicable, for the benefit of the Secured Parties in accordance with the terms thereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent for the benefit of the Secured Parties in accordance with the terms thereof.

Upon request by the Administrative Agent at any time, each of the Required Lenders will confirm in writing the Administrative Agent's or Collateral Agent's, as applicable, authority to release or subordinate its interest in particular types or items of property, or to release any guarantor from its obligations hereunder (including the Guaranty) and under the other Security Documents.

SECTION 8.12    Withholding Tax.  To the extent required by any applicable laws (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender or under any Loan Document an amount equivalent to any applicable withholding Tax.  Without limiting or expanding the provisions of _Section 2.17_, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payment in respect thereof within 10 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective).  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent or shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this _Section 8.11_.  The agreements in this _Section 8.11_ shall survive the resignation and/or replacement of the Administrative Agent any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

SECTION 8.13    Certain ERISA Matters.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and the Collateral Agent and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)       such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans in connection with the Loans or the Commitments,

(ii)      the prohibited transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable so as to exempt from the prohibitions of ERISA Section 406 and Section 4975 of the Code such Lender's entrance into, participation in, administration of and performance of the Loans the Commitments and this Agreement, or

(iii)     (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of subsections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement.

(b)       In addition, unless *sub-clause (i)* in the immediately preceding *clause (a)* is true with respect to a Lender, such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and the Collateral Agent and their respective Affiliates, and for the benefit of the Borrower and any other Loan Party, that none of the Administrative Agent or the Collateral Agent or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender involved in the Loans, the Commitments, and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent or the Collateral Agent under this Agreement, any Loan Document or any documents related to hereto or thereto).

SECTION 8.14       No Reliance on Collateral Agent's Customer Identification Program. Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the Administrative Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "*CIP Regulations*"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with the Borrower, its Affiliates or its agents, this Agreement, the Loan Documents or the transactions hereunder or contemplated hereby:  (1) any

identity verification procedures, (2) any record-keeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or such other laws.

SECTION 8.15    No Other Duties, etc.    Anything herein to the contrary notwithstanding, the Administrative Agent and/or the Collateral Agent shall not have any powers, duties or responsibilities under this Agreement or any of the Loan Documents, except in its capacity, as applicable, as the Administrative Agent and/or the Collateral Agent.  For the avoidance of doubt, the Administrative Agent and/or the Collateral Agent shall not be responsible for the perfection of any Lien or for the filing, form, content or renewal of any UCC financing statements, fixture filings, mortgages, deeds of trust and such other documents or instruments, provided that the Administrative Agent and/or the Collateral Agent shall effect such filings and renewals as instructed by the Required Lenders in writing.

SECTION 8.16    Credit Agreement Controls.  In the event of any conflict between this Agreement and any other Loan Document (except as set forth in the First Lien Pari Passu Intercreditor Agreement) with respect to the rights, duties, powers and responsibilities of the Administrative Agent and/or the Collateral Agent, the terms of this Agreement shall govern and control.

SECTION 8.17    Actions of the Administrative Agent and the Collateral Agent.  Notwithstanding anything herein to the contrary, all terms and provisions hereof with respect to the Administrative Agent and/or the Collateral Agent or in any Loan Document shall be subject to the terms of this *Section 8.17* (except as set forth in the First Lien Pari Passu Intercreditor Agreement).  In performing under the Loan Documents, the Administrative Agent and/or the Collateral Agent shall have all of its rights, protections and immunities granted to it under this Agreement.  The Lenders hereby authorize, empower and direct the Administrative Agent and/or the Collateral Agent to execute and deliver on their behalf the Loan Documents and all related agreements, documents or instruments as shall be necessary or appropriate as determined by the Lenders in good faith and in the forms presented to the Administrative Agent and/or the Collateral Agent as of the date hereof in order to effectuate the purposes of the Loan Documents and any such other related agreements, documents and instruments. Each of the Lenders hereby acknowledges that it has received a copy of the Loan Documents and agrees that it will be bound by and will take no actions contrary to the provisions of the Loan Documents to the extent then in effect.

SECTION 8.18    Regarding Collateral.

(a)    The Collateral Agent makes no representation as to the value, sufficiency or condition of the Collateral or any part thereof, as to the title of the Borrower to the Collateral, as to the security afforded by this Agreement or any Loan Document, and the Collateral Agent shall incur no liability or responsibility in respect of any such matters.  The Collateral Agent shall not be responsible for insuring the Collateral, for the payment of taxes, charges, assessments or liens upon the Collateral or otherwise as to the maintenance of the Collateral, except as provided in the immediately following sentence when the Collateral Agent has possession of the Collateral. The Collateral Agent shall have no duty to the Lenders as to any Collateral in its possession or in the possession of someone under its control or in the possession or control of any Collateral Agent or nominee of the Collateral Agent or any income thereon or as to the preservation of rights against

prior parties or any other rights pertaining thereto, except the duty to accord such of the Collateral as may be in its possession substantially the same care as it accords its own assets and the duty to account for monies received by it.  Neither the Collateral Agent nor any officer, the Collateral Agent or representative thereof shall be personally liable for any action taken or omitted to be taken by any such Person in connection with this Agreement or any Loan Document except for such Person's own gross negligence or willful misconduct.  In no instance shall the Collateral Agent have any liability for special, consequential or indirect damages or penalties (including lost profits) even if it has been advised of the likelihood of the same, except to the extent arising out of its gross negligence or willful misconduct.  Permissive rights, authorities and powers granted to the Collateral Agent under this Agreement or any Loan Documents shall not be construed to be mandatory duties to act.  The Collateral Agent shall not be under an obligation independently to request or examine insurance coverage with respect to any Collateral.

(b)    The Collateral Agent shall not be liable for the acts or omissions of any bank, depositary bank, custodian, independent counsel of the Borrower or any other party selected by the Collateral Agent with reasonable care or selected by any other party hereto that may hold or possess Collateral or documents related to Collateral and the Collateral Agent shall not be required to monitor the performance of any such Persons holding Collateral (except to the extent such Person is a co-agent or sub-agent appointed by the Collateral Agent).  Without prejudice to the generality of the foregoing, the Collateral Agent shall not be liable for any damage or loss resulting from or caused by events or circumstances beyond the Collateral Agent's reasonable control, including nationalization, expropriation, currency restrictions, the interruption, disruption or suspension of the normal procedures and practices of any securities market, power, mechanical, communications or other technological failures or interruptions, computer viruses or the like, acts of war or terrorism, riots, revolution, acts of God, work stoppages, strikes, national disasters of any kind, or other similar events or acts.

(c)    In connection with the exercise of any rights or remedies in respect of, or foreclosure or realization upon, any real estate-related collateral pursuant to this Agreement or any Loan Document, the Collateral Agent shall not be obligated to take title to or possession of real estate in its own name, or otherwise in a form or manner that may, in its reasonable judgment, expose it to liability.  In the event that the Collateral Agent deems that it may be considered an "owner or operator" under any environmental laws or otherwise cause the Collateral Agent to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Collateral Agent reserves the right, instead of taking such action, either to resign as Collateral Agent subject to the terms and conditions of *Section 8.06* or to arrange for the transfer of the title or control of the asset to a court appointed receiver.  The Collateral Agent will not be liable to any Person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Collateral Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any hazardous materials into the environment.

(d)    The Collateral Agent shall have no liability for losses arising from (i) any cause beyond its control, (ii) any delay, error, omission or default of any mail, telegraph, cable or wireless agency or operator, or (iii) the acts or edicts of any government or governmental agency

or other group or entity exercising governmental powers.  The Collateral Agent shall not be responsible for any special, exemplary, punitive or consequential damages.

(e)    The Collateral Agent shall not be responsible for the preparation or filing of any UCC financing statements or the correctness of any financing statements filed in connection with this Agreement or the validity or perfection of any lien or security interest created pursuant to this Agreement.

(f)    The Collateral Agent shall not be liable for interest on any money received by it except as the Collateral Agent may agree in writing with the Borrower.  The Collateral Agent shall not be required to expend or risk its own funds in the performance of its duties hereunder. Concurrently herewith, the Administrative Agent directs the Collateral Agent and the Collateral Agent is authorized to enter into the Collateral Documents and any other related agreements in the forms presented to the Collateral Agent.  For the avoidance of doubt, all of the Collateral Agent's rights, protections and immunities provided herein shall apply to the Collateral Agent for any actions taken or omitted to be taken under any Collateral Documents and any other related agreements in any of its capacities.  All protections provided herein shall apply to U.S. Bank National Association in its various capacities hereunder.

(g)    It is expressly agreed and acknowledged that the Collateral Agent is not guaranteeing performance of or assuming any liability for the obligations of the other parties hereto or any parties to the Collateral.

