**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x

In re:                                                              Chapter 11

Centric Brands, Inc.,                                               Case No. 20-22637 (SHL)

                                   Debtor.                          (Confirmed)
---------------------------------------------------------------x

## MEMORANDUM OF DECISION

**A P P E A R A N C E S :**

**ROPES & GRAY LLP**
*Attorneys for Debtor*
1211 Avenue of the Americas
New York, NY 10036
By:     Gregg M. Galardi, Esq.
        Cristine Pirro Schwarzman, Esq.

**ALICIA ALLEN**
*Pro Se*
6151 Orange Street, Unit # 112
Los Angeles, CA 90048


**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is Centric Brands, Inc.'s (the "Reorganized Debtor" or the "Debtor")

objection to two proofs of claim filed in this bankruptcy case by Alicia Allen (the "Objection")

[ECF No. 816] (objecting to Claim Nos. 469 and 1382).[1]  The Debtor seeks to (1) reduce and

allow Claim No. 469 as an unsecured priority claim in the amount of $5,330.35, and (2) disallow

and expunge Claim No. 1382, arguing that this claim has been waived and released by Ms.

---

[1]        Unless otherwise indicated, references to the Case Management/Electronic Case Filing ("ECF") docket are
to Case No. 20-22637.

Allen. *See* Objection at 6 of 34. For the reasons discussed below, the Debtor's Objection is granted in all respects.

## BACKGROUND

### A. Factual Background

Ms. Allen was an employee of the Debtor who separated from the company on March 1, 2020. *See* Hr. Tr. 42:12–21, Apr. 15, 2021 [ECF No. 885]. On February 18, 2020—less than two weeks before the end of her employment—Ms. Allen signed a letter acknowledging her separation date and setting forth her rights and obligations—and the obligations of the Debtor— upon her separation. *See* Objection at 22–27 of 34, Ex. B (the "Separation Agreement"). Among other things, the Debtor agreed to pay Ms. Allen $25,047 in exchange for her execution of the Separation Agreement. *See* Separation Agreement ¶ 2. This sum "represent[ed] an additional twelve [12] weeks of [her] current base annual salary (the 'Severance Payment') and three [3] months of COBRA reimbursement." *Id.* In exchange for these benefits, the Separation Agreement provides that Ms. Allen released all claims she had against the Debtor for, among other things, wrongful discharge, retaliation, and discrimination under federal and state laws (the "Claims Release"). *See* Separation Agreement ¶ 6(b). It provides:

> You understand and agree that you are releasing all known and unknown claims, promises, causes of action, or similar rights of any type that you may have (the "Claims") against any of the Released Parties, that arose at any time before the Separation Date, excluding only those Claims set forth in [paragraph 6](c) below. You further understand that the Claims you are releasing may have arisen under laws (including statutes, regulations, other administrative guidance, and common law doctrines), including, but not limited to: . . . any claim under the Age Discrimination in Employment Act [the "ADEA"][;] . . . Title VII of the Civil Rights Act of 1964[;] . . . the Americans with Disabilities Act [the "ADA"][;] . . . the Family and Medical Leave Act [the "FMLA"][;] . . . any other state or local labor, employment, or human rights laws; any other claim of discrimination, harassment or retaliation in employment (whether based on federal, state or local law, regulation, or decision)[;] any other claim (whether based on federal, state or local law, statutory or decisional) arising out of the terms and conditions of your

> employment with and/or termination from employment with the Company . . . [;]
> [and] any claim for wrongful discharge, . . . retaliation, . . . breach of contract . . .,
> emotional distress, back pay or front pay, compensatory or punitive damages,
> and/or equitable relief . . . .

Separation Agreement ¶ 6(b).

Notwithstanding the Claims Release, Paragraph 6(c) of the Separation Agreement makes

clear that certain rights of Ms. Allen are not being released.  More specifically, Paragraph 6(c)

states

> [y]ou are not releasing any claim that relates to: (i) your right to enforce this
> Separation Agreement; (ii) your rights, if any, to unemployment or workers'
> compensation benefits; (iii) rights or claims which may arise after the Separation
> Date; or (iv) your right, if any, to receive any benefits vested under any employee
> benefits plan.

Separation Agreement ¶ 6(c).

The Debtor filed for Chapter 11 bankruptcy relief on May 18, 2020.  *See* ECF No. 1.  A

few months later, Ms. Allen filed Proof of Claim No. 469 for the "[c]ontractual [b]alance of

[u]npaid [s]everance [p]ayments" in the amount of $11,137.07.  *See* Notice of Filing of

Documents Relating to the Reorganized Debtor's Objection to Proof of Claim Numbers 469 and

1382 Filed by Alicia Allen (the "Debtor's Hearing Exhibits"), Ex. B (Claim No. 469) [ECF No.

1047].  The parties appear to agree that, prior to the bankruptcy filing, the Debtor did not pay

Ms. Allen the full $25,047 owed under the Separation Agreement but rather only $19,716.65.