(h)    If, in performing its duties under this Agreement, the Collateral Agent is required to decide between alternative courses of action, the Collateral Agent may request written instructions from the Required Lenders as to the course of action desired by it.  If the Collateral Agent does not receive such instructions within three Business Days after it has requested them, the Collateral Agent may, but shall be under no duty to, take or refrain from taking any such courses of action.  The Collateral Agent shall act in accordance with instructions received after such three-Business Day period except to the extent it has already taken, or committed itself to take action inconsistent with such instructions.

(i)    The Collateral Agent shall have no liability for any failure, inability or unwillingness on the part of the Borrower to provide accurate and complete information on a timely basis to the Collateral Agent, or otherwise on the part of any such party to comply with the terms of this Agreement, and shall have no liability for any inaccuracy or error in the performance or observance on the Collateral Agent's part of any of its duties hereunder that is caused by or results from any such inaccurate, incomplete or untimely information received by it, or other failure on the part of any such other party to comply with the terms hereof.

## ARTICLE IX
### Miscellaneous

SECTION 9.01    Notices.  (a) Except in the case of notices and other communications permitted to be given by telephone (and except as provided in *subsection (b)* below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows,

and all notices and other communications permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

     (i)    if to any Loan Party, to its address set forth on *Schedule 9.01(a)(i)*;

       with a copy (which shall not constitute notice) to:

> Ropes & Gray LLP
> 1211 Avenue of the Americas
> New York, NY 10036
> Attention: Leonard Klingbaum and Max Silverstein
> Email:Leonard.Klingbaum@ropesgray.com;
> Max.Silverstein@ropesgray.com

     (ii)    if to the Blackstone Representative, to its address set forth on *Schedule 9.01(a)(i)*; and

     (iii)    if to the Administrative Agent or Collateral Agent, to the applicable address as set forth on *Schedule 9.01(a)(ii)* and including copies to any sub-agents as set forth therein.

     Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in *subsection (b)* below shall be effective as provided in such *subsection (b)*.

     (b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites), *provided* that the foregoing shall not apply to notices to any Lender pursuant to *Article II* if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications. In all events, whenever a document or notice is to be delivered to the Administrative Agent or the Collateral Agent, a copy of such document or notice shall also be delivered by the Borrower to each Lender.

     (c)    Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet

website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing *clause (i)* of notification that such notice or communication is available and identifying the website address therefor.

(d)       Each of the Borrower, the Administrative Agent, the Collateral Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower, the Administrative Agent and the Collateral Agent.  In addition, each Lender agrees to notify the Administrative Agent and the Collateral Agent from time to time to ensure that the Administrative Agent and the Collateral Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to the Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

(e)       The Administrative Agent, the Collateral Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Borrowing Requests) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, the Collateral Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such person on each notice purportedly given by or on behalf of the Borrower.  All telephonic notices to and other telephonic communications with the Administrative Agent and the Collateral Agent may be recorded by the Administrative Agent and Collateral Agent, and each of the parties hereto hereby consents to such recording.

(f)       Nothing in this Agreement or in any other Loan Document shall be construed to limit or affect the obligation of the Loan Parties or any other Person to serve upon the Administrative Agent, the Collateral Agent and the Lenders in the manner prescribed by the Bankruptcy Code any pleading or notice required to be given to the Administrative Agent, the Collateral Agent and the Lenders pursuant to the Bankruptcy Code.

SECTION 9.02       Survival of Agreement.  All covenants, agreements, representations and warranties made by the Borrower and the other Loan Parties herein, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, the execution and delivery of the Loan Documents, regardless of any investigation made by such persons or on their behalf, and shall continue in full force and effect as long as the principal of or

any accrued interest on any Loan or any Fee or any other Obligations (other than yet unasserted contingent Obligations) under this Agreement or any other Loan Document is outstanding and unpaid and so long as the Commitments have not been expired or terminated.  Without prejudice to the survival of any other agreements contained herein, indemnification and reimbursement obligations contained herein (including pursuant to *Section 2.15*, *2.17*, *8.10*, *8.11*, and *9.05*) shall survive the Payment in Full and the termination of the Commitments or this Agreement.

SECTION 9.03    Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower and the Administrative Agent and when the Administrative Agent shall have received copies hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the Borrower, the Administrative Agent and each Lender and their respective permitted successors and assigns.

SECTION 9.04    Successors and Assigns.  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section (and any attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in *paragraph (c)* of this Section), and, to the extent expressly contemplated hereby, the Related Parties of each of the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement or the other Loan Documents.

(b)    (i) Subject to the conditions set forth in *paragraph (b)(ii)* below, any Lender may at any time assign to one or more assignees (each, an "***Assignee***") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans with the prior written consent of the Required Lenders; *provided*, that no consent of the Required Lenders shall be required for an assignment of in the case of a Loan, all or any portion of such Loan to a Lender, an Affiliate of a Lender or an Approved Fund of such Lender.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans to related Approved Funds, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (as of the date such Assignment and Acceptance is recorded in the Register by the Administrative Agent) shall not be less than $1,000,000 in respect of Loans unless the Administrative Agent otherwise expressly consent to such assignment; *provided* that simultaneous assignments to two or more Related Funds or by two or more Related Funds to a single Assignee shall be treated as one assignment for purposes of the minimum assignment requirement, and shall be in

an amount that is an integral multiple of $1,000,000 (or the entire remaining amount of such Lender's Commitment);

(B)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500 (which may be waived or reduced at the Administrative Agent's sole discretion); *provided*, that (i) assignments pursuant to *Section 2.19* shall not require the signature of the assigning Lender to become effective and (ii) any such processing and recordation fee in connection with assignments pursuant to *Section 2.19* shall be paid by the assignee;

(C)    the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and all documentation and other information with respect to the assignee that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, including any tax forms required to be provided pursuant to *Section 2.17(g)*; and

(D)    in connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this *paragraph (D)*, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

For the purposes of this *Section 9.04*, "**Approved Fund**" means any person (other than a natural person or a Disqualified Institution) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to *paragraph (b)(v)* below, from and after the effective date specified in each Assignment and Acceptance (which shall be the date of such recordation) the Assignee thereunder shall be a party hereto

and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of *Section 2.15*, *2.16*, *2.17* and *9.05*). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this *Section 9.04* shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with *paragraph (c)* of this Section.

(iv)    The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices in the United States of America a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "***Register***").   The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  The Administrative Agent may conclusively rely on the Lender certifications that the proposed assignee of such Loan is an Eligible Assignee as set forth in the Assignment without any independent investigation.

(v)    Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, all documents required under *paragraph (ii)(C)* above (unless the Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in *paragraph (b)* of this Section and any written consent to such assignment required by *paragraph (b)* of this Section, the Administrative Agent shall acknowledge such Assignment and Acceptance and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless and until it has been recorded in the Register as provided in this *paragraph (v)*, *provided* that for the avoidance of doubt, the date that is the later of (i) the trade date specified (if any) in the Assignment and Assumption and (ii) the day such Assignment and Assumption has been recorded in the Register shall be the effective date of the assignment.

(c)    (i) Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (other than a natural person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person, a Defaulting Lender or a Disqualified Institution, or the Borrower or any of the Affiliated Lenders) (a "***Participant***") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); *provided*, that (a) such Lender's obligations under this Agreement shall remain unchanged, (b) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (c) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such

Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under _Section 9.05(b)_ with respect to any payments made by such Lender to its Participants.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents; _provided_, that (x) such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly and adversely affected thereby pursuant to _Section 9.04(a)(i)_ or _clause (i)_, _(ii)_, _(iii)_, _(iv)_, _(v)_ or _(vi)_ of the first proviso to _Section 9.09(b)_ and (2) directly and adversely affects such Participant and (y) no other agreement with respect to such Participant may exist between such Lender and such Participant.

(ii)    The Borrower agrees that each Participant shall be entitled to the benefits of _Section 2.16_ and _2.17_ (subject to the requirements and limitations therein, including the requirements under _Section 2.17(g)_ (it being understood that the documentation required under _Section 2.17(g)_ shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to _paragraph (b)_ of this Section; _provided_ that such Participant (A) agrees to be subject to the provisions of _Section 2.19_ as if it were an assignee under _paragraph (b)_ of this Section; and (B) shall not be entitled to receive any greater payment under _Section 2.16_ or _2.17_, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of _Section 2.19_ with respect to any Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of _Section 9.06_ as though it were a Lender; _provided_ that such Participant agrees to be subject to _Section 2.18(c)_ as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**_Participant Register_**"); _provided_ that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the Proposed United States Treasury Regulations (or, in each case, any amended or successor version).  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may, without the consent of the Administrative Agent or the Borrower, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (other than to any Disqualified Institution (*provided* that the list of Disqualified Institutions (other than any "***reasonably identifiable affiliate***" (on the basis of such Affiliate's name) included in the definition of "Disqualified Institution") is made available to any Lender who specifically requests a copy thereof) or any natural Person) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; *provided*, that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)    The Borrower, at its expense and following receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in *paragraph (d)* above.