*See* Objection at 12 of 34; Separation Agreement ¶ 2; Hr. Tr. 21:2–6; 28:17–30:4; 32:13–34:1,

Apr. 15, 2021.  Indeed, the Debtor concedes that Ms. Allen is entitled to the balance of the

Severance Payment in the amount of $5,330.35.  Objection at 12 of 34.[2]

---

[2]        At a hearing on April 15, 2021, the Court rejected Ms. Allen's argument that the Debtor's failure to pay this amount was a breach of the Separation Agreement.  The Court explained that, under the Bankruptcy Code, the Debtor was not permitted to pay the remaining amount after the bankruptcy was filed without first obtaining Court approval.  *See* Hr. Tr. 45:11–15, Apr. 15, 2021.  As to the precise amount still owed, Ms. Allen did not challenge the Debtor's calculation of $5,330.35.

3

In August 2020, Ms. Allen filed a second claim—Proof of Claim No. 1382—for

"[f]oregone wages and other cost [sic] due to wrongful termination and injuries" in the amount

of $2.4 million.  *See* Debtor's Hearing Exhibits, Ex. C (Claim No. 1382).[3]  Ms. Allen alleges that

the Debtor's actions leading up to and including her termination were unlawful under various

theories.  Ms. Allen characterizes her underlying claims against the Debtor as wrongful

discharge, discrimination, harassment, hostile work environment, retaliation, failure to provide

reasonable accommodations, failure to promote, failure to pay appropriate wages, including

overtime, and failure to reinstate in violation of, among other things, Title VII of the Civil Rights

Act, the ADEA, the ADA, the FMLA, and the New York Labor Law (the "NYLL").  *See*

*generally* Response to Objection to Claim, dated May 12, 2021 (the "Second Allen Response")

[ECF No. 898]; *see also* Hr. Tr. 37:25–42:9; 46:8–14, Apr. 15, 2021.

### B.  Procedural Background on this Objection

In February 2021, the Reorganized Debtor filed the Objection.  In March 2021, Ms. Allen

filed her initial response to the Objection.  *See* Response to Objection to Claim, dated March 15,

2021 (the "First Allen Response") [ECF No. 843].[4]  In April 2021, the Debtor filed a reply to the

---

[3]    At a hearing after all briefing was completed, the Debtor argued for the first time that Proof of Claim No. 1382 was filed after the bar date.  *See* Hr. Tr. 26:4–10, Oct. 13, 2021 [ECF No. 1012].  Indeed, the Debtor had previously described Ms. Allen's claims as "timely filed."  Debtor's Response to Ms. Allen's New Contentions at 13–14.  Given the Court's rulings in this Decision, the Court does not need to address whether Claim No. 1382 was timely filed or whether the Debtor's argument about timeliness was waived because the Debtor did not raise it in any of its pleadings.  *See In re AMR Corp.*, 598 B.R. 365, 384 (Bankr. S.D.N.Y. 2019); *see also White v. First Am. Registry*, 592 F. Supp. 2d 681, 683 (S.D.N.Y. 2009) (refusing to hear arguments that were raised for the first time in reply papers); *Goldberg v. UBS AG*, 690 F. Supp. 2d 92, 98–99 (E.D.N.Y. 2010) (stating with respect to an argument raised for the first time at oral argument that because it "was not raised until this late point, defendant cannot raise it now . . . ."); *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 137 (S.D.N.Y. 2008) ("As to [defendant's] second argument . . . this argument was raised for the first time at oral argument and so was waived in terms of this motion.").

[4]    The Debtor's Objection was initially granted at a hearing held on March 25, 2021, based on the Court's understanding that Ms. Allen had not filed any opposition.  However, the Court later learned that Ms. Allen had filed a timely response that was not docketed—through no fault of her own—until after the March 25th hearing, and a new hearing was scheduled for April 15, 2021 to provide Ms. Allen with an opportunity to be heard.  *See* ECF No. 856.

First Allen Response. *See* Reorganized Debtor's Reply to Alicia Allen's Response to the

Reorganized Debtor's Objection to Proof of Claim Numbers 469 and 1382 Filed by Alicia Allen

(the "Debtor's First Reply") [ECF No. 863].

On April 15, 2021, a hearing was held on the Objection. At that hearing, the parties first

discussed Ms. Allen's rights under the Separation Agreement. The Court specifically addressed

Ms. Allen's concerns about her ability to pursue certain rights as set forth in the agreement. Ms.

Allen stated:

> [c]laims that relate to, 1, your right to enforce the separation agreement; 2, your
> right, if any, to unemployment and workers' compensation benefits; 3, rights or
> claims which may arise after the separation date; 4, your right, if any to receive
> any benefits vested under any employment benefits plan. Therefore, even if the
> company had not already breached said contract, all unpaid wages I worked for,
> job protection benefits and that promised full salary wage protection employee
> benefits, which was subsequently unpaid to me—those would all still be due to
> me.

Hr. Tr. 21:16–22:3, Apr. 15, 2021. As the Court explained, these concerns involved Ms. Allen's

rights under paragraph 6(c) of the Separation Agreement, which were not the subject of the

Objection:

> [Ms. Allen's] rights that are in paragraph [6(c)] are protected. So, to the extent,
> Ms. Allen, that you have an objection that's based on those rights and how those
> rights played out, you have those rights. They aren't a promise of any particular
> benefit but you have the right to pursue those . . . . [But t]hat's not a basis to deny
> the request of the Debtors for relief here.