(f)    No Lender may at any time enter into a total return swap, total rate of return swap, credit default swap or other derivative instrument under which any Secured Obligation is a reference obligation with any counterparty that is a Disqualified Institution.

(i)    If any assignment or participation under this *Section 9.04* is made to any Disqualified Institution (other than any Bona Fide Debt Fund) without the Borrower's prior written consent (any such Person, a "***Disqualified Person***"), then the Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Person and the Administrative Agent, (A) terminate any Commitment of such Disqualified Person and cause the Borrower to repay all obligations of the Borrower owing to such Disqualified Person, (B) in the case of any outstanding Loans held by such Disqualified Person, purchase such Loans by paying the lesser of (x) par and (y) the amount that such Disqualified Person paid to acquire such Loans, *plus* accrued interest thereon, accrued fees and all other amounts payable to it hereunder and/or (C) require such Disqualified Person to assign, without recourse (in accordance with and subject to the restrictions contained in this *Section 9.04*), all of its interests, rights and obligations under this Agreement to one or more Eligible Assignees; *provided* that (I) in the case of *clause (B)*, the applicable Disqualified Person has received payment of an amount equal to the lesser of (1) par and (2) the amount that such Disqualified Person paid for the applicable Loans, *plus* accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the Borrower, (II) in the case of *clauses (A)* and *(B)*, the Borrower shall be liable to the relevant Disqualified Person under *Section 2.16* if any Eurocurrency Loan owing to such Disqualified Person is repaid or purchased other than on the last day of the Interest Period relating thereto and (III) in the case of *clause (C)*, the relevant assignment shall otherwise comply with this *Section 9.04* (except that no registration and processing fee required under this *Section 9.04* shall be required with any assignment pursuant to this paragraph). Nothing in this *Section 9.04(f)* shall be deemed to prejudice any right or remedy that the Borrower may otherwise have at law or equity.

(g)    Notwithstanding the foregoing, no assignment may be made or participation sold to (i) a natural person, (ii) other an during the continuance of an Event of Default, a Disqualified Institution without the prior written consent of the Borrower, (iii) any Defaulting

Lender or any of its subsidiaries, or any person who, upon becoming a Lender hereunder, would constitute any of the foregoing persons described in this *clause (iii)* or *(iv)* any Affiliated Lenders. Upon the request of any Lender, the Administrative Agent shall inform such Lender as to whether an actual proposed Participant or Assignee is a Disqualified Institution.

(h)    [Reserved].

SECTION 9.05    Expenses; Indemnity.  (a) Subject to the DIP Order, the Borrower agrees to pay, whether accrued or incurred prior to, on or after the Petition Date, (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent, GSO and their respective Affiliates in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution and delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) (including reasonable and documented fees, charges and disbursements of counsel for the Administrative Agent and Collateral Agent and the Lender Advisors) and (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent and any Lender (including the fees, charges and disbursements of any counsel for the Administrative Agent, the Collateral Agent or any Lender (including, without limitation, the Lender Advisors)), in connection with the enforcement or protection of their rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with the Loans made hereunder, including all such out-of-pocket costs incurred during any workout, restructuring or negotiations in respect of such Loans; *provided* that, the Borrower's obligations under this *(a)* for fees and expenses of legal counsel shall be limited to reasonable and documented fees and expenses of (x) one primary outside legal counsel for each of (A) the Administrative Agent and the Collateral Agent and (B) GSO (solely for so long as GSO is a Lender hereunder), (y) in the case of any actual or perceived conflict of interest, one outside legal counsel for each group of affected persons similarly situated, taken as a whole, in each appropriate jurisdiction and (z) if necessary, one local or foreign legal counsel in each appropriate material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all persons described in *clauses (i)* through *(ii)* above, taken as a whole.  For the avoidance of doubt, the Borrower's obligations under this *Section 9.05(a)* for fees and expenses of legal counsel shall exclude allocated costs of internal counsel to all persons described in *clauses (i)* through *(ii)* above.

(b)    The Borrower shall indemnify the Administrative Agent and the Collateral Agent, each Lender, their respective Affiliates and each of their respective directors, trustees, officers, employees and agents and other respective successors and assigns (each such person being called an "***Indemnitee***") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related reasonable out-of-pocket costs and expenses, including reasonable counsel fees, charges and disbursements (except the allocated costs of internal counsel and limited to the fees and expenses of (x) one primary outside legal counsel to each of (i) the Administrative Agent and the Collateral Agent and (ii) the other Indemnitees, taken as a whole, (y) in the case of any actual or perceived conflict of interest where the Indemnitee affected by such conflict has informed the Borrower of such conflict and thereafter retains its own counsel, one outside legal counsel for each group of affected Indemnitees similarly situated, taken as a whole, in each appropriate jurisdiction and (z) if necessary, one local or foreign legal counsel

in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) to the Indemnitees, taken as a whole), incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto and thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated hereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by you, a third party, by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, or (iv) any violation of Environmental Law or presence or Release of Hazardous Materials related in any way to the Borrower or any other Loan Party; *provided*, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are (x) determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Indemnitee (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (z) any dispute solely among Indemnitees (other than any claims against an Indemnitee in its capacity or in fulfilling its role as an agent or arranger or any similar role hereunder or under any other Loan Document and other than any claims arising out of any act or omission of the Borrower or any of its Affiliates).  The provisions of this _Section 9.05_ shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment, satisfaction and discharge of any of the Obligations, the resignation of the Administrative Agent or the Collateral Agent, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.  All amounts due under this _Section 9.05_ shall be payable no later than ten Business Days after written demand therefor, accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.  This _Section 9.05(b)_ shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     To the fullest extent permitted by applicable law, no party shall assert, and each party hereby waives, any claim against any other Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in _subsection (b)_ above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than as a result of the gross negligence, bad faith, fraud or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(d)     To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under *subsection (a)* or *(b)* of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), the Collateral Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the Collateral Agent (or any sub-agent thereof) or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), the Collateral Agent (or any sub-agent thereof) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), the Collateral Agent (or any sub-agent thereof) in connection with such capacity. The obligations of the Lenders under this *subsection (d)* are subject to the provisions of *Section 2.18(f)*.

SECTION 9.06     Right of Set-off. If an Event of Default shall have occurred and be continuing, subject to the DIP Orders and the First Day Orders (including the Carve Out), and each Lender is hereby authorized at any time and from time to time thereafter, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of the Borrower or any other Subsidiary against any of and all the obligations of the Borrower now or hereafter existing under this Agreement or any other Loan Document held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although the obligations may be unmatured; *provided*, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of *Section 2.23* and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. Subject to the DIP Orders and First Day Orders, the rights of each Lender under this *Section 9.06* are in addition to other rights and remedies (including other rights of set-off) that such Lender may have.

SECTION 9.07     Payments Set Aside. To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent, the Collateral Agent or any Lender, or the Administrative Agent, the Collateral Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, the Collateral Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Laws or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent or the Collateral Agent, as applicable, upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent or the Collateral Agent (as applicable), *plus* interest thereon from the date of such demand to the date

142

such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.