Hr. Tr. 44:24–45:10, Apr. 15, 2021.[5]

Also at the April 2021 hearing, Ms. Allen asserted for the first time that the Separation

Agreement was an unenforceable contract. *See* Hr. Tr. 20:24–21:15; 24:23–26:11; 41:11–42:2;

---

[5]    Indeed, at a later hearing on October 13th, the Debtor submitted evidence—which Ms. Allen did not contest—that Ms. Allen had received workers' compensation payments between July 2020 and April 2021 and asserted that Ms. Allen was scheduled to receive approximately $32,000 more in workers' compensation payments in "the next 30 days" to conform to the amounts she should have received initially. *See* Hr. Tr. 26:18–27:2; 28:23–31:1, Oct. 13, 2021; Debtor's Hearing Exhibits, Ex. A. These are the kind of rights preserved in paragraph 6(c).

43:16–44:18, Apr. 15, 2021.  As this argument was being made by Ms. Allen for the first time, the Court provided the Debtor with two weeks to file a response, which the Debtor did in late April 2021.  *See* Reorganized Debtor's Response to the Allen Contentions in Reply to the Reorganized Debtor's Reply to the Allen Response to the Reorganized Debtor's Objection to Proof of Claim Numbers 469 and 1382 Filed by Alicia Allen (the "Debtor's Response to Ms. Allen's New Contentions") [ECF No. 883].  In May 2021, Ms. Allen filed a pleading in further support of her position.  *See* Second Allen Response").

After reviewing the pleadings, the Court scheduled an evidentiary hearing on the threshold question of the enforceability and relevance of the Separation Agreement as to Ms. Allen's claims.  *See* Court Order Scheduling Evidentiary Hearing, dated September 17, 2021 [ECF No. 994].  The Order scheduling the evidentiary hearing stated that it would be held "to consider the impact of the Separation Agreement on the claims filed by Ms. Allen, and Ms. Allen's contentions . . . regarding the Separation Agreement."  *Id.* at 2.  The same order provided the parties an opportunity to submit additional documents "in connection with Ms. Allen's contention that she did not knowingly and voluntarily sign the Separation Agreement and/or that she signed the Separation Agreement under duress and/or was fraudulently induced to do so."  *Id.* at 1.  In response, Ms. Allen submitted additional briefing and documentation in support of her argument.  *See* Response Filed by Alicia Allen, dated October 1, 2021 (the "Third Allen Response") [ECF No. 1006].

The Court held an evidentiary hearing on the Objection on October 13, 2021.  *See generally* Hr. Tr., Oct. 13, 2021.  After the conclusion of the evidentiary hearing, the Court took the Objection under advisement.

## DISCUSSION

### I.    Enforceability of the Separation Agreement

#### A.  Ms. Allen's Contentions

Ms. Allen makes various arguments about why the Separation Agreement should be unenforceable.  She generally argues that (1) she did not sign the Separation Agreement knowingly and voluntarily; (2) she signed it under duress; and (3) she was fraudulently induced to sign the agreement.  Specifically, Ms. Allen contends that she signed the separation agreement with the understanding that (a) she could not receive medical attention for injuries she suffered on the job until after she signed it; (b) she was promised that she would be reinstated and would continue to receive her full salary through the FMLA, MetLife insurance coverage, and/or the Debtor itself until she was able to return to work; and (c) the Separation Agreement contained surprise, or hidden, language that she "probably won't actually get" these promised benefits.  *See* Hr. Tr. 25:23–26:7, 41:11–22, Apr. 15, 2021; Hr. Tr. 37:10–47:10, Oct. 13, 2021; *see generally* Second Allen Response; Third Allen Response.  As to this "hidden language," Ms. Allen appears to argue that, even though the Debtor knew that she would not be eligible for the "wage benefits" from MetLife because she was injured on the job, the Debtor still held that possibility out when negotiating the Separation Agreement.  *See* Second Allen Response at 3.  She further explains that there is "a policy clause restricting the company from allowing wage insurance to an employee that was hurt at work," and that this information had been suppressed "as it was already a known clause by the HR department staff."  *Id.*  Additionally, Ms. Allen argues that the Separation Agreement is void and unenforceable because it was a continuation of the Debtor's "abuse" leading up to her termination and was retaliatory.  *See* Hr. Tr. 36:18–22; 37:7–9, Oct. 13, 2021.

### B. The Applicable Legal Standard

The rules governing interpretation of contracts under New York law generally apply to releases of claims under federal civil rights statutes and to releases of claims brought under New York law, including the NYLL. *See Lamberti v. Motorola Sols., Inc.*, 2014 WL 1224501, at *6 (S.D.N.Y. Mar. 24, 2014), *aff'd*, 604 F. App'x 64 (2d Cir. 2015); *McCormack v. IBM*, 145 F. Supp. 3d 258, 268 (S.D.N.Y. 2015); *Hummel v. AstraZeneca LP*, 575 F. Supp. 2d 568, 570 (S.D.N.Y. 2008). "Releases are not to be disregarded and, in the absence of fraud, duress, illegality or mistake, a general release bars an action on any cause of action arising prior to its execution." *McCormack*, 145 F. Supp. 3d at 268 (quoting *Clark v. Buffalo Wire Works Co.*, 3 F. Supp. 2d 366, 372–73 (W.D.N.Y. 1998)). "Thus, 'a release that is clear and unambiguous and which is knowingly and voluntarily entered into will be enforced.'" *Id.* (quoting *Laramee v. Jewish Guild for Blind,* 72 F. Supp. 2d 357, 359 (S.D.N.Y. 1999)). The essential inquiry in determining the validity of such releases "is whether, considering the 'totality of the circumstances,' the individual's waiver of his or her right can be characterized as 'knowing and voluntary.'" *Lamberti*, 2014 WL 1224501, at *6 (quoting *Laramee,* 72 F. Supp. 2d at 359). "[T]he validity of a release is a peculiarly fact-sensitive inquiry." *Id.* (quoting *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437–38 (2d Cir. 1998)). In making this determination, Courts consider the following factors:

> (1) the plaintiff's education and business experience, (2) the amount of time the plaintiff had possession of or access to the agreement before signing it, (3) the role of plaintiff in deciding the terms of the agreement, (4) the clarity of the agreement, (5) whether the plaintiff was represented by or consulted with an attorney, [and] (6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law . . . .

*Id.* (quoting *Laramee,* 72 F. Supp. 2d at 359–60). "Additional factors include 'whether an employer encourages or discourages an employee to consult an attorney' and 'whether the employee had a fair opportunity to do so.'" *Figueroa v. MRM Worldwide*, 2014 WL 902953, at *6 (S.D.N.Y. Mar. 7, 2014) (quoting *Bormann v. AT & T Commc'ns, Inc.*, 875 F.2d 399, 403 (2d Cir. 1989)). "[T]he absence of a single factor is not necessarily dispositive." *Id.* (quoting *Laniok v. Advisory Comm. of the Brainerd Mfg. Co. Pension Plan,* 935 F.2d 1360, 1368 (2d Cir. 1991)); *see also Fletcher v. Palazzo*, 151 F. App'x 73, 75 (2d Cir. 2005) ("all factors need not be met or considered"); *Bachiller v. Turn On Prods., Inc.*, 2003 WL 1878416, at *4 (S.D.N.Y. Apr. 14, 2003) ("These factors are not exhaustive, nor must they all be satisfied."), *aff'd,* 86 F. App'x 465 (2d Cir. 2004). "A plaintiff seeking to set aside a release bears the burden to either 'demonstrate that [the release] does not apply to [the plaintiff's] claim or to establish an equitable basis to vitiate its effect.'" *Hummel*, 575 F. Supp. 2d at 570 (quoting *Hack v. United Cap. Corp.*, 669 N.Y.S.2d 280, 282 (1998)).

There is a slightly different standard for a waiver of an ADEA claim. "A purported waiver of ADEA claims is governed by [the Older Workers Benefit Protection Act (the "OWBPA")], which states that 'an individual may waive his rights only if the waiver is knowing and voluntary.'" *McCormack*, 145 F. Supp. 3d at 266 (quoting *Wahab v. Estee Lauder Cos., Inc.*, 2014 WL 4904592, at *16 (E.D.N.Y. July 17, 2014)). Unlike claims brought under other federal civil rights statutes and the NYLL, however, the OWBPA provides that "a waiver may not be considered knowing and voluntary unless at a minimum" eight specific conditions are met. *Id.* at 266–67. As relevant here, two of the conditions that must be met are (1) that "the individual is given a period of at least 21 days within which to consider the agreement," and (2) that "the agreement provides that for a period of at least 7 days following the execution of such

agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired." *Id.* Neither of these conditions were satisfied here. "'The OWBPA strictures on waivers are strict and unqualified[,]' and '[a]n employee may not waive an ADEA claim unless the employer complies with the statute.'" *Id.* at 267 (quoting *Ridinger v. Dow Jones & Co. Inc.*, 651 F.3d 309, 314 (2d Cir. 2011)). Moreover, and also unlike releases of claims under the other federal civil rights statutes and the NYLL, "[t]he burden of proving that a claimed 'waiver was knowing and voluntary' within the meaning of the OWBPA is on 'the party asserting the validity of [the] waiver.'" *Id.* (quoting *Ridinger*, 651 F.3d at 314). In any event, other than including the ADEA among her list of federal civil rights statutes, Ms. Allen has not made any specific allegations in any of her filings or at the two hearings before this Court that she was discriminated against based on her age. Accordingly, the Court does not apply the stricter knowing and voluntary standard under the ADEA and OWBPA here. *See Downey v. Adloox Inc.*, 238 F. Supp. 3d 514, 519 (S.D.N.Y. 2017) (To survive a motion to dismiss, "a plaintiff asserting an employment discrimination complaint under the ADEA must plausibly allege that adverse action was taken against her by her employer, and that her age was the 'but-for' cause of the adverse action[;]" and "must supply sufficient factual material, and not just legal conclusions, to push the misconduct alleged in the pleading beyond the realm of the 'conceivable' to the 'plausible.'") (internal citations omitted).