SECTION 9.08    Applicable Law.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN LETTERS OF CREDIT TO THE EXTENT SET FORTH THEREIN) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ANY CHOICE-OF-LAW PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

SECTION 9.09    Waivers; Amendment.  (a) None of the Administrative Agent, the Collateral Agent or the Lenders shall by any act (except by a written instrument pursuant to *clause (b)* below), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default.  No failure to exercise, nor any delay in exercising, on the part of the Administrative Agent, the Collateral Agent or any Lender, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by the Administrative Agent, the Collateral Agent or any Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which the Administrative Agent, the Collateral Agent or such Lender would otherwise have on any future occasion.  The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

(b)    Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified, other than (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders (or the Administrative Agent with the consent of the Required Lenders) or (y) in the case of any other Loan Document (other than any waiver, amendment or modification to effectuate any modification thereto expressly contemplated by the terms of such other Loan Document), pursuant to an agreement or agreements in writing entered into by each party thereto and any of the Administrative Agent or Collateral Agent that may be a party thereto, as applicable and consented to by the Required Lenders (or such other requisite parties expressly provided for therein); *provided*, *however*, that no such agreement shall:

(i)    decrease or forgive the principal amount of, or extend the final maturity of, or decrease the rate of interest on, any Loan of a Lender without the prior written consent of each Lender directly affected thereby; *provided* that any amendment to the financial covenant definitions or any component of the definitions thereof in this Agreement shall not constitute a reduction in the rate of interest for purposes of this *clause (i)*; it being understood that only the consent of the Required Lenders shall be necessary to amend the definition of "***Default Rate***" or to waive any obligation of the Borrower to pay interest at the Default Rate,

(ii)    increase or extend the Commitment of any Lender or decrease the fees of any Lender without the prior written consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default

or of a mandatory prepayment or reduction in the aggregate Commitments shall not constitute an increase of the Commitments of any Lender or a decrease of fees of any Lender),

(iii)    extend, waive or reduce the amount of any scheduled installment of principal or extend any date on which payment of interest on any Loan or any Fees is due, without the prior written consent of each Lender adversely affected thereby (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory prepayment or reduction in the aggregate Commitments shall not constitute an extension, waiver or reduction of the amount of a scheduled installment of principal or date of payment of interest or fees),

(iv)    amend or modify the provisions of _Section 2.18(a)_ or _(c)_ in a manner that would by its terms alter the pro rata sharing of payments required thereby, or require any Lender to make available Interest Periods longer than six months without its consent, without the prior written consent of each Lender adversely affected thereby,

(v)    amend or modify the provisions of this Section or the definition of the term "**_Required Lenders_**" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the prior written consent of each Lender adversely affected thereby (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the applicable Loans and Commitments),

(vi)    release all or substantially all the Collateral or release any of the Borrower or any other Loan Party from its Guarantee under the Guaranty, unless, in the case of a Loan Party, (x) such transaction is otherwise permitted by the Loan Documents or (y) all or substantially all of the Equity Interests of such Loan Party are sold or otherwise disposed of in a transaction permitted by this Agreement, without the prior written consent of each Lender, and

(vii)    except as provided by law or the DIP Order, subordinate the Liens in favor of the Administrative Agent or Collateral Agent, as applicable, securing the Obligations, with respect to all or substantially all of the Collateral, without the prior written consent of each Lender adversely affected thereby;

_provided further_ that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent hereunder without the prior written consent of the Administrative Agent or the Collateral Agent acting as such at the effective date of such agreement, as applicable.  Each Lender shall be bound by any waiver, amendment or modification authorized by this _Section 9.09_ and any consent by any Lender pursuant to this _Section 9.09_ shall bind any Assignee of such Lender.

(c)    Without the consent of any Lender, the Loan Parties and the Administrative Agent may (in their respective sole discretion, or shall, to the extent required by any Loan

Document) enter into any amendment, modification or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law.

(d)     Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any other waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

(e)     Subject to the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of Required Lenders.

(f)     Notwithstanding anything to the contrary contained in this Agreement, neither the Administrative Agent nor the Collateral Agent shall be bound to follow or agree to any amendment or supplement to this Agreement (including, without limitation, any Benchmark Replacement Conforming Changes) that would increase or materially change or affect the duties, obligations or liabilities of the Administrative Agent nor the Collateral Agent (including without limitation the imposition or expansion of discretionary authority), or reduce, eliminate, limit or otherwise change any right, privilege or protection of the Administrative Agent nor the Collateral Agent, or would otherwise materially and adversely affect the Administrative Agent nor the Collateral Agent, in each case in its reasonable judgment, without such party's express written consent.

(g)     Notwithstanding anything to the contrary contained in this *Section 9.09*, if at any time after the Closing Date, the Administrative Agent and the Borrower shall have unanimously identified an obvious error, ambiguity, defect, inconsistency or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders within five Business Days following receipt of notice thereof.

(h)     [Reserved].

(i)    Notwithstanding anything to the contrary contained in this *Section 9.09*, this Agreement and the other Loan Documents may be amended, restated, supplemented and/or otherwise modified with the written consent of the Administrative Agent, the Borrower and the Required Lenders, in order to increase the interest rate or yield applicable to the Credit Facility, including by increasing the Applicable Margin or similar component of the interest rate, by modifying the method of computing interest applicable to the Credit Facility (including by creating any new interest rate "floors") or paying additional upfront fees, consent fees or original issue discount on or with respect to the Credit Facility.

SECTION 9.10    Interest Rate Limitation.    Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable Requirements of Law, shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect.  In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrower shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect.  Notwithstanding the foregoing, it is the intention of the Lenders and the Borrower to conform strictly to any applicable usury laws.  Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to the Borrower.

SECTION 9.11    [Reserved].

SECTION 9.12    Entire Agreement.  This Agreement and the other Loan Documents represent the entire agreement of the parties hereto with respect to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.  There are no promises, undertakings, representations or warranties by the Administrative Agent, the Collateral Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

SECTION 9.13    WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR

OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.14      Severability.    In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.  Without limiting the foregoing provisions of this *Section 9.14*, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent then such provisions shall be deemed to be in effect only to the extent not so limited.

SECTION 9.15      Counterparts.  This Agreement (and each amendment, modification and waiver in respect of this Agreement) may be executed and delivered in counterparts (including by facsimile or electronic transmission (including .pdf file, .jpeg file or any electronic signature complying with the U.S. federal ESIGN Act of 2000, including Orbit, Adobe Sign, DocuSign, or any other similar platform identified by the Borrower and reasonably available at no undue burden or expense to the Administrative Agent), each of which shall be deemed an original, and all of which together constitute one and the same instrument. Delivery of an executed counterpart signature page of this Agreement by facsimile or any such electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.  Any electronically signed document delivered via email from a person purporting to be an authorized officer shall be considered signed or executed by such authorized officer on behalf of the applicable Person. Neither the Administrative Agent nor the Collateral Agent shall have any duty to inquire into or investigate the authenticity or authorization of any such electronic signature and shall be entitled to conclusively rely on any such electronic signature without any liability with respect thereto.

SECTION 9.16      Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 9.17      Jurisdiction; Consent to Service of Process.  (a) Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have, or abstains from, jurisdiction, any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in

this Agreement shall affect any right that any Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against the Borrower or any other Loan Party or their properties in the courts of any jurisdiction.

(b)     Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or federal court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

SECTION 9.18     Confidentiality.  Each of the Lenders, the Administrative Agent and the Collateral Agent agrees that it shall maintain in confidence any Information relating to the Borrower and the other Loan Parties furnished to it by or on behalf of the Borrower or the other Loan Parties (other than information that (a) has become generally available to the public other than as a result of a disclosure by such party, (b) has been independently developed by such Lender or such Agent Party without violating this *Section 9.18* or (c) was available to such Lender or such Agent Party from a third party having, to such person's knowledge, no obligations of confidentiality to the Borrower or any other Loan Party) and shall not reveal the same other than to its directors, trustees, officers, employees and advisors with a need to know or to any person that approves or administers the Loans on behalf of such Lender (so long as each such person shall have been instructed to keep the same confidential in accordance with this *Section 9.18*), except: (a) to the extent necessary to comply with law or any legal process or the requirements of any Governmental Authority, the National Association of Insurance Commissioners or of any securities exchange on which securities of the disclosing party or any Affiliate of the disclosing party are listed or traded, (b) as part of normal reporting or review procedures to Governmental Authorities or the National Association of Insurance Commissioners, (c) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors and representatives direct or indirect shareholders, partners or members, current and prospective financing sources, existing and prospective investors, legal counsel, independent auditors, professionals, advisors and other experts or agents of or its affiliates (so long as each such person shall have been instructed to keep the same confidential in accordance with this *Section 9.18*), (d) in order to enforce its rights under any Loan Document in a legal proceeding, (e) to any prospective assignee of, or prospective Participant in, any of its rights under this Agreement (so long as such person shall have been instructed to keep the same confidential in accordance with this *Section 9.18*); *provided* that in no case can such disclosure be made to a Disqualified Institution, (f) to any direct or indirect contractual counterparty in Swap Agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty is not a Disqualified Institution and agrees to be bound by the provisions of this Section), (g) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (h) to existing and prospective investors and funding sources, (i) any rating agency in connection with rating of the Borrower or its Subsidiaries or the Credit Facility, (j) with the consent of the Borrower, (k) by the order of any court or administrative agency in a legal, judicial or administrative proceeding or as otherwise required by law, regulation, subpoena or compulsory legal process where, in the reasonable judgment of such Lender or such Agent Party, as applicable, disclosure is required by such law

regulation, subpoena or compulsory legal process, or to the extent requested or required by any governmental and/or regulatory authorities (in which case such Lender such Agent Party shall promptly notify the Borrower, to the extent reasonably practicable, of such requirement to disclose to the extent permitted by law), (l) to industry trade organizations to the extent such information about the Credit Facility is customarily included in league table measurements or (m) to the Bankruptcy Court in connection with the approval of the Transactions contemplated hereby.  For purposes of this *Section 9.18*, "***Information***" shall mean all information received from the Borrower or any of its Subsidiaries relating to the Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent, the Collateral Agent or any Lender on a non-confidential basis prior to disclosure by the Borrower or any of its Subsidiaries; *provided* that, in the case of information received from the Borrower or any of its Subsidiaries after the Closing Date, all such information shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential.