### C. Whether the Separation Agreement Here Is a Valid Release

#### i. Education and Business Experience

While Ms. Allen's educational background and business experience are not clear from the record, she describes herself throughout the record as an exemplary and sought-after employee. *See, e.g.*, Second Allen Response at 4; Hr. Tr. 38:4–7, 21, Apr. 15, 2021 (noting her

"unique expertise and profitable contributions" to the company leading to a "promised

promotion"); Hr. Tr. 44:24–45:2, Oct. 13, 2021 (asserting that she "was a very highly praised

employee"). Moreover, the Court notes that Ms. Allen handled herself well in both her written

submissions and at court hearings, serving as a good advocate for herself. This is consistent with

the extensive and spirited back and forth exchanges between Ms. Allen and the Debtor's Human

Resources personnel leading up and following the signing of the Separation Agreement. *See*

First Allen Response at 4–5; Second Allen Response at 20–31; Third Allen Response at 12–19

(emails between Ms. Allen and Human Resources personnel concerning Ms. Allen's workers

compensation claim, her FMLA request, and her MetLife disability claim). Although it appears

unlikely that Ms. Allen has experience or education equal to that of the Debtor's professionals

related to drafting and negotiating separation agreements with claims releases, "h[er] job

description and self-description unmistakably suggest that [her education and business

experience] is higher than the level required by courts in this district to satisfy the first . . .

factor."[6] *See Mandavia v. Columbia Univ.*, 912 F. Supp. 2d 119, 130 (S.D.N.Y. 2012), *aff'd*,

556 F. App'x 56 (2d Cir. 2014) (finding that a Senior Technician in the Columbia University

Department of Microbiology & Immunology who did not specify his precise level of education

satisfied the first factor) (citing *Bachiller*, 2003 WL 1878416, at *4); *see also id.* (noting that the

plaintiff having "never encountered or dealt with a situation such as this before" did not alter the

court's analysis concerning the agreement's validity); *Bachiller*, 2003 WL 1878416, at *4

("Plaintiff, who has a High School Equivalency Diploma and who at the time her employment

---

[6]    Neither Ms. Allen nor the Debtor have listed Ms. Allen's specific job title, described her job duties with the
Debtor, or outlined her educational background. But Ms. Allen compares her job skills to vacant positions posted by
the Debtor, such as Technical Designer, Designer, Design Assistant, and Sample Assistant—many of which require
relevant experience and college degrees. *See* Second Allen Response at 33–41.

was terminated was an accounts payable clerk, was capable of understanding the Release and the

Notice."). Accordingly, this factor weighs in favor the Debtor.[7]

### ii.    Access to Agreement

Ms. Allen does not deny that she had the opportunity to review the Separation Agreement

for 14 days before signing. *See* Hr. Tr. 42:25–44:18, Apr. 15, 2021; *see also* Debtor's Objection

at 28 of 34 (the "Election to Execute Prior to Expiration of 14-day Period"). Rather, Ms. Allen

asserts that she did not take this opportunity because of her need for medical treatment. *See* Hr.

Tr. 42:25–44:18, Apr. 15, 2021. But Ms. Allen's "opportunity to review the agreement was

sufficient." *Figueroa*, 2014 WL 902953, at *7 (citing *Mandavia v. Columbia Univ.*, 2013 WL

2391695 at *7 (S.D.N.Y. June 3, 2013)). Thus, this factor weighs in favor of the Debtor.

### iii.    Role of Ms. Allen

Although Ms. Allen at one point seems to claim that she negotiated certain specific terms

of the Separation Agreement, the record does not suggest that she played a substantive role in

drafting the overall agreement. *See* Hr. Tr. 42:1–10, Oct. 13, 2021 (Ms. Allen asserting that she

"negotiated th[e] contract"). Due to her limited role in drafting the Separation Agreement, this

factor weighs largely in favor of Ms. Allen. *See Figueroa*, 2014 WL 902952, at *7.

### iv.    Clarity of Agreement

Ms. Allen does not argue that the language in the Separation Agreement is ambiguous.

Indeed, the Court finds that the Claims Release is sufficiently detailed and clear. Specifically,

the Separation Agreement broadly releases the Debtor from

> all known and unknown claims, promises, causes of action, or similar rights of
> any type that you may have (the "Claims") against any of the Released Parties,
> that arose at any time before the Separation Date, excluding only those Claims set

---

[7]    The Court notes that Ms. Allen does not contend that she did not understand the Separation Agreement
when it was signed. Rather, as discussed further below, she alleges that she was forced to sign the agreement in
exchange for medical attention and other benefits. *See* Third Allen Response at 3.

forth in [paragraph 6](c) below.  You further understand that the Claims you are
releasing may have arisen under laws (including statutes, regulations, other
administrative guidance, and common law doctrines), including, but not limited
to: . . . any claim[s] under the ADEA[;] . . . Title VII of the Civil Rights Act of
1964[;] . . . the ADA[;] . . . the FMLA[;] . . . any other state or local labor,
employment, or human rights laws; any other claim of discrimination, harassment
or retaliation in employment (whether based on federal, state or local law,
regulation, or decision)[;] any other claim (whether based on federal, state or local
law, statutory or decisional) arising out of the terms and conditions of your
employment with and/or termination from employment with the Company . . . [;]
[and] any claim for wrongful discharge, . . . retaliation, . . . breach of contract . . .,
emotional distress, back pay or front pay, compensatory or punitive damages,
and/or equitable relief . . . .

Separation Agreement ¶ 6(b).

Ms. Allen raises several arguments about events before her signing of the Separation

Agreement.  More specifically, she argues that she signed the Separation Agreement because she

could not receive medical attention until after she signed, because she was promised that she

would be reinstated and continue to receive her full salary until she was able to return to work,

and because the Separation Agreement contained hidden language indicating that she was

actually ineligible for these benefits.  *See* Hr. Tr. 25:23–26:7; 41:11–22, Apr. 15, 2021; Hr. Tr.