SECTION 9.19        Direct Website Communications.

(a)        Delivery.  (i) Each Loan Party hereby agrees that it will use commercially reasonable efforts to provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to this Agreement and any other Loan Document, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (a) relates to a request for a new, or a conversion of an existing, borrowing or other extension of credit (including any election of an interest rate or interest period relating thereto), (b) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (c) provides notice of any Default or Event of Default under this Agreement or (d) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any borrowing or other extension of credit hereunder (all such non-excluded communications collectively, the "***Communications***"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Required Lenders and the Administrative Agent.  In addition, each Loan Party agrees to continue to provide the Communications to the Administrative Agent or the Lenders in the manner specified in this Agreement or any other Loan Document.  Nothing in this *Section 9.19* shall prejudice the right of the Administrative Agent, the Collateral Agent or any Lender or any Loan Party to give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document.

(ii)        The Administrative Agent agrees that receipt of the Communications by the Administrative Agent at its e-mail address set forth in *Section 9.01* shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform (as defined below) shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees (a) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (b) that the foregoing notice may be sent to such e-mail address.  Notwithstanding the foregoing or

anything else contained herein or in the other Loan Documents to the extent and such Communications, materials, notices and/or documents, in each case required to be delivered pursuant to *Section 5.04(a)*, *(b)*, *(c)* and *(f)* are included in materials otherwise publicly filed with the SEC or otherwise there shall be no further delivery requirement for notice purposes hereunder and any such Communications, materials, notices and/or documents shall be deemed to be delivered on the earliest of (i) the date on which the Borrower post such Communications, materials, notices and/or documents or provides a link thereto on Borrower's website on the Internet or (ii) on which date such documents are posted on the Borrower's behalf on an Internet or internet website, if any, to which, each Lender, the Administrative Agent and the Collateral Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent).

(b)    Posting.    The Borrower hereby acknowledges that (a) at the Borrower's expense, the Administrative Agent will make the Communications available to the Lenders by posting the Communications on IntraLinks or another similar electronic system (the "*Platform*") and (b) certain of the Lenders (each, a "*Public Lender*") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such person's securities.  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Communications that may be distributed to the Public Lenders and that (w) all such Communications shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Communications "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Communications as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (*provided*, *however*, that to the extent such Communications constitute Information, they shall be treated as set forth in *Section 9.18*); (y) all Communications marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (z) the Administrative Agent shall be entitled to treat any Communications that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

(c)    Platform.    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE COMMUNICATIONS.   NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  In no event shall the Administrative Agent, the Collateral Agent or any of their respective Related Parties (collectively, the "*Agent Parties*") have any liability to the Borrower, any Lender or any other person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's, or the Administrative Agent's, or the Collateral Agent's, transmission of Communications through the

Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; _provided_, _however_, that in no event shall the Administrative Agent or the Collateral Agent have any liability to the Borrower, any Lender or any other person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

SECTION 9.20        Release of Liens and Guarantees.  In the event that any Loan Party conveys, sells, leases, assigns, transfers or otherwise disposes of all or any portion of any of the Equity Interests or assets of any Loan Party (other than the Equity Interests of the Borrower) to a person that is not (and is not required to become) a Loan Party in a transaction permitted by this Agreement, then the Administrative Agent and the Collateral Agent shall promptly (and the Lenders hereby authorize the Administrative Agent and the Collateral Agent to) take such action and execute any such documents as may be requested by the Borrower (without further action or consent by the Lenders) and at the Borrower's expense to release (or evidence the release) or permit the Borrower (or its agent or designee to take) such actions to release any Liens created by any Loan Document in respect of such assets or Equity interests, and, in the case of a Disposition of the Equity Interests of any Loan Party in a transaction permitted by this Agreement or the other Loan Documents and as a result of which such Loan Party would cease to be a Subsidiary, terminate such Loan Party's obligations under the Guaranty and any other applicable Security Document; _provided_ that the release of any Subsidiary because it ceases to be a Wholly Owned Subsidiary shall constitute an Investment in an amount equal to the fair market value of the net assets of such relevant Subsidiary and must be permitted under _Section 6.04_.  In addition, the Administrative Agent agrees to take such actions as are reasonably requested by the Borrower and at the Borrower's expense (or where applicable permit the Borrower (or its agent or representative to take such actions) to terminate (or to evidence the termination) the Liens and security interests created by the Loan Documents when all the Obligations are Paid in Full.  Any representation, warranty or covenant contained in any Loan Document relating to any such Equity Interests, asset or subsidiary of the Borrower shall no longer be deemed to be made once such Equity Interests or asset or subsidiary is so conveyed, sold, leased, assigned, transferred or disposed of.

SECTION 9.21        Power of Attorney.  Each Lender hereby (i) authorizes the Administrative Agent as its agent and attorney-in-fact to execute and deliver, on behalf of and in the name of such Lender (or Affiliate), all and any Loan Documents (including Security Documents) and related documentation, (ii) authorizes the Administrative Agent to appoint any further agents or attorneys-in-fact to execute and deliver, or otherwise to act, on behalf of and in the name of the Administrative Agent for any such purpose and (iii) authorizes the Administrative Agent to delegate its powers under this power of attorney and to do any and all acts and to make and receive all declarations that are deemed necessary or appropriate to the Administrative Agent.

SECTION 9.22        PATRIOT Act Notice.  Each Lender, the Administrative Agent (for itself and not on behalf of any Lender) and the Collateral Agent hereby notifies each Loan Party that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name, address and taxpayer information number of each Loan Party and other information that will allow such Lender, the Administrative Agent or the Collateral Agent, as applicable, to identify such Loan Party in accordance with the PATRIOT Act.  The Borrower shall, promptly following a request by any

Lender, the Administrative Agent or the Collateral Agent, provide such documentation and other information that such Lender, the Administrative Agent or the Collateral Agent, as applicable, reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money-laundering rules and regulations, including the PATRIOT Act.

SECTION 9.23    No Advisory or Fiduciary Relationship.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Required Lenders are arm's length commercial transactions between the Borrower and its Affiliates, on the one hand, and the Administrative Agent and the Required Lenders, on the other hand, (B) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any of its Affiliates, or any other person and (B) neither the Administrative Agent nor the Required Lenders have any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Required Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and neither the Administrative Agent nor any Required Lenders has any obligation to disclose any of such interests to the Borrower or its Affiliates.  To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Administrative Agent and the Required Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 9.24    Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a

bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

SECTION 9.25    Incorporation of DIP Orders by Reference.    Each of the Loan Parties, the Administrative Agent, the Collateral Agent and the Lenders agrees that any reference contained herein to (i) the Interim Order shall include all terms, conditions and provisions of such Interim Order and that the Interim Order is incorporated herein for all purposes and (ii) the Final Order shall include all terms, conditions and provisions of such Final Order and that the Final Order is incorporated herein for all purposes.    To the extent there is any inconsistency between the terms of this Agreement (or any other Loan Document) and the terms of either the Interim Order or the Final Order, the terms of the Interim Order or the Final Order, as applicable, shall govern.

SECTION 9.26    Parties Including Trustees; Bankruptcy Court Proceedings.    This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon the Loan Parties, the estate of each Loan Party, and any trustee, other estate representative or any successor in interest of each Loan Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Agents and the Secured Parties and their respective assigns, transferees and endorsees.    The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of the Loan Parties to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Collateral Agent file financing statements or otherwise perfect its Liens under applicable law. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the Loan Parties, the Agents and Secured Parties with respect to the transactions contemplated hereby and no Person (other than the Indemnitees) shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

SECTION 9.27    Lender Consent to Credit Bid.    Each Lender hereby irrevocably (x) authorizes and directs the Collateral Agent to, in a manner determined by the Required Lenders and subject to the Collateral Agent's rights and protections (including requesting direction and indemnity), credit bid all or any portion of the Obligations in connection with any Credit Bid Transaction and (y) in connection with any Credit Bid Transaction, consents to the assignment and delegation to a Qualified Purchaser of such rights and obligations under this Agreement and the other Loan Documents, in each case as the Required Lenders determine in order to consummate such Credit Bid Transaction (and each such Lender shall execute and deliver such documents as the Collateral Agent reasonably requests to evidence such assignment and delegation).