37:10–47:10, Oct. 13, 2021.  But her arguments about the purported "real" meaning of the

agreement flies in the face of its terms.  Those terms make clear both that she was leaving her

employment with the Debtor and that she was waiving the types of claims that she now asserts in

Claim No. 1382.  *See* Separation Agreement ¶¶ 1, 2, 6(b) (setting forth Ms. Allen's separation

date and the consideration being offered in exchange for her signing the agreement, including her

waiver of claims as discussed above).  Moreover, Ms. Allen points to nothing in the Separation

Agreement that can be read to support her argument here.  For example, there is no mention in

the Separation Agreement of providing her medical treatment once she signed or of her being

reinstated.  Ms. Allen's allegations are only supported by her testimony, which is extrinsic

evidence that flies in the face of the clear language of the agreement. "Courts do not consider extrinsic evidence of the meaning of a contract, however, unless the contract is ambiguous standing alone." *Lloyd v. City of New York*, 2017 WL 2266876, at *3 (S.D.N.Y. May 22, 2017) (citing *HOP Energy, L.L.C. v. Local 553 Pension Fund*, 678 F.3d 158, 162 (2d Cir. 2012)). Although "the interpretation of a release and the limitations on parole evidence are often subject to special rules in light of the nature of releases," these special rules come into play only when the parties' intentions are unknown due to broad releases that do not focus on the specific issues in the litigation. *In re Clinton St. Food Corp.*, 254 B.R. 523, 534–35 (Bankr. S.D.N.Y. 2000). This is decidedly not the case here. Ms. Allen's claims include allegations of wrongful discharge, discrimination, harassment, hostile work environment, retaliation, failure to provide reasonable accommodations, failure to promote, failure to pay appropriate wages, and failure to reinstate in violation of, among other things, Title VII of the Civil Rights Act, the ADEA, the ADA, the FMLA, and the NYLL. These are precisely the claims released by the Separation Agreement. *See* Separation Agreement ¶ 6(b) (release broadly covering all known and unknown claim arising under, but not limited to, the ADEA, Title VII of the Civil Rights Act, the ADA, the FMLA, "any other state or local labor, employment, or human rights laws[,] any other claim of discrimination, harassment or retaliation in employment[,] . . . [and] any claim for wrongful discharge, . . . [and/or] retaliation . . . .").

As the Claims Release clearly releases the exact claims that Ms. Allen now seeks to assert for wrongful termination, retaliation, and discrimination, this factor strongly weighs in favor of the Debtor. *See Figueroa*, 2014 WL 902952, at *7–8.

**v.    Legal Consultation**

Ms. Allen appears *pro se* in this proceeding and did not retain counsel or receive any legal advice prior to signing the Separation Agreement.  This factor weighs in favor of Ms. Allen.  *See Figueroa*, 2014 WL 902952, at *8.

**vi.    Consideration**

"In evaluating the consideration that an employee receives for signing a release, courts look to whether the consideration exceeds what 'the employee was already entitled [to] by contract or law.'"  *Lamberti*, 2014 WL 1224501, at *10 (quoting *Bormann*, 875 F.2d at 403). There is no dispute here that Ms. Allen received consideration in exchange for signing the Separation Agreement.  The Separation Agreement entitled Ms. Allen to the sum of $25,047—12 weeks of base salary—and three months of COBRA reimbursement.  *See* Debtor's Objection at 23; Separation Agreement ¶ 2.  While there is some debate about whether this was a standard severance payment,[8] there is no suggestion that the Debtor was obligated to make any severance payment at all.  Said another way, the Court has not been presented with any evidence that Ms. Allen accrued 12 weeks of pay or was entitled via contract or law to three months of COBRA reimbursements at the time she signed the Separation Agreement.  "These benefits qualify as the sort of consideration that . . . militate in favor of the Agreement's validity."  *Id.* (citing *Kramer v. Vendome Grp. LLC*, 2012 WL 4841310, at *5 (S.D.N.Y. Oct. 4, 2012)) (finding sufficient consideration where the plaintiff was entitled to only three weeks of accrued vacation and

---

[8]    Ms. Allen admits that this payment was "higher than [the] usual severance amount . . . negotiated in order to pay my medical bills which I had incurred while the company had broken policy and been denying my work injury medical rights."  Second Allen Response at 3.  But at the October 2021 hearing, Ms. Allen seemed to argue that this consideration did not exceed what she was previously entitled to by contract or law.  *See* Hr. Tr. 40:1–13, Oct. 13, 2021 ("The reason that money was increased to the amounts on the document was because it was to be reimbursements.  So, when I first asked for the money, I was still under the assumption that the company was not going to reach all of the agreed upon terms of our negotiation, because, again, this was not to be—according to me, it was to be something that was more like a leave, where I was coming back, and they were supposed to pay me the money.").

personal days, and the employer agreed to pay the plaintiff overtime, give him two additional weeks' salary, and provide a neutral letter of recommendation); *Mandavia*, 2013 WL 2391695, at *10 ("[a] release is not supported by sufficient consideration [only if] something of value is received to which [the employee] had no previous undisputed right") (quoting *DiMartino v. City of Hartford,* 636 F. Supp. 1241, 1249 (D. Conn. 1986)), *aff'd*, 556 F. App'x 56 (2d Cir. 2014); *see also Kramer,* 2012 WL 4841310, at *5 ("as a result of signing the Release, Plaintiff received a month's salary and other benefits that she would not have been entitled to had she simply been terminated").