## ARTICLE X
### Collateral

SECTION 10.01    <u>Grant of Security Interest</u>.  As collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of all Obligations, each Loan Party hereby collaterally assigns, pledges and grants to the Collateral Agent, for the benefit of the Secured Parties, a continuing first priority (subject to the Superpriority Carveout and as otherwise set forth in the applicable DIP Order) security interest in all property and assets of such Loan Party, whether now owned or existing or hereafter acquired or arising, or in which such Loan Party now has or at any time in the future may acquire any right, title or interest, regardless of where located, including the following:

(i)    all Accounts, including all Receivables;

(ii)    all contract rights;

(iii)    all chattel paper;

(iv)    all documents;

(v)    all instruments;

(vi)    all supporting obligations and letter-of-credit rights;

(vii)    all General Intangibles (including payment intangibles, intercompany accounts, Intellectual Property and software);

(viii)    all inventory and other goods;

(ix)    all motor vehicles, equipment and fixtures;

(x)    all Investment Property, financial assets and all securities accounts;

(xi)    all money, cash, cash equivalents, securities, and other property of any kind;

(xii)    all deposit accounts;

(xiii)    all notes, and all documents of title;

(xiv)    all commercial tort claims;

(xv)    all real property owned or leased by such Loan Party

(xvi)    all deposit accounts;

(xvii)    all books, records and other property related to or referring to any of the foregoing, including books, records, account ledgers, customer lists, supplier lists, data processing records, computer software and other property, and General Intangibles at any

time evidencing or relating to any of the foregoing or are otherwise necessary or helpful in the collection thereof or realization thereupon;

(xviii)  all other personal property of such Loan Party, including, subject to entry of the Final Order, proceeds from any avoidance actions under Chapter 5 of the Bankruptcy Code ("*Avoidance Actions*") and recoveries therefrom (but not the actions thereunder); and

(xix)    all accessions to, substitutions for, and replacements, products and proceeds of any of the foregoing, including, but not limited to, dividends or distributions on Investment Property, rents, profits, income and benefits, proceeds of any insurance policies, claims against third parties, and condemnation or requisition payments with respect to all or any of the foregoing.

All of the foregoing is herein collectively referred to as the "*Collateral*"; provided that the Collateral shall exclude Excluded Assets. For the avoidance of doubt, any lien or security interest created herein in favor of the Collateral Agent, for the benefit of the Secured Parties, in (x) any Securitization Assets shall be automatically released immediately upon and concurrently with the sale thereof pursuant to a Qualified Securitization Financing, to the extent, with respect to the PNC Securitization, transferred prior to the Purchase and Sale Termination Date (as defined in the PNC Purchase and Sale Agreement as in effect on the date hereof) but giving effect to any extension thereof (y) any Credit Support Assets shall be automatically released immediately upon and concurrently with the sale thereof pursuant to a Permitted Credit Support Arrangement; provided; however; that in each case the lien and security interest of the Collateral Agent shall attach to any consideration received by any Loan Party for the assets so disposed of.

SECTION 10.02        Perfection of Security Interest.

(a)        Notwithstanding the perfection of any security interest granted hereunder pursuant to the order of the Bankruptcy Court under the applicable DIP Order, each Loan Party agrees that the Collateral Agent, to the fullest extent permitted by applicable law and the Collateral and Guarantee Requirement, may file or authorize the filing of one or more financing statements disclosing the Collateral Agent's Liens on the Collateral.  Each Loan Party agrees that such financing statements may describe the Collateral in the same manner as described herein or as "all assets" or "all personal property" of the such Loan Party, whether now owned or hereafter existing or acquired by the such Loan Party or such other description as the Collateral Agent, in its sole judgment, determines is necessary or advisable.

(b)        In the event that a motion for dismissal from any of the Chapter 11 Cases is filed with respect to any Subsidiary and Equity Interests of such Subsidiary are owned by a Loan Party, to the extent such Equity Interests are in certificated form and are not already in the Collateral Agent's possession, and the extent permitted by the Collateral and Guarantee Requirement, such Loan Party shall promptly deliver all certificates or instruments at any time representing or evidencing such Equity Interests to the Collateral Agent, and shall be in suitable form for transfer by delivery, or shall be accompanied by instruments of transfer or assignment, duly executed in blank, all in form and substance sufficient to transfer such instruments to the Collateral Agent (or otherwise reasonably satisfactory to the Collateral Agent).  The Collateral

Agent shall have the right, at any time, after the occurrence and during the continuance of an Event of Default, to transfer to or to register in the name of the Collateral Agent or its nominee any Equity Interests in such Subsidiary.  In addition, the Collateral Agent shall have the right at any time to exchange certificates or instruments representing or evidencing Equity Interests of such Subsidiaries for certificates or instruments of smaller or larger denominations during the continuance of an Event of Default.

SECTION 10.03    Right to Cure.  The Collateral Agent shall have the right (but not the obligation), to pay any amount or do any act required of any Loan Party hereunder or under any other Loan Document (other than in respect of principal, interest or fees on the Loans) in order to preserve, protect, maintain, or enforce the Obligations, the Collateral, or the Collateral Agent's Liens on the Collateral, and which any Loan Party fails to pay or do, including payment of any judgment against any Loan Party, any insurance premium, any warehouse charge, any finishing or processing charge, any landlord's or bailee's claim, and any other obligation secured by a Lien upon or with respect to the Collateral; *provided, however,* that unless an Event of Default has occurred and is continuing or time is of the essence, the Collateral Agent shall not exercise this power without first making demand on the applicable Loan Party and such Loan Party failing to promptly comply therewith.  All payments that the Collateral Agent or any Lender makes under this *Section 10.03* and all out-of-pocket costs and reasonable expenses that the Collateral Agent pays or incurs in connection with any action taken by it hereunder shall be considered part of the Obligations.  Any payment made or other action taken by the Collateral Agent under this *Section 10.03* shall be without prejudice to any right to assert an Event of Default hereunder and to proceed thereafter as herein provided.

SECTION 10.04    The Collateral Agent's and Lenders' Rights, Duties, and Liabilities.  The Loan Parties assume all responsibility and liability arising from or relating to the use, sale, or other disposition of the Collateral.  The Obligations shall not be affected by any failure of the Secured Parties to take any steps to perfect the Collateral Agent's Liens on the Collateral or to collect or realize upon the Collateral, nor shall loss of or damage to the Collateral release any Loan Party from any of the Obligations.  Nothing in this Agreement shall be interpreted as giving the Collateral Agent responsibility for or any duty concerning the validity, perfection, priority or enforceability of the Liens granted hereunder or giving the Collateral Agent any obligation to take any action to procure or maintain such validity, perfection, priority or enforceability, including, without limitation, any duty to file any financing statements, amendments, continuation statements or other documents to perfect or maintain the perfection of the security interest granted hereunder.

SECTION 10.05    Rights in Respect of Investment Property.  During the existence of an Event of Default, subject to any order of the Bankruptcy Court (including the DIP Orders), the Collateral Agent may, upon written notice to the relevant Loan Party, (i) transfer or register in the name of the Collateral Agent or any of its nominees, for the benefit of the Secured Parties, any or all of the Collateral consisting of Investment Property, the proceeds thereof (in cash or otherwise), and all liens, security, rights, remedies and claims of any Loan Party with respect thereto (as used in this *Section 10.05* collectively, the "***Pledged Collateral***") held by the Collateral Agent hereunder, and the Collateral Agent or its nominee, and (ii) exercise all voting and corporate rights at any meeting of any corporation, partnership, or other business entity issuing any of the Pledged Collateral and any and all rights of conversion, exchange, subscription, or any other rights, privileges, or options pertaining to any of the Pledged Collateral as if it were the absolute owner

thereof, including the right to exchange at its discretion any and all of the Pledged Collateral upon the merger, amalgamation, consolidation, reorganization, recapitalization, or other readjustment of any corporation, partnership, or other business entity issuing any of such Pledged Collateral or upon the exercise by any such issuer or the Collateral Agent of any right, privilege or option pertaining to any of the Pledged Collateral, and in connection therewith, to deposit and deliver any and all of the Pledged Collateral with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as it may determine, all without liability except to account for property actually received by it, but the Collateral Agent shall have no duty to exercise any of the aforesaid rights, privileges or options, and the Collateral Agent shall not be responsible for any failure to do so or delay in so doing, (iii) to the extent permitted under applicable law, after the Collateral Agent's giving of the notice specified in this _Section 10.05_, all rights of any Loan Party to exercise the voting and other consensual rights which it would otherwise be entitled to exercise and to receive the dividends, interest and other distributions which it would otherwise be authorized to receive and retain thereunder shall be suspended until such Event of Default shall no longer exist, and all such rights shall, until such Event of Default shall no longer exist, thereupon become vested in the Collateral Agent which shall thereupon have the sole right to exercise such voting and other consensual rights and to receive and hold as Pledged Collateral such dividends, interest, and other distributions (provided that any such Pledged Collateral the Collateral Agent shall collect shall promptly be returned to each applicable Loan Party after such Event of Default is cured or waived to the extent such Pledged Collateral was not applied to repay the Obligations), and (iv) each Loan Party shall promptly execute and deliver (or cause to be executed and delivered) to the Collateral Agent all such proxies and other instruments as are necessary or that the Collateral Agent or a Secured Party may reasonably request for the purpose of enabling the Collateral Agent to exercise the voting and other rights which it is entitled to exercise pursuant to this _Section 10.05_ and to receive the dividends, interest, and other distributions which it is entitled to receive and retain pursuant to this _Section 10.05_..