Accordingly, this factor weighs in favor of the Debtor.

### vii.    Encouragement and Fair Opportunity

Finally, similar to the court's finding in *Figueroa*, "there is no genuine dispute [here] on whether [the Debtor] encouraged [Ms. Allen] to consult an attorney and whether [the Debtor] provided [her] with a fair opportunity to do so." *See id.* at *8. The Separation Agreement here "advise[d] [Ms. Allen] to consult with an attorney of [her] choice before signing" and gave Ms. Allen "an opportunity to consider the terms of this Separation Agreement for at least fourteen (14) days." Separation Agreement ¶¶ 8(d), (e). Moreover, because Ms. Allen decided to sign the agreement in less than 14 days, she signed an additional document titled "Election to Execute Prior to Expiration of Fourteen (14) Day Period," which included the following language: "After having the opportunity to consult with counsel, however, I have freely and voluntarily elected to execute this Agreement prior to expiration of the fourteen (14) day period." *See* Election to Execute Prior to Expiration of 14-day Period. Ms. Allen "has not alleged and nothing in the record raises an issue that [the Debtor] discouraged [her] from consulting with an attorney." *See Figueroa*, 2014 WL 902952, at *9. Accordingly, this factor weighs in favor of the Debtor.

16

### viii.   Totality of the Circumstances

Given all the facts developed up through and including the evidentiary hearing, the factors above overwhelmingly weigh in favor of the Debtor here. *See id.* at \*9. Although Ms. Allen did not consult an attorney and played little to no role in drafting or negotiating the terms of the Separation Agreement, "'not every factor must be in [the Debtor's] favor for the release to be found knowing and voluntary.'" *Id.* (collecting cases in this district upholding releases under similar circumstances). Accordingly, the Court concludes that the totality of the circumstances demonstrate that Ms. Allen executed the Separation Agreement knowingly and voluntarily. This means that the terms of the Separation Agreement—including the Claims Release—should be given effect unless the record demonstrates duress or fraudulent inducement. The Court turns to those issues next.

### D. Duress

Under New York law, "'[a] contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his [or her] free will.'" *Figueroa*, 2014 WL 902953, at \*9 (quoting *First Nat. Bank of Cincinnati v. Pepper,* 454 F.2d 626, 632 (2d Cir. 1972)). "To determine whether a party lacked a 'meaningful choice,' courts look for evidence of high pressure or deceptive tactics, as well as disparity in bargaining power." *Id.* at 10 (quoting *Pallonetti v. Liberty Mut.*, 2011 WL 519407 at \*5 (S.D.N.Y. Feb. 11, 2011)). "[T]he case law is clear that 'difficult choices do not constitute duress.'" *Id.* (quoting *Joseph v. Chase Manhattan Bank, N.A.*, 751 F. Supp. 31, 34 (E.D.N.Y.1990)). "Under New York law, a 'party seeking to avoid a contract because of economic duress shoulders a heavy burden.'" *Pallonetti*, 2011 WL

519407, at *5 (quoting *Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc.,* 165 F. Supp.

2d 514, 527 (S.D.N.Y. 2001)).

Ms. Allen argues that the Claims Release is invalid because she was forced to sign the

Separation Agreement due to her need for medical attention and was coerced to sign by false

promises that she would be reinstated and would continue to receive a full salary until that time.

*See* Hr. Tr. 44: 9–11, Apr. 15, 2021 ("So, I signed [the Separation Agreement] under the duress

of my physical situation and because I was told that you'll never go without your full salary.").

As Ms. Allen explained:

> [i]t was negotiated that, in exchange for my signature: I would then finally be sent
> to get [workers' compensation ("WC")] medical attention, that I would be given
> the money to make up for the $14k+ medical bills I had incurred while I was
> being denied WC benefits, that in the meantime, I would be paid my full salary
> through the company's MetLife insurance policy, and then that my full
> employment would be re-instated.

Third Allen Response at 3 (emphasis omitted).

Even liberally construing Ms. Allen's allegations, Ms. Allen has failed to sustain her

burden of demonstrating that the Debtor's "comments or conduct deprived [Ms. Allen] of [her]

free will." *See Figueroa*, 2014 WL 902953, at *10. The evidence submitted by Ms. Allen—

mostly in the form of emails between her and the Debtor's Human Resources personnel—

provide no support of any "wrongful threat[s]" or "high pressure or deceptive tactics." *See*

*Figueroa*, 2014 WL 902953, at *9–10; Third Allen Response at 12–19 (Exhibits 9–11). Indeed,

these emails demonstrate that Human Resources was responsive to her requests for assistance in

applying for workers' compensation, applying for disability benefits with MetLife, and taking

leave under the FMLA. *See* First Allen Response at 5; Second Allen Response at 20–31; Third

Allen Response at 12–19.