SECTION 10.06    Remedies.

(a)    Each Loan Party recognizes that the Collateral Agent may be unable to effect a public sale of any or all of the Collateral that constitutes Equity Interests to be sold by reason of certain prohibitions contained in the laws of any jurisdiction outside the United States or in applicable federal, provincial, territorial or state securities laws but may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such Collateral to be sold for their own account for investment and not with a view to the distribution or resale thereof. Each Loan Party acknowledges and agrees that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall, to the extent permitted by law, be deemed to have been made in a commercially reasonable manner. Unless required by applicable law, the Collateral Agent shall not be under any obligation to delay a sale of any of such Collateral to be sold for the period of time necessary to permit the issuer of such Equity Interests to register such Equity Interests under the laws of any jurisdiction outside the United States or under any applicable federal, provincial, territorial or state securities laws, even if such issuer would agree to do so. Each Loan Party further agrees to do or cause to be done, to the extent that such Loan Party may do so under applicable law, all such other acts and things as may be necessary to make such sales or resales of any portion or all of such Collateral or other property to be sold valid and binding and in compliance with any

157

and all applicable laws at the Loan Parties' expense. Each Loan Party further agrees that a breach of any of the covenants contained in this _Section 10.06(a)_ will cause irreparable injury to the Secured Parties for which there is no adequate remedy at law and, as a consequence, agrees that each covenant contained in this _Section 10.06(a)_ shall be specifically enforceable against such Loan Party, and each Loan Party hereby waives and agrees, to the fullest extent permitted by law, not to assert as a defense against an action for specific performance of such covenants that (i) such Loan Party's failure to perform such covenants will not cause irreparable injury to the Secured Parties or (ii) the Secured Parties have an adequate remedy at law in respect of such breach. Each Loan Party further acknowledges the impossibility of ascertaining the amount of damages which would be suffered by the Secured Parties by reason of a breach of any of the covenants contained in this _Section 10.06(a)_ and, consequently, agrees that, if such Loan Party shall breach any of such covenants and the Secured Parties shall sue for damages for such breach, such Loan Party shall pay to the Collateral Agent, for the benefit of the Secured Parties, as liquidated damages and not as a penalty, an aggregate amount equal to the value of the Collateral or other property to be sold on the date the Collateral Agent shall demand compliance with this _Section 10.06(a)_.

(b)    Subject to the terms of the DIP Orders, if an Event of Default has occurred and is continuing, the Collateral Agent shall have for the benefit of the Secured Parties, in addition to all other rights of the Secured Parties, the rights and remedies of a secured party under the UCC, and without limiting the generality of the foregoing, the Collateral Agent shall be empowered and entitled to: (i) take possession of, foreclose on and/or request a receiver of the Collateral and keep it on any Loan Party's premises at any time, at no cost to the Secured Parties, or remove any part of it to such other place or places as the Collateral Agent may desire, or the Loan Parties shall, upon the Collateral Agent's or the Required Lenders' demand, at the Loan Parties' cost, assemble the Collateral and make it available to the Collateral Agent at a place reasonably convenient to the Collateral Agent; (ii) exercise set-off rights on cash collateral or deposits (other than, for the avoidance of doubt, with respect to Excluded Accounts); (iii) sell and deliver any Collateral at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as the Collateral Agent deems advisable, in its sole discretion, and postpone or adjourn any sale of the Collateral by an announcement at the time and place of sale or of such postponed or adjourned sale; (iv) hold, lease, develop, manage, operate, control and otherwise use the Collateral upon such terms and conditions as may be reasonable under the circumstances (making such repairs, alterations, additions and improvements and taking other actions, from time to time, as may be reasonably necessary or desirable), exercise all such rights and powers of each Loan Party with respect to the Collateral, whether in the name of such Loan Party or otherwise, including without limitation the right to make, cancel, enforce or modify leases, obtain and evict tenants, and demand, sue for, collect and receive all rents, in each case, in accordance with the standards applicable to the Collateral Agent under the Loan Documents, and (v) take any other actions, as may be reasonably necessary or desirable, in connection with the Collateral (including preparing for the disposition thereof), and all actual, reasonable, out-of-pocket fees and expenses incurred in connection therewith shall be borne by the Loan Parties. Promptly following written demand from the Collateral Agent, the applicable Loan Party shall direct the grantor or licensor of, or the contracting party to, any property agreement with respect to any property to recognize and accept the Collateral Agent, for the benefit of and on behalf of the Secured Parties, as the party to such agreement for any and all purposes as fully as it would recognize and accept such Loan Party and the performance of such Loan Party thereunder and, in such event, without further notice or demand and at such Loan Party's sole cost and expense, the Collateral Agent, for the benefit of

158

and on behalf of the Secured Parties, may exercise all rights of such Loan Party arising under such agreements.  Without in any way requiring notice to be given in the following manner, each Loan Party agrees that any notice by the Collateral Agent of sale, disposition or other intended action hereunder or in connection herewith, whether required by the UCC or otherwise, shall constitute reasonable notice to such Loan Party if such notice is mailed by registered or certified mail, return receipt requested, postage prepaid, or is delivered personally against receipt, at least five (5) Business Days prior to such action to the Loan Parties' address specified in or pursuant to *Section 9.01*.  If any Collateral is sold on terms other than payment in full at the time of sale, no credit shall be given against the Obligations until the Collateral Agent receives payment, and if the buyer defaults in payment, the Collateral Agent may resell the Collateral.  In the event the Collateral Agent seeks to take possession of all or any portion of the Collateral by judicial process, each Loan Party irrevocably waives (to the extent permitted by applicable law):  (A) the posting of any bond, surety or security with respect thereto which might otherwise be required; (B) any demand for possession prior to the commencement of any suit or action to recover the Collateral; and (C) any requirement that the Collateral Agent retain possession and not dispose of any Collateral until after trial or final judgment.  Each Loan Party agrees that the Collateral Agent has no obligation to preserve rights to the Collateral or marshal any Collateral for the benefit of any Person.  The Collateral Agent is hereby granted a license or other right to use, without charge, each Loan Party's labels, patents, copyrights, name, trade secrets, trade names, trademarks and advertising matter, or any similar property, in completing production of, advertising or selling any Collateral, and each such Loan Party's rights under all licenses and all franchise agreements shall inure to the Collateral Agent's benefit for such purpose.  The Collateral Agent will return any excess to the applicable Loan Party and the Loan Parties shall remain liable for any deficiency.  The proceeds of sale shall be applied as required pursuant to *Section 2.18* hereof.

(c)    Notwithstanding anything herein to the contrary, (i) neither the Collateral Agent nor any Lender shall take any action under this *Section 10.06(c)* (or similar provisions of any Loan Document) except after compliance with any applicable notice requirements applicable thereto set forth in accordance with the DIP Orders and (ii) following the occurrence and during the continuance of an Event of Default, all amounts received by the Collateral Agent on account of the Obligations, from the Loan Parties and/or all amounts with respect to the proceeds of any Collateral shall be (subject to the proviso below) promptly disbursed by the Collateral Agent as required pursuant to *Section 2.18* hereof.

**ARTICLE XI**
**Guaranty**

SECTION 11.01    Guaranty; Limitation of Liability.