Moreover, Ms. Allen never explained why receiving medical treatment was contingent upon signing the Separation Agreement.  The Separation Agreement does not say that, nor do any of the emails that she submitted.  There is nothing in the record to suggest that Ms. Allen was precluded from receiving medical treatment prior to signing this Separation Agreement. Indeed, nothing in the evidentiary record supports a finding of duress, except for Ms. Allen's conclusory statement.  In fact, the evidence she submitted reveals that Ms. Allen was actually encouraged to seek medical treatment.  *See* Third Allen Response at 16 (email from the Debtor's Senior Benefits Manager, on February 26, 2020, encouraging Ms. Allen to "please go seek Medical attention.  Be sure to tell [sic] them know that this is a Workers Comp visit, your claim # is [redacted].").  As in *Figueroa*, "[t]here is no evidence here that [the Debtor] used high pressure or deceptive tactics; nor is there any evidence of a wrongful threat . . .[;] at all times, '[Ms. Allen] was free to reject the terms of the agreement, which [s]he did not.'"  *Figueroa*, 2014 WL 902953, at *10.

Accordingly, the Court concludes that Ms. Allen's duress claim is without merit and cannot invalidate the Separation Agreement that she knowingly and voluntarily signed.

### E.  Fraudulent Inducement

"To state a claim for fraudulent inducement under New York law, a plaintiff must show: (1) a representation of material fact, (2) which was untrue, (3) which was known to be untrue or made with reckless disregard for the truth, (4) which was offered to deceive another or induce him to act, and (5) which that other party relied on to its injury."  *McCormack*, 145 F. Supp. 3d at 268 (quoting *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 580 (2d Cir. 2005)).  "Although Federal Rule of Civil Procedure 8 only requires 'a short and plain statement' of the plaintiff's claim, Rule 9(b) requires that '[i]n alleging fraud . . ., a party must state with

particularity the circumstances constituting fraud.'" *Id.*  To satisfy Rule 9(b), "the plaintiff must:

'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker,

(3) state where and when the statements were made, and (4) explain why the statements were

fraudulent.'" *Id.* (quoting *First Hill Partners, LLC v. BlueCrest Cap. Mgmt. Ltd.,* 52 F. Supp. 3d

625, 637 (S.D.N.Y. 2014)).  "Moreover, although '[u]nder Rule 9(b), [m]alice, intent,

knowledge, and other condition of mind of a person may be averred generally, . . . plaintiffs must

allege facts that give rise to a strong inference of fraudulent intent.'" *Id.* at 268–69 (quoting

*Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290 (2d Cir. 2006)) (internal quotations omitted).

"The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show

that defendants had both motive and opportunity to commit fraud, or (b) by alleging

recklessness." *Id.* at 269 (quoting *Eaves v. Designs for Fin., Inc.,* 785 F. Supp. 2d 229, 247

(S.D.N.Y. 2011)).

      Similar to her duress argument, Ms. Allen essentially argues that she was induced to sign

the Separation Agreement based on (1) false assurances that she would receive workers'

compensation benefits, continue to receive her full salary, and be reinstated to her position; and

(2) the purposeful omission of the fact that employees who were injured on the job were not

eligible for wage benefits through MetLife.  *See* Hr. Tr. 25:16–26:7; 41:16–22; 44:1–18, Apr. 15,

2021; Hr. Tr. 38:12–19, Oct. 13, 2021 (Ms. Allen citing *Choquette v. Motor Info. Sys., Inc.*, 2017

WL 3309730, at *5 (S.D.N.Y. Aug. 2, 2017) (case discussing the elements for a claim of fraud in

the inducement under New York Law)).  But once again, there is nothing in the record to support

Ms. Allen but her conclusory statements.  The Separation Agreement does not guarantee her any

of the benefits she mentions, including continuing to receive full salary or workers

compensation.  What is clear is that Ms. Allen retained the right to pursue some of these benefits

in the Separation Agreement, but her eligibility was not guaranteed.  *See* Separation Agreement ¶ 6(c) ("You are not releasing any claim that relates to: (i) your right to enforce this Separation Agreement; (ii) your rights, *if any*, to unemployment or workers' compensation benefits; (iii) rights or claims which may arise after the Separation Date; or (iv) your right, *if any*, to receive any benefits vested under any employee benefits plan.") (emphasis added).

Nor do Ms. Allen's allegations satisfy the heightened pleading standard under Rule 9(b). Ms. Allen has not identified a speaker, the location, or the timing of any alleged promise of benefits—nor has she identified who was responsible for the omission of the fact that she was not actually eligible for benefits from MetLife.  Thus, Ms. Allen has failed to "allege facts that give rise to a strong inference of fraudulent intent."  *McCormack*, 145 F. Supp. 3d at 268–69.

Accordingly, the Court concludes that Ms. Allen's contention that she was fraudulently induced into signing the Separation Agreement is also without merit and cannot void the Separation Agreement.

## <u>CONCLUSION</u>

For the foregoing reasons, the Debtor's Objection is granted.  Ms. Allen's Proof of Claim No. 1382 is disallowed and expunged.  Further, for the reasons noted above and discussed on the record at the April 15, 2021 hearing, Ms. Allen's Proof of Claim No. 469 is reduced to the amount of $5,330.35—the unpaid portion of the amount owed to her under the Separation Agreement—and allowed as an unsecured priority claim.  *See* Hr. Tr. 44:24–45:15, Apr. 15, 2021.  The Debtor is directed to settle an order on five days' notice.  The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order shall also be served upon Ms. Allen.

Dated: March 25, 2022
       New York, New York

                                        */s/ Sean H. Lane*
                                        UNITED STATES BANKRUPTCY JUDGE