(a)    Each Guarantor, jointly and severally, hereby absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, to the Administrative Agent, for the benefit of the Secured Parties and their respective successors, endorsees, transferees and assigns, the performance and punctual payment when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Obligations of each other Loan Party now or hereafter existing under or in respect of the Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such Obligations being

the "*Guaranteed Obligations*"), and agrees to pay any and all reasonable out-of-pocket expenses (including reasonable out-of-pocket fees and expenses of counsel to the extent reimbursable pursuant to *Section 9.05* but excluding allocated costs of in-house counsel) incurred by the Administrative Agent in enforcing any rights under this Guaranty or any other Loan Document. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Loan Party to the Administrative Agent or any Secured Party under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization, winding-up or similar proceeding involving such other Loan Party.

(b)    Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to the Administrative Agent or any Secured Party under this Guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor so as to maximize the aggregate amount paid to the Administrative Agent and the Lenders under or in respect of the Loan Documents.

SECTION 11.02    Guaranty Absolute. Each Guarantor Guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Administrative Agent or any Secured Party with respect thereto. The Obligations of each Guarantor under or in respect of this Guaranty are independent of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Guaranty, irrespective of whether any action is brought against the Borrower or any other Loan Party or whether the Borrower or any other Loan Party is joined in any such action or actions. The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)    any lack of validity or enforceability of any provision under this Agreement, any Loan Document or any agreement or instrument relating thereto, any of the Guaranteed Obligations or any guarantee or right of offset with respect thereto at any time or from time to time held by any Secured Party;

(b)    any renewal extension or acceleration or other change in the time, manner or place of payment of, or in any other term of, or any increase in the amount of, all or any of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents, or any other amendment, supplement, modification or waiver of or any consent to departure from any Loan Document, including any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise;

(c)    the validity, perfection, non-perfection or lapse in perfection, priority or avoidance of any security interest or lien, the release of any or all collateral securing, or purporting to secure, the Guaranteed Obligations or any other impairment of such collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

(d)    any manner of application of Collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral for all or any of the Guaranteed Obligations or any other Obligations of any Loan Party under the Loan Documents or any other assets of any Loan Party;

(e)    any change, restructuring, reorganization or termination of the corporate structure or existence of any Loan Party or any of their Subsidiaries and any corresponding restructuring of the Guaranteed Obligations;

(f)    any failure of the Administrative Agent or any Secured Party to disclose to any Loan Party any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party now or hereafter known to the Administrative Agent or such Secured Party, as the case may be (each Guarantor waiving any duty on the part of the Administrative Agent and the Secured Parties to disclose such information);

(g)    the failure of any other Person to execute or deliver this Guaranty or the release or reduction of liability of any Guarantor or surety with respect to the Guaranteed Obligations;

(h)    any failure or omission to assert or enforce or agreement or election not to assert or enforce, delay in enforcement, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under any Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations;

(i)    any settlement, compromise, release, or discharge of, or acceptance or refusal of any offer of payment or performance with respect to, or any substitutions for, the Guaranteed Obligations or any subordination of the Guaranteed Obligations to any other obligations;

(j)    any exercise of remedies with respect to any security for the Guaranteed Obligations (including, without limitation, any collateral, including the Collateral securing or purporting to secure any of the Guaranteed Obligations) at such time and in such order and in such manner as the Administrative Agent and the Secured Parties may decide and whether or not every aspect thereof is commercially reasonable and whether or not such action constitutes an election of remedies and even if such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy that any Guarantor would otherwise have and without limiting the generality of the foregoing or any other provisions hereof, each Guarantor hereby expressly waives any and all benefits which might otherwise be available to such Guarantor under applicable law; and

(k)    any other circumstance (including any statute of limitations) or any existence of or reliance on any representation by the Administrative Agent or any Secured Party that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any

other guarantor or surety, in its capacity as a guarantor or surety (other than payment or performance).

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Administrative Agent or any Secured Party or any other Person, for whatever reason, all as though such payment had not been made.

SECTION 11.03    Waivers and Acknowledgments.

(a)    Each Guarantor hereby unconditionally and irrevocably waives (to the extent permitted by applicable law) any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(b)    Each Guarantor hereby unconditionally and irrevocably waives (to the extent permitted by applicable law) (i) any defense arising by reason of any claim or defense based upon an election of remedies by the Administrative Agent or any Lender that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Loan Parties, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the Obligations of such Guarantor hereunder.

(c)    Each Guarantor acknowledges that the Administrative Agent may, to the extent permitted by applicable law and the DIP Orders, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Guaranty, foreclose under any Loan Document by non-judicial sale, and each Guarantor hereby waives (to the extent permitted by applicable law) any defense to the recovery by the Administrative Agent and the Secured Parties against such Guarantor of any deficiency after such non-judicial sale and any defense or benefits that may be afforded by applicable law.

(d)    Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of the Administrative Agent or any Secured Party to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party or any of its Subsidiaries now or hereafter known by the Administrative Agent or such Secured Party, as the case may be.

(e)    Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in *Section 11.02* and this *Section 11.03* are knowingly made in contemplation of such benefits.

SECTION 11.04    Subrogation.    Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against the Borrower or any other Loan Party that arise from the existence, payment, performance or enforcement of such Guarantor's Obligations under or in respect of this Guaranty or any other Loan Document, including any right of subrogation, reimbursement, exoneration, contribution or

indemnification and any right to participate in any claim or remedy of the Administrative Agent or any Secured Party against the Borrower or any other Loan Party, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from the Borrower or any other Loan Party, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until Payment in Full  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of (a) Payment in Full and (b) the Maturity Date, such amount shall be received and held in trust for the benefit of the Administrative Agent and the Secured Parties, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the Administrative Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Loan Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising.  If Payment in Full and the Maturity Date shall have occurred, the Administrative Agent will, at any Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Guaranty.

SECTION 11.05    Continuing Guaranty; Assignments.  This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until Payment in Full, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Administrative Agent and the Secured Parties and their respective successors, transferees and assigns.  Without limiting the generality of clause (c) of the immediately preceding sentence, any Eligible Assignee that has been assigned or transferred all or any portion of a Lender's Loans, Commitments or rights and obligations under this Agreement in accordance with Section 9.04, shall thereupon become vested with all the benefits granted to such transferring Lender under this Guaranty.  No Guarantor shall have the right to assign its rights hereunder or any interest herein or delegate any of its duties, liabilities or obligations hereunder or under any other Loan Document without the prior written consent of the Required Lenders, except as otherwise permitted hereby.

*[Remainder of page left intentionally blank.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

CENTRIC BRANDS INC., as Borrower

By: _____
Name:
Title:

U.S. BANK NATIONAL ASSOCIATION, as
Administrative Agent

By: _____
Name:
Title:

[Signature Page to DIP Credit, Security and Guaranty Agreement]

[_____], as Guarantor

By: _____
Name:
Title:

U.S. BANK NATIONAL ASSOCIATION, as
Collateral Agent

By: _____
Name:
Title:

GSO CAPITAL OPPORTUNITIES FUND III LP, as Lender
By:  GSO Capital Opportunities Associates III LLC, its general partner

By: _____
Name:
Title:    Authorized Signatory

GSO CSF III HOLDCO LP, as Lender
By:  GSO Capital Solutions Associates III LP, its general partner
By:  GSO Capital Solutions Associates III (Delaware) LLC, its general partner

By: _____
Name:
Title:    Authorized Signatory

GSO CREDIT ALPHA II TRADING (CAYMAN) LP, as Lender
By:  GSO Credit Alpha Associates II LP, its general partner
By:  GSO Credit Alpha Associates II (Delaware) LLC, its general partner

By: _____
Name:
Title:    Authorized Signatory

GSO AIGUILLE DES GRANDS MONTETS FUND II LP, as Lender
By:  GSO Capital Partners LP, as attorney-in-fact

By: _____
Name:
Title:    Authorized Signatory

[Signature Page to DIP Credit, Security and Guaranty Agreement]

GSO HARRINGTON CREDIT ALPHA FUND
(CAYMAN) L.P., as Lender
By:  GSO Harrington Credit Alpha Associates
L.L.C.,
its general partner

By:  _____
Name:
Title:      Authorized Signatory

BTO LEGEND HOLDINGS L.P.
By:  BTO Holdings Manager L.L.C., its General Partner

By:  Blackstone Tactical Opportunities Associates L.L.C., its Managing Member

By:  BTOA, L.L.C., its Sole Member

By: _____

Name:

Title:     Authorized Person

BLACKSTONE FAMILY TACTICAL OPPORTUNITIES
INVESTMENT PARTNERSHIP - III ESC L.P.

By:  BTO Side-by-Side GP L.L.C., Its General Partner

By: _____

Name:

Title:     Authorized Person

[Signature Page to DIP Credit, Security and Guaranty Agreement]

[GSO CAPITAL PARTNERS LP], as Blackstone
Representative

By: _____
Name:
Title:     Authorized Signatory

[Signature Page to DIP Credit, Security and Guaranty Agreement]